## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MASSACHUSETTS

Ina Steiner,
David Steiner,
Steiner Associates, LLC,
     (*Publisher of EcommerceBytes*)
          Plaintiffs

   vs.

eBay, Inc., et al.,
       Defendants

CASE NO: 1:21-cv-11181

### PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
***(Request for Leave to File Consolidated Opposition Allowed November 15, 2021)***

### Introduction

eBay and PFC, through their agents, engaged in a campaign to "take [] down" the Steiners, and end their reporting on eBay, using online and in-person threats, intimidation, harassment, and stalking to carry out their objective. The directives came from the top – through then CEO Devin Wenig and Senior Vice President and Chief Communications Officer Steve Wymer – who provided the other Defendants with carte blanche authority to terminate the reporting of the Steiners by whatever means necessary, with Defendant Wymer expressing "…I want to see ashes. As long as it takes. Whatever it takes." Defendant Wymer promised the Defendants he would, "embrace managing any bad fallout" if the plan went south, further directing, "We need to STOP her."

As outlined in the Complaint, each of the Defendants assumed a role, all integral to carrying out the scheme to reach the goal of ending the Steiners reporting on eBay.

Defendants Wenig and Wymer set the plan in motion and enlisted Defendant Baugh to carry out the directives.  Defendant Baugh hand selected a team to assist with engaging in the threats, harassment, stalking and surveillance. Defendants Harville, Cooke and Gilbert led the younger staff members, and in using their background and expertise helped plan the campaign. Defendants Popp, Stockwell and Zea assisted with planning and carrying out the mission.  Defendant PFC financed the plan through the payment of expenses. All of the conduct was carried out while the Defendants were working within the scope of their employment as members of the security team, and at the behest of eBay.

Defendants Wenig and Wymer's directives shock the conscience, and have caused considerable damage to the Steiners. Starting with an online intimidation campaign, the Defendants harassed and threatened the Steiners through Twitter, then began sending ominous and disturbing package deliveries which included live spiders, cockroaches, and implied threats to kill with a bloody pig mask, a funeral wreath, and a book entitled "Grief Diaries: Surviving Loss of a Spouse" sent directly to David Steiner. These messages and deliveries often were accompanied by ominous simultaneous Twitter messages such as "do I have your attention now, cunt?"

After several days of around the clock threatening and vulgar emails, packages and online messages, Defendants Wenig and Wymer's underlings travelled from California to Natick[1] to stalk, harass and threaten the Steiners in-person, making clear that whoever was torturing them was now stalking them and their home. Simultaneously, the Defendants who remained in California continued with the online threats and stalking, subjecting the Steiners to relentless psychological distress. The Defendants also "doxed" the Steiners,

---

[1] Paid for by Defendant PFC.

posting their address online so that not only were the Defendants stalking the Steiner residence, strangers began showing up at their home.

The Steiners, justifiably terrified, began calling the Natick Police Department with frequency, which the Defendants monitored with a police scanner in an attempt to stay one step ahead of both the Steiners and any law enforcement.  The Defendants knew the panic and fear they were inflicting on the Steiners by carrying out Defendants Wenig and Wymer's directives, which only fueled their fire: they praised one another that their "work" was accomplishing their goal of intimidating, threatening, torturing, terrorizing, stalking and silencing the Steiners.  The Defendants callously joked that the Steiners were "seeing ghosts, think everyone is following them and they call the police every 10 minutes," and "We know the targets have been impacted by this op." Despite recognizing the mental and emotional anguish the Defendants were inflicting, the Defendants continued to persist with the campaign to "burn them down."

Once the Defendants realized that the Natick Police Department ("NPD") was investigating the conspiracy, the Defendants plotted to destroy evidence, mislead the investigation, and divert attention away from eBay. Defendant Baugh called a meeting and directed the others to delete all communications and evidence relating to the scheme, and the Defendants persistently lied to investigators and fabricated evidence. Their cover-up attempts included efforts to create a fake dossier, and a phony "persons of interest" file on the Steiners to make them appear dangerous, and ensure the Defendants could deflect their own blame when interacting with law enforcement.

Now, the Defendants each try to absolve themselves from liability, claiming the Steiners have failed to set forth a sufficient factual basis to satisfy the elements of each of

their claims.[2] The bulk of the Defendants' arguments, however, hold the Steiners to too high a burden, and suggest a standard more applicable to the summary judgment or trial stage. Ultimately, the Steiners have set forth a plausible claim for relief, and have included "enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal [conduct]" with respect to each defendant, and each claim set forth in the Complaint. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 17 (1st Cir. 2011). (recognizing chain of events leading to defendants' actions "may often be unavailable to a plaintiff at this early stage of the litigation"), citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

As such, this Court should deny the Defendants' motions to dismiss for the reasons set forth *infra*, and allow the Steiners to proceed to the discovery stage. *See Ocasio-Hernandez*, 640 F.3d at 19; *Iqbal*, 556 U.S. at 678.[3]

## Background

The Plaintiffs, David and Ina Steiner and Steiner Associates, LLC, filed a Complaint against eBay, Progressive Force Concepts ("PFC"), two eBay executives – Devin Wenig and Steve Wymer – and various other employees of eBay and PFC – Jim Baugh, David Harville, Brian Gilbert, Philip Cooke, Stephanie Popp, Stephanie Stockwell, and Veronica Zea – on July 21, 2021.[4]

---

[2] Not every Defendant moved to dismiss each and every claim, so the Steiners delineate during each argument which Defendant moved to dismiss each individual cause of action.
[3] Plaintiffs agree at this time to dismiss Count 6, Vandalism, and Count 10, Violation of M.G.L. c. 93A, § 11 at this time. Plaintiffs reserve the right to revive the 93A claim after conducting discovery.
[4] The Complaint also named several John and Jane Does.

All Defendants except for Defendant Harville – who filed an Answer – have filed motions to dismiss various counts of the Complaint.

This Court granted leave to file a consolidated opposition to the Defendant's Motions to Dismiss on November 15, 2021. This Order was stayed to allow the parties to attempt to mediate this case. The Plaintiff's opposition is due on May 23, 2022.

### Standard of Review

In assessing a 12(b)(6) motion to dismiss for failure to state a claim, the Court "must take all well-pleaded facts as true," and a count is properly dismissed only where the allegations are such that "the plaintiff can prove no set of facts to support [the] claim for relief." *Rockwell v. Cape Cod Hosp.,* 25 F.3d 254, 260 (1st Cir. 1994).

The Court assesses whether the "factual allegations gives rise to a plausible claim to relief." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013). The context specific inquiry does not demand "a high degree of factual specificity." *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). "There need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action." *Rodriguez-Reyes*, 711 F.3d at 55.

The ultimate question is "whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible." *Ocasio-Hernandez,* 640 F.3d at 14. A "plausible but inconclusive" inference from pleaded facts will survive a motion to dismiss. *Sepulveda-Villarini v. Dept. of Ed. Of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010). The standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal [conduct]."

*Ocasio-Hernandez*, 640 F.3d at 17, quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## **Considering Extrinsic Evidence**

### Extrinsic Evidence Demonstrates Wenig and Wymer Directed the Acts, and that they knew of Baugh's Background

While ordinarily the Court may not consider documents not attached to the complaint, or not expressly incorporated therein in assessing a Rule 12(b)(6) motion to dismiss, there are a number of exceptions: "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 4 (1st Cir. 1993).

Additionally, the Court may be more inclined to consider documents submitted by Plaintiffs, in order to bolster an argument against dismissing the Complaint. *See Watterson*, 987 F.2d at 4, quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("The problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff…Where the plaintiff has actual notice…and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."); *Berk v. Ascott Inv. Corp.,* 759 F. Supp. 245, 249 (E.D. Pa. 1991) ("When a plaintiff has admitted the authenticity of a document…, a court may consider that document in ruling on a motion under Fed. R. Civ. P. 12(b)(6).").

This Court should consider the filings in Defendants Baugh and Harville's criminal case, as well as the admissions made during their plea hearings. In those documents, Defendant Baugh alleges that Defendants Wenig, Wymer and other executives knew of his

government intelligence background, the type of operatives he used during his

employment with the Government, and that he was hired due to this experience. R536-537.

Defendant Baugh also alleges that when he received the directives from Defendant

Wymer, which he knew were sanctioned by Defendant Wenig, he knew he was expected to

use his background and experience, and the unlawful tactics to take down the Steiners for

the benefit of eBay and Progressive Force Concepts.

Defendant Baugh also pled guilty, and made several admissions during the Rule 11

hearing, including the following:[5]

> [B]etween approximately August 5, 2019, and August 23, 2019, the defendant,
> Mr. Baugh, and several coconspirators, all [of] whom worked at eBay, Inc., the
> multinational e-commerce company, agreed to engage in a harassment campaign
> that targeted a husband and wife who lived in Natick, Massachusetts.   They're
> described in the indictment as Victim 1 and Victim 2.
>
> …
>
> The campaign, your Honor, targeted Victims 1 and 2 for their roles in publishing a
> newsletter that reported on issuesof interest to eBay sellers.   Senior executives[6] at
> eBay were frustrated with the newsletter's tone and content, and with the tone and
> content of comments that appeared underneath the newsletter's articles online.   The
> harassment campaign arose from communications between those senior executives[7]
> and Mr. Baugh, who was at that time eBay's senior security employee.
> The campaign, which was intended to intimidate and harass the victims, was,
> of course, a conduct that included, first, sending threatening messages and
> communications to the victims over Twitter, which was an instrumental --
> instrumentality of interstate commerce.
>
> Second, ordering unwarranted and disturbing deliveries to the victims' home.
> And third, Zea, Harville, Mr. Baugh, and Popps [sic] traveled to Natick to surveil
> the victims in their home and community.   The deliveries ordered to the victims's
> homes included a book on surviving the death of a spouse, a bloody pig mask, a

---

[5] All criminal defendants, to include Defendants Harville, Gilbert, Cooke, Popp, Stockwell
and Zea admitted to the same material facts, to include the fact that the entire conspiracy
was at the behest of Defendants Wenig and Wymer, due to their frustration with
EcommerceBytes reporting.

[6] The senior executives were identified as Defendants Wenig and Wymer.

[7] Defendants Wenig and Wymer.

fetal pig, a funeral wreath, and live insects.   The harassment also featured Craigslist posts that invited the public for sexual encounters or estate sales at the victims's home.

The threatening Twitter messages were written to Victim 1 and sometimes addressed to Victim 2 by name as if they had been sent by eBay sellers who were unhappy with the victims's coverage of eBay in the newsletter.   Some of these messages posted the victims's addresses publicly on the Internet, a concept known as doxing, and threatened to visit the victims at their home.

Mr. Baugh intended for the harassment and intimidation to distract the victims from publishing the newsletter, to change the newsletter's coverage of eBay, and ultimately to enable eBay to contact the victims to offer assistance with the harassment, what the government has called a "White Knight Strategy."   The White Knight Strategy would earn goodwill with the victims such that they might help eBay learn the identity of Phytomaster, an anonymous online persona who frequently posted negative comments about eBay underneath the newsletter's articles and thereby allow eBay to discredit both Phytomaster and the victims. Mr. Baugh, Harville, Zea, and -- and Ms. Zea also flew to Boston and then drove immediately to Natick on August 15, 2019.   Mr. Baugh and Mr. Harville intended to install a GPS tracking device on the victim's car, but it was safely locked in their garage at the time.

The victims spotted the surveillance team on August 16th, which led them to call the Natick Police Department -- which I'll refer to as the NPD -- in fear.   Zea and Mr. Baugh and Ms. Popp, who arrived to replace Mr. Harville on August 17th, continued that surveillance even after having been spotted by the victims.

The NPD which began investigating the deliveries, the threats and the surveillance connected Ms. Zea and Mr. Harville to two rented cars and then to eBay.   The NPD reached out to the company for assistance; and when Mr. Baugh learned that the NPD was making inquiries, he and his coconspirators took steps to prevent the NPD from learning about eBay's involvement in the harassment campaign.   This included sending Brian Gilbert, one of the retired police captains, to a meeting with the NPD at which Mr. Gilbert made false statements about Zea and Harville's and eBay's involvement.

Mr. Baugh and several of his coconspirators also made false statements to internal investigators at eBay who they knew were attempting to respond to the NPD's request for information and assistance.

Mr. Baugh and other coconspirators also deleted digital evidence related to the cyberstalking campaign and falsified records intended to throw the NPD off the trail.

As these events were unfolding, the NPD referred the victims's harassment matter to the FBI for investigation in late August of 2019.

On or about the dates below, Mr. Baugh took the following additional steps in furtherance of the conspiracy charged in Count One of the indictment or in an attempt to obstruct the investigation into it.

And with respect to the Counts Two and Three, the interstate travel in furtherance of stalking, the evidence would show that on August 15, 2019, Mr. Baugh flew interstate from California to Boston with Ms. Zea; and that upon arrival at Logan Airport, the pair met up with Mr. Harville, rented cars and drove out to the victims's residence in Natick in that unsuccessful attempt to install a GPS device on the victim's car.

With respect to Counts Six and Seven, the use of the instrumentalities of interstate commerce in furtherance of stalking, the evidence would show that on August 5, 2021, Mr. Baugh convened a meeting at the GIC at eBay's corporate headquarters with Stephanie Stockwell, Veronica Zea, Stephanie Popp and others.   He directed them to brainstorm the harassing packages that could be sent to the victims's residence.   This meeting led to the delivery of the harassing packages that I described a moment ago.

On or about August 6, 2019, Mr. Baugh convened a second meeting among himself, Mr. Gilbert, Ms. Popp, and Mr. Cooke.   In that meeting, Mr. Baugh and those in attendance planned the online harassment that would lead to the White Knight Strategy that I described a moment ago, and that led to the delivery of those harassing and threatening communications that I described a moment ago.

In Natick, during the course of surveilling Victim 1 and Victim 2, Mr. Baugh dialed into a telephone conference line and used that facility of interstate commerce to communicate with other members of the surveillance team in part to monitor any police activity that might compromise the surveillance team. Mr. Baugh also used WhatsApp in a facility of interstate commerce to communicate with his coconspirators about the surveillance and about the content of the harassing messages that would be sent to Victims 1 and 2. As to Count Ten, the first of the witness tampering counts, your Honor, on August 21, 2019, at approximately   9:34 a.m. at Boston's Ritz Carlton Hotel the evidence would show that with the intent to prevent NPD Detective Jason Sutherland from speaking with Ms. Zea, Mr. Baugh falsely told the detective that Ms. Zea was his wife.   Mr. Baugh also stated that Ms. Zea didn't want to speak with the detective; and within 10 minutes Mr. Baugh took -- took Ms. Zea away from the Ritz Carlton where the police were looking to speak with her to another Boston area hotel. As to Count Eleven, a second obstruction count, your Honor.   By August 22, 2019, and thereafter, Mr. Baugh engaged in misleading conduct, including making false statements and statements that omitted certain material facts to eBay investigators, including eBay corporate counsel, internal

counsel.

The statements which Mr. Baugh made to keep eBay[8] and the NPD from learning about eBay's role in the campaign included that Mr. Baugh's team was not responsible for sending harassing deliveries or messages to the victims; that his team had been to Natick to investigate threats to the victims and that Mr. Harville had gone to Boston to attend a conference.

As to Count Three, the first of the falsification counts, your Honor, the evidence would show that on August 21, 2019, Mr. Baugh learned from Brian Gilbert, who had attended the meeting with the NPD, that the NPD was looking into the use of a prepaid debit card in the San Jose, California, area to purchase one of the harassing deliveries.

Veronica Zea,[9] one of the coconspirators, had, in fact, made that purchase using that prepaid debit card, but Mr. Baugh directed a subordinate, Stephanie Stockwell, to assemble a list of eBay, quote, persons of interest in the Bay area that could be used to throw the NPD off the trail of Ms. Zea as a suspect, and that persons of interest list did not include Ms. Zea's name.

As to Count Fourteen, a second falsification and destruction count, your Honor, on or about August 26, 2019, there was a meeting at eBay headquarters among Mr. Baugh and his coconspirators, and during that meeting Mr. Baugh directed the group to delete their WhatsApp and electronic messages concerning the trip to Boston and the harassment of the victims.

