# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT COURT OF MASSACHUSETTS

|  |  |
|---|---|
| Ina Steiner, | |
| David Steiner, | |
| Steiner Associates, LLC, | |
|     (*Publisher of EcommerceBytes*) | CASE NO: 1:21-cv-11181 |
|         Plaintiffs | |
| | |
|    vs. | |
| | |
| | |
| eBay, Inc., et al., | |
|         Defendants | |

## MOTION TO SUPPLEMENT PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTONS TO DISMISS

Now come the Plaintiffs and respectfully request that this Court grant Plaintiffs leave to supplement Plaintiff's Consolidated Opposition to Defendant's Motions to Dismiss. In support thereof, Plaintiffs state the following:

1. Plaintiffs filed a Consolidated Opposition to Defendants' Motions to Dismiss on May 23, 2022.

2. The Defendants filed both consolidated replies and individuals replies to the Plaintiffs' Opposition on June 24, 2022.

3. Plaintiffs now move for leave to supplement their Consolidated Motion to Dismiss with the following documents:

    A. Defendant Jim Baugh's Sentencing Memorandum filed on September 29, 2022;

    B. Defendant Jim Baugh letter of attrition filed on September 29, 2022; and

    C. Amended Sentencing Memorandum of David Harville filed on September 24, 2022.

1

Wherefore, Plaintiffs requests leave to supplement their Consolidated Opposition to Defendants' Motions to Dismiss.

Respectfully submitted,
PLAINTIFFS
By their attorneys,

/s/ Rosemary Curran Scapicchio
Rosemary C. Scapicchio, BBO No. 558312
Law Office of Rosemary Scapicchio
107 Union Wharf
Boston, MA 02109
617.263.7400
Rosemary@Scapicchiolaw.com

/s/ Jillise McDonough
Jillise McDonough, BBO No. 688694
Law Office of Rosemary Scapicchio
107 Union Wharf
Boston, MA 02109
617.263.7400
Jillise@Scapicchiolaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2022, the foregoing document was filed electronically with the Clerk of the Court using the ECF system, for uploading and service by electronic notice to counsel and parties authorized to receive electronically Notices of Electronic Filing.

*/s/ Rosemary Scapicchio*

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA

v.

JIM BAUGH *et al.*

No. 20-cr-10263-PBS

---

**DEFENDANT JIM BAUGH'S
SENTENCING MEMORANDUM**

William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

*Counsel for Defendant Jim Baugh*

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 4

    A.    Childhood, Education, and Family ........................................................ 4

    B.    Professional Experience Prior to eBay ................................................. 5

    C.    Work at eBay from 2016 to 2019 ......................................................... 5

    D.    Additional offense context .................................................................... 7

    E.    Life after arrest and prosecution ......................................................... 19

ARGUMENT ............................................................................................................... 20

    A.    The "Pattern of Activity" enhancement is inapplicable........................ 21

    B.    The proposed sentence will provide just punishment. .......................... 24

    C.    Neither specific nor general deterrence requires more than 30 months' incarceration. ........................................................................................ 27

    D.    Imprisonment would not facilitate any required "treatment." .............. 28

CONCLUSION............................................................................................................. 29

CERTIFICATE OF SERVICE ................................................................................... 30

Defendant Jim Baugh respectfully submits this Memorandum, accompanying letters,[1] and other exhibits to assist the Court with sentencing.

## INTRODUCTION

Jim Baugh is a devoted, father, son, brother, and friend. Those who have known him longest describe him as unfailingly dependable and generous with his time, attention, and financial resources. He has no prior criminal record, but does have a distinguished history of service both as a U.S. government employee and in the private sector.

While Mr. Baugh's role in the bizarre and disturbing criminal conduct at issue betrayed the principles he defended throughout his career, it was an aberrational episode in his life. Mr. Baugh recognizes that he stands before the Court guilty of very serious offenses that caused severe harm to real people. He has taken responsibility and accepts that meaningful punishment will follow.

But with all due respect to the government's sentencing arguments, Mr. Baugh should not be sentenced as the "face" of eBay, subject to a high-end "Guideline" term of imprisonment because this case involved the "resources of a Fortune 500 company" used to inflict a "three-week nightmare" on "a Natick couple, whose journalism had angered two of the company's most senior executives." Gov. Mem. at 1.

Yes, the Steiners suffered terribly, did not deserve it, and continue to struggle in the aftermath. Yes, Mr. Baugh is accountable for his actions, "knew better," and should have acted accordingly. Yes, Mr. Baugh is the most senior eBay employee the government chose to prosecute, and bears an extra measure of responsibility for his supervisory role.  But stopping there ignores

---

[1] Exhibit A is an allocution letter from Mr. Baugh to the Court.  Exhibit B is a compilation of support letters from third parties. Home addresses and contact information, as well as the names of children, have been redacted from the publicly-filed letters. Counsel can provide unredacted copies to the Court upon request.

the broader reality of what happened. Mr. Baugh had no personal animus against the Steiners, no psychotic pleasure in fostering fear, no desire to inflict harm for its own sake, and no disdain for "First Amendment values." Gov. Mem. at 14.

Rather, from his cubicle adjacent to the private offices in the insular, high-pressure environment of a Silicon Valley C-Suite, Mr. Baugh was convinced to view the Steiners (*wrongly*, he recognizes in hindsight) not as journalists but as dangerous "trolls" who posed an existential threat to the company and even to the physical safety of its employees. Mr. Baugh faced intense, relentless pressure from multiple executives (who have evaded criminal responsibility), including the CEO Devin Wenig, SVP Steve Wymer, COO Wendy Jones, and General Counsel Marie Huber, to do something, anything, about the "threat" which, they knew and told Mr. Baugh repeatedly, could not be solved through ordinary "lawyer" tools.

Indeed, reflecting a toxic culture that goes to the very top of many powerful technology companies, senior eBay executives hired Mr. Baugh precisely because of his prior experience as a government security professional with a demonstrated ability to solve difficult problems through unconventional means. *See, e.g.*, Kate Conger, *Uber Survived the Spying Scandal. Some Careers Didn't*, NEW YORK TIMES (Nov. 28, 2021) (quoting former CIA officer employed by Uber: "In the government, when you're given a mission or you're given a task, you go and you execute on the mission . . . . Your experience tells you to go execute because your boss or the leadership have given you this task, and you worry about how to do it — not whether or not you should do it, because you've never had to worry about that before.").[2]

---

[2] Available at https://www.nytimes.com/2021/12/06/technology/uber-spying-allegations.html.

The Steiners were a "threat" that Wenig, Wymer, Jones, and Huber were obsessed with neutralizing. Meanwhile, Mr. Baugh was a tool to be used—and then discarded, as an army of outside lawyers descended to conduct an "internal investigation" aimed at saving the company and its top executives from prosecution. Of course, that does not excuse Mr. Baugh's conduct. Although pushing back against a powerful CEO may not have been realistic, Mr. Baugh could and should have exercised good judgment grounded in common sense and just walked away. He deeply regrets his failure to do so. He has also candidly acknowledged and proactively addressed the contribution of alcoholism to his regrettable judgment.

Mr. Baugh cannot undo what he did, but context still bears on appropriate punishment. Accordingly, and for the reasons elaborated more fully below, we submit that **30 months imprisonment followed by 36 months of supervised release** is the appropriate sentence in this case. It is a severe sentence, a full year longer than that imposed on the only co-conspirator sentenced thus far, and commensurate with sentences in this district for other kinds of high-profile corporate misconduct, even in cases that involved extensive physical harm to many individual people.

Other than perhaps Mr. Baugh's young daughters, few would shed a tear or criticize the Court for following the government's recommendation. No punishment could ever be enough to undo what was done to the Steiners. But this Court has a more holistic responsibility than simply expressing community outrage, rigidly applying the advisory Guidelines in very unusual circumstances, or "sending a message" that will be loudly and widely broadcast across media that have avidly reported every salacious detail of this case.

Warehousing Mr. Baugh in federal prison for *additional* months or years would confer no marginal benefit on anyone and do nothing to advance the purposes of sentencing. To the contrary,

sentencing Mr. Baugh severely, as the capstone of eBay's role in the case, sends precisely the wrong message of impunity to corporate executives, that the security professionals they employ will absorb all the criminal exposure for corporate misconduct if the executives maintain willfully blind, "don't ask, don't tell" distance from operational specifics, as they claim to have done here.

## BACKGROUND[3]

### A.    Childhood, Education, and Family

Mr. Baugh is now 47 years old. Born and raised in Arkansas, his sister, Jill, described his childhood and education:

> Jim grew up in a small town with a population of approximately 2000 people. Educational resources were scarce in our town, but Jim was able to overcome this. He completed a bachelor's degree in Criminology, a master's degree in Public Administration, and also earned his Pilot's License at the age of 18. He continued his flight training and later got a Commercial/Multi-engine License. After he graduated college, he packed a U-Haul and moved from Arkansas to Los Angeles alone for his first job. This is significant because most people never leave the small town where we grew up. Jim was raised on our family farm, and he started working there when he was only 9 years old. This instilled a very strong work ethic in Jim that has lasted throughout his entire life.
>
> While in graduate school at the University of Oklahoma, Jim used what extra time he had available to volunteer at Big Brothers Big Sisters of America where is mentored an abused child for approximately three years before moving out-of-state. Over the next 5 years, Jim continued to stay in contact with his little brother and continued to send him birthday and Christmas presents. Jim's efforts had a positive impact on this child, and I know his life would have turned out much differently if he'd never met Jim. I was inspired by Jim's dedication to community service, so much that I later volunteered at the same organization and became a Big Sister. Jim continued his involvement in other charity organizations, such as the Seattle Milk Fund. By participating in this charity, Jim and his wife would adopt families during Christmas time and provide presents to them and their children.

Mr. Baugh married in 2009 but is now in the process of finalizing a divorce. He is the proud father of two daughters. Mr. Baugh's sister, Tammy, explained:

---

[3] The narrative in this section is a cursory synopsis based on the more extensive social history contained in the PSR and accompanying letters.

He has two beautiful daughters, E[] (10) and S[ ] (7) who are his world. They rely on Jim for financial, emotional, and physical support. They think he hung the moon. I feel that an extended sentence would be extremely detrimental to E[ ] and S[ ] as they are very  young and need their father during this very fragile time in their lives.

### B.       Professional Experience Prior to eBay

After graduate school, Mr. Baugh went to work at Microsoft as a protection agent for the Chairman and CEO. He left Microsoft to work for the National Clandestine Service of the CIA. He later returned to the private sector where he was employed directly by a company Bill Gates established to support the Gates Foundation, and then as an independent security consultant. He worked on many high-profile protection details including, for example, then-Vice President Joe Biden at the 2016 Oscars. *See* Ex. C.  He also provided private volunteer assistance to the FBI and CIA. Over the course of this work, he earned the trust and respect of security professionals around the world. A Danish colleague, Martin Keloe, wrote:

Jim was a very hard-working security agent who was very dedicated to protecting his clients. He always went the extra mile to make sure the people he was protecting were safe and that he had control over all imaginable and unimaginable scenarios. Jim has helped me a lot over the last 15 years and has always been willing to put himself aside to help others. It is a quality I have greatly appreciated over the years and hopefully can continue to benefit from in the future as well.

