# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JIM BAUGH *et al.* | No. 20-cr-10263-PBS |

**DEFENDANT JIM BAUGH'S
SENTENCING MEMORANDUM**

William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

*Counsel for Defendant Jim Baugh*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ....................................................................................................................... 4

      A.    Childhood, Education, and Family ................................................................ 4

      B.    Professional Experience Prior to eBay ....................................................... 5

      C.    Work at eBay from 2016 to 2019 ................................................................ 5

      D.    Additional offense context ........................................................................... 7

      E.    Life after arrest and prosecution ................................................................ 19

ARGUMENT ............................................................................................................................ 20

      A.    The "Pattern of Activity" enhancement is inapplicable ............................ 21

      B.    The proposed sentence will provide just punishment. ............................... 24

      C.    Neither specific nor general deterrence requires more than 30 months' incarceration. ............................................................................................. 27

      D.    Imprisonment would not facilitate any required "treatment." ................... 28

CONCLUSION .......................................................................................................................... 29

CERTIFICATE OF SERVICE ................................................................................................. 30

Defendant Jim Baugh respectfully submits this Memorandum, accompanying letters,[1] and other exhibits to assist the Court with sentencing.

## INTRODUCTION

Jim Baugh is a devoted, father, son, brother, and friend. Those who have known him longest describe him as unfailingly dependable and generous with his time, attention, and financial resources. He has no prior criminal record, but does have a distinguished history of service both as a U.S. government employee and in the private sector.

While Mr. Baugh's role in the bizarre and disturbing criminal conduct at issue betrayed the principles he defended throughout his career, it was an aberrational episode in his life. Mr. Baugh recognizes that he stands before the Court guilty of very serious offenses that caused severe harm to real people. He has taken responsibility and accepts that meaningful punishment will follow.

But with all due respect to the government's sentencing arguments, Mr. Baugh should not be sentenced as the "face" of eBay, subject to a high-end "Guideline" term of imprisonment because this case involved the "resources of a Fortune 500 company" used to inflict a "three-week nightmare" on "a Natick couple, whose journalism had angered two of the company's most senior executives." Gov. Mem. at 1.

Yes, the Steiners suffered terribly, did not deserve it, and continue to struggle in the aftermath. Yes, Mr. Baugh is accountable for his actions, "knew better," and should have acted accordingly. Yes, Mr. Baugh is the most senior eBay employee the government chose to prosecute, and bears an extra measure of responsibility for his supervisory role. But stopping there ignores

---

[1] Exhibit A is an allocution letter from Mr. Baugh to the Court. Exhibit B is a compilation of support letters from third parties. Home addresses and contact information, as well as the names of children, have been redacted from the publicly-filed letters. Counsel can provide unredacted copies to the Court upon request.

the broader reality of what happened. Mr. Baugh had no personal animus against the Steiners, no psychotic pleasure in fostering fear, no desire to inflict harm for its own sake, and no disdain for "First Amendment values." Gov. Mem. at 14.

Rather, from his cubicle adjacent to the private offices in the insular, high-pressure environment of a Silicon Valley C-Suite, Mr. Baugh was convinced to view the Steiners (*wrongly*, he recognizes in hindsight) not as journalists but as dangerous "trolls" who posed an existential threat to the company and even to the physical safety of its employees. Mr. Baugh faced intense, relentless pressure from multiple executives (who have evaded criminal responsibility), including the CEO Devin Wenig, SVP Steve Wymer, COO Wendy Jones, and General Counsel Marie Huber, to do something, anything, about the "threat" which, they knew and told Mr. Baugh repeatedly, could not be solved through ordinary "lawyer" tools.

Indeed, reflecting a toxic culture that goes to the very top of many powerful technology companies, senior eBay executives hired Mr. Baugh precisely because of his prior experience as a government security professional with a demonstrated ability to solve difficult problems through unconventional means. *See, e.g.*, Kate Conger, *Uber Survived the Spying Scandal. Some Careers Didn't*, NEW YORK TIMES (Nov. 28, 2021) (quoting former CIA officer employed by Uber: "In the government, when you're given a mission or you're given a task, you go and you execute on the mission . . . . Your experience tells you to go execute because your boss or the leadership have given you this task, and you worry about how to do it — not whether or not you should do it, because you've never had to worry about that before.").[2]

---

[2] Available at https://www.nytimes.com/2021/12/06/technology/uber-spying-allegations.html.

The Steiners were a "threat" that Wenig, Wymer, Jones, and Huber were obsessed with neutralizing. Meanwhile, Mr. Baugh was a tool to be used—and then discarded, as an army of outside lawyers descended to conduct an "internal investigation" aimed at saving the company and its top executives from prosecution. Of course, that does not excuse Mr. Baugh's conduct. Although pushing back against a powerful CEO may not have been realistic, Mr. Baugh could and should have exercised good judgment grounded in common sense and just walked away. He deeply regrets his failure to do so. He has also candidly acknowledged and proactively addressed the contribution of alcoholism to his regrettable judgment.

Mr. Baugh cannot undo what he did, but context still bears on appropriate punishment. Accordingly, and for the reasons elaborated more fully below, we submit that **30 months imprisonment followed by 36 months of supervised release** is the appropriate sentence in this case. It is a severe sentence, a full year longer than that imposed on the only co-conspirator sentenced thus far, and commensurate with sentences in this district for other kinds of high-profile corporate misconduct, even in cases that involved extensive physical harm to many individual people.

