# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
    v.                              )        20-cr-10263-PBS
                                    )
DAVID HARVILLE,                     )
                                    )
    Defendant.                      )
_____   )

**AMENDED SENTENCING MEMORANDUM OF DAVID HARVILLE**

On May 12, 2022, David Harville pled guilty to conspiracy to commit cyberstalking and multiple counts of interstate stalking. He has been on pretrial release without issue since June 2020. In their plea agreement, the parties take no position on the sentencing guidelines, or the position they will take at sentencing, and the government agrees to dismiss the witness tampering and obstruction of justice charges at sentencing.

The PSR and letters of support submitted on his behalf show that, throughout his life, Mr. Harville has been a good person. He served his country with dignity in the United States Army, has been a dedicated and successful professional, a valuable and contributing member of his community, and has always gone out of his way to help others. As a result of this prosecution, Mr. Harville has endured significant punishment already. He lost a job and a profession that he loved and had prepared for his entire adult life, was humiliated and embarrassed in his community, and had to start his life over from ground zero. As articulated in his letter to the Court, Mr. Harville has accepted full responsibility for his misconduct, is remorseful for his bad decisions, and is determined to do whatever it takes to rehabilitate his name and again become a productive member of society. See Letter of David Harville (Exhibit A1).

Mr. Harville has zero criminal history points.  The Presentence Investigation Report, dated September 22, 2022 (the PSR), calculates his Total Offense Level (TOL) as 21 with a guideline sentencing range (GSR) of 37-46 months.  PSR ¶¶ 166, 170.  For the reasons described herein, we submit that Mr. Harville should receive neither the two-level enhancement for pattern of activity under USSG § 2A6.2(b)(1) nor the two-levels for grouping under USSG § 3D1.2. This would result in a TOL of 19 and a GSR of 24-30 months.  In any event, for the reasons described herein and at the sentencing hearing, we submit that the factors under 28 U.S.C. § 3553, particularly that involving relative culpability, warrant a sentence significantly below the GSR.  Specifically, Mr. Harville submits that a sentence of probation or, in the alternative, 12 months home confinement, is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553.

## I.   THE PATTERN OF ACTIVITY ENHANCEMENT SHOULD NOT APPLY

The two-level enhancement for a "pattern of activity involving stalking, threatening, harassing or assaulting the same victim," under § 2A6.2(b)(1)(E)(E), should not apply to Mr. Harville.  Application Note 1 defines "pattern of activity" as any combination of "two or more *separate instances* of . . . harassing. . . the same victim, whether or not such conduct resulted in conviction." (Emphasis added.)  The notes do not define "instances."  The First Circuit has applied the enhancement to defendants who have engaged in other instances of stalking (or other violative) conduct separate from the offense conduct, rather than multiple instances of stalking or threats forming the course of the offense conduct itself.  See, e.g., United States v. Robinson, 433 F.3d 31, 36-37 (1st Cir.2005); United States v. Lee, 790 F.3d 12, 18-19 (1st Cir.2015); United States v. Walker, 665 F.3d 212 (1st Cir.2011) (applying "pattern" enhancement where defendant was convicted of multiple counts of cyberstalking, each count emanating from a particular

communication, along with a years-long history of other stalking and threatening behavior);

United States v. Fiume, 708 F.3d 59 (1st Cir.2013) (applying the pattern where defendant

assaulted his wife in 2010, which resulted in a protective order, then violated the protective order

in 2015 by sending a series of threatening communications).  See also United States v. Sayer,

748 F.3d 425, 431 (1st Cir.2014) (noting that the two-point enhancement was for "*long-term*

*pattern[s]*" of stalking, threatening, or harassing behavior) (emphasis added).

      The First Circuit's interpretation is logical because the statute itself requires a "course of

conduct," 18 U.S.C. § 2261A, which is in turn defined as "a pattern of conduct comprised of 2 or

more acts evidencing a continuity of purpose."  18 U.S.C. § 2266(2). Under the government's

interpretation, the enhancement is no different than the "course of conduct" element of the crime

and would result in the application of the enhancement in *every* cyberstalking case.  That cannot

be the purpose of an enhancement which implies an additional meaning or concern -- i.e., an

*enhancement* for facts rising to that level of meaning or concern.

