**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF MASSACHUSETTS**

|
Ina Steiner,                                    |
David Steiner,                                  |
Steiner Associates, LLC,                        |
     (*Publisher of EcommerceBytes*)  |   CASE NO: 1:21-cv-11181
          Plaintiffs       |
                                               |
    vs.                            |
                                               |
                                               |
eBay, Inc., et al.,                             |
         Defendants        |

<u>**APPENDIX IN SUPPORT OF MOTION FOR LIMITED DISCOVERY AND INCORPORATED MEMORANDUM OF LAW, AND FOR AN EXTENSION OF THE DEADLINE TO FILE AN AMENDED COMPLAINT**</u>

Declaration of Andrew Phelan, Esq.  …………………………………………… A2

eBay Presentation for United States Attorney's Office  ………………………… A9

Defendant Jim Baugh's Sentencing Memorandum  …………………………… A42

Email between Attorney William Fick and Attorney Jack Pirozzolo regarding Wenig communication "See you tomorrow. The Cavalry is back"  …………………… A74

Defendant Jim Baugh's Motion to Compel Discovery  …………………… A76

Excerpts from Privilege Log of Morgan, Lewis and Bockius LLP ……………… A88

Defendant Zea Sentencing Letter  …………………………………………… A104

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| vs. | Criminal No. 20-CR-10263-PBS |
| JIM BAUGH, et al., | HEARING SCHEDULED FOR: January 28, 2022 |
| Defendants. | |

## DECLARATION OF ANDREW C. PHELAN, ESQ.

I, Andrew C. Phelan, Esq., hereby depose and say as follows:

1.     I submit this declaration in support of the motions of eBay, Inc. ("eBay") and Morgan, Lewis & Bockius LLP ("Morgan Lewis") to partially quash the Rule 17  subpoenas served on them by defendant Jim Baugh ("Baugh" or "Defendant") in the above-captioned matter.  Unless otherwise noted, the statements set forth herein are based on my own personal knowledge.  They are true to the best of my knowledge, information and belief as of the date I signed this declaration.

2.     I am an attorney licensed to practice law in Massachusetts.  I am currently the managing partner of Phelan Law, LLC, a position I have held since January 2020.  Prior to January 2020, I was a partner for over fifteen years at the law firms of Morgan Lewis and Bingham McCutchen LLP prior to its acquisition by Morgan Lewis.  Prior to joining Bingham McCutchen, I was an Assistant United States Attorney in the District of Columbia and, before that, a Trial Attorney at the U.S. Department of Justice.  For the past twenty years, my practice has primarily focused on representing individuals and organizations in commercial litigation matters and criminal and regulatory investigations and enforcement matters, including many internal investigations.

1

A2

3.      On or about August 28, 2019, eBay engaged Morgan Lewis to conduct an internal investigation in coordination with eBay's in-house legal team (the "Internal Investigation") of allegations that certain eBay employees and contractors were involved in the harassment of Ina and David Steiner (the "Steiners"), a couple living in Natick, Massachusetts.

4.      Around that same time, the United States Attorney's Office for the District of Massachusetts ("USAO"), in conjunction with the Natick Police Department, the FBI and other law enforcement agencies, initiated an investigation of the alleged harassment (the "USAO Investigation").  Morgan Lewis represented eBay in connection with the USAO Investigation.

5.      I was the partner at Morgan Lewis primarily responsible for representing eBay in both the Internal Investigation and the USAO Investigation.  I held that role through the date of my departure from Morgan Lewis.  Following my departure, I continued to represent eBay as its principal outside counsel responsible for both the Internal Investigation and the USAO Investigation.  Morgan Lewis also continued to represent eBay in connection with the USAO Investigation after my departure.  Morgan Lewis and I continuously acted as eBay's attorneys in connection with both the Internal Investigation and the USAO Investigation from August 28, 2019 through the present.

6.      The purpose of the Internal Investigation was to collect relevant facts regarding the alleged harassment of the Steiners in order to provide legal advice to eBay.  Documents and communications created during the course of the Internal Investigation were prepared to provide legal advice and in anticipation of potential litigation.

7.      The Internal Investigation was conducted in close coordination with eBay's in-house legal team.  That team includes attorneys who regularly conduct internal investigations, including investigations of potential misconduct by eBay employees.  Among the members of

that team were Amir Vonsover, an attorney in eBay's legal department, who had principal responsibility within eBay to investigate the alleged harassment, and Shannon Macauley, a senior paralegal in eBay's legal department.

8.      Shortly before eBay engaged Morgan Lewis to conduct the Internal Investigation, eBay attorneys had begun their own investigation of the allegations regarding the Steiners. The Natick Police Department first contacted eBay about harassment of the Steiners on August 20 and 21, 2019, in response to which eBay immediately began an internal investigation. eBay's investigation included rapidly collecting documents and conducting numerous interviews, including of Baugh, the other co-conspirators identified in Baugh's indictment, then-Chief Communications Officer Steven Wymer, and others.

9.      As part of the Internal Investigation, Morgan Lewis collected relevant documents and conducted interviews.  Morgan Lewis also reviewed information that eBay's in-house legal team had collected as part of their initial investigation.

10.      As is common in my experience, both the initial eBay in-house investigation and the Internal Investigation were intended to be subject to eBay's attorney client privilege, as well as work product protection applicable to documents created during the course of the investigations by both eBay and Morgan Lewis.

11.      Beginning in September 2019 and continuing to the present, I communicated multiple times with the USAO on behalf of eBay.  I provided to the USAO information that eBay had learned during the course of the initial eBay in-house investigation and the Internal Investigation.  I also provided information in response to specific requests for information the USAO made of eBay.

3

**A4**

12.     The information I provided consisted of factual information collected during the course of the initial eBay in-house investigation and the Internal Investigation.  That information included documents collected during the investigations, for example, emails and text messages by and among Defendants in this matter and other eBay personnel.  I also provided information showing that certain individuals, including Defendants Baugh and Harville, had hidden their actions from eBay, including by destroying or otherwise deleting evidence of their harassment of the Steiners. The information included their communications and activities before, during, and after the harassment of the Steiners occurred. It also included, among other things, evidence of the Defendants' concealing and destroying evidence, inventing and coordinating a false "cover" story to tell eBay investigators, and falsifying a document to support that false cover story. Much of the information appeared later in the June 2020 FBI affidavit filed with the original charging documents as well as in the November 3, 2020 indictment in this case against Defendants Baugh and Harville.

13.     I informed the government of statements certain individuals made to eBay attorneys, during eBay's initial investigation of the conduct.  These included statements made to eBay's in-house counsel Amir Vonsover and paralegal Shannon Macauley.  I did not provide copies of any memoranda or notes of those interviews.  Rather, on or about October 13 and 16, 2020, I provided oral reports of statements the following individuals gave to eBay in-house attorneys in August 2019:

      a.   Defendant Jim Baugh (October 13);

      b.   Defendant David Harville (October 13); and

      c.   Steven Wymer (October 16).

**A5**

To the best of my recollection, I did not discuss with the government the substance of any other interviews conducted during the initial eBay investigation or the Internal Investigation.

14.    With regard to Defendant Baugh, I also told the government that Baugh's attorney had told me in substance in early September 2019 that Baugh had lied to Mr. Vonsover when he denied involvement in harassing the Steiners.  I told the government the attorney's statement that Baugh had confirmed to him that Devin Wenig had never told him to do anything illegal or improper with regard to the Steiners.

15.    On February 23, 2021, eBay made Mr. Vonsover available to the USAO for an interview via Zoom.  I attended that interview.  At the outset of the interview, the USAO said that it was not asking Mr. Vonsover or eBay to waive the attorney client privilege or work product protections and that it was not seeking information subject to those protections. The government said, both in requesting the interview and in the interview, that it was interested in the facts that came from persons interviewed, in particular, their statements about the Steiner harassment. During the interview, Mr. Vonsover related in detail statements that Baugh and Harville had made to him during his investigation in August 2019 as well as some statements made in telephonic interviews of other defendants on the same days as the Harville and Baugh interviews (Brian Gilbert, Scott Fitzgerald (not charged), Stephanie Popp, Veronica Zea, Stephanie Stockwell). The USAO did not ask about the statements made by these other witnesses in any detail. The government's focus was on Baugh and Harville, and the accounts they gave in late August 2019 of their August 2019 harassment of the Steiners. These facts included, for example, Baugh's and Harville's then-immediate efforts to coordinate the false cover story among all the defendants involved about the harassment actions and the steps they took to hide

5

**A6**

their actions. To the best of my recollection, the USAO did not ask Mr. Vonsover about any statements by Devin Wenig, Steve Wymer, or Wendy Jones.

16.     In March 2021, I, along with a lawyer from eBay, met with the USAO to discuss the question of eBay's potential criminal liability.  During that meeting we discussed the Department of Justice's principles of federal prosecution applicable to corporations, including the factors set forth in the Department of Justice Manual applicable to consideration of corporate criminal liability.  I showed a PowerPoint deck during the meeting, which set forth information relevant to how the DOJ factors applied to eBay.  That PowerPoint presentation was not represented to be, nor was it intended to be, subject to either the attorney client privilege or work product doctrine.

17.     All information that I provided to the government was subject to the understanding that eBay was not waiving any applicable attorney-client privilege or work product protection.  The government attorneys responsible for the USAO Investigation said to me multiple times that the only information they sought were non-privileged facts regarding the harassment of the Steiners and that the government was not asking eBay to waive the attorney client privilege or work product protection.

18.     I have reviewed the Rule 17 subpoena request for a "final report" on the Internal Investigation. I did not prepare any document that I would characterize as a final report. I did not prepare any written report of the investigation.  I made oral reports to the company without any handouts, PowerPoints or other writings, and in certain instances, I prepared updates reporting the current status of the matter for the company, each of which was one or two pages long.  I did not at any time relay to the government any privileged communications outside or in-house counsel had with the eBay Board regarding the Internal Investigation.

6

**A7**

I declare under the pains and penalties of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed, December 17, 2021, in the Commonwealth of Massachusetts, United States of America.

*/s/ Andrew C. Phelan*
Andrew C. Phelan, Esq.

**A8**

eBay Presentation on "Federal Corporate Principles" to the
Office of the U.S. Attorney for Massachusetts
Concerning the  August 2019 Crimes Committed by
Former eBay Employees Against the Natick Couple

March 16, 2021



**A9**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Introduction

- The government has charged 7 individual defendants for crimes committed against Ina and David Steiner.

- eBay realizes that, under the facts and legal principles (e.g., *respondeat superior*), DOJ could take enforcement action against the company. You have broad discretion in this determination under the 11 Principles of Federal Prosecution.

- Purpose of this presentation:

  - Explain why we believe that the Principles and facts here support a decision not to take enforcement action against eBay.

  - That decision is in the interest of justice, the victims, and the public.

**A10**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Executive Summary

**Five main points:**

1. eBay acknowledges the seriousness of the misconduct and the company's responsibility. The conduct of the seven defendants was clearly criminal, and eBay is troubled by the role here of its former-CEO and former-Chief Communications Officer in particular. We hope the government agrees that their actions do not warrant criminal charges against the company.

2. All the wrongdoers deliberately hid their misconduct from eBay because they knew the company would not condone it. They even said explicitly <u>before</u> the crimes that eBay would fire them if it found out.

3. eBay had a robust compliance program before the Natick events and has taken significant steps to buttress that program and revamp the Safety & Security unit to prevent anything like this from happening again.

4. eBay's cooperation with the government has been voluntary, swift, proactive, unconditional, and complete.

5. In the end, we hope to persuade you that, eBay – <u>the company</u> -- acted in a manner that the government would want other companies to model and that a decision not to take enforcement action against eBay is in the interests of justice, the victims, and the public.

**A11**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Presentation Roadmap: The 11 Principles
## (we will address all 11, not all in numerical order)

1. Nature of offenses

2. **Pervasiveness of wrongdoing**

3. Company history of similar misconduct

4. **Company's willingness to cooperate**

5. **Adequacy of compliance at time of wrongdoing and charging decision**

6. **Company's timely and voluntary disclosure**

7. **Company's remedial actions**

8. Collateral consequences

9. Adequacy of other remedies

10. Adequacy of prosecution of responsible individuals

11. **Interests of the Victims**

**A12**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 1
# Seriousness of Offenses

*Nature and seriousness of the offense, including risk of harm to the public, and applicable policies and priorities, if any, governing the prosecution of corporations for particular categories of crime (*__JM 9-28.400__*)*

1.  The wrongdoers committed serious crimes against the two victims.

2.  The crimes did not risk broader harm to the public.

3.  The crimes were very unusual: the government does not have applicable policies or priorities for them.

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 3
# No History of Similar Misconduct

*Company's history of similar misconduct, including prior criminal, civil, and regulatory enforcement actions against it (JM 9-28.600)*

1. eBay has been in business 25 years.

2. eBay has <u>no history</u> of similar misconduct.

3. eBay has <u>no history</u> of <u>any</u> criminal misconduct.

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

**A14**

# Principle 2
# Pervasiveness of Wrongdoing

*Pervasiveness of wrongdoing within company, including management complicity in, or condoning of, the wrongdoing (JM 9-28.500)*

We will address pervasiveness on three different levels:

1. Overall at the company

2. Specific to the Safety & Security team

3. The responsibility of the former-CEO and former-Chief Communications Officer

--------------------------------------------------------------------------------

**1. Companywide, overall, the conduct was not pervasive or condoned.**

eBay is an international company with **30,000** employees and contractors in **54 offices** across **31 countries**. These crimes were committed by **7** members in **1 unit** from **1 office**.

**A15**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 2, cont.
# Pervasiveness

**2.   Safety & Security Team: the wrongdoing was pervasive in Baugh's hand-picked group, but not more broadly among the 100+ members of Safety & Security unit.**

- Baugh was Senior Director of the Safety & Security unit. He hand-picked people he thought he could control from different teams within the unit

  - Intel (Popp, Zea, Stockwell), Resilience (Harville), Physical Security (Gilbert and Cooke)

- He deliberately excluded and concealed his plans from managers who would stop him.

  -  e.g. Dan Cory, Alicia-Maria Domingos

- Two junior Safety & Security members he recruited refused to participate (Alford and Mount).

- The hand-picked group knew eBay would not condone – and would severely punish the misconduct.

**A16**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

8

# Principle 2, cont.
# Not Pervasive/Condoned by eBay

- They showed by their <u>words and actions</u> that they knew eBay did not condone their wrongdoing and would punish it severely:

  - On August 11 on WhatsApp Baugh wrote, <u>before</u> the crimes were committed: "**Once you read it delete this entire thread and don't save to your phone or we will all get fired**."

  - Throughout, they tried to hide <u>all</u> their misconduct from eBay:

    - Booked travel "off the grid"

    - Lied to coworkers (and even family)

    - Created false covers and documents, doctored records

    - Communicated over WhatsApp so eBay could not trace

    - Deleted records and messages

    - Used burner devices and non-company cash cards

    - Conspired to lie extensively, and did lie extensively, to eBay investigators

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 2, cont.
# Pervasiveness

**3. Wenig/Wymer set an improper tone between themselves that was critical of Ms. Steiner and her website.**

- In 2019, Wenig & Wymer exchanged texts criticizing her and her website (i.e., "hate her" "take her down").

- We found no evidence that they sent these texts to other executives or ELT members. Their improper tone was not pervasive among other executives.  Only these two were preoccupied with Ina Steiner and eCommercebytes.

- eBay recognizes that their improper tone contributed significantly to the crimes in Natick.

- Wenig's tone was improper and unacceptable. But we did not find evidence that he directed or knew that criminal acts would occur.

- Wymer's tone was <u>much</u> worse. Inexcusable from any employee, much less an ELT member.

  - We did not find evidence he actually directed or knew that criminal acts would follow.

  - <u>But</u>: his words were extremely reckless and irresponsible AND eBay fired him <u>for cause</u>.

  - <u>Significant</u>: Wymer hid his August 1 Baugh texts from everyone – General Counsel; Chief of Litigation; and apparently even Wenig.

    - Why?  Because he knew they were wrong and would not be condoned by anyone else at eBay.

    - August 7 Wymer email: "Utterly vexed…Whatever. It. Takes."

  - Wymer: January 2019 hire: too green/inexperienced to push back on CEO tone, sought to curry favor.

**A18**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

10

# Principle 2, cont.
# Not Condoned by eBay

**4. The Corporate response upon learning of the crimes also demonstrates that eBay did not condone the wrongdoing.**

- eBay General Counsel, Chief People Officer, and Chief Compliance Officer took decisive action.

  - They <u>immediately</u> launched/pursued a thorough investigation, with unhindered scope and access.

  - Chief Compliance Officer (Molly Finn) rejected Baugh's effort to obstruct.

- Investigators determined the facts and roles, regardless of position or title.

  - Marshalled records.

  - Cut through coordinated lies and false documents with numerous interviews.

- eBay terminated all those responsible.

- ELT/Board of Directors immediately directed: full report to and assist government.

- eBay reported all facts to the government, including roles of CEO and Chief Communications Officer.

**A19**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

11

# Principles 4 & 6
# Immediate Disclosure and Cooperation

*4. Company willingness to cooperate, including as to potential wrongdoing by its agents (JM 9-28.700)*

*6. Company's timely and voluntary disclosure of wrongdoing (JM 9-28.900)*

- DOJ Manual seeks:
  - "early voluntary disclosure"
  - "timeliness of the cooperation"
  - "diligence, thoroughness and speed of the internal investigation"
  - "proactive nature of the cooperation"

- eBay met all parts of these criteria

- Speed: 32 Days from Notice to full eBay report to USAO
  - Aug. 22: eBay learned of inquiry, launched investigation, contacted NPD.
  - Aug. 23-Sep. 23: documents, interviews, devices, forensics, etc.
  - Sep. 11-20: eBay contacted NPD, FBI, AUSAs.
    - eBay will voluntarily report
    - No subpoenas needed
  - Sep. 24: eBay disclosed all facts and persons to USAO

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

**A20**

12

# Principles 4 & 6, cont.
# Cooperation: Extensive, Thorough, Continuing

1. Continuous: September 2019 through the present

2. Produced in response to <u>every</u> government request (no request denied)

3. Made further proactive disclosures/productions (witnesses, phones, et al.)

4. 12 main productions, +12,000 pages

5. Devices and images

6. Forensic results/reports

7. Additional company network searches run as requested

8. Appendix 1: Cooperation – Partial Chronology next slides:

**A21**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Appendix 1
# Cooperation: Partial Chronology

\*This chronology is only partial: it does not capture numerous eBay/AUSA calls and emails where eBay provided other assistance.

\*The cooperation continues through the present.

## 2019

| Aug. 22 | eBay received NPD inquiry, launched investigation, called NPD detective |
|---|---|
| Sep. 11-20 | eBay called FBI, spoke with AUSAs Kosto and Burkart: explained status, requested meeting to fully report investigation facts, no subpoenas needed |
| Sep. 24 | Full eBay report to AUSAs Burkart, Kosto |
| Oct. 9 | eBay production #1, up to Bates # E_000468. Key docs, including org chart, expense records, electronic records, device review facts/information, imagings, forensic results/reviews, texts, emails, email review summaries, and witness-specific records. |
| Oct. 18 | eBay production #2, up to E_000656. Native docs, internet search reports, web history reports, expense reimbursements. <br><br> eBay identified M. Alford, newly-discovered witness with relevant information |
| Oct. 25 | eBay production #3 up to E_000819. Expense and travel reports, native emails. |
| Oct. 29 | eBay produced results of network searches for specific data regarding IP addresses and domain names searched during misconduct by requested persons. |
| Nov. 1 | eBay production #4, up to E_000830. Phone call logs, installed-apps reports for employee phones, status of IP address and domain name searches. |
| Nov. 4 | eBay produced M. Alford for USAO interview. |
| Nov. 15 | eBay production #5, up to E_000831. Report of web browsing activity from eBay networked devices for 8 requested people and contact information for contract employee's company. |
| Nov. 21 | eBay production #6, up to E_001090. Date and time of every travel reservation booked for six requested former employees, reports of web browsing activity of 8 requested people, natives of emails from eBay's production #1. |
| Nov. 29 | eBay produced R. Moore for USAO interview. |
| Dec. 11 | eBay production #7, up to E_001097. Forensics from Cooke's ebay cell phone. |
| Dec. 17 | eBay produced P. Cooke for USAO interview. |
| Dec. 27 | eBay production #8, up to E_010127. Outlook calendars for 8 requested people. |

**A22**

14

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Appendix 1, cont.
# Cooperation: Partial Chronology

## 2020

| Date | |
|---|---|
| **Feb. 19** | eBay production #9, up to E_010142. Responses regarding defendants' work phones, 3 additional phones, and Popp notebook |
| | Delivery to government of Harville eBay phone. |
| June 15 | USAO announcement of charges against 6 defendants |
| **Oct. 13** | eBay fact proffer re: eBay investigator's three August 2019 Harville interviews. |
| **Oct. 13** | eBay fact proffer re: eBay investigator's several August 2019 Baugh interviews. |
| **Oct. 16** | eBay fact proffer re: eBay investigator's regarding two late-August Wymer interviews |
| Nov. 6 | eBay production #10, up to E_010194. Badge access records for requested defendants, data on receipt and dissemination of Natick Police Department's August 2019 communications to eBay. |
| **Nov. 3** | Grand jury indicts Baugh and Harville on additional charges. |
| Nov. 24 | eBay provided requested bank acct info re: Baugh |
| **Dec. 4** | eBay sent Wymer's eBay phone image to the government, with chain of custody. |
| | eBay also provided search consents for work phones. |
| Dec. 5 | eBay Production #11, up to E_010196. Floor plans/schematics of requested eBay office space and locations of access-card readers. |
| **Dec. 14** | eBay provided salary information for requested defendants |
| Dec. 29 | eBay Production #12, up to E_012340. All Wymer emails as requested for 8/23/19 to 9/1/19. |

## 2021

| Date | |
|---|---|
| **Feb. 23** | eBay produced for interview eBay investigator who interviewed Baugh and Harville several times each in late August 2019. |
| **March 12** | eBay produced Harville's original system record and the forged record (up to E_012347) Harville sent to the eBay investigator in August 2019. |

**A23**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principles 4 & 6, cont.
# Cooperation: Full & Thorough

- eBay cooperation was without any preconditions.

- eBay disclosed <u>all</u> relevant facts, including potential agent wrongdoing.

- Government confirmed accuracy of all facts.

- eBay did not omit, conceal, minimize any fact or actor, including then-CEO and Chief Communications Officer.

**A24**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 5
# Company's Compliance Program

*Adequacy and effectiveness of company's compliance program at times of the offense and charging decisions. (JM 9-28.800)*

- DOJ Manual: **"Compliance programs should be designed to detect the particular types of misconduct most likely to occur in a particular corporation's line of business."**

  - The misconduct here was <u>not</u> "likely to occur" in eBay's line of business

  - eBay never experienced this kind of conduct.

  - We do not believe any company has experienced this -- ever.

  - And: there was no "gap" in eBay's compliance program that missed this.

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

A25

17

# Principle 5, cont.
## Company's Compliance Program

- eBay already had a robust compliance program as of August 2019, with a long-established and well-developed Code of Business Conduct & Ethics:



Rule 6(e) Materials – Confidential Treatment Requested by eBay.

18

# Principle 5, cont.
# Company's Compliance Program

<u>Verbatim from Section 1 of eBay's August 2019 Code of Business Conduct & Ethics</u>:

**Following the Law**

-We are accountable for our actions, and we honor our commitments. Our success as a company is driven by our shared goals of honest and ethical action.

-We are committed to <mark>ensuring that every action we take is in full compliance with the law</mark> — and in keeping with our high ethical standards.

-<mark>Report suspected violations of the Code, eBay policies, or the law to your manager, a Business Ethics Officer or other resource available for assistance. You can email</mark> <u>askethics@ebay.com</u>; or submit an anonymous inquiry, by calling eBay's Integrity Helpline at 800.461.9330.

**Making Ethical Decisions**

-When you face difficult decisions at eBay, take the time to think and consider the ethical and legal consequences. Don't give in to pressure and rush your decision. Carefully consider the implications of your actions.

-<mark>Always Ask:</mark> Is it honest and fair? Is it consistent with the law and the Code? Is it consistent with our values? <mark>Does it make you feel good about yourself and the Company? Would you feel comfortable reading about your action in the news?</mark>

-If you answered yes to all of these questions, chances are that you're probably okay to proceed. If you hesitated in answering "yes" to even one of these questions, then it's best to get a second opinion from your manager or a Business Ethics Officer.

-<mark>**Most importantly, ask for help when you need it.**</mark>

**Understanding the Importance of Speaking Up**

-A culture that encourages us to voice our opinions and concerns will help keep eBay a great place to work. If something does not feel right, each of us should feel empowered to take action.

-<mark>**When you see or suspect misconduct, speak up promptly.**</mark> Doing so will <mark>allow the Company an opportunity to deal with the issue and correct it, ideally before it becomes a violation of law</mark> or a risk to health, security or the Company's reputation.

