# Exhibit B

```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,         )
                                       )
4              Plaintiff               )
                                       )
5         -VS-                         )  Criminal No. 20-10263-PBS
                                       )  Pages 1 - 48
6    JIM BAUGH, also known as James    )
     Baugh,                            )
7                                      )
               Defendant               )
8

9

10

11

12                          SENTENCING

13

14        BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES DISTRICT JUDGE
15

16

17

18                            United States District Court
                              1 Courthouse Way, Courtroom 19
19                            Boston, Massachusetts  02210
                              September 29, 2022, 9:37 a.m.
20

21

22                     LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
23              United States District Court
                1 Courthouse Way, Room 7200
24                  Boston, MA  02210
                     leemarz@aol.com
25
```

1   A P P E A R A N C E S:

2        SETH B. KOSTO, ESQ., Assistant United States Attorney,
     Office of the United States Attorney, 1 Courthouse Way,
3   Room 9200, Boston, Massachusetts, 02210, for the Plaintiff.

4        WILLIAM W. FICK, ESQ. and DANIEL N. MARX, ESQ.,
     Fick & Marx LLP, 24 Federal Street, 4th Floor, Boston,
5   Massachusetts, 02110, for the Defendant Jim Baugh.

6   ALSO PRESENT:  Iris Golus, U.S. Probation Office.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  Court calls Criminal Action 20-10263,

 3    United States v. Jim Baugh.  Could counsel please identify

 4    themselves and Probation.

 5              MR. KOSTO:  Good morning, your Honor.  Assistant U.S.

 6    Attorney Seth Kosto on behalf of the government.

 7              THE COURT:  Thank you.

 8              MR. FICK:  Good morning, your Honor.  William Fick and

 9    Daniel Marx for Mr. Baugh.

09:38 10         THE COURT:  Thank you.

11              MS. GOLUS:  Good morning, your Honor.  Iris Golus for

12    U.S. Probation.

13              THE COURT:  Thank you.  You all may be seated.

14              So we are here today for the sentencing of Mr. Baugh.

15    I've received the government's memo.  I've received two victim

16    letters.  I've received a brief from Mr. Baugh, and as well

17    attached to that various letters, as well as Mr. Baugh's

18    statement.  So I first wanted to start by asking the

19    government, are the victims here?

09:39 20         MR. KOSTO:  They are, your Honor, and both of them

21    would like to address the Court at whatever time the Court sees

22    fit during this proceeding.