R277-285.

In addition to the allegations set forth in the Steiner complaint, Defendant Baugh also admitted that the members of the conspiracy used a telephone conference line – which was a facility of interstate commerce – to "communicate with other members of the surveillance team in part to monitor any police activity that might compromise the surveillance team." R283. Defendant Baugh's admissions during his plea hearing are relevant to a claim of judicial estoppel, as discussed *supra*.

---

[8] Plaintiffs do not yet have all emails and reports to determine if eBay was in fact in the dark. In its PowerPoint, eBay admitted that at a minimum, Wymer could be criminally charged which implies that eBay's C-Suite had knowledge of the plan. R5-6.
[9] Defendant Zea was an employee of PFC.

Defendant Harville likewise pled guilty, and admitted the Defendants engaged in the conduct set forth in the Complaint, as well as additional information.  Defendant Harville admitted that Twitter is an instrumentality of interstate commerce, and that the Defendants used Twitter to carry out the campaign against the Steiners. Defendant Harville also admitted that Defendant Baugh forwarded Defendant Wymer's texts to Defendant Harville, to which Harville responded, "copy, find and destroy." Defendant Harville admitted to downloading an app called, "Broadcast," which allowed him to access to Natick Police Department communications. Defendant Harville was also instructed, in conjunction with the allegation that the Steiners were "Persons of Interest," to make up a story that the Steiners threatened executives.

Extrinsic Evidence Relating to Cooke's Prior Admissions

Moreover, this Court should consider Defendant Cooke's plea and sentencing hearings, and his sentencing memorandum. Specifically, in additions to the admissions made by Defendant, Baugh, Defendant Cooke agreed to the following facts:

As to Mr. Cooke specifically, on or about the dates below, he took the following steps in furtherance of the conspiracies charged in Counts One and Two of the information: First, on August 6, 2019, Mr. Cooke attended a meeting with Mr. Baugh, Ms. Popp, and Mr. Gilbert at which the four of them agreed to what the government has called the White Night Strategy, which included sending anonymous and harassing Twitter messages to Victim One so that she would be better receptive to eBay's offer of assistance with that very same harassment. On August 20, 2019, approximately two weeks after the harassing messages had begun, in a WhatsApp group that was created to vet the content of those anonymous messages to Victim One, Mr. Gilbert proposed to Mr. Cooke, Ms. Popp and Mr. Baugh the creation of more anonymous Twitter accounts in support of "our cause". And Mr. Gilbert proposed specific communications criticizing the victims' newsletter to be sent over those anonymous accounts. Within 60 seconds of that message being sent, Mr. Cooke send a thumbs up emoji in response.

On August 20, 2019, at 9:43 p.m. Eastern in response of Mr. Baugh's WhatsApp message to Mr. Cooke, Mr. Baugh, Ms. Popp, and Mr. Gilbert, stating that the surveillance team had "burned two cars", but there was "no cause and they can't

prove anything. They are seeing ghosts now. LOL." Mr. Cooke replied, "Perfect." At 9:46 p.m. that same day in response to Mr. Baugh's WhatsApp message to Mr. Cooke, Ms. Popp, and Mr. Gilbert that a Natick investigator was polite and clueless, Mr. Cooke then replied "Perfect". At 9:40 p.m. in response to Mr. Gilbert's WhatsApp message stating, "We have known the targets have been very impacted by this op.

Perfect time for the next phase." Mr. Cooke replied "Yes!"
On the 21st of August 2019, at 9:47 p.m. in  response to Mr. Gilbert's report that the Natick Police Department was looking into the purchase of prepaid gift cards at a Santa Clara Safeway. Mr. Cooke messaged the group, "If I was the detective, I would ask for a local police department contact to go get video. Might want to have a friendly in mind." In response Mr. Gilbert wrote, "I was thinking the same thing. I might volunteer to assist with that. Then we can control the local cop and maybe provide a video from a different Santa Clara Safeway."

At 12:15 a.m. on the 22nd of August, the night before Mr. Gilbert met with the Natick Police Department's investigation in person about Ms. Zea and Mr. Harville's connection to the harassment, Mr. Cooke agreed with the group's recommendation to have Stephanie Popp pose as Ms. Zea's supervisor and suggested to the group that there be no mention to the Natick Police Department of the identity of Ms. Zea's actual supervisor. Finally at 12.29 a.m. that morning in a discussion of whether or not the group should continue to attempt to install a GPS tracker on the victim's car, after Mr. Gilbert wrote, "They couldn't be more on guard right now. If we can calm them down and win them over, maybe. Right now I would not risk an attempt." Mr. Cooke replied, "Agree with Brian, was typing the same thing."

R495-497.

Throughout Defendant Cooke's sentencing hearing, he took full responsibility for the actions he knew would gravely impact the Steiners and admitted that "a group of people got together and immorally and illegally rationalized and justified horrific behavior in order to please the boss." R341.

Notably, Defendant Cooke also claimed during his sentencing hearing that he advised the other Defendants that "publication of the victims' address…was illegal in California. He also told the group that in California, the messages could not be threatening, and if the victims said 'stop,' the messages had to stop." R508. Defendant Cooke claimed

that "[w]hen deliveries of unwanted items were discussed, Mr. Cooke told the group that while the deliveries might seem funny, the Postal Inspectors would not look kindly on misuse of the mails. He also explained that deliveries, like messages, could not be threatening…When use of a possible GPS tracking device was discussed, Mr. Cooke warned trackers were illegal in California and possibly illegal in Massachusetts and suggested contacting a Massachusetts private investigator to find out. By the end of the meeting, Mr. Cooke believed Baugh had accepted his advice not to send threatening messages, not to do their own surveillance, not to use a tracker without first finding out if it was legal, not to use role play, not to use the mails improperly, and not to send threatening deliveries." (Id.).

During Defendant Cooke's plea and sentencing hearings and in his public filing, Defendant Cooke made statements and admissions that directly contradict the positions he now takes in his motion to dismiss. These records likewise cannot be disputed on authenticity grounds, and as discussed *supra*, are relevant to a claim of judicial estoppel.

Privilege Logs/Emails

In Defendants Baugh and Harville's criminal case, during the course of Rule 17 litigation relating to the Defendants' request for discovery relating to the eBay internal investigation and the Morgan Lewis investigation,[10] eBay references a privilege log which outlines additional interviews, emails and text communications that Plaintiffs have not yet had access to.[11] The privilege logs demonstrate that during the coverup stage, Defendant

---

[10] Morgan Lewis is the law firm eBay hired to conduct an investigation.
[11] Defendants Baugh and Harville agreed to limit their request to privilege logs from the year 2019, only.

Wenig texted Defendant Baugh that he would be returning from sabbatical the next day, and stated, "the cavalry is back." R545.

The materials also demonstrate Defendants Wenig and Wymer, Wendy Jones, and a number of other eBay employees[12] were interviewed by the eBay legal department and/or Morgan Lewis, but Plaintiffs have not yet had access to these interviews.[13] The Government admitted during the course of discovery litigation that it never sought access – nor did eBay voluntarily disclose – the internal interviews with Wendy Jones or Defendant Wenig.[14] After the interviews were conducted, ten individuals were either fired or forced to resign, despite that only seven were charged criminally.

Moreover, in email chains from August 6-7, 2019, Defendants Wenig, Wymer, and Baugh are discussing with members of the eBay legal department, to include Marie Huber and Aaron Johnson, an "eBay imposter Twitter account," which also mentions EcommerceBytes. The parties on the email chain discussing using lawful means to shut down the eBay imposter Twitter account, but the final email consists of Defendant Wymer directing the others to do "Whatever. It. Takes" to eradicate both the Twitter account and EcommerceBytes. R437-439. Johnson, from eBay legal, also inquires whether Defendant Baugh had any "news/developments on [his] end," suggesting Defendant Baugh was keeping the superiors up to date on his progress. R437.

---

[12] Wendy Jones was Defendant Baugh's direct supervisor, and along with Defendants Wenig and Wymer, was not charged in the criminal proceedings.

[13] eBay outlined in its PowerPoint to the government that 98 individuals were interviewed, and an excess of 1,200,000 documents were searched/reviewed. Plaintiffs have not yet had access to any of the interviews, or the bulk to the million-plus documents reviewed.

[14] Attorney Andrew Phelan of Morgan Lewis provided an affidavit indicating that the AUSA did not inquire regarding any statements by Devin Wenig, Steve Wymer, or Wendy Jones. R460-461, ¶ 15.

An earlier email from March 23, 2019 from Marie Huber, to Defendant Popp, Molly Finn[15] and Marc Rome, copying Defendant Baugh, refers to the FidoMaster Tweets, which was shortly before Defendant Gilbert flew to Natick to scrawl "FidoMaster" on the Steiner fence, in June of 2019. R100.

The privilege logs refer to documents dated October 30, 2019 shared by Marie Huber, Chief Legal Counsel at eBay, to outside counsel, Andy Phelan: (1) "Project Lewis – Reddit posting and revised statement – Privileged," and (2) "Project Lewis[16] Reddit posting and draft release Privileged."[17] R187-188.

eBay PowerPoint Presentation to Government

Also revealed during Defendants Baugh and Harville's criminal case is a PowerPoint eBay counsel presented to the Government, in an attempt to prevent eBay executives and eBay from being charged in the criminal case.[18] In that PowerPoint presentation, eBay admitted it could be charged criminally, stating, "ebay realizes that,

---

[15] Molly Finn was the Chief Compliance Officer at the time. R14.

[16] "Project Lewis" refers to the Morgan Lewis investigation.

[17] The entries may refer to an October 28, 2019 Reddit post that details that others within eBay knew about both the issues within the Global Security and Resiliency team, as well as the campaign against the Steiners before the news broke, and referred to Devin Wenig's attacks on the Steiners.

Later privilege log entries from January 6, 2020 refer to "DRAFT Project Lewis Leak Scenario Press Release.docx"; "DRAFT Project Lewis Leak Scenario Employee Letter.docx"; and "DRAFT Project Lewis Leak Indictment Scenario Press Release.docx." R65.

[18] Although the eBay presentation also advocates for the Government to forgo charging Wenig and Wymer, Defendants Baugh and Harville's criminal filings also refer to a presentation to the Board of Directors. Plaintiffs have not yet had access to this presentation, but notes that Defendant Wymer was fired after the presentation, and Defendant Wenig was forced to resign.  Other eBay staff also resigned and/or were fired after this presentation.

under the facts and legal principles (e.g., respondeat superior), DOJ could take enforcement action against the company acknowledges the seriousness of the misconduct and the company's responsibility...The conduct of the seven defendants[19] was clearly criminal, and eBay is troubled by the role here of its former-CEO and Chief Communications Officer in particular." R5-6. eBay also admitted that Defendants Wenig and Wymer were "preoccupied with Ina Steiner and eCommercebytes," and that "their improper tone contributed significantly to the crimes in Natick." R13. eBay also admits to Defendant Baugh's "unsuitability as a manager." R25. eBay also admitted that the investigations revealed that Defendant Wymer destroyed evidence by deleting all texts about the Steiners and EcommerceBytes, and all texts with Defendants Wenig and Baugh, and withheld knowledge of the activities during his first interview on August 17, 2019. R36. There is nothing in the record to determine at this stage if eBay secured Defendant Wenig's texts to Wymer and Baugh.

eBay also acknowledged that the Defendants had "robust reporting channels for the misconduct," including PFC supervisors, demonstrating Defendant Zea was acting as an agent of PFC. R25. Through the investigation, eBay claimed it learned of the "Alternative Work Force expensing loophole," i.e., an expensing loophole through PFC.[20] R29.

All of extrinsic evidence offered by Plaintiffs is contained within public pleadings, signed and affirmed by attorneys in good standing on behalf of parties of this case, and

---

[19] The PowerPoint presentation also admits that ten employees were either fired or forced to resign, so it appears the criminal proceedings did not implicate all of the bad actors. R27.

[20] Plaintiffs do not yet have copies of the contract between eBay and PFC, nor do Plaintiffs have the expense reports that were dispersed between eBay and PFC to fund this conspiracy.

should be considered by this Court where the authenticity of these documents cannot reasonably be questioned by the Defendants in the instant proceedings. *See Watterson*, 987 F.2d at 4.

**Argument**

I.      **The Plaintiffs have set forth a plausible claim of Intentional Infliction of Emotional Distress against Defendants Wenig, Wymer and Cooke.**

The Steiners have set forth sufficient evidence at this stage to demonstrate Defendants Wenig, Wymer and Cooke, while fulfilling their respective roles: (1) knew, or should have known their conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe. *See Polay v. McMahon*, 468 Mass. 379, 385 (2014). Each of their respective conduct "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Roman v. Trustees of Tufts College*, 461 Mass. 707, 718 (2012).

*Defendant Wenig*

Defendant Wenig essentially urges this Court to consider one text in a vacuum, while ignoring his role at eBay, and his actions leading up to his text message ordering his subordinates to take Ina Steiner down. The complaint contains more than a text that implicates Wenig.  Every defendant who has pled guilty in the criminal cases admitted that their actions were premised upon directives from Defendants Wenig and Wymer, Executives 1 and 2.  Each of the criminal defendants acknowledged that all of their actions were taken at the request of Wenig and Wymer to alter or shut down the Steiner's reporting on eBay, and that they knew that their intention was to cause the Steiners severe emotional distress.  When considering the totality of the Complaint, and all reasonable inferences, the

Plaintiffs have set forth a plausible claim for relief with respect to Defendant Wenig and the intentional infliction of emotional distress claim. *See Ocasio-Hernandez*, 640 F.3d at 14.

At the time of the conduct, Defendant Wenig was the CEO of eBay, a massive and powerful company with near limitless resources, when he directed subordinates to take down a two-person trade publication simply because he was unhappy with what he believed to be negative reporting about him, and eBay.

The Steiners' reporting about eBay that Defendant Wenig and others deemed negative primarily involved criticisms of Defendant Wenig, his income, and his decisions in managing eBay. In other words, the reporting directly implicated Defendant Wenig's reputation, which is apparently held by him in high regard given the outline of his background set forth in his Motion to Dismiss. (Wenig MTD at 1-2). Defendant Wenig required subordinates to keep him up-to-date on all reporting by EcommerceBytes relating to eBay.

Even Defendant Wenig's wife was so aware of the tensions surrounding the EcommerceBytes reporting and a comment on an article referring to Defendant Wenig as a "con artist and a thief" that she texted Defendant Baugh directly. While Defendant Wenig stresses that he did not directly hire or supervise Defendant Baugh, it is very telling that even Defendant Wenig's wife felt Defendant Baugh to be the appropriate person to contact to keep informed about negative reporting on Defendant Wenig.

Moreover, contrary to Defendant Wenig's claim, his conduct did not merely consist of one text directing Defendant Wymer to "take her down." On April 20, 2019, Defendants Wenig and Wymer were discussing *Wall Street Journal* coverage of eBay and Defendant

Wenig stated, "Fuck them. The journal is next on the list after [Ina Steiner]." R361, ¶19. On May 31, 2019, in direct response to an EcommerceBytes article, Defendant Wenig texted Defendant Wymer, "Take her down." R361, ¶20. Over two months later, on August 1, 2019, Defendant Wenig texted to Defendant Wymer – in response to an article Steiner published criticizing Defendant Wenig's strategy in dealing with Amazon through a lawsuit – "[Ina Steiner] is out with a hot piece on the litigation. If you are ever going to take her down…now is the time." R365, ¶ 11.  In other words, Defendant Wenig and Defendant Wymer engaged in months-long discussions aimed at taking the Steiners down.

In response to Defendant Wenig's directive on August 1, 2019 to take down Steiner, Defendant Wymer immediately contacted Defendant Baugh, again, the same person Defendant Wenig's wife reached out to regarding negative reporting on Defendant Wenig. Defendants Wenig and Wymer did not utilize the legal department to consider legal remedies, or public relations to deal with what they perceived to be the Steiner problem, but rather the director of security who had a history of engaging in alarming behavior such as stabbing chairs, harassing subordinates, and who had the knowledge and capabilities based on his law enforcement background to use unconventional means to deal with the Steiners, and who even eBay now admits was "unsuitab[le] as a manager." R25.