With regard to Mr. Baugh's criminal conduct, Mr. Keloe added:

As a former Police Officer, I have a deep understanding and appreciation for the law, and I do not condone what happened. But since I have been in Jim's shoes, I also have an understanding of how something like this could have happened when there is intense pressure from the top.

### C.       Work at eBay from 2016 to 2019

Mr. Baugh went to work at eBay in 2016. As the head of eBay's Global Security and Resiliency operations, he managed over 300 employees in 95 locations worldwide. Putting aside the offense conduct, Mr. Baugh is rightly proud of the honorable, demanding, and necessary work

his team performed on a daily basis to keep eBay's personnel and assets safe. As just one example,

in 2017:

> In the aftermath of Hurricane Irma's devastation, eBay employee Ursula Marren found herself stranded on Tortola in the British Virgin Islands. Ursula, a manager on [eBay's] Audit team based in San Jose, had been sailing off the island's coast with her brother as part of her sabbatical. They tried to leave the island in advance of the storm but couldn't get a flight. The hotel where they were in was left uninhabitable, with a collapsing foundation, by Irma's strong winds and flooding.
>
> Ursula and her brother, Adrian, quickly went into survival mode, making sure they had enough food and water, and searching for shelter on higher ground. They also became the caregivers to two elderly couples—one who was also vacationing and the other who lived on the island.
> …
> The security team was quick to respond. Stephanie Popp, Sr. Manager of eBay's Global Intelligence Center, activated a chain of events to rescue Ursula and her brother.
> …
> Over three days, the nine-person GIC team led by Jim Baugh, Senior Director of Global Security, evaluated all possible avenues to rescue Ursula and Adrian. The team had to act quickly, Baugh explains, because not only were conditions deteriorating on Tortola, with reports ranging from crime and looting to uninhabitably and people swimming off the island to try to reach boats that could lead to their return home, but also Hurricane José was brewing in the distance.
>
> "Our only priority was to ensure Ursula and her brother were safely evacuated from the island. In addition to working through our standard emergency response protocol, we were constantly thinking: What else can we do? Who else can we call? What other resources do we have in the region that could possibly assist?" Jim said. "At that point, we immediately activated our emergency evacuation protocol and put a backup special operations contingency on standby."
>
> With Stephanie taking lead, the team worked around the clock attempting to contact Ursula through any means possible, while also comforting her family, coworkers and close friends, assuring them that eBay and the rescue effort would bring Ursula and Adrian home.
> …

Along with the help of ISOS, an eBay travel partner who provides emergency medical assistance, the GIC deployed a helicopter to rescue Ursula, Adrian and the elderly couple who were also vacationing there.[4]

Given his responsibilities, Mr. Baugh was preoccupied by the potential for a "copycat" replay of two external events that occurred during his tenure at the company. On October 1, 2017, a gunman opened fire on a crowd attending a music festival from the 32d floor of the Mandalay Bay Hotel in Las Vegas, killing 60 people.[5] Mr. Baugh was worried that a similar attack could occur at the annual "eBay Open," a major gathering of eBay sellers in Las Vegas. (Indeed, the 2019 eBay Open was scheduled to take place at the Mandalay Bay, itself.) Separately, on April 3, 2018, an armed woman entered the headquarters of YouTube in San Bruno, California, and opened fire, wounding three people, one of them critically, before killing herself.[6] Mr. Baugh worried that eBay was particularly vulnerable to a similar attack because its headquarters in nearby San Jose was spread across a poorly protected, multiple-building campus comprising more than a city block. Fueling these serious and sincere concerns was the existence of a small but very angry and fractious sliver of the eBay seller community, some of whom were believed to be unstable, armed, and dangerous. Executives sometimes derisively referred to this cohort as "hillbilly garage sale" merchants.

### D.    Additional offense context

As Mr. Baugh made clear in his letter to the Court, he offers no excuses for his offense conduct. He knew better and should have acted accordingly. Still, additional context is helpful to

---

[4] Kendall Fields, *Swooping in to Rescue and Employee in the Aftermath of Hurricane Irma*, ebay HUB (September 20, 2017) (attached as Exhibit D).

[5] *See generally* https://en.wikipedia.org/wiki/2017_Las_Vegas_shooting.

[6] *See generally* https://en.wikipedia.org/wiki/YouTube_headquarters_shooting.

understand how and why an otherwise honorable man, with a long and unblemished career of serving the public and protecting others, would come to commit these crimes.

The Executive Leadership Team ("ELT") at eBay, in particular, Devin Wenig (CEO), Steve Wymer (Senior Vice President ("SVP") for Communications), Wendy Jones (SVP and COO), and Marie Huber (SVP and General Counsel), viewed eCommerceBytes (the Steiners' publication), the readers who posted comments on eCommerceBytes, and a Twitter account called "FidoMaster" (at various times, @unsuckEBAY and @FidoMaster1) as existential threats to the company. The ELT suspected that FidoMaster was either an alter-ego or collaborator of the Steiners, and that, together, they incited hostility from the seller "fringe" who posed a physical security threat to eBay employees.

In addition, the ELT suspected the Steiners and FidoMaster of colluding with and possibly receiving funding from an activist investor, Elliott Management, that was critical of eBay executives and wanted to obtain seats on the company's Board. The General Counsel, Marie Huber, advised the ELT that ordinary tools such as lawsuits and cease-and-desist letters would be ineffective to address the "problems" posed by eCommmerceBytes and FidoMaster. So the ELT turned to Mr. Baugh. The ELT was aware of Mr. Baugh's background, his primary responsibility for *physical* security, and his reputation for creative solutions to difficult problems. While the ELT never asked Mr. Baugh about specifics of his plans, it was certainly foreseeable to the ELT that Mr. Baugh would use harassment or other coercive means in an effort to modify behavior.

Concerns about FidoMaster first emerged in the June 2018 after it made a profane post on the eCommerceBytes blog in response to an article about eBay layoffs.



eBay's security team was concerned that FidoMaster had insider knowledge about Wenig's private travel plans for the July 4 holiday. On July 20, 2018, Fidomaster tweeted a request for Wenig's address in the Hamptons, tagging eCommeceBytes, with an ominous reference to Jack Welch's book entitled "Execution":



Then, on July 24, 2018, FidoMaster posted an eBay logo spattered in blood. The post tagged eCommerceBytes and SilverIceKing, a regular contributor to eCommerceBytes.



Throughout the summer of 2018, multiple negative tweets about the upcoming eBay Open event in Las Vegas prompted additional concerns about incitement of threats to physical security. FidoMaster also started to refer to Wenig as "DevilBoy."

The ELT's concerns about FidoMaster's threats and apparent connections to eCommerceBytes escalated further in the Spring of 2019. In an email thread on March 21, 2019, reacting to a FidoMaster tweet, General Counsel Marie Huber asked Mr. Baugh to provide "as much info as possible" on Fidomaster.

**From:** Huber, Marie <mhuber@ebay.com>
**Sent:** Thursday, March 21, 2019 9:06 AM
**To:** Rome, Marc; Finn, Molly; Baugh, Jim
**Cc:** Billante, Joe; Freiha, Selim
**Subject:** RE: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first

2

dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 🙄 #En...

Thanks.  Jim, can you give us as much info as possible on whose account this is?  Thanks, Marie

**From:** Rome, Marc <mrome@ebay.com>
**Sent:** Thursday, March 21, 2019 8:43 AM
**To:** Finn, Molly <mofinn@ebay.com>; Huber, Marie <mhuber@ebay.com>
**Subject:** Re: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 🙄 #En...

I assume we don't know who is behind the account?

Huber further instructed Mr. Baugh to notify her of all relevant online activity, and she separately inquired about a Twitter handle in the name of Jesse Cohn, a representative of Elliott Management on the eBay Board:

11

From: "Huber, Marie" <mhuber@ebay.com>
Date: Thursday, March 21, 2019 at 10:48 AM
To: Jim Baugh <jbaugh@ebay.com>
Cc: "Rome, Marc" <mrome@ebay.com>
Subject: RE: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 😳 #En...

Thanks, Jim. Please incl us on any messages like this as we've been dealing with the activists and know what's in the ags w/them.

Also, understand there's a "Jesse Cohn" Blind handle. Any way to find out who that is?

Thanks,
Marie

From: Baugh, Jim <jbaugh@ebay.com>
Sent: Thursday, March 21, 2019 10:23 AM
To: Huber, Marie <mhuber@ebay.com>; Rome, Marc <mrome@ebay.com>; Finn, Molly <mofinn@ebay.com>
Cc: Billante, Joe <jbillante@ebay.com>; Freiha, Selim <selim@ebay.com>
Subject: Re: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 😳 #En...

It is unknown who is behind the account.

I will send you a full report.

Jim Baugh
Sr. Director, Global Security
+1.408.768.8717

On May 22, 2019, FidoMaster and eCommerceBytes posted information about "Walker's West," a replica of Wenig's favorite New York pub constructed on the eBay campus. Baugh, Wymer, and Wendy Jones (Senior Vice President, COO, and Mr. Baugh's direct manager) discussed the issue by email on May 23, 2019. The information was apparently obtained from a building contractor's website, and apart from the embarrassment for supposed extravagant spending, the security team viewed publication of information about campus buildings as a potential security risk. Even after the contractor removed the information from its website, eCommerceBytes located and posted an archived version. Jones asked Mr. Baugh to "huddle on this at lunch…"

| Subject: | Re: Ina Steiner - Walker's West |
| --- | --- |
| Date: | Thursday, May 23, 2019 at 6:15:18 AM Pacific Daylight Time |
| From: | Jones, Wendy |
| To: | Phimister, Russell |
| CC: | Baugh, Jim |
| Attachments: | image009.png, image001.jpg, image006.jpg, image007.jpg, image008.jpg |

Let's huddle on this at lunch please today.

At the lunch meeting, Jones asked Mr. Baugh if he could find a way to deal with the issue "off the radar since comms and legal couldn't handle it." Jones told Mr. Baugh, "Just get it done. I don't want to know the details, just make sure you sync with Wymer." Mr. Baugh thereafter provided regular updates to Jones.

On June 8, 2019, co-conspirator Brian Gilbert spray painted "FidoMaster" on the Steiners' fence. Mr. Baugh told Wymer that his team had given the Steiners "a tap on the shoulder." Wymer expressed approval but did not ask questions. In the immediate aftermath of the vandalism, the ELT was pleased, because they executives perceived that negative postings had subsided.

On July 10, 2019, an eBay user emailed Wenig to complain about FidoMaster. This was discussed in an email thread that included Wymer and Huber, noting that Twitter would not take any action against the account. On July 15, Wymer forwarded the thread to Mr. Baugh, "FYI."

On July 18, 2019, Wenig's wife texted Mr. Baugh to complain about a post by Silver Ice King on eCommerceBytes:



cindywenig@yahoo.com >

by: Silver Ice King 🧊

Thu Jul 18 21:45:54 2019

Just another one of Wenigs lies. Judge
Judy says how can you tell that a
teenager is lying? A) Their lips are
moving. You can substitute Wenig for
Teenagers and you are still right on the
nose.