Other than perhaps Mr. Baugh's young daughters, few would shed a tear or criticize the Court for following the government's recommendation. No punishment could ever be enough to undo what was done to the Steiners. But this Court has a more holistic responsibility than simply expressing community outrage, rigidly applying the advisory Guidelines in very unusual circumstances, or "sending a message" that will be loudly and widely broadcast across media that have avidly reported every salacious detail of this case.

Warehousing Mr. Baugh in federal prison for *additional* months or years would confer no marginal benefit on anyone and do nothing to advance the purposes of sentencing. To the contrary,

sentencing Mr. Baugh severely, as the capstone of eBay's role in the case, sends precisely the

wrong message of impunity to corporate executives, that the security professionals they employ

will absorb all the criminal exposure for corporate misconduct if the executives maintain willfully

blind, "don't ask, don't tell" distance from operational specifics, as they claim to have done here.

## BACKGROUND[3]

### A.    Childhood, Education, and Family

Mr. Baugh is now 47 years old. Born and raised in Arkansas, his sister, Jill, described his

childhood and education:

> Jim grew up in a small town with a population of approximately 2000 people.
> Educational resources were scarce in our town, but Jim was able to overcome this.
> He completed a bachelor's degree in Criminology, a master's degree in Public
> Administration, and also earned his Pilot's License at the age of 18. He continued
> his flight training and later got a Commercial/Multi-engine License. After he
> graduated college, he packed a U-Haul and moved from Arkansas to Los Angeles
> alone for his first job. This is significant because most people never leave the small
> town where we grew up. Jim was raised on our family farm, and he started working
> there when he was only 9 years old. This instilled a very strong work ethic in
> Jim that has lasted throughout his entire life.
>
> While in graduate school at the University of Oklahoma, Jim used what extra time
> he had available to volunteer at Big Brothers Big Sisters of America where is
> mentored an abused child for approximately three years before moving out-of-state.
> Over the next 5 years, Jim continued to stay in contact with his little brother and
> continued to send him birthday and Christmas presents. Jim's efforts had a positive
> impact on this child, and I know his life would have turned out much differently if
> he'd never met Jim. I was inspired by Jim's dedication to community service, so
> much that I later volunteered at the same organization and became a Big Sister. Jim
> continued his involvement in other charity organizations, such as the Seattle Milk
> Fund. By participating in this charity, Jim and his wife would adopt families during
> Christmas time and provide presents to them and their children.

Mr. Baugh married in 2009 but is now in the process of finalizing a divorce. He is the proud father

of two daughters. Mr. Baugh's sister, Tammy, explained:

---

[3] The narrative in this section is a cursory synopsis based on the more extensive social history
contained in the PSR and accompanying letters.

He has two beautiful daughters, E[] (10) and S[ ] (7) who are his world. They rely on Jim for financial, emotional, and physical support. They think he hung the moon. I feel that an extended sentence would be extremely detrimental to E[ ] and S[ ] as they are very young and need their father during this very fragile time in their lives.

### B.    Professional Experience Prior to eBay

After graduate school, Mr. Baugh went to work at Microsoft as a protection agent for the Chairman and CEO. He left Microsoft to work for the National Clandestine Service of the CIA. He later returned to the private sector where he was employed directly by a company Bill Gates established to support the Gates Foundation, and then as an independent security consultant. He worked on many high-profile protection details including, for example, then-Vice President Joe Biden at the 2016 Oscars. *See* Ex. C. He also provided private volunteer assistance to the FBI and CIA. Over the course of this work, he earned the trust and respect of security professionals around the world. A Danish colleague, Martin Keloe, wrote:

> Jim was a very hard-working security agent who was very dedicated to protecting his clients. He always went the extra mile to make sure the people he was protecting were safe and that he had control over all imaginable and unimaginable scenarios. Jim has helped me a lot over the last 15 years and has always been willing to put himself aside to help others. It is a quality I have greatly appreciated over the years and hopefully can continue to benefit from in the future as well.

With regard to Mr. Baugh's criminal conduct, Mr. Keloe added:

> As a former Police Officer, I have a deep understanding and appreciation for the law, and I do not condone what happened. But since I have been in Jim's shoes, I also have an understanding of how something like this could have happened when there is intense pressure from the top.

### C.    Work at eBay from 2016 to 2019

Mr. Baugh went to work at eBay in 2016. As the head of eBay's Global Security and Resiliency operations, he managed over 300 employees in 95 locations worldwide. Putting aside the offense conduct, Mr. Baugh is rightly proud of the honorable, demanding, and necessary work

his team performed on a daily basis to keep eBay's personnel and assets safe. As just one example, in 2017:

> In the aftermath of Hurricane Irma's devastation, eBay employee Ursula Marren found herself stranded on Tortola in the British Virgin Islands. Ursula, a manager on [eBay's] Audit team based in San Jose, had been sailing off the island's coast with her brother as part of her sabbatical. They tried to leave the island in advance of the storm but couldn't get a flight. The hotel where they were in was left uninhabitable, with a collapsing foundation, by Irma's strong winds and flooding.