      Application Note 3 provides that in determining whether (b)(1)(E) applies, the court shall

consider "under the totality of the circumstances, any conduct that occurred prior to or during the

offense; however, conduct that occurred prior to the offense must be substantially and directly

connected to the offense."  There was no "prior" conduct alleged.  To determine whether the

"during the offense" prong should apply to Mr. Harville, therefore, it is necessary to review his

conduct "during the offense."

      The government does not allege that Mr. Harville was involved in, or had advance

knowledge of, any of the harassing messages or deliveries that were at the heart of this

conspiracy.  Nor does the government allege that he was involved in the white knight strategy.

Indeed, he was involved in neither.  As the government alleges, Mr. Harville was not part of the

conspiracy that began on August 5, 2019, which focused on sending harassing messages and deliveries to David and Ina Steiner (the "Victims").  The government does not allege that Mr. Harville joined the conspiracy until August 11, 2019, when his boss, Jim Baugh, directed him to travel to Boston for an "op" targeting Victim 1 and her website.  See PSR ¶¶ 17, 44.

Mr. Harville was in Las Vegas from August 6 to August 11, 2019, and had no knowledge of, or involvement in, any of the harassing performed by other eBay employees during this period.  See id. ¶¶ 29-43.  Similarly, Mr. Harville was not involved in, and had no knowledge of, the renewed harassment campaign involving messages and deliveries which took place between August 17 and August 20, 2019.  See id. ¶¶ 68-85.  Mr. Harville returned to California on August 17, 2019, and Stephanie Popp flew to Boston to replace him on the surveillance team.  Id. ¶ 70.

Mr. Harville's involvement in this matter, as it pertains to the Victims, was limited to two surveillances of their home and car (on August 15 and August 16, 2019), each of which lasted approximately 2-3 hours, which Mr. Harville participated in at the direction of his boss, Baugh.  Because Mr. Harville was not involved in the threatening messages or deliveries in which his co-conspirators engaged, and those acts were not reasonably foreseeable to him, that conduct should not be attributed to him personally as conduct that occurred "during the offense."

The sentencing of co-conspirator Philip Cooke is instructive.  The government sought the two-level "pattern" enhancement under § 2A6.2(b)(1)(E)(E).  Judge Burroughs declined to decide the issue.  Instead, she stated: "What I would do is duck the issue and just use the lower guideline calculation without actually ruling on the objection."  See United States v. Cooke, 20-10126-ADB, Transcript of Sentencing Hearing, dated July 27, 2021 ("Cooke Sent."), at 13-14 (a copy of the sentencing hearing transcript is attached hereto as Exhibit B).  Judge Burroughs further commented:

I'll leave it at this for those that come after me. I don't know the answer to this question. I don't think it's an easy thing. And I think that the guidelines are poorly drafted on it. It would lead to double counting; that the application notes from the case law don't make clear to me that it's what the guideline commission contemplated, but I also accept and agree with Mr. Kosta that there are aspects of the sentencing guidelines where double counting is allowed and contemplated, but I'm just not sure this is one of them, and I'm not going to come down with a decision on that given how that issue is resolved is not particularly material to the sentencing that we're going to do today. So that is a punt. I am going to sentence him based on the following advisory guideline sentencing range with the understanding that my focus is on the conduct and not so much on the exact place where the guidelines end up. With the grouping and where I come out with an adjusted base offense level of 19 which results in an advisory guideline sentencing range of 30 to 37 months given that he has zero criminal history points and is in Criminal History Category I. So again that's 30 to 37 months.

Id.

### A.     Mr. Harville's Role in the Cyberstalking Conspiracy

In August 2019, Mr. Harville was eBay's Director of Global Resiliency where he earned approximately $255,000 in salary and reported to Jim Baugh. In this position, Mr. Harville was generally responsible for the emergency preparedness and business continuity of eBay's employees and facilities worldwide. On September 16, 2019, he was terminated from eBay because of this matter. PSR ¶ 194.

In June 2019, there were a series of events involving Baugh, Brian Gilbert, Philip Cooke, Stephanie Stockwell, Veronica Zea, and others at Ebay, that led to the harassment campaign. Mr. Harville was not involved in, and had no knowledge of, any of these events. PSR ¶¶ 22-28. On or about August 6, 2019, Baugh, Gilbert, Cooke, and Popp met at eBay headquarters and planned the series of harassing messages and deliveries which would ensue, as well as the white knight strategy. Mr. Harville was in Las Vegas at the time and was not involved in, and had no knowledge of, this meeting or any of the discussions therein. Id. There was a second meeting at eBay on August 6, 2019, involving Baugh, Popp, Stockwell, Zea, and three GIC analysts, where

the harassment campaign was further articulated and directed by Baugh.  Mr. Harville was not present and had no knowledge of this meeting.  Id.