**A27**

19

# Principle 5, cont.
# Adequacy of Compliance

- eBay constantly emphasized the importance of the Code, via:
  - Periodic Trainings
  - Surveys on Ethics
  - Annual Compliance Trainings
  - Posters around campus
  - eBay's Intranet Home Page (Hub)
  - Regular Ethics & Compliance reminder emails.  E.g.
- eBay also reports quarterly on Ethics to Board/Audit Committee

---

**From:** 'eBay Business Ethics and Compliance' <EthicsandCompliance@ebay.com>
**Date:** Monday, April 15, 2019 at 3:08 PM
**To:**
**Subject:** Complete eBay's 2019 Ethics Survey by April 26

Take a minute to share your feedback about ethics at eBay.

## Our Company

Global team,

Our Code of Business Conduct and Ethics guides how we conduct business every day. Your feedback about how we're doing on eBay's 2019 Ethics Survey is critically important and helps ensure we stay aligned with our values.

Earlier today you received an invitation from Glint (survey@glintinc.com) with your unique survey link. **If you can't find the message, look in your "Clutter" or "Junk" folders.** The survey will be open through 11:59 p.m. Pacific on April 26, and takes just a minute on your computer or mobile device. Your responses are confidential and reported in aggregate, unless you identify yourself in your comments.

If you spot something which doesn't seem right, you can make an anonymous report through the Integrity Helpline — the link is at the bottom of every page on the Hub. And, if you ever have questions, you can always contact askethics@ebay.com.

Thank you for participating in this important survey,

eBay Business Ethics and Compliance
Distribution: Global Employees

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 5, cont.
# Specific/Recency of Compliance Training

- In June/July 2019, <u>just before these events</u>, the defendants <u>all</u> completed their 2019 Annual Compliance Training, including attesting to the Code and methods of reporting:

  - Jim Baugh – 7/5/2019
  - David Harville – 7/7/2019
  - Stephanie Popp – 6/21/2019
  - Stephanie Stockwell – 6/27/2019
  - Brian Gilbert – 7/8/2019
  - Veronica Zea – 6/26/2019
  - Phil Cooke – Completed 2018/2019 *New Hire Compliance Training* on 7/8/2019

- Eighty-eight percent (15 of 17) of Baugh's team had also completed the April 2019 Ethics Survey, and made no negative or concerning comments.

- Steve Wymer completed 2018/2019 New Hire Compliance Training on 4/9/2019

- Devin Wenig completed 2019 direct/in-person 2019 Annual Compliance Training on 4/30/2019

**A29**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 5, cont.
# Adequacy of Compliance

**eBay had robust reporting channels for the misconduct that occurred here.**

- Here, all that was required was for <u>1 person</u> to report. "**If you see something, say something**"

- Many channels to report.

  - eBay hotlines (including anonymous):   - Phone      - Intranet     - Email      - Internet

  - eBay/PFC supervisors

  - Any legal or compliance employee, including Business Ethics Officers (BEOs)

  - Any People Team member (HR)

- **But no one reported**.

  - Intimidation – the investigation uncovered new information about Baugh's unsuitability as a manager

  - eBay reviewed Baugh's hiring/personnel file <u>and</u> S&S team review and 3x/year survey files: no red flags

  - Baugh "spun" to the defendants Wymer's August texts and email

  - Self-interest?

**A30**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 7
# Remedial Actions

***Company's remedial actions, including efforts to implement an adequate and effective compliance program or improve existing one, replace responsible management, discipline or terminate wrongdoers, or pay restitution. (JM 9-28.1000)***

**1. <u>Additional</u> eBay reviews (in addition to independent investigation)**

- Reviewed <u>all</u> 2019 Wenig and Wymer emails, used search terms specific to Natick. (Vonsover, Macauley, eDiscovery, Phelan)

- Interviewed remaining Safety & Security members. (Finn, Vonsover, Macauley, Phelan)

- Metrics (all reviews combined):
  - Interviews: 98
  - Witnesses: 63
  - Records searched/reviewed: excess of 1,200,000

**A31**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 7, cont.
# Remedial Actions

**2. Management Changes and 10 Terminations due to Natick events**:

    a.  Wymer
    b.  Baugh
    c.  Harville
    d.  Popp
    e.  Gilbert
    f.  Stockwell
    g.  Zea
    h.  Fitzgerald
    i.  Cooke
    j.  Barrett

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 7, cont.
# Remedial Actions

**3. Safety and Security Team: Specific Changes**

a.  Safety & Security unit moved to the Legal Department from Global Operations division.

  - Reports to eBay Legal VP, Chief of Litigation (who is liaison with law enforcement to prevent fraud on eBay's platform)

b.  New Safety & Security Senior Director: Dan Cory. Well regarded, favorably vetted by independent security firm in 2020 (post-Natick).

c.  New Hire: Senior Manager, Americas Region (32-years Scotland Yard).

d.  Michelle Alford re-hired as full-time employee after eBay learned of termination.

e.  End-to-end review by Independent security firm of Safety & Security (policies & procedures, vendor management, hiring/talent acquisition, financial oversight).

f.  The role of the Safety & Security team has been made very clear:  it is limited now to address <u>only</u> physical security.

g.  Independent security firm working to develop Security Management Plan: policies/procedures per professional standards of the American Society for Industrial Security (ASIS).

h.  eBay outsourced POI (Person of Interest) work to third party security vendor with monthly cross-functional reviews (Legal, Compliance, Investor Relations, Safety & Security).

**A33**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 7, cont.
# Remedial Efforts

**4. Other Structural/Policy Improvements**

a.   Reframed 5 Core Beliefs of eBay to include: "Act with Integrity."

b.   Broad expansion of Business Ethics Officers (BEOs). Now in every office, business line, and across seniority levels.

c.   <u>More</u> training on duty to report <u>and</u> accessibility of reporting channels (e.g. BEOs, ethics hotlines, periodic reminders, etc.).

d.   Tone From The Top Initiative

- Enhanced program to require leaders to talk on compliance topics quarterly.

- e.g. include larger group of leaders to give ethics talks, track completion, and include ELT accountability

e.   Vendor identifying improvements to Alternative Work Force (i.e. non-employees) procedures/controls and  training.

- e.g., closed AWF expensing loophole discovered in Natick matter.

f.   Vendor RFPs and Master Service Agreements: will be required to comply with, and certify to, ethics requirements.

**A34**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 7, cont.
# Remedial Efforts

**5. Multiple uses of Natick facts for training/discussion.**

- eBay-wide "Fireside Chat" with CEO, GC, Chief Compliance Officer, ethics expert

- Multiple trainings for leaders (Directors and above) with ethics expert and ELT members

- Multiple business unit all-hands meetings (e.g., Americas, Information Security, Legal, Safety & Security)

- Multiple written communications

**A35**

27

# Principle 11
# Interests of Victims

*The interests of the victims (JM 9-28.1400)*

Since September 2019, eBay has sought to address the harm caused to the victims.

- eBay raised this in first government meeting and <u>several</u> times after. The Government asked eBay to wait given the ongoing investigation. eBay complied.

- Immediately after public charges announced, eBay publicly apologized and eBay's new CEO sent an apology letter to the Steiners.

- Counsel sought contact through the government. Victims' counsel responded that they did not currently wish to communicate with eBay.

- eBay remains ready to address restitution with the victims

**A36**

# Principle 8
# Collateral Consequences

*Collateral consequences, including whether there is disproportionate harm to shareholders, pension holders, employees, and others not proven personally culpable, and impact on public arising from prosecution (*<u>*JM 9-28.1100*</u>*)*

- eBay is a good company.

  - Vast majority of employees act ethically.

  - eBay is a company that: enables millions of people to earn or supplement their living; promotes and supports American small businesses; has donated over $1 billion to charity.

- The misconduct and crimes here <u>by a handful of wrongdoers</u> has caused eBay significant reputational harm.

  - This reputational harm was warranted given the facts.

- But, eBay submits that, what is not warranted is additional harm from criminal charges/enforcement.

  - eBay – the company – did all the right things – discussed in the Principles above – before and when it learned of the crimes and misconduct.

- **eBay's conduct throughout is the type of corporate conduct to reinforce by not bringing enforcement action.**

**A37**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Principle 9
# Adequacy of Other Remedies

*Adequacy of remedies such as civil or regulatory enforcement actions, including remedies resulting from the corporation's cooperation with relevant government agencies (JM 9-28.1200)*

- The remedies resulting from eBay's cooperation are extensive.

  a. eBay facilitated the government's ability to quickly charge the 7 culpable defendants

  b. 5 already pled guilty; eBay will continue to assist with regard to any trial of the other defendants.

  c. eBay gave the government all the evidence eBay had collected to assist the government in determining whether Wymer or Wenig also were criminally responsible.

  d. The evidence eBay provided in its cooperation will also help the victims recover to the extent they pursue available civil remedies:

    -against the 7 defendants

    -against Wymer and Wenig, if warranted

    -against eBay, if not mutually resolved

**A38**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

30

# Principle 10
# Prosecution of Culpable Individuals

***Adequacy of the prosecution of individuals responsible for the corporation's malfeasance (JM 9-28.1300)***

- The 7 defendants went to great lengths to hide their misconduct from eBay.

  - This shows that they <u>knew</u> the company did not condone that conduct.

  - By all their concealments, they <u>prevented</u> eBay from stopping them ahead of time.

- eBay's voluntary and extensive cooperation helped the government quickly bring the culpable ones to justice.

- eBay has made clear its intention to provide restitution.

- DOJ Manual 9-28.100: "**prosecutors should be mindful of the common cause we share with responsible corporate leaders who seek to promote trust and confidence.**"

  - The responsible corporate leaders at eBay demonstrated here the "common cause" that should be shared with prosecutors

**A39**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

# Conclusion / Questions / Follow-Up

- eBay had a robust compliance program before the events.

- Consistent with that program, eBay then:

  1. investigated and reported immediately;

  2. assisted the government in bringing those responsible to account;

  3. changed management;

  4. fired the wrongdoers;

  5. buttressed its compliance program;

  6. made structural changes to, and overhauled, the Safety & Security team; and

  7. sought to provide restitution to the victims.

- eBay respectfully suggests that the government should <u>want</u> other companies to model eBay conduct here.

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

A40

32

# Appendix 2
# Wenig/Wymer Table

| Wenig | Wymer |
|---|---|
| Texts with Wymer about Steiner/ECB were bad/improper | Same (Wymer texts with Wenig) |
| No apparent texts with Baugh about Steiner/ECB<br><br>1 text with Baugh about Unsuckebay – substance ok<br>-on some parts of Unsuckebay email chain with GC, SW, JB - substance ok | -Multiple texts with Baugh about Steiner/ECB, inflammatory and can support inference to take bad action (sin, ashes, whatever it takes, etc.)<br>-Concealed his Baugh texts before Natick<br>-Concealed his Baugh texts after Natick |
| Did not delete texts about Steiner/ECB with Wymer | Deleted all texts about Steiners/ECB |
| No apparent communications with Baugh or Wymer post-Natick | Monitored events with Baugh post-Natick |
| Apparent cooperation in investigation.<br>-No apparent withholding of knowledge/comms<br>-No deletion of August texts with Wymer<br>-No deletion of Baugh Unsuckebay text | Non-cooperation in investigation.<br>-Failed to report for 7 days <u>after</u> knew of NPD/eBay investigations<br>-Withheld knowledge/evidence 1st interview (Aug. 27)<br>-Admitted Baugh texts only when confronted in 2nd interview (Aug. 28).<br>-Deleted all Wenig texts<br>-Deleted all Baugh texts, incl. Aug. 24 detailed "Op" text<br>-Deleted forensics of 2 calls with Baugh Aug. 22 & 24 (+10 min.) |

**A41**

Rule 6(e) Materials – Confidential Treatment Requested by eBay.

IN  THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  DISTRICT  OF  MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | No. 20-cr-10263-PBS |
| v. | |
| JIM BAUGH *et al.* | |

**DEFENDANT JIM BAUGH'S
SENTENCING MEMORANDUM**

William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

*Counsel for Defendant Jim Baugh*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

BACKGROUND ....................................................................................................... 4

    A.    Childhood, Education, and Family ............................................................. 4

    B.    Professional Experience Prior to eBay ..................................................... 5

    C.    Work at eBay from 2016 to 2019 .............................................................. 5

    D.    Additional offense context ........................................................................ 7

    E.    Life after arrest and prosecution ............................................................. 19

ARGUMENT ............................................................................................................ 20

    A.    The "Pattern of Activity" enhancement is inapplicable.......................... 21

    B.    The proposed sentence will provide just punishment. ........................... 24

    C.    Neither specific nor general deterrence requires more than 30 months' incarceration................................................................................................ 27

    D.    Imprisonment would not facilitate any required "treatment." ............... 28

CONCLUSION........................................................................................................ 29

CERTIFICATE OF SERVICE ............................................................................... 30

Defendant Jim Baugh respectfully submits this Memorandum, accompanying letters,[1] and other exhibits to assist the Court with sentencing.

## INTRODUCTION

Jim Baugh is a devoted, father, son, brother, and friend. Those who have known him longest describe him as unfailingly dependable and generous with his time, attention, and financial resources. He has no prior criminal record, but does have a distinguished history of service both as a U.S. government employee and in the private sector.

While Mr. Baugh's role in the bizarre and disturbing criminal conduct at issue betrayed the principles he defended throughout his career, it was an aberrational episode in his life. Mr. Baugh recognizes that he stands before the Court guilty of very serious offenses that caused severe harm to real people. He has taken responsibility and accepts that meaningful punishment will follow.

But with all due respect to the government's sentencing arguments, Mr. Baugh should not be sentenced as the "face" of eBay, subject to a high-end "Guideline" term of imprisonment because this case involved the "resources of a Fortune 500 company" used to inflict a "three-week nightmare" on "a Natick couple, whose journalism had angered two of the company's most senior executives." Gov. Mem. at 1.

Yes, the Steiners suffered terribly, did not deserve it, and continue to struggle in the aftermath. Yes, Mr. Baugh is accountable for his actions, "knew better," and should have acted accordingly. Yes, Mr. Baugh is the most senior eBay employee the government chose to prosecute, and bears an extra measure of responsibility for his supervisory role. But stopping there ignores

---

[1] Exhibit A is an allocution letter from Mr. Baugh to the Court. Exhibit B is a compilation of support letters from third parties. Home addresses and contact information, as well as the names of children, have been redacted from the publicly-filed letters. Counsel can provide unredacted copies to the Court upon request.

the broader reality of what happened. Mr. Baugh had no personal animus against the Steiners, no psychotic pleasure in fostering fear, no desire to inflict harm for its own sake, and no disdain for "First Amendment values." Gov. Mem. at 14.

Rather, from his cubicle adjacent to the private offices in the insular, high-pressure environment of a Silicon Valley C-Suite, Mr. Baugh was convinced to view the Steiners (*wrongly*, he recognizes in hindsight) not as journalists but as dangerous "trolls" who posed an existential threat to the company and even to the physical safety of its employees. Mr. Baugh faced intense, relentless pressure from multiple executives (who have evaded criminal responsibility), including the CEO Devin Wenig, SVP Steve Wymer, COO Wendy Jones, and General Counsel Marie Huber, to do something, anything, about the "threat" which, they knew and told Mr. Baugh repeatedly, could not be solved through ordinary "lawyer" tools.

Indeed, reflecting a toxic culture that goes to the very top of many powerful technology companies, senior eBay executives hired Mr. Baugh precisely because of his prior experience as a government security professional with a demonstrated ability to solve difficult problems through unconventional means. *See, e.g.*, Kate Conger, *Uber Survived the Spying Scandal. Some Careers Didn't*, NEW YORK TIMES (Nov. 28, 2021) (quoting former CIA officer employed by Uber: "In the government, when you're given a mission or you're given a task, you go and you execute on the mission . . . . Your experience tells you to go execute because your boss or the leadership have given you this task, and you worry about how to do it — not whether or not you should do it, because you've never had to worry about that before.").[2]

---

[2] Available at https://www.nytimes.com/2021/12/06/technology/uber-spying-allegations.html.

The Steiners were a "threat" that Wenig, Wymer, Jones, and Huber were obsessed with neutralizing. Meanwhile, Mr. Baugh was a tool to be used—and then discarded, as an army of outside lawyers descended to conduct an "internal investigation" aimed at saving the company and its top executives from prosecution. Of course, that does not excuse Mr. Baugh's conduct. Although pushing back against a powerful CEO may not have been realistic, Mr. Baugh could and should have exercised good judgment grounded in common sense and just walked away. He deeply regrets his failure to do so. He has also candidly acknowledged and proactively addressed the contribution of alcoholism to his regrettable judgment.

Mr. Baugh cannot undo what he did, but context still bears on appropriate punishment. Accordingly, and for the reasons elaborated more fully below, we submit that **30 months imprisonment followed by 36 months of supervised release** is the appropriate sentence in this case. It is a severe sentence, a full year longer than that imposed on the only co-conspirator sentenced thus far, and commensurate with sentences in this district for other kinds of high-profile corporate misconduct, even in cases that involved extensive physical harm to many individual people.

Other than perhaps Mr. Baugh's young daughters, few would shed a tear or criticize the Court for following the government's recommendation. No punishment could ever be enough to undo what was done to the Steiners. But this Court has a more holistic responsibility than simply expressing community outrage, rigidly applying the advisory Guidelines in very unusual circumstances, or "sending a message" that will be loudly and widely broadcast across media that have avidly reported every salacious detail of this case.

Warehousing Mr. Baugh in federal prison for *additional* months or years would confer no marginal benefit on anyone and do nothing to advance the purposes of sentencing. To the contrary,

**A46**

sentencing Mr. Baugh severely, as the capstone of eBay's role in the case, sends precisely the wrong message of impunity to corporate executives, that the security professionals they employ will absorb all the criminal exposure for corporate misconduct if the executives maintain willfully blind, "don't ask, don't tell" distance from operational specifics, as they claim to have done here.

## BACKGROUND[3]

### A.      Childhood, Education, and Family

Mr. Baugh is now 47 years old. Born and raised in Arkansas, his sister, Jill, described his childhood and education:

> Jim grew up in a small town with a population of approximately 2000 people. Educational resources were scarce in our town, but Jim was able to overcome this. He completed a bachelor's degree in Criminology, a master's degree in Public Administration, and also earned his Pilot's License at the age of 18. He continued his flight training and later got a Commercial/Multi-engine License. After he graduated college, he packed a U-Haul and moved from Arkansas to Los Angeles alone for his first job. This is significant because most people never leave the small town where we grew up. Jim was raised on our family farm, and he started working there when he was only 9 years old. This instilled a very strong work ethic in Jim that has lasted throughout his entire life.

> While in graduate school at the University of Oklahoma, Jim used what extra time he had available to volunteer at Big Brothers Big Sisters of America where is mentored an abused child for approximately three years before moving out-of-state. Over the next 5 years, Jim continued to stay in contact with his little brother and continued to send him birthday and Christmas presents. Jim's efforts had a positive impact on this child, and I know his life would have turned out much differently if he'd never met Jim. I was inspired by Jim's dedication to community service, so much that I later volunteered at the same organization and became a Big Sister. Jim continued his involvement in other charity organizations, such as the Seattle Milk Fund. By participating in this charity, Jim and his wife would adopt families during Christmas time and provide presents to them and their children.

Mr. Baugh married in 2009 but is now in the process of finalizing a divorce. He is the proud father of two daughters. Mr. Baugh's sister, Tammy, explained:

---

[3] The narrative in this section is a cursory synopsis based on the more extensive social history contained in the PSR and accompanying letters.

4

He has two beautiful daughters, E[] (10) and S[ ] (7) who are his world. They rely on Jim for financial, emotional, and physical support. They think he hung the moon. I feel that an extended sentence would be extremely detrimental to E[ ] and S[ ] as they are very  young and need their father during this very fragile time in their lives.

## B.    Professional Experience Prior to eBay

After graduate school, Mr. Baugh went to work at Microsoft as a protection agent for the Chairman and CEO. He left Microsoft to work for the National Clandestine Service of the CIA. He later returned to the private sector where he was employed directly by a company Bill Gates established to support the Gates Foundation, and then as an independent security consultant. He worked on many high-profile protection details including, for example, then-Vice President Joe Biden at the 2016 Oscars. *See* Ex. C.  He also provided private volunteer assistance to the FBI and CIA. Over the course of this work, he earned the trust and respect of security professionals around the world. A Danish colleague, Martin Keloe, wrote:

> Jim was a very hard-working security agent who was very dedicated to protecting his clients. He always went the extra mile to make sure the people he was protecting were safe and that he had control over all imaginable and unimaginable scenarios. Jim has helped me a lot over the last 15 years and has always been willing to put himself aside to help others. It is a quality I have greatly appreciated over the years and hopefully can continue to benefit from in the future as well.

With regard to Mr. Baugh's criminal conduct, Mr. Keloe added:

> As a former Police Officer, I have a deep understanding and appreciation for the law, and I do not condone what happened. But since I have been in Jim's shoes, I also have an understanding of how something like this could have happened when there is intense pressure from the top.

## C.    Work at eBay from 2016 to 2019

Mr. Baugh went to work at eBay in 2016. As the head of eBay's Global Security and Resiliency operations, he managed over 300 employees in 95 locations worldwide. Putting aside the offense conduct, Mr. Baugh is rightly proud of the honorable, demanding, and necessary work

his team performed on a daily basis to keep eBay's personnel and assets safe. As just one example, in 2017:

> In the aftermath of Hurricane Irma's devastation, eBay employee Ursula Marren found herself stranded on Tortola in the British Virgin Islands. Ursula, a manager on [eBay's] Audit team based in San Jose, had been sailing off the island's coast with her brother as part of her sabbatical. They tried to leave the island in advance of the storm but couldn't get a flight. The hotel where they were in was left uninhabitable, with a collapsing foundation, by Irma's strong winds and flooding.
>
> Ursula and her brother, Adrian, quickly went into survival mode, making sure they had enough food and water, and searching for shelter on higher ground. They also became the caregivers to two elderly couples—one who was also vacationing and the other who lived on the island.
> …
> The security team was quick to respond. Stephanie Popp, Sr. Manager of eBay's Global Intelligence Center, activated a chain of events to rescue Ursula and her brother.
> …
> Over three days, the nine-person GIC team led by Jim Baugh, Senior Director of Global Security, evaluated all possible avenues to rescue Ursula and Adrian. The team had to act quickly, Baugh explains, because not only were conditions deteriorating on Tortola, with reports ranging from crime and looting to uninhabitably and people swimming off the island to try to reach boats that could lead to their return home, but also Hurricane José was brewing in the distance.
>
> "Our only priority was to ensure Ursula and her brother were safely evacuated from the island. In addition to working through our standard emergency response protocol, we were constantly thinking: What else can we do? Who else can we call? What other resources do we have in the region that could possibly assist?" Jim said. "At that point, we immediately activated our emergency evacuation protocol and put a backup special operations contingency on standby."
>
> With Stephanie taking lead, the team worked around the clock attempting to contact Ursula through any means possible, while also comforting her family, coworkers and close friends, assuring them that eBay and the rescue effort would bring Ursula and Adrian home.
> …

6

**A49**

Along with the help of ISOS, an eBay travel partner who provides emergency medical assistance, the GIC deployed a helicopter to rescue Ursula, Adrian and the elderly couple who were also vacationing there.[4]

Given his responsibilities, Mr. Baugh was preoccupied by the potential for a "copycat" replay of two external events that occurred during his tenure at the company. On October 1, 2017, a gunman opened fire on a crowd attending a music festival from the 32d floor of the Mandalay Bay Hotel in Las Vegas, killing 60 people.[5] Mr. Baugh was worried that a similar attack could occur at the annual "eBay Open," a major gathering of eBay sellers in Las Vegas. (Indeed, the 2019 eBay Open was scheduled to take place at the Mandalay Bay, itself.) Separately, on April 3, 2018, an armed woman entered the headquarters of YouTube in San Bruno, California, and opened fire, wounding three people, one of them critically, before killing herself.[6] Mr. Baugh worried that eBay was particularly vulnerable to a similar attack because its headquarters in nearby San Jose was spread across a poorly protected, multiple-building campus comprising more than a city block. Fueling these serious and sincere concerns was the existence of a small but very angry and fractious sliver of the eBay seller community, some of whom were believed to be unstable, armed, and dangerous. Executives sometimes derisively referred to this cohort as "hillbilly garage sale" merchants.

### D.    Additional offense context

As Mr. Baugh made clear in his letter to the Court, he offers no excuses for his offense conduct. He knew better and should have acted accordingly. Still, additional context is helpful to

---

[4] Kendall Fields, *Swooping in to Rescue and Employee in the Aftermath of Hurricane Irma*, ebay HUB (September 20, 2017) (attached as Exhibit D).

[5] *See generally* https://en.wikipedia.org/wiki/2017_Las_Vegas_shooting.

[6] *See generally* https://en.wikipedia.org/wiki/YouTube_headquarters_shooting.

understand how and why an otherwise honorable man, with a long and unblemished career of serving the public and protecting others, would come to commit these crimes.