23              THE COURT:  All right.  Well, let's start with what

24    I'll call more the mechanics of sentencing under the Sentencing

25    Guidelines, and then at that point I'll hear your argument, and
```

Case 1:21-cv-11181-PBS   Document 200-2   Filed 04/21/23   Page 5 of 50
Case 1:20-cr-10263-PBS   Document 239   Filed 10/07/22   Page 4 of 49

4

1    then I'll hear from the Steiners, and then allow -- actually,

2    I'm wondering.  I think their name is in the public, isn't it,

3    at this point?

4              MR. KOSTO:  It is, your Honor.

5              THE COURT:  Okay.  And then, Mr. Fick, I'll hear from

6    you.  And then I don't know if your client wants to address the

7    Court or not, but of course he has that opportunity.

8              So let me start with the Sentencing Guidelines.  As

9    you know, I am required to follow the Sentencing Guidelines,

09:39 10   and Probation did a thorough report, to which I think there's

11   only one objection from the defendant, and that had to do with

12   the pattern enhancement.  Did you want to address that at all,

13   Mr. Kosto?

14             MR. KOSTO:  Sure, your Honor.  In the government's

15   view, the Probation Office correctly applied the two-level

16   enhancement for a pattern of activity involving stalking,

17   threatening, and harassing.  All of those features were present

18   in this offense conduct, your Honor.  The key issue from the

19   government's perspective is that these separate instances of

09:40 20   harassment, of threats, of stalking, they magnified each other;

21   they amplified each other.  If packages started showing up at

22   your house that were odd or even macabre, you might scratch

23   your head and wonder.  When those packages are followed up with

24   a message over Twitter that said, "Did you get my gifts --

25   expletive?" the threat online and the packages at your doorstep

1   are now connected, and they're amplified.  When you next get a

2   message that said, "Why are you writing," in substance,

3   "negative things about eBay?  People make money on eBay.

4   People will do anything to protect their families," that threat

5   connects back to the packages.  That's at Paragraph 54 of the

6   PSR.

7         And then shortly thereafter a black mini-van shows up

8   coming down your street as your husband pulls away from the

9   driveway.  That brings together the stalking, the harassment,

09:41 10   and the threats.  And then when a pizza delivery shows up at

11   4:00 o'clock in the morning after you've seen the mini-van and

12   seen the stalking, that magnifies the concern even further

13   because the victims didn't know it was a pizza delivery man.

14   They only knew that people will do anything to protect their

15   family.  And then a few days later the Steiners' home address

16   shows up on the Internet.

17         These instances accompany each other.  They make the

18   harassment, the stalking, and the threats more serious.  The

19   Guidelines correctly capture that by adding a two-level

09:42 20   enhancement.

21         I think the government and the defense view *Lee*,

22   *United States v. Lee*, a little differently.  In our view, *Lee*

23   controls this case.  It involved an indictment that charged in

24   one count a series of emails in April, 2012, and then a trip to

25   harass the victim all in the same count.  It was a charge of

1    interstate travel.

2         THE COURT:  I think the argument is -- I read your

3    brief, and I agree that there's a pattern.  The question is, I

4    think what I read the defendant to be saying is, yeah, but it

5    basically double counts the actual offense conduct, the course

6    of conduct requirement that's part of the elements of the

7    offense.  I don't think they're disputing that all these things

8    happened, or at least they didn't object to those fact-findings.

9         So the question is whether, as I read *Lee* -- and maybe

09:43 10    it was one of the other cases -- you know, the argument is that

11    it's the same conduct.  In some circumstances, that may be the

12    case, and you're saying in this circumstance, it is not.

13         MR. KOSTO:  Well, let me switch gears to *Fiume*, your

14    Honor, which is the First Circuit case in which Judge Selya

15    addressed this issue of -- the First Circuit calls it "multiple

16    use."  They've asked that we not use this concept of double

17    counting because it sounds pejorative, and *Fiume* makes clear

18    that there are several instances in which multiple use of the

19    same facts are entirely appropriate.

09:43 20         *Fiume*, helpfully for the Court, involved the very

21    Guideline provision that the Court is applying here, 2A6.2, and

22    goes through a very thorough analysis, and, of note, carefully

23    states, as your Honor is familiar from your time with the

24    Sentencing Commission, that when the Sentencing Commission

25    wishes to prohibit double use of the same facts, it does so,

1    and it does so expressly in plenty of places in the Guidelines.

2              Beyond that, it does a careful analysis of the idea of

3    a course of conduct and a pattern -- or excuse me.  It goes

4    carefully through the elements of the offenses that index the

5    2A6.2, and it discovers that, yes, there are some instances

6    where the elements match up with the enhancement.  But that

7    isn't the end of the inquiry, where the Commission has not

8    said, "We prohibit double counting."

9              And the government would add, if this were a case

09:44 10   where the defendant had a limited knowledge or a limited role

11   of any of the particular instances of threatening, stalking, of

12   harassing, that might be a case where one could raise the

13   double-counting argument.  Here, as the government will explain

14   in its argument, Mr. Baugh had his fingerprints over all three

15   of the types of things that constituted a pattern.

16             And this wasn't a case where simply two acts of this

17   group formed a course of conduct under the statute, 2261(a),

18   and therefore formed a pattern.  There are dozens and dozens

19   and dozens of acts.  This would not be the case to find

09:45 20   multiple use of the same facts because whatever the appeal of

21   the argument, what possible cases are there that don't involve

22   both a pattern and a course of conduct?  This isn't that case.

23   This case involved weeks and weeks and weeks of conduct and

24   dozens and dozens and dozens of acts.

25             THE COURT:  All right, thank you.

Case 1:21-cv-11181-PBS   Document 200-2   Filed 04/21/23   Page 9 of 50
Case 1:20-cr-10263-PBS   Document 239   Filed 10/07/22   Page 8 of 49

8

| | |
|---|---|
| 1 | MR. KOSTO:  Thank you. |
| 2 | MR. FICK:  Thank you, your Honor.  I want to start |
| 3 | with sort of the last part of Mr. Kosto's argument, which is |
| 4 | he's trying to mix in the role notion here.  I don't think role |
| 5 | has anything to do with the sort of pattern versus course of |
| 6 | conduct.  In fact, Mr. Baugh is getting a four-point role |
| 7 | enhancement, undisputedly, that is the top of the pyramid that |
| 8 | the government charged, even though he may not be the top of |
| 9 | the pyramid of the overall situation.  And so to say that, you |
| 09:46 10 | know, the fact that he's got his fingers on different parts of |
| 11 | the case is a role issue, not a pattern versus course of |
| 12 | conduct issue. |
| 13 | THE COURT:  But he was engaged in multiple acts. |
| 14 | MR. FICK:  He was engaged in multiple acts. |
| 15 | THE COURT:  He personally, I mean, really over three |
| 16 | weeks essentially, four weeks, three or four weeks. |
| 17 | MR. FICK:  But that is what the statute itself |
| 18 | requires.  I mean, what makes harassment -- |
| 19 | THE COURT:  No, the statute -- that's what's |
| 09:46 20 | interesting here.  I mean, it's meant to -- because the pattern |
| 21 | says even if it was during the offense, so it doesn't exclude |
| 22 | the conduct during the offense. |
| 23 | MR. FICK:  It's very interesting, your Honor.  It says |
| 24 | you can consider conduct during the offense. |
| 25 | THE COURT:  During the offense. |

 1          MR. FICK:  But it doesn't say you consider conduct

 2   that constitutes the offense, and those are -- so, I mean, the

 3   application note itself sort of makes even more confusing, or I

 4   would suggest, you know, does not say that conduct during the

 5   offense that is the offense should be counted.  It says you can

 6   consider conduct before the offense or during the offense, but

 7   it doesn't say you must or should consider conduct that is the

 8   offense.  And what makes sort of, you know, individual acts

 9   into a federally chargeable harassment is the fact that there

09:47 10   is a course of conduct, and that's what's charged.

11          THE COURT:  The thing is, though, your interpretation

12   would grossly undercount what happened here because it would

13   just be two of the Twitter things would constitute the course

14   of conduct because they just want to make it enough to show the

15   intent?  And so here you had a three-week -- I can't remember

16   all the different things, but let me go through it, though --

17   all the Twitter messages.  There was a surveillance.  There was

18   the deliveries of upsetting things, like the wreath and the

19   pig's head and the pizza deliveries.  And so there were three,

09:48 20   like, at least three major kinds of harassment.  If ever there

21   was a pattern, isn't this it?

22          MR. FICK:  Well, I mean, the course of conduct

23   included a lot of stuff, but what the Guideline is getting at