The texts between Defendants Wymer and Baugh also suggest off-line conversations between Defendants Wenig and Wymer other than the texts to take Steiner down. In a text message on August 1, 2019, Defendant Baugh texted Defendant Wymer, "[Wenig] said to burn her to the ground correct?" Where the texts between Defendants Wenig and Wymer do not reflect that language, it suggests the text messages accessible to the Steiners at this stage are not the only communications that occurred.

Defendant Wenig contends that the texts did not suggest Wenig intended to cause, or knew that his directive or order would cause emotional distress." (Wenig MTD at 24). Taking logical inferences, however, suggests a plausible claim for relief. The facts pleaded demonstrate that Defendant Wenig became increasingly enraged by the EcommerceBytes reporting, and required subordinates to keep him updated on the latest, at all hours of the day and night. It reached the point where even his wife was contacting Defendant Baugh, suggesting the reporting had become all-consuming to Defendant Wenig. He then, as CEO, directed that others "take her down," and used the head of security to carry out the directive. While it was Defendant Wymer who ultimately communicated directly with Defendant Baugh, that Defendant Wenig's wife contacted Defendant Baugh about negative reporting suggests Defendant Wenig likewise had dealings with Baugh relating to the Steiners. At this point, this circumstantial evidence "suffices to clarify a protean issue such as [Wenig's] motive or intent." *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 56 (1st Cir. 2013).

It is reasonable to believe additional discovery in the possession of the Defendants will reveal further information regarding Defendant Wenig's involvement, intent, and communications with the other Defendants. As discussed *supra*, there is at least one communication between Defendants Wenig and Baugh after the fact, where within days of the commencement of the investigation by Natick Police Department, Defendant Wenig indicated he would be returning from his sabbatical the next day, and remarked "the cavalry is back." R545. Additionally, both Wendy Jones – Defendant Baugh's direct supervisor – and Defendant Wenig were interviewed by eBay legal counsel and/or Morgan Lewis but the Steiners have not yet had access to these interviews. Moreover, eBay

presented a Powerpoint to the Government in support of the appeal that executives and eBay not be charged where eBay admits, based on the evidence revealed during the internal and external investigations, the government could charge Defendants Wenig, Wymer and eBay. All of this information is in the Defendants' control, so "some latitude" is appropriate in "applying the plausibility standard." *Garcia-Catalan*, 734 F.3d at 104.

While Defendant Wenig has argued he could not plausibly know Defendant Baugh and others would engage in the conduct alleged in the Complaint, it begs the question as to what he believed would happen. Defendant Wenig did not instruct that the legal department send a cease and desist letter to the Steiners, nor did he direct the Public Relations department to release neutralizing statements or reach out to the Steiners to resolve any conflict. Instead, the director of security was enlisted to "take her down."

At this stage, the Steiners have pled sufficient evidence to demonstrate that Wenig's conduct was extreme and outrageous in directing his subordinates to take down a reporter due to what he perceived to be negative news coverage, and that he knew or should have known that his directive would cause the Steiners emotional distress. The Steiners have set forth a plausible claim for relief to entitle them to "unlock the doors of discovery" and proceed with the intentional infliction of emotional distress claim against Defendant Wenig. *See Ocasio-Hernandez*, 640 F.3d at 19, quoting *Iqbal*, 556 U.S. at 678.[21]

---

[21] Notably, in Defendants Baugh and Harville's criminal case, additional emails have come to light implicating Defendant Wenig, suggesting discovery would further substantiate the Steiners' claim.  In one email just after Defendant Baugh notified Defendant Wymer that the plan was going awry, Defendant Wenig emailed Baugh that he would be returning he next day and "the cavalry is back." R545.

*Defendant Wymer*

After receiving orders from Defendant Wenig, CEO of eBay, to take Steiner down, he immediately texted Defendant Baugh, "[h]atred is a sin" and "I am very sinful." R366, ¶ 39. Not needing any explanation as to context or who or what Defendant Wymer was referring to, Defendant Baugh responded that he was ready to escalate and he was not "fucking around with her anymore." R366, ¶ 39. Defendant Wymer responded, "[a]men. I want her DONE." R366, ¶ 39. Defendant Wymer further stated, "[Ina Steiner] is a biased troll who needs to get BURNED DOWN…I want to see ashes. As long as it takes. Whatever it takes." R370-371, ¶¶ 55-56.

Defendant Wymer also emailed[22] complaining that the EcommerceBytes website "gives me ulcers, harms employee moral [sic], and trickles into everything about our brand. I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the 'blind eye toward graffiti that turns into mayhem syndrome and I'm sick about it. Whatever. It. Takes." R369, ¶ 49.

Defendant Wymer, as Senior Vice President and Chief Communications Officer of eBay promised Defendant Baugh he would "manage any fallout." R366, ¶ 39.Once it was clear the Natick Police Department was involved and investigating the defendants, Defendant Baugh emailed Defendant Wymer requesting the "top cover" previously

---

[22] This email not only went to Defendant Baugh, but also Marie Huber and Aaron Johnson. R437.

promised by Defendant Wymer. R400, ¶ 177. In his role as Chief Communications Officer,
Defendant Wymer was in charge of Public Relations. Instead of addressing the Steiners'
reporting by releasing a statement, or utilizing other traditional methods of dealing with
"negative" press through the Public Relations department, Defendant Wymer reached out
to Defendant Baugh, head of security.

Again, like Defendant Wenig, common sense and taking all reasonable inferences
suggests that in enlisting the security department to "burn Ina Steiner down" – especially
given Defendant Baugh's reputation and behavior at eBay – would lead to conduct that
would cause severe emotional distress to the Steiners. Given Defendant Wymer's directive
that "anything they could do to solve it should be explored" to someone with Defendant
Baugh's background leads to the reasonable inference that Defendant Wymer did not want
the Steiners handled with conventional means, especially given his directive to do
whatever it takes. Defendant Wymer deleted all of his emails, text messages, and two
phone calls with Defendant Baugh[23] about the Steiners after the Natick Police began their
investigation.  Defendant Wymer also deleted emails and text messages with Defendants
Baugh and Wenig. Defendant Wymer would not cooperate with any internal investigation.
Defendant eBay found Wymer's conduct criminal in nature and represented to the
Government that he could be indicted. eBay even admitted it could be charged criminally,
stating, "ebay realizes that, under the facts and legal principles (e.g., respondeat superior),
DOJ could take enforcement action against the company…eBay acknowledges the
seriousness of the misconduct and the company's responsibility. The conduct of the seven

---

[23] The two deleted calls were from August 22 and 24, 2019 and were 10+ minutes each.
R36.

defendants was clearly criminal, and eBay is troubled by the role here of its former-CEO and former-Chief Communications Officer in particular." R5-6.

At this stage, the Steiners had pled sufficient evidence to demonstrate that Defendant Wymer's conduct was extreme and outrageous in directing his subordinates to burn Ina Steiner to the ground, and that he knew or should have known that his directive would cause the Steiners emotional distress. The Steiners have set forth a plausible claim for relief as to the intentional infliction of emotional distress claim against Defendant Wymer. *See Ocasio-Hernandez*, 640 F.3d at 19, quoting *Iqbal*, 556 U.S. at 678

*Defendant Cooke*

Defendant Cooke claims dismissal is warranted on the intentional infliction of emotional distress claim because while plaintiffs alleged Defendant Cooke was one of three people who approved tweets drafted and sent by Popp, "the Complaint is entirely devoid of any supporting factual allegations regarding the tweets Mr. Cooke purportedly approved, such as the nature of his approval and which tweets he was involved in approving."

Defendant Cooke overstates the Plaintiffs' burden at the pleading stage. Setting forth sufficient facts to satisfy the claim is plausible does not require "a high degree of factual specificity." *Garcia-Catalan*, 734 F.3d at 103. Requiring highly specific facts within the Complaint "is misplaced at the pleading stage," and is "reserved for summary judgment and trial." *Rodriguez-Reyes*, 711 F.3d at 53. As the Court has emphasized, "[n]otwithstanding the neoteric plausibility standard, no 'detailed factual allegations' are required in a complaint." *Id.*, quoting *Iqbal*, 556 U.S. at 677-78. *See also Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002).

24

The Complaint clearly alleges that Defendant Cooke approved tweets drafted by Popp, and sent using the Twitter handle @Tui_Elei. Complaint ¶ 79. The messages included the following:

- "I guess im goin to have to get ur attention another way bitch. . ."

- "U don't have the balls to talk to me?? Stop hiding behind ur computer screen u fuckin cunt!!!"

- "Ur fat pussy husband [David Steiner] needs to be put in line cunt"

- "after he takes the plugs out of his asshole . . . fucking pussies!!!"

- "U are sick motha fuckers . . . and every one will kno! U fuckin cunt ass bitch!!"

R374-375.

Alleging that Defendant Cooke approved these Tweets is sufficient at the pleading stage, where the allegation is not merely conclusory. *See Ocasio-Hernandez*, 640 F.3d at 10 ("The district court erred by not affording the plaintiffs' allegations the presumption of truth to which they were entitled."). In addition, attached to the Complaint was the affidavit in support of the criminal complaint that further detailed Cooke's actions.

Moreover, Cooke should be barred from denying his conduct in his motion to dismiss under the principles of judicial estoppel. Defendant Cooke admitted during his plea hearing that he attended an August 6, 2019 meeting with Defendants Baugh, Popp and Gilbert where they discussed the conspiracy, and the decision to send anonymous and harassing Twitter messages to Ina Steiner. R495. Defendant Cooke also admitted he was part of the WhatsApp group where the harassing messages were vetted. R495. In response to discussions regarding the groups' plan, Defendant Cooke sent a "thumbs up" emoji. R495. On August 20, 2019, when Baugh, Gilbert and Popp were discussing the in-person surveillance, that they had "burned two cars" and that "[the Steiners] couldn't prove

anything. They are seeing ghosts now. LOL", Defendant Cooke responded, "Perfect."

R496. That same day, Defendant Gilbert reported to the group, "We have known the

targets have been very impacted by this op. Perfect time for the next phase," to which

Defendant Cooke replied, "Yes!" R496.

Defendant Cooke admitted during his plea hearing – as did Defendants Baugh,

Harville, Gilbert, Popp, Stockwell and Zea – that the campaign was intended to intimidate

and harass the Steiners. Moreover, Defendant Cooke, as well as the other pleading

defendants, admitted that their conduct was intended to cause substantial emotional

distress. R279, 288.

During Defendant Cooke's sentencing hearing, he took full responsibility for the

actions he knew would gravely impact the Steiners and admitted that "a group of people

got together and immorally and illegally rationalized and justified horrific behavior in

order to please the boss." R341. He made these admissions both during his plea and

sentencing, in order to receive a lesser sentence than recommended by the Government and

in fact did receive a lower sentence than that requested by the Government.

"Judicial Estoppel is an equitable doctrine that prevents a litigant from taking a

litigation position that is inconsistent with a litigation position successfully asserted by him

in an earlier phase of the same case or in an earlier court proceeding." *RFF Family P'ship,*

*LP v. Ross*, 814 F.3d 520, 527 (1st Cir. 2016) (quoting *Perry v. Blum*, 629 F.3d 1,8 (1st Cir.

2010). Judicial estoppels, primary utility is to safeguard the integrity of the courts by

preventing parties form improperly manipulating the machinery of the judicial system.

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.* 374 F.3d 23, 33 (1st Cir. 2004). "[c]ourts

typically invoke judicial estoppel 'when a litigant tries to play fast and loose with the courts." *RFF Family P'ship, LP, 814 F.3d at 527-28 (*quoting *Perry, 629 F.3d at 8).*

In order for judicial estoppel to apply, the Court must apply a two factor test: (1) "the legal or factual assertion advanced in the earlier judicial proceeding must be 'directly inconsistent' with the assertion made in the current forum," and (2) "the court must have accepted or adopted the assertion made at the earlier proceeding." *Howell v. Town of Leyden*, 335 F.Supp.2d 248 (D. Mass. 2004), citing *Alternative Sys. Concepts, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004). "[w]hile it is not a formal element of a claim of judicial estoppel, courts frequently consider a third factor absent an estoppel, would the party asserting the inconsistent position derive an unfair advantage?" *Id; see also Guay v. Burack,* 677 F.3d 10, 16 (1st Cir. 2012). The rationale behind judicial estoppel is that "the potential exists that the judicial process will be endangered by inconsistent determinations applying to the court by the party asserting the contrary positions." *Alternative Sys. Concepts* 374 F.3d at 33.

Here, both factors apply, as well as the unfair advantage consideration. During the criminal proceedings, in Defendant Cooke's plea hearing, he admitted to meeting with Defendants Baugh, Popp and others to formulate the plan to send harassing Twitter messages to the Steiners. During a WhatsApp group chat, he engaged in the discussion relating the content of the Tweets, and approved of the messages. Defendant Cooke now claims the Steiners do not have sufficient evidence to demonstrate he in any way participated in the scheme to harass them.

The Court accepted Cooke's admissions both during a plea hearing, and when Defendant Cooke was attempting to seek a reduced term of imprisonment during his

sentencing hearing. The Court then took Defendant Cooke's statements during sentencing into consideration, and varied from the Government's recommendation, and instead of sentencing him to 30 months of incarceration, he was sentenced to 18 months of incarceration. R345.

Both factors relating to judicial estoppel apply in that Defendant Cooke now makes assertions that directly contradict his earlier admissions, and the Court relied on his earlier admissions in granting him a reduced sentence. *See Alternative Sys. Concepts, Inc.*, 374 F.3d at 33. As such, Defendant Cooke should be barred from asserting a contrary position in his motion to dismiss, so this Court should deny Defendant Cooke's request to dismiss this count of the complaint against him.

**II.      The Plaintiffs have set forth a plausible claim for stalking against each of the Defendants, the statute – although a California statute – applies in Massachusetts, or at the very least to the conduct that occurred in California but directed into Massachusetts, and there is no conflict of law issue. (ALL DEFENDANTS)**

Collectively, the Defendants[24] allege that the California stalking statute does not apply to conduct occurring in Massachusetts, so the stalking count should be dismissed. First, the Defendants ignore that the bulk of the activities aimed at stalking and harassing the Steiners occurred while the Defendants were in California.  Therefore, even if the Court were to interpret the statute as only covering activities that occurred in California, the Plaintiffs have still maintained a cause of action for stalking.

Second, contrary to the Defendants' contentions, the statute does, in fact, encompass activity that occurs in Massachusetts, especially here where the conduct in

---

[24] All Defendants who filed a Motion to Dismiss (i.e., all Defendants other than Harville) moved to dismiss the Stalking claim.

California and the conduct in Massachusetts were a part of one ongoing chain of events. Moreover, the purpose of the statute weighs in favor of applying the statute to all conduct in this case that was designed to harass, surveille and stalk the Steiners.

Third, conflict of law provisions do not bar use of the statute in Massachusetts. Although Massachusetts does not have an equivalent statute, had the Steiners sued in California, the statute would have applied. Therefore, it makes little sense to bar use of the statute because they chose the more appropriate and convenient forum to file the instant action.

i.    *There is no conflict of law, and even if there was, the factors weigh in favor of applying the California Stalking statute.*

Preliminarily, Plaintiffs maintain that although each of the Defendants argue there is a conflict of law because Massachusetts does not have a civil stalking statute, this is not correct. "The first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions." *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004). Where California has a stalking statute, but Massachusetts does not, no conflict exists. In fact, the case cited by eBay in support of the proposition that where there is "no parallel in Massachusetts law" this constitutes a conflict of law, states the *opposite*. (eBay Motion to Dismiss at 28), citing *Levin v. Dalva Bros. Inc.,* 459 F.3d 68, 74 (1st Cir. 2006).

In *Levin*, Plaintiff instituted the lawsuit in Massachusetts, for conduct that arose, in part, in New York. *Id.* at 74. Since there was no parallel Massachusetts express warranty statute, the Court unquestionably applied the New York express warranty statute. *Id.* Here, the same result should follow: where there is no Massachusetts civil stalking statute, the Court should find no conflict of law exists and apply the California stalking statue.