Wenig is nothing more than a con artist
and thief who would not know the truth if
it was actually spoken to him. One of
these days it will finally catch up to him
and when it does finally land, the landing
will be a crash landing for Wenig.

eBay CEO Devin Wenig Cites Extended Seller

I'm not exactly thrilled with this
post on my favorite
EcommerceBytes.com. The
author gets people worked up
with the way she skews her
stories. Don't tell Devin I sent
this -I'm just letting you know
about it. Ok?

On or about July 19, 2019, Mr. Baugh met with Jones and played a recorded call between

a security team member using a false identity and a subject associated with FidoMaster. Jones

"fist bumped" Mr. Baugh.

On August 1, 2019, Mr. Baugh and Wymer exchanged text messages:



Wymer added, "I'll embrace managing any bad fall out. We need to STOP her."

On August 6, 2019, Wenig received another email complaint about FidoMaster. He sent the following email to Huber, Wymer, and Mr. Baugh: "First of all we should shut down the account. Second, this user name keeps popping up causing all kinds of trouble. Might be worth some research Jim." Wymer responded that he had Mr. Baugh had been working on the issue. Huber and her colleagues responded that legal remedies were not and would not be effective. Huber wrote:

**From:** Huber, Marie <mhuber@ebay.com>
**Sent:** Tuesday, August 6, 2019 10:00 AM
**To:** Wenig, Devin <devin@ebay.com>; Wymer, Steve <swymer@ebay.com>
**Cc:** Baugh, Jim <jbaugh@ebay.com>; Johnson, Aaron <aajohnson@ebay.com>; Huber, Marie <mhuber@ebay.com>
**Subject:** FW: eBay Imposter Twitter account - Privileged

Oh man, ditto.  We have escalated through legal channels at Twitter and they've said that this doesn't violate their policies. (He also harasses me and others.) –

Unfortunately, it does not violate copyright laws b/c someone can use a logo in parody, and that's not actionable under the law.  Also, the user has a disclaimer saying that it isn't affiliated with eBay.

The next step could be a letter to Twitter and/or the Twitter user from our outside counsel.  Even tho' this is not a strong legal claim, we can send a letter.   It gets closer to the line to the extent the user purports to give advice on eBay policies;  it's still a tough claim.

If we send a letter, the user could tweet it and create more cycles.  Legally, we don't care about that, but don't know Steve if you do.

Marie

Mr. Baugh separately texted with Wenig:

Devin >

> I'm utilizing an alias twitter account and have been communicating directly with this individual for a couple of weeks. He is under the impression that I'm an "ally" of his. I'm slowly drawing him out, but it's a painfully slow process. Sorry I have not found him yet, but when I do, it will be fixed.

It's cool don't worry

You know this comes with the territory and it's part of running w consumer company.  I'm relaxed

> Cool...hope you are getting some down time...there will be plenty of problems waiting for you when you return 😊

Delivered

Yes unfortunately I'm aware and plugged in enough to know !

Mr. Baugh then forwarded the thread to Jones (to provide "visibility," keeping her in the loop). Jones responded with a "thumbs up."



On August 7, 2019, Aaron Johnson, another in-house lawyer, emailed Huber, Wymer, and Mr. Baugh:

**From:** Johnson, Aaron <aajohnson@ebay.com>
**Sent:** Wednesday, August 7, 2019 3:39:13 PM
**To:** Wymer, Steve <swymer@ebay.com>
**Cc:** Baugh, Jim <jbaugh@ebay.com>; Huber, Marie <mhuber@ebay.com>
**Subject:** RE: eBay Imposter Twitter account - Privileged

(-Devin)

Steve - What's your thinking on this from a comms perspective? We've escalated at Twitter, but as noted, the legal claim is weak and Twitter is notoriously slow to respond (~3 weeks) and rigid in their interpretation of the law and their policies. We can continue to press this, but to set expectations, I don't think they'll take action. The other avenue is to go after the Twitter directly with a cease & desist letter (if we can find him/her). That also has a low likelihood of success and potential backfire (low risk). Given the strength of the claims and the cost, I'd strongly recommend against suing.

Jim – any news/developments on your end?

Let me know if you want to discuss live.

Thanks,
aj

Wymer then responded to the group:

**Subject:** Re: eBay Imposter Twitter account - Privileged
**Date:** Wednesday, August 7, 2019 at 3:43:05 PM Pacific Daylight Time
**From:** Wymer, Steve .
**To:** Johnson, Aaron
**CC:** Baugh, Jim, Huber, Marie

I am utterly vexed by this! This twitter account dominates our social narrative with his CONSTANT obsession with trolling us. It's more than annoying, it's very damaging. There are a few people (this guy and the eComercebytes gal) infatuated with eBay who have seemingly dedicated their lives to erroneously trashing us as a way to build their own brand – or even build a business. It's genuinely unfair and causes tremendous damage because we look bad fighting back in public and standing up for ourselves. If we could engage, I'd welcome the fight and we have a lot of facts and truth to win with. But, instead we take shots broadside and sit on our powder. This issue gives me ulcers, harms employee moral, and trickles into everything about our brand. I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the "blind eye toward graffiti that turns into mayhem" syndrome and I'm sick about it. Whatever. It. Takes.

Shortly after that email, Wymer met Mr. Baugh:

- Wymer was very agitated, pointing his finger, etc.
- He instructed Baugh to take any actions necessary to neutralize the Steiners and identify FidoMaster.
- "Direct order" from the CEO.
- Wymer did not want to know details but assured Mr. Baugh that his group would have "executive level support" if efforts led to "any legal problems."
- "Devin [Wenig] wants the website burned to the ground."
- "The only thing that matters is that it stops."
- "If it doesn't stop, we are all done."
- "eBay Corporate is willing to absorb any legal exposure."

Later, in the immediate aftermath of the "blown operation" in Boston, Wymer spoke by phone

with Mr. Baugh.

- Wymer stated that he and Jones were aware of operation because they saw an email from Natick PD to eBay legal.
- Wymer reasoned that harassment – which he equated to "TPing" a house – is not a crime.
- Wymer seemed nervous and said multiple times that he didn't know anything about what was going on but that he wouldn't say anything to legal during its internal investigation.
- Wymer told Mr. Baugh, "Stick to your guns," which Mr. Baugh understood as instruction to have his security team stick to its cover story about attending an industry conference in Boston.
- Wymer asked Mr. Baugh how long it would be before legal started reading his emails/texts; Mr. Baugh said he didn't know.
- Wymer told Mr. Baugh they "just needed to get rid of the Hardy Boys," referring to eBay legal.

### E. Life after arrest and prosecution

After being fired by eBay and then charged in this case, the explosion of publicity made it

impossible for Mr. Baugh to secure employment. His marriage also disintegrated.

After "hitting bottom" in his years-long descent into alcoholism, Mr. Baugh voluntarily

checked into an in-patient treatment program and has continued follow-up care. He has now been

sober for over two years.

For a substantial part of his pretrial release, Mr. Baugh moved to the Seattle area to restore

and maintain a relationship with his young daughters and assist in their care while his ex-wife

worked full-time. More recently, he moved back home to Arkansas, where he has lived with one of his sisters and helped his elderly father run the family farm. He intends to return there after completing his sentence.

\* \* \*

This information, and the additional letters submitted with this Memorandum, demonstrate that Mr. Baugh and the conduct underlying his conviction are both far more complex than the most salacious facts or headlines viewed in isolation.

## **ARGUMENT**

A criminal penalty must be "sufficient, but not greater than necessary, to comply with the purposes of sentencing." 18 U.S.C. § 3553(a). Here, fair consideration of the offense in light Mr. Baugh's role, history, and characteristics compels the conclusion that incarceration for a term of 30 months is sufficient.

The Court is required to compute the Guideline Sentencing Range ("GSR") as a "starting point and the initial benchmark." *Gall v. United States*, 528 U.S. 38, 49 (2007). Here, the government and Probation take the position that the advisory GSR is 57-71 months (level 25, CHC I), while Mr. Baugh contends that the properly calculated GSR is 46-57 months (level 23, CHC I).

Whatever GSR the Court adopts, the Guidelines are not the sole factor, nor even the first among the many factors, that Congress has commanded the courts to apply in section 3553(a). The Court "may not presume that the Guidelines range is reasonable," rather it must "make an individualized assessment based on the facts presented." *Id.* at 50. Indeed, "the Guidelines are only one of the factors to consider . . . and 3553(a) directs the judge to consider sentences other than imprisonment." *Id.* at 59. The Supreme Court has emphasized that the "Guidelines are not only

*not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) (emphasis in original).

Thus, district courts are now required to consider whether the Sentencing Commission's underlying policy results in an advisory GSR that is unreasonably high. *See United States v. Kimbrough*, 552 U.S. 85, 109 (2007); *United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008); *United States v. Martin*, 520 F.3d 87, 93-94 (1st Cir. 1998).

The First Circuit has elaborated on the meaning and breadth of the so-called "parsimony principle" in *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008). It stressed that the Supreme Court's ruling in *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *Id*. at 228. That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

### A.    The "Pattern of Activity" enhancement is inapplicable.

Mr. Baugh objects to the proposed application of a 2-level "pattern of activity" enhancement under U.S.S.C. § 2A6.2(b)(1)(E) where, as here, the underlying charged offenses themselves are inherently based on multiple related acts of harassment. *See* 18 U.S.C. § 2261A(2) (punishing use of interstate commerce facilities "to engage in a *course of conduct*" that causes fear or emotional distress). Application Note 1 to section 2A6.2 defines a "pattern of activity" as

> any combination of two or more separate instances of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction. For example, a single instance of stalking accompanied by a separate instance of threatening, harassing, or assaulting the same victim constitutes a pattern of activity for purposes of this guideline.

21

Application Note 3 further directs the Court to "*consider*" (but not necessarily count), "under the totality of the circumstances, any conduct that *occurred* prior to or during the offense" (but notably, not conduct that *constitutes* elements of the offense). The application notes do not define what is meant by "separate instances."

The First Circuit has applied the enhancement where there are *other* instances of stalking *separate* from the charged offense conduct, whether those instances occurred before or during the charged offense. For example, in *United States v. Lee*, 790 F.3d 12, 19 (1st Cir. 2015), which the government cites but misinterprets, the defendant engaged in decades of abuse and harassment of his wife, culminating in a trip to find her in Maine, where he was arrested with a car full of weapons and materials that could be used to clean up a grisly murder scene. *See id*. at 14-15. The defendant was charged with interstate travel with the intent to kill, injure or harass, in violation of 18 U.S.C. § 2261A(1); he was not charged under the "communication" prong of the statute, section 2261A(2). The First Circuit held that an uncharged series of contemporaneous threatening emails was sufficient to trigger the "pattern of activity" enhancement, without need to consider still other, additional, older incidents of physical abuse. *See id.* at 19 & n.3. Critically, *Lee* did *not* endorse application of the enhancement for activity that was already encompassed in the charges. *See also United States v. Sayer,* 748 F.3d 425, 431 (1st Cir. 2014) (noting "pattern" enhancement was applied for "a long-term pattern of stalking, threatening, or harassing behavior" separate from the charged conduct); *United States v. Robinson*, 433 F.3d 31, 36-37 (1st Cir. 2005) (affirming application of "pattern" enhancement based on prior incidents of assault in case charging travel to violate restraining order).