> Ursula and her brother, Adrian, quickly went into survival mode, making sure they had enough food and water, and searching for shelter on higher ground. They also became the caregivers to two elderly couples—one who was also vacationing and the other who lived on the island.
> …
> The security team was quick to respond. Stephanie Popp, Sr. Manager of eBay's Global Intelligence Center, activated a chain of events to rescue Ursula and her brother.
> …
> Over three days, the nine-person GIC team led by Jim Baugh, Senior Director of Global Security, evaluated all possible avenues to rescue Ursula and Adrian. The team had to act quickly, Baugh explains, because not only were conditions deteriorating on Tortola, with reports ranging from crime and looting to uninhabitably and people swimming off the island to try to reach boats that could lead to their return home, but also Hurricane José was brewing in the distance.

> "Our only priority was to ensure Ursula and her brother were safely evacuated from the island. In addition to working through our standard emergency response protocol, we were constantly thinking: What else can we do? Who else can we call? What other resources do we have in the region that could possibly assist?" Jim said. "At that point, we immediately activated our emergency evacuation protocol and put a backup special operations contingency on standby."

> With Stephanie taking lead, the team worked around the clock attempting to contact Ursula through any means possible, while also comforting her family, coworkers and close friends, assuring them that eBay and the rescue effort would bring Ursula and Adrian home.
> …

Along with the help of ISOS, an eBay travel partner who provides emergency medical assistance, the GIC deployed a helicopter to rescue Ursula, Adrian and the elderly couple who were also vacationing there.[4]

Given his responsibilities, Mr. Baugh was preoccupied by the potential for a "copycat" replay of two external events that occurred during his tenure at the company. On October 1, 2017, a gunman opened fire on a crowd attending a music festival from the 32d floor of the Mandalay Bay Hotel in Las Vegas, killing 60 people.[5] Mr. Baugh was worried that a similar attack could occur at the annual "eBay Open," a major gathering of eBay sellers in Las Vegas. (Indeed, the 2019 eBay Open was scheduled to take place at the Mandalay Bay, itself.) Separately, on April 3, 2018, an armed woman entered the headquarters of YouTube in San Bruno, California, and opened fire, wounding three people, one of them critically, before killing herself.[6] Mr. Baugh worried that eBay was particularly vulnerable to a similar attack because its headquarters in nearby San Jose was spread across a poorly protected, multiple-building campus comprising more than a city block. Fueling these serious and sincere concerns was the existence of a small but very angry and fractious sliver of the eBay seller community, some of whom were believed to be unstable, armed, and dangerous. Executives sometimes derisively referred to this cohort as "hillbilly garage sale" merchants.

### D. Additional offense context

As Mr. Baugh made clear in his letter to the Court, he offers no excuses for his offense conduct. He knew better and should have acted accordingly. Still, additional context is helpful to

---

[4] Kendall Fields, *Swooping in to Rescue and Employee in the Aftermath of Hurricane Irma*, ebay HUB (September 20, 2017) (attached as Exhibit D).

[5] *See generally* https://en.wikipedia.org/wiki/2017_Las_Vegas_shooting.

[6] *See generally* https://en.wikipedia.org/wiki/YouTube_headquarters_shooting.

understand how and why an otherwise honorable man, with a long and unblemished career of serving the public and protecting others, would come to commit these crimes.

The Executive Leadership Team ("ELT") at eBay, in particular, Devin Wenig (CEO), Steve Wymer (Senior Vice President ("SVP") for Communications), Wendy Jones (SVP and COO), and Marie Huber (SVP and General Counsel), viewed eCommerceBytes (the Steiners' publication), the readers who posted comments on eCommerceBytes, and a Twitter account called "FidoMaster" (at various times, @unsuckEBAY and @FidoMaster1) as existential threats to the company. The ELT suspected that FidoMaster was either an alter-ego or collaborator of the Steiners, and that, together, they incited hostility from the seller "fringe" who posed a physical security threat to eBay employees.

In addition, the ELT suspected the Steiners and FidoMaster of colluding with and possibly receiving funding from an activist investor, Elliott Management, that was critical of eBay executives and wanted to obtain seats on the company's Board. The General Counsel, Marie Huber, advised the ELT that ordinary tools such as lawsuits and cease-and-desist letters would be ineffective to address the "problems" posed by eCommmerceBytes and FidoMaster. So the ELT turned to Mr. Baugh. The ELT was aware of Mr. Baugh's background, his primary responsibility for *physical* security, and his reputation for creative solutions to difficult problems. While the ELT never asked Mr. Baugh about specifics of his plans, it was certainly foreseeable to the ELT that Mr. Baugh would use harassment or other coercive means in an effort to modify behavior.

Concerns about FidoMaster first emerged in the June 2018 after it made a profane post on the eCommerceBytes blog in response to an article about eBay layoffs.



eBay's security team was concerned that FidoMaster had insider knowledge about Wenig's private travel plans for the July 4 holiday. On July 20, 2018, Fidomaster tweeted a request for Wenig's address in the Hamptons, tagging eCommeceBytes, with an ominous reference to Jack Welch's book entitled "Execution":



Then, on July 24, 2018, FidoMaster posted an eBay logo spattered in blood. The post tagged eCommerceBytes and SilverIceKing, a regular contributor to eCommerceBytes.



Throughout the summer of 2018, multiple negative tweets about the upcoming eBay Open event in Las Vegas prompted additional concerns about incitement of threats to physical security. FidoMaster also started to refer to Wenig as "DevilBoy."