From August 6 through August 10, Baugh, Popp, Gilbert, Cooke, Stockwell, Zea, and others, initiated the harassment campaign.  During this time, members of this group sent a host of harassing messages and deliveries to the Victims.  Mr. Harville, who was still in Las Vegas, did not participate in, and had no knowledge of, any of these events.  Id. ¶¶ 30-43.

On August 11, 2019, Baugh directed Mr. Harville to travel to Boston to surveil the Victim's car and home.  Id. ¶¶ 44-45.  This was the initiation of Mr. Harville into this conspiracy.  Over the next week, Mr. Harville would obtain only limited knowledge of the separate harassment campaign.  Consistent with his background in the US Intelligence Community, Baugh compartmentalized the different parts of the campaign, and the harassment campaign was largely kept separate from the surveillance campaign.  Thus, for example, on August 12, 2019, Baugh sent Popp, Stockwell, Zea, and other GIC analysts a WhatsApp message to "double our effort on everything. Spam, house deliveries, etc." through Wednesday of that week.  Id. ¶ 46.  Mr. Harville was not included in that WhatsApp group message and was never, throughout the conspiracy, included in the numerous WhatsApp messages between Baugh and various members of the harassment and white knight groups.  See PSR ¶ 34 FN 1 ("Generally, Baugh directed the timing of the messages and tweets. Gilbert drafted and shared them for approval with Cooke, Baugh, and Popp in a WhatsApp group, sometimes receiving input in response. Popp then sent the messages.").

On August 14, 2019, Baugh, Mr. Harville, Zea, Gilbert, and Popp met to discuss the surveillance of the victim's car and home and the possibility of putting a GPS on the victim's car.  During this meeting, Baugh told Zea to stop the deliveries since they could interfere with

the surveillance operation.  Id. ¶ 53.  On August 15, 2019, Mr. Harville used his eBay-issued phone to visit a website that could be used to monitor the Natick police and fire departments, and later that day Stockwell texted Mr. Harville the license plate numbers for the Victims' cars.  Id. ¶¶ 56-57.  Mr. Harville flew to Boston on August 15 and, later that day, he, Baugh, and Zea drove to the area of the Victim's home in Natick.  They surveilled the home for approximately 2-3 hours, during which time Baugh and Mr. Harville each separately walked down to the area of the garage, determined that it was locked, and looked in the window at the vehicles.  Mr. Harville did not have a GPS with him and does not know whether Baugh did but understood that Baugh wanted to have a GPS installed on the Victim's car at some point.  Id. ¶ 59.

On the morning of August 16, 2019, Baugh and Zea drove to Natick together in a rented Dodge Caravan.  At around lunch time, Baugh texted Mr. Harville, who was still at his Boston hotel, and told him to get tools to break into the Victim's garage, and to rent a car and meet them in Natick.  Mr. Harville walked to a local hardware store and bought the tools using his eBay corporate credit card.  He then rented a car using his eBay corporate credit card and drove to Natick, where he arrived in the late afternoon.  Mr. Harville parked several blocks away and then walked to where Baugh and Zea were parked in the Dodge Caravan, on the victim's street, and got in the back seat.  With Mr. Harville and Zea, Baugh drove the Dodge Caravan around the neighborhood and several neighbors and the victims themselves saw the van.  Zea heard on a police scanner app on her phone that the Dodge Caravan had been called in to the police and Baugh dropped Zea and Mr. Harville at the latter's rental car and they returned to Boston.  Mr. Harville was present in Natick for this surveillance for approximately 2-3 hours.  Id. ¶ 63.

After returning from surveillance, Baugh, Zea, and Mr. Harville went out to dinner in Boston.  During that dinner, Baugh and Mr. Harville joked about different items that could be

left on the Victim's porch and Baugh told Zea that the deliveries to the Victim's would need to resume.  Id. ¶ 67.  The next day, August 17, 2019, Mr. Harville flew back to California and Popp traveled to Boston to replace him on the surveillance team.  Id. ¶ 70.  On August 18, 2019, Baugh, Popp, and Zea conducted an additional surveillance of the Victims' car.  Id. ¶ 74.