The Executive Leadership Team ("ELT") at eBay, in particular, Devin Wenig (CEO), Steve Wymer (Senior Vice President ("SVP") for Communications), Wendy Jones (SVP and COO), and Marie Huber (SVP and General Counsel), viewed eCommerceBytes (the Steiners' publication), the readers who posted comments on eCommerceBytes, and a Twitter account called "FidoMaster" (at various times, @unsuckEBAY and @FidoMaster1) as existential threats to the company. The ELT suspected that FidoMaster was either an alter-ego or collaborator of the Steiners, and that, together, they incited hostility from the seller "fringe" who posed a physical security threat to eBay employees.

In addition, the ELT suspected the Steiners and FidoMaster of colluding with and possibly receiving funding from an activist investor, Elliott Management, that was critical of eBay executives and wanted to obtain seats on the company's Board. The General Counsel, Marie Huber, advised the ELT that ordinary tools such as lawsuits and cease-and-desist letters would be ineffective to address the "problems" posed by eCommmerceBytes and FidoMaster. So the ELT turned to Mr. Baugh. The ELT was aware of Mr. Baugh's background, his primary responsibility for *physical* security, and his reputation for creative solutions to difficult problems. While the ELT never asked Mr. Baugh about specifics of his plans, it was certainly foreseeable to the ELT that Mr. Baugh would use harassment or other coercive means in an effort to modify behavior.

Concerns about FidoMaster first emerged in the June 2018 after it made a profane post on the eCommerceBytes blog in response to an article about eBay layoffs.



eBay's security team was concerned that FidoMaster had insider knowledge about Wenig's private travel plans for the July 4 holiday. On July 20, 2018, Fidomaster tweeted a request for Wenig's address in the Hamptons, tagging eCommeceBytes, with an ominous reference to Jack Welch's book entitled "Execution":



Then, on July 24, 2018, FidoMaster posted an eBay logo spattered in blood. The post tagged eCommerceBytes and SilverIceKing, a regular contributor to eCommerceBytes.

9



Throughout the summer of 2018, multiple negative tweets about the upcoming eBay Open event in Las Vegas prompted additional concerns about incitement of threats to physical security. FidoMaster also started to refer to Wenig as "DevilBoy."

The ELT's concerns about FidoMaster's threats and apparent connections to eCommerceBytes escalated further in the Spring of 2019. In an email thread on March 21, 2019, reacting to a FidoMaster tweet, General Counsel Marie Huber asked Mr. Baugh to provide "as much info as possible" on Fidomaster.

---

**From:** Huber, Marie <mhuber@ebay.com>
**Sent:** Thursday, March 21, 2019 9:06 AM
**To:** Rome, Marc; Finn, Molly; Baugh, Jim
**Cc:** Billante, Joe; Freiha, Selim
**Subject:** RE: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first

2

---

dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 🖐 #En...

Thanks. Jim, can you give us as much info as possible on whose account this is? Thanks, Marie

**From:** Rome, Marc <mrome@ebay.com>
**Sent:** Thursday, March 21, 2019 8:43 AM
**To:** Finn, Molly <mofinn@ebay.com>; Huber, Marie <mhuber@ebay.com>
**Subject:** Re: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 🖐 #En...

I assume we don't know who is behind the account?

Huber further instructed Mr. Baugh to notify her of all relevant online activity, and she separately inquired about a Twitter handle in the name of Jesse Cohn, a representative of Elliott Management on the eBay Board:

From: "Huber, Marie" <mhuber@ebay.com>
Date: Thursday, March 21, 2019 at 10:48 AM
To: Jim Baugh <jbaugh@ebay.com>
Cc: "Rome, Marc" <mrome@ebay.com>
Subject: RE: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 🤣 #En...

Thanks, Jim. Please incl us on any messages like this as we've been dealing with the activists and know what's in the ags w/them.

Also, understand there's a "Jesse Cohn" Blind handle. Any way to find out who that is?

Thanks,
Marie

From: Baugh, Jim <jbaugh@ebay.com>
Sent: Thursday, March 21, 2019 10:23 AM
To: Huber, Marie <mhuber@ebay.com>; Rome, Marc <mrome@ebay.com>; Finn, Molly <mofinn@ebay.com>
Cc: Billante, Joe <jbillante@ebay.com>; Freiha, Selim <selim@ebay.com>
Subject: Re: In a bizarre Tweet, struggling #eBay CEO Devin "Misexecution" Wenig announced payout of $EBAY's first dividend saying he's "delighted to share (eBay's) ongoing success..." As if it were his idea and not a forced hand by #ElliottManagement 🤣 #En...

It is unknown who is behind the account.

I will send you a full report.

Jim Baugh
Sr. Director, Global Security
+1.408.768.8717

On May 22, 2019, FidoMaster and eCommerceBytes posted information about "Walker's West," a replica of Wenig's favorite New York pub constructed on the eBay campus. Baugh, Wymer, and Wendy Jones (Senior Vice President, COO, and Mr. Baugh's direct manager) discussed the issue by email on May 23, 2019. The information was apparently obtained from a building contractor's website, and apart from the embarrassment for supposed extravagant spending, the security team viewed publication of information about campus buildings as a potential security risk. Even after the contractor removed the information from its website, eCommerceBytes located and posted an archived version. Jones asked Mr. Baugh to "huddle on this at lunch…"

| Subject: | Re: Ina Steiner - Walker's West |
|---|---|
| Date: | Thursday, May 23, 2019 at 6:15:18 AM Pacific Daylight Time |
| From: | Jones, Wendy |
| To: | Phimister, Russell |
| CC: | Baugh, Jim |
| Attachments: | image009.png, image001.jpg, image006.jpg, image007.jpg, image008.jpg |

Let's huddle on this at lunch please today.

At the lunch meeting, Jones asked Mr. Baugh if he could find a way to deal with the issue "off the radar since comms and legal couldn't handle it." Jones told Mr. Baugh, "Just get it done. I don't want to know the details, just make sure you sync with Wymer." Mr. Baugh thereafter provided regular updates to Jones.

On June 8, 2019, co-conspirator Brian Gilbert spray painted "FidoMaster" on the Steiners' fence. Mr. Baugh told Wymer that his team had given the Steiners "a tap on the shoulder." Wymer expressed approval but did not ask questions. In the immediate aftermath of the vandalism, the ELT was pleased, because they executives perceived that negative postings had subsided.

On July 10, 2019, an eBay user emailed Wenig to complain about FidoMaster. This was discussed in an email thread that included Wymer and Huber, noting that Twitter would not take any action against the account. On July 15, Wymer forwarded the thread to Mr. Baugh, "FYI."

On July 18, 2019, Wenig's wife texted Mr. Baugh to complain about a post by Silver Ice King on eCommerceBytes:

13

**A56**



cindywenig@yahoo.com >

by: Silver Ice King

Thu Jul 18 21:45:54 2019

Just another one of Wenigs lies. Judge
Judy says how can you tell that a
teenager is lying? A) Their lips are
moving. You can substitute Wenig for
Teenagers and you are still right on the
nose.

Wenig is nothing more than a con artist
and thief who would not know the truth if
it was actually spoken to him. One of
these days it will finally catch up to him
and when it does finally land, the landing
will be a crash landing for Wenig.

eBay CEO Devin Wenig Cites Extended Seller

I'm not exactly thrilled with this
post on my favorite
EcommerceBytes.com. The
author gets people worked up
with the way she skews her
stories. Don't tell Devin I sent
this –I'm just letting you know
about it. Ok?

On or about July 19, 2019, Mr. Baugh met with Jones and played a recorded call between a security team member using a false identity and a subject associated with FidoMaster. Jones "fist bumped" Mr. Baugh.

On August 1, 2019, Mr. Baugh and Wymer exchanged text messages:



Wymer added, "I'll embrace managing any bad fall out. We need to STOP her."

On August 6, 2019, Wenig received another email complaint about FidoMaster. He sent the following email to Huber, Wymer, and Mr. Baugh: "First of all we should shut down the account. Second, this user name keeps popping up causing all kinds of trouble. Might be worth some research Jim." Wymer responded that he had Mr. Baugh had been working on the issue. Huber and her colleagues responded that legal remedies were not and would not be effective. Huber wrote:

**From:** Huber, Marie <mhuber@ebay.com>
**Sent:** Tuesday, August 6, 2019 10:00 AM
**To:** Wenig, Devin <devin@ebay.com>; Wymer, Steve <swymer@ebay.com>
**Cc:** Baugh, Jim <jbaugh@ebay.com>; Johnson, Aaron <aajohnson@ebay.com>; Huber, Marie <mhuber@ebay.com>
**Subject:** FW: eBay Imposter Twitter account - Privileged

Oh man, ditto. We have escalated through legal channels at Twitter and they've said that this doesn't violate their policies. (He also harasses me and others.) –

Unfortunately, it does not violate copyright laws b/c someone can use a logo in parody, and that's not actionable under the law. Also, the user has a disclaimer saying that it isn't affiliated with eBay.

The next step could be a letter to Twitter and/or the Twitter user from our outside counsel. Even tho' this is not a strong legal claim, we can send a letter. It gets closer to the line to the extent the user purports to give advice on eBay policies; it's still a tough claim.

If we send a letter, the user could tweet it and create more cycles. Legally, we don't care about that, but don't know Steve if you do.

Marie

Mr. Baugh separately texted with Wenig:

Devin >

I'm utilizing an alias twitter account and have been communicating directly with this individual for a couple of weeks. He is under the impression that I'm an "ally" of his. I'm slowly drawing him out, but it's a painfully slow process. Sorry I have not found him yet, but when I do, it will be fixed.

It's cool don't worry

You know this comes with the territory and it's part of running w consumer company. I'm relaxed

Cool...hope you are getting some down time...there will be plenty of problems waiting for you when you return 😊

Delivered

Yes unfortunately I'm aware and plugged in enough to know !

16

**A59**

Mr. Baugh then forwarded the thread to Jones (to provide "visibility," keeping her in the loop). Jones responded with a "thumbs up."



On August 7, 2019, Aaron Johnson, another in-house lawyer, emailed Huber, Wymer, and Mr. Baugh:

---

**From:** Johnson, Aaron <aajohnson@ebay.com>
**Sent:** Wednesday, August 7, 2019 3:39:13 PM
**To:** Wymer, Steve <swymer@ebay.com>
**Cc:** Baugh, Jim <jbaugh@ebay.com>; Huber, Marie <mhuber@ebay.com>
**Subject:** RE: eBay Imposter Twitter account - Privileged

(-Devin)

Steve - What's your thinking on this from a comms perspective? We've escalated at Twitter, but as noted, the legal claim is weak and Twitter is notoriously slow to respond (~3 weeks) and rigid in their interpretation of the law and their policies. We can continue to press this, but to set expectations, I don't think they'll take action. The other avenue is to go after the Twitter directly with a cease & desist letter (if we can find him/her). That also has a low likelihood of success and potential backfire (low risk). Given the strength of the claims and the cost, I'd strongly recommend against suing.

Jim – any news/developments on your end?

Let me know if you want to discuss live.

Thanks,
aj

---

Wymer then responded to the group:

**Subject:** Re: eBay Imposter Twitter account - Privileged
**Date:** Wednesday, August 7, 2019 at 3:43:05 PM Pacific Daylight Time
**From:** Wymer, Steve .
**To:** Johnson, Aaron
**CC:** Baugh, Jim, Huber, Marie

I am utterly vexed by this! This twitter account dominates our social narrative with his CONSTANT obsession with trolling us. It's more than annoying, it's very damaging. There are a few people (this guy and the eComercebytes gal) infatuated with eBay who have seemingly dedicated their lives to erroneously trashing us as a way to build their own brand – or even build a business. It's genuinely unfair and causes tremendous damage because we look bad fighting back in public and standing up for ourselves. If we could engage, I'd welcome the fight and we have a lot of facts and truth to win with. But, instead we take shots broadside and sit on our powder. This issue gives me ulcers, harms employee moral, and trickles into everything about our brand. I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the "blind eye toward graffiti that turns into mayhem" syndrome and I'm sick about it. Whatever. It. Takes.

18

**A61**

Shortly after that email, Wymer met Mr. Baugh:

- Wymer was very agitated, pointing his finger, etc.
- He instructed Baugh to take any actions necessary to neutralize the Steiners and identify FidoMaster.
- "Direct order" from the CEO.
- Wymer did not want to know details but assured Mr. Baugh that his group would have "executive level support" if efforts led to "any legal problems."
- "Devin [Wenig] wants the website burned to the ground."
- "The only thing that matters is that it stops."
- "If it doesn't stop, we are all done."
- "eBay Corporate is willing to absorb any legal exposure."

Later, in the immediate aftermath of the "blown operation" in Boston, Wymer spoke by phone with Mr. Baugh.

- Wymer stated that he and Jones were aware of operation because they saw an email from Natick PD to eBay legal.
- Wymer reasoned that harassment – which he equated to "TPing" a house – is not a crime.
- Wymer seemed nervous and said multiple times that he didn't know anything about what was going on but that he wouldn't say anything to legal during its internal investigation.
- Wymer told Mr. Baugh, "Stick to your guns," which Mr. Baugh understood as instruction to have his security team stick to its cover story about attending an industry conference in Boston.
- Wymer asked Mr. Baugh how long it would be before legal started reading his emails/texts; Mr. Baugh said he didn't know.
- Wymer told Mr. Baugh they "just needed to get rid of the Hardy Boys," referring to eBay legal.

### E.    Life after arrest and prosecution

After being fired by eBay and then charged in this case, the explosion of publicity made it impossible for Mr. Baugh to secure employment. His marriage also disintegrated.

After "hitting bottom" in his years-long descent into alcoholism, Mr. Baugh voluntarily checked into an in-patient treatment program and has continued follow-up care. He has now been sober for over two years.

For a substantial part of his pretrial release, Mr. Baugh moved to the Seattle area to restore and maintain a relationship with his young daughters and assist in their care while his ex-wife

worked full-time. More recently, he moved back home to Arkansas, where he has lived with one of his sisters and helped his elderly father run the family farm. He intends to return there after completing his sentence.

* * *

This information, and the additional letters submitted with this Memorandum, demonstrate that Mr. Baugh and the conduct underlying his conviction are both far more complex than the most salacious facts or headlines viewed in isolation.

## ARGUMENT

A criminal penalty must be "sufficient, but not greater than necessary, to comply with the purposes of sentencing." 18 U.S.C. § 3553(a). Here, fair consideration of the offense in light Mr. Baugh's role, history, and characteristics compels the conclusion that incarceration for a term of 30 months is sufficient.

The Court is required to compute the Guideline Sentencing Range ("GSR") as a "starting point and the initial benchmark." *Gall v. United States*, 528 U.S. 38, 49 (2007). Here, the government and Probation take the position that the advisory GSR is 57-71 months (level 25, CHC I), while Mr. Baugh contends that the properly calculated GSR is 46-57 months (level 23, CHC I).

Whatever GSR the Court adopts, the Guidelines are not the sole factor, nor even the first among the many factors, that Congress has commanded the courts to apply in section 3553(a). The Court "may not presume that the Guidelines range is reasonable," rather it must "make an individualized assessment based on the facts presented." *Id.* at 50. Indeed, "the Guidelines are only one of the factors to consider . . . and 3553(a) directs the judge to consider sentences other than imprisonment." *Id.* at 59. The Supreme Court has emphasized that the "Guidelines are not only

*not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) (emphasis in original).

Thus, district courts are now required to consider whether the Sentencing Commission's underlying policy results in an advisory GSR that is unreasonably high. *See United States v. Kimbrough*, 552 U.S. 85, 109 (2007); *United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008); *United States v. Martin*, 520 F.3d 87, 93-94 (1st Cir. 1998).

The First Circuit has elaborated on the meaning and breadth of the so-called "parsimony principle" in *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008). It stressed that the Supreme Court's ruling in *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *Id*. at 228. That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

## A.    The "Pattern of Activity" enhancement is inapplicable.

Mr. Baugh objects to the proposed application of a 2-level "pattern of activity" enhancement under U.S.S.C. § 2A6.2(b)(1)(E) where, as here, the underlying charged offenses themselves are inherently based on multiple related acts of harassment. *See* 18 U.S.C. § 2261A(2) (punishing use of interstate commerce facilities "to engage in a *course of conduct*" that causes fear or emotional distress). Application Note 1 to section 2A6.2 defines a "pattern of activity" as

> any combination of two or more separate instances of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction. For example, a single instance of stalking accompanied by a separate instance of threatening, harassing, or assaulting the same victim constitutes a pattern of activity for purposes of this guideline.

21

**A64**

Application Note 3 further directs the Court to "*consider*" (but not necessarily count), "under the totality of the circumstances, any conduct that *occurred* prior to or during the offense" (but notably, not conduct that *constitutes* elements of the offense). The application notes do not define what is meant by "separate instances."

The First Circuit has applied the enhancement where there are *other* instances of stalking *separate* from the charged offense conduct, whether those instances occurred before or during the charged offense. For example, in *United States v. Lee*, 790 F.3d 12, 19 (1st Cir. 2015), which the government cites but misinterprets, the defendant engaged in decades of abuse and harassment of his wife, culminating in a trip to find her in Maine, where he was arrested with a car full of weapons and materials that could be used to clean up a grisly murder scene. *See id*. at 14-15. The defendant was charged with interstate travel with the intent to kill, injure or harass, in violation of 18 U.S.C. § 2261A(1); he was not charged under the "communication" prong of the statute, section 2261A(2). The First Circuit held that an uncharged series of contemporaneous threatening emails was sufficient to trigger the "pattern of activity" enhancement, without need to consider still other, additional, older incidents of physical abuse. *See id.* at 19 & n.3. Critically, *Lee* did *not* endorse application of the enhancement for activity that was already encompassed in the charges. *See also United States v. Sayer,* 748 F.3d 425, 431 (1st Cir. 2014) (noting "pattern" enhancement was applied for "a long-term pattern of stalking, threatening, or harassing behavior" separate from the charged conduct); *United States v. Robinson*, 433 F.3d 31, 36-37 (1st Cir. 2005) (affirming application of "pattern" enhancement based on prior incidents of assault in case charging travel to violate restraining order).

As explained above, the statute itself requires a "course of conduct," 18 U.S.C. § 2261A(2), which is defined, in turn, as "a pattern of conduct comprised of 2 or more acts evidencing a

22

**A65**

continuity of purpose." 18 U.S.C. § 2266(2). If applied in circumstances like those here, the enhancement would duplicate the "course of conduct" element of the crime and would result in an enhanced sentence for every cyberstalking case.

The government's reliance on *United States v. Fiume*, 708 F.3d 59 (1st Cir. 2013), is misplaced. *Fiume* held that imposition of an enhancement for violation of a restraining order was not impermissible double-counting in a case charging interstate travel to violate such an order, *see id.* at 62, but the decision does not require or endorse double-counting in other contexts. Unlike the "pattern" enhancement, the "restraining order" enhancement is not cabined or limited by any application notes. Moreover, consistent with *Lee*, the district court in *Fiume* applied a "pattern" enhancement based on a prior assault conviction and threatening communications *separate* from the charged "travel" offense. *See id.* at 60-61. The government has not identified any case in this Circuit where a court imposed the "pattern" enhancement based on conduct encompassed by the offense itself.

Notably, in sentencing co-conspirator Philip Cooke, Judge Burroughs decided to "duck the issue and just use the lower guideline calculation without ruling on the objection." *United States v. Cooke*, No. 20-cr-10126-ADB, D.E. 25 (Jul. 27, 2021 Sent. Tr.) at 13. Judge Burroughs explained:

> I don't know the answer to this question. I don't think it's an easy thing. And I think that the guidelines are poorly drafted on it. It would lead to double counting; that the application notes from the case law don't make clear to me that it's what the guideline commission contemplated, but I also accept and agree with Mr. Kost[o] that there are aspects of the sentencing guidelines where double counting is allowed and contemplated, but I'm just not sure this is one of them….

*Id.* at 14. She then sentenced Mr. Cooke to 18 months imprisonment, twelve months below the low-end of the range that did *not* include the enhancement.

For these reasons, the Court should not apply the "pattern" enhancement. Accordingly, the total offense level should be 23, which for a defendant in criminal history category I (because Mr. Baugh has no criminal record), yields an advisory GSR of 46-57 months.

### B. The proposed sentence will provide just punishment.

The proposed sentence of 30 months' imprisonment followed by 36 months' supervised release is sufficient to reflect the seriousness of Mr. Baugh's offenses, to promote respect for the law, and to provide "just punishment" as required by § 3553(a)(2)(A).

While it is easy to become inured to enormous numbers in the federal sentencing system, incarceration for 30 months is a substantial penalty by any measure. As the government points out, cyberstalking cases are "each horrifying in their own way" for the victims. Gov. Mem. at 15. From the point of view of harm caused, the proposed sentence of 30 months is consistent with *overall* national, Circuit, and District norms identified by the government from Commission statistics. However, if the same data collection is limited to defendants, like Mr. Baugh, in Criminal History Category I, the national average sentence was 22 months and the median sentence 18 months. The First Circuit average sentence was 18 months and the median sentence 15 months. And the District of Massachusetts average and median sentences were both 15 months.[7] Thus, the proposed sentence is actually *double* the District average for defendants, like Mr. Baugh, with no criminal history. Indeed, there have been cases in this district where far more disturbing conduct over a much longer time period resulted in a significantly lower sentence. *See, e.g.*, *United States v. Connor*, No. 15-cr-10398-WGY (defendant engaged in three-year campaign of threats and intimidation plus extortion of sexually explicit images from college student; court imposed "time

---

[7] *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (filtered by 2015-2021, U.S.S.G. §§ 2A6.1 and 2A6.2, and CHC I).

served" sentence of approximately one month, plus 10 months home confinement, where GSR was 24-30 months).[8]

Here, of course, the offense was *sui generis*. On one hand, Mr. Baugh's supervisory role and obstructive conduct are aggravating factors, but on the other hand, his incarceration is not necessary to protect the victims or the public from a defendant with a personal animus, one who is psychotic, unable to control his anger, or otherwise presents an acute danger of further stalking or committing actual deadly physical violence. Mr. Baugh poses no ongoing danger and the offense, itself, never entailed any intent to inflict actual, physical violence.

The proposed sentence in this case is a year more than that imposed on Cooke, the only-co-conspirator sentenced to date and one of the former senior police officials whom Mr. Baugh employed and relied on to advise him about legal limits of acceptable activity.

As another comparative measure of appropriate punishment for corporate misconduct, the proposed sentence here is also consistent with the sentences imposed *after trial* in the Insys Pharmaceuticals prosecution, a high-profile case involving fraudulent sales and marketing of a specialized fentanyl pain medication that cost the government and private insurers millions in improper reimbursements and caused grievous physical and other harm to numerous patients who were not appropriate candidates to take the drug and became addicted to it. Facing a GSR of well over 10 years, the billionaire CEO and founder of the company received a sentence of 60 months; the other high-level executives received sentences ranging from 12 to 33 months. *See United States v. Simon*, 12 F.4th 1, 22 n.3 (1st Cir. 2021). It strains credulity to contend that Mr. Baugh somehow caused more harm or should be punished more severely than the Insys defendants under Kapoor,

---

[8] *See* https://www.justice.gov/usao-ma/pr/pennsylvania-man-sentenced-cyberstalking-and-sextorting-massachusetts-college-student.

who were convicted and sentenced after a lengthy trial. To do so would create unwarranted disparity.

Moreover, a federal felony conviction is also, by itself, a severe penalty, particularly for an individual with no criminal history whatsoever. Mr. Baugh has endured, and will continue to suffer, humiliation, stress, and financial devastation that he scarcely could have imagined before. Courts have recognized that myriad severe collateral consequences attach to a federal felony conviction, which can amount to a kind of "civil death." *United States v. Nesbeth*, 188 F. Supp. 3d 179, 181 (E.D.N.Y. 2016) (lengthy opinion detailing collateral consequences of conviction in imposing non-incarceration sentence). The district court's observations at sentencing in *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), also deserve attention:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong they have committed.

*Id*. at 343-44 (upholding sentence of probation with six months' home confinement and 1,000 hours of community service where the district court calculated the GSR as 87-108 months after conviction at a lengthy trial on over 100 felony counts of false statements and fraud related to the "Big Dig" project).

Finally, probation supervision as part of a required term of supervised release is also meaningful punishment. As the Supreme Court noted in *Gall*, probation supervision amounts to a "substantial restriction of freedom." 552 U.S. at 595. In combination with more than two years of pre-trial release (much of which he spent subject to a curfew), the proposed sentence will mean Mr. Baugh spends nearly eight years of his life in a combination of federal custody and supervision.

There is no need or principled reason to impose even more custody as a component of that punishment.

### C. Neither specific nor general deterrence requires more than 30 months' incarceration.

Imprisonment is not necessary to protect the public or to deter Mr. Baugh from similar crimes in the future, as required by § 3553(a)(2)(B) and (C). Mr. Baugh has no prior criminal history. The offense conduct was aberrant, not the product of any personal animus or propensity to inflict harm on others. Mr. Baugh will never work in corporate security again and has learned a lasting, painful lesson about the dangers of abdicating personal moral judgment to an employer's ill-conceived priorities.