24   is conduct that isn't captured by the charge.  And the cases I

25   would suggest show that, right?

1          I think the government is wrong about *Lee*.  *Lee*, there

2     were two counts in the indictment, as I read the opinion.  Both

3     were charging for different victims, the travel at the end of

4     the case with the intent to murder apparently the victim there.

5     The emails were separate, they were not charged, and the court

6     says, "Yes, that series of emails constitutes a pattern, and

7     we're going to enhance the offense with them."

8          And we can talk more about *Lee,* of course, during the

9     main argument.  That's a case that's wildly different from this

09:48 10   one.  There the harassment unfolded along with actual violence

11    over 30 years, not just three weeks, and so, you know, that's a

12    pattern.  This, okay, maybe in the colloquial you could call

13    this a pattern too; but in terms of the way the Guideline is

14    worded and the way the case is treated, the government hasn't

15    pointed to a case where conduct that constitutes the charged

16    offense is used to apply the enhancement.  I think that drives

17    sort of why Judge Burroughs landed where she did and said, you

18    know, "We can dance on the head of a pin like angels here, but

19    it really doesn't get to the --"

09:49 20        THE COURT:  I think she said she punted.

21         MR. FICK:  She punted.  And the other thing about --

22         THE COURT:  But I'm not punting, so --

23         MR. FICK:  -- about *Fiume* also, the other case the

24    government points to, right, there the court said essentially

25    it's okay to -- the double counting of the violation of a

Case 1:21-cv-11181-PBS   Document 200-2   Filed 04/21/23   Page 12 of 50
Case 1:20-cr-10263-PBS   Document 239   Filed 10/07/22   Page 11 of 49

11

1    restraining order is okay.  But it's interesting.  Judge Selya

2    doesn't say you must, you know, double count in the other

3    contexts.  A violation of a restraining order is a very simple

4    thing, right?  It either happened or it didn't.  It's a very

5    distinct and distinguishable fact that, you know, you flip a

6    switch on or off:  Yes, it happened, yes, it didn't.  There's

7    no sort of complicated accompanying application note the way

8    there is for the discussion of pattern and how that interfaces

9    or doesn't with course of conduct.  And in *Fiume,* the court

09:50 10   there, the District Court, applied course of conduct, again, in

11   a situation where the pattern was something that was different

12   from the offense conduct.

13         THE COURT:  Well, thank you.  So I think that after

14   having read the First Circuit cases, and in particular given

15   the charges against Mr. Baugh and the three-week pattern of

16   harassment, stalking, I think the Probation Department

17   correctly applied the two-level enhancement.  So there may be

18   other circumstances where one might vary or one might come to a

19   different conclusion, but in this case, it seems pretty

09:51 20   straightforward, and I preserve your objection.

21         I find the total offense level is 25.  The criminal

22   history category is I.  The Guideline range is 57 to 71 months.

23   Supervised release is one to three years.  Fine range is

24   $20,000 to $200,000.

25         Okay, now, as everyone knows, this is the beginning

Case 1:21-cv-11181-PBS   Document 200-2   Filed 04/21/23   Page 13 of 50
Case 1:20-cr-10263-PBS   Document 239   Filed 10/07/22   Page 12 of 49

12

1    part of the analysis, not the ending part.  That's where I

2    start, but that's not where I necessarily end.  And so I'm

3    going to allow the government now to make an argument for what

4    its sentence is and to introduce the victims.

5         I will also ask you just to make sure you went through

6    this whole -- I'm sure you did, you're such a thorough

7    lawyer -- you went through the whole report with your client?

8         MR. FICK:  Yes, we went through the report, yes.

9         THE COURT:  So, Mr. Kosto.

09:51 10  MR. KOSTO:  Thank you, your Honor.  The government is

11   asking the Court to impose a sentence at the top of that

12   Guidelines range, 71 months imprisonment, a $60,000 fine, three

13   years of supervised release, and the mandatory special

14   assessment of $900.

15        THE COURT:  Could you say that again.  71 months --

16   what do you want?

17        MR. KOSTO:  71 months, a $60,000 fine, 6-0, three

18   years supervised release, the required $900 special assessment.

19        There is no request for restitution, and there is no

09:52 20  statutorily applicable forfeiture.

21        When the facts of this case come up, your Honor, the

22   most common question that is asked is, who could make this

23   stuff up?  You can't make this up, what happened to David and

24   Ina Steiner.  And the answer unfortunately in this case from A

25   to Z is that Mr. Baugh, the defendant seated before the Court,

1      is responsible for all of it.  The very first meeting to plan

2      the deliveries, he convened it.  He showed a movie to the

3      people there to inspire it.  He convened the first meeting with

4      a different group to plan harassing messages.  He directed the

5      timing and the content of the deliveries, telling others at

6      eBay when they should start and when they should stop, and in

7      some cases what they should be.

8              He was, unlike others in the conspiracy, in Natick

9      outside the victims' home in the middle of the night.  He was

09:53 10   literally behind the wheel of the mini-van that followed David

11     Steiner as he pulled out of the driveway on Friday, August 16,

12     2019.  It was out of his mouth that a lie to Detective Jason

13     Sutherland of the Natick Police Department came.

14             The fake persons-of-interest document that the Court

15     considered back in the arguments on the motion to dismiss, he

16     directed their creation.  It was Mr. Baugh who sent a retired

17     police 21 Brian Gilbert, to meet with the Natick Police

18     Department and to lie with them and tell them eBay was helping

19     investigate the harassment, not causing it.

09:54 20           It was Mr. Baugh who directed his team to lie to

21     eBay's investigators, to delete electronic evidence.  It was

22     Mr. Baugh at the very end who paid Stephanie Stockwell, a

23     co-conspirator, $5,000 in cash, told her to structure the

24     deposits into her bank account because it wouldn't look good if

25     the government learned of it, and prepared her for a proffer by

1    instructing her not to talk about anything she hadn't seen with

2    her own eyes.

3          Mr. Baugh is easily the most culpable person charged

4    to date and significantly more culpable than any person charged

5    or involved in this case.  He earned every point of that

6    four-point enhancement for leader/organizer.  And the

7    seriousness of the offense under 3553(a), your Honor, goes

8    beyond that because this criminal conspiracy that Mr. Baugh

9    summoned is more serious than your typical cyberstalking case

09:55 10   where you have a lone individual, a spouse, a former intimate

11   partner acting alone and terrorizing victims.  They're all

12   horrible cases, but here Mr. Baugh summoned a group.  And

13   conspiracy is punished as a separate crime because groupthink,

14   quite frankly, is worse than what one can accomplish themselves.

15   The group is more creative.  It's more hurtful to the victims

16   as a result.

17         Mr. Baugh was showing movies to inspire the creativity

18   of his team.  Every participant was trying to outdo the others

19   at his direction.  Specialization is another feature of a

09:56 20   conspiracy that makes it more serious than something one could

21   do alone.  Mr. Baugh assigned the surveillance function to

22   Mr. Harville, the social media to Ms. Popp and others,

23   Mr. Gilbert, a former police officer, to go and meet with the

24   Natick Police.  All of these things make for a better plan for

25   Mr. Baugh and a worse outcome for the victims.  So it's both a

1   very serious offense, and then it's compounded by the fact that

2   he involved so many others with so many unique skill sets to

3   participate.

4        You'll hear directly from the victims, and I'll let

5   them speak about the impact this had on them physically,

6   psychologically, financially, professionally -- that's all in

7   our memo -- but in thinking a little bit about it this morning,

8   your Honor, I realized that what's worse than that as far as

9   what happened to the victims, and it took me a while to get my

09:56 10   arms around this, it changed the way they see the world today

11   and since this offense.  If Ms. Steiner was out kayaking on the

12   Charles River and somebody with a pair of binoculars is there

13   looking at the leaves, she pauses for a second and looks more

14   carefully and maybe isn't as comfortable as she once was

15   because of what happened to her.

16        Earlier in the case, there were some changes in

17   release conditions that would have permitted Mr. Baugh to

18   travel.  It made sense to have him be able to go and see his

19   children.  But the Steiners were worried about that change in

09:57 20   condition.  Objectively, the government didn't assess any risk

21   that Mr. Baugh was going to divert from Louisiana to Washington

22   and come to Boston and come after the Steiners, but for the

23   Steiners, Mr. Baugh had already come after them.  He was

24   already in their driveway walking around the back of their