The decision cited by PFC in support of the argument that the California statute should not apply also does not support the Defendants' cause. (PFC Motion to Dismiss at 32), citing *Burleigh v. Alfa Laval, Inc.*, 313 F. Supp. 3d 343, 353-54 (D. Mass. 2018). In *Burleigh,* Plaintiff, a Maine resident, sued in Massachusetts. *Id.* at 353. The injury also occurred in Maine. *Id.* Plaintiff urged the Court to apply the Massachusetts wrongful death statute, which had no cap on damages – where the Maine statute had a cap – and where the Maine statute imposed a higher standard of liability and burden of proof than the Massachusetts statute. *Id.* at 350. In assessing the competing interests, the Court applied the Maine statute. *Id.*

The rationale in applying Maine law in *Burleigh* simply does not apply in this case where the Court stated it would be "anomalous for [the non-forum state] to insist on providing greater benefits to its citizens under another state's law than it provides to its citizens under its own law." *Id.* at 357.  Here, it makes perfect sense to provide the Steiners with the protections of a California law, where outside residents – while in California, then by travelling to Massachusetts – reached into our state to harass, stalk, threaten and surveille Massachusetts residents, although the conduct is prohibited in their home state.[25]

---

[25] Notably, Defendant Cooke asserted during his sentencing hearing that he advised the other Defendants that "publication of the victims' address…was illegal in California. He also told the group that in California, the messages could not be threatening, and if the victims said 'stop,' the messages had to stop." R508. Defendant Cooke claimed that "[w]hen deliveries of unwanted items were discussed, Mr. Cooke told the group that while the deliveries might seem funny, the Postal Inspectors would not look kindly on misuse of the mails. He also explained that deliveries, like messages, could not be threatening…When use of a possible GPS tracking device was discussed, Mr. Cooke warned trackers were illegal in California and possibly illegal in Massachusetts and suggested contacting a Massachusetts private investigator to find out. By the end of the meeting, Mr. Cooke believed Baugh had accepted his advice not to send threatening messages, not to do their own surveillance, not to use a tracker without first finding out if it

Given that there is no actual conflict in the laws of California and Massachusetts, this Court should permit Plaintiffs to assert a cause of action under the California stalking statute.

Even if, however, the Court finds there is a conflict, the factors weigh in favor of applying the California stalking statute. *See* Restatement (Second) of Conflict of Laws § 145 (four factors: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) the "residence," "place of incorporation and place of business of the parties," and (4) "the place where the relationship, if any, between the parties is centered.").

While the physical stalking occurred in Massachusetts, it was part of a single scheme originating in California directed at the Plaintiff's in Massachusetts, all other factors weigh in favor of applying the California statute. All of the Tweets and Twitter messages threatening the Steiners originated from California. The Defendants sent the packages, and posted Craigslist and other ads from California. Even when four Defendants travelled to Massachusetts to physically stalk and surveille the Steiners, Defendants that remained in California listened to the Natick Police Department dispatch to alert Defendants Baugh, Harville, Popp and Zea as to police presence, to substantially aid in the

---

was legal, not to use role play, not to use the mails improperly, and not to send threatening deliveries." (Id.).

In sum, Defendant Cooke admitted that he had knowledge that the conduct was illegal under California law (and apparently, specifically, the stalking statute where he references the requirement that they stop if the Steiners said "stop"), and potentially in Massachusetts as well, that he advised other members of the conspiracy of this fact, and that they still decided to proceed with the conspiracy, including with acts that violated the California stalking statute.

stalking and surveillance efforts.[26] Defendants that stayed in California also continued to dox the Steiners on Twitter and Craigslist, and send threatening messages while in the in-person stalking occurred in Massachusetts.  California law recognizes that state remedies may extend to out-of-state parties when the parties are harmed by wrongful conduct occurring in California. *Norwest Mortgage, Inc. v. Superior Court,* 72 Cal. App. 4th 214, 224, 85 Cal. Rptr. 2d 18 (1999).

Taking the conduct in its totality, the actual physical surveillance and stalking occurred in Massachusetts, but the installation of fear leading up to those acts all occurred in California, and the in-person stalking was facilitated by conduct that continued while the Defendants remained in California. Given the nature of the events, the stalking and surveillance in Massachusetts would not have had the same effect without the conduct in California; the Steiners only noticed the presence of the black vehicle circling the block and following the Steiners, and the fear it caused, occurred only because of the realization that whoever was engaging in the extremely disturbing online threats and mailing packages and other deliveries were now, literally, at their doorstep. In short, the gravamen of the Defendants' conduct was a stalking that occurred in California; the Massachusetts in-person stalking was simply the crescendo of the totality of acts that caused the Steiners extreme alarm and turmoil.

Third, a majority of the parties are residents of California, and eBay's principal place of business is in California. All individual Defendants resided and worked in

---

[26] Defendant Baugh also admitted during his plea hearing that they used a conference line to communicate during the surveillance efforts in order to monitor police activity to evade detection. R283.

California at the time of the acts. As a result, this factor likewise favors applying the California statute.

Fourth, contrary to the Defendants' arguments, the relationship between the parties was centered in California, not Massachusetts. The relationship between the Steiners and eBay consisted of the Steiners reporting on eBay, headquartered in California. For several years, eBay would invite the Steiners to interview executive team members and other eBay employees and contractors. Complaint at 12, ¶ 42. Additionally, more than 50 eBay executives and employees subscribe to the EcommerceBytes newsletter. The relationship between the Steiners and eBay is centered on eBay's location and its activities, not EcommerceBytes. The Steiners could report on eBay from literally anywhere; Natick was not central to EcommerceBytes, but rather eBay's California business was the essential focus of the relationship.

Even if this Court finds there is an actual conflict of law issue, in assessing the totality of the factors, the California statute must prevail relating to the stalking claim.

> ii.   *The fact that the victim's suffered the injury from the Defendants' conduct in Massachusetts does not render the California statute inapplicable.*

While the Defendants physically stalked the Steiners in Massachusetts, the entirety of the Defendants' actions – even the conduct that occurred through electronic means and through the mail – fall within the conduct proscribed by the California stalking statute.

As set forth in the Complaint, the Defendants sent a series of harassing and threatening Twitter messages, while simultaneously mailing packages to the Steiner residence, including a bloody pig mask from the movie SAW and a book entitled "Surviving Loss of a Spouse" both of which the Steiners perceived as threats on their lives.

The Defendants also mailed live spiders and cockroaches, and attempted to send a pig fetus. While the Steiners were receiving these disturbing packages in Massachusetts, the Defendants were simultaneously sending messages such as "do I have your attention now, cunt?" All of this conduct originated in California. Defendants, while in California, also signed the Steiners up for dozens and dozens of harassing emails, from websites such as the Communist Party, and various sex websites.

Even though the Defendants physically surveilled and stalked the Steiners in Massachusetts, the planning and facilitating occurred in California. Before Defendants Baugh, Harville and Zea travelled to Massachusetts, Defendant Baugh practiced installing a GPS on a similar vehicle to the Steiners in an eBay parking lot. Presumably, the GPS device was purchased in California. Even after Defendants Baugh, Harville and Zea – and later Defendant Popp – arrived in Massachusetts, the other Defendants continued to send harassing and threatening Twitter messages, posted ads on Craiglist and other websites inviting strangers to the Steiners home for sex parties and advertising yard sales, and arranged for a delivery of a funeral wreath to the Steiner's home. When Defendants Baugh, Harville and Zea stalked and surveilled the Steiner residence and David while he drove throughout Natick, Defendant Popp – while remaining in California – monitored the NPD dispatch so she could alert the Defendants as to any police detection.

In short, although the most disturbing act of surveilling and stalking the Steiners in their home and while driving occurred in Massachusetts, the Defendants engaged in countless other bewildering, harassing and tortious acts from California. Additionally, the physical stalking in Massachusetts could not have occurred without the California acts, and would not have resulted in the same measure of fear, anticipation and torment to the

Steiners without the California acts leading up to those events. A black van merely circling the Steiners' block and following them would not have had the same force and would not have caused the Steiners to "see ghosts" without the California conduct leading up to those events. *See United States v. Walker*, 665 F.3d 212, 225-226 (1st Cir. 2011) (noting pre-travel threats through email placed victim's in reasonable apprehension of violence once defendant travelled across state lines to victim's location). It was all part of a larger plan that could not be carried out without support.

While the Defendants argue that the most "egregious" acts occurred in Massachusetts, this is irrelevant. Not only was all of the conduct egregious, the statute encompasses *all* of the aforementioned behavior, where the statute prohibits a "pattern of conduct the intent of which was to follow, **alarm,** place under surveillance, **or harass the plaintiff."** Cal. Civ. Code § 1708.7(a)(1) (emphasis added). The statute also specifically includes threats "communicated by means of an electronic communication device," suggesting the legislature contemplated actions occurring outside of California borders. *Id.* at (b)(2).

Whether the injury occurred in California is not solely determinative in evaluating the application of California law. *Diamond Multimedia Sys. Inc. v. Superior Court* 19 Cal. 4th 1036, 1063-64 80 Cal. Rptr. 2d 828, 968l; *Norwest Mortgage, Inc. v. Superior Court,* 72 Cal. App. 4th 214, 224, 85 Cal. Rptr. 2d 18 (1999).

Although the Defendants maintain that the statute does not apply to injuries occurring outside of California, the California Courts have decided otherwise. *See Diamond Multimedia v. Superior Ct.*, 968 P.2d 539, 554 n. 20 (Cal. 1999). In *Diamond Multimedia,* the Court found that even if the resulting effect of the conduct occurs out of

the state, a California statute applies as long as the conduct leading to liability occurs within California confines. *See Diamond Multimedia v. Superior Ct.*, 968 P.2d 539, 554 n. 20 (Cal. 1999) (applying state securities law applies to false statements occurring in California although transaction occurred out of state). *See also Kearney v. Saloman Smith Barney*, 137 P.3d 914 (Cal. 2006) (applying California statute where Georgia company unlawfully recorded conversations with customers in California).

Also contrary to the Defendants' argument, the purpose of the statute weighs in favor of applying the stalking statute in this case.  The California legislature stated that the purpose of the statute is to protect the "health, safety, and welfare of the people of the State of California, and **shall be liberally construed to effectuate those purposes."** Cal. Civ. Code § 1708.7(b)(7)(g) (emphasis added). Although the Steiners are Massachusetts residents, curtailing this type of behavior by employees of a massive California company will also serve to protect the people of the state of California, where it will serve as a deterrent effect both to eBay, and other large companies in California that may consider engaging in such egregious behavior to attack a private citizen.

Even if the Court were to parse out the stalking conduct that occurred in Massachusetts, and find that the statute does not apply because it was conduct that occurred outside of California borders, the Steiners have still set forth a cause of action for stalking relating to the conduct that occurred within California. Therefore, the Defendants have failed to demonstrate why this count must be dismissed relating to conduct that occurred within California borders, but where only the injury was suffered outside of California.

Ultimately, while a portion of the Defendants conduct which constitutes stalking and harassment under the statute occurred in Massachusetts, the California conduct still caused the Steiners "substantial emotional distress" and falls within the definition of stalking per the statute. As a result, the California stalking statute applies, and the Court should deny the Defendants' motion to dismiss the Stalking count on the grounds that it should not apply to any of the Defendants' conduct, even conduct occurring in California.

> iii.    *Even the actions that occurred in Massachusetts fall within the statute where they were part of an ongoing chain of events.*

Although California has adopted a presumption against extraterritoriality, and looks to the location of the conduct when applying its statutes, this Court should apply the California conduct even to conduct occurring in Massachusetts where the Massachusetts conduct was part and parcel of the ongoing pattern of stalking, threats and harassment falling within the statute. *See Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (Cal. 2011) ("[W]e presume the Legislature did not intend a statute to be operative, with respect to occurrences outside the state, unless such intention is clearly expressed or reasonably inferred from the language of the act or from its purpose, subject matter, or history"); *Diamond Multimedia Sys., Inc. v. Superior Court*, 968 P.2d 539, 554 n. 20 (Cal. 1999).

California state remedies may extend to out-of-state parties, however, when the parties are harmed by wrongful conduct occurring in California. *Wang v. OCZ Technology Group, Inc.*, 276 F.R.D. 618, 629 (N.D. Cal. 2011), citing *Diamond Multimedia,* 968 P.2d at 554; *Morgan, et al. v. Harmonix Music Sys., Inc.*, 2009 WL 2031765, at *2 (N.D. Cal. 2009). Whether the injury in California is not the sole determining factor as to whether apply California law; the Court also looks to whether the defendant's conduct occurred in the forum state. *Id.*

Here, as discussed *supra*, the conduct in Massachusetts was one portion of a chain of escalating events that resulted in the "substantial emotional distress" the Steiners experienced. Without one aspect of the stalking, harassment, threats, following and surveillance – when considering the Natick conduct and the California conduct separately – the totality of the acts would not have had the same force and effect. In other words, had the Defendants not threatened the Steiners online, and sent them disturbing packages in the 2-3 weeks leading up to the trip to Natick, the van circling their block and following David Steiner would not have instilled the same level of fear. Likewise, had the Steiners believed this was an online harassment and stalking scheme – without a fear that the actors would approach and attack them offline – the online acts would not have been as petrifying. Taking all of the acts together, however, created a campaign that terrorized the Steiners, and left them in a state of terrified anticipation as to what would befall them next.

Additionally, the conduct in California facilitated the conduct in Massachusetts. The GPS was purchased in California, and Defendant Baugh practiced installing it in the eBay parking lot. Even while Defendants Baugh, Harville and Zea were stalking the Steiners, Defendant Popp, from California, monitored the NPD dispatch so the Defendants in Massachusetts would not be caught. Therefore, the California conduct was necessary to the in-person stalking, harassment, following and surveillance.

In fact, the legislative history for the statute demonstrates that the statute was enacted because "it was believed that existing remedies such as criminal prosecution and restraining orders were insufficient to deter violent offenders…" thus suggesting the statute was aimed not only at *protecting* California residents, but also *deterring* California residents from engaging in stalking activities. 2013 CA A.B. 1356 (2014). Therefore,

public policy considerations, and the punitive nature of the statute, also support applying the California statute to all activity committed by California residents, even if directed outside the forum state.

Where the full scope of the stalking campaign could not be fully carried out without both aspects – the conduct occurring in California and the conduct occurring in Massachusetts – this Court should apply the California stalking statute to all of the conduct. This would advance the purposes of the statute where it would not absolve California residents from liability simply because they chose an out of state target. As such, this Court should deny the Defendants' motion to dismiss on the grounds that the California statute should not apply to conduct occurring out of state.

A. Contrary to Defendant Wenig and Wymer's contentions, it is not necessary to demonstrate they personally participated in stalking the Steiners where it was reasonably foreseeable that their directives would result in the conduct.

Defendants Wenig and Wymer both contend there is no evidence set forth in the Complaint to suggest either physically participated in the stalking and harassment. The Steiners, however, have set forth a plausible claim for relief against both Defendants, as set forth in the section on Intentional Infliction of Emotional Distress. Much like that claim, it is difficult to conceive what chain of events the Defendants believed their directives would set in motion, if not a campaign to harass the Steiners.

The inferences from the Complaint need not be conclusive, only plausible. It is at least plausible that the directives to Defendant Baugh – who Defendants Wenig and Wymer knew to be a loose cannon with experience engaging in the behavior at play here – to "burn her down" and "take her down" would result in the Defendants stalking, harassing and threatening the Steiners. The Complaint and inferences must be viewed in the context

of the events as a whole. The CEO and the Vice President of a powerful corporation were directing the head of security to eradicate Ina Steiner using whatever means possible, and it was foreseeable this would result in the type of conduct that occurred here. *See Ocasio-Hernandez*, 640 F.3d at 14 ("question confronting a court on a motion to dismiss is whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible").