As explained above, the statute itself requires a "course of conduct," 18 U.S.C. § 2261A(2), which is defined, in turn, as "a pattern of conduct comprised of 2 or more acts evidencing a

continuity of purpose." 18 U.S.C. § 2266(2). If applied in circumstances like those here, the enhancement would duplicate the "course of conduct" element of the crime and would result in an enhanced sentence for every cyberstalking case.

The government's reliance on *United States v. Fiume*, 708 F.3d 59 (1st Cir. 2013), is misplaced. *Fiume* held that imposition of an enhancement for violation of a restraining order was not impermissible double-counting in a case charging interstate travel to violate such an order, *see id.* at 62, but the decision does not require or endorse double-counting in other contexts. Unlike the "pattern" enhancement, the "restraining order" enhancement is not cabined or limited by any application notes. Moreover, consistent with *Lee*, the district court in *Fiume* applied a "pattern" enhancement based on a prior assault conviction and threatening communications *separate* from the charged "travel" offense. *See id.* at 60-61. The government has not identified any case in this Circuit where a court imposed the "pattern" enhancement based on conduct encompassed by the offense itself.

Notably, in sentencing co-conspirator Philip Cooke, Judge Burroughs decided to "duck the issue and just use the lower guideline calculation without ruling on the objection." *United States v. Cooke*, No. 20-cr-10126-ADB, D.E. 25 (Jul. 27, 2021 Sent. Tr.) at 13. Judge Burroughs explained:

> I don't know the answer to this question. I don't think it's an easy thing. And I think that the guidelines are poorly drafted on it. It would lead to double counting; that the application notes from the case law don't make clear to me that it's what the guideline commission contemplated, but I also accept and agree with Mr. Kost[o] that there are aspects of the sentencing guidelines where double counting is allowed and contemplated, but I'm just not sure this is one of them….

*Id*. at 14. She then sentenced Mr. Cooke to 18 months imprisonment, twelve months below the low-end of the range that did *not* include the enhancement.

23

For these reasons, the Court should not apply the "pattern" enhancement. Accordingly, the total offense level should be 23, which for a defendant in criminal history category I (because Mr. Baugh has no criminal record), yields an advisory GSR of 46-57 months.

**B.    The proposed sentence will provide just punishment.**

The proposed sentence of 30 months' imprisonment followed by 36 months' supervised release is sufficient to reflect the seriousness of Mr. Baugh's offenses, to promote respect for the law, and to provide "just punishment" as required by § 3553(a)(2)(A).

While it is easy to become inured to enormous numbers in the federal sentencing system, incarceration for 30 months is a substantial penalty by any measure. As the government points out, cyberstalking cases are "each horrifying in their own way" for the victims. Gov. Mem. at 15. From the point of view of harm caused, the proposed sentence of 30 months is consistent with *overall* national, Circuit, and District norms identified by the government from Commission statistics. However, if the same data collection is limited to defendants, like Mr. Baugh, in Criminal History Category I, the national average sentence was 22 months and the median sentence 18 months.  The First Circuit average sentence was 18 months and the median sentence 15 months. And the District of Massachusetts average and median sentences were both 15 months.[7] Thus, the proposed sentence is actually *double* the District average for defendants, like Mr. Baugh, with no criminal history. Indeed, there have been cases in this district where far more disturbing conduct over a much longer time period resulted in a significantly lower sentence. *See, e.g.*, *United States v. Connor*, No. 15-cr-10398-WGY (defendant engaged in three-year campaign of threats and intimidation plus extortion of sexually explicit images from college student; court imposed "time

---

[7] *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (filtered by 2015-2021, U.S.S.G. §§ 2A6.1 and 2A6.2, and CHC I).

served" sentence of approximately one month, plus 10 months home confinement, where GSR was 24-30 months).[8]

Here, of course, the offense was *sui generis*. On one hand, Mr. Baugh's supervisory role and obstructive conduct are aggravating factors, but on the other hand, his incarceration is not necessary to protect the victims or the public from a defendant with a personal animus, one who is psychotic, unable to control his anger, or otherwise presents an acute danger of further stalking or committing actual deadly physical violence. Mr. Baugh poses no ongoing danger and the offense, itself, never entailed any intent to inflict actual, physical violence.

The proposed sentence in this case is a year more than that imposed on Cooke, the only-co-conspirator sentenced to date and one of the former senior police officials whom Mr. Baugh employed and relied on to advise him about legal limits of acceptable activity.

As another comparative measure of appropriate punishment for corporate misconduct, the proposed sentence here is also consistent with the sentences imposed *after trial* in the Insys Pharmaceuticals prosecution, a high-profile case involving fraudulent sales and marketing of a specialized fentanyl pain medication that cost the government and private insurers millions in improper reimbursements and caused grievous physical and other harm to numerous patients who were not appropriate candidates to take the drug and became addicted to it. Facing a GSR of well over 10 years, the billionaire CEO and founder of the company received a sentence of 60 months; the other high-level executives received sentences ranging from 12 to 33 months. *See United States v. Simon*, 12 F.4th 1, 22 n.3 (1st Cir. 2021). It strains credulity to contend that Mr. Baugh somehow caused more harm or should be punished more severely than the Insys defendants under Kapoor,

---

[8] *See* https://www.justice.gov/usao-ma/pr/pennsylvania-man-sentenced-cyberstalking-and-sextorting-massachusetts-college-student.

25

who were convicted and sentenced after a lengthy trial. To do so would create unwarranted disparity.

Moreover, a federal felony conviction is also, by itself, a severe penalty, particularly for an individual with no criminal history whatsoever. Mr. Baugh has endured, and will continue to suffer, humiliation, stress, and financial devastation that he scarcely could have imagined before. Courts have recognized that myriad severe collateral consequences attach to a federal felony conviction, which can amount to a kind of "civil death." *United States v. Nesbeth*, 188 F. Supp. 3d 179, 181 (E.D.N.Y. 2016) (lengthy opinion detailing collateral consequences of conviction in imposing non-incarceration sentence). The district court's observations at sentencing in *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), also deserve attention:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong they have committed.

*Id*. at 343-44 (upholding sentence of probation with six months' home confinement and 1,000 hours of community service where the district court calculated the GSR as 87-108 months after conviction at a lengthy trial on over 100 felony counts of false statements and fraud related to the "Big Dig" project).

Finally, probation supervision as part of a required term of supervised release is also meaningful punishment. As the Supreme Court noted in *Gall*, probation supervision amounts to a "substantial restriction of freedom." 552 U.S. at 595. In combination with more than two years of pre-trial release (much of which he spent subject to a curfew), the proposed sentence will mean Mr. Baugh spends nearly eight years of his life in a combination of federal custody and supervision.

There is no need or principled reason to impose even more custody as a component of that punishment.

### C. Neither specific nor general deterrence requires more than 30 months' incarceration.

Imprisonment is not necessary to protect the public or to deter Mr. Baugh from similar crimes in the future, as required by § 3553(a)(2)(B) and (C). Mr. Baugh has no prior criminal history. The offense conduct was aberrant, not the product of any personal animus or propensity to inflict harm on others. Mr. Baugh will never work in corporate security again and has learned a lasting, painful lesson about the dangers of abdicating personal moral judgment to an employer's ill-conceived priorities.

A 30-month sentence, and even the very fact of federal prosecution, are also more than sufficient serve the interest in *general* deterrence. Nobody looking at what Mr. Baugh has experienced, the pain inflicted on him and his family, and the obstacles he will face in the future could mistakenly conclude that his commission of crimes as an agent of eBay was anything other than extremely serious or that they should engage in similar conduct.  Life as Mr. Baugh knew it is already demolished, and no purpose would be served by prolonging his incapacitation gratuitously, chiefly at the expense of his young daughters. Moreover, sentencing Mr. Baugh as a proxy for the company and the most culpable person in the harassment scheme would send precisely the wrong message to Weing, Wymer, Jones, and Huber, who were the real "but for" causes of the crime, and their C-suite peers in other companies.

Moreover, there are no data to suggest that a longer sentence would have any marginally greater general deterrent effect. Empirical research consistently has shown that "increases in the severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006). "Three National

Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Research regarding white-collar offenders in particular (presumably, the most rational of potential offenders) found *no difference* in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). On the other hand, a substantial body of evidence establishes that "crime-reducing aspects of imprisonment are considerably negated by crime-enhancing ones." Todd Clear, *Backfire: When Incarceration Increases Crime, The Unintended Consequences of Incarceration* (Vera Inst. 1996).

**D.    Imprisonment would not facilitate any required "treatment."**

Mr. Baugh plainly does not require "treatment" of the sort that a Bureau of Prisons placement would *uniquely* facilitate under § 3553(a)(2)(D). While he would surely benefit from the BOP's residential substance abuse treatment program ("RDAP"), and would welcome the opportunity to participate, the Court need not impose a sentence of imprisonment greater than 30 months for that reason. The Court also should bear in mind that Mr. Baugh likely will not receive any sentence credit for RDAP, nor will he likely benefit from other types of "earned" credits under the First Step Act, because the BOP categorically classifies "cyberstalking" as a violent crime that apparently renders him ineligible for such credits.[9] Like every prisoner, he can earn "good time,"

---

[9] *See* https://www.bop.gov/policy/progstat/5162_005.pdf.

but under current BOP policies, he will serve substantially all of the sentence this Court imposes and likely will not get any kind of perceived "break" from the recent federal sentencing "reforms" enacted by Congress.

Accordingly, the statutory "treatment" factor would counsel in favor of a shorter prison sentence. As the Sentencing Commission staff has recognized, sentences that include lesser periods of incarceration "divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." U.S. Sentencing Commission, Staff Discussion Paper, Sentencing Options Under the Guidelines, at 19 (Nov. 1996).

## **CONCLUSION**

For the foregoing reasons, the Court should sentence Mr. Baugh to 30 months in custody followed by an additional 36 months of supervised release, with a recommendation that he participate in RDAP. While it also may be appropriate for the Court, in its discretion, to impose a fine, the Court should bear in mind that the case has already financially devastated Mr. Baugh and any fine payable to the government will reduce the resources available for resolution of the civil case brought by the Steiners and for support of Mr. Baugh's young daughters.

Respectfully submitted,

**JIM BAUGH**

By his attorneys,

*/s/ William W. Fick*
William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 27, 2022.

*/s/ William W. Fick*

# Exhibit B

Exhibit A

Judge Patti Saris
United State District Court
Boston, MA

Dear Judge Saris,

I am grateful to have the opportunity to submit this letter to you. My hope is to fully articulate
the massive regret I have for my actions. I will also try my best to provide you with an
understanding of who I am and how I ended up here. I am fully accountable for everything I've
done and will do whatever it takes make this situation right for all the people I have hurt. I am
determined to come out of this situation as a better person.