The ELT's concerns about FidoMaster's threats and apparent connections to eCommerceBytes escalated further in the Spring of 2019. In an email thread on March 21, 2019, reacting to a FidoMaster tweet, General Counsel Marie Huber asked Mr. Baugh to provide "as much info as possible" on Fidomaster.

From: Huber, Marie <mhuber@ebay.com>
Sent: Thursday, March 21, 2019 9:06 AM
To: Rome, Marc; Finn, Molly; Baugh, Jim
Cc: Billante, Joe; Freiha, Selim
Subject: RE: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first

2

dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by
#ElliottManagement 😡 #En...

Thanks.  Jim, can you give us as much info as possible on whose account this is?  Thanks, Marie

From: Rome, Marc <mrome@ebay.com>
Sent: Thursday, March 21, 2019 8:43 AM
To: Finn, Molly <mofinn@ebay.com>; Huber, Marie <mhuber@ebay.com>
Subject: Re: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first
dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by
#ElliottManagement 😡 #En...

I assume we don't know who is behind the account?

Huber further instructed Mr. Baugh to notify her of all relevant online activity, and she separately inquired about a Twitter handle in the name of Jesse Cohn, a representative of Elliott Management on the eBay Board:

From: "Huber, Marie" <mhuber@ebay.com>
Date: Thursday, March 21, 2019 at 10:48 AM
To: Jim Baugh <jbaugh@ebay.com>
Cc: "Rome, Marc" <mrome@ebay.com>
Subject: RE: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 🤷 #En...

Thanks, Jim. Please incl us on any messages like this as we've been dealing with the activists and know what's in the ags w/them.

Also, understand there's a "Jesse Cohn" Blind handle. Any way to find out who that is?

Thanks,
Marie

From: Baugh, Jim <jbaugh@ebay.com>
Sent: Thursday, March 21, 2019 10:23 AM
To: Huber, Marie <mhuber@ebay.com>; Rome, Marc <mrome@ebay.com>; Finn, Molly <mofinn@ebay.com>
Cc: Billante, Joe <jbillante@ebay.com>; Freiha, Selim <selim@ebay.com>
Subject: Re: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 🤷 #En...

It is unknown who is behind the account.

I will send you a full report.

Jim Baugh
Sr. Director, Global Security
+1.408.768.8717

On May 22, 2019, FidoMaster and eCommerceBytes posted information about "Walker's West," a replica of Wenig's favorite New York pub constructed on the eBay campus. Baugh, Wymer, and Wendy Jones (Senior Vice President, COO, and Mr. Baugh's direct manager) discussed the issue by email on May 23, 2019. The information was apparently obtained from a building contractor's website, and apart from the embarrassment for supposed extravagant spending, the security team viewed publication of information about campus buildings as a potential security risk. Even after the contractor removed the information from its website, eCommerceBytes located and posted an archived version. Jones asked Mr. Baugh to "huddle on this at lunch…"

| Subject: | Re: Ina Steiner - Walker's West |
| --- | --- |
| Date: | Thursday, May 23, 2019 at 6:15:18 AM Pacific Daylight Time |
| From: | Jones, Wendy |
| To: | Phimister, Russell |
| CC: | Baugh, Jim |
| Attachments: | image009.png, image001.jpg, image006.jpg, image007.jpg, image008.jpg |

Let's huddle on this at lunch please today.

At the lunch meeting, Jones asked Mr. Baugh if he could find a way to deal with the issue "off the radar since comms and legal couldn't handle it." Jones told Mr. Baugh, "Just get it done. I don't want to know the details, just make sure you sync with Wymer." Mr. Baugh thereafter provided regular updates to Jones.

On June 8, 2019, co-conspirator Brian Gilbert spray painted "FidoMaster" on the Steiners' fence. Mr. Baugh told Wymer that his team had given the Steiners "a tap on the shoulder." Wymer expressed approval but did not ask questions. In the immediate aftermath of the vandalism, the ELT was pleased, because they executives perceived that negative postings had subsided.

On July 10, 2019, an eBay user emailed Wenig to complain about FidoMaster. This was discussed in an email thread that included Wymer and Huber, noting that Twitter would not take any action against the account. On July 15, Wymer forwarded the thread to Mr. Baugh, "FYI."

On July 18, 2019, Wenig's wife texted Mr. Baugh to complain about a post by Silver Ice King on eCommerceBytes:



cindywenig@yahoo.com >

by: Silver Ice King 🐾

Thu Jul 18 21:45:54 2019

Just another one of Wenigs lies. Judge
Judy says how can you tell that a
teenager is lying?  A)  Their lips are
moving.  You can substitute Wenig for
Teenagers and you are still right on the
nose.

Wenig is nothing more than a con artist
and thief who would not know the truth if
it was actually spoken to him.  One of
these days it will finally catch up to him
and when it does finally land, the landing
will be a crash landing for Wenig.

eBay CEO Devin Wenig Cites Extended Seller

I'm not exactly thrilled with this
post on my favorite
EcommerceBytes.com.  The
author gets people worked up
with the way she skews her
stories. Don't tell Devin I sent
this –I'm just letting you know
about it.  Ok?

On or about July 19, 2019, Mr. Baugh met with Jones and played a recorded call between a security team member using a false identity and a subject associated with FidoMaster.  Jones "fist bumped" Mr. Baugh.