The harassment and delivery campaign against the Victims resumed on August 18 and continued through August 20, 2019.  During this time, Baugh communicated in a WhatsApp group message with, and delivered instructions to, Popp, Cooke, and Gilbert regarding the harassment campaign and the white knight strategy.  Id. ¶¶ 76-84.  Mr. Harville was not included in this WhatsApp message group and was not involved in, and did not have knowledge of, the harassing messages and deliveries sent during this time frame.

### B.  Application of Facts to the Pattern of Activity Enhancement

While Mr. Harville accepted Baugh's direction to join him in Boston to surveil the Victims, he was not personally involved in two or more separate "instances" of harassing the same victim.  His involvement is more fairly described as a single "course of conduct" or "pattern of conduct comprised of 2 or more acts evidencing a continuity of purpose pattern of activity."  That is, his conduct is more fairly described as precisely that conduct prohibited by the underlying statute under which he was charged.  See 18 U.S.C. §§ 2261A & 2266(2).

Mr. Harville's conduct vis-à-vis the Victims occurred over two days (August 15 and 16, 2019), for 2-3 hours per day, and was limited to surveilling their home and car and buying tools to break into their garage to install a GPS (which did not happen).  Mr. Harville's involvement is more fairly characterized as a single "pattern of conduct comprised of 2 or more acts evidencing continuity of purpose" rather than separate instances of activity or a long-term pattern.  See 18 U.S.C. §§ 2261A & 2266(2).  Indeed, the Indictment groups Counts Four and Five (the

substantive stalking charges involving Mr. Harville) together in a single narrative: "From on or about August 15, 2019 through on or about August 17, 2019 . . . DAVID HARVILLE, did travel in interstate commerce with the intent to harass, intimidate, and place under surveillance with intent to harass and intimidate another person [Victim 1 and Victim 2] . . . ."

Further support for this interpretation of the enhancement is set forth in Application Note 3 which provides an example of where "a defendant engaged in several acts of stalking the same victim over a period of years…." The period involved here was limited to two days, and Mr. Harville's actions were directed at a singular purpose. Mr. Harville did not engage in or know anything about the deliveries until Baugh told Zea at the dinner on August 15, 2009, that deliveries should stop, and Baugh told Zea at the dinner on August 16, 2019, that deliveries should resume. Because the harassment, threatening deliveries, and white knight strategy were not reasonably foreseeable to Mr. Harville, they should not be considered conduct that occurred "prior to or during the offense" for personal attribution to Mr. Harville. The two-level enhancement for a "pattern of activity involving stalking, threatening, harassing or assaulting the same victim," under § 2A6.2(b)(1)(E)(E), therefore should not apply to Mr. Harville.

## II.    A DOWNWARD VARIANCE IS APPROPRIATE UNDER 18 U.S.C. §3553(A)

### A.    History and Characteristics of Mr. Harville

Prior to his involvement in this case, Mr. Harville led a positive and productive life. He had no prior troubles with the law, and no history of alcohol or drug abuse. For decades, he served honorably in the United States military, worked hard in his chosen profession of security, and is universally described by his wife and friends as loyal, respectful, and supportive.

Mr. Harville grew up in Louisiana and graduated from Louisiana State University in 1995. In 1990, Mr. Harville enlisted in the national guard, and he served in the Army in both

active duty and the reserves until 1999.  He served his country as a Specialist in Operation Desert Storm and later served as a Captain on active duty.  <u>See</u> PSR ¶¶ 190-91.  After leaving the Army Mr. Harville served, until 2002, as a Subject Matter Expert on Weapons of Mass Destruction for the US Department of Justice, Office of Domestic Preparedness.  <u>See</u> Harville Letter (Exhibit A1).

From January 2002 to June 2020, Mr. Harville worked almost exclusively in the security profession, earning as much as $276,000 per year.  When he lost his job (and his profession) after his Indictment, he and his wife Heidi lost their home in New York and moved in with Heidi's relatives in Las Vegas.  While he and Heidi lived in a spare bedroom for over 18 months, Mr. Harville took the only job he could get, loading boxes in a warehouse for an hourly wage. Rather than feel sorry for himself, he took to the job with enthusiasm and vigor and was quickly promoted to warehouse supervisor earning $50,000 a year.  <u>See</u> <u>id.</u> ¶¶ 192-95.  He fears and anticipates losing that job after his sentencing.

Many of Mr. Harville's friends, former co-workers, and family members have written letters that are attached hereto as Exhibits A1-13.[1]  The letters, in the aggregate, paint a picture of Dave Harville as a man who cares deeply about hard work, duty, and, perhaps most of all, helping and treating others with dignity and respect regardless of their station in life.