A 30-month sentence, and even the very fact of federal prosecution, are also more than sufficient serve the interest in *general* deterrence. Nobody looking at what Mr. Baugh has experienced, the pain inflicted on him and his family, and the obstacles he will face in the future could mistakenly conclude that his commission of crimes as an agent of eBay was anything other than extremely serious or that they should engage in similar conduct. Life as Mr. Baugh knew it is already demolished, and no purpose would be served by prolonging his incapacitation gratuitously, chiefly at the expense of his young daughters. Moreover, sentencing Mr. Baugh as a proxy for the company and the most culpable person in the harassment scheme would send precisely the wrong message to Weing, Wymer, Jones, and Huber, who were the real "but for" causes of the crime, and their C-suite peers in other companies.

Moreover, there are no data to suggest that a longer sentence would have any marginally greater general deterrent effect. Empirical research consistently has shown that "increases in the severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006). "Three National

Academy of Science panels . . .reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Research regarding white-collar offenders in particular (presumably, the most rational of potential offenders) found *no difference* in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). On the other hand, a substantial body of evidence establishes that "crime-reducing aspects of imprisonment are considerably negated by crime-enhancing ones." Todd Clear, *Backfire: When Incarceration Increases Crime, The Unintended Consequences of Incarceration* (Vera Inst. 1996).

### D. Imprisonment would not facilitate any required "treatment."

Mr. Baugh plainly does not require "treatment" of the sort that a Bureau of Prisons placement would *uniquely* facilitate under § 3553(a)(2)(D). While he would surely benefit from the BOP's residential substance abuse treatment program ("RDAP"), and would welcome the opportunity to participate, the Court need not impose a sentence of imprisonment greater than 30 months for that reason. The Court also should bear in mind that Mr. Baugh likely will not receive any sentence credit for RDAP, nor will he likely benefit from other types of "earned" credits under the First Step Act, because the BOP categorically classifies "cyberstalking" as a violent crime that apparently renders him ineligible for such credits.[9] Like every prisoner, he can earn "good time,"

---

[9] *See* https://www.bop.gov/policy/progstat/5162_005.pdf.

but under current BOP policies, he will serve substantially all of the sentence this Court imposes and likely will not get any kind of perceived "break" from the recent federal sentencing "reforms" enacted by Congress.

Accordingly, the statutory "treatment" factor would counsel in favor of a shorter prison sentence. As the Sentencing Commission staff has recognized, sentences that include lesser periods of incarceration "divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." U.S. Sentencing Commission, Staff Discussion Paper, Sentencing Options Under the Guidelines, at 19 (Nov. 1996).

## CONCLUSION

For the foregoing reasons, the Court should sentence Mr. Baugh to 30 months in custody followed by an additional 36 months of supervised release, with a recommendation that he participate in RDAP. While it also may be appropriate for the Court, in its discretion, to impose a fine, the Court should bear in mind that the case has already financially devastated Mr. Baugh and any fine payable to the government will reduce the resources available for resolution of the civil case brought by the Steiners and for support of Mr. Baugh's young daughters.

Respectfully submitted,

**JIM BAUGH**

By his attorneys,

*/s/ William W. Fick*
William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 27, 2022.

*/s/ William W. Fick*

jpirozzolo@sidley.com

**From:** William Fick <wfick@fickmarx.com>
**Sent:** Tuesday, November 23, 2021 11:33 AM
**To:** Pirozzolo, Jack <jpirozzolo@sidley.com>; Daniel Marx
<dmarx@fickmarx.com>
**Cc:** Alessi, Kathryn L. <kalessi@sidley.com>; Nonaka, Scott
<snonaka@sidley.com>; Domina, Drew A. <ddomina@sidley.com>; Feith,
Daniel J. <dfeith@sidley.com>
**Subject:** RE: US v. Baugh, 20-cr-10263

Jack:

We write in response to your letter dated November 22, 2021, and to
follow-up on the various meet-and-confer discussions chronicled in that
letter, in an ongoing effort to narrow potential areas of dispute
concerning the subpoenas served on eBay. Nothing in our proposals,
here and in prior communications and discussions, should be
interpreted as an admission that the Subpoena as drafted was
overbroad, unduly burdensome, or without legal basis. Nor should any
particular proposed "concessions" about scope in this email be viewed
as binding, should we be unable to reach agreement on other aspects
of the Subpoena. Rather, as in any negotiation, we are engaging in give-
and-take discussions aimed at reaching a potential compromise to
resolve or narrow disputed matters.

As noted, should we reach agreement regarding production of any
arguably privileged materials, we are prepared to work with you to
accomplish that in a way that minimizes the risk of others claiming a
waiver of those arguably applicable privileges.

We propose the following:

### Request 1

Based on your representations about the forward-looking nature of the
"Guidepost Solutions" exercise, we are prepared to agree that log entry
238 can be excluded from the scope of the request.

The PowerPoint presentation to the USAO is clearly not privileged. We
believe it falls squarely within the ambit of *Nixon* (assuming without
conceding that *Nixon* controls over Mr. Baugh's constitutional right to
compulsory process) and should be produced in its entirety, not merely
the "portions of the presentation that refer to" Mr. Baugh.

With regard to the other responsive documents, we continue to believe
that Mr. Baugh's constitutional rights to defense overcome eBay's
corporate privilege, but we could agree that the materials be redacted
to conceal legal advice and to disclose only findings of fact.

### Request 2

We are prepared to limit the scope of this request to 2019.

### Request 3

As noted previously, we are prepared to accommodate production in a
manner to minimize the risk that third parties may claim eBay waived

any arguably applicable privileges.

### Request 4

Based on your representations about the nature of interviews in and after 2020, we are prepared to limit the scope of production to materials concerning interviews conducted in 2019. However, we are not prepared to limit the scope to "charged individuals." At a minimum, without limitation, the production should also include interview materials for Wenig, Wymer, and Jones.

### Request 5

We are prepared to limit the scope of this request to the full forensic extraction (UFED or comparable) of Mr. Baugh's phone, subject to the understanding that eBay will cooperate should we need to obtain a native copy and/or business record certification for other communications or documents already disclosed to the government, e.g., the 8/25/29 Wenig communication "See you tomorrow. The Cavalry is back" referenced at E_000021 (EBAY-BAUGHPRIV_00007).

### Request 6

We are prepared to limit the scope of this request to communications from January through September 2019. Arguably privileged, responsive communications during this time period, some of which included Mr. Baugh, provide critical contemporaneous context to the alleged offense conduct, at a time when eBay executives, including Wenig, Wymer, and Jones, were arguably unindicted co-conspirators. Accordingly, Mr. Baugh's constitutional rights clearly overcome eBay's assertion of any corporate privilege, and these materials easily satisfy the *Nixon* standard.

We would welcome further discussion if it could be fruitful in reaching compromise.

Bill

**From:** Pirozzolo, Jack <jpirozzolo@sidley.com>
**Sent:** Monday, November 22, 2021 5:02 PM
**To:** William Fick <wfick@fickmarx.com>; Daniel Marx <dmarx@fickmarx.com>
**Cc:** Alessi, Kathryn L. <kalessi@sidley.com>; Nonaka, Scott <snonaka@sidley.com>; Domina, Drew A. <ddomina@sidley.com>; Feith, Daniel J. <dfeith@sidley.com>
**Subject:** RE: US v. Baugh, 20-cr-10263

Ok. Thx.

**JACK W. PIROZZOLO**

**SIDLEY AUSTIN LLP**
60 State Street, 36th Floor
Boston, MA 02109

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

JIM BAUGH, *et al.*

No. 20-cr-10263-PBS

## DEFENDANT JIM BAUGH'S MOTION TO COMPEL DISCOVERY

Defendant, Jim Baugh, moves to compel discovery pursuant to Fed. R. Crim. P. 16, Local Rule 16.2, *Brady v. Maryland,* 373 U.S. 83 (1963), and the inherent power of the Court to order discovery as appropriate. Specifically, the Court should order the prosecution to produce requested materials concerning Mr. Baugh's work, while in the private sector, assisting U.S. government intelligence and/or law enforcement agencies with various undercover operations from 2014 to 2018. The requested materials are relevant and exculpatory as to the *mens rea* elements of the charged offenses and a potential defense of necessity.

## BACKGROUND[1]

The Charges

The prosecution alleges that Defendant, Jim Baugh, along with other eBay employees and contractors, harassed, intimidated, and surveilled a couple ("Victims 1 and 2"), who published an online newsletter ("Newsletter") about eBay and other ecommerce companies. The alleged objectives of the charged conspiracy, according to the Indictment, were "to distract the Victims from publishing the Newsletter, to alter the Newsletter's coverage of eBay, and to gather

---

[1] This background narrative is presented for the purpose of this Motion only. It is substantially based on the charging documents and materials produced by the government in discovery. Mr. Baugh does not concede that any particular facts or allegations, many of which are outside his personal knowledge, are true or accurate.

1

information that the defendants and their co-conspirators could use to discredit the Victims and the Newsletter." D.E. 33 (Indictment) ¶ 12.

Specifically, the fifteen-count Indictment charges that, in violation of 18 U.S.C. § 371, Mr. Baugh conspired (i) to travel in interstate commerce to stalk the Victims and (ii) to use the facilities of interstates commerce to cyber-stalk them (Count I). D.E. 33. It also charges the substantive offense of stalking in violation of 18 U.S.C. § 2261(A)(1)(B) (Counts II and III) and cyber-stalking in violation of 18 U.S.C. § 2261(A)(2)(B) (Counts VI and VII). Further, the Indictment charges that, in violation of 18 U.S.C. § 1512(b)(3), Mr. Baugh committed witness tampering against a Natick Police Department ("NPD") detective (Count X) and eBay investigators (Count XI). Finally, it charges that, in violation of 18 U.S.C. § 1519, Mr. Baugh obstructed a federal investigation into the charged conspiracy by directing a colleague to falsify a document (Count XIII) and by destroying data on his cellphone (Count XIV).[2]

At the time of the alleged conspiracy, in August and September 2019, Mr. Baugh served as eBay's Director of Safety and Security and, in that capacity, oversaw Global Security and Resiliency ("GSR"), a division responsible for the physical security of eBay's employees and facilities. D.E. 33 ¶ 1. He also worked with other employees and contractors, including co-defendant David Harville (eBay's Director of Global Resiliency) and separately charged defendants Brian Gilbert, Philip Cooke, Stephanie Popp, Stephanie Stockwell, and Veronica Zea. Gilbert and Cooke were retired police captains working in GSR who were responsible for various security operations. *Id*. ¶¶ 6-7. Popp, Stockwell, and Zea operated eBay's Global Intelligence

---

[2] The Superseding Indictment includes parallel counts against co-Defendant, David Harville, for all but two of the substantive charges (Counts IV, V, VIII, IX, XII, and XV).

Center ("GIC"), an intelligence and analytics group within GSR that supported the company's overall security operations. *Id.* ¶¶ 3-5.

eBay's senior corporate leadership, including CEO Devin Wenig and SVP Steve Wymer, believed the Victims and their Newsletter posed an existential threat to the company as well as a personal safety threat to executives and their families because of the Newsletter's contents, the comments that its readers posted online, and the hostility toward the company and its executives the Newsletter and comments provoked. D.E. 33 ¶ 10.

Concerns that false, misleading, personal, and inflammatory content in the Newsletter could incite actual physical violence preoccupied eBay's executives—and, as a result, Mr. Baugh and his eBay security team, too. In the wake of the April 2018 mass shooting at YouTube headquarters, the large, open eBay "campus" comprised of multiple buildings in San Jose was viewed as particularly vulnerable. And the eBay "Open" conference, which draws a large, often-fractious collection of eBay sellers to Las Vegas every year, was also viewed as high-risk. Indeed, the 2019 conference was held at the Mandalay Bay, the same site where one of the nation's worst mass shooting incidents had taken place in 2017.

In an effort to distract the Victims from publishing the Newsletter, to alter its coverage, and to gather information that might discredit the Victims, Mr. Baugh allegedly conspired with eBay colleagues to "harass and intimidate the Victims" by sending "repeated and hostile Twitter messages" to the Victims and "deliveries of unwanted – and in some instances disturbing – items" to their home. *Id.* ¶¶ 11-12. In addition, Mr. Baugh allegedly conspired with his co-defendants to place the Victims "under surveillance" by travelling from California to Massachusetts to "conduct physical surveillance." *Id.*

3

On or about August 15, 2019, Mr. Baugh travelled from California to Massachusetts with Harville and Zea. *Id.* ¶ 16z. Later that same day, all three drove to Natick in a rental car. The plan was to install a GPS tracking device on the Victims' car, but the car was locked in their garage. *Id.* ¶ 16bb. Then, on August 16, 2019, Mr. Baugh, Harville, and Zea returned to Natick, repeatedly drove past the Victims' home, and followed Victim 2 as he drove around town. *Id.* ¶ 16ff, 16hh. On or about August 18, 2019, Mr. Baugh, Popp (who had travelled to Boston on August 17, 2019, and replaced Harville on the "surveillance team"), and Zea drove to Natick and, again, followed Victim 2 in his car. Mr. Baugh and the others were spotted again, and Victim 2 was able "to take a photograph of the surveillance team's license plate." *Id.* ¶ 16qq. Shortly thereafter, on August 20, 2019, Mr. Baugh texted Popp, Cooke, and Brian Gilbert to report that two different rental cars had been "burned." *Id.* ¶ 16rr.

On or about August 21, 2019, an NPD detective came to the Boston hotel where Mr. Baugh, Popp, and Zea were staying, "to investigate Zea and Harville's connection" to the alleged "cyberstalking campaign." *Id.* ¶ 16vv. Mr. Baugh also learned that the NPD detective was looking into the purchase of prepaid debit cards in Santa Clara, California, to order pizzas for delivery to the Victims. *Id.* ¶ 16ddd. Mr. Baugh and Popp then "directed" Stockwell to create "a list of eBay 'Persons of Interest' in the San Francisco Bay Area" that Gilbert could use in talking with the NPD to "deflect attention from Zea." *Id.* ¶ 16eee.

The charged conspiracy failed to accomplish its alleged objectives. Rather than distract the Victims or change the content of their Newsletter, it prompted a local police investigation in Massachusetts. After an NPD detective followed several clues back to eBay's headquarters in California, Mr. Baugh and other eBay employees and contractors allegedly lied to "eBay

4

investigators," destroyed records on "eBay-issued cellphones," and removed computers from eBay's offices. *Id.* ¶¶ 13, 16jjj, 16lll, 16mmm, 16ooo.

Mr. Baugh's Prior Covert Operations as a Security Contractor

As the prosecution knows, earlier in his career, Mr. Baugh was a U.S. government agent involved in national security activities. Later, while working as a private sector security contractor, Mr. Baugh was enlisted from time to time by U.S. government agencies, via a "handler" from the FBI, to conduct and assist those agencies with certain covert operations. These activities involved conducting physical and electronic surveillance, engaging in physical trespass, using false pretenses and fake identities, and gaining unauthorized access to private corporate computer systems, documentation, and resources, all in support of certain national security objectives.

For example, in one covert government operation, Mr. Baugh used private corporate resources to facilitate installation of surveillance devices at a hotel to monitor a visiting head of state and accompanying delegation from a hostile foreign power; he then secretly funneled the government-provided cash back into the corporation's finance system to reimburse the costs. In another operation, Mr. Baugh surreptitiously obtained falsified corporate credentials, without the company's consent, to permit a government agent to attend meetings between corporate employees and a visiting foreign delegation. In yet another operation, Mr. Baugh used false pretenses to help arrange meetings between a suspected foreign agent (target) and an undercover federal agent who pretended to be a business consultant retained by Mr. Baugh, in order help the undercover agent form a close relationship with, and obtain compromising information about, the target.

Mr. Baugh was consistently instructed by his FBI handler to stick with his false "cover story" if confronted or questioned by local law enforcement or corporate representatives about his actions in connection with these covert government operations.

eBay executives were well aware of Mr. Baugh's background, and they expected he would use strategies and tactics that he learned in service of the U.S. government to address what they characterized as the existential threat posed by the Newsletter. eBay's General Counsel, Marie Huber, had advised executives and Mr. Baugh that ordinary legal tools were unlikely to be effective in addressing issues posed by the Newsletter and a Twitter account believed to be associated with the Victims. Executives therefore turned to Mr. Baugh to solve the problem by less conventional means. SVP Wymer's direction to Mr. Baugh, cc'ed to GC Huber, could not have been more clear:

> I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the "blind eye toward graffiti that turns into mayhem" syndrome and I'm sick about it. Whatever. It. Takes.

D.E. 3-2 (Cmplt. Aff.) ¶ 49.

<u>The Requested Discovery.</u>

By letter dated June 29, 2021, Mr. Baugh requested, *inter alia*, the following items in discovery:

- Documents sufficient to identify activities performed by Mr. Baugh authorized by or in support of U.S. government intelligence or law enforcement agencies or operations from 2014 to 2018.

- Documents concerning or comprising any agreements between Mr. Baugh and U.S. government agencies relating to the activities referenced in the previous request.

- Documents concerning or comprising written instructions or warnings provided to Mr. Baugh relating to the activities referenced in the previous two requests.

D.E. 62 ¶¶ 6-8.

The prosecution, "[w]ithout confirming or denying the existence of any of the described activities, agreements, instructions, or warnings for the period between 2014 and 2018, …

6

decline[d] to produce such records." D.E. 67 at 3-4. It asserted the information is "irrelevant because it predates the existence of the conspiracy alleged in the Indictment." *Id.* at 4. Moreover, implicitly admitting that the information, at minimum, would be relevant to the "degree of the defendant's culpability" under Local Rule 116.2(b)(4), the prosecution argued that the information is not discoverable *yet*: "To the extent you seek information in the government's possession that, assuming it existed, would tend to diminish the degree of the defendants' culpability, Local Rule 116.2(b)(4) requires only that a written summary of any information be provided before the earlier of a plea or the defendant's submission of objections to a Presentence Investigation Report." *Id.*[3]

The prosecution is wrong. Because the requested information is potentially exculpatory and material to preparing Mr. Baugh's defense, it must be turned over now. And even under the prosecution's narrow and jaundiced view of its obligation as limited to pre-plea sentence mitigation, Mr. Baugh cannot meaningfully weigh whether to *consider* a plea without access to the requested materials now. Finally, even if discovery were not yet required under the Local Rules, delay under these circumstances is a waste of resources and inconsistent with the prosecution's obligation to seek justice, not simply a conviction.

## ARGUMENT

The requested information is material to Mr. Baugh's state of mind. Did he "*intend*" to "*harass*" the alleged victims, using various means including physical surveillance, as the federal stalking statute requires? Did he "*corruptly*" engage in misleading conduct as the witness tampering statute requires? Or, instead, did he act in good faith, believing his actions to be appropriate and necessary to avoid greater harms? Even if such a belief appears erroneous or

---

[3] Notably, the government has not invoked the declination provision of Local Rule 116.6.

7

unreasonable today, with the benefit of hindsight, Mr. Baugh is entitled to develop and present evidence bearing on his state of mind at the time of alleged conduct at issue.

Evidence concerning Mr. Baugh's prior participation in U.S. government-sponsored covert operations that employed physical surveillance and other arguably unlawful means in service of a greater good (that is, to avoid greater perceived or potential harm), and any instructions and warnings his official handler may have provided (*e.g.,* to maintain a false "cover story" in response to inquiries from local law enforcement or corporate representatives) would be exculpatory and material to as evidence that tends to negate specific intent and/or support an affirmative defense of actual or perceived necessity.

## I. Legal Standard

The government has a constitutional "duty to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment." *United States v. Prochilo*, 629 F.3d 264, 266 (1st Cir. 2011) (citing *Brady v. Maryland,* 373 U.S. 83 (1963)). The Local Rules further provide:

> [e]xculpatory information includes, *but may not be limited to*, all information that is material and favorable to the accused because it tends to:
> (1) Cast doubt on defendant's guilt as to any essential element in any count of the indictment or information;
> (2) Cast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief, that might be subject to a motion to suppress or exclude . . . .;
> (3) Cast doubt on the credibility or accuracy of any evidence that the government anticipates offering in its case-in-chief; or
> (4) Diminish the degree of the defendant's culpability or the defendant's Offense Level under the United States Sentencing Guidelines.

Local Rule 116.2(a) (emphasis added).

In addition, the criminal discovery rules provide that

> [u]pon a defendant's request, the government must permit the
> defendant to inspect and to copy or photograph books, papers,
> documents, data, photographs, tangible objects, buildings or places,
> or copies or portions of any of these items, if the item is within the
> government's possession, custody, or control and:
> (i) <u>the item is material to preparing the defense;</u>
> (ii) the government intends to use the item in its case-in-chief at trial;
> or
> (iii) <u>the item was obtained from or belongs to the defendant.</u>

Fed. R. Crim. P. 16(a)(1)(E) (emphasis added); *see* Local Rule 116.1(c)(1)(A) (requiring

production of Rule 16 material within 28 days of arraignment). Thus, under Local Rule

116.1(c)(1)(E) and Fed. R. Crim. P. 16(a)(1)(E), the government must permit the inspection of

requested documents, within 28 days of arraignment, if they are "material to preparing the

defense." Fed. R. Crim. P. 16(a)(1)(E)(i).

Materiality is a low threshold: The First Circuit has observed that

> Rule 16's mandatory discovery provisions were designed to
> contribute to the fair and efficient administration of justice by
> providing the defendant with sufficient information upon which to
> base an informed plea and litigation strategy; by facilitating the
> raising of objections to admissibility prior to trial; by minimizing
> the undesirable effect of surprise at trial; and by contributing to the
> accuracy of the fact-finding process.

*United States v. Lanoue*, 71 F.3d 966, 976 (1st Cir. 1995), *abrogated on other grounds by United*

*States v. Watts*, 519 U.S. 148 (1997). Information is material even if it does not ultimately lead to

a viable defense. *See United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013)

("[i]nformation is material even if it simply causes a defendant to completely abandon a planned

defense and take an entirely different path").

## II.     The Court Should Order the Requested Discovery

The requested information is exculpatory and material to Mr. Baugh's *mens rea*, which is

directly at issue in both the stalking and witness tampering charges. *See* Fed. R. Crim. P.

16(a)(1)(E)(i). Moreover, to the extent the requests include agreements, warnings, and other

9

documents that Mr. Baugh actually signed, they constitute materials "obtained from" him to which he is automatically entitled. *See* Fed. R. Crim. P. 16(a)(1)(E)(iii).

In order to obtain a federal "stalking" conviction under 18 U.S.C. § 2261A, the government must prove, among other things, that Mr. Baugh travelled in interstate commerce "[with] the intent to kill, or injure, or harass, or intimidate, or place under surveillance with the intent to kill, injure, harass or intimidate, the person named in the Indictment." *United States v. Walker*, 665 F.3d 212, 224 (1st Cir. 2011); *see* 18 U.S.C. § 2261A(1); *see also* Pattern Crim. Jury Inst. for the District Courts of the First Circuit 4.18.2261A.[4] That specific intent must exist at the time of the interstate travel. *See United States v. Casile*, 490 Fed. Appx. 470, 2012 U.S. App. LEXIS 15872 (3d Cir. Aug. 1, 2012).

In order to obtain a witness tampering conviction under 18 U.S.C. § 1512(b)(3), the government must prove that Mr. Baugh *knowingly* and *corruptly* persuaded or attempted to persuade, or engaged in misleading conduct toward an identified person with the intent to hinder, delay, or prevent communication of information to federal law enforcement. Construing that statute, the Supreme Court has emphasized that "[o]nly persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuade.'" *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705-06 (2005) (ellipsis in original).

As to both sets of charges, Mr. Baugh is entitled to present evidence that he did not have the requisite *mens rea*—the specific intent to *harass* the Victims, or to *corruptly* tamper with a witness. While the government always bears the burden to prove *mens rea* elements beyond a reasonable doubt, Mr. Baugh may request a "good faith" instruction. *See* Pattern Crim. Jury Inst.

---

[4] Available at https://www.med.uscourts.gov/pdf/crpjilinks.pdf .

for the District Courts of the First Circuit § 5.02 ("Evidence has been presented of [defendant's] [. . . good faith. . .]. Such [ ] may be inconsistent with [the requisite culpable state of mind]"); *United States v. Sturm*, 870 F.2d 769, 777 (1st Cir. 1989) ("Jury instructions that allow a conviction even though the jury may not have found that the defendant possessed the mental state required for the crime constitute plain error.").

Relatedly, Mr. Baugh can also seek to establish the necessity or, at least, the good-faith *perceived* necessity of his conduct. That affirmative defense would require Mr. Baugh to prove that he "(1) was faced with a choice of evils and chose the lesser evil, (2) acted to prevent imminent harm, (3) reasonably anticipated a direct causal relationship between his acts and the harm to be averted, and (4) had no legal alternative but to violate the law." *United States v. Lebreault-Feliz*, 807 F.3d 1, 3-4 (1st Cir. 2015).