25   house, and that makes for a different world view, and that

1     might be the worst legacy of his crimes.  It's changed the way

2     that they look at the world around them.

3          I should speak for a second, even as Mr. Fick raised

4     it earlier, about the idea that this offense is eBay's fault.

5     It was refreshing and encouraging to see Mr. Baugh in the

6     letter he sent to the Court saying it took him a long time to

7     get his arms around it, but he's done blaming the Steiners for

8     what happened to the Steiners, but he's still blaming others

9     for what he did.  Even as Mr. Baugh tells it to the Court in

09:58 10    his memorandum, in his letter, no one at eBay told him to

11    anonymously threaten and harass and stalk the Steiners.  That

12    idea, what happened to the Steiners, was his and his alone.

13    There's no one above Jim Baugh at eBay who thought up the

14    depraved things that happened to David and Ina Steiner.

15         THE COURT:  Isn't there some evidence, though, that

16    one of his superiors understood you couldn't do anything

17    legally to close them down, so said, "Do what you need to do,

18    take them down, burn them"?  I can't remember all the terms.

19         MR. KOSTO:  If Mr. Baugh sees in that environment, and

09:59 20    he describes it as an environment --

21         THE COURT:  And you talked about groupthink, but that

22    could be part of it.

23         MR. KOSTO:  Well, let's assume for a second that there

24    was someone at eBay as part of that groupthink who encouraged

25    Mr. Baugh to solve the problem, that --

1         THE COURT:  In an extralegal way.  Remember they said,

2    "There's no legal way we can do this, so do what you need to

3    do"?

4         MR. KOSTO:  Assume for a second that that's the case,

5    that does not make Mr. Baugh less culpable.  That means that if

6    there is evidence beyond a reasonable doubt that someone else

7    shared the intent to harass and intimidate David and Ina

8    Steiner, that that person should be charged.  It is not a

9    mitigating fact to take a directive from your boss or a

10:00 10    suggestion from your boss and commit a crime.

11         What Mr. Baugh saw was an environment at eBay in 2019,

12    the activist investor, the thin-skinned CEO who was frustrated

13    with the tone and content of what the Steiners were writing.

14    But if he thinks that tone and content and activist investors

15    and frustration with people who post online, underneath the

16    articles of EcommerceBytes, justifies funeral wreaths and

17    surveillance and profane threats, then the Court's sentence, or

18    at least some component of it, is still needed to deter

19    Mr. Baugh, because he went from "solve this problem," in the

10:01 20    Court's hypothetical, to a criminal conspiracy to do what he

21    did with no stops in between.  A nonstop line from "solve this

22    problem" to what he did does not mitigate for Mr. Baugh.

23         And you know that whatever the circumstances were in

24    place at eBay, and even if someone said "solve this problem,"

25    Mr. Baugh knew that the Steiners were not a threat.  And, your

1    Honor, you know that because you've read the PSR at Paragraph 63.

2    When Mr. Baugh writes to Stephanie Stockwell and says, "I need

3    you to create that person-of-interest document, I need you in

4    the narrative to write that the Steiners have made direct

5    threats to eBay, its CEO," and he says "Make it up," he knew at

6    that moment there was nothing to the frustration, there was

7    nothing to the "solve this problem" that was an existential

8    crisis for eBay.

9           And then to this idea of pressure, I'd ask the Court

10:02 10   to consider Analyst 1 and Analyst 2 who are mentioned in the

11   Presentence Report at Paragraph 77, two women, eBay employees

12   early in their careers -- almost no industry training, no

13   government service in their history, no advanced degree,

14   master's in public administration like the one that Mr. Baugh

15   received early in his education, no experience taking care of

16   Bill Gates and the Gates Foundation, no letters from the Vice

17   President of the United States -- they saw this, what Mr. Baugh

18   asked them to do, for what it was, a crime.  One of them quit

19   rather than go to Boston and participate in this harassment,

10:02 20   and one of them got fired for refusing to do so.  That was the

21   response, and it didn't take years and years and years of

22   industry training to know right from wrong.  So whatever the

23   environment at eBay was is not in mitigation of what Mr. Baugh

24   did.

25           You also know, your Honor, that what Mr. Baugh did was

not about eBay because he was doing it to someone else for his

own reasons at the exact same time.  In the Presentence Report,

the government highlights a communication from Mr. Baugh that a

prosecutor in Arkansas who was involved in litigation with a

member of his family -- maybe it was a good case, maybe it was

a bad case, the government doesn't know -- but what Mr. Baugh's

answer to that dispute was on August 20, 2019, while he was in

the middle of harassing the Steiners, was the exact same thing.

He sends a message to two of his employees and says, "An idiot

prosecutor in my hometown, who brought a bullshit case against

my dad, if it does go to trial, it's risky, and my dad could

actually serve time in jail.  Obviously, I'm going to make sure

this doesn't happen.  I'll provide more details on the case and

circumstance later, but now I need things, like his office and

cell number, his email, wife's name and cell, email, kids'

names, vehicle information, et cetera.  I've done a quick

open-source intelligence search, and I can see that likely

having an affair with at least one person."

He continues later in the messages:  "This is a very

small town.  If I give him an ounce of what we've been giving

to the Steiners, it would be devastating to him."  And he

offered the analyst to whom he was sending that message a

$1,000 bonus, the eBay analyst, if the charges related to his

father were dropped.

To be clear here, Mr. Baugh is not doing something at

eBay's bidding.  He's taking care of himself, and he's talking

in August of 2019 about using a prosecutor's kids to harass a

prosecutor, and paying someone to help him do it.  This was

Mr. Baugh's campaign.

Let me switch gears a little bit, your Honor, to I

think an important consideration for the Court, which is

relative culpability.  We've already offered to the Court that

the government's submission is that Mr. Baugh is significantly

more culpable than any other participant in the conspiracy.

THE COURT:  Right, and he got the four-level bump for

that.

MR. KOSTO:  And he got the four-level bump.  Mr. Baugh

suggests Mr. Cooke's 18-month sentence with 12 months of home

confinement and a $15,000 fine as the relevant metric that the

Court should be weighing Mr. Baugh's sentence against.  And the

government submits that it might be logical -- Mr. Cooke is the

only person to be sentenced so far in the case -- but he's not

the right metric for the Court's sentence for Mr. Baugh.

As the Court pointed out, Mr. Baugh had his hands over

every aspect of this case.  Mr. Cooke had knowledge of some

aspects of the case, but participated substantively in one

meeting to plan the harassing messages that would be sent, and

then left on a business trip to Asia.  Participated in a

WhatsApp group, and the Court has read the back-and-forth in

the WhatsApp group as the obstruction campaign unrolled.  He

1    was easily the least participant of the group that included

2    Stephanie Popp, Mr. Baugh, and Mr. Gilbert.  He is not at all

3    similarly situated to Mr. Baugh, and that 18-month sentence is

4    not a good benchmark for the Court to consider this sentence.

5    As you point out, the four-level enhancement takes Mr. Baugh

6    into an entirely different part of the Guidelines.

7         It's worth noting in passing that Mr. Cooke pled

8    guilty and accepted responsibility more than two years ago and

9    was sentenced at that time.  And there's some mention in

10:07 10   passing that Mr. Baugh, because of his charges, might not earn

11   First Step Act credit or RDAP credit.  To the government's

12   understanding, Mr. Cooke earned plenty of First Step Act

13   credit, even though he was in BOP custody for a stalking

14   offense.

15        There's another piece to the case that the government

16   submits is not really fully addressed in Mr. Baugh's memo and

17   his request for a 30-month sentence, and that's the entirely

18   separate crime of obstruction, really several different kinds

19   of obstruction crimes:  the creation and deletion of that

10:07 20   personal interest document, the false statement to the Natick

21   police officer, the false statement to eBay's investigators as

22   they're trying to respond to Natick's request for help of eBay.

23        It's just worth noting in passing that what happened

24   to the Steiners happened in part because Mr. Baugh kept the

25   Natick Police from finding out what was going on.  It prolonged

the Steiners' experience.  He professes an utmost respect for

law enforcement now, but he took the NPD on a wild goose chase

then, and that is the reason for the charge.

It's really the complete opposite of what this idea of

executive protection within a Fortune 500 company should be.

It should be working together with law enforcement to solve

problems, not to create them.  And the idea that he would pay

cash to a witness before she sat down in a proffer, where she

was trying to help herself in the investigation, does injury to