While Defendants Wenig and Wymer allege they did not physically engage in any stalking, they directed and encouraged the acts by ordering Defendant Baugh to take Ina down and burn her to the ground.  In addition, defendant Wymer deleted all of his emails, texts, and communications with Defendant Baugh and Defendant Wenig. R36. This encouragement, when taking the totality of the circumstances and all reasonable inferences, amounted to aiding and abetting the stalking. *See Massachusetts Port Authority v. Turo Inc.,* 487 Mass. 235, 244 (2021); *Kyte v. Philip Morris, Inc.*, 408 Mass. 162, 168-169 (1990).  Moreover, California Stalking Statute was amended in June 1998 to include electronic communications "that it will not matter if the harasser is capable of carrying out the threat – it will be enough that the target believes the threat to be credible and "had reasonable fear for his or her safety or the safety of his or her immediate family."

Where the requirement of plausibility "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal [conduct]" and where "a material part of the information needed" is "within the defendant's control" this Court should allow "some latitude…in applying the plausibility standard." *Garcia-Catalan*, 734 F.3d at 104. As noted previously, there are additional emails that have not been destroyed that may evince the level of Defendants Wenig and Wymers' knowledge,

their directives, and how involved they were in each of the torts alleged. Moreover, both

Defendants Wenig and Wymer were interviewed, but Plaintiffs had not yet had access.[27]

Given the low standard of plausibility, and that common sense and reasonable

inferences suggest Defendants Wenig and Wymer intended to instill fear into the Steiners,

the Court should deny Defendants Wenig and Wymers motion to dismiss on the grounds

that they did not personally engage in the stalking activities.

B. Defendant Cooke's claim that Plaintiffs failed to set forth evidence that he
   intended to place the Steiners in fear fails where he approved of the harassing
   and threatening Twitter messages.

Defendant Cooke alleges that there is no evidence he intended to place the Steiners

in fear. As outlined *supra*, Cooke, in his plea, admitted that he approved the harassing and

threatening Twitter messages, which accompanied the disturbing package deliveries. He

admitted that he put the Steiners in fear.  It is unclear what the intent of such conduct

would be other than to instill fear in the Steiners. Based on his guilty plea, Cooke should

be judicially estopped from making this claim.

Moreover, when Defendant Baugh sent a WhatsApp message stating, "[t]hey are

seeing ghosts now. LOL", Defendant Cooke responded, "Perfect." R496. That same day,

Defendant Gilbert reported to the group, "We have known the targets have been very

impacted by this op. Perfect time for the next phase," to which Defendant Cooke replied,

"Yes!" R496. These messages demonstrate Defendant Cooke's intent to place the Steiners

in fear as a result of the Defendants' collective conduct. This circumstantial evidence

"suffices to clarify a protean issue such as an actor's motive or intent." *Rodriguez-Reyes v.*

---

[27] Plaintiffs also do not yet have access to emails, interviews and internal investigations.

*Molina-Rodriguez*, 711 F.3d 49, 56 (1st Cir. 2013). Based on his guilty plea, Cooke should be judicially estopped from making this claim.

    C.  <u>Plaintiffs were not required to demand that the activity cease, where it would have been both unsafe for them to do so, and where they did not know the identity of the perpetrators. (Defendant Cooke)</u>

Cooke makes a bemusing claim that he cannot be liable for stalking because the Steiners never demanded the Defendants cease their conduct. The statute, however, clearly states that a Plaintiff need not demand the conduct cease if the communication was "impractical or unsafe." Cal. Civ. Code § 1708.7(a)(3)(A)(ii). Where the Steiners were unable to determine who was harassing, stalking, intimidating and threatening them despite their best efforts, and even if they did, it would have been unsafe to communicate such a request, Cooke is not absolved from liability based on their inability to communicate a request to stop torturing them. As such, the Court should deny Defendant Cooke's motion to dismiss on the grounds that the Steiners did not demand that the Defendants cease their conduct.

## III.    The Plaintiffs have set forth a plausible RICO claim under Section 1962(c) (All Defendants)

RICO prohibits a person associated with an "enterprise" from conducting the enterprise's affairs "through a pattern of racketeering activity" and provides a right of action for treble damages for any person "injured in his business or property by reason of a violation. 18 U.S.C. §§ 1962(c), 1964(c). Plaintiff must demonstrate: (1) that an enterprise affecting interstate commerce existed, (2) that the defendant knowingly joined the conspiracy, and (3) that the defendant intended to further an endeavor which, if completed, would have satisfied the pattern requirement of RICO. *Aetna Casualty Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1561 (1st Cir. 1994); *United States v. Cianci*, 378 F.3d 71, 88 (1st

Cir. 2004). The plaintiff does not need to allege that each conspirator agreed to commit (or

actually committed) two or more predicate acts. *Salinas v. United States*, 522 U.S. 52, 64

(1997). No overt act is required. *Id.*  A defendant may be a part of a RICO conspiracy even

if he has not committed a substantive RICO violation. *Cianci*, 378 F.3d at 92.

A.  The eBay/PFC Enterprise is an associated-in-fact RICO enterprise

Under RICO, an "enterprise" includes "any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity. 18 U.S.C. § 1961(4). The Supreme Court has described an

association-in-fact RICO enterprise as "a group of persons associated together for a

common purpose of engaging in a course of conduct. *See United States v. Turkette*, 452

U.S. 576, 583 (1981). Such an enterprise is proved "by evidence of an ongoing

organization, formal or informal, and by evidence that the various associates function as a

continuing unit." *Id.*

The Plaintiffs need not demonstrate the enterprise has a particular organizational

structure, nor do members of the group need to have fixed roles; different members may

perform different roles at different times. *Boyle v. United States*, 556 U.S. 938, 948 (2009).

Under *Boyle*, an association-in-fact enterprise requires only three structural features: "(1) a

purpose, (2) relationships among those associated with the enterprise, and (3) longevity

sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

i.  *Contrary to their arguments, eBay and PFC can be sued as
defendants where they exist separate and apart from the
criminal enterprise.*

While "the same entity cannot do double as both the RICO defendant and the RICO

enterprise," the Complaint clearly delineates an enterprise separate and apart from the

individual defendants. *See Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44-45 (1st Cir. 1991). In other words, the Plaintiffs have plead sufficiently the existence of an enterprise distinct from the RICO person. *See id. at* 45; *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 29-34 (1st Cir. 1986).

As outlined, an association-in-fact enterprise was created involving Defendants eBay, PFC, Wenig, Wymer, Baugh, Harville, Gilbert, Cooke, Popp, Stockwell, Zea and John and Jane DOE. The participants in the enterprise coordinated and targeted the Steiners in a scheme to intimidate, threaten, torture, terrorize, stalk and silence the Steiners into ceasing their reporting of eBay, as well as conspired to target other journalists, bloggers and newspapers in order to eradicate all negative reporting on eBay.

B. Plaintiffs have set forth sufficient evidence at the pleading stage that the Defendants engaged in a pattern of racketeering activity.

Plaintiffs must demonstrate a "pattern of racketeering activity," with at least two acts of racketeering within ten years. 18 U.S.C. § 1961(5). A pattern is two or more "related" predicate acts of racketeering activity, that "amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). There must be either an "close-ended" pattern of racketeering activity, or "amounted-to continuity," where the related predicate acts extended over a substantial period of time. *See Eagle Investment Systems Corp. v. Tamm*, 146 F.Supp.2d 105 (2001); *H.J. Inc.*, 492 U.S. at 242.

Under the "opened-ended" or "threat-of-continuity" approach, the Plaintiff can establish a pattern even where the predicate acts occurred over a narrow time frame if "the racketeering acts themselves include a specific threat of repetition extending indefinitely

into the future [or]…are part of an ongoing entity's regular way of doing business." *See Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 37 (1st Cir. 1991).

Here, the Steiners have set forth a plausible claim of both a close-ended and open-ended pattern of racketeering activity. The Complaint sets forth sufficient evidence to demonstrate at the pleading stage that the eBay/PFC enterprise had the goal of eradicating any negative reporting on eBay, that it harassed at least two people in the past, and that it discussed eliminating other journalists after taking down the Steiners. Additionally, given the type of people eBay hired, including Defendant Baugh, when considering common sense and all reasonable inferences, the Steiners have set forth sufficient evidence at the pleading stage to demonstrate this was eBay's regular way of doing business. eBay had also worked in the past to erroneously remove EcommerceBytes from the internet by reporting it as a phishing site, and by infiltrating the comment section on the website, in order to generate ill will and undermine the credibility of the site.

PFC paid eBay expenses which eBay acknowledged as an "expensing loophole." eBay admitted that travel expenses, including plane tickets, hotel rooms, car rentals, and restaurant meals, were booked "off the grid", which eBay admits were paid for by PFC. R29. In addition, eBay admits that PFC's payment of its expenses related to this conspiracy allowed other defendants to use burner devices and non-company cash cards R12. In addition, eBay also admitted that it reviewed PFC expense records, expense reimbursements, travel reports, and travel reservations. eBay identifies Progressive Force Concepts in PowerPoint - Principal 7e as "alternative work force (i.e. non-employees)", where eBay told the Government it closed an alternative work force expensing loophole in the Natick matter. R29. Plaintiffs still do not have expense reports that were sent from

eBay to PFC, payments of the expenses with the mark up sent from PFC to eBay, and the contract between PFC and eBay for the payment of expenses off the books.  Using this loophole, Defendant Zea purchased the plane tickets to Natick for her, Baugh and Harville, all meals and other expenses to further the conspiracy, while both PFC and eBay signed off on the transactions.

At this stage, the Plaintiffs have met their low burden of setting forth a plausible pattern under RICO.

a.   Close-ended

To demonstrate a close-ended RICO pattern, a plaintiff must allege "a series of related predicates extending over a substantial period of time" that "amount to a threat of continued criminal activity." *See Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 37 (1st Cir. 1991). While "predicate acts extending over a few weeks or months…do not satisfy this requirement," the Steiners have alleged several predicate acts spanning over several years, all with the goal of eradicating the Steiner's reporting: [28]

   i.   On April 28, 2009, an eBay employee engaged in wire fraud.  The employee fraudulently posed as an anonymous eBay seller, and wrote criticizing remarks in the EcommerceBytes comments section, libeling the website. The IP address belonged to an eBay employee in the public relations department.

   ii.   In May of 2012, members of eBay engaged in wire fraud.  An eBay employee from eBay's audit, fraud and investigations department, while acting in the scope of his employment, falsely reported EcommerceBytes as a phishing

---

[28] The privilege logs and discovery requests in the criminal case where Defendants Baugh and Harville were charged limited discovery to 2019.  As such, plaintiff do not yet have emails and communications from eBay about eBay's conduct from 2009-2019.

website, in order to have the website removed from the internet. At that point, as eBay was aware, EcommerceBytes had been operating as a legitimate website for over 13 years. The fraudulent activity was an attempt to silence the Steiners, and eliminate their legitimate reporting on eBay.

iii.   On January 28, 2014, an eBay employee engaged in wire fraud.  The employee, fraudulently acting as a legitimate EcommerceBytes user, attacked a long-standing user of the website, fostering a threatening environment intended to intimidate users. Interactions with the EcommerceBytes website (and all websites), drives Google and other search engine metrics. As a result, causing a downturn in interactions with the website has a direct correlation to rankings, traffic to the website and, in turn, profits.

iv.   On October 15, 2018, an eBay employee engaged in wire fraud.  The anonymous user posed as an eBay seller and made derogatory comments towards users of the EcommerceBytes website. The comments were linked to an eBay IP address, and the fraudulent activity had the effect of attacking legitimate EcommerceBytes users.

v.   In the Spring of 2019, Defendant Baugh and the other Defendants conspired to commit mail fraud. The Defendants discussed sending a fake threatening letter to the Steiners, with a post-stamp making it appear as if the letter came from a disgruntled seller in Texas. The purpose was to attempt to silence the Steiners.

vi.   On or about June 8, 2019 Defendant Gilbert, at Defendant Baugh's direction, flew cross country from California to Boston and drove to the Steiner's home

in Natick, Massachusetts and scrawled the word "FIDOMASTER" on their

fence. This act had the common purpose of attempting to threaten and silence

the Steiners.

vii.   During the month of August 2019, the Defendants, including but not limited

to Defendants Baugh, Harville, Cooke, Gilbert, Popp, Stockwell, Zea and

others stalked, harassed, intimidated, tortured and attempted to silence the

Steiners through online threats, package deliveries, in-person stalking and

surveillance, and then destroyed evidence, obstructed justice and tampered

with witnesses and victims.

While the Defendants contend that the conduct was too sporadic to entail an open-

ended pattern of continuity, it demonstrates a years-long campaign to attempt to shut down

the EcommerceBytes' website, and when the website was able to withstand the attacks, the

enterprise turned its sights on eradicating the Steiners, evincing an ongoing pattern of

racketeering activity.

There was also considerable conspiring relating to the goal of taking down the

Steiners, which started in the top echelons.  For example, on April 10, 2019, Defendant

Wymer texted Defendant Wenig, "We are going to crush this lady," sending along a link to

the Newsletter's coverage that day of Defendant Wenig's compensation. Criminal

Affidavit at 19.  On April 20, 2019, while discussing the Wall Street Journal's coverage of

Defendant Wenig, he texted Defendant Wymer, "fuck them. The journal is next on the list

after [Ina Steiner]." R361, ¶ 19. On May 31, 2019, commenting on the Newsletter's

coverage of eBay that day, Defendant Wymer texted Defendant Wenig, "Shockingly

reasonable..." Defendant Wenig replied, "I couldn't care less what she says." Seconds later, Defendant Wenig added, "Take her down." R361, ¶ 20.

Moreover, these are the events the Steiners know about. The full breadth of the enterprise's activities is within the possession of the Defendants, and where "a material part of the information needed is likely to be within the defendant's control" the Court should grant the Steiners "latitude…in applying the plausibility standard." *See Saldivar v. Racine*, 818 F.3d 14, 23 (1st Cir. 2016). Where the Steiners have set forth numerous events occurring over a several year span, it is at least plausible they will maintain a cause of action under the close-ended theory, which is sufficient to "unlock the doors of discovery." *See Ocasio-Hernandez*, 640 F.3d at 17.

Where Plaintiffs have set forth a plausible claim, this Court should deny the Defendants' motions to dismiss on the grounds that they did not establish a closed-ended pattern of racketeering activity.

      b.  <u>Open-ended</u>

The Defendants allege in the various motions to dismiss that the Plaintiffs failed to set forth sufficient facts to demonstrate an open-ended pattern of racketeering activity occurred, meaning the "racketeering acts themselves includes a specific threat of repetition extending indefinitely into the future [or]…are part of an ongoing entity's regular way of doing business."

Not only did the members of the enterprise target the Steiners, they also targeted and conspired against others who they deemed to report negatively on eBay. In October of 2018, eBay executives intimidated a YouTube journalist into removing a negative YouTube video about the company. In April of 2019, the Wall Street Journal published an

article discussing Defendant Wenig's $18.2 million compensation. In response, Defendant Wenig texted Defendant Wymer, "The journal is next on our list." This was during the same timeframe that the Defendants were planning their attacks on the Steiners.

Not only did eBay and its agents and employees conspire to target journalists other than the Steiners, demonstrating a threat of repetition, the racketeering acts were part of an eBay's ongoing and regular way of doing business. Defendant Baugh was promoted to the position of Head of Security, who eBay executives knew was trained by the FBI as a U.S. intelligence agent, and had engaged in operations on behalf of the government to spy and manipulate others. R536-537.

Additionally, the practice of using the Security Department to eliminate negative reporting – rather than the legal department through a cease and desist letter or a lawsuit, or even the Public Relations Department, which Defendant Wymer was head of – evinces that eBay uses unconventional means to deal with negative reporting. The Security Department had both the means and the background to carry out such a conspiracy, through the use of Protonmail email accounts, knowledge of how to cover up the investigation, and experience with using psychological torture.

Plaintiffs have set forth a plausible claim that there was a threat of repetition had the Defendants not been caught and prosecuted. Even after the investigation, eBay promoted Cooke as director of security knowing his role in stalking the Steiners.  It was not until after he was indicted that he was terminated from eBay. The Steiners should not be precluded from establishing a RICO claim simply because the Defendants were caught, where this was the enterprise's regular way of doing business, and they had already set their sights on the next target, demonstrating a specific threat of repetition. Where the facts

alleged set forth a plausible claim for relief, this Court should deny the Defendants' motion to dismiss.