Honestly, it took a very long time for me to come to terms with what I had done and the harm
my actions had caused. At the time of my crime and for several months after my arrest, I tried
every way imaginable to justify my actions. Taking ownership for my behavior never crossed my
mind and I took advantage of every opportunity possible to shift the blame to other people,
especially the victims of my actions, David and Ina Steiner. This was all just complete nonsense.
Once I admitted to myself that my actions had harmed innocent people, I was horrified and
overwhelmed with shame. I am still very much appalled with my behavior and consumed with
remorse. As I write this, the best I can hope for is that the Steiners will be able to recover from
the emotional trauma I caused them and maybe someday they will find it in their hearts to
forgive me.

I also regret and apologize for the contempt and disrespect I displayed for law enforcement in
my stupid efforts to minimize and hide my conduct. Despite my behavior, I have the utmost
respect for all law enforcement agencies and personnel and recognize the sacrifices these men
and women make to protect us every day. I have spent my entire career working closely with
members of the law enforcement community, not only in the United States, but also abroad.
Throughout my career, I have employed hundreds of officers, worked closely alongside them,
and continuously received their support on special cases in the private sector. I, of all people
knew better and should not have behaved as I did.

In addition to the Steiners and law enforcement, there were many others who were impacted
by my actions. These people include my two little girls, my ex-wife and her family, my sisters,
my parents, my friends, former colleagues, and anyone who has ever trusted me or depended
on me. I betrayed their trust and brought disappointment, humiliation, and sadness into their
lives. These are people who care for me the most and they did not deserve this. I don't know if I
will ever be able to completely fix the things I broke and make this right for them, but I will
dedicate the rest of my life trying.

Up until this point in my life, I have never been in any kind of trouble. I always worked hard to
reach my goals and tried my best to set a good example for everyone around me. When I was in
college, I worked two different jobs so I could pay tuition. I pumped gas at an airport during the
day and worked at a juvenile detention center at night. In graduate school, I was employed at

the Oklahoma County Juvenile Bureau where I worked in a diversion program for troubled kids and their parents to help young people avoid conviction and incarceration.

After graduate school, I went on to work at Microsoft as a protection agent for both the Chairman and CEO. I left Microsoft to pursue work in the public sector and was employed by the Central Intelligence Agency and served in the National Clandestine Service. My covert role at the CIA was challenging for my family and I later returned to the private sector where I was employed directly by Bill Gates. In this role, I supported the Bill and Melinda Gates Foundation, providing personal protection all over the world. During my 10 years with Microsoft and with Bill Gates, I worked in more than 60 countries, many of which were poverty stricken, third world high risk areas.

I later worked as an independent security consultant. My clients included many notable companies, including Apple, Amazon, Walmart, Dell, and the Academy of Motion Picture Arts and Sciences. During this time, I had the privilege of consulting with many prominent people and dignitaries including the former Secretary of Defense, Robert Gates.

After I left public service, I was contacted by the CIA and agreed to assist the organization with various intelligence gathering activities as a private citizen. As a private citizen, I was assigned the code name "mx overwatch". A few years later, I was also contacted by the FBI and agreed to assist the organization with intelligence operations as well. The FBI assigned me the code name "brother." During this six-year period, the nature of my private sector employment provided a high degree of access useful to these organizations. I assisted with recruitment of foreign agents, electronic surveillance of foreign leaders, and reported observations from my international travel and business meetings. I also recruited private sector colleagues and even a CEO to assist the government by allowing the use of their private sector resources. I did this work voluntarily because I believed in the mission of the CIA and the FBI. I was never paid for my service, and I would have never accepted money anyway. I felt honored to be trusted with such sensitive information and to be able to provide security assistance to our government.

In each position I've held, I was chosen because people trusted me with their safety and wellbeing. They also knew I would represent them and their organization in an honorable way. Realizing I had abused my power and abilities was devastating to me. I've spent my entire adult life putting myself in harm's way to protect others, helping those who couldn't help themselves, and making personal sacrifices in the hopes of achieving a greater good. My offense undermined the respect and reputation I worked so hard to earn and betrayed the very principles I have defended my entire career. I'm proud of everything I've accomplished in my life up until this point. I am determined to rebuild trust that I lost and become an example of good moral character.

During the period when I committed the crime, I was under the influence of alcohol almost every day, including the entire time I was in Boston. At the time, I did not see the Steiners as people, but instead, they were simply problems – for eBay and its senior leadership -- that needed to be handled. The Steiners had been a focus of the corporation for a long time. There

was enormous pressure on me to do something about them and their activities, for reasons I still don't fully understand. I only saw in the Steiners what the company wanted me to see. I was a seasoned professional in my field, fully capable of identifying credible risk and threats, but in this instance, I completely failed to see what was real and what was not. This is 100 percent my fault and is the biggest regret of my life. I failed to protect the Steiners, in fact I grievously harmed the Steiners, and for this, I am sorry.

I've had a lot of time to reflect on everything that has happened and how I ended up here. There was a fracture in my life somewhere along the way and I temporarily departed from the morals, ethics, and high standards I've always lived by. As my professional and personal responsibilities dramatically increased over the years, I had great difficulty coping with the stress of my job and family obligations. I think from the outside, people probably saw me as a person who really had it all together, confident, reliable, and able to handle anything. But on the inside, my emotions were in complete disarray. I was insecure, scared, and only defined my self-worth by success at work, rather than by the things that truly matter. I repeatedly overextended myself at work and I never said no to anything.

My behavior during this time makes me nauseous to think about and I still struggle to comprehend it. Looking back on this period, I realize that I was completely out of control and made horrible decisions. I was arrogant, selfish, manipulative, and reckless. I did not consider whom I might hurt, and I did not recognize nor care about the consequences of my behavior. I was a really rotten drunk.

Alcohol has always been problematic for me, but while working at eBay my life began a downward spiral leading to my rock bottom. I've since learned that alcoholism is progressive over time, eventually causing complete physical and emotional dependence. The more I drank, the less concern I had for the problems building up at work and my behavior became increasingly destructive. Eventually, I became completely reliant on alcohol to cope with what I was feeling, and I hit an all-time low. Drinking became the centerpiece of my life and everything and everyone became a lower priority. I did not believe this could happen to me, but after taking a hard look at my behavior, the things I said, and the way I treated people, I know this was the case.

Alcohol is NOT an excuse for anything, but it certainly contributed to me breaking the law, hurting the Steiners, and betraying the people I care about most.

There is a history of alcoholism in my family and growing up I lost three aunts and two uncles to alcohol related diseases. It never occurred to me it was remotely possible for me to have the same fate as them, but that is almost precisely what could have happened if I would have been allowed to continue down this destructive path. This may sound odd coming from someone in my position, but I realize had I not been arrested, I would have potentially continued down this destructive path, doing more harm to myself and others, so my arrest was actually a good thing. No matter what happens now, I'm thankful this part of my life is over. As of September 20th, I have been sober for two years. I realize I have a long road ahead of me, but at least I'm

sober, healthy, and in a good position to repair the damage I caused. I'm excited about a lot of things, but mostly look forward to just being a better father, friend, son, brother, and being a productive, honest, and law-abiding member of society again.

As a direct result of my sobriety, my relationship with my children is much stronger than it was before this incident. I truly value every second I get to spend with them and for the first time in a long time, I am able to focus 100 percent on them and their needs. Unlike before, when I'm with them now, I am fully present, and it's been a really beautiful experience.

I'm also very fortunate to have been able to reconnect with family members and some really true friends that I had lost contact with. I spent most of my career traveling for work and I failed to maintain many of these important relationships. Reconnecting with my parents and siblings has been one of the most rewarding and significant experiences of my life. I've been reminded of how much they love me and know they will be there for me no matter what happens. Having this reassurance from them was crucial for my recovery and I don't know how I would have gotten through this period of my life without their love and support.

I have been able to rejoin my dad working with him on our family farm where I grew up. My dad is at retirement age and has recently experienced serious medical issues, so I know my help has been of great value to him and the business. Returning to work where I grew up has been one of the best things to come out of this situation. This work is something I have always enjoyed and allows me to be close to my family and friends. Once I finish my sentence, I plan to return to work there so he can have time to rest and spend time with his grandchildren. I'm thankful to have an opportunity like this because I know many people in my situation have very limited options.

I know the hardship I've experienced pales in comparison to what David and Ina Steiner have been forced to endure over the past three years. There is not a day that goes by that I do not think about them and the impact my actions have had on their lives. I realize my words can barely begin to express the remorse I feel inside and can do very little to actually repair the emotional trauma I have caused. But for what it's worth, I am extending my most sincere apology to David and Ina Steiner. I am so sorry. I pray you can heal from the horrible experience and live productive lives and continue making valuable contributions to society as you once did.

Thank you.

Jim Baugh

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 20-cr-10263-PBS |
| ) | |
| DAVID HARVILLE, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**AMENDED SENTENCING MEMORANDUM OF DAVID HARVILLE**

On May 12, 2022, David Harville pled guilty to conspiracy to commit cyberstalking and multiple counts of interstate stalking. He has been on pretrial release without issue since June 2020. In their plea agreement, the parties take no position on the sentencing guidelines, or the position they will take at sentencing, and the government agrees to dismiss the witness tampering and obstruction of justice charges at sentencing.

The PSR and letters of support submitted on his behalf show that, throughout his life, Mr. Harville has been a good person. He served his country with dignity in the United States Army, has been a dedicated and successful professional, a valuable and contributing member of his community, and has always gone out of his way to help others. As a result of this prosecution, Mr. Harville has endured significant punishment already. He lost a job and a profession that he loved and had prepared for his entire adult life, was humiliated and embarrassed in his community, and had to start his life over from ground zero. As articulated in his letter to the Court, Mr. Harville has accepted full responsibility for his misconduct, is remorseful for his bad decisions, and is determined to do whatever it takes to rehabilitate his name and again become a productive member of society. See Letter of David Harville (Exhibit A1).

Mr. Harville has zero criminal history points.  The Presentence Investigation Report, dated September 22, 2022 (the PSR), calculates his Total Offense Level (TOL) as 21 with a guideline sentencing range (GSR) of 37-46 months.  PSR ¶¶ 166, 170.  For the reasons described herein, we submit that Mr. Harville should receive neither the two-level enhancement for pattern of activity under USSG § 2A6.2(b)(1) nor the two-levels for grouping under USSG § 3D1.2. This would result in a TOL of 19 and a GSR of 24-30 months.  In any event, for the reasons described herein and at the sentencing hearing, we submit that the factors under 28 U.S.C. § 3553, particularly that involving relative culpability, warrant a sentence significantly below the GSR.  Specifically, Mr. Harville submits that a sentence of probation or, in the alternative, 12 months home confinement, is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553.