On August 1, 2019, Mr. Baugh and Wymer exchanged text messages:



Wymer added, "I'll embrace managing any bad fall out. We need to STOP her."

On August 6, 2019, Wenig received another email complaint about FidoMaster. He sent the following email to Huber, Wymer, and Mr. Baugh: "First of all we should shut down the account. Second, this user name keeps popping up causing all kinds of trouble. Might be worth some research Jim." Wymer responded that he had Mr. Baugh had been working on the issue. Huber and her colleagues responded that legal remedies were not and would not be effective. Huber wrote:

From: Huber, Marie <mhuber@ebay.com>
Sent: Tuesday, August 6, 2019 10:00 AM
To: Wenig, Devin <devin@ebay.com>; Wymer, Steve <swymer@ebay.com>
Cc: Baugh, Jim <jbaugh@ebay.com>; Johnson, Aaron <aajohnson@ebay.com>; Huber, Marie <mhuber@ebay.com>
Subject: FW: eBay Imposter Twitter account - Privileged

Oh man, ditto.  We have escalated through legal channels at Twitter and they've said that this doesn't violate their policies. (He also harasses me and others.) –

Unfortunately, it does not violate copyright laws b/c someone can use a logo in parody, and that's not actionable under the law.  Also, the user has a disclaimer saying that it isn't affiliated with eBay.

The next step could be a letter to Twitter and/or the Twitter user from our outside counsel.  Even tho' this is not a strong legal claim, we can send a letter.   It gets closer to the line to the extent the user purports to give advice on eBay policies;  it's still a tough claim.

If we send a letter, the user could tweet it and create more cycles.  Legally, we don't care about that, but don't know Steve if you do.

Marie

Mr. Baugh separately texted with Wenig:

Devin >

I'm utilizing an alias twitter account and have been communicating directly with this individual for a couple of weeks. He is under the impression that I'm an "ally" of his. I'm slowly drawing him out, but it's a painfully slow process. Sorry I have not found him yet, but when I do, it will be fixed.

It's cool don't worry

You know this comes with the territory and it's part of running w consumer company.  I'm relaxed

Cool...hope you are getting some down time...there will be plenty of problems waiting for you when you return 😊

Delivered

Yes unfortunately I'm aware and plugged in enough to know !

Mr. Baugh then forwarded the thread to Jones (to provide "visibility," keeping her in the loop). Jones responded with a "thumbs up."





On August 7, 2019, Aaron Johnson, another in-house lawyer, emailed Huber, Wymer, and Mr. Baugh:

---

**From:** Johnson, Aaron <aajohnson@ebay.com>
**Sent:** Wednesday, August 7, 2019 3:39:13 PM
**To:** Wymer, Steve <swymer@ebay.com>
**Cc:** Baugh, Jim <jbaugh@ebay.com>; Huber, Marie <mhuber@ebay.com>
**Subject:** RE: eBay Imposter Twitter account - Privileged

(-Devin)

Steve - What's your thinking on this from a comms perspective? We've escalated at Twitter, but as noted, the legal claim is weak and Twitter is notoriously slow to respond (~3 weeks) and rigid in their interpretation of the law and their policies. We can continue to press this, but to set expectations, I don't think they'll take action. The other avenue is to go after the Twitter directly with a cease & desist letter (if we can find him/her). That also has a low likelihood of success and potential backfire (low risk). Given the strength of the claims and the cost, I'd strongly recommend against suing.

Jim – any news/developments on your end?

Let me know if you want to discuss live.

Thanks,
aj

---

Wymer then responded to the group:

**Subject:** Re: eBay Imposter Twitter account - Privileged
**Date:** Wednesday, August 7, 2019 at 3:43:05 PM Pacific Daylight Time
**From:** Wymer, Steve .
**To:** Johnson, Aaron
**CC:** Baugh, Jim, Huber, Marie

I am utterly vexed by this! This twitter account dominates our social narrative with his CONSTANT obsession with trolling us. It's more than annoying, it's very damaging. There are a few people (this guy and the eComercebytes gal) infatuated with eBay who have seemingly dedicated their lives to erroneously trashing us as a way to build their own brand – or even build a business. It's genuinely unfair and causes tremendous damage because we look bad fighting back in public and standing up for ourselves. If we could engage, I'd welcome the fight and we have a lot of facts and truth to win with. But, instead we take shots broadside and sit on our powder. This issue gives me ulcers, harms employee moral, and trickles into everything about our brand. I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the "blind eye toward graffiti that turns into mayhem" syndrome and I'm sick about it. Whatever. It. Takes.

Shortly after that email, Wymer met Mr. Baugh:

- Wymer was very agitated, pointing his finger, etc.
- He instructed Baugh to take any actions necessary to neutralize the Steiners and identify FidoMaster.
- "Direct order" from the CEO.
- Wymer did not want to know details but assured Mr. Baugh that his group would have "executive level support" if efforts led to "any legal problems."
- "Devin [Wenig] wants the website burned to the ground."
- "The only thing that matters is that it stops."
- "If it doesn't stop, we are all done."
- "eBay Corporate is willing to absorb any legal exposure."

Later, in the immediate aftermath of the "blown operation" in Boston, Wymer spoke by phone

with Mr. Baugh.