Deserie Presley has known Mr. Harville as a friend and mentor for 15 years.  She states:

> David is always willing to give advice and truly shows he cares about people. I have grown to admire David for his great work ethic and how he approaches life. My husband and I have had success in our careers because of David's mentorship and advice. David's loyalty, work ethic, strong sense of family, friendship, and moral compass has earned my respect. David has always shown great emotional intelligence and is typically the role model in our relationship.

---

[1] Exhibit A also includes the letter from David Harville.

Linh Nguyen met Mr. Harville when he was Vice President of Operations for a company that Mr. Nguyen had recently joined.  Mr. Nguyen observes:

> His initial visit was to provide a leadership workshop to me and my leadership team. Then, upon my request, he would gladly make time for my subordinate leaders on several occasions to conduct more leadership workshops. His focus on loyalty and respect made an impact with the many employees that I worked with.
> . . . .
>
> . . . .  In the years that I've known David, he has exhibited an ethic of hard work, loyalty, kindness, and understanding. After he left his position with our company, he continued to give me guidance and support.  He has made a powerful impact on my career and outlook on life.

John Eversole, the Executive Vice President & Chief Security Officer at Madison Square Garden Entertainment, notes that, "[r]egardless of if it were a personal or business interaction, David was a man that cared for his friends, his peers and his employees in a way that is truly unique in the world we all operate in today."  Laura Ortiz, who has known Mr. Harville as a friend for 12 years, observes: "Dave Harville is forever in my mind because of his emission of love, care and tenderness towards the elderly and children at my first encounter with him.  I know and have seen that those virtues and heartfelt characteristics that I saw during that first encounter are the true person that Dave is."

Michael Bailey, who worked with Mr. Harville in a corporate setting, states:

> I observed that Dave had a very strong work ethic and was constantly assisting people, but most importantly helping people because he genuinely cared about their well-being. He was empathetic towards people and took ownership of making sure that at the end of his dealings with people they were in a better place than before they met him. Dave dealt with many situations where people were impacted adversely in one manner or another and Dave always made a genuine approach to the person and did his best to make sure that they he took care of and helped them even after the crisis was over. I viewed this as a true barometer of his character because he took care of people above and beyond because he genuinely cared about people.

Mr. Harville's wife Heidi echoes the sentiments of his friends and former co-workers.

"David treats everyone with respect and dignity regardless of their station in life. I admire this

about him. He has made me a better person through our relationship. I want to live up to the person he is."

## B.     Nature and Circumstances of the Offense

While the cyberstalking crime is extremely serious, Mr. Harville's participation in the conspiracy was limited.  Mr. Harville was not involved in, and did not have knowledge of, any of the meetings involving Baugh and his other co-conspirators to plan the harassment and delivery campaign and the white knight strategy.  Unlike Baugh, Gilbert, Cooke, Popp, Stockwell, Zea, and GIC Analysts 1, 2, and 3, Mr. Harville did not participate in the two planning meetings kicking off the harassment campaign that took place at eBay headquarters on August 6, 2019. PSR ¶¶ 29-30.

Mr. Harville was not involved in, and did not have knowledge of, any of the harassing messages that were sent to the Victim's in this case, both before and after he engaged in his surveillance role on August 15-16, 2019.  Mr. Harville was not involved in, and did not have knowledge of, the white knight strategy.  Mr. Harville was not included in the many WhatsApp group messages between Baugh and his various co-conspirators, Popp, Zea, Stockwell, Gilbert, and Cooke, discussing the harassing messages, deliveries, and white knight strategy.  Id. ¶ 34 FN 1 ("Generally, Baugh directed the timing of the messages and tweets.  Gilbert drafted and shared them for approval with Cooke, Baugh, and Popp in a WhatsApp group, sometimes receiving input in response.  Popp then sent the messages.").

Mr. Harville was not involved in any of the deliveries that were sent to the Victims in this case.  Mr. Harville had no knowledge of the deliveries that occurred between August 8 and August 14, 2009.  He obtained some limited knowledge that there were deliveries in play when, during dinner on August 15, 2019, Baugh told Zea, in Mr. Harville's presence, that deliveries

should stop, and again during dinner on August 16, 2019, when Baugh told Zea, again in Mr.