The circumstances here indicate that Mr. Baugh: (1) believed the Victims and the Newsletter posed a grave and imminent threat in the form of incitements to violence against eBay personnel; (2) believed the alleged actions would avert the threatened harm; (3) was told by the GC Huber that "ordinary" legal tools were ineffective to neutralize that threat; (4) had previously, at the U.S. government's direction and with its authorization, engaged in surveillance, trespassing, and misleading activities similar to those charged here, in what he understood to be necessary for the greater good. The requested discovery would show that Mr. Baugh was previously hired to engage in similar conduct by the U.S. government; he reasonably understood the conduct was lawful or, at least, necessary; and he undertook that conduct not to "harass or intimidate" or to "corruptly" mislead but to serve important national security objectives. Such evidence would help to demonstrate Mr. Baugh's good faith.

Stated differently, evidence that Mr. Baugh previously engaged in surveillance and other arguably unlawful activities believing them to be justified, supports the inference that he did so here, too. In *United States v. Lee*, 790 F.3d 12 (1st Cir. 2015), the First Circuit found that historical evidence of the defendant's abuse of his former wife was relevant (and admissible) in a § 2261A stalking prosecution, not only to show the *victim*'s state of mind but "relevant to [the defendant's] motive or intent" as well. *Id*. at 16-17 (emphasis added). If such evidence is relevant and admissible when offered to show an inculpatory state of mind, as in *Lee*, it is similarly relevant and admissible to show an *exculpatory* state of mind.

## CONCLUSION

For the foregoing reasons Mr. Baugh respectfully requests that this Court order the government to provide the discovery requested in paragraphs 6-8 of his June 29, 2021 letter.

Respectfully submitted,

**JIM BAUGH**

by his attorneys,

/s/ William Fick
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO # 601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM
ABARSKY@FICKMARX.COM

## CERTIFICATE OF SERVICE

I caused the foregoing document to be served, by ECF filing August 16, 2021, on the parties registered for ECF notices in this case.

/s/ William Fick

12

**A87**

UNITED STAES V. BAUGH, ET AL.
20-CR-10263

Case 1:20-cr-10263-PBS Document 178-11 Filed 02/18/22 Page 88 of 128
INITIAL PRIVLEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 8 | Standalone Document | 8/30/19 10:28 AM | eBay Legal / Morgan Lewis | | | | | Baugh.pdf | Attorney Client; Work Product | Notes of confidential interview of Josh Bentley on 9/12/2019 at 3:19 PM attended by Andrew Phelan reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 9 | Standalone Document | 8/30/19 10:28 AM | eBay Legal / Morgan Lewis | | | | | Baugh.pdf | Attorney Client; Work Product | Notes of confidential interview of Josh Bentley on 9/12/2019 at 10:50 AM attended by Andy Phelan and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 10 | Standalone | 8/28/2019 22:29 | Macauley, Shannon | | | | | 2019.08.27 Jim Baugh_3.docx | Attorney Client; Work Product | Notes of confidential interview of Jim Baugh on 8/27/2019 at 7:58 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 11 | Standalone | 8/28/2019 22:22 | Macauley, Shannon | | | | | 2019.08.23 Jim Baugh_2.docx | Attorney Client; Work Product | Notes of confidential interview of Jim Baugh on 8/23/2019 at 4:50 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 12 | Standalone | 8/28/2019 22:20 | Macauley, Shannon | | | | | 2019.08.23 Jim Baugh.docx | Attorney Client; Work Product | Notes of confidential interview of Jim Baugh on 8/23/2019 at 3:30 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 13 | Standalone | 8/28/2019 22:35 | Macauley, Shannon | | | | | 2019.08.28 Jim Baugh_4.docx | Attorney Client; Work Product | Notes of confidential interview of Jim Baugh on 8/28/2019 at 10:17 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 14 | Standalone | 8/28/2019 22:32 | Macauley, Shannon | | | | | 2019.08.27 Steve Wymer.docx | Attorney Client; Work Product | Notes of confidential interview of Steve Wymer on 8/27/2019 at 10:35 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 15 | Standalone Document | 9/20/19 12:08 PM | eBay Legal / Morgan Lewis | | | | | Jones.pdf | Attorney Client; Work Product | Notes of confidential interview of Wendy Jones on 8/30/2019 attended by Andrew Phelan and Jordan Mundell reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

UNITED STAES V. BAUGH, ET AL.
20-CR-10263

INITIAL PRIVLEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 16 | Standalone Document | 9/20/19 12:08 PM | eBay Legal / Morgan Lewis | | | | | Jones.pdf | Attorney Client;Work Product | Notes of confidential interview of Wendy Jones on 8/30/2019 at 9:00 AM attended by Andrew Phelan, Jordan Mundell, and Shannon Macauley reflecting the collection of information and annotations by counsel or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 17 | Standalone Document | 9/20/19 12:08 PM | eBay Legal / Morgan Lewis | | | | | Jones.pdf | Attorney Client;Work Product | Notes in preparation of confidential interview of Wendy Jones on 9/6/2019 reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 18 | Standalone Document | 9/20/19 12:08 PM | eBay Legal / Morgan Lewis | | | | | Jones.pdf | Attorney Client;Work Product | Notes in preparation of confidential interview of Wendy Jones on 9/6/2019 reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 19 | Standalone Document | 9/20/19 12:08 PM | eBay Legal / Morgan Lewis | | | | | Jones.pdf | Attorney Client;Work Product | Notes of confidential interview of Wendy Jones on 9/6/2019 attended by Andrew Phelan, Colin West, and Shannon Macauley reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 20 | Standalone | 8/28/2019 22:18 | Macauley, Shannon | | | | | 2019.08.23 Dave Harville.docx | Attorney Client;Work Product | Notes of confidential interview of Dave Harville on 8/23/2019 at 12:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 21 | Standalone | 9/20/19 12:36 PM | eBay Legal | | | | | Shepard.pdf | Attorney Client;Work Product | Notes of confidential interview of Tony Shepard on 8/23/2019 at 12:45 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 22 | Standalone Document | 9/20/19 12:55 PM | eBay Legal / Morgan Lewis | | | | | Wymer.pdf | Attorney Client;Work Product | Notes of confidential interview of Steve Wymer on 8/27/2019 at 10:35 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

UNITED STAES V. BAUGH, ET AL.
20-CR-10263

INITIAL PRIVLEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 23 | Standalone Document | 9/20/19 12:55 PM | eBay Legal / Morgan Lewis | | | | | Wymer.pdf | Attorney Client;Work Product | Notes of confidential interview of Steve Wymer on 8/28/2019 at 1:30 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 24 | Standalone Document | 9/20/19 12:55 PM | Mundell, Jordan | | | | | Wymer.pdf | Attorney Client;Work Product | Notes of confidential interview of Steve Wymer on 8/30/2019 attended by Andrew Phelan and Jordan Mundell reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 25 | Standalone Document | 9/20/19 12:55 PM | eBay Legal / Morgan Lewis | | | | | Wymer.pdf | Attorney Client;Work Product | Notes of confidential interview of Steve Wymer on 8/30/2019 at 3:30 PM attended by Andrew Phelan, Jordan Mundell, and Shannon Macauley reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 26 | Standalone Document | 9/20/19 12:55 PM | eBay Legal / Morgan Lewis | | | | | Wymer.pdf | Attorney Client;Work Product | Notes of confidential interview of Josh Bentley on 9/12/2019 at 3:19 PM attended by Andrew Phelan reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 27 | Standalone Document | 9/20/19 12:55 PM | eBay Legal / Morgan Lewis | | | | | Wymer.pdf | Attorney Client;Work Product | Notes of confidential interview of Steve Wymer on 9/9/2019 attended by Shannon Macauley, Andy Phelan and Colin West reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 28 | Standalone Document | 9/20/19 12:55 PM | eBay Legal / Morgan Lewis | | | | | Wymer.pdf | Attorney Client;Work Product | Notes of confidential interview of Steve Wymer on 9/9/2019 attended by Shannon Macauley, Andy Phelan and Colin West reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 29 | Standalone | 8/28/2019 22:26 | Macauley, Shannon | | | | | 2019.08.26 Dave Harville_2.docx | Attorney Client;Work Product | Notes of confidential interview of Dave Harville on 8/26/2019 at 10:22 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 30 | Standalone Document | 9/7/19 9:46 AM | Phelan, Andrew C. | | | | | Popp.pdf | Attorney Client;Work Product | Notes of confidential interview of Stephanie Popp on 8/23/2019 at 8:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 31 | Standalone Document | 9/7/19 9:46 AM | eBay Legal / Morgan Lewis | | | | | Popp.pdf | Attorney Client;Work Product | Notes of confidential interview of Stephanie Popp on 8/26/2019 at 9:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 32 | Standalone Document | 9/7/19 9:46 AM | eBay Legal / Morgan Lewis | | | | | Popp.pdf | Attorney Client;Work Product | Notes of confidential interview of Stephanie Popp on 8/27/2019 at 11:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 33 | Standalone Document | 9/4/19 11:42 AM | eBay Legal / Morgan Lewis | | | | | Gilbert.pdf | Attorney Client;Work Product | Notes of confidential interview of Brian Gilbert on 8/23/2019 at 10:00 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 34 | Standalone Document | 9/4/19 11:42 AM | eBay Legal / Morgan Lewis | | | | | Gilbert.pdf | Attorney Client;Work Product | Notes of confidential interview of Brian Gilbert on 8/30/2019 attended by Andrew Phelan reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 35 | Standalone Document | 9/4/19 11:42 AM | eBay Legal / Morgan Lewis | | | | | Gilbert.pdf | Attorney Client;Work Product | Notes in preparation of confidential interview of Brian Gilbert on 9/3/2019 reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 36 | Standalone Document | 9/4/19 11:42 AM | eBay Legal / Morgan Lewis | | | | | Gilbert.pdf | Attorney Client;Work Product | Notes of confidential interview of Brian Gilbert on 8/30/2019 at 2:00 PM attended by Andrew Phelan, Jordan Mundell, and Shannon Macauley reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

UNITED STAES V. BAUGH, ET AL.
20-CR-10263

INITIAL PRIVLEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 37 | Standalone Document | 9/4/19 11:42 AM | eBay Legal / Morgan Lewis | | | | | Gilbert.pdf | Attorney Client;Work Product | Notes of confidential interview of Brian Gilbert on 9/2/2019 at 2:00 PM attended by Andrew Phelan, Jordan Mundell, Colin West, and Shannon Macauley reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 38 | Standalone | 9/16/2019 10:06 | eBay Legal / Morgan Lewis | | | | | 2019.09.13 Julianne Whitelaw Interview.docx | Attorney Client;Work Product | Notes of confidential interview of Julianne Whitelaw on 9/13/2019 attended by Andrew Phelan, Colin West, and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 39 | Standalone | 9/20/19 12:48 PM | eBay Legal / Morgan Lewis | | | | | Whitelaw.pdf | Attorney Client;Work Product | Notes of confidential interview of Julianne Whitelaw on 9/13/2019 attended by Andrew Phelan, Colin West, and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 40 | Standalone | 8/28/2019 22:25 | Macauley, Shannon | | | | | 2019.08.23 Veronica Zea_2.docx | Attorney Client;Work Product | Notes of confidential interview of Veronica Zea on 8/23/2019 at 12:00 PM attended by Shannon Macauley, Amir Vonsover, and Tony Shepard reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 41 | Standalone Document | 9/20/19 12:44 PM | eBay Legal / Morgan Lewis | | | | | Wenig.pdf | Attorney Client;Work Product | Notes in preparation for a confidential interview of Devin Wenig for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 42 | Standalone Document | 9/20/19 12:44 PM | eBay Legal / Morgan Lewis | | | | | Wenig.pdf | Attorney Client;Work Product | Notes of confidential interview of Devin Wenig on 9/10/2019 attended by Andrew Phelan and Colin West reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 43 | Standalone | 9/10/2019 9:25 | Macauley, Shannon | | | | | 2019.09.09 Steve Wymer Interview Notes eBay acp-combined CWest and SMacauley summary.docx | Attorney Client;Work Product | Notes of confidential interview of Steve Wymer on 9/9/2019 attended by Andrew Phelan, Colin West, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 44 | Standalone | 8/28/2019 22:26 | Macauley, Shannon | | | | | 2019.08.26 Stephanie Popp_2.docx | Attorney Client;Work Product | Notes of confidential interview of Stephanie Popp on 8/26/2019 at 9:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 45 | Standalone | 8/28/2019 22:31 | Macauley, Shannon | | | | | 2019.08.27 Stephanie Popp_3.docx | Attorney Client;Work Product | Notes of confidential interview of Stephanie Popp on 8/27/2019 at 11:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 46 | Standalone | 8/28/2019 22:36 | Macauley, Shannon | | | | | 2019.08.28 Steve Wymer _2.docx | Attorney Client;Work Product | Notes of confidential interview of Steve Wymer on 8/28/2019 at 1:30 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 47 | Standalone | 9/4/2019 20:32 | Connor, Bryan M. | Project Lewis - File | | | | 2019.08.30 Project Lewis - Scott Fitzgerald August 30th Interview Memo.DOCX | Attorney Client;Work Product | Memorandum of confidential interview of Scott Fitzgerald on 8/30/2019 by Colin West, Bryan Connor, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 48 | Standalone Document | 9/20/19 12:01 PM | eBay Legal / Morgan Lewis | | | | | Harville.pdf | Attorney Client;Work Product | Notes of confidential interview of Dave Harville on 8/23/2019 at 12:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 49 | Standalone Document | 9/20/19 12:01 PM | eBay Legal / Morgan Lewis | | | | | Harville.pdf | Attorney Client;Work Product | Notes of confidential interview of Dave Harville on 8/23/2019 at 10:22 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 50 | Standalone Document | 9/20/19 12:01 PM | eBay Legal / Morgan Lewis | | | | | Harville.pdf | Attorney Client;Work Product | Notes of confidential interview of Dave Harville on 8/23/2019 at 4:35 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 51 | Standalone Document | 9/20/19 12:01 PM | eBay Legal / Morgan Lewis | | | | | Harville.pdf | Attorney Client;Work Product | Notes of confidential interview of Dave Harville on 9/13/2019 at 3:00 PM attended by Andy Phelan, Colin West, Amir Vonsover, and Evan Nelson reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

**UNITED STAES V. BAUGH, ET AL.**
**20-CR-10263**

INITIAL PRIVLEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 52 | Standalone | 8/28/2019 22:25 | Macauley, Shannon | | | | | 2019.08.23 Veronica Zea.docx | Attorney Client;Work Product | Notes of confidential interview of Veronica Zea on 8/23/2019 at 9:00 AM attended by Shannon Macauley, Amir Vonsover, and Tony Shepard reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 53 | Standalone | 9/13/2019 17:31 | Vonsover, Amir | | | | | 2019.09.13 Harville Attorney Meeting Notes.docx | Attorney Client;Work Product | Notes of confidential interview of David Harville on 9/13/2019 at 3:00 PM attended by Andrew Phelan, Colin West, Amir Vonsover, and Evan Nelson reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 54 | Standalone | 9/17/2019 18:39 | Connor, Bryan M. | | | | | 2019.09.17 Jose Gordon Interview.docx | Attorney Client;Work Product | Notes of confidential interview of Jose Gordon on 9/17/2019 at 2:35 PM attended by Andrew Phelan reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 55 | Standalone | 9/20/19 12:24 PM | eBay Legal / Morgan Lewis | | | | | Moore.pdf | Attorney Client;Work Product | Notes of confidential interview of Ryan Moore on 9/13/2019 attended by Andrew Phelan, Colin West, and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 56 | Standalone | 8/30/2019 17:47 | Connor, Bryan M. | West, Colin C. | | | August 30th Meeting with Scott Fitzgerald | August 30th Meeting with Scott Fitzgerald | Attorney Client;Work Product | Email between counsel providing and discussing legal advice and prepared in anticipation of litigation regarding eBay internal investigation after Natick events. |
| 57 | Standalone | 9/16/2019 10:06 | eBay Legal / Morgan Lewis | | | | | 2019.09.13 Ryan Moore Interview.docx | Attorney Client;Work Product | Notes of confidential interview of Ryan Moore on 9/13/2019 attended by Andrew Phelan, Colin West, and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 58 | Standalone Document | 9/20/19 1:00 PM | eBay Legal / Morgan Lewis | | | | | Zea.pdf | Attorney Client;Work Product | Notes of confidential interview of Veronica Zea on 8/23/2019 at 9:00 AM attended by Shannon Macauley, Amir Vonsover, and Tony Shepard reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 59 | Standalone Document | 9/20/19 1:00 PM | eBay Legal / Morgan Lewis | | | | | Zea.pdf | Attorney Client;Work Product | Notes of confidential interview of Veronica Zea on 8/23/2019 at 12:00 PM attended by Shannon Macauley, Amir Vonsover, and Tony Shepard reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

UNITED STAES V. BAUGH, ET AL.
20-CR-10263

INITIAL PRIVLEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 60 | Standalone Document | 9/20/19 1:00 PM | eBay Legal / Morgan Lewis | | | | | Zea.pdf | Attorney Client;Work Product | Notes of confidential interview of Veronica Zea on 8/26/2019 at 12:30 PM attended by Shannon Macauley, Amir Vonsover, Tony Shepard, and Ellen Sherman reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 61 | Standalone | 8/28/2019 22:37 | Macauley, Shannon | | | | | 2019.08.27 Dave Harville_3.docx | Attorney Client;Work Product | Notes of confidential interview of Dave Harville on 8/27/2019 at 4:35 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 62 | Standalone | 9/12/2019 12:36 | Macauley, Shannon | | | | | 2019.09.05 Scott Fitzgerald (ML).docx | Attorney Client;Work Product | Notes of confidential interview of Scott Fitzgerald on 9/5/2019 attended by Colin West, Andrew Phelan, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 63 | Standalone | 9/20/19 12:38 PM | eBay Legal | | | | | Stockwell.pdf | Attorney Client;Work Product | Notes of confidential interview of Stephanie Stockwell on 8/26/2019 at 2:16 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 64 | Standalone | 10/15/2019 23:47 | Vonsover, Amir | | | | | Michelle Interview Oct 15 2019 Project Lewis.docx | Attorney Client;Work Product | Notes of confidential interview of Michelle (last name unknown) on 10/15/2019 at 4:30 PM attended by Molly Finn and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 65 | Standalone | 8/28/2019 22:24 | Macauley, Shannon | | | | | 2019.08.23 Stephanie Popp.docx | Attorney Client;Work Product | Notes of confidential interview of Stephanie Popp on 8/23/2019 at 8:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 66 | Standalone Document | 9/20/19 11:53 AM | eBay Legal / Morgan Lewis | | | | | Fitzgerald.pdf | Attorney Client;Work Product | Notes of confidential interview of Scott Fitzgerald on 8/23/2019 at 10:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

CONFIDENTIAL - SUBJECT TO AGREED UPON ORDER OF CONFIDENTIALITY REGARDING PRIVILEGE LOGS

MLB_BAUGHPRIV_0001

UNITED STAES V. BAUGH, ET AL.
20-CR-10263

INITIAL PRIVILEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 67 | Standalone Document | 9/20/19 11:53 AM | eBay Legal / Morgan Lewis | | | | | Fitzgerald.pdf | Attorney Client;Work Product | Notes of confidential interview of Scott Fitzgerald on 9/3/2019 at 5:50 PM reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 68 | Standalone Document | 9/20/19 11:53 AM | eBay Legal / Morgan Lewis | | | | | Fitzgerald.pdf | Attorney Client;Work Product | Notes in preparation for confidential interview of Scott Fitzgerald on 9/5/2019 at 2:30 PM reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 69 | Standalone Document | 9/20/19 11:53 AM | eBay Legal / Morgan Lewis | | | | | Fitzgerald.pdf | Attorney Client;Work Product | Notes of confidential interview of Scott Fitzgerald on 8/30/2019 at 3:00 PM attended by Colin West, Bryan Connor, and Shannon Macauley reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 70 | Standalone Document | 9/20/19 11:53 AM | eBay Legal / Morgan Lewis | | | | | Fitzgerald.pdf | Attorney Client;Work Product | Notes of confidential interview of Scott Fitzgerald on 9/3/2019 at 3:43 PM attended by Colin West, Jordan Mundell, Andrew Phelan, and Shannon Macauley reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 71 | Standalone Document | 9/20/19 11:53 AM | eBay Legal / Morgan Lewis | | | | | Fitzgerald.pdf | Attorney Client;Work Product | Notes of confidential interview of Scott Fitzgerald on 9/5/2019 attended by Colin West, Andrew Phelan, and Shannon Macauley reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 72 | Standalone Document | 8/28/2019 22:17 | Macauley, Shannon | | | | | 2019.08.23 Brian Gilbert.docx | Attorney Client;Work Product | Notes of confidential interview of Brian Gilbert on 8/23/2019 at 10:00 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 73 | Standalone Document | 8/30/19 | Mundell, Jordan | File | | | | Memorandum of Interview with eBay Employees.DOCX | Attorney Client;Work Product | Memorandum of confidential interviews of Wendy Jones, Brian Gilbert, and Steve Wymer on 8/30/2019 attended by Andrew Phelan, Colin West, Bryan Connor, and Jordan Mundell reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

**A96**

UNITED STAES V. BAUGH, ET AL.
20-CR-10263

Case 1:20-cr-10263-PBS   Document 172-1   Filed 02/18/22   Page 97 of 128
INITIAL PRIVLEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 74 | Standalone Document | 8/28/2019 22:27 | Macauley, Shannon | | | | | 2019.08.26 Stephanie Stockwell.docx | Attorney Client;Work Product | Notes of confidential interview of Stephanie Stockwell on 8/26/2019 at 2:16 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 75 | Standalone Document | 8/28/2019 22:23 | Macauley, Shannon | | | | | 2019.08.23 Scott Fitzgerald.docx | Attorney Client;Work Product | Notes of confidential interview of Scott Fitzgerald on 8/23/2019 at 10:30 AM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 76 | Standalone Document | 8/28/2019 22:29 | Macauley, Shannon | | | | | 2019.08.26 Veronica Zea_3.docx | Attorney Client;Work Product | Notes of confidential interview of Veronica Zea on 8/26/2019 at 12:30 PM attended by Shannon Macauley, Amir Vonsover, Tony Shepard, and Ellen Sherman reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 77 | Standalone Document | 9/12/2019 12:34 | Macauley, Shannon | | | | | 2019.08.30 Steve Wymer (ML)_107862029_1.DOCX | Attorney Client;Work Product | Notes of confidential interview of Steve Wymer on 8/30/2019 at 3:30 PM attended by Andrew Phelan, Jordan Mundell, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 78 | Standalone Document | 9/12/2019 12:35 | Macauley, Shannon | | | | | 2019.08.30 Wendy Jones (ML)_107862030_1.DOCX | Attorney Client;Work Product | Notes of confidential interview of Wendy Jones on 8/30/2019 at 9:00 PM attended by Andrew Phelan, Jordan Mundell, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 79 | Standalone Document | 9/12/2019 12:35 | Macauley, Shannon | | | | | 2019.09.03 Scott Fitzgerald (ML)_107862032_1.DOCX | Attorney Client;Work Product | Notes of confidential interview of Scott Fitzgerald on 9/3/2019 at 3:34 PM attended by Colin West, Jordan Mundel, Andrew Phelan, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 80 | Standalone Document | 9/12/2019 12:37 | Macauley, Shannon | | | | | 2019.09.06 Wendy Jones (ML)_107862035_1.DOCX | Attorney Client;Work Product | Notes of confidential interview of Wendy Jones on 9/6/2019 at 11:00 AM attended by Andrew Phelan, Colin West, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 81 | Standalone Document | 9/12/2019 12:09 | Macauley, Shannon | | | | | 2019.09.03 Brian Gilbert (ML)_107862040_1.DOCX | Attorney Client;Work Product | Notes of confidential interview of Brian Gilbert on 9/3/2019 at 2:00 PM attended by Andrew Phelan, Jordan Mundell, Colin West, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

INITIAL PRIIVLEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 82 | Standalone Document | 9/12/2019 12:15 | Macauley, Shannon | | | | | 2019.08.23 Tony Shepard_107862008_1.DOCX | Attorney Client;Work Product | Notes of confidential interview of Tony Shepard on 8/23/2019 at 12:45 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 83 | Standalone Document | 9/12/2019 12:33 | Macauley, Shannon | | | | | 2019.08.30 Scott Fitzgerald (ML)_107862026_1.DOCX | Attorney Client;Work Product | Notes of confidential interview of Scott Fitzgerald on 8/30/2019 at 3:00 PM attended by Colin West, Bryan Connor, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 84 | Standalone Document | 9/12/2019 12:32 | Macauley, Shannon | | | | | 2019.08.30 Brian Gilbert (ML)_107862027_1.DOCX | Attorney Client;Work Product | Notes of confidential interview of Brian Gilbert on 8/30/2019 at 2:00 PM attended by Andrew Phelan, Jordan Mundell, and Shannon Macauley reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 85 | Standalone Document | 9/12/2019 12:08 | Macauley, Shannon | | | | | 2019.08.22 Sutherland Convo_107862041_1.DOCX | Attorney Client;Work Product | Notes of confidential interview of Detective Jason Sutherland on 8/22/2019 at 4:00 PM attended by Shannon Macauley and Amir Vonsover reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 86 | Parent Document | 10/23/19 3:44 PM | Phelan, Andrew C. | Huber, Marie; Finn, Molly | Vonsover, Amir; Connor, Bryan M. | | Project Lewis -- USAO Update 10/23/19 - Privileged and Confidential | Project Lewis -- USAO Update 10/23/19 - Privileged and Confidential | Attorney Client;Work Product | Email between counsel and company employees on 8/30/2019 and prepared in anticipation of litigation regarding eBay internal investigation after Natick events. |
| 87 | Standalone Document | 11/7/2019 | Andrew C. Phelan | Special Committee, eBay Board of Directors | | | | 052094-02__100777006v1_eBay ACP Memo to Special Committee 11_7_19.DOCX | Attorney Client;Work Product | Memorandum from Andrew C. Phelan to Special Committee prepared by counsel providing legal advice regarding eBay internal investigation after Natick events; regarding eBay response to law enforcement investigations after Natick events; regarding employment/personnel matters and/or actions after Natick events; and regarding corporate communications after Natick events prepared in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

* Morgan Lewis & Bockius LLP produces this privilege log without waiver of, and expressly preserves, any and all objections and challenges to the Fed. R. Crim. P. 17(c) subpoena issued to it, and reserves all rights to file a motion to quash the subpoena or to seek other protections, on all available grounds. The provision of this privilege log, or any purported failure to list a document or information within the privilege log, shall not constitute a waiver of the attorney client privilege, work product protections or other applicable protections in this case or in any other federal or state proceeding and shall not limit the right of eBay or Morgan Lewis & Bockius LLP to assert privilege or work product protection over material or information in connection with this or any other proceeding. Further, Morgan Lewis & Bockius LLP notes that certain of the documents logged within this privilege log may reflect potentially attorney client privileged and/or work product protected information concerning matters not responsive to the subpoena. Morgan Lewis & Bockius LLP has not undertaken to review all nonresponsive content for attorney client privilege and/or work product protection, but expressly preserves and does not waive all claims of privilege/protection. Morgan Lewis & Bockius LLP reserves the right to supplement and/or amend this privilege log.