that witness herself by, you know, exposing her to not being

able to give a good proffer because Mr. Baugh has told her,

"Don't say anything about deliveries to the driveway at 4:00

a.m.  You don't know that that happened.  You weren't in

Boston."  That's obstruction, and it's serious, even apart from

what happened to the Steiners.

I'll finish, your Honor, on a note that I think is

important in cyber cases in particular.  Judge Young sentenced

a cyber stalker years ago, a very significant case involving a

17-year sentence that the defendant earned every moment of in

this courthouse.  And Mr. Baugh is not Ryan Lin, but what

Judge Young said in imposing that sentence really applies well

to Mr. Baugh's conduct, particularly about the glee and

enthusiasm that the defendant seemed to take in engaging in all

of this action behind the keyboard that had real, real, real

results in the real world for the victims.

1          Judge Young said, "This conduct is monstrous.  We live

2     in a community.  Reading this entire record, listening to the

3     victims, listening to the Assistant Attorneys, listening to

4     your counsel, who has done a superb job on your behalf, not the

5     least of which a negotiation of a plea agreement, he's right to

6     point out all of these crimes committed were with you sitting

7     behind a computer.  That point is well-taken.  Yet in today's

8     world, that does not diminish the crimes in any way.  In fact,

9     it ought to bring home to all of us how interconnected we are

10:10 10    and what havoc can be wreaked by the improper evil criminal

11    conduct in which you so gleefully engaged.  I'll grant that you

12    may not have fully appreciated the harm you did to your

13    specific victims and to the community as a whole.  In the eyes

14    of this Court, that does not diminish the sentence which ought

15    to be imposed."

16          The Court is familiar with the real-world harms that

17    stem from the behind-the-keyboard behavior in this case.  This

18    requested sentence, it's a stiff one.  I've been in the

19    courthouse for a dozen years, and I can't recall very many

10:11 20    times asking for a sentence at the top of a Guidelines range,

21    and this is that case, your Honor.

22          This requested sentence will go a long way toward

23    making sure that what happened to the Steiners doesn't happen

24    to others.  Just this morning there was an article in the

25    newspaper about a partner at a major law firm who's been

             1    charged with getting fired and then responding with hundreds

             2    and hundreds of emails to his former colleagues and showing up

             3    around the corner from the office.  It is too quick to turn

             4    online what people wouldn't do in person.  Neither of them is

             5    an appropriate response to adversity, and in this case, the

             6    senseless things that happened to these victims require a

             7    sentence that promotes respect for the law, that is a just

             8    punishment for Mr. Baugh, and deters others from engaging in

             9    this conduct in the future.  Thank you.

10:12       10              THE COURT:  Thank you.  Do they want to speak?  I've

            11    read their letters, so there's no requirement, but I know that

            12    they wanted me to give them time.  And I think at least

            13    Mr. Steiner, at least I saw on the Zoom call we had several

            14    weeks ago, so either one or both of them are welcome to speak

            15    now.

            16              MR. KOSTO:  Ms. Steiner would like to speak to the

            17    Court first and then Mr. Steiner, and if it's okay --

            18              THE COURT:  They can come up together if they want to.

            19              MR. KOSTO:  -- Mr. Steiner has also asked if he can

10:12       20    address the Court seated.  I can make sure there's a microphone

            21    that can pick him up.

            22              THE COURT:  I'd be happy to do it.  Who wants to go

            23    first, Ms. Steiner?

            24              MS. STEINER:  Yes, please, your Honor.

            25              THE COURT:  Okay.  And speak into the mic.  It's a

1    huge courtroom, and actually it's hard to hear, and the court

2    reporter needs to and so do I.

3              MS. STEINER:  Can you hear me?

4              THE COURT:  Barely.

5              MS. STEINER:  Oh.  Is this on?

6              THE COURT:  Go ahead.

7              MS. STEINER:  My name is Ina Steiner.  I am Victim

8    No. 1.  Like many couples starting out, David and I got

9    married, saved up, and bought a fixer-upper.  We worked nights

10:13 10   and weekends to make it the house of our dreams.  In August,

11   2019, it became our prison.  Strangers began arriving along

12   with death threats, a book on surviving the loss of a spouse, a

13   funeral wreath, a pig mask from a horror movie in which the

14   villain kidnaps, tortures, and kills the victims, and was

15   stalked multiple times.  And then, on one of our newly

16   installed security cameras, I spotted a van tailing David.  I

17   was terrified.

18              My neighbor, who was unaware I had just frantically

19   called the police, came over and asked if I had seen the men

10:13 20   who had been acting suspiciously outside his home.  I could see

21   the concern for the safety of his children in his eyes, and I

22   could not reassure him.

23              This was not a corporate security operation.  This was

24   a deliberate cruel attempt to destroy us personally,

25   professionally, financially, in the eyes of our neighbors, in

1    the eyes of our readers and advertisers, and in the eyes of the

2    police.

3            David and I started our publishing business in 1999,

4    and with the same passion and hard work we used to fix up our

5    home, we built it into a site that online sellers could rely on

6    for news and information.  eBay placed their executives at our

7    disposal for interviews, including Devin Wenig and former CEOs

8    Meg Whitman and John Donahoe.  But when the criminal case was

9    made public in 2020, eBay referred to us as "a blogger who

10:15 10    writes about the company and her husband" instead of 20-year

11    veterans of the e-commerce industry.

12            Defendant Jim Baugh said he was just doing his job as

13    his bosses expected him to do.  It was about pleasing the

14    bosses for personal gain.  In doing so, eBay weaponized small

15    mom-and-pop retailers to send unwanted deliveries to our home.

16    The defendants harmed the reputation of the platform on which

17    sellers rely, causing some shoppers to swear off using eBay

18    ever again.

19            Online sellers now fear retaliation when they contact

10:15 20    eBay about a problem.  Online sellers fear reaching out to us

21    because they're afraid eBay will punish them.  I rely on

22    sources.  Gathering and verifying information is the heart of

23    what I do as a reporter.

24            Not only does being the victim of stalking interfere

25    with your capacity to trust, one defendant, Philip Cooke,

1    admitted they had planted a mole of some sort to try to

2    influence my reporting.

3            I'm especially angry and upset when I see how this has

4    impacted David.  His strength saved me through this ongoing

5    nightmare.  Since this became public, our readers offered us

6    their support and their prayers, which still brings me to

7    tears.

8            The conviction and sentencing of the seven defendants

9    is powerful and vital to our healing, but it doesn't mean David

10   and I get to return to normal; and our beautiful home that we

11   spent years to make a haven from the outside world will never

12   give us the sense of safety we used to take for granted, a

13   feeling that every person should feel in their own home.

14           Thank you, your Honor.

15           THE COURT:  Thank you.

16           Mr. Steiner, do you want to stay seated?  That's fine.

17           MR. STEINER:  Please.

18           THE COURT:  Yes, but make sure you're talking into the

19   mic.  Is there one there?

20           MR. STEINER:  Yes.

21           THE COURT:  Okay, good.

22           MR. STEINER:  Thank you, your Honor.  My name is David

23   Steiner.  I'm Victim No. 2.  I have provided the Court a

24   written statement --

25           THE COURT:  Excuse me.  Hold on a second.  The court

1   reporter is having trouble because you're maybe a little too

2   close to the mic.

3           MR. STEINER:  Okay.  I have provided the Court a

4   written statement detailing the damaging impact the defendant's

5   actions have had on my wife and myself.  Suffice it to say, the

6   damage has been substantial, but a few things have come to mind

7   in the past several weeks that I would like to express.

8           This was a bizarre, premeditated assault on our lives,

9   planned around a corporate conference table with buy-in at the

10:17 10   highest levels of eBay.  The defendant's defense that he was

11   simply following orders, and he had been hired by eBay because

12   of his unique skill set, shows his unwillingness to accept

13   responsibility for what he did to us.  Without question, I feel

14   that having not been caught, right now he would be doing the

15   same thing to another innocent person that he did to us.

16           Sadly, his methods were effective.  He and the other

17   defendants were successful in terrifying my wife and me and

18   upending our lives and our business.  As the agents of eBay,