The full breadth of the enterprise's activities is within the possession of the Defendants, and where "a material part of the information needed is likely to be within the defendant's control" the Court should grant the Steiners "latitude…in applying the plausibility standard." *See Salvidar v. Racine*, 818 F.3d 14, 23 (1st Cir. 2016). Where the Steiners have set forth numerous events occurring over a several year span, it is at least plausible they will maintain a cause of action under the open-ended theory, which is sufficient to "unlock the doors of discovery." *See Ocasio-Hernandez*, 640 F.3d at 17.

C. Plaintiffs alleged sufficient predicate acts

Plaintiffs have also set forth plausible predicate acts to satisfy the "pattern of racketing" activity requirement. The Defendants engaged in numerous acts of mail fraud, interfered with commerce through threats and/or violence, tampered with witnesses and obstructed justice.

1. Mail and Wire Fraud

"To prove wire or mail fraud, the government must show: (1) a scheme [or artifice] to defraud by means of false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the issue of interstate wire or mail communications in furtherance of the scheme." *United States v. Martin*, 228 F.3d 1, 15 (1st Cir. 2000). Schemes or artifices to defraud "include everything designed to defraud by [material] representations as to the past or present, or suggestions and promises as to the future." *Durland v. United States*, 161 U.S. 306, 313 (1896); *Neder v. United States*, 527 U.S. 1, 24 (1999).

Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell and Zea mailed threatening, intimidating and harassing items to the Steiners, which was for the purpose of intimidating, threatening and coercing the Steiners, so that they would cease reporting on eBay, which in turn, would cause damage to the trade publication's business. The defendants admitted during their respective pleas that the intent of the campaign was "for the harassment and intimidation to distract the [Steiners] from publishing the newsletter, to change the newsletter's coverage of eBay, and ultimately to enable eBay to contact the victims to offer assistance with the harassment…". Therefore, by their own admissions, the goal of the conspiracy was to prevent the Steiners from continuing with their business in the usual course, to their detriment. A text from Defendant Wymer to Defendant Baugh also directed him to shut the website down.

    i.     Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell and Zea drafted and posted threatening Twitter messages, and sent threatening private messages to Ina and David Steiner through Twitter, an instrumentality of interstate commerce;

    ii.    Defendants Cooke, Popp, Gilbert, Stockwell and Zea admitted to mailing a book on surviving the death of a spouse and a bloody pig mask – veiled death threats – to the Steiners, in order to threaten and intimidate them into ceasing all reporting on eBay, financed by PFC;

    iii.    Defendants Wenig and Wymer conspired with the Defendants, including but not limited to Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell, Zea, and John and Jane DOE and others to stalk, threaten, harass, intimidate and silence the Steiners by use of the mail, through their

directive to "do whatever it takes" to take down the Steiners, and conspired with the other Defendants to commit the predicate acts, financed by PFC;

iv.    The mail transmissions described herein were made in furtherance of the Defendants' scheme and common course of conduct to threaten, intimidate, harass and silence the Steiners and their reporting on eBay, and use of the mail was foreseeable to all participants;

v.    Emails, texts and telephone calls with inquiries or meetings to conspire about the attacks on the Steiners;

vi.    Construct false identities and online avatars to deceive the Plaintiffs;

vii.    Mail and wire transmissions to carry out the scheme and common course of conduct, financed by PFC;

viii.    In May of 2012, Defendant eBay, or an employee acting on its behalf within the scope of his or her employment, fraudulently reported the EcommerceBytes website as a phishing site. At that point, as eBay was aware, EcommerceBytes had been operating as a legitimate website for over 13 years;

ix.    In August of 2019, the Defendants posed as the Steiners and subscribed to over 50 email subscriptions on computers paid for by PFC;

x.    Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell and Zea created fake avatars and identities on Twitter, and contacted the Steiners using threats of violence, intimidation and coercion in order to prevent any further reporting on eBay. Harville admitted in his plea that Tweets were part of interstate commerce.  Defendants Popp, Stockwell, Zea, and Gilbert

admitted to creating the false Twitter accounts, and using them to attack the Steiners, on computers paid for by PFC.  Defendants Popp, Gilbert, Stockwell and Zea admitted during their plea hearings that they then created other accounts to attempt to conceal their illegal actions;

xi.     The Defendants, including but not limited to Defendants Gilbert, Stockwell, Popp and Zea, posted fraudulent Craigslist and other classified websites, inviting strangers to the Steiners home for sex and estate sales, on computers paid for by PFC;

xii.    Defendants Wenig and Wymer directed the conspiracy through the use of wire communications, where they discussed taking down the Steiners over text and email and ordered other employees and/or contractors to carry out their directives;

xiii.   Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell and Zea admitted during their plea hearings that they conspired to and did obstruct justice by destroying evidence and tampering with witnesses through the use of wire communications, where they discussed deleting all phone, social media activity and email activity over Whatsapp, an instrument of interstate commerce;[29]

---

[29] As revealed during the investigation conducted by Morgan Lewis, Defendant Wymer also obstructed justice by deleting text messages, making false statements, and misleading investigators while staying in contact with Defendant Baugh as to the progress of the Natick Police investigation.

xiv.　　The wire transmissions and communications were made in furtherance of the Defendants' scheme and common course of conduct to intimidate and threaten any members of the public who engaged in reporting on eBay;

xv.　　In furtherance of the scheme to defraud, it was reasonably foreseeable that interstate wire communications would be used, and interstate wire communications were in fact used. Defendants caused to be transmitted by means of wire communication in interstate commerce numerous communications that were designed to defraud Plaintiffs out of property and money, and to cause reputational harm.

2.　Multiple violations of 18 U.S.C. § 1510 by obstructing justice.

viii.　Defendants Popp, Zea and Stockwell pled guilty to conspiracy to obstruct justice;

ix.　　Once the Defendants realized members of the Natick Police Department were investigating their conduct, Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell and Zea destroyed evidence, lied to investigators and misled the Natick Police investigation in order to both further and conceal their racketeering activity;

x.　　Defendants Popp, Stockwell, and Zea did plead guilty to conspiracy to obstruct justice. During their plea hearings, the Defendants admitted to destroying evidence, including deleting electronic communications, and lying to police;

xi.　　Defendant Baugh also contacted Defendant Wymer, and requested he institute the previously promised "manage any bad fallout" from

55

Defendants Wenig and Wymer, thereby conspiring to obstruct justice.

Defendant Wymer did, in fact, delete text and email communications,

thereby obstructing justice.

3. <u>Multiple violations of 18 U.S.C. § 1512 by conspiring to tamper with witnesses and victims.</u>

ii.   Defendants Gilbert and Cooke pled guilty to conspiracy to tamper with

witnesses;

iii.   "Tampering with a witness, victim or an informant," provides in pertinent

part:

> (2) Whoever uses physical force or the threat of physical force
>
> against any person, or attempts to do so, with intent to –
>
> (C) hinder, delay, or prevent the communication to a law
>
> enforcement officer…information relating to the commission or
>
> possible commission of a Federal offense…
>
> shall be punished…

iv.   Here, the Defendants, including but not limited to, Defendants Baugh,

Harville, Cooke, Gilbert, Popp, Stockwell, Zea and others used the threat of

physical force to hinder, delay or prevent the Steiners from reporting and

communicating with officers to report the Defendants' activities;

v.   Defendants Baugh, Harville, Gilbert, Cooke and Popp did prevent each

other and other members of the conspiracy from speaking with police, and

influenced their communications with Natick Police detectives;

vi.   Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell and Zea also

conspired to and did call Ina Steiner with the purpose of intimidating,

threatening and coercing her to hinder, delay or prevent her cooperation

with the Natick Police Department or any investigation. These actions were

intended to engender positive feelings towards eBay and disguise eBay's

involvement, by aligning themselves with the Steiners, dubbed the "White

Knight Strategy." Such a sophisticated plan lends the inference that the

Defendants had done it before. The internal investigation noted Defendant

Wymer was "inexperienced" which lent the means for such a plan;

vii.     It was reasonably foreseeable to Defendants eBay, Wenig and Wymer that

the other Defendants would use means to cover-up the conspiracy, where

the Defendants were strategically hired for their unique expertise and skills,

including prior law enforcement and military experience. Additionally, the

culture within eBay required the Defendants to protect eBay, so it was

reasonably foreseeable that the Defendants would utilize means to ensure

eBay's involvement in the conspiracy was not detected by outside law

enforcement.

D.  <u>Contrary to the Defendants claim the Plaintiffs have no standing, they have plead a
sufficient injury to establish a RICO claim.</u>

Under Title 18 U.S.C. § 1964(c), a RICO plaintiff has standing where "he has been

injured in his business or property by the conduct constituting the violation. *See Sedema,*

*S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985). Plaintiffs must demonstrate the

defendant's RICO violation was the "but-for" cause-in-fact of his injury, and that it was

the legal or proximate cause. *See Holmes v. S.I.P.C.*, 503 U.S. 258, 265-68 (1992).

Plaintiffs have plead sufficient facts to demonstrate they were damaged in their

business and property. The enterprise interfered with the Steiners' contractual relations

with freelance writers, advertisers and sources. The Defendants' actions have caused the Steiners to become suspicious of freelance writers, advertisers and sources, thus hindering their ability to use these critical resources. The Defendants' actions have also caused sources to not to want to associate with the Steiners, for fear that the Defendants will likewise target them. This also has a direct correlation to the amount of content the Steiners are able to produce for EcommerceBytes and the newsletters, affecting website traffic and advertisements. In turn, EcommerceBytes revenue has also decreased. Complaint at 78-79, ¶¶ 276-277.

Furthermore, Defendants Baugh, Harville, Cooke, Gilbert, Popp, Stockwell and Zea all admitted during their plea hearings that "Senior executives[30] at eBay were frustrated with the newsletter's tone and content, and with the tone and content of comments that appeared underneath the newsletter's articles online," and that as a result, the intent of the campaign was "for the harassment and intimidation to distract the [Steiners] from publishing the newsletter, to change the newsletter's coverage of eBay, and ultimately to enable eBay to contact the victims to offer assistance with the harassment…". Therefore, by their own admissions, the goal of the conspiracy was to prevent the Steiners from continuing with their business in the usual course, to their detriment. A text from Defendant Wymer to Defendant Baugh also directed him to shut the website down.

Moreover, while the First Circuit has not yet decided the issue, several courts have held that reputational damage can constitute a RICO injury. *See e.g., Lewis v. Lhu*, 696 F.Supp. 723 (D.D.C. 1988); Securitron *Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262 (2d Cir. 1995); *Spitzer v. Abdelhak*, 1999 WL 1204352 at *3 (E.D. Pa. Dec. 15, 1999);

---

[30] Defendants Wenig and Wymer

*Wang Laboratories, Inc. v. Burts*, 612 F.Supp. 441 (D.Md. 1984); *Alexander Grant and Co. v. Tiffany Industries, Inc.*, 770 F.2d 717 (8th Cir. 1985).

Furthermore, Plaintiffs have alleged that the Defendants purposefully obstructed justice, destroyed evidence, manipulated witnesses, and that the eBay investigation turned a blind eye to misconduct such that it would remain under wraps. In other words, one purpose of the eBay/PFC enterprise was to injure Plaintiffs' cause of action against the Defendants. A cause of action is a property right, *See Standard Oil Co. v. New Jersey*, 341 U.S. 428, 439 (1951), and the Defendants infringed upon that property right through their RICO activity. The Third Circuit reversed a district court's decision to dismiss a similar RICO claim, explaining:

> The district court dismissed the RICO claims predicated on the alleged obstructions of justice…because, it held, interference with a lawsuit did not constitute an injury to 'business or property' within the meaning of RICO. We believe, especially in light of the Supreme Court's intervening decisions in *Sedima*, that this constituted reversible error…A cause of action, of course, is a form of "property[.]"

> *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.,* 792 F.2d 341, 345 (3d Cir. 1986).

As set forth in the Complaint, the Defendants deleted text messages, emails, and WhatsApp messages. Defendants Baugh and Popp influenced the other Defendants during their interviews. Additionally, in an apparent attempt to contain the misconduct and distance itself from liability, eBay in-house counsel did not follow standard protocols during the investigation, allowing it to be easily manipulated. That eBay was attempting to absolve itself from liability is apparent from the email sent to the Steiners, and the public statement issued by CEO Jamie Iannone who alleged "[t]hose responsible for this matter

hid their actions from the company," even though the conduct began at the top.[31] Complaint at 91, ¶ 365. The public statement did not place any blame on Defendants Wenig and Wymer, stating only that "inappropriate" comments were made. *Id., contrast with* PowerPoint (eBay admitting Defendants Wenig and Wymer engaged in criminal acts and could be charged). It appears there is additional evidence the Steiners can obtain during discovery, which will shed more light on this claim, where Defendants Wenig and Wendy Jones were both interviewed, which eBay has admitted to during Defendants Baugh and Harville's criminal investigation. This would reveal whether eBay conducted a sham investigation, or whether they turned a blind eye to other misconduct among eBay agents.

Therefore, the conduct of all Defendants in obstructing justice by destroying evidence and manipulating the investigation into any wrongful conduct has hindered Plaintiffs ability to bring this lawsuit, which is a recognized property right.

At this stage, Plaintiffs need not "cite statistics, appraisals, attempts to sell, or other 'concrete evidence' to 'quantify' their [injury]." *Crimson v. Galeria Ltd. P'ship v. Healthy Pharms, Inc.,* 337 F.Supp.3d 20, 37-38 (D. Mass. 2018), quoting *Safe Street Alliance v. Hickenlooper*, 859 F.3d 865, 888 (10th Cir. 2017). The First Circuit has emphasized the low bar in demonstrating injury, and causation at the pleading stage. *See Efron v. Embassy Suites*, 223 F.3d 12, 15-16 (1st Cir. 2000) (noting "lack of causation seems to be a

---

[31] The sole purpose of the PowerPoint eBay presented to the Government was to convince the Government not to charge eBay criminally. In that PowerPoint, eBay admitted liability, including that its C-suite staff and other employees destroyed evidence, and claimed one reason the Government should not charge eBay was because it would make it right with the Steiners; instead, eBay has filed a motion to dismiss.

significant possibility" but "extremely generous reading of complaint might allow the inference" the defendants' actions caused the injury).

> E. <u>Contrary to Defendants PFC, Wenig and Wymer's assertions that there was no information to suggest PFC or Wenig operated or managed enterprise, there was evidence within the Complaint demonstrating all three parties were integral to carrying out the enterprise's activities.</u>

Defendants Wenig, Wymer and PFC claim there is no evidence contained within the Complaint to suggest they were involved in the "operation or management" of the enterprise.

A civil RICO plaintiff must allege that each defendant "conduct[ed] or participate[d] directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). The Supreme Court has interpreted this language to mean that the RICO defendant must have participated "in the operation or management of the enterprise." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). As the First Circuit has made clear, "a defendant who is 'plainly integral to carrying out the enterprise's activities may be held…liable under RICO." *See United States v. Ernst*, 502 F.Supp.3d 637, 661 (2020), quoting *United States v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997).

Not only did Defendants Wenig and Wymer personally issue the directives which set the conspiracy into action, the Defendants promised "top cover" should the plan go south. Immediately after learning that the Natick Police Department had determined Defendant Zea was associated with eBay, Defendant Baugh emailed Defendant Wymer requesting the promised cover. While the Steiners do not yet have access to the ensuing conversations, one day later Defendant Wenig emailed Defendant Baugh that the "cavalry is back" and that he would be returning the next day. R545. Common sense and reasonable inferences demonstrate that Defendants Wenig and Wymer – who would have known of

their directives – were just as involved in the cover up as Defendant Baugh and the other

Defendants.

As to PFC, Defendant Zea – who was a PFC employee – booked Defendant Baugh

and Harville's plane tickets to Boston. eBay and PFC were utilizing an "expensing

loophole" so PFC could finance the conspiracy. Where the enterprise was using PFC

resources and employees, and the relationship with eBay was through Defendant Baugh,

Plaintiffs have set forth a plausible claim that PFC was "plainly integral to carrying out the

enterprise's activities." *See Ernst*, 502 F.Supp.3d at  661.