I.    __THE PATTERN OF ACTIVITY ENHANCEMENT SHOULD NOT APPLY__

The two-level enhancement for a "pattern of activity involving stalking, threatening, harassing or assaulting the same victim," under § 2A6.2(b)(1)(E)(E), should not apply to Mr. Harville.  Application Note 1 defines "pattern of activity" as any combination of "two or more *separate instances* of . . . harassing. . . the same victim, whether or not such conduct resulted in conviction." (Emphasis added.)  The notes do not define "instances."  The First Circuit has applied the enhancement to defendants who have engaged in other instances of stalking (or other violative) conduct separate from the offense conduct, rather than multiple instances of stalking or threats forming the course of the offense conduct itself.  See, e.g., United States v. Robinson, 433 F.3d 31, 36-37 (1st Cir.2005); United States v. Lee, 790 F.3d 12, 18-19 (1st Cir.2015); United States v. Walker, 665 F.3d 212 (1st Cir.2011) (applying "pattern" enhancement where defendant was convicted of multiple counts of cyberstalking, each count emanating from a particular

communication, along with a years-long history of other stalking and threatening behavior);

United States v. Fiume, 708 F.3d 59 (1st Cir.2013) (applying the pattern where defendant

assaulted his wife in 2010, which resulted in a protective order, then violated the protective order

in 2015 by sending a series of threatening communications).  See also United States v. Sayer,

748 F.3d 425, 431 (1st Cir.2014) (noting that the two-point enhancement was for "*long-term*

*pattern[s]*" of stalking, threatening, or harassing behavior) (emphasis added).

    The First Circuit's interpretation is logical because the statute itself requires a "course of

conduct," 18 U.S.C. § 2261A, which is in turn defined as "a pattern of conduct comprised of 2 or

more acts evidencing a continuity of purpose."  18 U.S.C. § 2266(2). Under the government's

interpretation, the enhancement is no different than the "course of conduct" element of the crime

and would result in the application of the enhancement in *every* cyberstalking case.  That cannot

be the purpose of an enhancement which implies an additional meaning or concern -- i.e., an

*enhancement* for facts rising to that level of meaning or concern.

    Application Note 3 provides that in determining whether (b)(1)(E) applies, the court shall

consider "under the totality of the circumstances, any conduct that occurred prior to or during the

offense; however, conduct that occurred prior to the offense must be substantially and directly

connected to the offense."  There was no "prior" conduct alleged.  To determine whether the

"during the offense" prong should apply to Mr. Harville, therefore, it is necessary to review his

conduct "during the offense."

    The government does not allege that Mr. Harville was involved in, or had advance

knowledge of, any of the harassing messages or deliveries that were at the heart of this

conspiracy.  Nor does the government allege that he was involved in the white knight strategy.

Indeed, he was involved in neither.  As the government alleges, Mr. Harville was not part of the

conspiracy that began on August 5, 2019, which focused on sending harassing messages and deliveries to David and Ina Steiner (the "Victims").  The government does not allege that Mr. Harville joined the conspiracy until August 11, 2019, when his boss, Jim Baugh, directed him to travel to Boston for an "op" targeting Victim 1 and her website.  See PSR ¶¶ 17, 44.

Mr. Harville was in Las Vegas from August 6 to August 11, 2019, and had no knowledge of, or involvement in, any of the harassing performed by other eBay employees during this period.  See id. ¶¶ 29-43.  Similarly, Mr. Harville was not involved in, and had no knowledge of, the renewed harassment campaign involving messages and deliveries which took place between August 17 and August 20, 2019.  See id. ¶¶ 68-85.  Mr. Harville returned to California on August 17, 2019, and Stephanie Popp flew to Boston to replace him on the surveillance team.  Id. ¶ 70.

Mr. Harville's involvement in this matter, as it pertains to the Victims, was limited to two surveillances of their home and car (on August 15 and August 16, 2019), each of which lasted approximately 2-3 hours, which Mr. Harville participated in at the direction of his boss, Baugh. Because Mr. Harville was not involved in the threatening messages or deliveries in which his co-conspirators engaged, and those acts were not reasonably foreseeable to him, that conduct should not be attributed to him personally as conduct that occurred "during the offense."

The sentencing of co-conspirator Philip Cooke is instructive.  The government sought the two-level "pattern" enhancement under § 2A6.2(b)(1)(E)(E).  Judge Burroughs declined to decide the issue.  Instead, she stated: "What I would do is duck the issue and just use the lower guideline calculation without actually ruling on the objection."  See United States v. Cooke, 20-10126-ADB, Transcript of Sentencing Hearing, dated July 27, 2021 ("Cooke Sent."), at 13-14 (a copy of the sentencing hearing transcript is attached hereto as Exhibit B).  Judge Burroughs further commented:

4

I'll leave it at this for those that come after me.  I don't know the answer to this question.  I don't think it's an easy thing.  And I think that the guidelines are poorly drafted on it.  It would lead to double counting; that the application notes from the case law don't make clear to me that it's what the guideline commission contemplated, but I also accept and agree with Mr. Kosta that there are aspects of the sentencing guidelines where double counting is allowed and contemplated, but I'm just not sure this is one of them, and I'm not going to come down with a decision on that given how that issue is resolved is not particularly material to the sentencing that we're going to do today.  So that is a punt.  I am going to sentence him based on the following advisory guideline sentencing range with the understanding that my focus is on the conduct and not so much on the exact place where the guidelines end up.  With the grouping and where I come out with an adjusted base offense level of 19 which results in an advisory guideline sentencing range of 30 to 37 months given that he has zero criminal history points and is in Criminal History Category I.  So again that's 30 to 37 months.

Id.

### A.     Mr. Harville's Role in the Cyberstalking Conspiracy

In August 2019, Mr. Harville was eBay's Director of Global Resiliency where he earned approximately $255,000 in salary and reported to Jim Baugh.  In this position, Mr. Harville generally responsible for the emergency preparedness and business continuity of eBay's employees and facilities worldwide.  On September 16, 2019, he was terminated from eBay because of this matter.  PSR ¶ 194.

In June 2019, there were a series of events involving Baugh, Brian Gilbert, Philip Cooke, Stephanie Stockwell, Veronica Zea, and others at Ebay, that led to the harassment campaign.  Mr. Harville was not involved in, and had no knowledge of, any of these events.  PSR ¶¶ 22-28.  On or about August 6, 2019, Baugh, Gilbert, Cooke, and Popp met at eBay headquarters and planned the series of harassing messages and deliveries which would ensue, as well as the white knight strategy.  Mr. Harville was in Las Vegas at the time and was not involved in, and had no knowledge of, this meeting or any of the discussions therein.  Id.  There was a second meeting at eBay on August 6, 2019, involving Baugh, Popp, Stockwell, Zea, and three GIC analysts, where

the harassment campaign was further articulated and directed by Baugh.  Mr. Harville was not

present and had no knowledge of this meeting.  Id.

From August 6 through August 10, Baugh, Popp, Gilbert, Cooke, Stockwell, Zea, and

others, initiated the harassment campaign.  During this time, members of this group sent a host of

harassing messages and deliveries to the Victims.  Mr. Harville, who was still in Las Vegas, did

not participate in, and had no knowledge of, any of these events.  Id. ¶¶ 30-43.

On August 11, 2019, Baugh directed Mr. Harville to travel to Boston to surveil the

Victim's car and home.  Id. ¶¶ 44-45.  This was the initiation of Mr. Harville into this

conspiracy.  Over the next week, Mr. Harville would obtain only limited knowledge of the

separate harassment campaign.  Consistent with his background in the US Intelligence

Community, Baugh compartmentalized the different parts of the campaign, and the harassment

campaign was largely kept separate from the surveillance campaign.  Thus, for example, on

August 12, 2019, Baugh sent Popp, Stockwell, Zea, and other GIC analysts a WhatsApp message

to "double our effort on everything. Spam, house deliveries, etc." through Wednesday of that

week.  Id. ¶ 46.  Mr. Harville was not included in that WhatsApp group message and was never,

throughout the conspiracy, included in the numerous WhatsApp messages between Baugh and

various members of the harassment and white knight groups.  See PSR ¶ 34 FN 1 ("Generally,

Baugh directed the timing of the messages and tweets. Gilbert drafted and shared them for

approval with Cooke, Baugh, and Popp in a WhatsApp group, sometimes receiving input in

response. Popp then sent the messages.").

On August 14, 2019, Baugh, Mr. Harville, Zea, Gilbert, and Popp met to discuss the

surveillance of the victim's car and home and the possibility of putting a GPS on the victim's

car.  During this meeting, Baugh told Zea to stop the deliveries since they could interfere with

the surveillance operation.  Id. ¶ 53.  On August 15, 2019, Mr. Harville used his eBay-issued

phone to visit a website that could be used to monitor the Natick police and fire departments, and

later that day Stockwell texted Mr. Harville the license plate numbers for the Victims' cars.  Id.

¶¶ 56-57.  Mr. Harville flew to Boston on August 15 and, later that day, he, Baugh, and Zea

drove to the area of the Victim's home in Natick.  They surveilled the home for approximately 2-

3 hours, during which time Baugh and Mr. Harville each separately walked down to the area of

the garage, determined that it was locked, and looked in the window at the vehicles.  Mr.

Harville did not have a GPS with him and does not know whether Baugh did but understood that

Baugh wanted to have a GPS installed on the Victim's car at some point.  Id. ¶ 59.

On the morning of August 16, 2019, Baugh and Zea drove to Natick together in a rented

Dodge Caravan.  At around lunch time, Baugh texted Mr. Harville, who was still at his Boston

hotel, and told him to get tools to break into the Victim's garage, and to rent a car and meet them

in Natick.  Mr. Harville walked to a local hardware store and bought the tools using his eBay

corporate credit card.  He then rented a car using his eBay corporate credit card and drove to

Natick, where he arrived in the late afternoon.  Mr. Harville parked several blocks away and then

walked to where Baugh and Zea were parked in the Dodge Caravan, on the victim's street, and

got in the back seat.  With Mr. Harville and Zea, Baugh drove the Dodge Caravan around the

neighborhood and several neighbors and the victims themselves saw the van.  Zea heard on a

police scanner app on her phone that the Dodge Caravan had been called in to the police and

Baugh dropped Zea and Mr. Harville at the latter's rental car and they returned to Boston.  Mr.

Harville was present in Natick for this surveillance for approximately 2-3 hours.  Id. ¶ 63.

After returning from surveillance, Baugh, Zea, and Mr. Harville went out to dinner in

Boston.  During that dinner, Baugh and Mr. Harville joked about different items that could be

left on the Victim's porch and Baugh told Zea that the deliveries to the Victim's would need to resume. Id. ¶ 67. The next day, August 17, 2019, Mr. Harville flew back to California and Popp traveled to Boston to replace him on the surveillance team. Id. ¶ 70. On August 18, 2019, Baugh, Popp, and Zea conducted an additional surveillance of the Victims' car. Id. ¶ 74.

The harassment and delivery campaign against the Victims resumed on August 18 and continued through August 20, 2019. During this time, Baugh communicated in a WhatsApp group message with, and delivered instructions to, Popp, Cooke, and Gilbert regarding the harassment campaign and the white knight strategy. Id. ¶¶ 76-84. Mr. Harville was not included in this WhatsApp message group and was not involved in, and did not have knowledge of, the harassing messages and deliveries sent during this time frame.