- Wymer stated that he and Jones were aware of operation because they saw an email from Natick PD to eBay legal.
- Wymer reasoned that harassment – which he equated to "TPing" a house – is not a crime.
- Wymer seemed nervous and said multiple times that he didn't know anything about what was going on but that he wouldn't say anything to legal during its internal investigation.
- Wymer told Mr. Baugh, "Stick to your guns," which Mr. Baugh understood as instruction to have his security team stick to its cover story about attending an industry conference in Boston.
- Wymer asked Mr. Baugh how long it would be before legal started reading his emails/texts; Mr. Baugh said he didn't know.
- Wymer told Mr. Baugh they "just needed to get rid of the Hardy Boys," referring to eBay legal.

### E.    Life after arrest and prosecution

After being fired by eBay and then charged in this case, the explosion of publicity made it

impossible for Mr. Baugh to secure employment. His marriage also disintegrated.

After "hitting bottom" in his years-long descent into alcoholism, Mr. Baugh voluntarily

checked into an in-patient treatment program and has continued follow-up care. He has now been

sober for over two years.

For a substantial part of his pretrial release, Mr. Baugh moved to the Seattle area to restore

and maintain a relationship with his young daughters and assist in their care while his ex-wife

worked full-time. More recently, he moved back home to Arkansas, where he has lived with one of his sisters and helped his elderly father run the family farm. He intends to return there after completing his sentence.

* * *

This information, and the additional letters submitted with this Memorandum, demonstrate that Mr. Baugh and the conduct underlying his conviction are both far more complex than the most salacious facts or headlines viewed in isolation.

## ARGUMENT

A criminal penalty must be "sufficient, but not greater than necessary, to comply with the purposes of sentencing." 18 U.S.C. § 3553(a). Here, fair consideration of the offense in light Mr. Baugh's role, history, and characteristics compels the conclusion that incarceration for a term of 30 months is sufficient.

The Court is required to compute the Guideline Sentencing Range ("GSR") as a "starting point and the initial benchmark." *Gall v. United States*, 528 U.S. 38, 49 (2007). Here, the government and Probation take the position that the advisory GSR is 57-71 months (level 25, CHC I), while Mr. Baugh contends that the properly calculated GSR is 46-57 months (level 23, CHC I).

Whatever GSR the Court adopts, the Guidelines are not the sole factor, nor even the first among the many factors, that Congress has commanded the courts to apply in section 3553(a). The Court "may not presume that the Guidelines range is reasonable," rather it must "make an individualized assessment based on the facts presented." *Id.* at 50. Indeed, "the Guidelines are only one of the factors to consider . . . and 3553(a) directs the judge to consider sentences other than imprisonment." *Id.* at 59. The Supreme Court has emphasized that the "Guidelines are not only

*not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) (emphasis in original).

Thus, district courts are now required to consider whether the Sentencing Commission's underlying policy results in an advisory GSR that is unreasonably high. *See United States v. Kimbrough*, 552 U.S. 85, 109 (2007); *United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008); *United States v. Martin*, 520 F.3d 87, 93-94 (1st Cir. 1998).

The First Circuit has elaborated on the meaning and breadth of the so-called "parsimony principle" in *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008). It stressed that the Supreme Court's ruling in *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *Id*. at 228. That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

## A.    The "Pattern of Activity" enhancement is inapplicable.

Mr. Baugh objects to the proposed application of a 2-level "pattern of activity" enhancement under U.S.S.C. § 2A6.2(b)(1)(E) where, as here, the underlying charged offenses themselves are inherently based on multiple related acts of harassment. *See* 18 U.S.C. § 2261A(2) (punishing use of interstate commerce facilities "to engage in a *course of conduct*" that causes fear or emotional distress). Application Note 1 to section 2A6.2 defines a "pattern of activity" as

> any combination of two or more separate instances of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction. For example, a single instance of stalking accompanied by a separate instance of threatening, harassing, or assaulting the same victim constitutes a pattern of activity for purposes of this guideline.

21

Application Note 3 further directs the Court to "*consider*" (but not necessarily count), "under the totality of the circumstances, any conduct that *occurred* prior to or during the offense" (but notably, not conduct that *constitutes* elements of the offense). The application notes do not define what is meant by "separate instances."

The First Circuit has applied the enhancement where there are *other* instances of stalking *separate* from the charged offense conduct, whether those instances occurred before or during the charged offense. For example, in *United States v. Lee*, 790 F.3d 12, 19 (1st Cir. 2015), which the government cites but misinterprets, the defendant engaged in decades of abuse and harassment of his wife, culminating in a trip to find her in Maine, where he was arrested with a car full of weapons and materials that could be used to clean up a grisly murder scene. *See id*. at 14-15. The defendant was charged with interstate travel with the intent to kill, injure or harass, in violation of 18 U.S.C. § 2261A(1); he was not charged under the "communication" prong of the statute, section 2261A(2). The First Circuit held that an uncharged series of contemporaneous threatening emails was sufficient to trigger the "pattern of activity" enhancement, without need to consider still other, additional, older incidents of physical abuse. *See id.* at 19 & n.3. Critically, *Lee* did *not* endorse application of the enhancement for activity that was already encompassed in the charges. *See also United States v. Sayer,* 748 F.3d 425, 431 (1st Cir. 2014) (noting "pattern" enhancement was applied for "a long-term pattern of stalking, threatening, or harassing behavior" separate from the charged conduct); *United States v. Robinson*, 433 F.3d 31, 36-37 (1st Cir. 2005) (affirming application of "pattern" enhancement based on prior incidents of assault in case charging travel to violate restraining order).