Harville's presence, that deliveries should resume.  Mr. Harville returned to California on August

17, 2019 and had no involvement in or knowledge of any deliveries that took place between

August 17 and August 20, 2019.[2]

At Baugh's direction, Mr. Harville participated in the two surveillances of the Victim's

home and car on August 15 and 16, 2019.  At Baugh's direction, Mr. Harville bought tools to

break into the Victim's garage so that a GPS could be placed on the Victim's car.  Because the

surveillance was blown on August 16, 2019, the tools were never used, and no one broke into the

Victim's garage or placed a GPS on their vehicle.  The fact that Mr. Harville used his eBay

corporate card to buy the tools, as well as to rent the car that he drove to Natick, evinces his state

of mind at the time (i.e., he thought this was an eBay sanctioned operation).[3]

The USSG calculation overstates the seriousness of the offense for Mr. Harville where a

single course of conduct was involved that impacted two victims, as opposed to injuring two

victims in entirely different episodes.  See United States v. Hernandez Coplin, 24 F.3d 312, 319

n.7 (1st Cir.1994) (finding the Guidelines overstated the seriousness of an offense by requiring

separate groups for each victim, explaining that harm to two victims in one course of conduct is

"less culpable than injuring two victims in two entirely different episodes.").

Mr. Harville recognizes that the grouping rules under Application Note 8 of USSG §

3D1.2 envision two different groups, one for each victim (see, e.g., United States v. Vasco, 564

F.3d 12, 23 (1st Cir. 2009)), but submits that in this case, where his participation was limited and

---

[2] On or about August 21, 2019, Baugh forwarded to Mr. Harville threatening tweets that Popp had sent Victim 1 earlier that day.  PSR ¶ 95.  Mr. Harville was in California at the time and had not been involved in the case since he left Boston on August 17, 2019.

[3] Baugh's initial messages to Mr. Harville implied that this was an eBay sanctioned operation.  See PSR ¶¶ 44-45 ("I won't send the bosses texts, but I've been ordered to find and destroy.").

the same course of conduct impacted two victims, the resulting USSG calculation overstates the seriousness of the offense for him.  Although the offense conduct resulted in "independent, personal, and deeply traumatic effects" to two separate victims (see United States v. Nedd, 262 F.3d 85, 92 (1st Cir.2001)), the surveillance involved a single course of conduct designed for a singular purpose.  Indeed, as previously noted, the Indictment groups Counts Four and Five, the substantive stalking charges involving Mr. Harville, together in a single narrative.

If the Court agrees that neither the two-level enhancement for pattern of activity nor the two-levels for grouping apply, then the TOL is 17, leading to a GSR of 24-30 months.[4]  In any event, under 28 U.S.C. § 3553, we submit that the appropriate sentence is well below both the GSR calculated by the government and the GSR calculated by Mr. Harville so the Court need not necessarily decide these guidelines issues.

### C.   Need for the Sentence Imposed under 28 U.S.C. § 3553

#### 1.   Avoiding Unwarranted Sentencing Disparities -- Relative Culpability

Four other defendants in this matter have been convicted and are awaiting sentencing (Gilbert, Popp, Stockwell, and Zea).  The clear and unequivocal leader of this conspiracy, Baugh, is scheduled for sentencing earlier the same day as Mr. Harville.  Philip Cooke is the only defendant sentenced to date.  On July 27, 2021, Judge Burroughs sentenced Cooke to a term of incarceration of 18 months, and 12 months home confinement as a special condition of supervised release.  Judge Burroughs calculated Cooke's guideline sentencing range as 30-37 months, based on TOL 19 and CHC I.  See Cooke Sent. at 14.  Analysis of Cooke's role in the conspiracy shows that he was far more involved, and far more culpable, than Mr. Harville.

---

[4] With respect to grouping, the request is technically for a two-level downward variance.

Cooke was a Senior Manager on eBay's Global Security Team at the time of the offense and a retired police captain with 27 years' experience on the police force. In contrast to Mr. Harville, Cooke was involved in the planning and execution of both the harassment campaign and the white knight strategy. Cooke was present for the August 6, 2019, meeting at eBay headquarters with Baugh, Gilbert, and Popp in which "the group . . . planned a series of anonymous, harassing messages to the Victims." PSR ¶ 29. "The four discussed that the messages would become increasingly hostile and that they would culminate in the doxing of the Victims (*i.e.*, the publication of the Victims' address and other personal information over the internet)." Id. The four also discussed the white knight strategy and Baugh informed the other three that GIC would be sending deliveries to the Victims' home. Id.