UNITED STATES V. BAUGH, ET AL.
20-CR-10263

Case 1:20-cv-10263-PBS   Document 172-1   Filed 02/13/22   Page 99 of 128
SUPPLEMENTAL PRIVILEGE LOG OF MORGAN, LEWIS AND BOCKIUS LLP*

| Log Number | Parent/Attachment/Standalone | Family Date | Author/From | Recipient/To | Other Recipient(s)/CC | Other Recipient(s)/BCC | Email Subject | File Name | Privilege Basis | Document Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 88 | Standalone | 09/11/19 | Phelan, Andrew C. | | | | | 2021.12.03 HW interviews DW, JW, MA, PC.pdf | Attorney Client; Work Product | Notes of confidential interview of Devin Wenig on 9/11/2019 attended by Andrew Phelan, reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 89 | Standalone | 09/12/19 | Phelan, Andrew C. | | | | | 2021.12.03 HW interviews DW, JW, MA, PC.pdf | Attorney Client; Work Product | Notes of confidential conversation with Devin Wenig on 9/12/2019 attended by Andrew Phelan, reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 89 | Standalone | 09/13/19 | Phelan, Andrew C. | | | | | 2021.12.03 HW interviews DW, JW, MA, PC.pdf | Attorney Client; Work Product | Notes of confidential conversation with Devin Wenig on 9/13/2019 attended by Andrew Phelan, reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 90 | Standalone | 09/17/19 | Phelan, Andrew C. | | | | | 2021.12.03 HW interviews DW, JW, MA, PC.pdf | Attorney Client; Work Product | Notes of confidential interview of Julieann Whitelaw on 9/17/2019 attended by Andrew Phelan, reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 91 | Standalone | 11/01/19 | Phelan, Andrew C. | | | | | 2021.12.03 HW interviews DW, JW, MA, PC.pdf | Attorney Client; Work Product | Notes of confidential interview of Michelle Alford (Echevarria) on 11/1/2019 attended by Andrew Phelan, reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 92 | Standalone | 11/22/19 | Phelan, Andrew C. | | | | | 2021.12.03 HW interviews DW, JW, MA, PC.pdf | Attorney Client; Work Product | Notes of confidential interview of Phil Cooke on 11/22/2019 attended by Andrew Phelan, reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| 93 | Standalone | 11/25/19 | Phelan, Andrew C. | | | | | 2021.12.03 HW interviews DW, JW, MA, PC.pdf | Attorney Client; Work Product | Notes of confidential interview of Phil Cooke on 11/25/2019 attended by Andrew Phelan, reflecting the collection of information and annotations by counsel and/or counsel's agents for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

| Log Number | Parent Attachment | Date | Subpoena Request | Author | From | To | CC | BCC | Subject** | Filename** | Privilege Basis | Privilege Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Log00244 | Standalone Document | 8/21/2020 | Request 4 | Douglas, Stephanie | | | | | | GSR Interview Questions eBay August 21, 2020 docx | Attorney Client Privileged; Work Product Protected | Notes of confidential interviews of Lou Pezzola, Karl Barnhart, and Michelle Alford on August 21, 2020, reflecting the collection of information for the purpose of rendering legal advice in connection with assessment of policies, procedures, and organization of Global Security & Resiliency, prepared by Guidepost Solutions at the direction of counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| Log00245 | Standalone Document | 8/27/2020 | Request 4 | Osborne, Angela | | | | | | Questions for eBay Interview Jandir, Gurneet.docx | Attorney Client Privileged; Work Product Protected | Notes of confidential interview of Gurneet Jandir on August 27, 2020, reflecting the collection of information for the purpose of rendering legal advice in connection with assessment of policies, procedures, and organization of Global Security & Resiliency, prepared by Guidepost Solutions at the direction of counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| Log00246 | Standalone Document | 8/27/2020 | Request 4 | Osborne, Angela | | | | | | gurneet docx | Attorney Client Privileged; Work Product Protected | Notes of confidential interview of Gurneet Jandir on August 27, 2020, reflecting the collection of information for the purpose of rendering legal advice in connection with assessment of policies, procedures, and organization of Global Security & Resiliency, prepared by Guidepost Solutions at the direction of counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |

| Log Number | Parent Attachment | Date | Subpoena Request | Author | From | To | CC | BCC | Subject** | Filename** | Privilege Basis | Privilege Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Log00265 | Standalone Document | 9/2/2020 | Request 4 | Douglas, Stephanie | | | | | | Interview Michelle Alford eBay August 21, 2020 docx | Attorney Client Privileged; Work Product Protected | Notes of confidential interview of Michelle Alford on August 21, 2020, reflecting the collection of information for the purpose of rendering legal advice in connection with assessment of policies, procedures, and organization of Global Security & Resiliency, prepared by Guidepost Solutions at the direction of counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's agents. |
| Log00266 | Standalone Document | 11/2/2021 | Request 4 | | | | | | | 2019 09.13 Ryan Moore Interview (ML).docx | Attorney Client Privileged; Work Product Protected | Notes of confidential interview of Ryan Moore on September 13, 2019, attended by Andy Phelan, Colin West, Amir Vonsover, and Ryan Moore reflecting the collection of information for the purpose of rendering legal advice in connection with eBay internal investigation after Natick events, prepared by counsel in anticipation of litigation, and reflecting mental impressions, conclusions, opinions and/or legal theories of counsel and/or counsel's. |
| Log00267 | Standalone Document | 2/15/2019 | Request 6 | Wymer, Steve | Wymer, Steve [REDACTED] | Wenig, Devin [REDACTED] ; Lee, Jay [REDACTED] Fisher, Steve [REDACTED] ; Yetto, Kristin[REDACTED] ; Miller, Kris [REDACTED] ; Coppo, Alessandro [REDACTED] ; Singh Cassidy, Sukhinder [REDACTED] ; Schenkel, Scott [REDACTED] ; Huber, Marie [REDACTED] Jones, Wendy [REDACTED] | | | UPDATED MEDIA COVERAGE: EBAY EVOLVES REGIONAL MARKET ORGANIZATION - February 15, 2019 as of 9:30 AM PT / 12:30 PM EST | | Attorney Client Privileged | Email from company employee to counsel providing information to allow for the rendering of legal advice regarding evaluation of media reports, articles, or posts concerning eBay and regarding shareholder activism matters. |
| Log00268 | Standalone Document | 7/29/2019 | Request 6 | Schenkel, Scott | Schenkel, Scott [REDACTED] | Wymer, Steve [REDACTED] | | | RE: eBay Open 2019 Coverage Snapshot - Day 2 | | Attorney Client Privileged | Email chain between company employees discussing legal advice regarding general corporate matters. |

| Log Number | Parent Attachment | Date | Subpoena Request | Author | From | To | CC | BCC | Subject** | Filename** | Privilege Basis | Privilege Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Log00331 | Parent | 9/6/2019 | Request 6 | Huber, Marie | Huber, Marie [REDACTED] | Rome, Marc [REDACTED] | Finn, Molly [REDACTED] Johnson, Aaron [REDACTED] | | FW: Project Lewis - holding statement | | Attorney Client Privileged; Work Product Protected | Email chain from in-house counsel providing and discussing legal advice regarding eBay internal investigation after Natick events and regarding corporate communications after Natick events and prepared in anticipation of litigation. |
| Log00332 | Attachment | 9/6/2019 | Request 6 | | | | | | | DRAFT Lewis Leak Scenario Holding Statement (01121521-8xA26CA) docx | Attorney Client Privileged; Work Product Protected | Draft document prepared at the direction of counsel providing information to allow for the rendering of legal advice and prepared in anticipation of litigation. |
| Log00333 | Standalone Document | 9/7/2019 | Request 6 | Finn, Molly | Finn, Molly [REDACTED] | Macauley, Shannon [REDACTED] Phelan, Andrew C. [REDACTED] Vonsover, Amir [REDACTED] | Connor, Bryan M. [REDACTED] Mundell, Jordan [REDACTED] Shaulson, Samuel S. [REDACTED] West, Colin C. [REDACTED] | | Re: Atty/Client Privilege - Interesting Doc | | Attorney Client Privileged; Work Product Protected | Email chain between in-house counsel and outside counsel providing and discussing legal advice regarding eBay internal investigation after Natick events and prepared in anticipation of litigation. |
| Log00334 | Standalone Document | 9/8/2019 | Request 6 | Finn, Molly | Finn, Molly [REDACTED] | Macauley, Shannon [REDACTED] Phelan, Andrew C. [REDACTED] Vonsover, Amir [REDACTED] | Connor, Bryan M. [REDACTED] Mundell, Jordan [REDACTED] Shaulson, Samuel S. [REDACTED] West, Colin C. [REDACTED] | | Re: Atty/Client Privilege - Interesting Doc | | Attorney Client Privileged; Work Product Protected | Email chain between in-house counsel and outside counsel providing and discussing legal advice regarding eBay internal investigation after Natick events and prepared in anticipation of litigation. |
| Log00335 | Parent | 9/8/2019 | Request 6 | Finn, Molly | Finn, Molly [REDACTED] | Vonsover, Amir [REDACTED] | Phelan, Andrew C. [REDACTED] | | Fwd: Privileged and Confidential FW: Timeline | | Attorney Client Privileged; Work Product Protected | Email chain between in-house counsel and outside counsel providing information to allow for the rendering of legal advice regarding eBay internal investigation after Natick events and prepared in anticipation of litigation. |
| Log00336 | Attachment | 9/8/2019 | Request 6 | | | | | | | Project Lewis - Key Wenig and Wymer Texts for Client - 09.08.2019 docx | Attorney Client Privileged; Work Product Protected | Memorandum prepared by counsel providing information to allow for the rendering of legal advice regarding eBay internal investigation after Natick events and prepared in anticipation of litigation. |

| Log Number | Parent Attachment | Date | Subpoena Request | Author | From | To | CC | BCC | Subject** | Filename** | Privilege Basis | Privilege Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Log00542 | Attachment | 10/23/2019 | Request 6 | | | | | | | 2019.10.18 - Production Letter 2 to USAO.pdf | Attorney Client Privileged | Attachment to Privileged/Protected Communication prepared by counsel providing information to allow for the rendering of legal advice regarding eBay internal investigation after Natick events and regarding eBay response to law enforcement investigations after Natick events. |
| Log00543 | Standalone Document | 10/23/2019 | Request 6 | Huber, Marie | Huber, Marie [REDACTED] | Phelan, Andrew C. [REDACTED] Finn, Molly [REDACTED] | Connor, Bryan M. [REDACTED] Vonsover, Amir [REDACTED] | | RE: Project Lewis -- USAO Update 10/23/19 - Privileged and Confidential | | Attorney Client Privileged; Work Product Protected | Email chain between in-house counsel and outside counsel providing and discussing legal advice regarding eBay internal investigation after Natick events and regarding eBay response to law enforcement investigations after Natick events and prepared in anticipation of litigation. |
| Log00544 | Standalone Document | 10/23/2019 | Request 6 | Huber, Marie | Huber, Marie [REDACTED] | Tierney, Thomas [REDACTED] | Finn, Molly [REDACTED] Schenkel, Scott [REDACTED]      Yetto, Kristin [REDACTED] | | RE: Project Lewis -- USAO Update 10/23/19 - Privileged and Confidential | | Attorney Client Privileged; Work Product Protected | Email chain between counsel and company representative(s) providing and discussing legal advice regarding eBay internal investigation after Natick events and regarding eBay response to law enforcement investigations after Natick events and prepared in anticipation of litigation. |
| Log00545 | Standalone Document | 10/25/2019 | Request 6 | Vonsover, Amir | Vonsover, Amir [REDACTED] | Billante, Joe [REDACTED]      Finn, Molly [REDACTED]      de la Calle, Sergio [REDACTED] | Project Lewis JF [REDACTED] | | Re: DRAFT Project Lewis Release | | Attorney Client Privileged; Work Product Protected | Email chain between counsel and company representative(s) providing information to allow for the rendering of legal advice regarding corporate communications after Natick events and prepared in anticipation of litigation. |
| Log00546 | Standalone Document | 10/27/2019 | Request 6 | Huber, Marie | Huber, Marie [REDACTED] | Billante, Joe [REDACTED]      Yetto, Kristin [REDACTED] | Finn, Molly [REDACTED] Huber, Marie [REDACTED] | | RE: DRAFT Project Lewis Release | | Attorney Client Privileged; Work Product Protected | Email chain between counsel and company employee(s) requesting information to render legal advice regarding corporate communications after Natick events and regarding unrelated litigation/legal matters and prepared in anticipation of litigation. |

**A103**

Honorable Judge Young:

It's a weird thing to have to write a letter in defense of your own life.
Particularly when one has abysmally low self-esteem.

I don't like myself. I have never liked myself. I especially dislike myself now.

I've tried to sit down and write this letter countless times now in the past three years. I can get as far as fifteen pages in and suddenly abandon the effort. There is so much to say and I can't find the words to say it. I could fill a thousand pages and never feel like I've done enough.

I am going to do my best to provide a background on some of the more chaotic and abusive things that occurred during my time as a contractor at eBay. I am going to try and write these memories as concisely as I can while still making some sense. This is not to serve as an excuse for my actions, but as an explanation.

I hope you'll forgive the casual tone I may take in my writing. It may come across as cold and matter-of-fact – this is a coping mechanism. I regret that I come across as cold, as I fear I did in my proffers with the AUSAs. Though it may come off as casual – please know there is absolutely nothing casual about this. I feel the gravity of this in everything I do. My body is physically weighed down with remorse, as are my emotions. I haven't genuinely smiled or laughed in years. I'm not sure I ever will again.

I'm not a cold person. I'm just trying to keep myself together and survive. Which was also my error in this series of events.

I'd also like to make it clear from the start here that I am sorry. I'm more sorry about my involvement in this than all of the other mistakes in my life combined.

---

I've had mental health issues since childhood. I first showed signs of severe anxiety around age five. Major depressive disorder made its first appearance in my life at age 12. I spent nearly the entire summer between sixth and seventh grade locked in my house because I was afraid to go outside. I remember trying to go for a walk with my mom and only making it about 200 yards before I broke down sobbing and ran back home. I thought I was going to die.

The agoraphobia thankfully went away over time, but the anxiety and depression remained constant through high school, college, and now into adulthood. Most recently, I was diagnosed with ADHD in high school and autism in adulthood.

In the middle of the mental health issues, there was always a strong feeling of guilt. I had a decent life. I had family and friends who loved me. Why couldn't I just be happy?

College started to show me that I didn't need to be scared all the time. Thanks to support from my boyfriend, I was able to move across the country to attend school – something that was unprecedented even a year prior.

4857-0833-1830v1
FRU\27742001

I still experienced some setbacks in college. At the beginning of my junior year, I had two concurrent concussions that resulted in a diagnosis of Post-Concussion Syndrome (PCS). Compounded by a traumatic brain injury I had in kindergarten and ADHD, the PCS led to months of chronic fatigue, poor executive function, and constant headaches.

I decided not to take time off from school to recuperate. By the time summer arrived, it was recommended I refrain from working and let my brain rest.
This was a blow to my self-esteem. I felt lazier and more stupid than ever before. I was all too aware about the massive gap growing on my resume. By the time I graduated college, my most recent job experience was as a roller coaster operator at the local amusement park.

My anxiety increased as I began my job search post-college. Nowhere I applied showed an interest in me until I finally got an interview with Concentric Advisors in May 2017 – a full year after graduation.

I started work at eBay as a contractor with Concentric Advisors in late May 2017. My title was 'Intelligence Operator', and I earned $25/hour. At the time, I worked in the Global Security Operations Center (GSOC).

The GSOC was a windowless room filled with fluorescent lights and dozens of screens. The GSOC itself was about 20' by 30'. One wall was made entirely of glass, with a glass door leading into the connected room; called 'The War Room,' another windowless box of roughly the same size.

Things in the GSOC were weird from the start. Within 6 weeks of my hire, nine of my colleagues were fired without cause. The people that trained me were suddenly gone, and I was forced to work overtime to fill the gap. With only a month of experience, I suddenly had to train new people on a job I knew little about, while fearing that I was next on the chopping block. There were so many times I wanted to quit. I dreaded going to the office most days, even in the beginning. I worried it was my anxiety telling me to jump ship again. At that point, I'd had anxiety as a constant presence in my life for nearly 20 years. The only way I knew how to deal with it was to push through it and pretend the anxiety wasn't happening.

So I pushed through. I did what I could to keep my head above water.

I ignored so many warning signs. Looking back, they seem so obvious. I've spent so many nights going through everything that happened in detail, and I struggle to treat my past self with kindness. I hate her for being so stupid. I hate her for being involved with eBay. I hate her for being involved in anything that hurt others. And I hate her for ruining her life.

But I'm also in a lot of therapy. And a big part of therapy for me is going through my traumas and examining the instances one by one. It's like taking a giant ball of tangled up strings and going through and pulling them out so they can be inspected as singular strands.

As I do this, I'm learning to see myself in each scenario as it popped up. It's painful to relive each memory as though I'm in it again – but it allows me to understand myself a little better. Examining myself this way allows me to see how I missed signs in the beginning. I can see why I failed to notice as things started to escalate. And I'm allowing myself to see why I thought I was out of options when I was asked to do things that I found morally reprehensible. I was threatened, I was scared, and I was doing what I thought was necessary to survive.

The first warning signs that things were "off" at eBay were subtle. As I said previously, my only official job experience prior to being an analyst was at the local amusement park as a ride attendant. I truly had no idea what was normal or not in an office environment.

After the initial nine analysts were fired, I faced sexual harassment while working alone on the night shift. Some of the harassment came from the janitor, who escalated his actions to the point of trying to kiss me one night. When I raised a concern over this to Stephanie Popp, she laughed it off. It became a joke in the office with people laughing about the 'janitor with a crush.' I started to take the trash out myself to avoid having the janitor in the room with me.

Then a new analyst was hired to work on graveyard shift. During one of our nights working together, he told me about his sex life in extreme detail. I told my supervisor through Concentric Advisors about it, and they immediately reported it to Popp and Jim Baugh. Popp and Baugh reacted by chastising me for telling my supervisor instead of going straight to Popp, who was by then an eBay employee. I was told to never go to Concentric again about any issues I had. The other analyst was made aware that I had told others about his actions, but was otherwise not reprimanded. I was forced to continue working on the night shift with him.

I faced further sexual harassment and abuse over the years at eBay – some instances even from Baugh himself. Previous experience told me to keep it to myself, as no one would help me and it would only make my situation worse. This thought of having no one to help me stuck with me through all aspects of my job.

Over the next few months in 2017, the shift work was hell. The GSOC was rebranded as the Global Intelligence Center (GIC), and my title was changed to Intelligence Analyst. During this time, more of my colleagues were fired. I was forced to work the night shift alone for weeks at a time. This included on the night of the mass shooting at the Harvest Festival in Las Vegas. I had to call dozens of eBay workers in the area to assure they were safe, watch extremely graphic footage, and send out accurate updates to the highest levels of eBay. I was in charge of the welfare of others because almost all of the senior staff on the security team was out drinking and incapable of making the decisions needed. It was a baptism by fire.

During a low time in my life, I ended up receiving a lot of praise for the way I handled the shooting. Our team had also dispatched a rescue crew to the British Virgin Islands to save an eBay employee who was stranded there following Hurricane Maria. The crew rescued her, her brother, and an elderly couple they had befriended. I decided to continue my work at eBay as I felt that the good in helping desperate people outweighed the moments of darkness in the job.

The dark spots definitely still existed, though. We learned that an embarrassed Baugh was a dangerous man. We were frequently punished for making Baugh look "incompetent." In October 2017, the GIC failed to report on the Northern California Wildfires before the CEO, Devin Wenig, asked Baugh about them. Baugh was unable to give Wenig updated information, for which Wenig chastised him. Baugh went into a rage against Popp and the GIC, unleashing an onslaught of insults about our intelligence and mental capacity.

Things slowly started to unravel more from late 2017 into 2018. When Baugh was having a bad day, he would come to the GIC to take it out on the analysts. He would quiz us on obscure world events to make sure we were staying up to date on everything happening in the world. Failing to know the answer would result in public humiliation. He would also pin analysts against one another, spreading gossip about analysts behind our backs.

Baugh incited fear frequently amongst the entire security team. He would hold active shooter drills at random, forcing analysts to run outside into the parking lot and practice running from the "shooter" in front of other eBay employees. One such instance forced analysts to take "cover" in someone's car. Baugh would slam his hand down on the roof of the car while yelling, "Bang! You're dead! You're dead! Bang! You're all dead!"

When we would discuss these drills after the fact, Baugh would explain to us that he was doing them for our (the analysts') benefit, as we were at "constant risk" of a mass shooting. This was an ongoing theme during everything to occur in the GIC – constantly on guard, never knowing if today was the day someone was going to go crazy and try to kill us.

Baugh would further demonstrate what could happen if we ever let our guard down by showing us horrific videos. One that stands out is footage taken after a car crash. The camera pans over a car on fire, surrounded by severed limbs. A decapitated head sat next to the upside down car and one person was just a twitching torso. Baugh would show us these graphic videos – and if he noticed you looking away or flinching, he would decide you were "weak." And being "weak" was reason for termination. One of Baugh's favorite things to tell us was that if we were ever caught crying, we'd be fired on the spot.

Baugh also had the GIC subscribe to various newsletter sources about the Islamic State and similar terrorist organizations. Our inboxes were filled with terrorist propaganda – and we were forced to read every email. Baugh would know if we didn't, as he'd quiz us on their content. These newsletters were often filled with violent content – I was often subjected to videos of beheadings and other gruesome killings that continue to stick with me.

Did I wonder why analysts for a tech company were subjected to such content? Yes. Questions about this were met with long lectures about how eBay could very well be the next target for a terrorist attack. We were told to scour these newsletters to try and deliberate if any terrorist organizations viewed the company as a threat. Every new terrorist attack or mass shooting in a location where eBay had a footprint sent the GIC into chaos, all while Baugh told the analysts we needed to anticipate something like this happening to us. We were on edge constantly.

4857-0833-1830v1
FRU\27742001

**A107**

If Baugh felt the analysts were getting too comfortable or starting to question him, he'd increase the intensity of things in the GIC. When he learned the analysts weren't locking our personal lockers (we were never told to do so previously), he ordered an armed off-duty police officer to march into the GIC and remove all of the analysts' personal belongings and throw them in trash bags. I vividly remember the shock and humiliation we all felt. I remember one analyst was barred from working that day – his laptop was in his locker, and therefore relocated to a trash bag. Baugh said he could spend his eight hours cleaning instead. In an attempt towards being helpful, I told the analyst, Max, that he could use my desktop while I worked from my own laptop.

When Baugh learned of this suggestion, it was the first time I witnessed how angry he could become.