19   they made our lives a living hell in 2019, and that has

10:18 20   continued for the past three years.  But setting aside for a

21   moment what happened to us, the most dangerous aspects of the

22   defendants' actions is that perhaps some other corporation will

23   use this as a blueprint to terrorize another targeted person or

24   journalist.

25           There are members of the press in the courtroom today.

In June of 2020, when the criminal complaint was unsealed, many reached out to say how shocked and appalled they were about what had happened to us.  Perhaps some had experienced some type of harassment as we did.  There is a reason the press is referred to as "the fourth estate."  Their independent voice holds the three branches of government to account for their actions or inaction.  Read the court filings, look around this courtroom, take note of who isn't sitting in the defendant's chair, and ask yourself if what happened to us can happen again.

This has taken up a substantial part of our lives at an age when time becomes more precious.  Ina and I aren't young.  We were hoping that after years of working hard to build our business, our credibility and reputation, that we might be able to enjoy some of the rewards of our labor -- to travel a bit, perhaps exchange our 17-year-old car for a new one, to enjoy pursuits outside of the 12 to 15 hours a day that we spend focusing and reporting on e-commerce -- and we were hoping to do this without emotional and psychological baggage, without looking over our shoulders to see if someone was following us, and without fear that our financial future was in jeopardy.  These are things that the defendant has stolen from us.

Not too long ago I heard Ina tell someone, "I wish you had known David before all this happened," and it took me back,

1    and, frankly, it broke my heart because it made me realize that

2    even I don't fully understand the extent of the damage this has

3    done to us.  What Ina told this person sounded like my eulogy,

4    and in a way it was.  What eBay, the defendant, and other

5    coconspirators, both indicted and unindicted, did to us has

6    changed me forever, and I don't think the old David is coming

7    back.

8              I'd like to thank the Court for listening and

9    considering my words in sentencing.

10:21 10             THE COURT:  Thank you.

11             Mr. Fick?

12             MR. FICK:  Thank you, your Honor.  It's impossible not

13   to be moved by what we've just heard.  I mean, this was a

14   terrible crime with terrible effects on people.  There's no two

15   ways about that.  Nothing good to say about any of the offense

16   conduct.  And Mr. Baugh I think has tried to make clear in his

17   submission to the Court, and we've tried to make clear in the

18   way we've tried to argue what an appropriate sentence should

19   be, that there is no excuse.  He is not making excuses.

10:22 20             At the same time, we're trying to suggest that what

21   the Court needs to accomplish in imposing a sentence needs to

22   take a broader view and be more holistic than simply the

23   knee-jerk reaction of wanting to throw the book at Mr. Baugh,

24   lock him up and throw away the key.  I mean, this case is

25   bizarre.  No one has seen anything like it.  It has all the

Case 1:21-cv-11181-PBS   Document 200-2   Filed 04/21/23   Page 32 of 50
Case 1:20-cr-10263-PBS   Document 239   Filed 10/07/22   Page 31 of 49

31

 1    sort of clickbait attributes that sort of generate an

 2    incredible amount of outrage and incomprehension.  And, you

 3    know, we understand that; we absorb that; Mr. Baugh accepts

 4    that.  He understands that he is going to be punished for the

 5    terrible things he did.

 6         Now, in this context, right, he was a very angry drunk

 7    during this time.  That's not an excuse; it's part of the

 8    context.  He's addressed that issue.  But it certainly was

 9    something that interfered with his judgment all the way.  But

10:23 10    even if you put aside for a moment any of the context, any of

11    the mitigation, there's still the question:  Okay, you've got

12    this offense conduct.  How do you calibrate what the right

13    punishment is?

14         And, of course, the Court calculated the Guidelines.

15    You start with the Guidelines.  I think the 2A6 Guideline is in

16    many ways a blunt instrument, right, because it covers conduct

17    that runs the gamut from harassment, to intent to cause injury,

18    to intent to kill, all of those kinds of crimes.  And the way

19    the enhancements apply and the way it all works sort of don't,

10:23 20    I would suggest, do a very good job suggesting what the right

21    answer is, what the right number is.

22         The case that we talked about a lot earlier, *Lee*, is

23    interesting, right, because there you had -- there's nothing

24    good to say about this case, but that case was a 30-year

25    pattern of physical violence, harassment, and it ends with an

intent to murder, a trip to Maine where the defendant is going
to chase down the victim.  He's caught in a car with a bunch of
firearms that can only be described as a serial killer cleanup
kit.

          The sentence in that case, 100 months, above the
Guidelines.  If *Lee* is 100, where do we land Mr. Baugh?  Where
do we land this case?  Is it really, really -- does it make
sense to say that if *Lee* is 100 on a scale of 1 to 100,
Mr. Baugh is a 72?  I mean, again, terrible offense conduct,
but we're talking about a three-week pattern versus a 30-year
pattern and a murder that was intercepted.  I think to suggest
that Mr. Baugh is a 72 on the *Lee* scale of 1 to 100 just
doesn't make sense.  Even if you put aside everything else
about this case, all of the context, all of the mitigation, all
of the information about Mr. Baugh is, on the *Lee* 1 to 100
scale, the 30 months that we have proposed, I would suggest
even that's maybe a little bit high on the *Lee* scale, but it's
a reasonable sentence, and certainly more reasonable than
suggesting, you know, that he's anywhere near the top of the
*Lee* scale.

          And even though we have terrible offense conduct here,
you know, the one thing that's missing that we often see in
cyberstalking cases is a real concern about a need to lock up
the defendant to stop him, right?  This is not a case where
there's some kind of personal animus against an ex-wife, an

1    ex-girlfriend, a celebrity obsession.  Mr. Baugh has been out

2    for two years.  He's done fine.  He's gotten off the alcohol.

3    We don't need to lock him up to prevent him from being a

4    stalker in the future.  That seems abundantly clear.  And

5    that's the piece of this case that, however bad the offense

6    conduct is, is missing that we often have in stalking cases,

7    and there's a reason why, again, on this 1 to 100 scale, I

8    think we fall into certainly the bottom part of that scale.

9         So what to say about context?  I understand the sort

10:26 10   of reflex of the government, and certainly even the feeling of

11   the Steiners, that Mr. Baugh is somehow trying to deflect

12   responsibility by saying he was just following orders.  I hope

13   that we have tried to be clear and that the Court understands

14   that what we're saying is more subtle than that, right?  Again,

15   it's not an excuse.  He's guilty of what he did.  The people

16   under him are guilty of what they did.  But role in the offense

17   and context of the offense is still something that matters in

18   assessing what the appropriate punishment is.

19         Yes, Mr. Baugh is the top of the pyramid that the

10:27 20   government charged.  None of this would have happened if

21   Mr. Baugh hadn't brought the people together to do what they

22   did.  But he's not the only "but for" cause here.  He's not

23   even the primary "but for" cause here.  Mr. Kosto began his

24   presentation with, you know, I think he identified a question

25   that everyone asks about the case.  Well, I think the question

that I see most often about this case is, where is the C suite?

Where are Wenig, Wymer, Jones, and Huber, right?  They are, if

nothing, the "but for" cause of this.  Mr. Baugh has no reason

to go after the Steiners absent the obsession at the top of

eBay about the Steiners.  They are the "but for" cause of this

above Mr. Baugh.  They didn't order him to do it, didn't know a

lot of the operational details, but make no mistake, would a

jury have convicted them on a willful blindness theory if they

had been charged?  I certainly think there's a strong chance of

that.  I've seen better or worse willful blindness cases

brought in one.  But, whatever, the government chose not to

charge them, but I think it would be a mistake for anyone to

say that at some level of just baseline moral culpability for

what happened here, they're above him.  And, you know, we put

in as many of the emails as we could locate that sort of show

the amped-up language that was being used, but make no mistake:

Mr. Baugh sits in a cubicle outside their offices all day every

day, and the latest thing comes up on EcommerceBytes that one

of the executives doesn't like, they're out, you know, in

Mr. Baugh's face and in his ear in his cubicle.  This was

relentless.  Again, it's not an excuse, but it's an explanation

because there is no other explanation.

            And so, you know, where are all those people now?

Well, Devin Wenig had to leave, but he gets a $60 million

golden parachute.  And I want to take a particular moment to

Case 1:21-cv-11181-PBS   Document 200-2   Filed 04/21/23   Page 36 of 50
Case 1:20-cr-10263-PBS   Document 239   Filed 10/07/22   Page 35 of 49

35