At this stage, Plaintiffs have set forth a plausible claim for relief under the RICO

claim.

F.   Plaintiff's also set forth a plausible claim of a RICO Conspiracy.

To prove a conspiracy under 18 U.S.C. § 1962(d), all that is necessary is to

demonstrate the particular defendant agreed with one or more co-conspirators to participate

in the conspiracy. *See Aetna Causualty Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1562 (1st

Cir. 1994). The agreement need not be express, "so long as its existence can plausibly be

inferred from words, actions, and the interdependence of activities and persons involved."

*Id.*, citing *United States v. Concemi*, 957 F.2d 942, 950 (1st Cir. 1992).

The agreement should be "to further [the] endeavor which, if completed, would

satisfy all of the elements of a substantive [RICO] offense." *United States v. Rodriguez-*

*Torres*, 939 F.3d 16, 23-24 (1st Cir. 2019), quoting *Salinas v. United States*, 522 U.S. 52,

65 (1997). Under a RICO conspiracy under § 1962(d), the Defendants need not have

personally participated in the operation or management of the enterprise in order to be held

liable. *See Ernst*, 502 F.Supp. 3d at 657-58.

Even a defendant who does not know the "entire conspiratorial sweep" is "nevertheless jointly and severally liable, in the civil context, for all acts in furtherance of the conspiracy." *Aetna Causualty Sur. Co.*, 43 F.3d at 1562; *United States v. Boylan*, 898 F.2d 230, 242 (1st Cir. 1990) ("A RICO conspiracy does not demand…that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with all other defendants.").

Where each of the Defendants agreed to participate to both "take down" the Steiners, and then obstruct the investigation, including Defendant Wenig who was returning from sabbatical with the "cavalry" during the investigation, and Defendant Wymer who promised "top cover," and Defendant PFC, who financed this conspiracy, even if this Court finds each of the Defendants did not operate or manage the enterprise, Plaintiffs have set forth a plausible claim for relief for conspiracy under 18 U.S.C. § 1962(d).

**IV.   Plaintiffs have set forth a plausible claim for relief for a violation of Title II, Ch. 12, § 11I (Massachusetts Civil Rights Act Violation) where the Defendants engaged in conduct constituting threats and intimidation, for the purpose of hindering their freedom of speech and the press. (All Defendants Except eBay)**

The Steiners have set forth a plausible claim for relief under Title II, Ch. 12, § 11I with respect to each Defendant. In order to demonstrate a violation of the Massachusetts Civil Rights Act, the Plaintiffs must prove: (1) his/her exercise or enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth; (2) have been interfered with, or attempted to be interfered with; and (3) that the interference or attempted interferences was by threats, intimidation or coercion. *See* Title

II, Ch. 12, § 11I; *Mancuso v. Mass. Interscholastic Ath. Ass'n*, 453 Mass. 116, 130-131 (2009).

"A 'threat' is 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League v. Blake*, 417 Mass. 467, 474 (1994). Intimidation "involves putting one in fear for the purpose of compelling or deterring conduct." *Id.* Coercion "is the application to another of force to constrain him to do against his will something he would not otherwise have done." *Id.*; *Deas v. Dempsey*, 403 Mass. 468, 471 (1988).

While the Defendants cite to an unpublished Massachusetts Superior Court decision setting forth the requirement of a "physical confrontation," the Supreme Judicial Court has left open the question of whether physical confrontation is required to sustain a cause of action for a violation of the Civil Rights Acts. *See Freeman v. Plan. Bd. of W. Boyston*, 419 Mass. 548, 566 n. 18 (1995) ("We assume without deciding that certain forms of oppression or domination not involving physical force might constitute coercion under the Act…"). *See also Ayasli v. Armstrong*, 56 Mass. App. Ct. 740, 752 (2002) (noting decisions inconsistent on whether physical force required); *Acciavatti v. Professional Serv. Group, Inc.,* 982 F. Supp. 69, 78 (D. Mass. 1997) (remarking physical confrontation not always required).

Contrary to the Defendants' assertions, the Steiners have set forth a plausible claim for relief under the Civil Rights Act where all three elements are satisfied. First, the Steiners were exercising their right to free speech and freedom of the press when the Defendants engaged in the scheme to attempt to shut them down. *See Batchelder v. Allied*

*Stores Corp.*, 388 Mass. 83, 88-90 (1983) (suggesting Article 16 falls within Civil Rights Act for cause of action against private entity).

Second, the Steiners have set forth sufficient evidence to suggest the Defendants attempted to interfere with their right to free speech and freedom of the press. The entire goal of the conspiracy was to put an end to the Steiners' reporting, and at least according to one text message between Defendants Baugh and Wymer, to shut down the entire website. R370-371.

Third, the Defendants engaged in threats, oppression and coercion to interfere with the Steiners' constitutional rights. Defendants Popp and Stockwell drafted threatening Twitter messages, while Defendants Baugh, Harville, Cooke and Gilbert approved the messages, and the messages directly threatened Steiner to stop reporting. Defendants Baugh, Harville, Popp and Zea physically menacingly stalked the Steiners and their residence, and in conjunction with the Twitter messages, made apparent this was due to EcommerceBytes.  The Defendants mailed a bloody pig mask from the movie SAW, a book on surviving the death of a spouse and a funeral wreath to the Steiner residence, all clear death threats.

Defendant PFC financed the operation by paying expenses including plane tickets, hotel rooms, car rentals, meals, gift cards, and laptop purchases.  The entire conspiracy could not have existed without the financial support of PFC.  Defendant eBay admits in their PowerPoint presentation that PFC's involvement created an "expensing loophole" that allowed Defendants access to funds absent any oversight from PFC or eBay, which they termed "off-the-grid" financing of the conspiracy's activities.  R12.

While Defendants Wenig and Wymer allege they did not physically engage in any threats, oppression or coercion, the whole purpose of their directive to take down Ina Steiner, and burn her down was in response to her reporting. Therefore, the logical inference is that their intent was to curtail the Steiners' right to freedom of speech and the press. Where Defendants Wenig and Wymer encouraged the conduct, knew of the conduct and the Defendants ultimately committed the Civil Rights violation, the Steiners have set forth a plausible claim that Defendants Wenig and Wymer aided and abetted the other Defendants. *See Massachusetts Port Authority v. Turo Inc.,* 487 Mass. 235, 244 (2021); *Kyte v. Philip Morris, Inc.*, 408 Mass. 162, 168-169 (1990).

Where all three elements of a Civil Rights Violation are met, the Steiners have set forth a plausible claim for relief.

### V.   Plaintiffs have set forth a plausible claim for relief for defamation where the Defendants made statements damaging the Steiners' reputation, which caused them injury. (All Defendants except Defendants eBay and Baugh)

In order to sustain a claim of defamation, the Plaintiff must demonstrate, (1) the defendant made a statement concerning the plaintiff, to a third party, (2) the statement could damage the plaintiff's reputation in the community, (3) the defendant was at fault in making the statement, and (4) the statement either caused the plaintiff economic loss, or is actionable without proof of economic loss. *See Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630 (2003).

Four types of statements are actionable without proof of economic loss: (1) statements that constitute libel; (2) statements that charge the plaintiff with a crime; (3) statements that allege the plaintiff has certain diseases; and (4) statements that may prejudice the plaintiff's profession or business. *See Sharfir v. Steele*, 431 Mass. 365, 373

(2000); *Lynch v. Lyons,* 303 Mass. 116, 118-119 (1939). Where the statement falls within one of the four exceptions, the plaintiff may recover for noneconomic losses, such as emotional injury or damage to reputation. *Sharfir*, 431 Mass. at 373; Restatement (Second) of Torts, § 623.

A statement is considered to prejudice a person's profession or business "if it alleges that the plaintiff lacks a necessary characteristic of the profession." *Ravnikar*, 438 Mass. at 631, citing Restatement (Second) of Torts, § 573 ("One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession…is subject to liability without proof of special harm").

The statement may be published in writing or some other medium (in which case it is designated as libel), or orally (in which case it is designated as slander). *Ravnikar*, 438 Mass. at 629, citing *Draghetti v. Chmielewski*, 416 Mass. 808, 812 n. 4 (1994); Restatement (Second) of Torts, § 568 (1977). A "statement" for purposes of defamation means "'communication that tends to 'harm the reputation of another.'" *Jimenez-Nieves v. United States*, 682 F.2d 1, 17 (1st Cir. 1982); Restatement (Second) of Torts, § 559 ("A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."). A "communication" is interpreted broadly, and need not include only verbal and written statements, but also encompasses any activity whereby "one person has brought an idea to the perception of another," or communicates an idea to a third party. *Id.*

Plaintiffs have set forth a plausible claim for defamation where the act of sending the "Barely Legal" magazines to the Steiners neighbors in David Steiner's name, dubbing

the Steiners as "Persons of Interest" and associating the Steiners as swingers, as members

of the Communist Party, as people engaging in sex with animals,  and having sex parties

all fall within the definition of defamation, and where the Defendants harbored an

improper motive in engaging in this conduct. The Defendants also admitted to attempting

to make the Steiners look "crazy" and referred to Ina Steiner as a "troll."

Moreover, the Twitter posts suggested Ina Steiner was biased, that she was

destroying families due to her reporting, and other negative connotations where the

statements "allege[d] that the plaintiff lacks a necessary characteristic of the profession" of

a journalist. *Ravnikar*, 438 Mass. at 631.

Taken in its totality, the Complaint has set forth sufficient facts to demonstrate a

plausible claim for relief for defamation.

### VI. Plaintiffs have set forth a plausible claim for relief for trespassing where all Defendants either entered the Steiner property without permission, or aided the trespass.  (All Defendants Except eBay and Defendant Baugh)

To sustain a claim for trespass a plaintiff must show "(1) plaintiff's actual

possession of the property at issue and (2) an intentional and illegal entry by defendant."

*New England Box Co. v. C&R Constr. Co.*, 313 Mass. 696, 707 (1943).

To demonstrate a defendant aided and abetted a trespass, the plaintiffs need only

demonstrate that (1) one of the other defendants committed the relevant tort; (2) that the

defendant knew the other defendants were committing the relevant tort; and (3) that the

defendant actively participated in or substantially assisted in the commission of the tort.

*See Massachusetts Port Authority v. Turo Inc.,* 487 Mass. 235, 244 (2021); *Kyte v. Philip*

*Morris, Inc.*, 408 Mass. 162, 168-169 (1990) (charge of aiding and abetting requires proof

that defendant knew of substantial, supporting role in unlawful enterprise); *Brown v.*

*Perkins*, 83 Mass. 89, 1 Allen 89, 98 (1861) ("any person who is…encouraging or exciting [a trespass]…or who in any way or by any means countenances or approves the same, is in law deemed to be an aider or abettor"). Substantial assistance can be established by demonstrating that the alleged abettor's actions were a "substantial factor" in the trespasser's "ability to perpetrate" the trespass. *Massachusetts Port Authority,* 487 Mass. at 244.

The Steiners have set forth a plausible claim for trespassing as to all defendants. Defendants Baugh, Harville, Zea and Gilbert physically entered the Steiners' property, and Defendants Wenig, Wymer, Popp, Cooke, and Stockwell aided and abetted the trespass. PFC is vicariously liable where Zea was acting within the scope of her employment at the time of the trespass.

### Defendants Baugh, Zea and Gilbert

On or around June 8, 2019, Defendant Gilbert flew from California to Boston, then drove to the Steiner residence in Natick, entered onto the Steiner's property, and scrawled "Fidomaster" on their fence. P. 14, § 54.  This constituted both a physical trespass, and a trespass to chattels. *See Richardson v. Ne. Hosp. Corp.*, 883 N.E.2d 342 (Mass. App. Ct. 2008).

On August 15, 2019, Defendants Baugh, Harville and Zea approached the Steiner home in an attempt to install a GPS on the Steiner vehicle, but were unable to do so only because the vehicle was parked in the garage.  Complaint at 28, § 104. This constituted an unlawful entry onto the Steiner property.

*Defendant Popp*

While Defendants Baugh, Harville and Zea attempted to install the GPS device on the Steiner vehicle, Defendant Popp monitored the NPD dispatch so she could alert the other defendants of any police detection. This constituted substantial assistance in the trespass, where Defendant Popp was assisting the others in avoiding apprehension. As such, Plaintiffs have set forth a plausible claim that she aided and abetted the trespass. *See Massachusetts Port Authority.,* 487 Mass. at 244.

*PFC*

Defendant Zea physically trespassed onto the Steiner property while acting within the scope of her employment with PFC, as discussed *supra* in "Personal Jurisdiction." As such, Plaintiffs have set forth a plausible claim that PFC, who financed the conspiracy, is vicariously liable for the Defendant Zea's trespassing onto the Steiner property.

PCF was also an aider and abettor in this conduct where it financially facilitated Defendants Zea, Baugh and Harville's trip to Natick including the purchase of first-class airline tickets, the payment of hotel rooms, the rental of cars, the payment of meals, the funds to purchase and send a pig mask, a funeral wreath a book about the death of a spouse, live spiders, as well as gift cards, and the purchase of laptops. *See Massachusetts Port Authority,* 487 Mass. at 244; *Kyte*, 408 Mass. at 168-169.

**VII.    Plaintiffs have set forth a plausible claim for relief for false imprisonment where the Defendants engaged in threats, with the purpose of confining the Steiners to their home. (All Defendants)**

False imprisonment is the intentional, unjustified confinement of a person, directly or indirectly, by force or by threat, of which that person is conscious of or by which he or she is harmed. *Ortiz v. Hampden County*, 16 Mass. App. Ct. 138, 140 (1983).

It is not necessary to demonstrate that the restraint was the result of force or violence, or physical contact. *Sweeney v. F.W. Woolworth Co.,* 247 Mass. 277, 142 N.E. 50 (1924). A mere threat of physical force can result in a restraint of liberty. *McCann v. Wal-Mart Stores, Inc.*, 210 F.3d 51, 54 (1st Cir. 2000). If a person is restrained by fear, that amounts to false imprisonment. *See Jacques v. Childs Dining Hall Co.*, 244 Mass. 438, 138 N.E. 843 (1923). In other words, a person who relinquishes the right to move about freely as the only available alternative is restrained for purposes of the tort of false imprisonment. *See Foley v. Polaroid Corp*, 400 Mass. 82 (1987); *Coblyn v. Kennedy's Inc.*, 359 Mass. 319, 321 (1971) ("If a man is restrained of his personal liberty by fear of a personal difficulty, that amounts to 'false imprisonment' within the legal meaning of such term.").

A person may be held liable for false imprisonment even though he did not directly impose a restraint upon the liberty of another where he causes such restraint to be imposed. *See Sarvis v. Boston Safe Deposit and Trust Co.,* 47 Mass. App. Ct. 86, 98 (1999).

Here, the Defendants intentionally made the Steiners afraid to leave their home, falsely imprisoning them. They threatened to kill the Steiners and followed the Steiners. The Defendants also intentionally made the Steiners fear visitors at their front door, by placing advertisements for sex parties and yard sales to send strangers to their home at all hours of the day and night.  The Defendants subjected the Steiners to around the clock harassment, package deliveries, threats, and ultimately, a car stalking the Steiners and their home. The Defendants doxed the Steiners by posting their address online.

The Defendants were aware that the Steiners made numerous phone calls to the police over threats to their safety and considered this a success in their goal to falsely

imprison the Steiners. The Defendants callously joked that the Steiners were "seeing ghosts, think everyone is following them and they call the police every 10 minutes," and "We know the targets have been impacts by this op." Complaint at p. 41, ¶ 162.

The Defendants' use of a Samoan sounding Twitter handle was not accidental and was intended to further intimidate the Steiners into confining themselves to their home. Complaint at 38, ¶ 141. One step further, Defendant Baugh informed the others that if the distraction campaign did not work, he would send the gang to the Steiners. R368, ¶ 45. This further evidenced the Defendants use of the Samoan handle was to establish continuity between the online harassment and threats to the real world, and use fear to imprison the Steiners in their home.