### B.      Application of Facts to the Pattern of Activity Enhancement

While Mr. Harville accepted Baugh's direction to join him in Boston to surveil the Victims, he was not personally involved in two or more separate "instances" of harassing the same victim. His involvement is more fairly described as a single "course of conduct" or "pattern of conduct comprised of 2 or more acts evidencing a continuity of purpose pattern of activity." That is, his conduct is more fairly described as precisely that conduct prohibited by the underlying statute under which he was charged. See 18 U.S.C. §§ 2261A & 2266(2).

Mr. Harville's conduct vis-à-vis the Victims occurred over two days (August 15 and 16, 2019), for 2-3 hours per day, and was limited to surveilling their home and car and buying tools to break into their garage to install a GPS (which did not happen). Mr. Harville's involvement is more fairly characterized as a single "pattern of conduct comprised of 2 or more acts evidencing continuity of purpose" rather than separate instances of activity or a long-term pattern. See 18 U.S.C. §§ 2261A & 2266(2). Indeed, the Indictment groups Counts Four and Five (the

substantive stalking charges involving Mr. Harville) together in a single narrative: "From on or

about August 15, 2019 through on or about August 17, 2019 . . . DAVID HARVILLE, did travel

in interstate commerce with the intent to harass, intimidate, and place under surveillance with

intent to harass and intimidate another person [Victim 1 and Victim 2]  . . . ."

Further support for this interpretation of the enhancement is set forth in Application Note

3 which provides an example of where "a defendant engaged in several acts of stalking the same

victim over a period of years…."  The period involved here was limited to two days, and Mr.

Harville's actions were directed at a singular purpose.  Mr. Harville did not engage in or know

anything about the deliveries until Baugh told Zea at the dinner on August 15, 2009, that

deliveries should stop, and Baugh told Zea at the dinner on August 16, 2019, that deliveries

should resume.  Because the harassment, threatening deliveries, and white knight strategy were

not reasonably foreseeable to Mr. Harville, they should not be considered conduct that occurred

"prior to or during the offense" for personal attribution to Mr. Harville.  The two-level

enhancement for a "pattern of activity involving stalking, threatening, harassing or assaulting the

same victim," under § 2A6.2(b)(1)(E)(E), therefore should not apply to Mr. Harville.

## II.    A DOWNWARD VARIANCE IS APPROPRIATE UNDER 18 U.S.C. §3553(A)

### A.    History and Characteristics of Mr. Harville

Prior to his involvement in this case, Mr. Harville led a positive and productive life.  He

had no prior troubles with the law, and no history of alcohol or drug abuse.  For decades, he

served honorably in the United States military, worked hard in his chosen profession of security,

and is universally described by his wife and friends as loyal, respectful, and supportive.

Mr. Harville grew up in Louisiana and graduated from Louisiana State University in

1995.  In 1990, Mr. Harville enlisted in the national guard, and he served in the Army in both

active duty and the reserves until 1999.  He served his country as a Specialist in Operation Desert Storm and later served as a Captain on active duty.  See PSR ¶¶ 190-91.  After leaving the Army Mr. Harville served, until 2002, as a Subject Matter Expert on Weapons of Mass Destruction for the US Department of Justice, Office of Domestic Preparedness.  See Harville Letter (Exhibit A1).

From January 2002 to June 2020, Mr. Harville worked almost exclusively in the security profession, earning as much as $276,000 per year.  When he lost his job (and his profession) after his Indictment, he and his wife Heidi lost their home in New York and moved in with Heidi's relatives in Las Vegas.  While he and Heidi lived in a spare bedroom for over 18 months, Mr. Harville took the only job he could get, loading boxes in a warehouse for an hourly wage. Rather than feel sorry for himself, he took to the job with enthusiasm and vigor and was quickly promoted to warehouse supervisor earning $50,000 a year.  See id. ¶¶ 192-95.  He fears and anticipates losing that job after his sentencing.

Many of Mr. Harville's friends, former co-workers, and family members have written letters that are attached hereto as Exhibits A1-13.[1]  The letters, in the aggregate, paint a picture of Dave Harville as a man who cares deeply about hard work, duty, and, perhaps most of all, helping and treating others with dignity and respect regardless of their station in life.

Deserie Presley has known Mr. Harville as a friend and mentor for 15 years.  She states:

David is always willing to give advice and truly shows he cares about people. I have grown to admire David for his great work ethic and how he approaches life. My husband and I have had success in our careers because of David's mentorship and advice. David's loyalty, work ethic, strong sense of family, friendship, and moral compass has earned my respect. David has always shown great emotional intelligence and is typically the role model in our relationship.

---

[1] Exhibit A also includes the letter from David Harville.

Linh Nguyen met Mr. Harville when he was Vice President of Operations for a company that Mr. Nguyen had recently joined.  Mr. Nguyen observes:

> His initial visit was to provide a leadership workshop to me and my leadership team. Then, upon my request, he would gladly make time for my subordinate leaders on several occasions to conduct more leadership workshops. His focus on loyalty and respect made an impact with the many employees that I worked with. . . . .
>
> . . . .  In the years that I've known David, he has exhibited an ethic of hard work, loyalty, kindness, and understanding. After he left his position with our company, he continued to give me guidance and support.  He has made a powerful impact on my career and outlook on life.

John Eversole, the Executive Vice President & Chief Security Officer at Madison Square Garden Entertainment, notes that, "[r]egardless of if it were a personal or business interaction, David was a man that cared for his friends, his peers and his employees in a way that is truly unique in the world we all operate in today."  Laura Ortiz, who has known Mr. Harville as a friend for 12 years, observes: "Dave Harville is forever in my mind because of his emission of love, care and tenderness towards the elderly and children at my first encounter with him.  I know and have seen that those virtues and heartfelt characteristics that I saw during that first encounter are the true person that Dave is."

Michael Bailey, who worked with Mr. Harville in a corporate setting, states:

> I observed that Dave had a very strong work ethic and was constantly assisting people, but most importantly helping people because he genuinely cared about their well-being. He was empathetic towards people and took ownership of making sure that at the end of his dealings with people they were in a better place than before they met him. Dave dealt with many situations where people were impacted adversely in one manner or another and Dave always made a genuine approach to the person and did his best to make sure that they took care of and helped them even after the crisis was over. I viewed this as a true barometer of his character because he took care of people above and beyond because he genuinely cared about people.

Mr. Harville's wife Heidi echoes the sentiments of his friends and former co-workers.

"David treats everyone with respect and dignity regardless of their station in life. I admire this

about him. He has made me a better person through our relationship. I want to live up to the person he is."

### B.    Nature and Circumstances of the Offense

While the cyberstalking crime is extremely serious, Mr. Harville's participation in the conspiracy was limited.  Mr. Harville was not involved in, and did not have knowledge of, any of the meetings involving Baugh and his other co-conspirators to plan the harassment and delivery campaign and the white knight strategy.  Unlike Baugh, Gilbert, Cooke, Popp, Stockwell, Zea, and GIC Analysts 1, 2, and 3, Mr. Harville did not participate in the two planning meetings kicking off the harassment campaign that took place at eBay headquarters on August 6, 2019. PSR ¶¶ 29-30.

Mr. Harville was not involved in, and did not have knowledge of, any of the harassing messages that were sent to the Victim's in this case, both before and after he engaged in his surveillance role on August 15-16, 2019.  Mr. Harville was not involved in, and did not have knowledge of, the white knight strategy.  Mr. Harville was not included in the many WhatsApp group messages between Baugh and his various co-conspirators, Popp, Zea, Stockwell, Gilbert, and Cooke, discussing the harassing messages, deliveries, and white knight strategy.  Id. ¶ 34 FN 1 ("Generally, Baugh directed the timing of the messages and tweets.  Gilbert drafted and shared them for approval with Cooke, Baugh, and Popp in a WhatsApp group, sometimes receiving input in response.  Popp then sent the messages.").

Mr. Harville was not involved in any of the deliveries that were sent to the Victims in this case.  Mr. Harville had no knowledge of the deliveries that occurred between August 8 and August 14, 2009.  He obtained some limited knowledge that there were deliveries in play when, during dinner on August 15, 2019, Baugh told Zea, in Mr. Harville's presence, that deliveries

should stop, and again during dinner on August 16, 2019, when Baugh told Zea, again in Mr.

Harville's presence, that deliveries should resume.  Mr. Harville returned to California on August

17, 2019 and had no involvement in or knowledge of any deliveries that took place between

August 17 and August 20, 2019.[2]

At Baugh's direction, Mr. Harville participated in the two surveillances of the Victim's

home and car on August 15 and 16, 2019.  At Baugh's direction, Mr. Harville bought tools to

break into the Victim's garage so that a GPS could be placed on the Victim's car.  Because the

surveillance was blown on August 16, 2019, the tools were never used, and no one broke into the

Victim's garage or placed a GPS on their vehicle.  The fact that Mr. Harville used his eBay

corporate card to buy the tools, as well as to rent the car that he drove to Natick, evinces his state

of mind at the time (i.e., he thought this was an eBay sanctioned operation).[3]

The USSG calculation overstates the seriousness of the offense for Mr. Harville where a

single course of conduct was involved that impacted two victims, as opposed to injuring two

victims in entirely different episodes.  See United States v. Hernandez Coplin, 24 F.3d 312, 319

n.7 (1st Cir.1994) (finding the Guidelines overstated the seriousness of an offense by requiring

separate groups for each victim, explaining that harm to two victims in one course of conduct is

"less culpable than injuring two victims in two entirely different episodes.").

Mr. Harville recognizes that the grouping rules under Application Note 8 of USSG §

3D1.2 envision two different groups, one for each victim (see, e.g., United States v. Vasco, 564

F.3d 12, 23 (1st Cir. 2009)), but submits that in this case, where his participation was limited and

---

[2] On or about August 21, 2019, Baugh forwarded to Mr. Harville threatening tweets that Popp had sent Victim 1 earlier that day.  PSR ¶ 95.  Mr. Harville was in California at the time and had not been involved in the case since he left Boston on August 17, 2019.

[3] Baugh's initial messages to Mr. Harville implied that this was an eBay sanctioned operation.  See PSR ¶¶ 44-45 ("I won't send the bosses texts, but I've been ordered to find and destroy.").

the same course of conduct impacted two victims, the resulting USSG calculation overstates the seriousness of the offense for him. Although the offense conduct resulted in "independent, personal, and deeply traumatic effects" to two separate victims (see United States v. Nedd, 262 F.3d 85, 92 (1st Cir.2001)), the surveillance involved a single course of conduct designed for a singular purpose. Indeed, as previously noted, the Indictment groups Counts Four and Five, the substantive stalking charges involving Mr. Harville, together in a single narrative.

If the Court agrees that neither the two-level enhancement for pattern of activity nor the two-levels for grouping apply, then the TOL is 17, leading to a GSR of 24-30 months.[4] In any event, under 28 U.S.C. § 3553, we submit that the appropriate sentence is well below both the GSR calculated by the government and the GSR calculated by Mr. Harville so the Court need not necessarily decide these guidelines issues.