As explained above, the statute itself requires a "course of conduct," 18 U.S.C. § 2261A(2), which is defined, in turn, as "a pattern of conduct comprised of 2 or more acts evidencing a

continuity of purpose." 18 U.S.C. § 2266(2). If applied in circumstances like those here, the enhancement would duplicate the "course of conduct" element of the crime and would result in an enhanced sentence for every cyberstalking case.

The government's reliance on *United States v. Fiume*, 708 F.3d 59 (1st Cir. 2013), is misplaced. *Fiume* held that imposition of an enhancement for violation of a restraining order was not impermissible double-counting in a case charging interstate travel to violate such an order, *see id.* at 62, but the decision does not require or endorse double-counting in other contexts. Unlike the "pattern" enhancement, the "restraining order" enhancement is not cabined or limited by any application notes. Moreover, consistent with *Lee*, the district court in *Fiume* applied a "pattern" enhancement based on a prior assault conviction and threatening communications *separate* from the charged "travel" offense. *See id.* at 60-61. The government has not identified any case in this Circuit where a court imposed the "pattern" enhancement based on conduct encompassed by the offense itself.

Notably, in sentencing co-conspirator Philip Cooke, Judge Burroughs decided to "duck the issue and just use the lower guideline calculation without ruling on the objection." *United States v. Cooke*, No. 20-cr-10126-ADB, D.E. 25 (Jul. 27, 2021 Sent. Tr.) at 13. Judge Burroughs explained:

> I don't know the answer to this question. I don't think it's an easy thing. And I think that the guidelines are poorly drafted on it. It would lead to double counting; that the application notes from the case law don't make clear to me that it's what the guideline commission contemplated, but I also accept and agree with Mr. Kost[o] that there are aspects of the sentencing guidelines where double counting is allowed and contemplated, but I'm just not sure this is one of them....

*Id.* at 14. She then sentenced Mr. Cooke to 18 months imprisonment, twelve months below the low-end of the range that did *not* include the enhancement.

For these reasons, the Court should not apply the "pattern" enhancement. Accordingly, the total offense level should be 23, which for a defendant in criminal history category I (because Mr. Baugh has no criminal record), yields an advisory GSR of 46-57 months.

**B.     The proposed sentence will provide just punishment.**

The proposed sentence of 30 months' imprisonment followed by 36 months' supervised release is sufficient to reflect the seriousness of Mr. Baugh's offenses, to promote respect for the law, and to provide "just punishment" as required by § 3553(a)(2)(A).

While it is easy to become inured to enormous numbers in the federal sentencing system, incarceration for 30 months is a substantial penalty by any measure. As the government points out, cyberstalking cases are "each horrifying in their own way" for the victims. Gov. Mem. at 15. From the point of view of harm caused, the proposed sentence of 30 months is consistent with *overall* national, Circuit, and District norms identified by the government from Commission statistics. However, if the same data collection is limited to defendants, like Mr. Baugh, in Criminal History Category I, the national average sentence was 22 months and the median sentence 18 months.  The First Circuit average sentence was 18 months and the median sentence 15 months. And the District of Massachusetts average and median sentences were both 15 months.[7] Thus, the proposed sentence is actually *double* the District average for defendants, like Mr. Baugh, with no criminal history. Indeed, there have been cases in this district where far more disturbing conduct over a much longer time period resulted in a significantly lower sentence. *See, e.g.*, *United States v. Connor*, No. 15-cr-10398-WGY (defendant engaged in three-year campaign of threats and intimidation plus extortion of sexually explicit images from college student; court imposed "time

---

[7] *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (filtered by 2015-2021, U.S.S.G. §§ 2A6.1 and 2A6.2, and CHC I).

served" sentence of approximately one month, plus 10 months home confinement, where GSR was 24-30 months).[8]

Here, of course, the offense was *sui generis*. On one hand, Mr. Baugh's supervisory role and obstructive conduct are aggravating factors, but on the other hand, his incarceration is not necessary to protect the victims or the public from a defendant with a personal animus, one who is psychotic, unable to control his anger, or otherwise presents an acute danger of further stalking or committing actual deadly physical violence. Mr. Baugh poses no ongoing danger and the offense, itself, never entailed any intent to inflict actual, physical violence.

The proposed sentence in this case is a year more than that imposed on Cooke, the only co-conspirator sentenced to date and one of the former senior police officials whom Mr. Baugh employed and relied on to advise him about legal limits of acceptable activity.

As another comparative measure of appropriate punishment for corporate misconduct, the proposed sentence here is also consistent with the sentences imposed *after trial* in the Insys Pharmaceuticals prosecution, a high-profile case involving fraudulent sales and marketing of a specialized fentanyl pain medication that cost the government and private insurers millions in improper reimbursements and caused grievous physical and other harm to numerous patients who were not appropriate candidates to take the drug and became addicted to it. Facing a GSR of well over 10 years, the billionaire CEO and founder of the company received a sentence of 60 months; the other high-level executives received sentences ranging from 12 to 33 months. *See United States v. Simon*, 12 F.4th 1, 22 n.3 (1st Cir. 2021). It strains credulity to contend that Mr. Baugh somehow caused more harm or should be punished more severely than the Insys defendants under Kapoor,

---

[8] *See* https://www.justice.gov/usao-ma/pr/pennsylvania-man-sentenced-cyberstalking-and-sextorting-massachusetts-college-student.

who were convicted and sentenced after a lengthy trial. To do so would create unwarranted disparity.