In contrast to Mr. Harville, Cooke was also involved in the execution of the scheme to send harassing messages and deliveries and he was included in the WhatsApp group messages (with Baugh, Gilbert, and Popp) discussing various aspects of the scheme. See, e.g., id. ¶ 34 FN 1 ("Generally, Baugh directed the timing of the messages and tweets. Gilbert drafted and shared them for approval with Cooke, Baugh, and Popp in a WhatsApp group, sometimes receiving input in response. Popp then sent the messages."); id. ¶ 32 ("On or about August 6, 2019, Popp created a Twitter account in the name of '@Tui_Elei,' a Samoan-sounding name that Popp, Cooke, Gilbert and Baugh had discussed using ('the @Tui_Elei Account'). The @Tui_Elei Account featured a profile picture of a skeleton mask, which was intended to scare the Victims.").

Throughout August 2019, Baugh confided in and kept Cooke, Gilbert, and Popp apprised by WhatsApp message of the status of the harassment campaign. On August 20, 2019, for example, "Baugh sent Popp, Gilbert, and Cooke a video from the movie Old School in which a

character announces at a stranger's front door that he has arrived for a 'gang bang.' Baugh noted 'this has been the [Victims'] house for the past 5 nights.' Gilbert, the former police captain, replied, 'Lol!!! Awesome.' Cooke, another former police captain, replied 'Hahaha.'" Id. ¶ 81.

Unlike Mr. Harville, Cooke was also involved in the planning of the white knight strategy, again through the WhatsApp group messaging connection between the four core conspirators -- Baugh, Cooke, Popp, and Gilbert. For example, "[o]n August 20, 2019, Gilbert messaged Baugh, Popp, and Cooke to propose introducing 'additional on-line supporters of our cause. The next time [Victim l] posts something negative have Tui [i.e., the @Tui_Elei Account] hit her with, 'Why do you keep attacking us and hurting om family business???' Then, introduce a new player to support Tui with, "I agree! [The Newsletter] is hurting small businesses with all the negativity, pushing buyers to Amazon." Id. ¶ 76. Cooke responded to the proposed language with a "thumbs up" emoji. Id. ¶ 77. Gilbert then responded to the group: "Then introduce a crazy 3rd party who joins with, '[Victim 1] focus on something else and stop fucking with our customers! I don't want to see another fucking post about ebay. Leave our businesses alone!!! When she doesn't respond, then this, 'What the fuck?!?! Hey what was [Victim's] home address again? I guess I have to pay her a visit. The Tui can send . . . their home address again." Id. In a reference to the white knight strategy, Gilbert concluded to the group: "This sets up my contact with them." Id. Cooke and Popp then replied to Gilbert's proposal: "Copy all." Id. ¶ 78.

Finally, Cooke, along with Baugh, Gilbert, and Popp, was also involved in the *planning* (as well as the execution) of the scheme to obstruct the NPD investigation. Id. ¶¶ 86-113. This involved a host of WhatsApp messages between this core group of four conspirators during which they also decided to re-initiate the harassment campaign against the Victims. See, e.g., ¶ 92 (Popp asked Cooke, Gilbert, and Baugh by WhatsApp message: "Am I clear to start tweeting

[Victim 1]?").  They also monitored the anxiety level of the Victims.  <u>See, e.g.</u>, ¶ 97 ("Gilbert messaged Baugh, Popp, and Cooke that the Victims were 'totally rattled.'").

This core group of four conspirators also planned and decided the strategy that *they* would employ to explain the presence of Mr. Harville and Zea for the surveillance.  <u>See, e.g.</u>, ¶ 104 ("On or about August 21, 2019, Gilbert messaged Baugh, Popp, and Cooke: '. . . We can say [Zea] and Harville were looking into the Tui case. That investigation is confidential and details weren't shared with Special Ops. I'll [] brief the cops on the [Victims'] background and make them look like the problem. The cops just want a logical and legitimate reason for [Zea] and Harville being here.").  <u>See also id.</u> ¶107 (Gilbert message: "We just need to explain away [Zea] and Dave's [Harville's] activities. Adamantly deny any deliveries and put focus on the POIs."); ¶ 108 (Gilbert message: "How does this sound for [Zea] and [Harville]: - they were in Boston for the conference (if we can prove it) . . .); ¶ 109 (On or about August 21, 2019, "Baugh messaged Popp, Cooke, and Gilbert, 'for Daves cover . . . since he is business continuity, we could just tell them we are reopening our Boston office - which is confidential. . . .").