The analysts were gathered in the War Room and yelled at for nearly an hour. We were told that our job was basically "Disneyland" compared to all other security jobs out there. Baugh informed me that I was nowhere near as smart as him and warned against him ever "defying" or "undermining" him again – his interpretation of me offering Max my computer.

This is the first instance that I can clearly recall of Baugh using classic abusive techniques. He spent the better half of an hour telling the analysts how stupid we all were and threatening our future in the security industry. Then he started building back up to compliments. He started telling us that he was only so hard on us because he knew we could be great if only we tried harder. He would say that we were all there for a reason – we had all survived so many rounds of firings because he knew that we were cut out for the job. That being said, some analysts were fired just a few weeks later.

In May 2018, eBay had a round of mass layoffs and three of the analysts were let go – Romteen, Max, and Morgan. The analysts that remained in the GIC following the layoffs were all women that were 24 years of age or younger.

Baugh noted that while he legally had to refer to them as layoffs, he considered the employees to be 'fired.' Romteen was apparently fired for "his attitude," Max was fired for "trying to stir sh*t up" and Morgan was fired for finding another job behind Baugh's back.

Bizarrely, Baugh also took this opportunity to spend an hour convincing the remaining analysts that Romteen was an Iranian spy and that he had been hired as a favor to Baugh's wife, who was in the CIA. Baugh's wife supposedly needed him to keep an eye on Romteen as he was investigated for terrorist activities. Baugh spent an inordinate amount of time convincing the analysts that we had unknowingly worked with a terrorist and that we would consequently all be investigated for our ties to him.

Once Baugh revealed that he was messing with us, he mocked us for being stupid enough to believe him. Then he turned around and told us that we were correct in being suspicious of others. He told us that moving forward, we needed to be suspicious of everyone and that he was the only one we could ever really trust.

4857-0833-1830v1
FRU27742001

Looking back, this is when the environment in the GIC started to turn more toxic and abusive.

Baugh liked to find the weak points of everyone working under him and delighted in pushing them until they broke. We first noticed this was happening to our manager, Lauryn. She was hired alongside Stephanie Stockwell in February 2018 and remained largely off of Baugh's radar until the layoffs occurred three months later.

Popp was on vacation during the layoffs, so Lauryn had to take her place in attending to Baugh's whims. Months after the fact, Baugh claimed that he watched something snap inside Lauryn during the week of the layoffs. He admitted that he noticed how anxious she got and enjoyed making her upset. He told us that he would purposefully stress her out to entertain himself. Baugh would make up elaborate stories about ways he wanted to prank Popp, and would force Lauryn to participate in the prank against her will. Oftentimes, Popp was "in" on the prank and would react in extreme manners to make it worse for Lauryn. She was caught crying several times by analysts and other employees.

Lauryn was also harsh towards the analysts. She would twist our words to get us in trouble with Baugh and Popp. She kept a detailed notebook about our mistakes and would use them against us when convenient to her. When she'd leave for Washington to visit her husband, she made me watch her cat. She didn't pay me for this service – she expected it as part of my job. I think because of the way Lauryn acted towards the analysts, we failed to notice the pressure Baugh put on her until she was gone.

Sometime in the summer of 2018, Baugh decided Lauryn should not be the only salaried employee in the GIC and all analysts were switched to salaried positions. We were initially excited about the bump in pay and the prospect of more regular working hours. We were all given work phones and quickly added to a group chat with Baugh and Popp.

It wasn't long before our lives were entirely consumed by our work. Baugh began keeping us in the office for 10-12 hours a day. We were expected to rotate being "on call" where we would have the office phones forwarded to our cell phones after hours, including weekends. We were not allowed to be away from our laptops or out of cell service when we were on call. We would be punished if we did not respond to messages within ten minutes of receipt. Even if an analyst wasn't on call, we were expected to respond to texts from Baugh immediately, no matter the time of day. If we didn't entertain his whims, he would berate us for being "bad employees" and remind us that we were privileged for having our jobs.

Baugh started spending more time with the analysts altogether during this. We had a "team bonding" trip in San Francisco where we boated around the bay and drank wine. He started spending his days in the War Room. Nearly every evening, he would tap on the glass partition and beckon for us to join him at the conference table. These talks would interrupt us as we were finishing up work and could occasionally drag on for hours. These meetings rarely had any point aside from listening to Baugh talk about himself and try to gather personal information about the analysts.

4857-0833-1830v1
FRU\27742001

During one of these meetings, Baugh had our intern, Meli, convince the analysts to take various personality tests. Meli was like a niece to Baugh – she grew up next door to him and her mother was the nanny for his children. She was living with Baugh while she interned, and told him about these personality tests that she did in psychology classes in college. Every analyst partook in the personality tests. Baugh had us send the results directly to Popp so she would have a record of our answers. They essentially received detailed reports on how to torture each analyst. I remember being mocked for having 'empathy' as my number one trait. In contrast, Baugh and Lauryn had empathy as their lowest traits.

I believe Baugh used the personality test results against the analysts. He learned the best way to appeal to us in order to get us to do things. He knew getting me to empathize with his cause was the key to coercing me. In another test, I was labeled as an 'Enthusiast, 'Helper' and 'Loyalist.' Essentially, these results showed that I wanted to help others and was loyal to those I trusted. Baugh played on these traits consistently during the rest of my time at eBay.

Things in the GIC got even worse when Lauryn was fired alongside my friend and fellow analyst, Madeline. After a particularly hard weekend of being on call, Madeline came into work on Monday exhausted and angry about her weekend. She was visibly upset during a presentation we were giving to the entire Global Security team. After the presentation, Baugh and Popp pulled Lauryn and myself into a separate conference room. Baugh said, "If she's going to be such a b*tch about all of this, she cannot be here. She cannot be ungrateful like that. She is pouting in front of everyone like a child. Get her out of my face. Tell her she needs to meet with Popp and I in an hour. If she doesn't completely change her attitude by then, she's fired."

I was not Madeline's supervisor; I have no idea why I was involved in this conversation. Since I was, I took a moment in private to warn her that Baugh was furious and she was apparently in danger of being reprimanded. Madeline understandably became more upset, and thanked me for letting her know. Shortly after, Baugh kicked all of the analysts out except for Madeline and our fellow analyst/her best friend, Anneli.

After some time in the War Room with them, Anneli joined the rest of us outside. She said that Madeline was clearly upset and was trying to explain that she was burning out. When Baugh and Popp repeatedly told her to calm down, Madeline asked for them to please refer her to her HR representative.

This had been a common point of confusion for the analysts – since we were contractors, our HR was technically supposed to be through Concentric Advisors. But we were never really given a name of a specific HR person. Baugh and Popp always told us to come to them about any personnel issues. Once Madeline asked for the name of an HR representative specifically, Anneli was asked to leave the room. We found out later that Baugh and Popp never referred Maddy to anyone. She was told to leave and was suspended for the rest of the week.

At the end of the week, Madeline was fired, alongside Lauryn. Baugh gleefully announced to the remaining four analysts that he had Lauryn go to the Concentric office in San Francisco under the guise of dropping off Madeline's personal effects. While there, she was brought into a conference room and fired.

4857-0833-1830v1
FRU\27742001

Concentric Advisors was understandably upset by the cruelty of these actions. I'm sure Madeline and Lauryn also let them know about certain aspects of what was going on behind the scenes at eBay. The CEO of Concentric came to eBay and got into a heated argument with Popp, telling her that Concentric was not a "temp agency" and that they could not keep up with the revolving door of employees. When Baugh found out about Concentric's complaint, he terminated ties with Concentric on the spot. We were to have a new contracting agency by the end of the year.

At the end of 2018, Anneli gave notice that she found another job. Baugh was blindsided. Anneli got the job through a friend from her old sorority – it was in a completely different field that Baugh did not have any connections in. He was furious. Annie offered to continue working for a few more weeks as they found someone to fill her role, but Baugh terminated her position immediately.

At this point in time, we were already understaffed. We lost an analyst and a manager in October. Now we were losing another analyst. Six roles suddenly had to be filled by only three analysts.

By January 2019, the remaining analysts (Michelle, Stephanie Stockwell, and me) were onboarded by Progressive F.O.R.C.E. Concepts (PFC). PFC did not have a background in intelligence analysis. Up until this point, they were strictly doing physical security. Employees consisted almost entirely of former law enforcement and veterans. Baugh told us they were perfect for being our contracting agency because it was run by a friend of his who would be "very hands off" and let Baugh "do whatever he wanted." Baugh said he hired them as "puppets" – they had no idea how to manage an intel unit, they would just pay our bills.

Whenever our supervisors at PFC did show up to the eBay office, it was always with Popp in the room. We were never given a chance to speak with them privately, even though it was clear we were run ragged and needed help. Any complaint we brought up to them was immediately reported back to Popp and Baugh. There was no way to comfortably ask for help.

We were worked to the bone. We were in the office by 8:00 in the morning, and regularly stayed until 10:00 at night. We were frequently woken up by random emails and texts from Baugh, with the occasional emergency call in the middle of the night. I was awoken with such frequency by 'urgent' texts with a certain text tone that hearing that "ping" today still sends me into a state of panic.

Approximately the last four hours of my time in the office every day was taken up by what we called "Baugh Time" which was literally just Baugh talking to the analysts about whatever he wanted. We were not allowed to use our laptops during this time. Looking at our phones was considered rude – we had to leave them in our pockets. If we answered a work call or text while Baugh was talking, we were yelled at in front of our peers.

This block of "Baugh Time" made it so we would fall behind on our projects. This often meant that I would be awake until around 1 or 2 in the morning, scrambling to finish my tasks for the day. Once I fell asleep, I was under constant threat of receiving a call or text I needed to act on. I

never fell into a deep sleep, I was always ready to act if I needed to. After about 4 hours of low quality sleep, I'd wake up to get a head start on my emails and get ready to leave for work.

I averaged 4-5 hours of sleep a night for my final eight months at eBay.

I was under so much debilitating stress that I didn't know how to channel. I didn't understand that the things happening at my job were abnormal. I didn't know how to handle what was happening. I started to consider leaving again, but still feared what Baugh would do to me if he learned I was looking elsewhere.

Almost like he could detect my restlessness, Baugh announced that Michelle and I would accompany him on an Executive Protection trip to Europe in spring 2019. This is how life went – when I wanted to leave, a new opportunity would present itself, convincing me to stay at eBay just a "little bit longer." This was a common coping mechanism for me in my final months there.

The trip to Europe was awful. I did not get an opportunity to acclimate to the time change. I had to do my daily tasks on Pacific Time while also handling a flurry of tasks in Berlin as well. After work hours, Michelle and I were invited to eat dinner and drink with Baugh. Invitations from Baugh were always mandatory. Anyone who turned them down would be ridiculed behind their back and were usually terminated within the month.

Baugh forced copious amounts of alcohol on us, ordering refills before we finished our first. We would get shamed for wasting money if we did not finish our drinks. In one particularly upsetting evening, Baugh forced Michelle and I to list things that were "wrong" with our coworker Tiffany. Baugh became increasingly irate when we insisted we liked her. He made us start to nitpick small actions of hers – things that didn't really bother us, but that may bother others. Baugh took these critiques and blew them wildly out of proportion. The next day, he informed us that he would be using our reasoning to fire Tiffany in the coming weeks.

During this dinner, Baugh also spent the better part of an hour trying to convince Michelle that her fiancé was having an affair with her best friend. When I repeatedly defended Michelle and her fiancé, Baugh told me I was an idiot. Baugh's commentary about Michelle's fiancé lasted up to her wedding two months later. He brought it up with some frequency amongst mixed company in the office, and passed a photo of Michelle's best friend around the office to prove that she was a home wrecker.

A side note – it was common for Baugh to embarrass us publicly. Baugh had a video of me falling off a stool in the office saved on his phone. He showed the video to everyone – all of my coworkers had seen it. Baugh would show it whenever he wanted to belittle me. He showed the CEO of eBay. He even showed our waiters at restaurants.

By spring 2019, Baugh had been telling me for months that I was going to be promoted. I had been waiting for that to happen before I started applying for new jobs. I wanted a more senior role so I could find a comparable job elsewhere. I was starting to plan my escape. I confided in my mom that I was going to quit. Unaware of the extreme situation I was in, she advised that I stay in my job until I had a new one lined up. I agreed this was the logical thing to do.

Regrettably, my autistic brain gets stuck in patterns – it only saw two facts at this point.

    1.  I could not leave eBay without another job lined up.

    2.  I could not apply to other jobs because Baugh would find out and ruin my life over it.

I can't explain why my brain operates like that. I had learned to exist at eBay with learned helplessness. Per Medical News Today, "learned helplessness is **a state that occurs after a person has experienced a stressful situation repeatedly**. They come to believe that they are unable to control or change the situation, so they do not try — even when opportunities for change become available" (Leonard 2022).

Baugh had a falling out with Popp in May 2019 and promoted Stockwell to an eBay employee from her contract position with no interviews or explanation. He had a private meeting with me and told me that I could say any concerns I had without fear of being punished. I told him that I was hurt that I had been lied to about a promotion and shared that Michelle and I were having problems with Stockwell taking credit for our projects. I also shared with Baugh that there was an ongoing issue with Stockwell implying that I was stupid in front of our peers. Baugh listened to my words and acted appreciative that I shared my thoughts with him. He assured me that I was still a valued member of the team and that big things were coming for me.

The next day, Baugh scheduled a meeting with me. When I entered the room, he looked like he was ready to kill me. He used everything I had said in our previous meeting against me and threatened to fire me for being disloyal to Stockwell and for talking behind her back. He berated me for being stupid and r*tarded until I started to cry. He told me I would be fired and kicked out of the intelligence community until I apologized to Stockwell.

He sent Stockwell up to the room so I could apologize to her. And I earnestly did. I felt terrible that Baugh had told Stockwell that I spoke behind her back. I was not trying to jeopardize her job; I was just trying to explain some concerns I had and my frustration over the situation.

Baugh later called this the day he "broke" me. It was May 21, 2019. He brought it up again in early August, when he was telling me about how he had to "break" Dave Harville to get him to do what he wanted.

Harville is one of the rudest, most corrupt, and misogynistic people I have ever met. He was in trouble with HR numerous times for saying horribly graphic things. He called the analysts "Girl Scouts" and constantly insulted us over our age and gender. We asked Baugh to keep him away from us.

Baugh responded by publicly humiliating Harville in numerous ways, including by pairing him up with me for a mentorship program. I was forced to spend time with Harville under the guise of helping one another grow. I had complained about this man and as a result, was forced to spend more time one-on-one with him.

After a few weeks with Harville as my mentor, Baugh decided to kick him out of the mentorship program and made himself my mentor. It was during one of these meetings that he explained the

concept of "breaking" someone so you could build them back up into what you needed. And he explained he had done that with me.

To be honest, I'm not sure when I broke at this job. I think it was a slow rupture over time that went unnoticed. Like the lobster in a pot analogy – I was set in a pot of cool water that started to heat up slowly and I didn't notice I was boiling until it was too late.

The "water" started to really heat up in the weeks following the meeting where Baugh "broke" me. I spoke with Michelle, who had a similar meeting with Baugh. She said she was just going to keep her head down moving forward and try to stay afloat. She described herself as having two personalities – "Work Michelle" and "Home Michelle." We agreed to stick things out while we prepared for some trainings in the coming months – an attempt to beef up our resumes before breaking free from Baugh.

One such training was a course on Internet investigations. It was entitled "Internet Intelligence Training: Social Media Exploitation," hosted by the Hetherington Group and the National White Collar Crime Center (NWC3). It was attended by public and private sector analysts a like. Another training Michelle and I attended was the "Reid Technique of Interviewing and Interrogation." Going to such trainings further convinced us that what we were doing was normal.

The Reid training took place in Austin in June 2019. I was back and forth between San Jose and Austin most of that month. I was on to my third sinus infection in six months and averaging three hours of sleep a night as I struggled to keep up. It was during this time that Baugh and Stockwell approached me about a project they were working on regarding the Steiners. At the outset, it seemed like a typical look into the background of one of our Persons of Interest.

At this point, I was aware of the Steiners. We had Google Alerts set up so we would receive an email whenever a news article about eBay was written. Since the Steiners wrote frequently about eBay, their blog content would pop up in our inbox a few times every week.

The Steiners were also mentioned a few times by Baugh in the weeks leading up to this request – I was aware that the Chief Executive Officer of eBay and the Chief Communications Officer, were frequently complaining about the Steiners' blog. Baugh also let the GIC know that eBay had previously tried communicating with the Steiners to try and influence their content to be more positive towards eBay.

This is all to say that it wasn't that weird when Baugh suggested we needed to start monitoring the Steiners' online activity more closely. Baugh explained to me that he had reason to believe that the Steiners were receiving money from activist investors that were interested in joining eBay's board of directors.

Baugh explained to us that these activist investors, Elliott Management, intended to use their stake in the company to put pressure on the C-Suite to fire the current CEO and massively downsize the company. Baugh told us it was our job to prevent this from happening because it was our job to protect CEO and all other eBay employees. Throughout Baugh's rants against

4857-0833-1830v1
FRU\27742001

**A114**

Elliott Management and the Steiners, he would emphasize to us that mass layoffs would result in an increase of suicidal eBay employees. This was mentioned because during the last layoffs, a video of an employee jumping in front of a train was circulated around the security team. No one wanted to see anything like that again.

Baugh also explained to us that Elliott Management was a ruthless company. He claimed they had a reputation for destroying the lives of those that resisted them. He said that if they learned the name of any individual analysts researching them, they would uncover any information about us as possible and use it to come after our loved ones.

Baugh said we needed new laptops in order to research Elliott Management. He explained that since our eBay laptops had our identifying information on them, it wasn't safe to use them when we looked into the investors or the Steiners. According to Baugh, Elliott Management would be able to track our activity and connect it to us.

So Stockwell took me to Best Buy in Austin to purchase a cheap laptop – the "blue laptop." Via phone call, Baugh instructed me to never connect the laptop to my home or work Wi-Fi, as Elliott could track those. Baugh had me download Virtual Private Network (VPN) apps on my cell phone and the laptop and told me to only use these to access the Internet.

Baugh also explained that since Elliott Management was likely funding the Steiners' blog, they were probably tracking web traffic pertaining to the Steiners' newsletter, Ecommercebytes, as well. He said all research into the blog needed to therefore take place through VPNs and the blue laptop. He again emphasized that these bizarre layers of obfuscation were necessary to protect me from Elliott Management.

From then on, Baugh had Stockwell and I trading off the monitoring of the blog. We had to send real-time messages on WhatsApp whenever the Steiners posted something relevant about eBay. If Baugh saw the article before we sent it, we were in big trouble. We had to send screenshots of their website every few hours and make in depth summaries of all articles. Baugh said that he needed this done in order to monitor or any activity that might show that they were in contact with Elliott Management. When we asked if there was something specific for us to watch out for, Baugh said only he could know. So we kept trading off these shifts. We were scouring the news and writing detailed reports constantly – on top of our regular work and the hiring and training of new operators for the GSOC in Austin.

I didn't have time to think about how bizarre this was or to research if this was a common occurrence in tech companies. Even if I did have time, Baugh had isolated the analysts so effectively from all other intelligence teams that I wouldn't even have known who to speak with.

Soon after we got home from Austin, Baugh had Michelle and our new analyst, Eleanor, join the monitoring efforts. A former analyst for the Santa Clara Police Department, Meagan, also worked in the GIC as well. When she didn't seem to think anything was off with the monitoring project, I figured it was typical of security teams to take these precautions.

Meagan also didn't bat an eye when Baugh started having other analysts harass the Twitter account "FidoMaster" from various fake accounts. Around this time, the account changed its name from FidoMaster to UnsuckEBay. Baugh was convinced that Mr. Steiner was behind this Twitter account and was obsessed with getting it to stop tweeting negative content about eBay. Many executives at eBay closely followed the account (not publicly) and would text Baugh every time it tweeted anything negative. Baugh told us they were pressuring him to shut it down.

I wasn't involved in the tweets at FidoMaster. I was already starting to grow uncomfortable with the way things were moving, particularly when Michelle created an account meant to look like it was run by a terrorist and tweeting vaguely threatening things in Arabic at them. I was the analyst in charge of intel gathering for the eBay Open event in Las Vegas. I busied myself with that as Michelle and Eleanor posed as a disgruntled former eBay employee in an attempt to get FidoMaster to give us his phone number or reveal his identity.

During one of my first days in Vegas for eBay Open, I was woken up early in the morning by frantic calls from the GIC informing me that FidoMaster had tweeted a photo from an airport – they were convinced that FidoMaster was on the way to eBay Open. They had determined that FidoMaster had tweeted from the Atlanta airport (if I recall correctly) and identified a flight from that location to Las Vegas. Baugh thought FidoMaster or the Steiners were on that flight. He ordered Brian Gilbert and myself to get to the airport and watch people exiting the plane.

Michelle bought us the cheapest tickets she could find to a random destination so we could get through security. Once we did, Baugh had us take video of people leaving the plane. I was deeply uncomfortable but afraid of what Baugh and Gilbert would do if I refused. We sent the video to the analysts in San Jose and no one was ever able to identify a person of interest (POI) in the video. Baugh did manage to blame me for my failure to identify FidoMaster in the crowd. The rest of my time in Vegas was deeply uncomfortable. My significantly older coworkers started to act more open around me. They would drink and make inappropriate jokes. It all culminated in them deciding to go to a strip club on our final evening. I saw many of my married coworkers do things that were not at all appropriate for a work trip. Baugh said I needed to stay because they were using my PFC credit card. He recognized I was uncomfortable though and worked to keep people working at the club away from me. He explained to me how typical this was in the security industry and that I needed to get used to it. I don't remember much from that night aside from wanting to leave. Baugh kept making me take shots and just kept reminding me that this was a lesson in not being able to trust anyone except him.

I flew home from Vegas the next day. I was eager to leave everything behind. Baugh decided to stay an additional night – I learned of this when he called me while belligerently drunk that evening. He had been locked out of his room because he did not notify the hotel of his intent to stay another night. He called me r*tarded, told me I was worthless and too stupid to work for him, and many other insults about my intelligence. The other analysts watched as I broke down crying. I spent the whole weekend worried about my job.

When I mentioned this incident the next week, Baugh told me he forgave me. He turned the whole thing around on me and said I was being too sensitive. He made me feel like I was crazy

for my reaction. He successfully gas lit me into thinking that I was overly sensitive and that I needed to get a thicker skin to keep working in the industry.

The next few weeks were constantly filled with Baugh taking the analysts out for drinks and acting inappropriately. There was one evening where he tried to convince the newest analyst, Eleanor, that her boyfriend was abusive. Eleanor had only been at eBay for six weeks at this point, but Baugh was already consistently and effectively manipulating her.

That same night, I tripped as we were trying to leave (this is common for me – I have a birth defect that impacts my physical stability). I badly scraped my hand. Baugh convinced me to go to Popp's apartment with him – she lived just up the street from where we were.

I went with him and he cleaned up my hand. He gave me a drink and put on a movie as Popp went to sleep in the other room. I just remember getting really tired and struggling to keep my head up. The last thing I really remember is him telling me that the movie we were watching was his plan for his next step with the Steiners – I didn't remember this until long after that night. I just remembered that Leonardo DiCaprio was in it and that his character had brown eyes – meaning he had colored contacts for the role. When I Googled it later, I saw that the movie was "Body of Lies." In it, DiCaprio's character is a CIA agent that creates a fake terrorist organization to force another terrorist out of hiding.

Again – I don't remember much else from that night. I know I tried to call an uber and leave, but was prohibited from doing so. I know that I woke up on top of Popp's bed. Not a normal place for me to seek out, as I don't like physical contact with others. I got up to leave and saw a shirtless Baugh covered by a blanket on the couch. The things I don't know from that night continue to haunt me.

The next week at work, Baugh announced that the executives were growing more irate with the FidoMaster and the Steiners. He said we needed to figure something out before the CEO and Wendy Jones arrived back from their sabbaticals in late August.

Baugh explained that he wanted to spam the Steiners like they were spamming eBay. He instructed the analysts to start signing up their emails for random email lists. He said he wanted to overwhelm the Steiners website so they couldn't post any more. When that didn't work, he said he wanted to spam their home as well. He showed us a clip from the movie "Johnny Be Good" that showed random nuisances showing up to someone's home. He said the first phase of his plan involved getting prepaid Visa gift cards.

Already deeply uncomfortable with this plan, I volunteered to go get the gift cards with the intern Meli. I didn't want to be involved in the planning of this – I wanted to get out of that office. This was the only way I knew how. Baugh told us what we were doing was not illegal – but he wanted us to wear hats in the store. He used his background in the CIA to persuade us, explaining that things like this were commonplace in government operations. He said wearing the hat would be good practice for future occasions should we choose that career path.

I remember wearing the hat at one or two stores, but taking it off after a while because I thought it looked needlessly conspicuous and still believed it was for practice purposes at the time.

When we arrived back at the GIC, we learned that the analysts had compiled a long list of items to potentially send the Steiners. Baugh had Stockwell go over the list of ideas once we were all in the room. I was horrified by its contents.