```
 1    focus on Marie Huber, the general counsel, right, because maybe
 2    it's just me, but I think bad lawyering I think is really --
 3    it's a problem, right?  Marie Huber is on all of these
 4    emails -- not all these emails but a lot of these emails, the
 5    most sort of inflammatory language, amped-up emails, "Whatever
 6    it takes" Steve Wymer says.  What does Marie Huber do?  Does
 7    she say, "Steve, call now.  Devin, chill out"?  Does she even
 8    say, "Mr. Baugh, glad that you're going to be taking care of
 9    this, but, by the way, before you do anything, come check it
10    out with me to make sure we don't, like, cross any lines"?  No,
11    she doesn't say any or do any of those things.  What kind of
12    lawyering is that?
13            When the proverbial excrement hits the fan, what does
14    she do?  Well, she convenes the giant independent, you know,
15    external investigation by outside counsel.  Notably, though,
16    even though she's a percipient witness to all of this, she's
17    not interviewed in the investigation in this apparently.  She's
18    still at the company today.
19            It's not an excuse for what Mr. Baugh did, but you
20    can't deny that context.  None of this happens if there's not
21    this just sort of crazy, radical breakdown at the top of eBay.
22    This obsession, the obsession we usually see in the stalker is
23    in the executives.  They wind up Mr. Baugh and send him off on
24    his way, you know.  He shouldn't have done it.  He should have
25    walked away.  He didn't do it.  But, you know, make no mistake:
```

1   He's not the top of the culpability pyramid, regardless of who

2   got charged here.

3        You know, I think the government at some level

4   caricatures our arguments here.  We're not saying that

5   Mr. Cooke is an appropriate measure for how Mr. Baugh should be

6   punished.  What we're saying is, the proposal that we're making

7   punishes Mr. Baugh a lot more severely than Mr. Cooke, even

8   though Cooke is a retired former police official.  And he may

9   not have been very deeply involved in a lot of the specific

10:31 10   activity here, but one of the reasons Mr. Baugh has those kinds

11   of people around him is to give him some advice about, you

12   know, what might or might not cross the line.  That's absent

13   here too.  Again, it's not an excuse, but it's context.

14        So, you know, I don't want to belabor what I think we

15   said pretty clearly in our papers, but punishment is

16   appropriate.  Even without any mitigation, it has to be

17   calibrated, and I think it's, you know, certainly on the lower

18   half of what I'll call the "*Lee* scale."  And when you start

19   looking at context and the things we know about Mr. Baugh in

10:31 20   terms of his struggle with alcoholism, those are some other

21   reasons to say, "I understand the outrage, I understand the

22   harm caused, I understand the sort of clickbait attraction of

23   the case," but the task here is to impose a sentence that, you

24   know, is punishment, but that meets all of the other

25   considerations that the Court is supposed to consider at the

 1   time of sentencing.  And so for that reason, I think our

 2   suggestion is a reasonable and appropriate one.  To go as high

 3   as 70 months I think is just, in the circumstances, well more

 4   than what is minimally necessary, which is the standard that

 5   the courts and the statutes set.

 6          THE COURT:  Thank you.  Does he want to say something?

 7          MR. FICK:  Yes, he does.

 8          THE COURT:  Thank you.

 9          THE DEFENDANT:  Mr. and Mrs. Steiner, as far as blame,

10:32  10   you don't have to look any further than where I stand right

11   here.  As the head of eBay's security, I was one hundred

12   percent responsible for everything that happened on my watch,

13   and that means everything.  I take one hundred percent

14   responsibility for this, and there is no excuse for what I've

15   done.  A lot of finger-pointing has taken place in this case,

16   and even now we still debate the reasons of why this happened

17   and justify it.  Justifications have been offered, but the

18   bottom line is simply this:  If I would have done the right

19   thing and been strong enough to make the right choice, we

10:33  20   wouldn't be here today, and for that, I'm truly sorry.

21          Ms. Steiner, what you and your husband do for a living

22   is both valuable and necessary, and you ought to be able to do

23   your work without worrying about your safety.  That's clear.

24   I'm sorry that I hurt you when I should have been protecting

25   you.  I hope that one day you'll be able to hear my apology and

maybe even forgive me, but I certainly understand if you can't

do that.  I truly wish you the best, and I fully embrace any

punishment the Court sees fit, and I hope it can give you

peace.  I'm really sorry, and thank you for hearing me.

Thank you, Judge Saris.

THE COURT:  Thank you.  So this is what I'm going to

do.  I start, as I must, with the United States Sentencing

Guidelines, which are 57 to 71 months.  I actually think

sometimes they're too harsh, but here I think they're spot-on

for picking up an appropriate range of punishment for what

happened here.

I start with, under Section 3553(a), the seriousness

of the offense.  I think there's no one in this room, including

Mr. Baugh, who would in any way minimize the seriousness of

this offense.  It was extreme and outrageous, the kinds of

things we don't see in a civilized society.  It involved a

campaign of terror against two people.  Maybe -- I mean, I must

admit I'm not a technical -- I don't use eBay, and I never

heard of e-commerce, but at the end of the day, it was a blog

about a company.  And it's really almost impossible to

understand the level of -- the toxic culture around what

happened here.  I just don't understand it, why it created this

atmosphere in the top levels of eBay.

What it did to the Steiners, you know, not being able

to take a canoe ride without being afraid someone is looking at

1   you with binoculars, you know, the effect that you have on

2   David Steiner, he's not who he used to be, you can't help but

3   talk about the effect on the victims here.

4         And it isn't just one thing.  That's the thing.  I

5   mean, we all do stupid things that are aberrational at moments,

6   but this was a pattern of cruel conduct, actually funeral

7   wreaths, and how to survive the death of a spouse, and

8   cockroaches, and funeral masks, and Samoan masks, skeleton

9   masks.  I don't even understand it all, but it spanned both not

10:36 10   just sitting at a keyboard -- in some ways, it's worse than

11   that case you read me -- but it was actually surveying them in

12   their home and following them.  The terror every time, you

13   know, maybe the wind blew and they heard something outside

14   their home, it's hard to imagine.

15         I do buy the fact that sometimes people do horrible

16   things as part of groupthink.  I was trying to understand why,

17   actually, Mr. Baugh.  I was reading everything and saying to

18   myself "why?"  I didn't buy the fact that you thought that the

19   Steiners were somehow a threat to the personnel of eBay.  Maybe

10:36 20   this Fidomaster had this -- I read the emails.  Mr. Fick put

21   together a great memo on the blood coming out of the eBay logo.

22   Now, maybe people were afraid, you know, about Fidomaster and

23   what it was trying to do, but it was never the Steiners.  It

24   was never the Steiners.

25         And then I think, well, okay, they did all these

 1    things, the surveillance and the mailings and the doc things,

 2    that was groupthink, but there was more than that.  For

 3    example, I can't imagine -- there are two women I hope who get

 4    this sort of pat on the back.  They quit because how do you

 5    not -- you worked for some of the finest people in our country,

 6    and you worked for the CIA, you worked for the government --

 7    how did you not sort of have your internal check say "This is

 8    wrong," just like these two lower-level women did?  "This is

 9    wrong.  We're not going to do it."  Two of them lost their jobs

10:37 10    over this thing, effectively.

11          And then the notion that, well, it's not going to

12    happen again, it's aberrational, well, that may be true, and

13    you are a Criminal History Category I.  I have to weigh that,

14    that you've never been in trouble before.  But that email about

15    what you were going to do to the prosecutor in your dad's case

16    makes me think you thought this was a way of responding to

17    things you don't like in society today.  So I really take the

18    conduct, as everyone does here, extremely seriously here.

19          So then my question is, I do come back to "why?"  Why

10:38 20    weren't you like one of those women who just said, "I'm not

21    going to do this, even if my bosses really wanted to take down

22    the Steiners"?  You know, why didn't you just say "no"?  You

23    worked for the CIA.  I don't understand why you didn't just

24    say, "No.  I'm not going that far.  I'm not going extralegal."

25    I don't understand it.  Perhaps one is that you were an

alcoholic, and I do take the fact that alcoholics, before they

get treatment, sometimes do terrible things.  I do think that

may be one mitigator.  I actually don't think you're going to

do it again.  The consequences are too dramatic.

I do think that there was something in the toxic

culture that somehow made you part of a groupthink that this

would be okay.  But, you know, you used to say to your kids,

you know, "If your friend told you to jump off a bridge, would

you do it?"  I mean, at some point you have to have this inner

moral code that says, "No, I'm just not."

And, finally, I do view as a mitigator that,

finally -- when this case first came in the front door and it

was all about "My bosses told me to do this, that, and the

other thing" -- maybe they did, maybe they didn't, maybe it was

"hear no evil, see no evil" on their part, but whatever it was,

you have finally taken responsibility for what happened here,

and I did view your statement as heartfelt.

I should also mention the comparator.  I don't think

Cooke is a good comparator and neither is *Lin, Lee, Lin*, all

these things.  I'm looking at this case.  This case is what I

think is appropriate here.  I think, as I started off with, the

Guidelines have it about right.  I take into account the fact

of your alcoholism and the fact you're a first-time offender to

go to the bottom of the Guideline range, which is 57 months.

I don't know why there's such a long supervised

 1   release range.  I think after that I don't necessarily --

 2   except for the --

 3        I see Iris is about to jump.  Is this because of the

 4   penalty, paying it off?

 5        MS. GOLUS:  I think, given the conditions that are

 6   recommended, I don't think three years is necessary.

 7        THE COURT:  Yes, I agree with that.  What did you

 8   recommend again?

 9        MS. GOLUS:  We would think no more than two years.

10:40 10        THE COURT:  Yes.  First of all, I want to thank

11   Ms. Golus for being here because she is doing this even though

12   there's a Probation Office retreat or something today, and she

13   was here because of the importance of the sentencing, and I

14   really thank her for doing that.  But also I'm not sure three

15   years is necessary.  So she recommends two years, and I think

16   that that's sufficient and not greater than necessary.  I

17   should say, that's true of the 57 months.  I don't think I need

18   to go to 71 months or depart or vary.

19        I think the fine range, I couldn't quite figure out

10:41 20   his finances.  Let me ask you this question, which I should

21   know the answer to, and, of course, I see the -- I know you

22   haven't sought restitution, and he doesn't have endless

23   resources.  So the question is, if I do this high fine, does

24   that mean he won't have money to pay restitution or pay damages

25   in a civil suit?  What takes priority here?

1          MR. KOSTO:  Your Honor, looking at Paragraphs 204 and

2     205 of Mr. Baugh's Presentence Report, the government sees

3     reference to a $385,000 expected settlement from divorce, a

4     significant amount of credit card debt, a 225,000 odd-dollar

5     401K and a $60,000-odd IRA amount.  These are I think amounts

6     that would make a middle-class American blush, and the

7     government submits that --

8          THE COURT:  No, this isn't probably whether he can

9     afford the fine, but does that get priority over a damage

10:42  10   amount?  Do you know the answer to that?

11          MR. KOSTO:  I don't, your Honor.

12          MR. FICK:  Well, apart from that, your Honor, the

13     civil suit is still pending.  If the Court imposes a fine,

14     he'll pay it, and then there's less money left whenever the

15     civil suit settles or --

16          THE COURT:  Yes, I don't know --

17          MR. KOSTO:  But what's with that, your Honor, is --

18          THE COURT:  You don't know --

19          MR. KOSTO:  -- the civil suit is being actively

10:42  20   litigated --

21          THE COURT:  Yes, I can't do anything about it.

22          MR. KOSTO:  -- and there's no promise --

23          THE COURT:  All right, thank you.  Thank you.

24          So in terms of a fine, I'll do a $40,000 fine and $900

25     special assessment.  The conditions that are being recommended,

1    there's obviously the issue of alcohol treatment.  I think

2    you've come a long way in that.  I think that's one of the few

3    good things that have come out of this.  Thank you, you've

4    dealt with that.  And let me just --

5            MR. FICK:  We would request the RDAP recommendation,

6    your Honor.  Whether or not he's going to get credit --

7            THE COURT:  I'd be happy to do that, the RDAP

8    recommendation.  Do you have a particular -- I forget -- you

9    know, it's confusing to me -- is he living in Oklahoma,

10:43 10   Arkansas, Seattle?  Where is he living?

11           MR. FICK:  He's living in Arkansas with his family,

12   and that's where he would expect to release to also, so, like,

13   a recommendation to an appropriate facility, you know, with

14   proximity to Arkansas would be --

15           THE COURT:  Is there a low-risk facility in Arkansas?

16           MR. FICK:  I haven't actually looked at the specific

17   recommendations you asked for, given the history of the BOP and

18   my history of success in the BOP, but --

19           THE COURT:  I'll just say a recommendation near

10:44 20   Arkansas.

21           MR. FICK:  Yes.

22           THE COURT:  All right.  And I'm just trying to think,

23   I'm trying to find if the -- oh, wait a minute, I have the

24   conditions.  The mandatory conditions of supervision are

25   imposed.  I don't think we need drug testing other than the

1    minimum amount.  Obviously you must not have any contact,

2    direct or indirect, with the victims.  You're prohibited from

3    consuming alcoholic beverages.  I think there's no indication

4    of drug testing, so I think the minimum amount of drug testing,

5    not the maximum amount.

6         Now, let me ask you this:  Probation recommends mental

7    health treatment.  Does that make any sense here, or is it

8    really just the alcoholism?  I know he's suffered from some

9    anxiety and depression from this case, but I didn't know if it

10:45 10   was more longstanding.

11        MR. FICK:  I mean, I think in terms of a mandatory

12   condition, I think Mr. Baugh when he finishes his sentence will

13   avail himself of resources that he needs.  I'm not sure it

14   needs to be a Probation-Imposed --

15        THE COURT:  No, but then the government pays for it.

16        (Discussion between Mr. Fick and the defendant.)

17        MR. FICK:  I mean, that's true.  And also, as he

18   points out, I think alcohol treatment sort of is tied into

19   mental health treatment.

10:45 20   THE COURT:  I'll say mandatory mental health

21   treatment, as directed by the Probation Department.  And to the

22   extent there's any money left, that you contribute to the cost

23   of the evaluation and treatment programming and monitoring.

24   Pay any fine that I've imposed.  There is no restitution.

25   You're prohibited from incurring new credit card charges or

opening additional lines of credit without the approval of

Probation, and you must provide the Probation Office with

access to financial information.  There's also a $900 special

assessment.

And I just finish this off by saying that I'm really

sorry to the Steiners for what they've gone through and will

probably continue to live through with the litigation on the

civil side, and I think this is going to hopefully send a

deterrent message to other people that you can't solve the

problems of a corporation through this kind of conduct.

Mr. Baugh, I hope things -- you've done other good

things in your life.  I've read about them.  I don't really

fully, I have to still say, understand why you did this, but,

in any event, I'm confident that you've accepted responsibility

and won't do it again.

THE CLERK:  Self-surrender?

THE COURT:  Self-surrender.

(Discussion between the Court and Clerk.)

THE COURT:  The question that we're talking about here

is, we know he has two children that he loves very much.  I'm

happy to make a self-report after Thanksgiving.  I don't know

if he was -- I also know that there's a divorce involved, so I

didn't know whether you wanted to get going.

MR. FICK:  I'm sure he will take the opportunity to

see his children between now and his surrender date.