As intended, the Steiners remained in their home and cancelled countless visits they had planned with friends and family out of fear they would expose their loved ones to the stalking campaign. Not knowing who was following them and what could happen, they were in fear for their own lives, and the lives of their loved ones. The Steiners installed a dashcam in the rear window of their car to detect and record anyone following them. The Steiners also installed numerous surveillance cameras outside of their home, and manned the cameras at all hours of the day and night, separating themselves in the house so they could determine whether someone was entering any area of their home.

Under these circumstances, where the Steiners relinquished their right to leave their home for fear of what could occur next, they have set forth a plausible claim for false imprisonment. *See Foley v. Polaroid Corp*, 400 Mass. 82 (1987); *Coblyn v. Kennedy's Inc.*, 359 Mass. 319, 321 (1971).

**VIII.   Plaintiffs set forth a plausible claim for relief for civil conspiracy where all Defendants either engaged in the conspiracy to harass, threaten and stalk the Steiners, or engaged in planning the common design to do a wrongful act. (All Defendants except eBay and Gilbert)**

In Massachusetts, a civil conspiracy requires (1) "a common design or an agreement…between two or more persons to do a wrongful act" and (2) "proof of some tortious act in furtherance of the agreement." *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994). To establish civil conspiracy, a plaintiff must provide "evidence that the defendants agreed together" to commit an underlying tort. *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 772 N.E.2d 552, 568 (Mass. 2002).

This theory of liability is "akin to a theory of common law joint liability in tort." *Aetna Cas. Sur. Co.*, 43 F.3d at 1564. It denotes vicarious liability in tort for "concerted action." *Id.* Therefore, it supports liability of one person for a tort committed by another, as long as there was an agreement to do a wrongful act, and one of the co-conspirators commits a tortious act in furtherance of the agreement. *Id.*; *New England Foundation Co. v. Reed*, 209 Mass. 556, 95 N.E. 935, 935 (1911).

While meeting in eBay conference rooms, discussing plans on WhatsApp, and through other communications, the Defendants conspired to inflict emotional distress on the Steiners, then bragged about how much the Steiners were affected, and they planned the stalking, threats and harassment which would be effectuated through Twitter, deliveries and ultimately a trip to Boston.

The conduct began with the directives from Defendants Wenig and Wymer to take down Ina Steiner, and burn her to the ground. These texts evince and "agreement to do an unlawful act."  It is irrelevant that Defendants Wenig and Wymer did not actually carry out any of the acts, where the other Defendants carried out the tortious acts in furtherance of

the agreement. *See Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994).

Taking the totality of the Complaint, and supplying all inferences in favor of the Steiners, they have set forth a plausible claim for relief for civil conspiracy. *See Rodriguez-Reyes*, 711 F.3d at 56 (plausibility of claim does not require "a high degree of factual specificity"); *Grajales v. Puerto Rico*, 682 F.3d 40, 47 (1st Cir. 2012)

*Intra-Corporate Conspiracy Doctrine*

Defendants Wenig, Wymer, Baugh, Popp, Stockwell and Zea maintain the intra-corporate conspiracy doctrine precludes liability on this count because all individual defendants were employed by eBay, or contracted by eBay through PFC, so they are considered all "agents of the same legal entity" and one cannot conspire with himself.

This claim fails where the Steiners clearly set forth in the Complaint that Defendant Zea was an employee of PFC, and that her acts were taken within the scope of her employment with PFC. Complaint at p. 2, ¶¶ 4, 5, 13.

In order for the intra-corporate conspiracy doctrine to apply, the agents must be a part of the same legal entity. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769-71 (1984) ("an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy"). A civil conspiracy can exist among corporations. *See Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867 (2017); *Williams v. Northfield Mount Hermon Sch.,* 504 F. Supp. 1319, 1327 (D. Mass. 1981).

Defendant Zea was acting within the scope of her employment with PFC during the conspiracy, and all other defendants were acting within the scope of their employment with eBay. A contractor is a non-agent of the corporation, and the intra-corporate doctrine

protects agents only of a corporation principal. *See King's Choice Neckwear, Inc., v. FedEx Corp.,* 2007 U.S. Dist. LEXIS 93843 (Dist. N.J. 2007).

Additional discovery will reveal the full extent of Defendant Zea's relationship with both PFC and eBay, however at this stage, the Steiners have set forth sufficient facts to demonstrate Defendant Zea is an employee of PFC, and that PFC and eBay were two separate agencies, rendering the intra-corporate conspiracy defense inapplicable.

IX.     **Plaintiffs have set forth a plausible claim for relief for tortious interference with business relations where the Defendants were aware of the Steiners business relationship with sources, subscribers, readers and advertisers, and purposely interfered with the relationships, causing injury to the Plaintiffs.  (All Defendants).**

To establish a claim of tortious interference with business, a plaintiff must establish he (1) had a business relationship for economic benefit with a third party; (2) the defendants knew of the relationship; (3) the defendants interfered with the relationship through improper motive; and (4) that the interference caused the plaintiff harm. *See Kurker v Hill*, 44 Mass. App. Ct. 184, 191 (1998); *Mullane v. Breaking Media, Inc.,* 433 F.Supp.3d 102, 113 (D. Mass. 2020).

As to the first element, the Defendants interference must be with an "advantageous business relationship between plaintiff and a third party." *See Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 855 N.E. 2d 1137, 1141 (2006). This entails demonstrating only that the plaintiff "had a business relationship for economic benefit with a third party." *Guest-Tek Interactive Entm't, Inc. v. Pullen*, 731 F. Supp. 2d 80, 86 (D. Mass. 2010).

As to the third element, the improper conduct must extend "beyond the interference itself." *James L. Miniter Ins. Agency, Inc. v. Ohio Indemnity Co.,* 112 F.3d 1240, 1250 (1st Cir. 1997). Violation of a statute or common law, or use of threats provides sufficient

improper motive or means. *Draghetti v. Chmielewski*, 416 Mass. 808, 626 N.E.2d 862, 869 (Mass. 1994). "Improper motive or means" can include defamation. *Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 817 (1990).

Here, as set forth in the Complaint, Plaintiffs had a number of sources who would provide Ina Steiner with material for both the Newsletters and the EcommerceBytes website, which would increase readership and generate profits. Additionally, the Steiners have subscribers who read both the website and the Newsletters. Without material for both the EcommerceBytes website and the Newsletters, the Steiners were unable to provide the level of content expected by their readers. Moreover, because of the decrease in content, and in turn readership, the Steiners lost advertisers, causing a direct decline in revenue. This information is sufficient to demonstrate an "advantageous business relationship between plaintiff and a third party." *See Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 855 N.E. 2d 1137, 1141 (2006).

Moreover, the entire object of the Defendants' conduct was to "take down" the Steiners using whatever means available. This is sufficient to demonstrate interference with the business relationship with an improper motive. *See Kurker v Hill*, 44 Mass. App. Ct. 184, 191 (1998). The Defendants carried out the goal by defaming them online through Tweets and online postings on Craigslist, threatening them to stop reporting on eBay, claiming it was "destroying lives," and even went so far as to attempt to place a GPS device on the Steiner vehicle in an attempt to determine the identities of their sources, all of which caused the Steiners harm. *Id.*

Plaintiffs also set forth in the Complaint that sources have ceased sharing information with the Steiners, causing their output to decrease, and thus their revenue through the website to decline. Where the purpose of the Defendants' conduct was to interfere with the relationship between the Steiners and their sources.

Given the low standard for demonstrating plausibility, the Steiners have set forth sufficient evidence to demonstrate the Defendants are not entitled to dismissal of the tortious interference with business relations claim.

**X.     The Plaintiffs have set forth a plausible claim that eBay ratified the Defendants' conduct. (All Defendants Except Wenig and Wymer)**

As eBay has conceded, Massachusetts has not yet addressed the issue of whether allowing an employee to voluntarily resign, as opposed to terminating him, so that he can obtain a $57million severance package can, as a matter of law, amount to ratification of the behavior. (eBay motion to dismiss at 31).

"A corporate officer is personally liable for a tort committed by the corporation that employs him, if he personally participated in the tort by, for example, directing, controlling, approving or ratifying the act that injured the aggrieved party." *Conning v. Halpern*, 2020 U.S. Dist. LEXIS 178635 (D. Mass. 2020); *Townsends, Inc. v. Beaupre*, 47 Mass. App. Ct. 747, 751 (Mass. App. Ct. 1999). "The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery…A principal may be liable when it ratifies an originally unauthorized tort." *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094, 1110-11 (2009).

Here, eBay and PFC both ratified the conduct of their employees. The members of the conspiracy charged criminally were fired, but Defendant Wenig was permitted to

voluntarily resign and maintain his severance package. Defendant Cooke was promoted as Director of Security, and was not fired until he was charged criminally despite the fact that the eBay investigation would have revealed his participation in the conduct.

Moreover, the obsessive tracking of the Steiners and EcommerceBytes went on for months, and included a trip Defendant Gilbert made to Natick to scrawl "Fidomaster" on the Steiners' fence. Defendants Baugh, Harville and Zea disappeared for days on end, and there were a number of meetings on eBay property relating to the conspiracy. Other John and Jane Doe employees were present during the planning stages. Despite this, the conspiracy was able to not only carry on, but thrive. Where the conduct was "open and notorious," a company can be said to have ratified the conduct. *See McKenney v. New York City Off-Track Betting Corp.*, 903 F.Supp. 619, 621 (S.D.N.Y. 1995).

Additionally, eBay legal counsel presented Powerpoint to the Government in order to convince the Government not to prosecute executives and eBay as a result of the incident. This attempt to absolve wrongdoers of criminal liability sets forth a plausible claim of ratification.

Ultimately, the Steiners have set forth a plausible claim for ratification, so this Court should deny eBay's motion to dismiss as to this claim.

XI.    **Defendant PFC's claim that Massachusetts lacks personal jurisdiction over the company fails where its agent, Defendant Zea, caused injury in Massachusetts.**

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction 'is the functional equivalent of a state court sitting in the forum state." *Daynard v. Ness Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 51 (1st Cir. 2002). Accordingly, personal jurisdiction is assessed through the

lens of the Massachusetts long-arm statute and the Constitution. *Lyle Richards Int'l, Ltd. V. Ashworth, Inc.,* 132 F.3d 111, 112 (1st Cir. 1997). Because courts construe "the Massachusetts long-arm statute as being coextensive with the limits permitted by the Constitution," this Court may "turn directly to the constitutional test for determining specific jurisdiction." *Adelson v. Hananel*, 652 F.3d 75, 80 (1st Cir. 2011).

The Massachusetts long-arm statute "deals with torts committed by persons who have no ongoing relationship with the forum state," and applies when the act causing the injury occurs in Massachusetts. *Bay Promo, LLC v. Alaniz*, 2021 U.S. Dist. LEXIS 82088 (D. Mass. 2021), *quoting Ticketmaster-N.Y., Inc. v. Alioto*, 26 F.3d 201, 205 (1st Cir. 1994). The long-arm statute does not require that a defendant be physically present in Massachusetts at the time the plaintiff was injured, as long as the act that is the "but for" cause of the injury was purposely directed at the plaintiff in Massachusetts. *Id.*

Here, the long-arm statute applies where Defendant Zea – acting as an agent for PFC – both directed acts at the Steiners from California into Massachusetts, and where Defendant Zea physically travelled to Massachusetts and caused the Steiners injury in Massachusetts. Cf. *Bay Promo, LLC v. Alaniz*, 2021 U.S. Dist. LEXIS 82088 (D. Mass. 2021),

Since the Massachusetts long-arm statute applies, the next question is whether exercising personal jurisdiction over PFC satisfies constitutional due process requirements. Personal jurisdiction over a defendant is constitutionally sound if the requirements for exercising either specific or general jurisdiction over the defendant apply. *Cossaboon v. Me. Med. Ctr.*, 600 F.3d 25, 31 (1st Cir. 2010).

Specific jurisdiction exists where the plaintiff's cause of action arises from or relates directly to the defendant's contacts with the forum state, *Prizker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994); general jurisdiction is broader, and "subjects the defendant to suit in the forum state's courts 'in respect to all matters, even those that are unrelated to the defendant's contacts with the forum.'" *Cossaboon*, 600 F.3d at 31, quoting *Phillips Exeter Acad. V. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir. 1999). The First Circuit applies a three factor tests in determining whether specific jurisdiction is appropriate: "(1) whether the claims arise out of or related to the defendant's in-state activities, (2) whether the defendant has purposefully availed itself to the laws of the forum state, and (3) whether the exercise of jurisdiction is reasonable under the circumstances." *Pesmel N. Am., LLC v. Caraustar Indus., Inc,*, 754 F. Supp. 2d 168, 172 (D. Mass. 2010).

The first prong, relatedness, "'is a flexible, relaxed' standard that focuses on the nexus between the plaintiff's claim and the defendant's contacts with the forum state." *Id.,* quoting *Astro-Med*, 591 F.3d at 9. One co-defendant may have its contacts with a state imputed to another co-defendant where the co-defendants lead "the public to believe they were co-venturers" or where one co-defendant ratifies the other co-defendant's transactional contact with the forum state by "knowingly accepting the benefits of the transaction." *Daynard*, 290 F.3d at 57, 60. '

The second prong, purposeful availment, requires some act or series of acts "by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The purposeful availment test "focuses on the defendant's intentionality," and "is only satisfied when the defendant purposefully and

voluntarily directs his activities towards the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." *United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 623-24 (1st Cir. 2001). The final prong, reasonableness, turns on a series of so-called "Gestalt factors," including: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. *Cossaboon*, 600 F.3d at 33 n. 3.

Here, all factors weigh in favor of subjecting PFC to personal jurisdiction. Defendant Zea was an employee of PFC at the time of the events, and she was acting within the scope of her employment as a security analyst contracted with eBay. *See Wang Labs, Inc. v. Bus. Incentives, Inc.*, 398 Mass. 854, 859 (1986) (employee's conduct falls within scope of employment if: (1) it is the kind for which he is hired to perform, (2) it occurs within the authorized time and space limits, and (3) it was motivated, at least in part, by a purpose to serve the employer"). As such, PFC is vicariously liable for her conduct.

The claims against PFC arise out of Defendant Zea's purposeful contacts with Massachusetts. Not only did Defendant Zea assist in sending packages to the Steiners in Massachusetts for the purpose of harassing and threatening them, she physically traveled to Natick, financed by PFC, to stalk, surveil, threaten and harass the Steiners, which she pled guilty to. *See Pesmel N. Am., LLC,* 754 F. Supp. 2d at 172.  Defendant PFC paid the travel expenses for Zea and other members including plane tickets, hotel rooms, car rentals,

meals.  Defendant PFC also funded the conspiracy by paying the expenses for the mailings of the pig mask, the funeral wreath, the spiders, the cockroaches, the gift cards, and the laptops.  Defendant Zea also purposefully availed herself to Massachusetts jurisdiction where all activities were voluntarily and purposely directed to Massachusetts. *Id.* Lastly, Massachusetts has an interest in adjudicating the dispute where citizens of California travelled into Massachusetts to torture Massachusetts citizens, the forum is more convenient for the Steiners, all but two causes of action deal with Massachusetts law, and all other Defendants will proceed in Massachusetts. *See Cossaboon*, 600 F.3d at 33 n. 3.

As such, PFC should be subjected to personal jurisdiction in Massachusetts.

**CONCLUSION**

Wherefore, the Plaintiffs respectfully request that this Court deny all Defendants' Motions to Dismiss.  In the alternative, if this Court deems that any claim is susceptible to being dismissed, Plaintiffs request that this court allow them leave to amend their complaint.

Respectfully submitted,
INA AND DAVID STEINER
By their attorney,

/s/ Rosemary Curran Scapicchio
Rosemary C. Scapicchio, BBO No. 558312
Law Office of Rosemary Scapicchio
107 Union Wharf
Boston, MA 02109
617.263.7400
Rosemary@Scapicchiolaw.com

Respectfully submitted,
STEINER ASSOCIATES, LLC
By its attorney,

/s/ Jillise McDonough
Jillise McDonough, BBO No. 688694
Law Office of Jillise McDonough
107 Union Wharf
Boston, MA 02109
617.263.7400
Jillise@Scapicchiolaw.com

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by complying with this Court's directives on electronic filing.

Dated:   May 23, 2022                         Signed: /s/ Jillise McDonough