### C.    Need for the Sentence Imposed under 28 U.S.C. § 3553

#### 1.    Avoiding Unwarranted Sentencing Disparities -- Relative Culpability

Four other defendants in this matter have been convicted and are awaiting sentencing (Gilbert, Popp, Stockwell, and Zea). The clear and unequivocal leader of this conspiracy, Baugh, is scheduled for sentencing earlier the same day as Mr. Harville. Philip Cooke is the only defendant sentenced to date. On July 27, 2021, Judge Burroughs sentenced Cooke to a term of incarceration of 18 months, and 12 months home confinement as a special condition of supervised release. Judge Burroughs calculated Cooke's guideline sentencing range as 30-37 months, based on TOL 19 and CHC I. See Cooke Sent. at 14. Analysis of Cooke's role in the conspiracy shows that he was far more involved, and far more culpable, than Mr. Harville.

---

[4] With respect to grouping, the request is technically for a two-level downward variance.

Cooke was a Senior Manager on eBay's Global Security Team at the time of the offense and a retired police captain with 27 years' experience on the police force.  In contrast to Mr. Harville, Cooke was involved in the planning and execution of both the harassment campaign and the white knight strategy.  Cooke was present for the August 6, 2019, meeting at eBay headquarters with Baugh, Gilbert, and Popp in which "the group . . . planned a series of anonymous, harassing messages to the Victims."  PSR ¶ 29.  "The four discussed that the messages would become increasingly hostile and that they would culminate in the doxing of the Victims (*i.e.*, the publication of the Victims' address and other personal information over the internet)."  Id.  The four also discussed the white knight strategy and Baugh informed the other three that the GIC would be sending deliveries to the Victims' home.  Id.

In contrast to Mr. Harville, Cooke was also involved in the execution of the scheme to send harassing messages and deliveries and he was included in the WhatsApp group messages (with Baugh, Gilbert, and Popp) discussing various aspects of the scheme.  See, e.g., id. ¶ 34 FN 1 ("Generally, Baugh directed the timing of the messages and tweets.  Gilbert drafted and shared them for approval with Cooke, Baugh, and Popp in a WhatsApp group, sometimes receiving input in response.  Popp then sent the messages."); id. ¶ 32 ("On or about August 6, 2019, Popp created a Twitter account in the name of '@Tui_Elei,' a Samoan-sounding name that Popp, Cooke, Gilbert and Baugh had discussed using ('the @Tui_Elei Account').  The @Tui_Elei Account featured a profile picture of a skeleton mask, which was intended to scare the Victims.").

Throughout August 2019, Baugh confided in and kept Cooke, Gilbert, and Popp apprised by WhatsApp message of the status of the harassment campaign.  On August 20, 2019, for example, "Baugh sent Popp, Gilbert, and Cooke a video from the movie Old School in which a

character announces at a stranger's front door that he has arrived for a 'gang bang.'  Baugh noted 'this has been the [Victims'] house for the past 5 nights.' Gilbert, the former police captain, replied, 'Lol!!! Awesome.' Cooke, another former police captain, replied 'Hahaha.'"  Id. ¶ 81.

Unlike Mr. Harville, Cooke was also involved in the planning of the white knight strategy, again through the WhatsApp group messaging connection between the four core conspirators -- Baugh, Cooke, Popp, and Gilbert.  For example, "[o]n August 20, 2019, Gilbert messaged Baugh, Popp, and Cooke to propose introducing 'additional on-line supporters of our cause. The next time [Victim 1] posts something negative have Tui [i.e., the @Tui_Elei Account] hit her with, 'Why do you keep attacking us and hurting om family business???' Then, introduce a new player to support Tui with, "I agree! [The Newsletter] is hurting small businesses with all the negativity, pushing buyers to Amazon." Id. ¶ 76.  Cooke responded to the proposed language with a "thumbs up" emoji.  Id. ¶ 77.  Gilbert then responded to the group: "Then introduce a crazy 3rd party who joins with, '[Victim 1] focus on something else and stop fucking with our customers! I don't want to see another fucking post about ebay. Leave our businesses alone!!! When she doesn't respond, then this, 'What the fuck?!?! Hey what was [Victim's] home address again? I guess I have to pay her a visit. The Tui can send . . . their home address again." Id.  In a reference to the white knight strategy, Gilbert concluded to the group: "This sets up my contact with them." Id.  Cooke and Popp then replied to Gilbert's proposal: "Copy all." Id. ¶ 78.

Finally, Cooke, along with Baugh, Gilbert, and Popp, was also involved in the *planning* (as well as the execution) of the scheme to obstruct the NPD investigation.  Id. ¶¶ 86-113.  This involved a host of WhatsApp messages between this core group of four conspirators during which they also decided to re-initiate the harassment campaign against the Victims.  See, e.g., ¶ 92 (Popp asked Cooke, Gilbert, and Baugh by WhatsApp message: "Am I clear to start tweeting

[Victim 1]?").  They also monitored the anxiety level of the Victims.  <u>See, e.g.</u>, ¶ 97 ("Gilbert messaged Baugh, Popp, and Cooke that the Victims were 'totally rattled.'").

This core group of four conspirators also planned and decided the strategy that *they* would employ to explain the presence of Mr. Harville and Zea for the surveillance.  <u>See, e.g.</u>, ¶ 104 ("On or about August 21, 2019, Gilbert messaged Baugh, Popp, and Cooke: '. . . We can say [Zea] and Harville were looking into the Tui case. That investigation is confidential and details weren't shared with Special Ops. I'll [] brief the cops on the [Victims'] background and make them look like the problem. The cops just want a logical and legitimate reason for [Zea] and Harville being here.").  <u>See also</u> <u>id.</u> ¶107 (Gilbert message: "We just need to explain away [Zea] and Dave's [Harville's] activities. Adamantly deny any deliveries and put focus on the POIs."); ¶ 108 (Gilbert message: "How does this sound for [Zea] and [Harville]: - they were in Boston for the conference (if we can prove it) . . .); ¶ 109 (On or about August 21, 2019, "Baugh messaged Popp, Cooke, and Gilbert, 'for Daves cover . . . since he is business continuity, we could just tell them we are reopening our Boston office - which is confidential. . . .").

Cooke, the former police captain, was one of the four core group of conspirators involved in the planning, organizing, ongoing managing, and execution of all aspects of the cyberstalking conspiracy.  By contrast, Mr. Harville was involved, at the direction of his boss (Baugh), in the surveillance of the Victims on August 15 and August 16, 2019.  At Baugh's direction, he also executed his part of the coverup planned and organized by Baugh, Cooke, Gilbert, and Popp (i.e., he deleted or attempted to delete data from his mobile phone and lied to eBay investigators (<u>id.</u> ¶¶ 123-24)).  Mr. Harville takes responsibility for those actions.  Unlike Cooke, however, he was not a leader, not a planner, not an organizer, and was not part of the core group of four that

shared information about all aspects of the conspiracy. In this respect, under § 3553, he is far less culpable than Cooke and warrants a sentence that reflects his relative culpability.

### 2. Specific and General Deterrence

There is no need for specific deterrence here. Mr. Harville has been a law-abiding and productive member of society his entire life. He served proudly in the United States Army for nine years, including on active duty during Operation Desert Storm and achieving the rank of Captain. He was proud and fulfilled in his profession in the security business and knows full well that, because of his conviction for these crimes, he will never be able to serve in that profession again. He has been humbled and publicly humiliated. Judge Burroughs observation regarding Cooke applies with equal force to Mr. Harville. "I very much doubt we will see this defendant here or involved in the criminal justice system again." Cooke Sent. at 51.[5]

As to general deterrence, the eBay matter has received intense media coverage worldwide, and a bright spotlight has been shined on all participants. This prosecution has sent an unequivocal message to the public about how the federal government, with all its resources and expertise, will treat cyberstalking and obstruction of justice. There is also a related civil case which will continue to garner attention and keep this case in the spotlight and the public will continue to see all the negative ramifications for the defendants because of their conduct. Everyone who follows this case understands and will continue to understand just how serious it was and just how serious it is being treated from a variety of different avenues.

---

[5] For the same reasons that specific deterrence is unnecessary there is no need to protect the public from further crimes of Mr. Harville and no grounds for incarceration on this basis.

D.        **A Sentence of Probation or Home Confinement is Appropriate in this Case**

Under 28 U.S.C. § 3553, the Court has the authority to impose a non-guideline sentence

of probation for defendants, like Mr. Harville, who are first-time non-violent offenders "provided

that the terms and conditions of probation can be fashioned so as to meet fully the statutory

purposes of sentencing, including promoting respect for law, providing just punishment for the

offense, achieving general deterrence, and protecting the public from further crimes by the

defendant."  See 28 U.S.C. § 3553, § 5B (Introductory Comment) ("The Comprehensive Crime

Control Act of 1984 makes probation a sentence in and of itself.").  See also USSG, Supplement

to Appendix C (November 1, 2018) (implementing 28 U.S.C. § 994(j) and providing that "[t]he

Commission shall insure that the guidelines reflect the general appropriateness of imposing a

sentence other than imprisonment in cases in which the defendant is a first offender who has not

been convicted of a crime of violence").

The Supreme Court recognized in Gall v. United States, 552 U.S. 38, 48-49 (2007), that

probation "is not an act of leniency" but a "substantial restriction of freedom."  As the Gall Court

observed:

> [O]ffenders on probation are . . . subject to several standard conditions that
> substantially restrict their liberty. Probationers may not leave the judicial district,
> move, or change jobs without notifying, and in some cases receiving permission
> from, their probation officer or the court. They must report regularly to their
> probation officer, permit unannounced visits to their homes, refrain from
> associating with any person convicted of a felony, and refrain from excessive
> drinking.  USSG §5B1.3.  Most probationers are also subject to individual
> "special conditions" imposed by the court.

Id. (citations omitted).  See also United States v. Knights, 534 U. S. 112, 119 (2001) ("Inherent

in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which

every citizen is entitled'") (quoting Griffin v. Wisconsin, 483 U. S. 868, 874 (1987)).

Since <u>Gall</u>, courts have frequently recognized that probation is a real sentence that serves real jurisprudential considerations.  <u>See, e.g.</u>, <u>United States v. Ramos</u>, No. 04-cr-10275-NG (D.Mass.2008) ("<u>Gall</u> recognized . . . that probation is not nothing, that there are substantial restrictions on an individual's freedom in probation, that we can structure a probationary sentence that meets all the purposes of sentencing, and that is entirely appropriate").  If the Court determines that probation is not appropriate, we submit that a sentence of 12 months home confinement would be an appropriate alternative.

Conclusion

For the foregoing reasons, Mr. Harville respectfully requests that the Court sentence him to a term of probation or, in the alternative, to 12 months home confinement.  He also requests that the Court find that no fine is warranted.

> Respectfully submitted,
>
> */s/ Peter K. Levitt*
> Peter K. Levitt (BBO# 565761)
> Donnelly Conroy & Gelhaar, LLP
> Boston, Massachusetts 02110
> pkl@dcglaw.com

September 24, 2022                      (617) 720-2880

<u>CERTIFICATE OF SERVICE</u>

I, Peter K. Levitt, hereby certify that on this date, September 24, 2022, a copy of the foregoing document has been served via the Electronic Court Filing system on all registered participants.

> */s/ Peter K. Levitt*
> Peter K. Levitt