Moreover, a federal felony conviction is also, by itself, a severe penalty, particularly for an individual with no criminal history whatsoever. Mr. Baugh has endured, and will continue to suffer, humiliation, stress, and financial devastation that he scarcely could have imagined before. Courts have recognized that myriad severe collateral consequences attach to a federal felony conviction, which can amount to a kind of "civil death." *United States v. Nesbeth*, 188 F. Supp. 3d 179, 181 (E.D.N.Y. 2016) (lengthy opinion detailing collateral consequences of conviction in imposing non-incarceration sentence). The district court's observations at sentencing in *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), also deserve attention:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong they have committed.

*Id*. at 343-44 (upholding sentence of probation with six months' home confinement and 1,000 hours of community service where the district court calculated the GSR as 87-108 months after conviction at a lengthy trial on over 100 felony counts of false statements and fraud related to the "Big Dig" project).

Finally, probation supervision as part of a required term of supervised release is also meaningful punishment. As the Supreme Court noted in *Gall*, probation supervision amounts to a "substantial restriction of freedom." 552 U.S. at 595. In combination with more than two years of pre-trial release (much of which he spent subject to a curfew), the proposed sentence will mean Mr. Baugh spends nearly eight years of his life in a combination of federal custody and supervision.

There is no need or principled reason to impose even more custody as a component of that punishment.

### C. Neither specific nor general deterrence requires more than 30 months' incarceration.

Imprisonment is not necessary to protect the public or to deter Mr. Baugh from similar crimes in the future, as required by § 3553(a)(2)(B) and (C). Mr. Baugh has no prior criminal history. The offense conduct was aberrant, not the product of any personal animus or propensity to inflict harm on others. Mr. Baugh will never work in corporate security again and has learned a lasting, painful lesson about the dangers of abdicating personal moral judgment to an employer's ill-conceived priorities.

A 30-month sentence, and even the very fact of federal prosecution, are also more than sufficient serve the interest in *general* deterrence. Nobody looking at what Mr. Baugh has experienced, the pain inflicted on him and his family, and the obstacles he will face in the future could mistakenly conclude that his commission of crimes as an agent of eBay was anything other than extremely serious or that they should engage in similar conduct.  Life as Mr. Baugh knew it is already demolished, and no purpose would be served by prolonging his incapacitation gratuitously, chiefly at the expense of his young daughters. Moreover, sentencing Mr. Baugh as a proxy for the company and the most culpable person in the harassment scheme would send precisely the wrong message to Weing, Wymer, Jones, and Huber, who were the real "but for" causes of the crime, and their C-suite peers in other companies.

Moreover, there are no data to suggest that a longer sentence would have any marginally greater general deterrent effect. Empirical research consistently has shown that "increases in the severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006). "Three National

Academy of Science panels . . .reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Research regarding white-collar offenders in particular (presumably, the most rational of potential offenders) found *no difference* in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). On the other hand, a substantial body of evidence establishes that "crime-reducing aspects of imprisonment are considerably negated by crime-enhancing ones." Todd Clear, *Backfire: When Incarceration Increases Crime, The Unintended Consequences of Incarceration* (Vera Inst. 1996).

### D. Imprisonment would not facilitate any required "treatment."

Mr. Baugh plainly does not require "treatment" of the sort that a Bureau of Prisons placement would *uniquely* facilitate under § 3553(a)(2)(D). While he would surely benefit from the BOP's residential substance abuse treatment program ("RDAP"), and would welcome the opportunity to participate, the Court need not impose a sentence of imprisonment greater than 30 months for that reason. The Court also should bear in mind that Mr. Baugh likely will not receive any sentence credit for RDAP, nor will he likely benefit from other types of "earned" credits under the First Step Act, because the BOP categorically classifies "cyberstalking" as a violent crime that apparently renders him ineligible for such credits.[9] Like every prisoner, he can earn "good time,"

---

[9] *See* https://www.bop.gov/policy/progstat/5162_005.pdf.

but under current BOP policies, he will serve substantially all of the sentence this Court imposes and likely will not get any kind of perceived "break" from the recent federal sentencing "reforms" enacted by Congress.

Accordingly, the statutory "treatment" factor would counsel in favor of a shorter prison sentence. As the Sentencing Commission staff has recognized, sentences that include lesser periods of incarceration "divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." U.S. Sentencing Commission, Staff Discussion Paper, Sentencing Options Under the Guidelines, at 19 (Nov. 1996).

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should sentence Mr. Baugh to 30 months in custody followed by an additional 36 months of supervised release, with a recommendation that he participate in RDAP. While it also may be appropriate for the Court, in its discretion, to impose a fine, the Court should bear in mind that the case has already financially devastated Mr. Baugh and any fine payable to the government will reduce the resources available for resolution of the civil case brought by the Steiners and for support of Mr. Baugh's young daughters.

Respectfully submitted,

**JIM BAUGH**

By his attorneys,

*/s/ William W. Fick*
William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 27, 2022.

*/s/ William W. Fick*