Cooke, the former police captain, was one of the four core group of conspirators involved in the planning, organizing, ongoing managing, and execution of all aspects of the cyberstalking conspiracy.  By contrast, Mr. Harville was involved, at the direction of his boss (Baugh), in the surveillance of the Victims on August 15 and August 16, 2019.  At Baugh's direction, he also executed his part of the coverup planned and organized by Baugh, Cooke, Gilbert, and Popp (i.e., he deleted or attempted to delete data from his mobile phone and lied to eBay investigators (<u>id.</u> ¶¶ 123-24)).  Mr. Harville takes responsibility for those actions.  Unlike Cooke, however, he was not a leader, not a planner, not an organizer, and was not part of the core group of four that

shared information about all aspects of the conspiracy.  In this respect, under § 3553, he is far less culpable than Cooke and warrants a sentence that reflects his relative culpability.

### 2.  Specific and General Deterrence

There is no need for specific deterrence here.  Mr. Harville has been a law-abiding and productive member of society his entire life.  He served proudly in the United States Army for nine years, including on active duty during Operation Desert Storm and achieving the rank of Captain.  He was proud and fulfilled in his profession in the security business and knows full well that, because of his conviction for these crimes, he will never be able to serve in that profession again.  He has been humbled and publicly humiliated.  Judge Burroughs observation regarding Cooke applies with equal force to Mr. Harville.  "I very much doubt we will see this defendant here or involved in the criminal justice system again."  Cooke Sent. at 51.[5]

As to general deterrence, the eBay matter has received intense media coverage worldwide, and a bright spotlight has been shined on all participants.  This prosecution has sent an unequivocal message to the public about how the federal government, with all its resources and expertise, will treat cyberstalking and obstruction of justice.  There is also a related civil case which will continue to garner attention and keep this case in the spotlight and the public will continue to see all the negative ramifications for the defendants because of their conduct.  Everyone who follows this case understands and will continue to understand just how serious it was and just how serious it is being treated from a variety of different avenues.

---

[5] For the same reasons that specific deterrence is unnecessary there is no need to protect the public from further crimes of Mr. Harville and no grounds for incarceration on this basis.

**D.** **A Sentence of Probation or Home Confinement is Appropriate in this Case**

Under 28 U.S.C. § 3553, the Court has the authority to impose a non-guideline sentence of probation for defendants, like Mr. Harville, who are first-time non-violent offenders "provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant." See 28 U.S.C. § 3553, § 5B (Introductory Comment) ("The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself."). See also USSG, Supplement to Appendix C (November 1, 2018) (implementing 28 U.S.C. § 994(j) and providing that "[t]he Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence").

The Supreme Court recognized in Gall v. United States, 552 U.S. 38, 48-49 (2007), that probation "is not an act of leniency" but a "substantial restriction of freedom." As the Gall Court observed:

> [O]ffenders on probation are . . . subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG §5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

Id. (citations omitted). See also United States v. Knights, 534 U. S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'") (quoting Griffin v. Wisconsin, 483 U. S. 868, 874 (1987)).

Since Gall, courts have frequently recognized that probation is a real sentence that serves real jurisprudential considerations. See, e.g., United States v. Ramos, No. 04-cr-10275-NG (D.Mass.2008) ("Gall recognized . . . that probation is not nothing, that there are substantial restrictions on an individual's freedom in probation, that we can structure a probationary sentence that meets all the purposes of sentencing, and that is entirely appropriate"). If the Court determines that probation is not appropriate, we submit that a sentence of 12 months home confinement would be an appropriate alternative.

Conclusion

For the foregoing reasons, Mr. Harville respectfully requests that the Court sentence him to a term of probation or, in the alternative, to 12 months home confinement. He also requests that the Court find that no fine is warranted.

Respectfully submitted,

/s/ Peter K. Levitt
Peter K. Levitt (BBO# 565761)
Donnelly Conroy & Gelhaar, LLP
Boston, Massachusetts 02110
pkl@dcglaw.com
September 24, 2022                          (617) 720-2880

CERTIFICATE OF SERVICE

I, Peter K. Levitt, hereby certify that on this date, September 24, 2022, a copy of the foregoing document has been served via the Electronic Court Filing system on all registered participants.

/s/ Peter K. Levitt
Peter K. Levitt