The list contained things beyond anything I would have expected. A casket, funeral wreath, sex workers, explicit magazines…Baugh cackled as they reviewed the list. I told Baugh things were too far – that the casket and funeral wreath in particular were so extreme that I worried they would cause heart attacks. Meagan agreed. Baugh chastised us – he said the Steiners were devious people that would not be at all shocked by these "gifts." He re-emphasized that they were responsible for doxxing eBay users (publishing private information), that they were inciting death threats towards the CEO, and that they refused to talk to eBay in a civil manner.

I didn't know what to do. Baugh continued the meeting by looking up sex workers on a website he learned about from the police officers on our team. Analysts laughed as he searched for bizarre kinks. Meli suggested that the porn magazines on the list be sent to the Steiners' neighbors instead of their own home. Baugh loved it. He said the magazines should be "barely legal" type content. He said those should be the first things ordered – Eleanor got right on it.

I remember as the meeting broke up, I tried to talk to Michelle and gauge how she felt about all of this. The only thing she was upset about was Stockwell taking credit for her idea of sending a book on grieving the loss of one's spouse.

When people typically talk about stress responses, they refer to "fight or flight." There are actually four identified responses– fight, flight, freeze, or fawn. Freezing causes one to feel stuck in place, when your body doesn't think you can fight or flight. To fawn is a body's emotional reaction that involves becoming highly agreeable towards the abusive person.

I did a mix of freeze and fawn. I didn't feel like I could fight – it was becoming clear how unstable Baugh was. I had seen this man stab a giant hole in a chair during a meeting. I'd seen him throw things at people. He had been sexually abusive towards me and was known to carry a gun. Similarly, I couldn't "fly" – Baugh made it clear he knew where I lived and knew where my parents lived. I was starting to realize that his "exaggerated" stories about harassing people in his past might not be as overstated as I previously thought. I knew too much. If he was willing to do this to people he'd never met before – what would he do to me?

There was no one I could turn to. I did not have an HR representative. Worse – my supervisors at PFC were on Baugh's side. Their response to seeing a strip club on my credit card report was to laugh and tell me about the last time they'd been there. No concerns about a hostile work environment whatsoever. I was worried anything I told them would go right back to Baugh.

Baugh had also made this clear that several people in the C-Suite were aware of this, including Marie Huber, the head of legal. Worst – I didn't think there were any law enforcement I could trust anymore. I clearly worked with ones that believed they were above the law – Brian Gilbert

and Phillip Cooke spoke frequently about their questionable actions when working in narcotics. And Gilbert had a lot of connections to all local police departments. I was sure if one of them heard about an eBay employee concerned about activity happening in the security team, they would immediately ask Gilbert about it – again leading straight back to Baugh.

I decided to try and minimize what the GIC did. I managed to talk Baugh out of sending a coffin. I appealed to him with logic rather than emotion – I knew it's what he responded to best. I managed to convince him they were too expensive. I also tried to stop the funeral wreath from going – showing only expensive options as well. Unfortunately someone found cheaper options and sent one along.

I avoided all efforts of harassment as best I could in the coming days. On August 7-8, the other analysts were busy with the "campaign" while I busied myself with other tasks. I remember frustrating Stockwell a lot during this time because I was helping Dan Cory and Cooke with their travel to Asia as a way to get away from what the analysts were doing.

I busied myself with gathering information on the Hong Kong protests on August 12-13. The airport was shut down due to police brutality protests and we had travelers in the country that we needed to monitor.
Unfortunately I do think I ordered roaches to be sent to the Steiners sometime that week. Baugh physically stood over me to ensure that I did it. I don't remember if I'm actually the one that sent them or if someone else ended up doing it. But I do remember Baugh having me look at the website.

From there, Baugh asked that I physically go to Boston with him. He explained that I needed to go as they needed to keep the hotel and other charges off of eBay company credit cards. He explained that they needed to use a PFC card and that it had to be me going since I was 25 and therefore old enough to rent a car. Stockwell could not go because she needed to stay back as manager.

Baugh made me aware that Harville had his team purchase a GPS tracker to put on the Steiners' vehicle. I immediately questioned if this was legal and Baugh explained that it was. He explained that the intent behind the tracker was to see if the Steiners were travelling anywhere to meet up with members of Elliott Management. He said we also needed to drive past their home to see if there were any obvious displays of wealth such as a new car or renovations. He had me book tickets and rent a car that evening.

He told me to sign up for a nearby cyber security convention as a cover for eBay. He said that he didn't need middle management asking about a trip to Boston at that time and needed a simple way to explain it. He even said if we got off the waitlist, we would actually go once we were done in Natick.

He also told me that he or Harville might need to leave a message for the Steiners with a sharpie. He asked that I purchase some. I did as he asked, but I purposely purchased the wrong kind. In the end, I was able to leave them in my suitcase without Baugh asking about them.

4857-0833-1830v1
FRU\27742001

**A119**

From there, I traveled to Boston with Baugh. We were to meet Harville when we landed. Baugh slept most of the flight. When he woke up during the last hour, he decided to divulge more details of his plan.

He started to explain that Gilbert's recent trips to Southern California to speak with Samoan gang members were related to what we were doing. He said he had a backup plan to send "thugs" in if needed. He explained this would be a last resort use of the tracking device. Seeing that this alarmed me, he started to assure me there were other backup plans in place first. For example, he had Gilbert and another retired police officer , Scott, was ready to go to Boston in the coming days to speak with the Steiners. He laughed at how clueless Scott was about the whole thing.

I started to panic more here. I was starting to see how intent Baugh was on doing whatever he deemed necessary. We got off the plane and found Harville. We picked up our car, headed to the hotel, and checked in. Then Baugh told us to meet downstairs at a certain time. I had a panic attack in my room. I remember Baugh contacting the GIC via our WhatsApp chat and saying he wanted a POI list for some reason. I remember Stockwell asking me to forward my POI sheet from eBay Open to her and rebuking me for not helping more. I was in an intense fog – this began a week of constantly feeling like I was in a bad dream.
I threw up and went downstairs to meet Baugh and Harville. On the drive to Natick, I prayed that the Steiners were out of town while the two men sat in the back and joked around.

I remember driving past their house and being relieved that the car wasn't in the driveway. Then I was filled with dread as Baugh said he and Harville would have to get out and look in the unattached garage. Baugh had me get on a phone call with them and Popp. Popp was to listen to a police scanner. I muted myself on the call so the others wouldn't hear me having a panic attack as I came to the realization that they were all out of their minds. I worried that I was too.

I was filled with relief when Baugh and Harville gave up on testing the doors and windows to the garage. Then terror as Harville mentioned getting tools to break in to the garage. It was an idea they had mentioned in passing previously, but I never thought they would actually seriously consider it.

We went back to the hotel and ordered some food to Baugh's room. Harville soon left to go call his wife. Baugh explained to me that Harville was scared of his wife because her family was involved with a large gang. Supposedly Harville had cheated on her in the past and she said if it happened again, he'd go "missing." I didn't know what to do with this information, but it didn't make me any more comfortable being stuck in a hotel room alone with Baugh. The place he was sitting effectively blocked my access to the door. Even though we were in separate chairs with a table between us, I was uncomfortable.

Baugh and Harville had both made comments about pretending to be involved in an affair with me if the police were to walk up to us in Natick and ask what we were doing. Baugh claimed it was the perfect cover for odd activity. I was growing increasingly uncomfortable with how casually he talked about me having to kiss him or Harville. I did not want to be alone with either of them, but kept getting put in one-on-one situations.

4857-0833-1830v1
FRU\27742001

**A120**

Baugh finally let me head back to my own room and said we'd regroup the next day.

The next day, Baugh stayed in his room most of the day. Harville used me to pay for lunch and then said he was headed to a hardware store. I declined to join him and went to my room. Baugh then had me drive him to Natick to purchase athletic clothes to walk around the neighborhood in. On the drive there, he explained to me that his father was having legal issues with his farm in Arkansas. He said Stockwell and Meli were helping him launch a similar "campaign" against the local prosecutor there. I declined his request to help – I figured I could at least avoid getting involved in that since it wasn't strictly work related.

In Natick, we parked and walked around. I avoided the Steiners' street as best I could, but Baugh was tracking my location via my cell phone and would make me walk by on occasion. When I did, I stayed fully across the street without stopping to look at the house.

At some point Harville joined us in Natick and got in the van with us. Baugh parked down the street from their home. I sat in the backseat with Harville and tried not to show that I was panicked. Baugh started to yell excitedly as Mr. Steiner apparently got in his car. Baugh started up the van. I thought we were leaving back to Boston, but was horrified to see that Baugh was following the Steiner's car. I remember screaming and begging that Baugh stop as he haphazardly drove through the neighborhood. I didn't understand at all what his goal was with this. Harville joined in asking Baugh to stop. Baugh finally did.

Baugh made fun of me as he dropped Harville and me off at Harville's rental car. He said he could hear the panic in my voice. Harville and I were pretty quiet on the ride back to the hotel. Baugh dropped off the rental van and instructed us to meet him for dinner.

At dinner, I was shocked to hear that Baugh wanted to start leaving things at the Steiners' doorstep. He and Harville made jokes as I tried to stay calm. Baugh told the GIC group chat to call 9-1-1 to the Steiner household. Nobody did so.

The next day was uneventful except Harville went home and Popp took his place in Boston. I was supposed to go home the next morning, but Baugh had me cancel that plan.

The next morning, Baugh told me to book a new car so we could drive to Natick again. He had me drive alone to Natick in Harville's car. He and Popp traveled together in the new rental car.

I had no idea what Baugh and Popp were doing around Natick, but he told me to park in the lot downtown and walk around. I walked around downtown alone, while on the phone with Baugh and Popp. I remember walking around a little square off the main street and sitting on a bench. I mostly just tried to stay out of sight from Baugh and Popp.

While walking across the main street, I heard Baugh and Popp exclaim something on the phone. The Steiner car was apparently moving again. Baugh used the car under my name to once again follow the SUV belonging to the Steiners. As I stood on the main road, I saw Baugh aggressively tailing a red car. Baugh instructed me to pull up a police scanner and when I did, I heard a

mention of someone being followed to the police department. I told Baugh and Popp, who backed off and told me to meet them in a parking lot. I was shaking with fear and rage as Baugh told me he saw the driver take a photo of their plates. I was furious that Baugh has taken it so far – I realized that if the Steiners were calling the police, then they clearly weren't "in on it" or "expecting" that kind of retaliation as Baugh had claimed.

Baugh saw my distress and told me I had nothing to worry about. He claimed that even if I did, they couldn't trace rental plates once the car is turned in. He had me return the rental car he was driving at the hotel and told me to book a flight home.

Later that night, we went to dinner. Baugh and Popp got in an argument about something that had happened the week prior. Baugh stormed out of the bar and I headed back to the hotel with Popp. As I got back to the hotel, Baugh texted me to meet him at a different bar. He complained about Popp and her attitude and told me to change my flight because he decided I shouldn't leave in the morning. I was crushed that I wasn't going home. I knew I needed to talk to my parents and ask for their help in figuring out what to do next. Baugh texted Stockwell and the other analysts instructing them to travel to Boston the next day.

As we were walking back to the hotel, Stockwell called Baugh and told him that Michelle was quitting. Apparently Michelle was planning to give her two-week notice, but decided to quit earlier to avoid needless spending on her travel. Baugh flew into a rage and told me that Michelle was now dead to us and that I was not to contact her. He told me that he would be sure to ruin her life. He had me join him in his hotel room as he tried to reach Popp.

Soon after Michelle quit, Eleanor texted Stockwell to say that she did not want to travel to Boston on short notice, and that she thought she should stay back at the office so someone was there while everyone else was gone. Baugh was incredibly drunk at this point and fired Eleanor via group chat. His rage continued for some time, now directed at me. He said if I left him too, there would be hell to pay. I dodged as he threw items at my head and yelled at me for f*cking everything up. He finally let me leave to go to bed.

The next few days were relatively quiet. Baugh had Popp and me meet him at a bar late on the night of August 20. I did not eat dinner before hand and was quite inebriated.

I woke up the next morning to my hotel room phone ringing. I rushed to answer it, scared that it was Baugh. The man on the other end identified himself as a Natick detective and asked if I could speak with him. I panicked and told him that I had a phone call I needed to handle first, but might be able to meet him downstairs in half an hour. We hung up.

I tried to call Baugh several times and eventually ran to his hotel room. He was very clearly drunk. He told me not to panic and that he was handling everything. He told me to pack my suitcase and that we needed to leave the hotel. As we left the hotel, my phone rang with a Natick area code. I showed it to Baugh who took it out of my hand and answered. He informed the detective on the other end that he was my husband and that I did not want to speak with him. He hung up and told me to get a cab.

4857-0833-1830v1
FRU127742001

Baugh had me find another hotel to go to and rented a room. He made me order three Bloody Marys and repeatedly watched the Johnny Be Good clip as we waited for Popp to join us. He laughed at the apparent fear on my face. He was truly unhinged. He drained two of the drinks and the third went untouched. Popp finally joined us and Baugh left the hotel, announcing that he'd see us back in California.

I took a shower and sorted through my bag. As I did so, I witnessed Popp messing around on a Twitter account. She told me Baugh was having her pull attention away from me. It wasn't until later that I knew the full scope of what went in to these truly heinous and unforgivable messages. I went to the airport and headed home.

When I arrived back in San Jose, I received an email from Amir, an attorney on eBay's legal team. I forwarded it to Baugh, asking him how to handle it since he said he was working with people in eBay's legal department.

He told me to go ahead and take the call with Amir; that it was just a formality. He said to tell Amir the cover story about the cyber security conference and that Amir just needed to check this off his list.

I took the call with Amir and was shocked to learn that he was in contact with Natick police. Amir went on to claim that they had video evidence of me knocking on the Steiners' front door and revving a car engine in their driveway late at night. I knew this couldn't possibly be true, since I never did such things. I started to cry and told Amir that I wasn't comfortable with his aggressive questions and that I wanted to speak with my contracting agency. He told me that was fine.

Baugh came back from the east coast and told me that Amir was trying to blame everything that happened on me. He told me the Natick police department had contacted eBay and now people that were previously out of the loop were aware something was going on. Baugh explained that they needed someone to take the blame and they were trying to use me as a scapegoat and claim that I was just a contractor that went rogue. Baugh told me the next time I spoke with legal, Popp would be present to help guide me. He sent me home early.

The next morning, I had a meeting in the War room with Baugh, Popp, Gilbert, and Harville. Baugh coached us on what to say in our upcoming phone calls. He had us listen in on the calls legal had with Popp and Harville.

He told us that legal clearly wasn't taking this too seriously since they were doing the calls via phone rather than in person or via video chat. He had Popp sit in with me during my conference call and instruct me on what to say in response to Amir's questions.

When the calls were over, we received notice that eBay legal had hired outside counsel. Baugh told me that for my own safety, he would be suspending me with pay so that eBay had no right to speak with me. He assured me that he just needed to speak with someone higher up in legal and that all would be well. He told me that he forbade me from meeting with outside counsel.

4857-0833-1830v1
FRU\27742001

Before I left, Baugh had me pull up an email on my laptop where I had submitted the receipts for the gift cards for reimbursement. He took the laptop from me and permanently deleted the email. He said it would lead to less confusion without it. He also said to delete my WhatsApp messages to clear my phone of confidential information that the legal team didn't have the right to see. I left my laptops in the office and went on leave. It was the last time I was ever at eBay. From what I've learned, my laptops were never seen again.

I had a planned family trip that I went on the following week. While gone, I learned Baugh and all others involved were suspended without pay. Baugh told me it was just a formality.

Later that week I went to Las Vegas to speak with PFC. I was under the impression that they hired an attorney to represent me when speaking with eBay. I quickly discovered the attorney was just trying to determine PFC's liability with the whole operation. Baugh told me to give the attorney the cover story as well. Baugh and Gilbert also instructed me to ask the payroll team to delete the email with the gift card receipts. I made the request, but didn't physically delete the email myself like they suggested. I wasn't comfortable doing so and didn't understand why they thought it was necessary.

The following week, Baugh, Harville, Popp, Gilbert, Stockwell, and Scott were all fired. Baugh had us over to his house to tell us that he was suing eBay over this. He went on and on about getting millions from them. I still had a job with PFC at the time and Baugh assured me that he spoke with the CEO at PFC to confirm that I'd continue working with them. He showed the group texts from the eBay CEO saying that he was sorry to see Baugh go and Baugh said his loyalty would pay off. I was fired from PFC the next day.

The following month I received a letter notifying me that an investigation into eBay and the people involved would be taking place. At the same time, my younger sister was dealing with a septic kidney infection and was suspected to have cancer. This was heavy on my mind as I navigated the following weeks.

Not long before my first meeting with the Assistant United States Attorneys handling the investigation into this matter, my sister was declared cancer free. I was relieved, but still did not have the time or mental capacity to process what had happened at eBay before my initial proffer session with the Government.

I was also still in contact with Baugh and Stockwell leading up to the proffer. Baugh continued to try to exert control over me. It worked because I was convinced he was the only person that could help me. He managed to isolate me further from family and friends by telling me I couldn't say anything about this to them or I'd risk getting them involved.

I remember I submitted my final expense report a few weeks after being fired. The expense report included receipts from my trip to Boston. Baugh was furious. He said I had just handed over evidence to PFC. At this point, I still wasn't understanding that what occurred was a serious crime. I didn't understand why Baugh was furious. I don't regret turning those receipts in.

My last contact with Baugh was when he referred me to an attorney. He also offered to send me money to help pay my legal fees. Growing wearier of him at this point, I declined. I did not want

him to have any further hold on me. I believe this was an attempt at a bribe and am very thankful I turned it down.

I went back to San Jose from there and continued my new job at Facebook. I loved it. I was treated with respect and never expected to work more than eight hours. My bosses gave reasonable timelines for tasks to be completed and emphasized work-life balance. I was never punished for mistakes or humiliated in front of my peers. No one threatened my livelihood or me. I was able to spend time with friends and family again.

I cried over the realization that this was how workplaces actually operated in the real world. I started to realize the depths of the mental abuse I was subjected to at eBay when I would bring up anecdotes about it at Facebook and was met with shock and concern from my peers.

Then the COVID lockdowns happened and we were working from home. I was informed in spring that the United States Attorney in Boston was moving forward with charges. I was inconsolable, but grateful that I wasn't physically at work when I found out.

In June, I woke up to a text from one of my best friends on the east coast. She said the story was all over the news there. I had already told her what was happening, so she wasn't surprised. But I had not told anyone at Facebook yet. I called my boss and told her what happened. They told me to take the day off as they investigated the story. Many of the news articles were particularly unflattering - I read some that made claims that I physically broke into the Steiners' home. I was fired from Facebook that day.

I also hadn't told my extended family about what was happening yet. Not sure how to do so, and unable to speak on the phone due to crying, I took to text to inform them. I said I was sorry they had to find out that way, but that I wanted them to hear from me before they saw it online.

The next few months are a blur of tears and very intense regret and self-hatred. I became more and more aware of the pain the team's actions put the Steiners through. I agonized over being involved in something that caused others to live in fear.

I pleaded guilty in October 2020 and have since lived a life in purgatory. Never knowing when I would have to travel to Boston, unable to find serious employment, and trying so hard to keep myself together to prevent my loved ones from worrying too much. I wished I were dead.

Nowadays, people ask me about plans for the future and I can't answer. I can't move past this time in my life. I can't imagine anything good happening for me ever again - I don't deserve it.

I was happy to help Ms. Scapicchio with her case for the Steiners when my attorney let me know she wanted to interview me. I did an interview with the New York Times to give insight into the toxic culture at eBay. We discussed the bizarre and threatening movie clips that Baugh would play to make points. I didn't realize how odd that was until the reporter told me as much.

It's so easy to look at this situation in hindsight or as an outside observer and to ask why I didn't leave. I've agonized over that as well. I've been attending therapy for this for over two years

now. In therapy, I do a process called "eye movement desensitization and reprocessing" (EMDR). The point of EMDR is to re-examine events that trigger PTSD and to alleviate some of the distress associated with them.

Through EMDR, I've been able to revisit much of the events above and recognize how scared and alone I felt in those moments. Again – I felt I had no one to turn to when I was at eBay. I believed everyone in the company was in on it and would tell Baugh – same with police. While I deeply regret my actions, I can see why 25-year-old me did what I did. I don't excuse it, but I understand.

Maya Angelou famously wrote, "Do the best you can until you know better. Then, when you know better, do better." I did what I could at the time with the only resources I thought I had available. My actions were deeply flawed, but I thought they were my only option. Now that I know better and am out from under Baugh's thumb, I can see the massive support system I have in my family and friends. I know who I can trust to help me if anything terrible happens again.

To be honest, I felt a very deep relief and sense of calm on the day PFC fired me. I was almost gleeful knowing that I never had to step foot in eBay again. My joy was obviously almost entirely diminished by the reality of what had happened in the months prior. But for a moment there, I felt that spark of relief. And I was so sad that I hadn't realized I could leave sooner and have avoided any involvement in eBay's actions towards the Steiners.

---

As I work on this letter, I'm reeling from the unexpected loss of a pet.

I've had a lot of loss in the past five years. My best friend's dad and my favorite aunt both died in 2017. My cousin was killed in 2018. I lost a great-uncle in Germany to cancer in 2021 and stood by my grandma's bedside during her final hours this past spring.

The unexpected death of my cat in February 2019 sent me into a deep spiral. I struggled with his loss for months; weakened by a deep grief that Baugh regrettably took advantage of.

Pet loss hits me the hardest because there's no way to speak with them. You aren't able to make sure they're aware of your love like you are with humans. You can't explain your actions.

And as I sit here with this familiar hollow feeling of grief in my soul, I realize that I've felt this way on some level since 2019. I've been grieving over how my actions impacted the Steiners for more than three years now. I haven't been able to give them the apology they so rightly deserve. My inability to give them any sort of closure impacts me the same way as my grief over my loved ones.

I sleep more now than I did working at eBay, but I've never been more exhausted. I often wake up in a cold sweat, with nightmares about Baugh or prison or being back in Natick, with my back against a wall, terrified. My mom has woken several times to me yelling in my sleep.

I toss and turn so bad at night that I've had serious back pain for the past year. I can physically feel the weight of my grief and remorse as it drags my body down with it. Medicine and physical therapy have yet to ease the problem.

I'm losing my hair. My body breaks out in frequent rashes from stress. I'm carrying extra weight in my face and stomach from the high production of cortisol. I'm constantly covered in a thin layer of anxious sweat and I pick at various blemishes all over my body until they bleed as some form of self-punishment.

And my heart hurts. I can feel it sitting like a rock in my chest.

I'm scared every day of my life. Every black Porsche that drives by makes me jump because I'm afraid Baugh or Gilbert are inside. They both know where I live. Baugh was sure to remind me of that.

I physically run away from figures in the distance that resemble the men involved in this. I've left stores to get away from people that were triggering my fear.

And I know this must be similar to how the Steiners feel. I hate to presume anything about them now. It even feels wrong to use their name – like I don't have the privilege to type it.

But I torture myself every day by imagining how they must have felt in those weeks when they were getting bombarded by confusing and scary mail. How they must have feared any movement by their front door. Perhaps they jumped whenever the phone rang. They were probably exhausted.

I feel that now, on a lesser level. I know the names and faces of the things that scare me. I'm scared to check my email, calls and texts frighten me, and I stopped reading the local news. For the most part, I live in a carefully crafted bubble meant to shelter me from anything that could finally make me fall apart entirely.

But the Steiners didn't have that comfort. The things that were happening to them were occurring inside their bubble – their home. Mysterious boxes sent to their front door that frightened and confused them. Baugh, Popp, and myself walking past their street. The truly heinous messages that Popp and Baugh sent them. Gilbert apparently showing up at their front door.

Disgusting. The actions from the eBay team were disgusting. I am disgusted with myself for my involvement. I truly do no not understand how my friends and family still love me.

I didn't dare reach out to the Steiners – even before I was officially barred from doing so. There was no way I was going put my need to make myself feel better above their feelings. I cry now as I consider how a letter from me would make them feel. My name on the envelope striking fear into their hearts, reminding them of everything they've been through. It's how I would feel if I received a message from any of the other defendants in this case. It's how I feel when I get mail related to the case.

4857-0833-1830v1
FRU127742001

And that's what keeps me up at night. The knowledge that I was involved in something that made anyone else feel like I do. This is hell.

I wish I could tell the Steiners that I'm not an evil person and have them know that to be true. I fear Baugh, Popp, Harville, and Gilbert everywhere I go. I know the Steiners probably do as well. I'd imagine I'm also one of these shadow figures to them. The thought breaks my heart. I wish I could reassure them that there was no evil intent on my part.

I'm sure they know they did absolutely nothing to deserve what happened. But I want them to know that at least one person involved knew that as well. That I wasn't going along with the plan convinced that the Steiners were getting what they deserved. I was scared. I hate myself for being so weak.

I made stupid choices. I regret them every day. I will never be able forgive myself.

I'm sorry.

Sincerely,

Veronica Zea