```
 1              THE COURT:  I'll just do six weeks.  So just give us a
 2     date six weeks out.
 3              THE CLERK:  After Thanksgiving?
 4              THE COURT:  Six weeks out.  It's not clear he's going
 5     to see them on Thanksgiving.
 6              THE CLERK:  Okay, so the week before Thanksgiving,
 7     Wednesday, November 16.
 8              THE COURT:  I'm happy to wait until the day after if
 9     you're going to be with your family.
10:47 10          (Discussion between Mr. Fick and the defendant.)
11              THE DEFENDANT:  It would be greatly appreciated if I
12     could see the kids over Thanksgiving, but --
13              THE CLERK:  So Wednesday, December 7 at 2:00 to the
14     institution designated by BOP.
15              MR. FICK:  Thank you.
16              THE COURT:  Thank you.  Anything else, Iris, that I've
17     missed?
18              MS. GOLUS:  No, unless you want to indicate whether
19     interest is waived on the fine.
10:48 20          THE COURT:  Interest is waived on the fine.
21              MR. KOSTO:  Mr. Baugh has been compliant with his
22     release conditions, but we would ask that the Court impose them
23     through the report date or continue them.
24              THE COURT:  Say it again.
25              MR. KOSTO:  Mr. Baugh has been compliant with his
```

1  release conditions, so we would ask that the Court continue

2  them.

3          THE COURT:  I'll continue the conditions of release.

4  So, please, the notice of appeal rights.

5          THE CLERK:  Sir, could you please stand.  The Court

6  hereby notifies you of your right to appeal this sentence.  Any

7  appeal from this sentence must be filed with fourteen days of

8  entry of judgment on the docket.

9          Do you understand these rights?

10:48 10          THE DEFENDANT:  I do.

11          THE COURT:  Thank you.  Now we have another

12  sentencing.  What time is it?

13          THE CLERK:  11:30.

14          THE COURT:  11:30, so I'll see you back here then.  I

15  guess what I'd like to say is, I don't know if the Steiners

16  would want to stay and address the Harville sentencing as well

17  or if they just want me to take it into account.  The letter

18  has been available to Mr. Harville.

19          MR. KOSTO:  I believe they would like to address the

10:49 20  Court as to Mr. Harville as well.

21          THE COURT:  All right, thank you.

22          (Adjourned, 10:49 a.m.)

23

24

25

1                      C E R T I F I C A T E

2


3

UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5

6


7           I, *Lee* A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 1

9    through 48 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Criminal No. 20-10263-PBS,

11   United States of America v. Jim Baugh, and thereafter by me

12   reduced to typewriting and is a true and accurate record of the

13   proceedings.

14           Dated this 6th day of October, 2022.

15

16

17

18

19

                 /s/ *Lee* A. Marzilli
20           _____
                 *Lee* A. MARZILLI, CRR
21           OFFICIAL COURT REPORTER

22

23

24

25