**UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MASSACHUSETTS**

| | |
|---|---|
| Ina Steiner, <br> David Steiner, <br> Steiner Associates, LLC, <br>      (*Publisher of EcommerceBytes*) <br>                Plaintiffs <br><br> vs. <br><br><br> eBay, Inc., et al., <br>               Defendants | CASE NO: 1:21-cv-11181 |

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE AMENDED COMPLAINT**
***(Request for Leave to File Consolidated Opposition Allowed May 2, 2023)***

**Introduction**

eBay and PFC, through their agents, engaged in a campaign to "take [] down" the Steiners, and end their reporting on eBay, using online and in-person threats, intimidation, harassment, and stalking to carry out their objective. The directives came from the top – through then CEO Devin Wenig; Wendy Jones, Senior Vice President of Global Operations; and Senior Vice President and Chief Communications Officer Steve Wymer – who provided the other Defendants with carte blanche authority to terminate the reporting of the Steiners by whatever means necessary, with Defendant Wymer expressing "…I want to see ashes. As long as it takes. Whatever it takes." Defendant Wymer promised the Defendants he would, "embrace managing any bad fallout" if the plan went south, further directing, "We need to STOP her."

As outlined in the First Amended Complaint (hereinafter "FAC"), each of the Defendants assumed a role, all integral to carrying out the scheme to reach the goal of ending the Steiners

reporting on eBay. Defendants Wenig, Jones and Wymer set the plan in motion and enlisted Defendant Baugh to carry out the directives.  Defendant Baugh hand selected a team to assist with engaging in the threats, harassment, stalking and surveillance. Defendants Harville, Cooke and Gilbert led the younger staff members, and in using their background and expertise helped plan the campaign. Defendants Popp, Stockwell and Zea assisted with planning and carrying out the mission.  Defendants PFC and Krystek financed the plan through the payment of expenses. All of the conduct was carried out while the Defendants were working within the scope of their employment as members of the security team, and at the behest of eBay and PFC.

Defendants Wenig, Wymer and Jones' directives shock the conscience, and have caused considerable damage to the Steiners. Starting with an online intimidation campaign, the Defendants harassed and threatened the Steiners through Twitter, then began sending ominous and disturbing package deliveries which included live spiders, cockroaches, and implied threats to kill with a bloody pig mask, a funeral wreath, and a book entitled "Grief Diaries: Surviving Loss of a Spouse" sent directly to David Steiner. These messages and deliveries often were accompanied by ominous simultaneous Twitter messages such as "do I have your attention now, cunt?"

After several days of around the clock threatening and vulgar emails, packages and online messages, Defendants Wenig and Wymer's underlings travelled from California to Natick[1] to stalk, harass and threaten the Steiners in-person, making clear that whoever was torturing them was now stalking them and their home. Simultaneously, the Defendants who remained in California continued with the online threats and stalking, subjecting the Steiners to relentless psychological distress. The Defendants also "doxed" the Steiners, posting their address online so

---

[1] Paid for by Defendants PFC and Krystek.

that not only were the Defendants stalking the Steiner residence, strangers began showing up at their home.

The Steiners, justifiably terrified, began calling the Natick Police Department with frequency, which the Defendants monitored with a police scanner in an attempt to stay one step ahead of both the Steiners and any law enforcement.  The Defendants knew the panic and fear they were inflicting on the Steiners by carrying out Defendants Wenig and Wymer's directives, which only fueled their fire: they praised one another that their "work" was accomplishing their goal of intimidating, threatening, torturing, terrorizing, stalking and silencing the Steiners.  The Defendants callously joked that the Steiners were "seeing ghosts, think everyone is following them and they call the police every 10 minutes," and "We know the targets have been impacted by this op." Despite recognizing the mental and emotional anguish the Defendants were inflicting, the Defendants continued to persist with the campaign to "burn them down."

Once the Defendants realized that the Natick Police Department ("NPD") was investigating the conspiracy, the Defendants plotted to destroy evidence, mislead the investigation, and divert attention away from eBay. Defendant Baugh called a meeting and directed others to delete all communications and evidence relating to the scheme, and the Defendants, including but not limited to, Defendants Gilbert, Harville, Cooke, Popp, Stockwell, and Zea persistently lied to investigators and fabricated evidence. Defendants Baugh and Wymer also had at least two conversations discussing the investigation where Defendant Wymer instructed Baugh to "stick to his guns," and then subsequently deleted his phone logs memorializing his calls with Defendant Baugh, and deleted all texts relating to the conspiracy. Their cover-up attempts included efforts to create a fake dossier, and a phony "persons of interest" file on the Steiners to make them appear dangerous, and ensure the Defendants could

deflect their own blame when interacting with law enforcement.  While Defendant Wenig was the stealthiest and appeared to have limited phone communications relating to the campaign against Plaintiffs, he did text Defendant Baugh in the midst of the investigation and coverup, the day before he was returning from sabbatical, "See you tomorrow. The cavalry is back." Defendant Jones' phone was never seized, so the extent of her phone communications is unknown.

Now, the Defendants each try to absolve themselves from liability, claiming the Steiners have failed to set forth a sufficient factual basis to satisfy the elements of each of their claims. The bulk of the Defendants' arguments, however, hold the Steiners to too high a burden, and suggest a standard more applicable to the summary judgment or trial stage. Ultimately, the Steiners have set forth a plausible claim for relief, and have included "enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal [conduct]" with respect to each defendant, and each claim set forth in the Complaint. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 17 (1st Cir. 2011). (recognizing chain of events leading to defendants' actions "may often be unavailable to a plaintiff at this early stage of the litigation"), citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

As such, this Court should deny the Defendants' Motions to Dismiss for the reasons set forth *infra*, and allow the Steiners to proceed to the discovery stage. *See Ocasio-Hernandez*, 640 F.3d at 19; *Iqbal*, 556 U.S. at 678.

## **Background**

The Plaintiffs, David and Ina Steiner and Steiner Associates, LLC, filed a Complaint against eBay, Progressive Force Concepts ("PFC"), two eBay executives – Devin Wenig and Steve Wymer – and various other employees of eBay and PFC – Jim Baugh, David Harville,

Brian Gilbert, Philip Cooke, Stephanie Popp, Stephanie Stockwell, and Veronica Zea – on July 21, 2021.

All Defendants except for Defendant Harville – who filed an Answer – filed motions to dismiss various counts of the Complaint.

The Court granted leave to file a consolidated opposition to the Defendant's Motions to Dismiss on November 15, 2021. (Woodlock, J.). This Order was stayed to allow the parties to attempt to mediate this case. The Plaintiffs' filed their consolidated Opposition to Defendants' Motions to Dismiss on June 9, 2022. The Defendants filed a number of replies, and consolidated replies, on June 24, 2022. On September 29, 2022, Plaintiffs filed a Motion for Leave to File Supplement to Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss, including new information learned in the Defendants' respective criminal cases. The next date, September 30, 2022, the Court allowed the Motion for Leave. (Woodlock, J.). On October 11, 2022, Defendant Wenig filed a Motion for Leave to File a Supplemental Reply in Support of Motion to Dismiss, which was allowed by the Court the next day. On October 15, 2022, eBay also filed a Motion for Leave to File a Supplemental Reply, which was likewise allowed. On October 17, 2022, Defendant Wymer also filed a Motion for Leave to File a Supplemental Reply, which was also granted by the Court. On October 26, 2022, Plaintiffs filed a Motion for Leave to file a Consolidated Response to Defendants eBay, Wenig and Wymer's replies, which the Court allowed the next day.

On January 4, 2023, the Court entered an "Order Regarding Pending Motions to Dismiss and Consent to Transfer." (ECF No. 167). The Order stated as follows:

> Pending before this Court is a collection of motions to dismiss for failure to state a claim [Dkt Nos. 79, 81, 83, 88, 89, 93, 98 (and also to dismiss for lack of jurisdiction), 101, 102, 106, 118 (as to counterclaim of defendant Baugh)]. As a result of the successive guilty pleas by various of the defendants in criminal proceedings against them, Plaintiffs

have been permitted leave to supplement the currently operative initial complaint [Dkt. No. 1] that commenced this action on July 21, 2021, with materials from those criminal cases and to filed a consolidated response [Dkt No. 159] to the various supplemental reply materials Defendants have filed. The consequence of the successive filings of these supplemental – albeit current – materials is that a) the allegations of the currently operative initial complaint – filed well before the effective conclusion of all of the parallel criminal litigation – have been obscured by a massive accumulation of paper that does not provide a simple, concise and direct statement of currently plausible claims and counterclaims, see Fed. R. Civ. P. 8(d)(1); those allegations cannot be said any longer to be plain and (c) Plaintiffs' allegations would undoubtedly benefit from careful reconsideration for purposes of specific reframing and focus on whether there is a likelihood that current case law and factual circumstances would support the variety of separate claims initially made in the way they were. Plaintiffs are entitled to state their claims in light of the current development of litigation bearing on their civil case before motion to dismiss practice is completed. Plaintiffs will be afforded that opportunity through the filing of an amended complaint on or before February 15, 2023. In the interim, the currently outstanding motions to dismiss are hereby DENIED without prejudice to reassertion if no such amended complaint is timely filed by Plaintiffs.

In the interests of justice and to further the efficient performance of the business of this court, after consultation with Chief Judge Saylor and Judge Saris, I hereby direct the transfer of this case to Judge Saris, with her consent, pursuant to Local Rule 40.1(i)(1). ("a district judge may,…with respect to civil cases only,…transfer the case to another district judge, if the other judge consents to the transfer.").

(Woodlock, J.)

Plaintiffs filed the FAC on March 1, 2023. All Defendants except Defendant Harville – who filed an Answer – filed Motions to Dismiss various counts of the FAC.

## Summary of the Argument

The fatal flaw in each of the Defendants' motions to dismiss is that they parse out the facts, attempt to hold Plaintiffs to the burden of proving facts to conclusively satisfy each element of each claim set forth in the FAC, and fail to assess the "cumulative effect of the factual allegations" to determine whether Plaintiffs' claims are merely "plausible" at this stage. *See Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 14-15 (1st Cir. 2011).

Instead of applying the correct legal standard – taking the Plaintiffs facts as true and determining whether, in their totality, they set forth a plausible claim for relief – each of the

Defendants make assertions and interject "facts" that are not part of the FAC, stretch the pleaded facts in an attempt to interpret them in the light most favorable to the Defendants, and suggest Plaintiffs need to offer irrefutable proof of each element of each claim asserted in the FAC.[2] The Defendants inability to lodge arguments based solely on the facts asserted in the FAC, along with applying the correct legal standard, casts a spotlight on the hollowness of the Defendants' allegations that Plaintiffs failed to meet their burden under Fed. R. Civ. P. 12(b)(6).

The Defendants each make arguments that are more apt for a closing argument at trial, rather than a Rule 12(b)(6) motion to dismiss, which requires the Court to "take all well-pleaded facts as true." *Rockwell v. Cape Cod Hosp.,* 25 F.3d 254, 260 (1st Cir. 1994). Instead, the Defendants contort the facts, and attempt to downplay, minimize and apply one interpretation to their statements and communications, in the light most favorable to their respective PR campaigns.

> [T]he question of whether the Plaintiffs have accurately or reasonably interpreted [statements] raises numerous factual issues that cannot be resolved on a motion to dismiss…the court's obligation on a motion to dismiss is to accept the Plaintiff's well-pleaded facts as true and draw all reasonable inferenced in the Plaintiffs' favor. At this stage, the Plaintiffs are entitled to have their factual allegations, including their interpretation and characterization of witness [statements]…accepted as true. The defendants are free to challenge the Plaintiffs' allegations using the underlying evidence, and any other evidence developed during discovery, at a later stage in the proceedings.
>
> *Metro. Prop. & Cas. Ins. Co. v. Savin Hill Family Chiropractic, Inc.*, 322 F.R.D. 151, 155-156 (D. Mass 2017).

---

[2] Many of the Motions to Dismiss include facts or documents taken from the first Complaint. "An amended complaint [however], supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader." *Intergen NV v. Grina*, 344 F.3d 134, 145 (1st Cir. 2003). As such, Plaintiffs file with this Consolidated Opposition a Motion to Strike the improper references to the original complaint and documents, as well as other facts interjected by Defendants that are not part of the FAC record.

Because Plaintiffs have set forth a plausible claim for relief as to each Defendant and each claim, this Court should deny the motions to dismiss and allow this case to proceed to discovery.

## **DEFENDANT EBAY**

Defendant eBay files a partial motion to dismiss the FAC, moving to dismiss the following claims: stalking (Count II); negligent hiring, supervision and retention (Counts V, VI and VII); assault (Count VIII); false imprisonment (XII); Civil Conspiracy (Count XIII); and ratification (Count XIV).

Defendant eBay erroneously interjects that "eBay is committed to compensating Plaintiffs Ina and David Steiner…appropriately and in accordance with the law.

## **DEFENDANT PFC**

Defendant PFC first asserts that this Court does not have personal jurisdiction over the corporation. Defendant Zea, however, was an employee of PFC, acting within the scope of her employment at all times relevant to the FAC, and since PFC is vicariously liable for her conduct – including when she traveled to Natick to harass, stalk, intimidate and torture the Plaintiffs – PFC is subject to personal jurisdiction.

Defendant PFC also moves to dismiss each individual claim on the basis that it did not direct, control or supervise Defendant Zea, that Defendant PFC did not have prior notice that Defendant Zea may have criminal proclivities or that the harm was foreseeable, and that the allegations as to Defendant PFC are conclusory or insufficient to state a claim against PFC.

Defendant Zea, however, was hired, fired and supervised by Defendant PFC. Defendant Zea had an assigned supervisor at PFC, who regularly traveled to eBay to check on her and the other contractors. Defendant Zea reported conduct occurring at eBay to her PFC supervisor, who

would share the information with Defendants Baugh and Popp, suggesting Defendant PFC did not merely supply contractors; they provided oversight of its employees, and kept an open line of communication with eBay.

Under the totality of the circumstances, Plaintiffs have met their burden of establishing Defendant Zea is an employee of Defendant PFC, and that her misconduct occurred during the course of her employment, subjecting Defendant PFC both to personal jurisdiction and liability for her conduct. Moreover, PFC is independently liable where it supplied the funds for the conspiracy, and failed to take appropriate steps to remedy Defendant Zea's behavior once it became – or should have became – apparent to the company.

## DEFENDANT DEVIN WENIG

Defendant Wenig misconstrues the standard for deciding a motion to dismiss, interjecting bare assertions that are not contained within the FAC, and contorting the facts instead of taking the facts pleaded in the FAC as true, and all reasonable inferences flowing from those facts. Wenig attempts to extract his words and conduct outlined in the FAC, and twist them in a light favorable to himself, which is the exact opposite of the standard the Court should apply when determining whether the Plaintiffs have met the low standard of a well-pleaded FAC. Wenig interjects the following:

> Plaintiffs' claims are contrary to Wenig's character, conduct, and reputation. They rest on just three words. Ripped from a lone, decontextualized text sent to eBay's head of communications and construed by Plaintiffs in an implausible manner contrary to Wenig's intent, those three words cannot sustain Plaintiff's claims.

> Moreover, Plaintiffs ignore clear evidence that Wenig had no role in harassing them, including that an outside investigation found no evidence that Wenig "directed or knew that [the harassment] would occur"; that no one participated in the harassment has ever said that Wenig was involved; that Jim Baugh, the architect of the harassment campaign, admitted that he is "one hundred percent responsible"; that that the U.S. Attorney's

9

Office that investigated the case told this Court that "[t]here's no one above Jim Baugh at eBay who thought up the depraved things that happened to David and Ina Steiner."

Putting aside that the Plaintiffs also allege that the "outside investigation" was a sham (¶ 296)[3] – so any purported "clearing" of Wenig was also a sham[4] – none of the facts Wenig rests upon to claim he is absolved from liability are outlined in the Plaintiffs' FAC. Instead, Wenig either makes them up out of whole cloth, or includes information that is simply not part of the FAC apparently in an effort to lodge summary judgment or trial arguments during Rule 12(b)(6) litigation.[5]

Defendant Wenig also attempts to parse out individual paragraphs in the FAC instead of taking the allegations as a whole. The claim that the Plaintiffs rely solely on a three-word text in establishing Wenig's liability is a fallacy. Instead, the Plaintiffs rely on all of the allegations in the FAC as a whole, including but not limited to: the culture at eBay, which started with the C-Suite; Wenig's obsession with taking Ina Steiner down; Wenig's frequent and direct communication with either Baugh, or Wymer who disseminated his communications to Baugh; and the fact that Wenig's actions and statements were the match that lit the fire, which then travelled down the chain of command. And to be clear, nowhere do the Plaintiffs allege that Wenig planned a fly-by-night sabbatical on the eve of the acts, in order to claim "plausible deniability." Instead, Plaintiffs point to the uncanny timing of Wenig's match-lighting message that "…If we are ever going to take [Ina] down…now is the time," on the eve of his scheduled

---

[3] Paragraphs in the First Amended Complaint are cited as "¶ #").

[4] Also, as noted in the FAC, Defendant Cooke was also initially cleared by the investigation, and was promoted from Manager and Director, but was ultimately terminated after he was charged criminally. ¶ 286.

[5] Plaintiffs also file with this Opposition a Motion to Strike all of the superfluous interjections by Wenig (and other Defendants) throughout his motion to dismiss, where they are not appropriate at this stage of the litigation.

departure. ¶ 82. In other words, directing his subordinates to engage in the conspiracy while he knew he would be on sabbatical is the attempt at "plausible deniability."

As outlined below, Wenig does nothing more than interject speculation and extraneous information not contained within the FAC in an attempt to allege the claims against him must be dismissed, and misconstrues the standard that applies at this stage. The Court should take this for what it is – various strawman arguments to divert attention from the fact that the FAC against Wenig is well-pleaded, and sustains each of the alleged claims. As such, this Court should deny Wenig's motion to dismiss.

## DEFENDANT STEVE WYMER

Wymer, like Wenig, attempts to stretch his text communications and argues as though they are subject to one interpretation and one interpretation only – the one that serves Wymer. *See e.g.,* Wymer Memorandum at 4 ("For instance, Wymer allegedly used the phrase 'Whatever. It. Takes' in an email with eBay's General Counsel Marie Huber – obviously not referring to criminal conduct."). That Wymer was not referring to criminal conduct is far from obvious, and Wymer's interpretation of that communication – and others – is not contained within the FAC, nor would the interpretations be reasonable inferences from the facts outlined in the FAC, and are nothing more than self-serving.

Wymer also misconstrues the standard for a Rule 12(b)(6) motion, and interjects claims not within the FAC in an attempt to bolster his unfounded arguments. For example, Wymer argues that Plaintiffs refer to a conversation between Baugh and Wymer where Baugh indicated his "his team had given the Steiners a 'tap on the shoulder,'" and that Wymer expressed approval. Wymer claims the allegation is "unsubstantiated by any contemporaneous record or document, derives from Baugh's self-serving sentencing memorandum, and should not be

11

credited." *See* Baugh Sentencing Memorandum at 5-6 n. 4. First, not only does Wymer assume this information came solely from Baugh's sentencing memorandum, it was not appended to the FAC and thus is not part of the record. Moreover, suspiciously absent is any citation to any rule or case that requires a Plaintiff to provide a "contemporaneous record or document" for every claim and factual allegation set forth in the FAC. This is unsurprising as the standard Wymer attempts to hold Plaintiffs to at this stage is the opposite of what is required. Instead, the Court must simply take the facts as alleged as true.

## DEFENDANT WENDY JONES

Defendant Jones attempts to refute the factual allegations by interjecting extraneous information and her personal thoughts, just as Defendants Wenig and Wymer have done, and urges this Court to interpret her words in conduct in the light most favorable to herself, rather than the Plaintiffs. Given Defendant Jones' obsession with getting rid of the Steiners' and EcommerceBytes' reporting, her role in promoting Defendant Baugh despite his apparent unfitness, her directive to Defendant Baugh to take care of the situation off the radar and to just "get it done" provide context for Defendant Jones' language. Moreover, her approval of Cooke's promotion into Defendant Baugh's role after Baugh was fired provide context and demonstrate her approval of the acts.

Defendant Jones also discussed "huddling up" during lunch to discuss the Steiners in an email to Defendant Baugh, and during that lunch meeting directed Defendant Baugh to take care of the issue off the radar, that the legal and communications departments could not handle the issue, and that Defendant Baugh just needed to "get it done." Defendant Baugh was Defendant Jones' direct report, and they had weekly meetings where they would, among other topics, discuss the Plaintiffs. When Defendant Baugh kept Defendant Jones in the loop, and played a

harassing call to the Steiners, Defendant Jones gave Defendant Baugh a fist bump, demonstrating her continued encouragement.

Moreover, Plaintiffs note that although Defendant Jones was interviewed by Morgan Lewis and eBay, these interviews were never disclosed to the Government, so none of her statements have ever become available to the Steiners. *See Menard v. CSX Transp., Inc.,* 698 F.3d 40, 45 (1st Cir. 2012) ("'some latitude may be appropriate in applying the plausibility standard' where 'a material part of the information needed is likely to be within the defendant's control"). It is unclear whether Defendant Jones' phone was ever seized, in order to determine the full extent of her communications.

## DEFENDANT JIM BAUGH

Defendant Baugh moves to dismiss eight of the counts of the FAC, and largely adopts the arguments made by the various other Defendants. While Defendants eBay, Wenig, Wymer and Jones attempt to deflect all blame on Defendant Baugh and his supervisees, and attempt to cast him as a "rogue" employee, Defendant Baugh did not begin to plan the campaign against the Steiners, or set the chain of events in motion until Defendants Wenig, Wymer and Jones lit the match. Defendant Baugh is certainly liable for his conduct, but the buck did not stop with him.

## DEFENDANT STEPHANIE POPP

Despite her leadership role in the stalking and harassment campaign against the Plaintiffs, Defendant Popp still regards herself as a victim, essentially contending Plaintiffs are wrong for asserting civil claims against her claiming they are "apparently unsatisfied with the pound of flesh already extracted from Ms. Popp through the criminal process" and lambasting Plaintiffs

for "seeking monetary damages from an incarcerated young woman."[6] The Steiners were not a party to the criminal litigation, they were the victims. They never sought a pound of flesh from anyone. In fact, the Sentencing Guidelines suggested a sentence far greater than what the Government requested, and what the Court ultimately imposed.

Notably, Defendant Popp was an integral part of the planning stage, actually traveled to Natick and followed, stalked, intimidated and harassed the Steiners at their home, then continued to post on Twitter after the Natick Police Department investigation began in order to deflect attention from eBay. Defendant Popp ultimately pled guilty to conspiracy to commit stalking and conspiracy to tamper with a witness stemming from this conduct, and while she requested house arrest, unlike the other women sentenced before the Court she received a prison sentence, reflecting her leadership role in the campaign. Despite this, Defendant Popp moves to dismiss seven of the counts, and still casts herself as "a victim of the 'sick and dysfunctional culture' at eBay. (Popp ECF No. 211 at 3).

As outlined below, Plaintiffs have set forth sufficient evidence for each of the counts set forth in the FAC against Defendant Popp, and that Defendant Popp need not "*guess* why and how each count might be applicable to her" where the FAC sufficiently outlines, in great detail, the cruel acts she assisted in planning, carrying out and covering up.

## <u>DEFENDANT BRIAN GILBERT</u>

Defendant Gilbert – a retired police Captain for the Santa Clara Police Department – likewise pled guilty to conspiracy to commit stalking and conspiracy to tamper with a witness, but he has not yet been sentenced. Despite his guilty plea, he moves to dismiss all counts of the

---

[6] Defendant Popp was 31 years old at the time of the acts set forth in the FAC, and is now 35 years old, well past the age of claiming ignorance.

FAC except the Intentional Infliction of Emotional Distress Claim, and claims his conduct was not delineated specifically enough, and attempts to distance himself from much of the conduct by stating that although he may have "approved" the threatening Tweets and packages, he did not specifically hit "send" in order to publish the Tweets, or order the packages. Defendant Gilbert's disingenuous attempts to downplay his conduct should be rejected.

## DEFENDANT PHILIP COOKE

Defendant Cooke – another retired police Captain for the Santa Clara Police Department – likewise pled guilty to a criminal Information, and received a prison sentence. Despite this, he moves to dismiss all counts of the FAC, including for acts for which he accepted responsibility in the criminal case and alleges that all allegations against him are "conclusory" and that "Plaintiffs fail to allege specific facts to tie Mr. Cooke to the individual acts underlying their claims," playing fast and loose with the law given his previous acceptance of responsibility to attempt to secure a lesser sentence than advised by the Sentencing Guidelines. (Cooke ECF No. 204 at 1). *See also Patriot Cinemas, Inc. v. Gen. Cinema Corp.,* 834 F.2d 208, 212 (1st Cir. 1978) ("Courts are prone to invoke [doctrine of judicial estoppel] 'when a litigant is playing fast and loose with the courts'…").

## DEFENDANT STEPHANIE STOCKWELL

Defendant Stockwell moves to dismiss ten of the counts of the FAC, and largely adopts the arguments made by the various other Defendants. Defendant Stockwell also pled guilty to conspiracy to commit stalking and conspiracy to tamper with a witness stemming from her conduct – acts which are outlined in the FAC – but claims the FAC alleges only "shotgun allegations" against her, and that she is unable to decipher the conduct attributed to her. This is despite that the FAC outlines her role in the meetings planning the attack on the Steiners, how

she purchased the items used to carry out the campaign, including a computer, and her role in drafting Tweets and mailing threatening packages to the Steiners.

## DEFENDANT STEVEN KRYSTEK

Defendant Krystek is the CEO of PFC, and was at the time of these events. He was one of the original founding members of the company, and has a relationship with Defendant Baugh spanning back 25-years.

Before acquiring the contract with eBay, PFC had only three employees but became a $4million enterprise after acquiring the contract. Defendant Krystek, as one of the three employees, benefited directly from the contract, and had an incentive to ensure its success. Defendants Baugh and Krystek would frequently meet, and Defendant Baugh would keep Defendant Krystek informed regarding the Defendant PFC contractors. Defendant Krystek would travel to eBay Headquarters to meet with Defendant Baugh, and Defendant Baugh would also travel to Las Vegas to PFC Headquarters to meet with Defendant Krystek.

Defendant Krystek was one of the individuals who would review expense reports for Defendant Zea's credit card, which accumulated over $100,000.00 in expenses leading up to these events. Defendant Krystek also benefited from the approval of these expenses, where Defendant PFC received a 5% markup for all expenses paid on eBay's behalf. Defendant Baugh frequently used Defendant Zea's credit card as a slush fund, and would require her to attend trips so he could use the card. Defendant Krystek allowed this practice to persist. Even after Defendant Baugh was terminated by eBay, he met with Defendant Krystek and encouraged him to keep Defendant Zea as an employee.

Ultimately, Plaintiffs set forth plausible claims for relief where Defendant Krystek was responsible for the financial success of the campaign against the Plaintiffs.

## Standard of Review

In assessing a 12(b)(6) motion to dismiss for failure to state a claim, the Court "must take all well-pleaded facts as true," and a count is properly dismissed only where the allegations are such that "the plaintiff can prove no set of facts to support [the] claim for relief." *Rockwell v. Cape Cod Hosp.,* 25 F.3d 254, 260 (1st Cir. 1994).

The Court assesses whether the "factual allegations gives rise to a plausible claim to relief." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013). The context specific inquiry does not demand "a high degree of factual specificity." *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). "There need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action." *Rodriguez-Reyes*, 711 F.3d at 55.

The ultimate question is "whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible." *Ocasio-Hernandez,* 640 F.3d at 14. A "plausible but inconclusive" inference from pleaded facts will survive a motion to dismiss. *Sepulveda-Villarini v. Dept. of Ed. Of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010). The standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal [conduct]." *Ocasio-Hernandez*, 640 F.3d at 17, quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ARGUMENT

I.   **The Defendants' claims that "collective allegations" do not support claims against each individual Defendants is erroneous where Plaintiffs' FAC sufficiently outlines the conduct and plain statement of the facts as to each Defendant and Count.**

The Defendants take the "collective pleading" concept out of context. The Plaintiffs specifically delineated the role of each Defendant in each of the claims, including the directives

issued by the C-Suite Defendants, the role of each Defendant within eBay, which allowed Defendants Wenig, Wymer and Jones to carry out their respective roles in the campaign against the Plaintiffs, and each of the roles and actions carried out by the other Defendants. The Plaintiffs also provided context as to the culture at eBay, and that the actions of Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell and Zea would not have been carried out were it not for Defendants Wenig, Wymer and Jones' obsession with the Plaintiffs, and their directives to take the Plaintiffs down, which was disseminated down the chain of command. Moreover, Defendants Krystek and PFC were an integral part of the campaign through Defendant Baugh's close relationship with Defendant Krystek and PFC, and their funding of the campaign. Defendant Baugh's desk – who was a member of the security team, not a C-Suite member – was directly outside the offices of Defendants Wenig, Wymer and Jones. Defendant Baugh was unhinged, not just during the acts that led to the FAC, but throughout his tenure at eBay, which was apparent to all, including up the chain of command. This is evidenced by a Reddit post published before the criminal investigation even became public, as well as the surrounding circumstances and Defendant Baugh's close relationship with the C-Suite members, despite his lower ranking role in the Company. The Reddit post suggests it was common practice for eBay security to intimidate critics.[7] It strains credulity to believe that Defendant Baugh's nature and treatment of his subordinates remained completely hidden from his supervisors, despite that his work station was adjacent to Defendants Wenig, Wymer and Jones' offices.

The cases cited by the Defendants which admonish grouping the Defendants in the FAC deal with situations where a specific act or acts form the basis for a claim, but Plaintiffs failed to

---

[7] The level of detail contained within the Reddit post and the knowledge of circumstances that later became public demonstrate the poster had inside knowledge and was not merely speculating.

delineate who actually committed that act, instead referring to all Defendants. *See Alston v. Spiegel*, 988 F.3d 564, 583 (1st Cir. 2021); *Fine v. Guardian Life Ins. Co. of Am.*, 2021 WL 916270, at *5 (D. Mass. Mar. 10, 2021). For example, in *Fine*, the Plaintiff lumped all Defendants together, instead of outlining which Defendant hired him, used a false allegation to terminate him, or failed to produce his personnel file, all specific acts that had to be proven against a particular defendant.

Here, on the other hand, Plaintiffs allege specific actions taken by each defendant, in order to satisfy the elements of each claim. While the actor for some conduct was unknown and unknowable at the time of the FAC drafting – e.g., who specifically pressed "Order" when purchasing the Saw mask or fetal pig – this information can be uncovered with discovery. Ultimately, however, the Defendants were conspiring together at the behest of Defendants Wenig, Wymer and Jones, in furtherance of their directives, and Defendants PFC and Krystek were integral in supplying the finances, through an "expensing loophole" so that the conspiracy could be successfully carried out. The FAC sufficiently establishes this, and each Defendants respective role within the campaign against the Plaintiffs.

## II.   Plaintiffs sufficiently stated negligence claims where proximate cause and foreseeability is a question of fact, and where the allegations set forth in the FAC meet the plausibility standard.

The Defendants assert that the FAC failed to establish the harm was reasonably foreseeable or that their actions were the proximate cause of the Plaintiffs' injuries. Preliminarily, Plaintiffs note that "[t]he question whether the risk of injury was foreseeable is almost always one of fact." *Moose v. Massachusetts Inst. of Technology*, 43 Mass. App. Ct. 420, 425 (1997). Therefore, "[q]estions of negligence and causation are usually left to the jury." *Christopher v. Father's Huddle Café, Inc.*, 57 Mass. App. Ct. 217, 226 (2003), *citing O'Hanley*

*v. Ninety-Nine, Inc.,* 12 Mass. App. Ct. 64, 68 (1981) ("the question of the proximate cause of the plaintiff's injury is one for the jury").

For a negligence claim, Plaintiffs must show: (1) a legal duty owed by defendant to plaintiff; (2) a breach of the duty; (3) proximate or legal cause; and (4) actual damage or injury. *See Jorgensen v. Massachusetts Port Authority*, 905 F.2d 515, 522 (1st Cir. 1990).

To demonstrate a duty of care, Plaintiffs must prove that harms caused were foreseeable. *See Irwin v. Ware*, 392 Mass. 745, 756-757 (1984); *Bernier v. Boston Edison Co.,* 380 Mass. 372 (1980). While there is no duty owed when the risk which results in the plaintiff's injury is not one which could be reasonably anticipated by the defendant, the extent and manner of the harms need not be foreseeable. *See Dos Santos v. Coleta*, 465 Mass. 148, 162 (2013); *Bernier v. Boston Edison Co*., 380 Mass. 372, 403 N.E.2d 391, 400 (1980). *See also Kent v. Commonwealth*, 437 Mass. 213, 320 (2002) ("negligent conduct is the proximate cause of an injury…[if] the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct."). A result is foreseeable if it was not highly extraordinary. *See Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 242 (2005), *citing Rae v. Air-Speed, Inc.*, 386 Mass. 187, 193 (1982).

The foreseeability analysis is not altered when the original negligent act is followed by an independent act "or event that actively operates in bringing about a plaintiff's injury, that is, a so-called intervening cause. Where the intervening occurrence was foreseeable by a defendant, the causal chain of events remains intact and the original negligence remains a proximate cause of a plaintiff's injury. *See Sarna v. American Bosch Magneto Corp.,* 290 Mass. 340, 343-344 (1935).

Defendants eBay, PFC, Wenig, Wymer, Jones and Krystek erroneously contend that the harm caused to the Steiners was not reasonably foreseeable to them, and therefore, the FAC is insufficient to set forth a cause of action for negligence. They each similarly argue that

Defendant Baugh's actions were "rogue," (Wenig ECF No. 197 at 10) and that there is no way they could have "reasonably anticipated that Baugh would order a deranged campaign of harassment, stalking threats, and torture of Plaintiffs." Wymer ECF No. 198 at 11; Jones ECF No. 206 at 9-11.

As is well-established, however, "the extent and manner of the harms need not be foreseeable." *Dos Santos v. Coleta*, 465 Mass. at 162. The goal of Defendant Wenig, Wymer and Jones' directives was to shut down EcommerceBytes' reporting. There were discussions between Defendants Wenig, Wymer, Jones, Baugh and the legal department relating to the fact that there were no further legal means to shut things down, and that the communications department had no tools at its disposal. ¶ 308. Defendant Wenig ordered Defendant Wymer to "take her down." ¶ 82. Defendant Wymer then ordered Defendant Baugh to burn Ina Steiner to the ground and to do whatever it takes. ¶ 85. In a heated conversation, Defendant Wymer informed Defendant Baugh that Defendant Wenig wants the website burned to the ground that eBay would absorb any legal exposure, and that they were "all done" if the reporting did not stop. ¶ 111.

The plan was then immediately set in motion. After almost a week of online threats and harassment, Defendant Wymer then texted Defendant Baugh, "I want to see ashes. As long as it takes. Whatever it takes." ¶ 126. Defendant Jones also previously directed Defendant Baugh to do things off the radar, and to "just get it done." ¶ 230.

Taking all of this information in context, the most powerful person in a Fortune-500 Company, as well as two other C-Suite executives, were directing a member of the security team to handle a situation that the legal department and communications department could not manage. These same executives made clear they wanted all reporting by EcommerceBytes to cease immediately, or they were "all done." Defendant Baugh was told to handle the issue off the

radar, and to do whatever it takes to get it done. He was also told he would receive executive level support, and assistance with any legal issues that arose.

While the Defendants repeatedly refer to their language as merely "hyperbolic" that is not a logical inference from the facts and circumstances outlined in the FAC and the Defendants' claimed interpretation of the statements cannot be considered by this Court when evaluating these motions in the light most favorable to the Plaintiffs. *See Gargano v. Liberty Intem. Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009) ("A court must draw all reasonable inferences in the plaintiff's favor…"). Any reasonable person could foresee that *some* harm to the Steiners would result from these directives. As the Plaintiffs pled in the FAC, the goal of the directives was to take down the Steiners' reporting – i.e., eviscerate their First Amendment right to free speech and freedom of the press. The Defendants knew Defendant Baugh would not merely be writing them a letter, that he would not be reaching out to ask them to cease reporting, or issuing a neutralizing statement in the press because Defendants Wenig, Wymer and Jones already made clear those paths were useless. Instead, the implication is that some form of tortious or criminal conduct would be necessary, because all legal means were already assessed, deemed inadequate, and rejected.

While the precise extent and manner of the acts may not have been entirely anticipated, at the very least it was foreseeable that the Steiners would suffer damage to their business and that they would be distressed by whatever conduct resulted from the C-Suite directives. The elephant in the room throughout Defendant Wenig, Wymer and Jones' protestations that Defendant Baugh was "rogue" and they had no idea he would engage in such behavior is: What could they possibly have believed Defendant Baugh, head of the security department, would do? The only plausible inference is that he would engage in some conduct designed to intimidate or place the

Steiners in fear in order to coerce them into stopping all press they deemed "negative" relating to eBay, demonstrating that when evaluating the circumstances facts and inferences from the FAC, the acts carried out by the criminal defendants were foreseeable to those who issued the directives.  Again, there is no evidence contained with the FAC to suggest Defendants Wenig, Wymer and Jones had no idea Defendant Baugh would engage in such behavior; in fact, the reasonable and logical inferences support the opposite.

Under the circumstances, Plaintiffs have sufficiently pled claims of negligence, where it was reasonably foreseeable that their directives would result in serious harm, both emotional and to the Plaintiffs' business, when viewing the totality of the circumstances at play. As such, this Court should deny the motions to dismiss the negligence claims.

i. Plaintiffs do not adequately allege proximate causation (Wenig)

Defendant Wenig asserts that his conduct was not the proximate cause of Plaintiffs' harm because Defendant Baugh's conduct was "a superseding cause" of Plaintiffs' injuries. (Wenig ECF No. 197 at 9-11).

As Massachusetts law makes clear:

> Even if the Defendant could not have foreseen the precise manner in which the injury occurred, 'where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.'

*Lawrence v. Kamco, Inc.*, 8 Mass. App. Ct. 854, 858 (1979), *quoting* Restatement (Second) of Torts § 442B (1965).

As pleaded in the FAC, Defendant Wenig's obsession with EcommerceBytes and Ina Steiner, tasking Defendant Baugh and his team to monitor the site at all hours of the day and night (¶ 459), the culture his tenure as CEO created at eBay (¶¶ 297-338), and his ultimate

directive to take Steiner down (¶ 82) "increase[d] the risk of a particular harm" and was "a substantial factor in causing that harm" to the Plaintiffs. *Id.* Defendant Wenig's actions and directive lit the match, and the acts of the other Defendants followed. The articles written by EcommerceBytes that were disseminated to others, discussed and that led to discussions of taking Ina Steiner down were directly discussing Defendant Wenig. ¶¶ 63, 82. The article that Wenig's wife complained about to Defendant Baugh was about Defendant Wenig. ¶ 80. Defendant Baugh would not have simply taken it upon himself to plan and carry out the scheme, as evidenced by the fact that he did not plan and enlist his team until after Defendants Wenig and Wymer's orders.

Moreover, even if Defendant Baugh and his team strayed beyond what Defendant Wenig anticipated, this does not relieve him of liability. This is because the plan that Defendant Baugh carried out was "within the scope of the risk created by [Wenig's] conduct." *Id.* Ultimately, however, Plaintiffs have met the low bar of demonstrating a plausible claim for negligence, and proximate cause is a question for a jury.  *See Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 14-15 (2011) ("The question confronting a court on a motion to dismiss is whether <u>all</u> the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible."); *Christopher v. Father's Huddle Café, Inc.*, 57 Mass. App. Ct. 217, 226 (2003).

> ii. <u>Despite the Defendants' contentions, Plaintiffs set forth sufficient facts to support allegations of Negligent Hiring (eBay), Negligent Supervision (eBay, PFC, Wenig, Jones, Krystek) and Negligent Retention (eBay and PFC)</u>

An employer's liability for negligent hiring is based on a failure to exercise reasonable care, by selecting a person who the employer knew or should have known was unfit or

incompetent for the work assigned, and thereby, exposing third parties to an unreasonable risk of harm. *See Fraioli v. Lemcke*, 328 F.Supp.2d 250 (D.C. R.I. 2004).

"Negligent retention [and/or supervision] occurs when, during the course of employment, the employer becomes aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment." *Andrews v. Cronin*, 2018 Mass. Super. LEXIS 43 (2018), *quoting Foster v. Loft, Inc.,* 26 Mass.App.Ct. 289, 291 (1988). The Court examines the totality of the circumstances in determining whether it was reasonably foreseeable that an employee would cause harm to a plaintiff. *See Coughlin v. Titus & Bean Graphics, Inc.,* 54 Mass. App. Ct. 633, 639 (2002).

Importantly, "[l]ack of notice of a perpetrator's prior acts or potential to cause harm is not an automatic bar to recovery." *Andrews*, 2018 Mass. Super. LEXIS 43 at *8, *citing Doe v. Boston Med. Ctr. Corp.*, 88 Mass. App. Ct. 289, 291-92 (2015). Instead, the question is whether the defendant "should have known" about an employee's activities, and if so, the Defendant would have reasonably foreseen that the employee would cause harm to a plaintiff. *See Coughlin*, 54 Mass. App. Ct. at 639.

### *Defendant eBay*

Defendant Wenig, Wymer, and Jones became obsessed with EcommerceBytes and Ina Steiner's reporting. ¶ 459. They directed their subordinates to monitor the reporting on an hourly basis (*Id.*), then directed the acts that resulted in the stalking, harassment, threats, and torture of the Steiners. ¶¶ 65, 82, 85. Had eBay properly supervised these executives, they would have known, or should have known, that the eBay executives were directing members of their staff to handle the problem through unconventional means, leading to criminal activity.

Before eBay hired Defendant Baugh, he was working as the Senior Director of Special Operations for Security Industry Specialists, Inc. ¶ 301. It was through this employment that he first established a relationship with Defendant eBay. *Id.* Defendant eBay and its executives, including Defendants Wenig and Jones, were well aware of Defendant Baugh's background when he was hired and promoted and given bonuses, and they expected he would use strategies and tactics he learned in service of the U.S. government to address EcommerceBytes and the Steiners. ¶ 303.

Reflecting a toxic culture that goes to the very top of many powerful technology companies, senior eBay executives, including Defendants Wenig and Jones, hired Defendant Baugh precisely because of his prior experience as a government security professional with a demonstrated ability to solve difficult problems through unconventional means. ¶ 307. As pled in the FAC, the purpose in hiring and promoting someone like Defendant Baugh was to use him as a tool to use to carry out the company's objectives, while attempting to shield and insulate C-Suites executives from liability. ¶ 307.

Defendant eBay was aware or should have become aware of Defendant Baugh's harassment and mistreatment of subordinates, his use of corporate funds for personal use, his violent actions, including stabbing a chair, and demonstrating an unstable mental and emotional capacity, that Defendant eBay knew or should have known about.  Defendant eBay failed to investigate, reassign, discipline or discharge Baugh to prevent the Steiners and EcommerceBytes injuries. As pled in the FAC, Defendant eBay admitted in its lobby to the USAO that they "uncovered new information about Baugh's unsuitability as a manager." ¶ 334. This suggests both that eBay had at least *some* information about Defendant Baugh's unsuitability as a manager before the conspiracy, but also that it learned new information that it should have

known before Defendant Baugh and his subordinates harassed, stalked, threatened and tortured the Steiners. Had eBay investigated, disciplined, reassigned or discharged Defendant Baugh for his unsuitability as a manager before the conspiracy, they would have determined that he should not be in charge of subordinates, and needed to either be terminated or discharged, which likely would have curtailed the acts that followed.

### *Defendant PFC*

Defendant PFC provided contractors to Defendant eBay, and Defendant Zea was one of the contractors. Defendant Zea was an employee of PFC, and had at least one supervisor with PFC. While she worked at eBay headquarters, a supervisor would periodically visit to speak to her and the other contractors, as well as Defendant Baugh and other supervisors. ¶ 351.

While Defendant Zea was provided with a credit card for expenses, it initially had a very low limit, but was increased to $20,000.00 at the urging of Defendant Baugh. Defendant Zea was using her credit card as a slush fund and to fund the conspiracy, and Defendants PFC and Krystek were providing and approving the expenses, for a 5% markup when billing Defendant eBay, who also approved the expenses. ¶¶ 352-353.  Defendant Zea booked Defendants Baugh and Harville's plane tickets with the card, and expensed the hotel in Boston. ¶ 348. As pled in the FAC, had PFC monitored her expenses rather than just paying them carte blanche, and making a profit from the expenses through a 5% markup, they would have discovered that Defendant Baugh and Defendant Zea were using the card for inappropriate means, to fund the conspiracy.

Defendant PFC maintains that it did not supervise Defendant Zea, and had no control over her day to day activities in claiming they are not vicariously liable for her conduct. Defendant Zea had at least one supervisor at PFC, however, and she was under their control enough to have a PFC credit card, and to be fired by PFC. If Defendant PFC simply was not

supervising her, and is disavowing vicarious liability on that basis, then they negligently supervised her.

### _Defendant Wenig_

Defendant Wenig alleges there is no evidence he knew or should have known of Baugh's unfitness. As pled in the FAC, during the Morgan Lewis investigation, eBay "uncovered new information about Baugh's unsuitability as a manager," suggesting the appropriate level of oversight would have discovered this _before_ the acts were committed against the Plaintiffs. ¶ 334.

Defendant Wenig claims Plaintiffs have not set forth any facts to support the assertion that Wenig "'knew or should have known' that '[f]or years…Baugh engaged in a pattern of breaking down the analysts, firing them without cause, and creating a toxic work environment.'" (Wenig ECF No. 197 at 11). To the contrary, Plaintiffs have set forth evidence that although Defendant Baugh did not directly report to Defendant Wenig, for some reason his desk was immediately outside of Defendant Wenig's conference room suite, Defendant Baugh had Defendant Wenig's personal cell phone number, and Defendant Wenig's wife had Defendant Baugh's cell phone number and had a close enough relationship to text him about media mentioning Defendant Wenig, suggesting a closer relationship than their titles in the company would suggest. ¶¶ 80, 311. Moreover, as pled in the FAC, the fact that Defendant Baugh showed Defendant Wenig a video of Defendant Zea falling off a stool (¶ 321) was not noted to suggest a commonality between Defendant Baugh's treatment of Zea and the Steiners, or that "Baugh was prone to outrageous criminal activity," (Wenig ECF No. 197 at 12), but instead to illustrate the relationship between the two: Baugh, who was a director of one of the security units, felt

comfortable enough humiliating one of his staff to the CEO of the company, without fear of admonishment or recourse.

Additionally, Defendant Baugh's conduct within the company was not merely isolated to practicing active shooter drills (¶ 315), as Defendant Wenig implies and suggests was good security work. Instead, as pled in the FAC, Defendant Baugh harassed, berated and intimidated his subordinates, made them stay up at all hours of the night carrying out his directives – including monitoring the Steiners and EcommerceBytes even in the middle of the night – and even stabbed a chair to drive fear into his employees. ¶¶ 314-318. These are all acts of an employee who should have been disciplined and reprimanded. The lack of any remedial action with Baugh allowed him to harm members of the public on behalf of eBay, when Defendant eBay knew or should have known he had the propensity to engage in tortious and/or criminal acts on behalf of eBay. Defendant Wenig knew or should have known this, and cannot hide behind the fact that Defendant Baugh directly reported to Defendant Jones, not him, where Defendant Baugh's close relationship with CEO Defendant Wenig likely emboldened him.

### *Defendant Jones*

Defendant Baugh successfully convinced Defendant Jones to fire his predecessor and place him in the Director role as pled in the FAC. ¶ 305. For years, however, Defendant Baugh engaged in a pattern of breaking down the analysts, firing them without cause, and creating a toxic work environment. ¶¶ 314-318, 341-343.  Because Concentric Advisors pushed back, Defendant Baugh fired the contracting company, and hired PFC with a $4million contract, which eBay approved without investigating why Concentric Advisors was fired. ¶¶ 349, 463.

Defendant Baugh also engaged in violent conduct towards his employees, stabbing chairs and forcing them to watch graphic video footage in an effort to break them down. ¶¶ 314-318.

Defendants eBay, Wenig and Jones knew or should have known about Defendant Baugh's violent propensities.

Despite that Defendant Jones knew or should have known about Defendant Baugh's treatment of his employees – which placed him in a position of power over employees, who C-Suite staff referred to as "Jim's Angels," (¶ 322), to allow this conspiracy to happen – Defendant Jones never investigated, reassigned or discharged Defendant Baugh.

### *Defendant Krystek*

Defendant Krystek forged the relationship between PFC and eBay, through Defendant Baugh, in order to secure a multi-million dollar contract that allowed him to greatly expand the business for which he was CEO, including the "expensing loophole" where Defendant PFC received a 5% markup for all expenses paid on behalf of eBay. ¶ 353. While Defendant Baugh and others used Defendant Zea's credit card as a personal slush fund, Defendant Krystek was responsible for approving all expenses, which allowed the campaign against the Steiners to flourish. ¶¶ 355-356.

Defendant Krystek knew or should have known that Defendant Zea was using the credit card for improper purposes, but she was never fully investigated. If she were investigated or the expense reports were looked at with scrutiny, then Defendant PFC would have known to either discharge Defendant Zea, reassign her, or remove her ability to fund the conspiracy.

iii.  <u>Plaintiffs' facts set forth a plausible claim of Negligent Infliction of Emotional Distress against each Defendant.</u>

To recover for the tort of negligent infliction of emotional distress, a plaintiff must prove: (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomology; and (5) that a reasonable person would have suffered emotional distress under

the circumstances of the case. *Conley v. Romeri*, 60 Mass. App. Ct. 799, 801 (2004); *Payton v. Abbott Labs*, 386 Mass. 540, 557 (1982).

Under the negligence prong, Plaintiff must establish the Defendant owed a duty of care and the defendant's failure to exercise reasonable care resulted in a breach of the duty. *See Helfman v. Northeastern Univ.*, 485 Mass. 308, 315 (2020). "Whether a defendant has a duty of care to the plaintiff in the circumstances is a question of law for the court, to be determined by reference to existing social values and customs and appropriate social policy." *O'Sullivan v. Shaw*, 431 Mass. 201, 203 (2000).

Physical harm is interpreted to include a broad range of symptoms; what is required is only enough "objective evidence" to "corroborate [plaintiffs'] mental distress claims." *Lanier v. President and Fellows of Harvard College*, 490 Mass. 37, 44 (2022), *quoting Sullivan v. Boston Gas Co.*, 414 Mass. 129, 137-38 (1993). Qualifying symptoms include those that "could be classified as more 'mental' than 'physical,' provided that they go beyond "mere upset, dismay, humiliation, grief and anger." *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 412 (2004).

Plaintiffs set forth a claim for negligent infliction of emotional distress against Defendants Wenig, Wymer and Jones. As discussed *infra,* Section III, the directives, timeline of events, the Defendants' roles in the corporation and use of Defendant Baugh and the security team in carrying out their directives demonstrate that they knew the conduct that would flow would cause harm to the Steiners. While the precise manner of Defendant Baugh's tactics to "burn Ina to the ground," "take her down" and handle the issue no matter what it took may not have been fully anticipated, using the security department to handle a situation "off the radar"

would cause any reasonable person to anticipate that the actions that would follow would cause the victims mental distress.

Plaintiffs have set forth a plausible claim for relief for negligent infliction of emotional distress, especially where negligence, causation and foreseeability are typically trial issues. *See Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 14-15 (2011) ("The question confronting a court on a motion to dismiss is whether <u>all</u> the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible."); *Christopher v. Father's Huddle Café, Inc.*, 57 Mass. App. Ct. 217, 226 (2003). As such, this Court should deny the motion to dismiss this count.

iv.  <u>Plaintiffs set forth a cause of action for negligence against the remaining Defendants (Gilbert, Baugh, Cooke, Popp and Stockwell).</u>

The remaining Defendants allege that they owed no duty of care to Plaintiffs, so a claim of negligence fails. "Fundamentally, the existence of a duty of care depends on the foreseeability of a risk of harm that the defendant has an ability to prevent." *Heath-Latson v. Styller*, 487 Mass. 581, 584 (2021), *citing Lev v. Beverly Enters.-Mass.*, 457 Mass. 234, 243 (2010). Where the defendant's conduct "is both a cause in fact of the injury and where the resulting injury is within the scope of the foreseeable risk arising from the negligent conduct," he is liable for negligence. *Leavitt v. Brockton Hosp. Inc.,* 454 Mass. 37, 39 (2009).

Here, the acts that the Defendants personally engaged in caused the harm to the Steiners, and the resulting injuries were within the foreseeable risk of harm. The Defendants sent harassing and threatening Tweets to the Steiners, followed up by packages that constituted death threats. Defendants Baugh, Harville, Popp and Zea then travelled to Natick and physically surveilled, stalked and harassed the Steiners. Along the way, the Defendants communicated via WhatsApp and laughed about how the Steiners were seeing "ghosts" and praised each other for

their good work. Under the circumstances, the Plaintiffs have alleged a plausible claim for negligence against Defendants Gilbert, Baugh, Cooke, Popp and Stockwell. *See Heath-Latson*, 487 Mass. at 584. *See also Ocasio-Hernandez*, 640 F.3d at 14; *Iqbal*, 556 U.S. at 678.

### III.   Defendants' conduct was extreme and outrageous, and sets forth a cause of action for Intentional Infliction of Emotional Distress (Defendants Wenig, Wymer, Jones and Cooke)

The Steiners have set forth sufficient evidence at this stage to demonstrate Defendants Wenig, Wymer, Jones and Cooke, while fulfilling their respective roles: (1) knew, or should have known their conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe. *See Polay v. McMahon*, 468 Mass. 379, 385 (2014). Each of their respective conduct "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Roman v. Trustees of Tufts College*, 461 Mass. 707, 718 (2012).

Defendants Wenig, Wymer and Jones all essentially urge this Court to consider their communications and directives piece meal. Spinning their interpretation which are not part of the FAC and urge this Court to consider them in isolation, while ignoring the totality of the Plaintiffs' claims, their respective roles at eBay, and their actions leading up to their orders to take Ina Steiner down. Every defendant who has pled guilty in the criminal cases admitted that their actions were premised upon directives from Defendants Wenig and Wymer, Executives 1 and 2. Defendant Baugh has also asserted that he received orders from Defendant Jones.  Each of the criminal defendants acknowledged that all of their actions were taken at the request of eBay executives to alter or shut down the Steiner's reporting on eBay, and that they knew that their intention was to cause the Steiners severe emotional distress. ¶¶ 366-369.  Defendant Harville

even admits as such in his Answer, and admits that all actions were taken on behalf of Defendants eBay, Wenig and Wymer. (Harville ECF No. 191).

The timeline and communications also corroborate this. As pled in the FAC, starting at least as early as March of 2019, there were email communications discussing attempts to determine who was behind the Fidomaster Twitter account. ¶ 58. The communications, which also included discussions regarding EcommerceBytes, continued through May of 2019. ¶¶ 59-63. This was when Defendant Jones informed Defendant Baugh that the legal and communications departments were unable to handle the situation, that Defendant Baugh should handle it "off the radar" and that Defendant Jones did not want to "know the details." ¶ 65. Shortly thereafter, Defendant Gilbert traveled to Natick and scrawled "Fidomaster" on the Steiners' fence, demonstrating they believed there was a connection between the two. ¶ 73. When Defendant Gilbert returned, at the very least, Defendant Baugh informed Defendant Wymer that they had given the Steiners a "tap on the shoulder," and Defendant Wymer expressed approval during the conversation. ¶ 75.

Throughout this time, Defendant Zea and the other analysts were tasked with monitoring EcommerceBytes at all hours of the day and night, and sending updates to Defendant Baugh, who would then forward the work to Defendants Wenig, Wymer and Jones. ¶¶ 52-53.  Defendant Wenig was emailing Defendant Wymer and Huber regarding Twitter complaints (¶¶ 78, 91), and Defendant Wenig's wife texted Defendant Baugh about EcommerceBytes. ¶ 80. The conduct and communications then escalated, and the plan was set in motion.

Defendant Baugh also had Defendant Wenig's personal cell phone number, and his desk was directly outside of Defendant Wenig's conference room suite, demonstrating their close

relationship, even though Defendant Baugh was only a director of one security team, not a C-Suite member. ¶ 310.

As pled in the FAC, it all came to a head on August 1, 2019 when EcommerceBytes published an article about the lawsuit eBay filed against Amazon, and the short piece ended with the article questioning Defendant Wenig's strategy in dealing with Amazon. ¶ 82. Within a half hour of the article's posting, at 2:19pm, eBay through its CEO, Defendant Wenig, texted Defendant Wymer "[Ina] is out with a hot piece on the litigation. If we are ever going to take her down . . . now is the time." Defendant Wymer responded, "[o]n it." ¶ 82.

After Defendant Wenig's text, Defendant Wymer texted Defendant Baugh: "[h]atred is a sin" and "I am very sinful," to which Defendant Baugh replied that he was ready to escalate stating, "I'm not fucking around with her anymore." Defendant Wymer responded, "[a]men. I want her DONE." Defendant Baugh replied, "[Wenig] said to burn her to the ground correct?" Defendant Wymer wrote "[s]he is a biased troll who needs to get BURNED DOWN." ¶ 82. Defendant Wymer assured Defendant Baugh that he would "embrace managing any bad fall out. We need to STOP her," making it clear that all Defendants would receive support and backing from the executive leadership at eBay regardless of the actions used against the Steiners, and if they did not stop the reporting, the were "all done." ¶ 111.

While Defendants Wenig, Wymer and Jones attempt to take their communications in isolation, completely divorcing their context from their respective roles in the company, the communications must be considered in their entirety. Each of the Defendants ignore the facts and circumstances in the FAC which outline the culture at eBay, the focus on the Steiners and EcommerceBytes which originated with the C-Suite and flowed down, and that the Defendants charged criminally were – quite literally –carrying out their orders. Most importantly, *the entire*

*attack on the Steiners and EcommerceBytes would not have occurred* were it not for their need to get rid of the Plaintiffs and their reporting, and their ultimate directives to take care of it "off the radar," to "take her down," and to "burn her to the ground." The Defendants' argument that Defendant Baugh and the others would have gone rogue on their own volition defies logic, which again, is not a part of the FAC nor is it a logical inference from the facts outlined in the FAC so it cannot be considered by this Court in deciding the Motions to Dismiss. *See Gargano,* 572 F.3d at 48. All along, Defendants Wenig, Wymer and Jones were requesting frequent updates on EcommerceBytes reporting, attempting to find ways to handle what they viewed as the issue, then ultimately determining that there were no legal means through either the legal department or the communications department.

Notably, through all of Defendants Wenig, Wymer and Jones' interjections of extraneous information and disavowals of the FACs' interpretation of their communications and dubbing of the FAC as taking the communications out of context. Any rational person would foresee that such directives, coming from individuals as powerful as Defendants Wenig, Wymer and Jones, would result in illegal conduct designed to intimidate, alarm and frighten the Plaintiffs to the point that they would completely cease reporting on eBay.

Taking the totality of the circumstances – the culture; the positions of power Defendants Wenig, Wymer and Jones were in; their knowledge of Defendant Baugh's volatile behavior; and their ultimate directives – the Plaintiffs have set forth sufficient evidence to meet the low bar of demonstrating at this point that the Defendants each intended and caused extreme emotional distress to the Steiners. *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 56 (1st Cir. 2013) ("For pleading purposes, circumstantial evidence often suffices to clarify 'a protean issue such as an actor's motive or intent.'"), *quoting Anthony v. Sundlun*, 952 F.2d 603, 605 (1st Cir.

1991). *See also American Communications Ass'n v. Douds*, 339 U.S. 382, 411 (1950) (noting court assesses circumstantial evidence, taken as a whole, gives rise to plausible inference of required intent).

### Defendant Wenig

When considering the totality of the FAC, and all reasonable inferences, the Plaintiffs have set forth a plausible claim for relief with respect to Defendant Wenig and the intentional infliction of emotional distress claim. *See Ocasio-Hernandez*, 640 F.3d at 14.

At the time of the conduct, Defendant Wenig was the CEO of eBay, a massive and powerful company with near limitless resources, when he directed subordinates to take down a two-person trade publication simply because he was unhappy with what he believed to be negative reporting about him, and eBay.

The Steiners' reporting about eBay that Defendant Wenig and others deemed negative primarily involved criticisms of Defendant Wenig, his income, and his decisions in managing eBay. In other words, the reporting directly implicated Defendant Wenig's reputation. Defendant Wenig required subordinates to keep him up-to-date on all reporting by EcommerceBytes relating to eBay.

Even Defendant Wenig's wife was so aware of the tensions surrounding the EcommerceBytes reporting and a comment on an article referring to Defendant Wenig as a "con artist and a thief" that she texted Defendant Baugh directly. ¶ 80. While Defendant Wenig stresses that he did not directly hire or supervise Defendant Baugh, it is very telling that even Defendant Wenig's wife felt Defendant Baugh to be the appropriate person to contact to keep informed about negative reporting on Defendant Wenig.

Moreover, contrary to Defendant Wenig's claim, his conduct did not merely consist of one text directing Defendant Wymer to "take her down." On April 20, 2019, Defendants Wenig and Wymer were discussing *Wall Street Journal* coverage of eBay and Defendant Wenig stated, "Fuck them. The journal is next on the list after [Ina Steiner]." ¶ 62. On May 31, 2019, in direct response to an EcommerceBytes article, Defendant Wenig texted Defendant Wymer, "Take her down." ¶ 66. Over two months later, on August 1, 2019, Defendant Wenig texted to Defendant Wymer – in response to an article Steiner published criticizing Defendant Wenig's strategy in dealing with Amazon through a lawsuit – "[Ina Steiner] is out with a hot piece on the litigation. If you are ever going to take her down…now is the time." ¶ 82.  In other words, Defendant Wenig and Defendant Wymer engaged in months-long discussions aimed at silencing and taking the Steiners and EcommerceBytes down.

In response to Defendant Wenig's directive on August 1, 2019 to take down Steiner, Defendant Wymer immediately contacted Defendant Baugh, again, the same person Defendant Wenig's wife reached out to regarding negative reporting on Defendant Wenig. ¶ 85. Defendants Wenig and Wymer did not utilize the legal department to consider legal remedies, or public relations to deal with what they perceived to be the Steiner problem, but rather the director of security who had a history of engaging in alarming behavior such as stabbing chairs, harassing subordinates, and who had the knowledge and capabilities based on his law enforcement background to use unconventional means to deal with the Steiners, and who even eBay now admits was "unsuitab[le] as a manager." ¶¶ 314, 318, 337.

The texts between Defendants Wymer and Baugh also suggest off-line conversations between Defendants Wenig and Wymer other than the texts to take Steiner down. In a text message on August 1, 2019, Defendant Baugh texted Defendant Wymer, "[Wenig] said to burn

her to the ground correct?" ¶ 85. Where the texts between Defendants Wenig and Wymer do not reflect that language, it suggests the text messages accessible to the Steiners at this stage are not the only communications that occurred.

Defendant Wenig claims that because he was not a party to the texts between Defendants Wymer and Baugh, Plaintiffs "falsely attribute statements to Wenig" that were actually directives from Defendant Wymer. (Wenig ECF No. 197 at 5). As set forth in the FAC, however, during Defendant Wymer's text directives to Defendant Baugh to take Ina Steiner down, and burn her down, these directives were *coming from Defendant Wenig*. ¶¶ 111.

Defendant Wenig contends that the texts did not suggest Wenig intended to cause, or knew that his directive or order would cause emotional distress." (Wenig ECF No. 197 at 24). Not only is Defendant Wenig's claim not contained within the FAC, it is not a logical inference to be drawn from all the facts and circumstances outlined in the FAC, so it cannot be considered by this Court in deciding the Motions to Dismiss. *See Gargano,* 572 F.3d at 48. Taking the circumstantial evidence logical inferences suggests a plausible claim for relief. *See Anthony v. Sundlun*, 952 F.2d 603, 605 (1st Cir. 1991) ("For pleading purposes, circumstantial evidence often suffices to 'clarify a protean issue such as an actor's motive or intent."); *American Communications v. Ass'n v. Douds*, 339 U.S. 382, 411 (1950) (court is to assess whether "circumstantial evidence, taken as a whole, gives rise to a plausible inference" as to defendant's intent).

The facts pleaded demonstrate that Defendant Wenig became increasingly enraged by the EcommerceBytes reporting, and required subordinates to keep him updated on the latest, at all hours of the day and night. It reached the point where even his wife was contacting Defendant Baugh, suggesting the reporting had become all-consuming to Defendant Wenig. He then, as

CEO, directed that others "take her down," and used the head of security to carry out the directive. While it was Defendant Wymer who ultimately communicated directly with Defendant Baugh, that Defendant Wenig's wife contacted Defendant Baugh about negative reporting suggests Defendant Wenig likewise had dealings with Baugh relating to the Steiners. At this point, this circumstantial evidence "suffices to clarify a protean issue such as [Wenig's] motive or intent." *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 56 (1st Cir. 2013).

It is reasonable to believe additional discovery in the possession of the Defendants will reveal further information regarding Defendant Wenig's involvement, intent, and communications with the other Defendants. There is at least one communication between Defendants Wenig and Baugh after the fact, where within days of the commencement of the investigation by Natick Police Department, Defendant Wenig indicated he would be returning from his sabbatical the next day, and remarked "the cavalry is back." R545. Moreover, Defendant Wenig sent Defendant Baugh a text message shortly after Defendant Baugh was terminated that he was sorry to see Baugh go, and Baugh said Defendant Wenig's loyalty would pay off. ¶ 285.

Additionally, both Wendy Jones – Defendant Baugh's direct supervisor – and Defendant Wenig were interviewed by eBay legal counsel and/or Morgan Lewis but the Steiners have not yet had access to these interviews. ¶ 294. Moreover, eBay lobbied the Government in support of the appeal that executives and eBay not be criminally charged where eBay admits, based on the evidence revealed during the internal and external investigations, the government could charge Defendants eBay. ¶ 294. All of this information is in the Defendants' control, so "some latitude" is appropriate in "applying the plausibility standard." *Garcia-Catalan*, 734 F.3d at 104.

While Defendant Wenig has argued he could not plausibly know Defendant Baugh and others would engage in the conduct alleged in the FAC, it begs the question as to what he believed would happen. Defendant Wenig did not instruct that the legal department send a cease and desist letter to the Steiners, nor did he direct the Public Relations department to release neutralizing statements or reach out to the Steiners to resolve any conflict. Instead, the director of security was enlisted to "take her down."

Defendant Wenig's after the fact conduct also suggests knowledge and that he was complicit. On August 25, 2019, Defendant Wenig sent Defendant Baugh a communication just before his return from sabbatical: "See you tomorrow. The Cavalry is back." ¶ 270. Shortly after their termination, Defendant Baugh had Defendants Harville, Gilbert, Popp, Stockwell and Zea over to his house to discuss the conspiracy. During that meeting, Defendant Baugh showed the group texts from Defendant Wenig saying that he was sorry to see Baugh go, and Baugh said his loyalty would pay off. ¶ 285.

At this stage, the Steiners have pled sufficient evidence to demonstrate that Wenig's conduct was extreme and outrageous in directing his subordinates to take down a reporter due to what he perceived to be negative news coverage, and that he knew or should have known that his directive would cause the Steiners emotional distress. The Steiners have set forth a plausible claim for relief to entitle them to "unlock the doors of discovery" and proceed with the intentional infliction of emotional distress claim against Defendant Wenig. *See Ocasio-Hernandez*, 640 F.3d at 19; *Iqbal*, 556 U.S. at 678.

### Defendant Wymer

After receiving orders from Defendant Wenig, CEO of eBay, to take Steiner down, he immediately texted Defendant Baugh, "[h]atred is a sin" and "I am very sinful." ¶ 85. Not

needing any explanation as to context or who or what Defendant Wymer was referring to, Defendant Baugh responded that he was ready to escalate and he was not "fucking around with her anymore." *Id.* Defendant Wymer responded, "[a]men. I want her DONE." *Id.* Defendant Wymer further stated, "[Ina Steiner] is a biased troll who needs to get BURNED DOWN…I want to see ashes. As long as it takes. Whatever it takes." ¶¶ 85, 126.

Defendant Wymer also emailed complaining that the EcommerceBytes website "gives me ulcers, harms employee moral [sic], and trickles into everything about our brand. I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the 'blind eye toward graffiti that turns into mayhem syndrome and I'm sick about it. Whatever. It. Takes." ¶ 110.

After receiving the directive from Defendant Wenig on August 1, 2019 to take Ina Steiner down, he immediately contacted Defendant Baugh in order to set the plan in motion. ¶¶ 82-85. Defendant Wymer remained in contact with Defendant Baugh as he gathered the security team members to carry out the plan. Several days into the harassment of the Steiners, on August 7, 2019 – after Defendant Wymer received an email from Aaron Johnson from eBay legal advising that escalating at Twitter and a cease-and-desist letter were unlikely to solve the problem – he approached Defendant Baugh in person and was very agitated, pointing his finger at Defendant Baugh as he spoke. ¶¶ 109-111. Defendant Wymer instructed Defendant Baugh to take any actions necessary to neutralize the Steiners, and that it was a "direct order" from Defendant Wenig. ¶ 111. During this conversation, Defendant Wymer assured Defendant Baugh that he and his team would have "executive level support" if efforts led to "any legal problems." *Id.* Defendant Wymer also stated that Defendant Wenig "wants the website burned to the

ground," and that the only thing that matters is that it stops." *Id.* Defendant Wymer also stated, "If it doesn't stop, we are all done," and that "eBay corporate is willing to absorb any legal exposure." *Id.*

When this conversation occurred, the only actions taken by Defendant Baugh and the other criminal defendants were harassing and threatening Tweets directed at Ina, so the instructions from Defendant Wymer were clearly a directive to escalate the conduct, because the Tweets were not accomplishing the intended goal. ¶¶ 99-107.

That Defendant Wymer was abreast of what was occurring is further evidenced by his text messages to Defendant Baugh on August 11, 2019. After Defendant Baugh and his team had already sent a relentless stream of Tweets, email subscriptions, and attempted to send a preserved fetal pig, Defendant Wymer texted Defendant Baugh, "I want to see ashes. As long as it takes. Whatever it takes." ¶ 126. If Defendant Wymer did not know there was an ongoing stalking and harassment campaign, the timing of the text would certainly be an uncanny coincidence. Instead, it at least suggests a plausible inference that Defendant Baugh was keeping Defendant Wymer updated – just as Defendant Jones had instructed – and he was demanding that Defendant Baugh escalate beyond online harassment and threats.

While Defendant Wymer claims that this was merely "hyperbolic" language, and that "neither the messages themselves nor any other pleaded facts plausibly suggest that the messages were intended as directives to stalk, harass, or threaten the Steiners – or engage in criminal conduct of any sort," (Wymer ECF No. 198 at 4) this assertion fails for many reasons. First, that the language was merely "hyperbolic" is not contained within the FAC, is not a logical inference, and the reasonable inferences must be taken in favor of the Plaintiffs, not Defendant Wymer. *See Gargano,* 572 F.3d at 48 ("A court must draw all reasonable inferences in the plaintiff's

favor…"). Second, Defendant Wymer's intent and the interpretation of his words is a question of fact for trial, not for a Rule 12(b)(6) motion. Third, the actual circumstances suggest the contrary to Defendant Wymer's assertions; Defendant Wymer, Vice President of Communications was instructing a security officer to handle the issue – rather than using his role in public relations to counteract the Steiners – and specifically referred to "legal problems" in his discussions with Defendant Baugh, suggesting he knew, at the very least, the conduct was wrong on some level, and potentially criminal.

Furthermore, once it was clear the Natick Police Department was involved and investigating the defendants, Defendant Baugh emailed Defendant Wymer requesting the "top cover" previously promised by Defendant Wymer. ¶¶ 111, 266.  In his role as Chief Communications Officer, Defendant Wymer was in charge of Public Relations. Instead of addressing the Steiners' reporting by releasing a statement, or utilizing other traditional methods of dealing with "negative" press through the Public Relations department, Defendant Wymer reached out to Defendant Baugh, head of security.

Again, like Defendant Wenig, common sense and taking all reasonable inferences suggests that in enlisting the security department to "burn Ina Steiner down" – especially given Defendant Baugh's reputation and behavior at eBay – would lead to conduct that would cause severe emotional distress to the Steiners. Given Defendant Wymer's directive that "anything they could do to solve it should be explored" to someone with Defendant Baugh's background leads to the reasonable inference that Defendant Wymer did not want the Steiners handled with conventional means, especially given his directive to do whatever it takes. Defendant Wymer deleted all of his emails, text messages, and two phone calls with Defendant Baugh[8] about the

---

[8] The two deleted calls were from August 22 and 24, 2019 and were 10+ minutes each.

Steiners after the Natick Police began their investigation. ¶ 269. Defendant Wymer also deleted emails and text messages with Defendants Baugh and Wenig. *Id.* Defendant Wymer would not cooperate with any internal investigation. *Id.*

At this stage, the Steiners had pled sufficient evidence to demonstrate that Defendant Wymer's conduct was extreme and outrageous in directing his subordinates to burn Ina Steiner to the ground, and that he knew or should have known that his directive would cause the Steiners emotional distress. The Steiners have set forth a plausible claim for relief as to the intentional infliction of emotional distress claim against Defendant Wymer. *See Ocasio-Hernandez*, 640 F.3d at 19, quoting *Iqbal*, 556 U.S. at 678

*Defendant Jones*

Defendant Jones likewise alleges that her conversations with Baugh did not "rise to the level of outrageous conduct necessary to maintain a claim of IIED." (Jones ECF No. 206 at 6).

Jones also strips the allegations from their context, and attempts to downplay her conduct. "Although Ms. Jones said no such thing, asking a direct report to take care of an improper post by a company contractor 'off the radar' does not in any way qualify as 'atrocious' conduct." (Jones ECF No. 206 at 6). Defendant Jones' intent during these conversations is not part of the FAC and cannot be considered by this Court where all inferences must be taken in the light most favorable to Plaintiffs, not the Defendants. The plausible inference is that Defendant Jones intended that Defendant Baugh engage in tortious and/or criminal acts where he was instructed to engage "off the radar" and where Defendant Baugh as head of security was informed during the same conversation that the legal and communications department could not handle the situation. ¶ 65.

First, Jones claims – without any evidence to suggest it within the FAC – that any directive to handle the Steiners "off the radar" was actually referring to a contractor's website who had worked on the Walker's West replica bar. ¶¶ 63-64; Jones ECF No. 206 at 6. This was not pled in the FAC nor is it a logical inference. Instead, the FAC outlines that the emails between Wymer, Jones and Baugh discussed an EcommerceBytes article, Jones asked Baugh to discuss at lunch, then Jones asked Baugh at lunch to handle the issue "off the radar" because "comms and legal couldn't handle it." ¶ 64. At that point, they already had the contractor remove the information from its website; Wymer, Jones and Baugh's "problem" remained only with the EcommerceBytes article. ¶¶ 64-65. During the lunch meeting, not only did Jones instruct Baugh to "sync" with Wymer, she also said she did "not want to know the details," demonstrating she knew Baugh's subsequent conduct would be nefarious. Defendant Baugh, however, continued to provide Jones with regular updates. ¶ 65.

At this stage, the Steiners had pled sufficient evidence to demonstrate that Defendant Jones's conduct was extreme and outrageous in directing Defendant Baugh, head of security to take care of the issue off the radar and just "get it done," and that she knew or should have known that her directive would cause the Steiners emotional distress. The Steiners have set forth a plausible claim for relief as to the intentional infliction of emotional distress claim against Defendant Jones. *See Ocasio-Hernandez*, 640 F.3d at 19; *Iqbal*, 556 U.S. at 678.

*Defendant Cooke*

Defendant Cooke claims dismissal is warranted on the intentional infliction of emotional distress claim because Plaintiffs did not allege any factual allegations that Cooke intended to harm Plaintiffs or should have known that his conduct would harm the Plaintiffs. (Cooke ECF

No. 204 at 15). Cooke maintains that there is no information to suggest Cooke sent any items to the Plaintiffs, or came up with the idea to send certain items. *Id.*

The allegations set forth by the Plaintiffs are sufficient to establish Defendant Cooke's liability at the pleading stage. *Garcia-Catalan*, 734 F.3d at 103. Requiring highly specific facts within the Complaint "is misplaced at the pleading stage," and is "reserved for summary judgment and trial." *Rodriguez-Reyes*, 711 F.3d at 53. As the Court has emphasized, "[n]otwithstanding the neoteric plausibility standard, no 'detailed factual allegations' are required in a complaint." *Id.*, quoting *Iqbal*, 556 U.S. at 677-78. *See also Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002).

The FAC clearly alleges that Defendant Cooke was present during the planning meeting (¶ 93), and later approved tweets drafted by Popp, and sent using the Twitter handle @Tui_Elei. The messages included the following:

- "I guess im goin to have to get ur attention another way bitch. . ."

- "U don't have the balls to talk to me?? Stop hiding behind ur computer screen u fuckin cunt!!!"

-  "Ur fat pussy husband [David Steiner] needs to be put in line cunt"

- "after he takes the plugs out of his asshole . . . fucking pussies!!!"

- "U are sick motha fuckers . . . and every one will kno! U fuckin cunt ass bitch!!"

   ¶¶ 104, 117, 125.

That Defendant Cooke was involved and intended to cause harm is evidenced by the communications occurring during the campaign. When the Defendants were discussing the coverup stage, and diverting NPD's attention from them, Defendant Cooke responded with a "thumbs up" emoji. ¶ 242. When Defendant Baugh sent a message that the Steiners were "seeing ghosts" and attached a link to the audio recording of an NPD dispatcher describing the threats,

intimidation and silencing of the Steiners, "[a] little glimpse of what all your hard work is has led too. And stuff like this around the clock," indicating that things like that had happened for the past five nights, Defendant Cooke responded with, "hahaha," demonstrating that he was taking pleasure in the Steiners' suffering. ¶ 190.

Alleging that Defendant Cooke approved these Tweets, he was present during the planning meetings, that he was active in encouraging the success of the campaign, and he was involved in discussing the coverup is sufficient at the pleading stage, where the allegation is not merely conclusory, and where Defendant Cooke already pled guilty to these acts. *See Ocasio-Hernandez*, 640 F.3d at 10 ("The district court erred by not affording the plaintiffs' allegations the presumption of truth to which they were entitled.").

Moreover, Cooke should be barred from denying his conduct in his motion to dismiss under the principles of judicial estoppel. Defendant Cooke admitted during his plea hearing that he attended an August 6, 2019 meeting with Defendants Baugh, Popp and Gilbert where they discussed the conspiracy, and the decision to send anonymous and harassing Twitter messages to Ina Steiner. Defendant Cooke also admitted he was part of the WhatsApp group where the harassing messages were vetted. In response to discussions regarding the groups' plan, Defendant Cooke sent a "thumbs up" emoji. On August 20, 2019, when Baugh, Gilbert and Popp were discussing the in-person surveillance, that they had "burned two cars" and that "[the Steiners] couldn't prove anything. They are seeing ghosts now. LOL", Defendant Cooke responded, "Perfect." That same day, Defendant Gilbert reported to the group, "We have known the targets have been very impacted by this op. Perfect time for the next phase," to which Defendant Cooke replied, "Yes!"

Defendant Cooke admitted during his plea hearing – as did Defendants Baugh, Harville, Gilbert, Popp, Stockwell and Zea – that the campaign was intended to intimidate and harass the Steiners to stop their reporting. Moreover, Defendant Cooke, as well as the other pleading defendants, admitted that their conduct was intended to cause substantial emotional distress.

During Defendant Cooke's sentencing hearing, he took full responsibility for the actions he knew would gravely impact the Steiners and admitted that he stalked the Steiners. He made these admissions both during his plea and sentencing, in order to receive a lesser sentence than recommended by the Government and in fact did receive a lower sentence than that requested by the Government.

"Judicial Estoppel is an equitable doctrine that prevents a litigant from taking a litigation position that is inconsistent with a litigation position successfully asserted by him in an earlier phase of the same case or in an earlier court proceeding."  *RFF Family P'ship, LP v. Ross*, 814 F.3d 520, 527 (1st Cir. 2016) (quoting *Perry v. Blum*, 629 F.3d 1,8 (1st Cir. 2010). Judicial estoppels, primary utility is to safeguard the integrity of the courts by preventing parties form improperly manipulating the machinery of the judicial system.  *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.* 374 F.3d 23, 33 (1st Cir. 2004). "[c]ourts typically invoke judicial estoppel 'when a litigant tries to play fast and loose with the courts." *RFF Family P'ship, LP, 814 F.3d at 527-28 (*quoting *Perry, 629 F.3d at 8).*

In order for judicial estoppel to apply, the Court must apply a two factor test: (1) "the legal or factual assertion advanced in the earlier judicial proceeding must be 'directly inconsistent' with the assertion made in the current forum," and (2) "the court must have accepted or adopted the assertion made at the earlier proceeding." *Howell v. Town of Leyden*, 335 F.Supp.2d 248 (D. Mass. 2004), citing *Alternative Sys. Concepts, Inc.*, 374 F.3d 23, 33 (1st

Cir. 2004). "[w]hile it is not a formal element of a claim of judicial estoppel, courts frequently consider a third factor absent an estoppel, would the party asserting the inconsistent position derive an unfair advantage?" *Id; see also Guay v. Burack,* 677 F.3d 10, 16 (1ˢᵗ Cir. 2012). The rationale behind judicial estoppel is that "the potential exists that the judicial process will be endangered by inconsistent determinations applying to the court by the party asserting the contrary positions." *Alternative Sys. Concepts* 374 F.3d at 33.

Here, both factors apply, as well as the unfair advantage consideration. During the criminal proceedings, in Defendant Cooke's plea hearing, he admitted to meeting with Defendants Baugh, Popp and others to formulate the plan to send harassing Twitter messages to the Steiners. During a WhatsApp group chat, he engaged in the discussion relating the content of the Tweets, and approved of the messages. Defendant Cooke now claims the Steiners do not have sufficient evidence to demonstrate he in any way participated in the scheme to stalk and harass them.

The Court accepted Cooke's admissions both during a plea hearing, and when Defendant Cooke was attempting to seek a reduced term of imprisonment during his sentencing hearing. The Court then took Defendant Cooke's statements during sentencing into consideration, and varied from the Government's recommendation, and instead of sentencing him to 30 months of incarceration, he was sentenced to 18 months of incarceration.

Both factors relating to judicial estoppel apply in that Defendant Cooke now makes assertions that directly contradict his earlier admissions, and the Court relied on his earlier admissions in granting him a reduced sentence. *See Alternative Sys. Concepts, Inc.*, 374 F.3d at 33. As such, Defendant Cooke should be barred from asserting a contrary position in his motion

to dismiss, so this Court should deny Defendant Cooke's request to dismiss this count of the
FAC against him.

IV.     **Plaintiffs sufficiently stated a cause of action for assault where – taking the
        actions of the Defendant as a whole – placed them in reasonable
        apprehension of immediate physical harm.**

"The intent required [for civil assault] is the intent to make the victim apprehensive of
immediate physical harm." *Commonwealth v. Musgrave*, 38 Mass. App. Ct. 519, 523-524
(1995), *citing* Nolan & Sartorio, Tort Law § 12(1)(2d ed. 1989). *Kennedy v. Town of Billerica*,
617 F.3d 520, 538 (1st Cir. 2010) ("Assault, under Massachusetts tort law, requires that the
defendant "act[ed] intending to cause a harmful or offensive contact" with plaintiff, "or an
imminent apprehension of such a contact," and that plaintiff was "thereby put in such imminent
apprehension."); *Restatement (Second) of Torts* § 21(1) (1965);  *Conley v. Romeri*, 60 Mass.
App. Ct. 799, 806 (2004).

A defendant may be found liable for assault based on words, if "together with other acts
or circumstances they put the other in reasonable apprehension of imminent harmful or offensive
contact with his person." *Commonwealth v. Delgado*, 326 N.E.2d 716, 719 n. 3 (Mass. 1975),
*quoting Restatement (Second) of Torts* § 31 (1965). An act that places "another in reasonable
apprehension that force *may* be used is sufficient" to prove assault. *Smith v. Jones*, 75 Mass.
App. Ct. 540, 548 n. 3 (2009).  The Court looks to the totality of the "actions and words of the
defendant in light of the attendant circumstances" in determining whether "an apprehension of
anticipated physical force is reasonable." *Commonwealth v. Gordon*, 407 Mass. 340, 349 (1990).

Plaintiffs have set forth a plausible claim for relief for assault. *See Ocasio-Hernandez*,
640 F.3d at 14. As set forth in the FAC, Defendants Wenig, Wymer and Jones set the plan in
motion. Defendant Popp, Stockwell and Zea drafted and sent Tweets threatening and doxing the
Steiners; Defendants Baugh, Harville, Gilbert and Cooke approved the messages. Once the

Defendants began sending packages which included death threats in the form of a book entitled "Grief Diaries: Surviving Loss of a Spouse" to David Steiner, and a funeral wreath, they Tweeted messages such as "U get my gifts cunt???" ¶¶ 130, 187. The same day that the Steiners received the funeral wreath, Defendants Baugh, Harville and Zea arrived in Natick, and began surveilling the Steiners' home. ¶ 143. The next day, the Steiners observed a black van circling their block, and parking at the end of the street to watch their residence. ¶¶ 153-155. Later that day, the van began following David as he drove into town. ¶ 155. The deliveries and Tweets continued, and two days later, a woman circled the block on foot – and Defendant Zea later admitted this was her – and an SUV again followed David as he drove down his street. ¶ 172. The SUV was closed enough that David was able to take a photograph of the license plate. ¶ 172. The Steiners were terrified. ¶¶ 153-154, 172.

The Defendants contend that these actions do not constitute assault as a matter of law, because the "allegations do not establish the immediacy necessary for assault." (eBay ECF No. 208 at 11). Leading up to Defendants Zea, Baugh, Harville and Popp, at various times, circling the block on foot then by vehicle, then following David Steiner in the vehicle, trailing closely behind, the Defendants sent threats over Twitter and through packages. ¶¶ 154-156. The packages and doxing made it clear that not only did the perpetrators seek to harm the Steiners, they also knew where they lived. ¶ 187. The possibility that the Defendants would physically harm the Steiners then came to fruition when they saw individuals on foot and in vehicles, stalking their home and following them. The immediacy was palpable both when the Defendants could have broken into their home, or struck David's vehicle with their own.

eBay and the other Defendants attempt to parse out the Twitter messages and package deliveries to contend that "[a] threat by telephone or on the Internet is not a civil assault." (eBay

ECF No. 208 at 11), *citing Marczeski v. Law*, 122 F. Supp. 2d 315, 325 (D. Conn. 2000). This argument misses the point. Plaintiffs instead allege that the threats and menacing acts that occurred through Tweets and package deliveries set up the apprehension the Steiners then experienced when individuals were stalking their home and David in his vehicle, both on foot and by following them in a van and an SUV. Without the threats, doxing and taunting leading up to the trip to Natick, that there was now foreign vehicles and individuals on their sleepy street would not have carried the same level of apprehension and fear.

Although many cases in Massachusetts analyzing the "immediacy" requirement deal with face-to-face encounters[9] where the court has assessed whether conduct was sufficient to create apprehension – and where the Defendants extract the requirement that a defendant must be "so close to striking distance that he can reach [plaintiff] almost at once" – Massachusetts cases have also made clear that the court must look to the totality of the actions and words of the Defendant in assessing whether an assault occurred. *See Gordon*, 407 Mass. at 349. Given that the Defendants engaged in escalating threats and conduct for approximately ten days when they appeared at the Steiners' doorstep, and the behavior intensified from Tweets, to package deliveries to in-person stalking, this was sufficient to cause a reasonable fear that the Defendants were then "close to striking distance." *Id.*; *see also Ginsberg*, 67 Mass. App. Ct. at 144 (noting defendant's "increasingly 'erratic and unstable behavior' over the recent past that had 'escalated'" created reasonable apprehension of force).

Moreover, in at least one case, Massachusetts has found that the distance between a defendant standing in the street and making threatening gestures, while the victim was inside her

---

[9] *See e.g., Ginsberg v. Blacker*, 67 Mass. App. Ct. 139, (2006); *Commonwealth v. Gordon*, 407 Mass. 340, 341-42 (1990).

home, was sufficient to establish assault. *See Commonwealth v. Robicheau*, 421 Mass. 176, 181 (1995) (noting "defendant got out of his automobile, stood in the middle of the street in front of [the victim's] residence, yelled obscene language, and made an obscene gesture" and "made an ambiguous statement that he would do exactly as he pleased," then later called victim and said he would kill her).

Considered in their totality, the Defendants' attempts to break into the Steiners' home, following the Steiners, and sending threats online and through the mail were actions which placed the Steiners "in reasonable apprehension that force *may* be used" and the conduct was also "menacing by objective standards." *Smith*, 75 Mass. App. Ct. at 548 n. 3; *Commonwealth v. Slaney*, 345 Mass. 135, 140 (1962).

### V. Plaintiffs state a claim for stalking where the California statute applies, and Plaintiffs have set forth sufficient facts to satisfy the statute.

Collectively, the Defendants[10] allege that the California stalking statute does not apply to conduct occurring in Massachusetts, so the stalking count should be dismissed. First, the Defendants ignore that the bulk of the activities aimed at stalking and harassing the Steiners occurred while the Defendants were in California. Therefore, even if the Court were to interpret the statute as only covering activities that occurred in California, the Plaintiffs have still maintained a cause of action for stalking.

Second, contrary to the Defendants' contentions, the statute does, in fact, encompass activity that occurs in Massachusetts, especially here where the conduct in California and the conduct in Massachusetts were a part of one ongoing chain of events. Moreover, the purpose of

---

[10] All Defendants who filed a Motion to Dismiss (i.e., all Defendants other than Harville) moved to dismiss the Stalking claim.

the statute weighs in favor of applying the statute to all conduct in this case that was designed to harass, surveille and stalk the Steiners.

Third, conflict of law provisions do not bar use of the statute in Massachusetts. Although Massachusetts does not have an equivalent statute, had the Steiners sued in California, the statute would have applied. Therefore, it makes little sense to bar use of the statute because they chose the more appropriate and convenient forum to file the instant action.

      a.   <u>There is no conflict of law, and even if there was, the factors weigh in favor of applying the California Stalking statute.</u>

Preliminarily, Plaintiffs maintain that although each of the Defendants argue there is a conflict of law because Massachusetts does not have a civil stalking statute, this is not correct. "The first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions." *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004). Where California has a stalking statute, but Massachusetts does not, no conflict exists. In fact, the case cited by eBay in support of the proposition that where there is "no parallel in Massachusetts law" this constitutes a conflict of law, states the *opposite*. (eBay Motion to Dismiss at 28), citing *Levin v. Dalva Bros. Inc.,* 459 F.3d 68, 74 (1st Cir. 2006).

In *Levin*, Plaintiff instituted the lawsuit in Massachusetts, for conduct that arose, in part, in New York. *Id.* at 74. Since there was no parallel Massachusetts express warranty statute, the Court unquestionably applied the New York express warranty statute. *Id.* Here, the same result should follow: where there is no Massachusetts civil stalking statute, the Court should find no conflict of law exists and apply the California stalking statue.

The decision cited by PFC in support of the argument that the California statute should not apply also does not support the Defendants' cause. (PFC ECF No. 215 at 32), citing *Burleigh*

*v. Alfa Laval, Inc.*, 313 F. Supp. 3d 343, 353-54 (D. Mass. 2018). In *Burleigh,* Plaintiff, a Maine

resident, sued in Massachusetts. *Id.* at 353. The injury also occurred in Maine. *Id.* Plaintiff urged

the Court to apply the Massachusetts wrongful death statute, which had no cap on damages –

where the Maine statute had a cap – and where the Maine statute imposed a higher standard of

liability and burden of proof than the Massachusetts statute. *Id.* at 350. In assessing the

competing interests, the Court applied the Maine statute. *Id.*

　　　The rationale in applying Maine law in *Burleigh* simply does not apply in this case where

the Court stated it would be "anomalous for [the non-forum state] to insist on providing greater

benefits to its citizens under another state's law than it provides to its citizens under its own

law." *Id.* at 357.  Here, it makes perfect sense to provide the Steiners with the protections of a

California law, where outside residents – while in California, then by travelling to Massachusetts

– reached into our state to harass, stalk, threaten and surveille Massachusetts residents, although

the conduct is prohibited in their home state. Given that there is no actual conflict in the laws of

California and Massachusetts, this Court should permit Plaintiffs to assert a cause of action under

the California stalking statute.

　　　Even if, however, the Court finds there is a conflict, the factors weigh in favor of

applying the California stalking statute. *See* Restatement (Second) of Conflict of Laws § 145

(four factors: (1) "the place where the injury occurred"; (2) "the place where the conduct causing

the injury occurred"; (3) the "residence," "place of incorporation and place of business of the

parties," and (4) "the place where the relationship, if any, between the parties is centered.").

　　　While the physical stalking occurred in Massachusetts, it was part of a single scheme

originating in California directed at the Plaintiff's in Massachusetts, all other factors weigh in

favor of applying the California statute. All of the Tweets and Twitter messages threatening the

Steiners originated from California. The Defendants sent the packages, and posted Craigslist and other ads from California. ¶¶ 114-143. Even when four Defendants travelled to Massachusetts to physically stalk and surveille the Steiners, Defendants that remained in California listened to the Natick Police Department dispatch to alert Defendants Baugh, Harville, Popp and Zea as to police presence, to substantially aid in the stalking and surveillance efforts, and to monitor the progress of the conspiracy.[11] ¶ 149. Defendants that stayed in California also continued to dox the Steiners on Twitter and Craigslist, and send threatening messages while in the in-person stalking occurred in Massachusetts.  California law recognizes that state remedies may extend to out-of-state parties when the parties are harmed by wrongful conduct occurring in California. *Norwest Mortgage, Inc. v. Superior Court,* 72 Cal. App. 4th 214, 224, 85 Cal. Rptr. 2d 18 (1999).

Taking the conduct in its totality, the actual physical surveillance and stalking occurred in Massachusetts, but the installation of fear leading up to those acts all occurred in California, and the in-person stalking was facilitated by conduct that continued while the Defendants remained in California. Given the nature of the events, the stalking and surveillance in Massachusetts would not have had the same effect without the conduct in California; the Steiners only noticed the presence of the black vehicle circling the block and following the Steiners, and the fear it caused, occurred only because of the realization that whoever was engaging in the extremely disturbing online threats and mailing packages and other deliveries were now, literally, at their doorstep. In short, the gravamen of the Defendants' conduct was a stalking that occurred in California; the Massachusetts in-person stalking was simply the crescendo of the totality of acts that caused the Steiners extreme alarm and turmoil.

---

[11] Defendant Baugh also admitted during his plea hearing that they used a conference line to communicate during the surveillance efforts in order to monitor police activity to evade detection.

Third, a majority of the parties are residents of California, and eBay's principal place of business is in California. All individual Defendants resided and worked in California at the time of the acts. As a result, this factor likewise favors applying the California statute.

Fourth, contrary to the Defendants' arguments, the relationship between the parties was centered in California, not Massachusetts. The relationship between the Steiners and eBay consisted of the Steiners reporting on eBay, headquartered in California. For several years, eBay would invite the Steiners to interview executive team members and other eBay employees and contractors. ¶ 48. Additionally, more than 50 eBay executives and employees subscribe to the EcommerceBytes newsletter. ¶47. The relationship between the Steiners and eBay is centered on eBay's location and its activities, not EcommerceBytes. ¶¶ 42-45. The Steiners could report on eBay from literally anywhere; Natick was not central to EcommerceBytes, but rather eBay's California business was the essential focus of the relationship.

Even if this Court finds there is an actual conflict of law issue, in assessing the totality of the factors, the California statute must prevail relating to the stalking claim.

      b.  <u>The fact that the victim's suffered the injury from the Defendants' conduct in Massachusetts does not render the California statute inapplicable.</u>

While the Defendants physically stalked the Steiners in Massachusetts, the entirety of the Defendants' actions – even the conduct that occurred through electronic means and through the mail – fall within the conduct proscribed by the California stalking statute.

As set forth in the FAC, the Defendants sent a series of harassing and threatening Twitter messages, while simultaneously mailing packages to the Steiner residence, including a bloody pig mask from the movie SAW and a book entitled "Surviving Loss of a Spouse" both of which the Steiners perceived as threats on their lives. ¶¶ 123, 130. The Defendants also mailed live

spiders and cockroaches, and attempted to send a pig fetus. ¶¶ 122, 133. While the Steiners were

receiving these disturbing packages in Massachusetts, the Defendants were simultaneously

sending messages such as "do I have your attention now?" and "U get my gifts cunt??" ¶ 124,

187. All of this conduct originated in California. Defendants, while in California, also signed the

Steiners up for dozens and dozens of harassing emails, from websites such as the Communist

Party, and various sex websites.

Even though the Defendants physically surveilled and stalked the Steiners in

Massachusetts, the planning and facilitating occurred in California, and the expensing loophole

which allowed the conspiracy to flourish was carried out in both California and Nevada. ¶ 353.

Before Defendants Baugh, Harville and Zea travelled to Massachusetts, Defendant Baugh

practiced installing a GPS – purchased by Defendant PFC – on a similar vehicle to the Steiners

in an eBay parking lot. ¶141. Presumably, the GPS device was purchased in California. Even

after Defendants Baugh, Harville and Zea – and later Defendant Popp – arrived in

Massachusetts, the other Defendants monitored the progress and other Defendants continued to

send harassing and threatening Twitter messages, posted ads on Craiglist and other websites

inviting strangers to the Steiners home for sex parties and advertising yard sales, and arranged

for a delivery of a funeral wreath to the Steiner's home. When Defendants Baugh, Harville and

Zea stalked and surveilled the Steiner residence and David Steiner while he drove throughout

Natick, Defendant Popp – while remaining in California – monitored the NPD dispatch so she

could alert the Defendants as to any police detection.

In short, although the most disturbing act of surveilling and stalking the Steiners in their

home and while driving occurred in Massachusetts, the Defendants engaged in countless other

bewildering, harassing and tortious acts from California. Additionally, the physical stalking in

Massachusetts could not have occurred without the California acts, and would not have resulted

in the same measure of fear, anticipation and torment to the Steiners without the California acts

leading up to those events. A black van merely circling the Steiners' block and following them

would not have had the same force and would not have caused the Steiners to "see ghosts"

without the California conduct leading up to those events. *See United States v. Walker*, 665 F.3d

212, 225-226 (1st Cir. 2011) (noting pre-travel threats through email placed victim's in

reasonable apprehension of violence once defendant travelled across state lines to victim's

location). It was all part of a larger plan that could not be carried out without support.

While the Defendants argue that the most "egregious" acts occurred in Massachusetts,

this is irrelevant.  Not only was all of the conduct egregious, the statute encompasses *all* of the

aforementioned behavior, where the statute prohibits a "pattern of conduct the intent of which

was to follow, **alarm,** place under surveillance, **or harass the plaintiff."** Cal. Civ. Code §

1708.7(a)(1) (emphasis added). The statute also specifically includes threats "communicated by

means of an electronic communication device," suggesting the legislature contemplated actions

occurring outside of California borders. *Id.* at (b)(2).

Whether the injury occurred in California is not solely determinative in evaluating the

application of California law.  *Diamond Multimedia Sys. Inc. v. Superior Court* 19 Cal. 4th 1036,

1063-64 80 Cal. Rptr. 2d 828, 968l; *Norwest Mortgage, Inc. v. Superior Court,* 72 Cal. App. 4th

214, 224, 85 Cal. Rptr. 2d 18 (1999).

Although the Defendants maintain that the statute does not apply to injuries occurring

outside of California, the California Courts have decided otherwise. *See Diamond Multimedia v.*

*Superior Ct.*, 968 P.2d 539, 554 n. 20 (Cal. 1999). In *Diamond Multimedia,* the Court found that

even if the resulting effect of the conduct occurs out of the state, a California statute applies as

long as the conduct leading to liability occurs within California confines. *See Diamond Multimedia v. Superior Ct.*, 968 P.2d 539, 554 n. 20 (Cal. 1999) (applying state securities law applies to false statements occurring in California although transaction occurred out of state). *See also Kearney v. Saloman Smith Barney*, 137 P.3d 914 (Cal. 2006) (applying California statute where Georgia company unlawfully recorded conversations with customers in California).

Also contrary to the Defendants' argument, the purpose of the statute weighs in favor of applying the stalking statute in this case.  The California legislature stated that the purpose of the statute is to protect the "health, safety, and welfare of the people of the State of California, and **shall be liberally construed to effectuate those purposes."** Cal. Civ. Code § 1708.7(b)(7)(g) (emphasis added). Although the Steiners are Massachusetts residents, curtailing this type of behavior by employees of a massive California company will also serve to protect the people of the state of California, where it will serve as a deterrent effect both to eBay, and other large companies in California that may consider engaging in such egregious behavior to attack a private citizen.

Even if the Court were to parse out the stalking conduct that occurred in Massachusetts, and find that the statute does not apply because it was conduct that occurred outside of California borders, the Steiners have still set forth a cause of action for stalking relating to the conduct that occurred within California. Therefore, the Defendants have failed to demonstrate why this count must be dismissed relating to conduct that occurred within California borders, but where only the injury was suffered outside of California.

Ultimately, while a portion of the Defendants conduct which constitutes stalking and harassment under the statute occurred in Massachusetts, the California conduct still caused the Steiners "substantial emotional distress" and falls within the definition of stalking per the statute.

As a result, the California stalking statute applies, and the Court should deny the Defendants'

motion to dismiss the Stalking count on the grounds that it should not apply to any of the

Defendants' conduct, even conduct occurring in California.

     c.  <u>Even the actions that occurred in Massachusetts fall within the statute</u>
<u>where they were part of an ongoing chain of events.</u>

Although California has adopted a presumption against extraterritoriality, and looks to

the location of the conduct when applying its statutes, this Court should apply the California

conduct even to conduct occurring in Massachusetts where the Massachusetts conduct was part

and parcel of the ongoing pattern of stalking, threats and harassment falling within the statute.

*See Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (Cal. 2011) ("[W]e presume the Legislature did

not intend a statute to be operative, with respect to occurrences outside the state, unless such

intention is clearly expressed or reasonably inferred from the language of the act or from its

purpose, subject matter, or history"); *Diamond Multimedia Sys., Inc. v. Superior Court*, 968 P.2d

539, 554 n. 20 (Cal. 1999).

California state remedies may extend to out-of-state parties, however, when the parties

are harmed by wrongful conduct occurring in California. *Wang v. OCZ Technology Group, Inc.*,

276 F.R.D. 618, 629 (N.D. Cal. 2011), citing *Diamond Multimedia,* 968 P.2d at 554; *Morgan, et*

*al. v. Harmonix Music Sys., Inc.*, 2009 WL 2031765, at \*2 (N.D. Cal. 2009). Whether the injury

in California is not the sole determining factor as to whether apply California law; the Court also

looks to whether the defendant's conduct occurred in the forum state. *Id.*

Here, as discussed *supra*, the conduct in Massachusetts was one portion of a chain of

escalating events that resulted in the "substantial emotional distress" the Steiners experienced.

Without one aspect of the stalking, harassment, threats, following and surveillance – when

considering the Natick conduct and the California conduct separately – the totality of the acts

would not have had the same force and effect. In other words, had the Defendants not threatened the Steiners online, and sent them disturbing packages in the weeks leading up to the trip to Natick, the van circling their block and following David Steiner would not have instilled the same level of fear. Likewise, had the Steiners believed this was an online harassment and stalking scheme – without a fear that the actors would approach and attack them offline – the online acts would not have been as petrifying. Taking all of the acts together, however, created a campaign that terrorized the Steiners, and left them in a state of terrified anticipation as to what would befall them next.

Additionally, the conduct in California facilitated the conduct in Massachusetts. The Defendants met in a conference room at eBay to discuss deliveries and instructions to stalk and harass the Plaintiffs. The computers and cell phones used during the conspiracy were purchased in California, and those devices were used to book plane tickets to Boston, and a hotel room. The Defendants also used the devices to book tickets to the conference in Boston. The GPS was purchased in California by Defendant PFC, and Defendant Baugh practiced installing it in the eBay parking lot. Even while Defendants Baugh, Harville and Zea were stalking the Steiners, Defendant Popp, from California, monitored the NPD dispatch so the Defendants in Massachusetts would not be caught. Therefore, the California conduct was necessary to the in-person stalking, harassment, following and surveillance.

In fact, the legislative history for the statute demonstrates that the statute was enacted because "it was believed that existing remedies such as criminal prosecution and restraining orders were insufficient to deter violent offenders…" thus suggesting the statute was aimed not only at *protecting* California residents, but also *deterring* California residents from engaging in stalking activities. 2013 CA A.B. 1356 (2014). Therefore, public policy considerations, and the

punitive nature of the statute, also support applying the California statute to all activity committed by California residents, even if directed outside the forum state.

Where the full scope of the stalking campaign could not be fully carried out without both aspects – the conduct occurring in California and the conduct occurring in Massachusetts – this Court should apply the California stalking statute to all of the conduct.  This would advance the purposes of the statute where it would not absolve California residents from liability simply because they chose an out of state target. As such, this Court should deny the Defendants' motion to dismiss on the grounds that the California statute should not apply to conduct occurring out of state.

      d.  <u>Contrary to Defendant Wenig, Wymer and Jones's contentions, it is not necessary to demonstrate they personally participated in stalking the Steiners where it was reasonably foreseeable that their directives would result in the conduct.</u>

Defendants Wenig, Wymer and Jones contend there is no evidence set forth in the FAC to suggest either physically participated in the stalking and harassment. The Steiners, however, have set forth a plausible claim for relief against the three Defendants, as set forth in the section on Intentional Infliction of Emotional Distress. Much like that claim, it is difficult to conceive what chain of events the Defendants believed their directives would set in motion, if not a campaign to harass the Steiners.

The inferences from the FAC need not be conclusive, only plausible. It is at least plausible that the directives to Defendant Baugh – who Defendants Wenig, Wymer and Jones knew had experience with engaging in the behavior at play here – to "burn her down," "take her down" and to handle the situation "off the radar" would result in the Defendants stalking, harassing and threatening the Steiners. The FAC and inferences must be viewed in the context of the events as a whole. The CEO and the Vice President of a powerful corporation were directing

the head of security to eradicate Ina Steiner using whatever means possible, and it was foreseeable this would result in the type of conduct that occurred here. *See Ocasio-Hernandez*, 640 F.3d at 14 ("question confronting a court on a motion to dismiss is whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible").

While Defendants Wenig, Wymer and Jones allege they did not physically engage in any stalking, they directed and encouraged the acts by ordering Defendant Baugh to take Ina down and burn her to the ground.  In addition, Defendant Wymer deleted all of his emails, texts, and communications with Defendant Baugh and Defendant Wenig. This encouragement, when taking the totality of the circumstances and all reasonable inferences, amounted to aiding and abetting the stalking. *See Massachusetts Port Authority v. Turo Inc.,* 487 Mass. 235, 244 (2021); *Kyte v. Philip Morris, Inc.*, 408 Mass. 162, 168-169 (1990).  Moreover, California Stalking Statute was amended in June 1998 to include electronic communications "that it will not matter if the harasser is capable of carrying out the threat – it will be enough that the target believes the threat to be credible and "had reasonable fear for his or her safety or the safety of his or her immediate family."

Defendant Jones also asserts that there are no facts to suggest she engaged in a "pattern of conduct" or a "series of acts over time." As set forth in the FAC, Defendant Jones ordered Defendant Baugh to take care of the issue off the radar. She also expressed approval by "fist bumping" Defendant Baugh when Defendant Baugh informed her that they engaged in harassing conduct in July of 2019. ¶ 81. Defendant Jones was therefore kept abreast of and informed of at least some of the conduct, and her orders and conduct demonstrated her participation, or at the least, should have known but was willfully blind.

Where the requirement of plausibility "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal [conduct]" and where "a material part of the information needed" is "within the defendant's control" this Court should allow "some latitude…in applying the plausibility standard." *Garcia-Catalan*, 734 F.3d at 104. As noted previously, there are additional emails, texts, and call logs that have not been destroyed that may evince the level of Defendants Wenig and Wymers' knowledge, their directives, and how involved they were in each of the torts alleged. Moreover, both Defendants Wenig and Wymer were interviewed, but Plaintiffs had not yet had access to reports or interviews.[12]

Given the low standard of plausibility, and that common sense and reasonable inferences suggest Defendants Wenig and Wymer intended to instill fear into the Steiners, the Court should deny Defendants Wenig, Wymers and Jones' motion to dismiss on the grounds that they did not personally engage in the stalking activities.

      e.  <u>Defendant Cooke's claim that Plaintiffs failed to set forth evidence that he intended to place the Steiners in fear fails where he approved of the harassing and threatening Twitter messages.</u>

Defendant Cooke alleges that there is no evidence he intended to place the Steiners in fear. As outlined *supra*, Cooke, in his plea, admitted that he approved the harassing and threatening Twitter messages, which accompanied the disturbing package deliveries. He admitted that he put the Steiners in fear.  It is unclear what the intent of such conduct would be other than to instill fear in the Steiners. Based on his guilty plea, Cooke should be judicially estopped from making this claim.

Moreover, when Defendant Baugh sent a WhatsApp message stating, "[t]hey are seeing ghosts now. LOL", Defendant Cooke responded, "Perfect." ¶ 190. That same day, Defendant

---

[12] Plaintiffs also do not yet have access to emails, interviews and internal investigations.

Gilbert reported to the group, "We have known the targets have been very impacted by this op. Perfect time for the next phase," to which Defendant Cooke replied, "Yes!" These messages demonstrate Defendant Cooke's intent to place the Steiners in fear as a result of the Defendants' collective conduct. This circumstantial evidence "suffices to clarify a protean issue such as an actor's motive or intent." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 56 (1st Cir. 2013). Based on his guilty plea, Cooke should be judicially estopped from making this claim.

        f.   <u>Plaintiffs were not required to demand that the activity cease, where it would have been both unsafe for them to do so, and where they did not know the identity of the perpetrators. (Defendant Cooke)</u>

Cooke makes a bemusing claim that he cannot be liable for stalking because the Steiners never demanded the Defendants cease their conduct. The statute, however, clearly states that a Plaintiff need not demand the conduct cease if the communication was "impractical or unsafe." Cal. Civ. Code § 1708.7(a)(3)(A)(ii). Where the Steiners were unable to determine who was harassing, stalking, intimidating and threatening them despite their best efforts, and even if they did, it would have been unsafe to communicate such a request, Cooke is not absolved from liability based on their inability to communicate a request to stop torturing them. As such, the Court should deny Defendant Cooke's motion to dismiss on the grounds that the Steiners did not demand that the Defendants cease their conduct.

**VI.**    **Plaintiffs set forth a plausible claim under the Massachusetts Civil Rights Act where the entire object of the campaign was to shut down Plaintiffs' free speech rights.**

The Steiners have set forth a plausible claim for relief under Title II, Ch. 12, § 11I with respect to each Defendant. In order to demonstrate a violation of the Massachusetts Civil Rights Act, the Plaintiffs must prove: (1) his/her exercise or enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth; (2) have been

interfered with, or attempted to be interfered with; and (3) that the interference or attempted interferences was by threats, intimidation or coercion. *See* Title II, Ch. 12, § 11I; *Mancuso v. Mass. Interscholastic Ath. Ass'n*, 453 Mass. 116, 130-131 (2009).

"A 'threat' is 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League v. Blake*, 417 Mass. 467, 474 (1994). Intimidation "involves putting one in fear for the purpose of compelling or deterring conduct." *Id.* Coercion "is the application to another of force to constrain him to do against his will something he would not otherwise have done." *Id.*; *Deas v. Dempsey*, 403 Mass. 468, 471 (1988).

While the Defendants cite to an unpublished Massachusetts Superior Court decision setting forth the requirement of a "physical confrontation," the Supreme Judicial Court has left open the question of whether physical confrontation is required to sustain a cause of action for a violation of the Civil Rights Acts. *See Freeman v. Plan. Bd. of W. Boyston*, 419 Mass. 548, 566 n. 18 (1995) ("We assume without deciding that certain forms of oppression or domination not involving physical force might constitute coercion under the Act…"). *See also Ayasli v. Armstrong*, 56 Mass. App. Ct. 740, 752 (2002) (noting decisions inconsistent on whether physical force required); *Acciavatti v. Professional Serv. Group, Inc.,* 982 F. Supp. 69, 78 (D. Mass. 1997) (remarking physical confrontation not always required).

Contrary to the Defendants' assertions, the Steiners have set forth a plausible claim for relief under the Civil Rights Act where all three elements are satisfied. First, the Steiners were exercising their right to free speech and freedom of the press when the Defendants engaged in the scheme to attempt to shut them down. *See Batchelder v. Allied Stores Corp.*, 388 Mass. 83,

88-90 (1983) (suggesting Article 16 falls within Civil Rights Act for cause of action against private entity).

Second, the Steiners have set forth sufficient evidence to suggest the Defendants attempted to interfere with their right to free speech and freedom of the press. The entire goal of the conspiracy was to put an end to the Steiners' reporting, as evidenced by Defendant Wenig, Wymer and Jones' communications and texts, and at least according to one text message between Defendants Baugh and Wymer, to shut down the entire website, and then the events that flowed from those communications and the plan carried out by Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell and Zea all stemmed from those communications demonstrating their intent to shut the website down.

Third, Defendants Wenig, Wymer and Jones gave orders to carry out the plan to stop Plaintiffs' reporting. The criminal Defendants engaged in threats, oppression and coercion to interfere with the Steiners' constitutional rights. Defendants Popp and Stockwell drafted threatening Twitter messages, while Defendants Baugh, Harville, Cooke and Gilbert approved the messages, and the messages directly threatened Steiner to stop reporting. Defendants Baugh, Harville, Popp and Zea physically and menacingly stalked the Steiners and their residence, and in conjunction with the Twitter messages, made apparent this was due to EcommerceBytes.  The Defendants mailed a bloody pig mask from the movie SAW, a book on surviving the death of a spouse and a funeral wreath to the Steiner residence, all clear death threats.

Defendant PFC financed the operation by paying expenses including plane tickets, hotel rooms, car rentals, meals, gift cards, and laptop purchases.  The entire conspiracy could not have existed without the financial support of PFC.  Defendant eBay admitted that during their investigation, they uncovered an "expensing loophole" which was fostered by PFC's

involvement that allowed Defendants access to funds absent any oversight from PFC or eBay, which they termed "off-the-grid" financing of the conspiracy's activities.

While Defendants Wenig, Wymer and Jones allege they did not physically engage in any threats, oppression or coercion, the whole purpose of their directive to take down Ina Steiner, and burn her down was in response to her reporting. Defendant Jones specifically directed Defendant Baugh to do it off the radar because "legal" and "comms" were unable to handle the situation, suggesting Plaintiffs were engaging in legitimate free speech and press, and that the Defendants were attempting to curtail it in an illegal manner. Where Defendants Wenig, Wymer and Jones directed and encouraged the conduct, knew of the conduct and the Defendants ultimately committed the Civil Rights violation, the Steiners have set forth a plausible claim that Defendants Wenig, Wymer and Jones aided and abetted the other Defendants. *See Massachusetts Port Authority v. Turo Inc.,* 487 Mass. 235, 244 (2021); *Kyte v. Philip Morris, Inc.*, 408 Mass. 162, 168-169 (1990).

### VII.   Plaintiffs sufficiently set forth a claim for defamation under the plausibility standard.

In order to sustain a claim of defamation, the Plaintiff must demonstrate, (1) the defendant made a statement concerning the plaintiff, to a third party, (2) the statement could damage the plaintiff's reputation in the community, (3) the defendant was at fault in making the statement, and (4) the statement either caused the plaintiff economic loss, or is actionable without proof of economic loss. *See Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630 (2003).

Four types of statements are actionable without proof of economic loss: (1) statements that constitute libel; (2) statements that charge the plaintiff with a crime; (3) statements that allege the plaintiff has certain diseases; and (4) statements that may prejudice the plaintiff's profession or business. *See Sharfir v. Steele*, 431 Mass. 365, 373 (2000); *Lynch v. Lyons,* 303

Mass. 116, 118-119 (1939). Where the statement falls within one of the four exceptions, the plaintiff may recover for noneconomic losses, such as emotional injury or damage to reputation. *Sharfir*, 431 Mass. at 373; Restatement (Second) of Torts, § 623.

A statement is considered to prejudice a person's profession or business "if it alleges that the plaintiff lacks a necessary characteristic of the profession." *Ravnikar*, 438 Mass. at 631, citing Restatement (Second) of Torts, § 573 ("One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession…is subject to liability without proof of special harm").

The statement may be published in writing or some other medium (in which case it is designated as libel), or orally (in which case it is designated as slander). *Ravnikar*, 438 Mass. at 629, citing *Draghetti v. Chmielewski*, 416 Mass. 808, 812 n. 4 (1994); Restatement (Second) of Torts, § 568 (1977). A "statement" for purposes of defamation means "'communication that tends to 'harm the reputation of another.'" *Jimenez-Nieves v. United States*, 682 F.2d 1, 17 (1st Cir. 1982); Restatement (Second) of Torts, § 559 ("A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."). A "communication" is interpreted broadly, and need not include only verbal and written statements, but also encompasses any activity whereby "one person has brought an idea to the perception of another," or communicates an idea to a third party. *Id.*

Plaintiffs have set forth a plausible claim for defamation where Defendants called Ina Steiner a "biased troll" publicly on Twitter, and where the act of sending the "Barely Legal" magazines to the Steiners neighbors in David Steiner's name, dubbing the Steiners as "Persons

of Interest" and associating the Steiners as swingers, as members of the Communist Party, as people engaging in sex with animals, and having sex parties, all fall within the definition of defamation, and where the Defendants harbored an improper motive in engaging in this conduct. The Defendants also admitted to attempting to make the Steiners look "crazy" and referred to Ina Steiner as a "troll."

Defendant Gilbert alleges he did not publish any false or defamatory statements, however, he specifically informed the other conspirators that he was going to create a dossier and fake Persons of Interest file on the Steiners, and "brief the cops on the [Steiner's] background to make them look like the problem." ¶¶ 224, 243, 236. Defendant Gilbert then travelled to Natick and met with Natick Police Officers. ¶ 252. The reasonable inference is that Defendant Gilbert carried out his plan to defame the Steiners during this meeting, and provide the fake Persons of Interest file to "make them look like the problem." *See Jimenez-Nieves*, 682 F.2d at 17 (defamation includes oral statements designed to harm reputation of subject).

Moreover, the Twitter posts suggested Ina Steiner was biased, that she was destroying families due to her reporting, and other negative connotations where the statements "allege[d] that the plaintiff lacks a necessary characteristic of the profession" of a journalist. *Ravnikar*, 438 Mass. at 631.

Taken in its totality, the FAC has set forth sufficient facts to demonstrate a plausible claim for relief for defamation.

*Defendant Jones*

Defendant Jones further claims that the FAC does not allege that Defendant Jones physically participated in the actions, and "do not allege a single defamatory statement attributable to her." (Jones ECF No. 206 at 7-8). "Moreover, Plaintiffs do not plead facts

plausibly suggesting that Ms. Jones was otherwise 'at fault for' the publication of any defamatory statement." (Jones ECF No. 206 at 8). "Indeed, Plaintiffs do not even allege beyond the threadbare assertion that Ms. Jones was 'willfully blind' – that Ms. Jones was aware of the existence of the allegedly defamatory actions and materials." (Jones ECF No. 206 at 8).

Contrary to Jones' assertion, Plaintiffs have not merely alleged a "threadbare assertion that Ms. Jones was 'willfully blind…'" (Jones ECF No. 206 at 8). Instead, Plaintiffs allege that Jones, as Baugh's direct report and the individual who instructed Baugh to take care of the issue "off the radar," to "just get it done" and who received regular updates from Baugh was most assuredly "at fault" for the defamatory statements. ¶ 65.

*Defendant Wenig*

Defendant Wenig likewise contends that he was not "at fault" for any defamatory publication. The obsession with getting rid of EcommerceBytes', and the entire campaign was set in motion due to Defendant Wenig. The reporting that was discussed and that incensed Defendant Wenig and the others dealt directly with Defendant Wenig's decisions within eBay. Even Defendant Wenig's wife reached out to Defendant Baugh regarding EcommerceBytes. Under the circumstances, where Defendant Wenig lit the match which ultimately led Defendant Baugh and the others to publish the defamatory statements, he was "at fault" for the defamatory statements, and Plaintiffs set forth a plausible claim for relief.

**VIII.   Plaintiffs set forth a claim for trespass.**

To sustain a claim for trespass a plaintiff must show "(1) plaintiff's actual possession of the property at issue and (2) an intentional and illegal entry by defendant." *New England Box Co. v. C&R Constr. Co.*, 313 Mass. 696, 707 (1943).

To demonstrate a defendant aided and abetted a trespass, the plaintiffs need only demonstrate that (1) one of the other defendants committed the relevant tort; (2) that the defendant knew the other defendants were committing the relevant tort; and (3) that the defendant actively participated in or substantially assisted in the commission of the tort. *See Massachusetts Port Authority v. Turo Inc.,* 487 Mass. 235, 244 (2021); *Kyte v. Philip Morris, Inc.*, 408 Mass. 162, 168-169 (1990) (charge of aiding and abetting requires proof that defendant knew of substantial, supporting role in unlawful enterprise); *Brown v. Perkins*, 83 Mass. 89, 1 Allen 89, 98 (1861) ("any person who is…encouraging or exciting [a trespass]…or who in any way or by any means countenances or approves the same, is in law deemed to be an aider or abettor"). Substantial assistance can be established by demonstrating that the alleged abettor's actions were a "substantial factor" in the trespasser's "ability to perpetrate" the trespass. *Massachusetts Port Authority,* 487 Mass. at 244.

The Steiners have set forth a plausible claim for trespassing as to all defendants. Defendants Baugh, Harville, Zea and Gilbert physically entered the Steiners' property, and Defendants Wenig, Wymer, Jones, Popp, Cooke, and Stockwell aided and abetted the trespass. PFC is vicariously liable where Zea was acting within the scope of her employment at the time of the trespass.

### Defendants Baugh, Zea and Gilbert

On or around June 8, 2019, Defendant Gilbert flew from California to Boston, then drove to the Steiner residence in Natick, entered onto the Steiner's property, and scrawled "Fidomaster" on their fence. ¶ 73.  This constituted both a physical trespass, and a trespass to chattels. *See Richardson v. Ne. Hosp. Corp.*, 883 N.E.2d 342 (Mass. App. Ct. 2008).

On August 15, 2019, Defendants Baugh, Harville and Zea approached the Steiner home in an attempt to install a GPS on the Steiner vehicle, but were unable to do so only because the vehicle was parked in the garage. ¶ 148. This constituted an unlawful entry onto the Steiner property.

### Defendant Popp

While Defendants Baugh, Harville and Zea attempted to install the GPS device on the Steiner vehicle, Defendant Popp monitored the NPD dispatch so she could alert the other defendants of any police detection. This constituted substantial assistance in the trespass, where Defendant Popp was assisting the others in avoiding apprehension. As such, Plaintiffs have set forth a plausible claim that she aided and abetted the trespass. *See Massachusetts Port Authority.,* 487 Mass. at 244.

### PFC

Defendant Zea physically trespassed onto the Steiner property while acting within the scope of her employment with PFC, as discussed *supra* in "Personal Jurisdiction." As such, Plaintiffs have set forth a plausible claim that PFC, who financed the conspiracy, is vicariously liable for the Defendant Zea's trespassing onto the Steiner property.

Defendants PCF and Krystek were also aiders and abettors in this conduct where it financially facilitated Defendants Zea, Baugh and Harville's trip to Natick including the purchase of first-class airline tickets, the payment of hotel rooms, the rental of cars, the payment of meals, the funds to purchase and send a pig mask, a funeral wreath a book about the death of a spouse, live spiders, as well as gift cards, and the purchase of laptops and made money for PFC by authorizing the finances necessary to carry out the in-person stalking. *See Massachusetts Port Authority,* 487 Mass. at 244; *Kyte*, 408 Mass. at 168-169.

**IX.    Plaintiffs set forth a plausible claim for false imprisonment.**

False imprisonment is the intentional, unjustified confinement of a person, directly or indirectly, by force or by threat, of which that person is conscious of or by which he or she is harmed. *Ortiz v. Hampden County*, 16 Mass. App. Ct. 138, 140 (1983).

It is not necessary to demonstrate that the restraint was the result of force or violence, or physical contact. *Sweeney v. F.W. Woolworth Co.,* 247 Mass. 277 (1924). A mere threat of physical force can result in a restraint of liberty. *McCann v. Wal-Mart Stores, Inc.*, 210 F.3d 51, 54 (1st Cir. 2000). If a person is restrained by fear, that amounts to false imprisonment. *See Jacques v. Childs Dining Hall Co.*, 244 Mass. 438 (1923). In other words, a person who relinquishes the right to move about freely as the only available alternative is restrained for purposes of the tort of false imprisonment. *See Foley v. Polaroid Corp*, 400 Mass. 82 (1987); *Coblyn v. Kennedy's Inc.*, 359 Mass. 319, 321 (1971) ("If a man is restrained of his personal liberty by fear of a personal difficulty, that amounts to 'false imprisonment' within the legal meaning of such term.").

A person may be held liable for false imprisonment even though he did not directly impose a restraint upon the liberty of another where he causes such restraint to be imposed. *See Sarvis v. Boston Safe Deposit and Trust Co.,* 47 Mass. App. Ct. 86, 98 (1999).

Here, the Defendants intentionally made the Steiners afraid to leave their home, falsely imprisoning them. They threatened to kill the Steiners and followed the Steiners.  The Defendants also intentionally made the Steiners fear visitors at their front door, by placing advertisements for sex parties and yard sales to send strangers to their home at all hours of the day and night.  The Defendants subjected the Steiners to around the clock harassment, package

deliveries, threats, and ultimately, a car stalking the Steiners and their home. The Defendants doxed the Steiners by posting their address online.

The Defendants were aware that the Steiners made numerous phone calls to the police over threats to their safety and considered this a success in their goal to falsely imprison the Steiners. The Defendants callously joked that the Steiners were "seeing ghosts, think everyone is following them and they call the police every 10 minutes," and "We know the targets have been impacted by this op." ¶ 190, 226.

The Defendants' use of a Samoan sounding Twitter handle (¶193) was not accidental and was intended to further intimidate the Steiners into confining themselves to their home. One step further, Defendant Baugh informed the others that if the distraction campaign did not work, he would send the gang to the Steiners, and Defendant Gilbert traveled to meet with the Samoan gang members and paid them $4,000.00 to be prepared to carry out "plan B." ¶¶ 88-90. This further evidenced the Defendants use of the Samoan handle was to establish continuity between the online harassment and threats to the real world, and use fear to imprison the Steiners in their home.

As intended, the Steiners remained in their home and cancelled countless visits they had planned with friends and family out of fear. ¶ 156. Not knowing who was following them and what could happen, they were in fear for their own lives, and the lives of their loved ones. The Steiners installed a dashcam in the rear window of their car to detect and record anyone following them. ¶ 393. The Steiners also installed numerous surveillance cameras outside of their home, and manned the cameras at all hours of the day and night, separating themselves in the house so they could determine whether someone was entering any area of their home. ¶ 153.

While David Steiner travelled out of the home only out of necessity, Ina remained in the home where she was the principal target of the death threats. ¶ 10. When David Steiner drove down his street and into town, both a black van and a silver SUV tailed him, to the point where they were close enough for David to partially record and photograph the license plate numbers. ¶ 173. David was unable to travel to his destination, and was forced to return home because of the stalking and intimidating acts. As a result, he was confined both to his home and vehicle during the entirety of the campaign.

Under these circumstances, where the Steiners relinquished their right to leave their home for fear of what could occur next, they have set forth a plausible claim for false imprisonment. *See Foley v. Polaroid Corp*, 400 Mass. 82 (1987); *Coblyn v. Kennedy's Inc.*, 359 Mass. 319, 321 (1971).

## X.  Defendants Wenig, Wymer and Jones are vicariously liable for torts committed by others.

Massachusetts recognizes two types of civil conspiracy: a "true conspiracy" and conspiracy based on section 876 of the Restatement (Second) of Torts. *See Taylor v. American Chemistry Council*, 576 F.3d 16, 34-35 (1st Cir. 2009); *Kurker v. Hill*, 44 Mass. App. Ct. 184 (1998). The second type of conspiracy, based on the Restatement of Torts, is a form of vicarious liability for the torts of others. *See Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 241-242 (D. Mass. 1999).

Defendants Wenig, Wymer and Jones allege that they are not liable under the conspiracy claim because they claim Plaintiffs did not sufficiently demonstrate they agreed to participate in or had knowledge of the actions of Defendants Baugh, Harville, Gilbert, Cooke, Popp, Stockwell, and Zea.

For vicarious liability under conspiracy, two theories apply here: (1) concert of action; and (2) aiding and abetting. The FAC sets forth facts to render each theory plausible.

       i.   Concert of action

This theory holds a defendant liable for harm resulting from the tortious acts of another when two elements are established. The first is that the defendant and the other have an agreement to perform the act or achieve the particular result. *Payton v. Abbott Labs*, 512 F.Supp. 1031, 1035 (D. Mass. 1981), *citing Gurney v. Tenney*, 197 Mass. 457, 466 (1908). The Plaintiff need not prove the existence of an agreement with direct evidence, but rather the existence of an agreement can be inferred from conduct of the parties suggesting they had an implied meeting of the minds. *Orszulak v. Bujnevicie*, 355 Mass. 157, 158-59 (1969). The second element requires that the defendant's own conduct be tortious. *See Gurney*, 197 Mass. at 466.

The defendant's conduct need not be the cause or be a substantial factor in causing Plaintiff's injury. *See Payton*, 512 F.Supp. at 1035. Instead, Plaintiff need only prove that a defendant acted negligently or in an intentionally tortious manner. *Id.*

Here, as set forth *supra*, Defendants Wenig, Wymer and Jones each directed Defendant Baugh to end Plaintiffs' reporting into eBay. In other words, they all agreed to "achieve a particular result" of ensuring the Steiners no longer reported on eBay in what they perceived to be a negative manner in their EcommerceBytes publication.  *See Payton*, 512 F.Supp. at 1035. Not only is there direct evidence that Defendants Wenig, Wymer and Jones wanted Plaintiffs' reporting to end, the other facts and circumstances, other than their statements, also provide circumstantial evidence that the entire purpose of the campaign, and the motive of all parties was to put an end to the reporting. *See Orszulak,* 355 Mass. at 158-59.

Next, as set forth *supra* relating to Intentional Infliction of Emotional Distress and Negligence, Defendants Wenig, Wymer and Jones each engaged in tortious conduct. Starting with Defendant Wenig, after EcommerceBtyes published articles questioning his business decisions, a flurry of communications would follow surrounding the desire for C-Suite executives to find a way to end the reporting. Defendant Wenig issued a direct order to Defendant Wymer to take Ina Steiner down. Defendant Wymer, in turn, then instructed Defendant Baugh to burn Steiner to the ground. One step further, Defendant Wymer also promised Defendant Baugh that he would have "top cover," and even as the conspiracy transpired, Defendant Wymer remained in contact with Defendant Baugh, and instructed him to up the ante, directing that Defendant Baugh do "whatever it takes." Likewise, Defendant Jones instructed Defendant Baugh to handle the situation "off the radar" because legal and communications could not handle it, and to just "get it done."

Defendant Jones contends that her directives to Defendant Baugh were insufficient to demonstrate a concerted action. (Jones ECF No. 206 at 15) *citing Thomas v. Harrington*, 909 F.3d 483 (1st Cir. 2018). Defendant Jones emphasizes that in *Thomas*, the Court found that a town manager's instruction to an investigator to "dig deep" relating to a town police officer was insufficient evidence for concerted action, so here too this Court should find the instructions to "get it done" and "off the radar" are likewise insufficient. The circumstances in *Thomas*, however, are inapposite. There, the directive to "dig deep" was made by the town manager – who had a wrongful purpose in attempting to terminate the town police officer – to the investigator, who had no unlawful intent. *Id.* As a result, the Court found that because there was no evidence the investigator knew of the town manager's unlawful intent and purpose, and merely conducted an investigation which happened to uncover terminable information about the

town police officer, it could not be said the investigator was involved in the conspiracy under a concert of action theory. *Id.*

Here, on the other hand, when Defendant Jones issued her directives, she not only knew of the unlawful intent of the conspiracy – to infringe upon the Steiners free speech and free press rights by using "off the radar" means because the legal department and communications department did not have any legal means of ending the reporting – she wanted the goal accomplished and instructed Defendant Baugh to commit the wrongful acts, i.e., to just "get it done."

As elaborated in further detail *supra*, these statements – given Defendant Wenig, Wymer and Jones' role in the Corporation and the knowledge they had about Defendant Baugh, including his role as Director of Security – constituted egregious behavior constituting Intentional Infliction of Emotional Distress. At the very least, Defendants Wenig, Wymer and Joones were negligent in lighting this match, knowing what would occur. As such, Plaintiffs also satisfy the second element, that each of the Defendants engaged in tortious acts.

Under the circumstances, Plaintiffs have set forth a plausible claim for conspiracy under a concert of action theory, so this Court should deny Defendant Wenig, Wymer and Jones' motion to dismiss this Count of the Complaint. *See Rodriguez-Reyes*, 711 F.3d at 56; *Grajales*, 682 F.3d at 47.

  ii. <u>Aiding and abetting</u>

Under an aiding and abetting theory, there are also two elements. *See Payton*, 512 F.Supp. at 1035. First, the defendant must give substantial assistance or encouragement to the other party. *Id.*, *citing Brown v. Perkins*, 83 Mass. (1 Allen) 89, 97-98 (1861). The court considers "the nature of the act encouraged, the amount of assistance given by the defendant, his

presence or absence at the time of the tort, his relation to the other and his state of mind." *Payton*, 512 F.Supp. at 1035, *citing* Comment on Clause (b), Restatement § 876. Second, the defendant must have an unlawful intent, or knowledge that the other party is breaching the duty and the intent to assist that party's actions. *See McGrath v. Sullivan*, 303 Mass. 327 (1939).

While meeting in eBay conference rooms, discussing plans on WhatsApp, and through other communications, the Defendants conspired to inflict emotional distress on the Steiners, then bragged about how much the Steiners were affected, and they planned the stalking, threats and harassment which would be effectuated through Twitter, deliveries and ultimately a trip to Boston.

The conduct began with the directives from Defendants Wenig, Wymer and Jones to take down Ina Steiner, and burn her to the ground, and to do it "off the radar." These texts evince an "agreement to do an unlawful act." It is irrelevant that Defendants Wenig and Wymer did not actually carry out any of the acts, where the other Defendants carried out the tortious acts in furtherance of the agreement. *See Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994).

Defendants Wenig, Wymer and Jones' conduct went well beyond even providing permission to commit whatever acts necessary to take down the Steiners, including tortious and criminal acts, but went as far as to *cause* the acts and provide company authorization through C-Suite executives, starting with the CEO, the Vice President of Communications and to the head of security who Baugh directly reported to. While Defendant Baugh directly reported to Defendant Jones, he was able to travel out of state for several days, without question. Moreover, Defendant Wymer promised Defendant Baugh "top cover," and helped Defendant Baugh continue to cover up the campaign once police were involved. Defendant Wenig, despite now

claiming he was shocked and appalled the conduct, communicated with Defendant Baugh after Baugh was terminated from eBay, and said that he was sorry to see Defendant Baugh go. All of the communications leading up to the acts, and the conduct and statements made after, all demonstrate the level of encouragement provided by Defendants Wenig, Wymer and Jones, and thereby prove they aided and abetted the campaign against the Plaintiffs.

Taking the totality of the FAC, and supplying all inferences in favor of the Steiners, they have set forth a plausible claim for relief for civil conspiracy. *See Rodriguez-Reyes*, 711 F.3d at 56 (plausibility of claim does not require "a high degree of factual specificity"); *Grajales v. Puerto Rico*, 682 F.3d 40, 47 (1st Cir. 2012)

  iii. The Intra-Corporate Conspiracy Doctrine does not apply.

Defendants Wenig, Wymer, Jones, Baugh, Popp, Stockwell and Zea maintain the intra-corporate conspiracy doctrine precludes liability on this count because all individual defendants were employed by eBay, or contracted by eBay through PFC, so they are considered all "agents of the same legal entity" and one cannot conspire with himself.

This claim fails where the Steiners clearly set forth in the FAC that Defendant Zea was an employee of PFC, and that her acts were taken within the scope of her employment with PFC and as an independent contractor with eBay.

In order for the intra-corporate conspiracy doctrine to apply, the agents must be a part of the same legal entity. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769-71 (1984) ("an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy"). A civil conspiracy can exist among corporations. *See Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867 (2017); *Williams v. Northfield Mount Hermon Sch.,* 504 F. Supp. 1319, 1327 (D. Mass. 1981).

Defendant Zea was acting within the scope of her employment with PFC during the conspiracy, and all other defendants were acting within the scope of their employment with eBay. A contractor is a non-agent of the corporation, and the intra-corporate doctrine protects agents only of a corporation principal. *See King's Choice Neckwear, Inc., v. FedEx Corp.,* 2007 U.S. Dist. LEXIS 93843 (Dist. N.J. 2007). Defendant Krystek was also a member of the conspiracy – allowing PFC to provide funding – and is not an employee of eBay.

Additional discovery will reveal the full extent of Defendants Zea and Krystek's relationship with both PFC and eBay, however at this stage, the Steiners have set forth sufficient facts to demonstrate Defendant Zea is an employee of PFC, Defendant Krystek was the President of PFC, and that PFC and eBay were two separate agencies, rendering the intra-corporate conspiracy defense inapplicable.

## XI.     The Plaintiffs have set forth a plausible claim that eBay ratified the Defendants' conduct.

As eBay has conceded, Massachusetts has not yet addressed the issue of whether allowing an employee to voluntarily resign, as opposed to terminating him, so that he can obtain a $57 million severance package can, as a matter of law, amount to ratification of the behavior. eBay ECF No. 208 at 19-20.

"A corporate officer is personally liable for a tort committed by the corporation that employs him, if he personally participated in the tort by, for example, directing, controlling, approving or ratifying the act that injured the aggrieved party." *Conning v. Halpern*, 2020 U.S. Dist. LEXIS 178635 (D. Mass. 2020); *Townsends, Inc. v. Beaupre*, 47 Mass. App. Ct. 747, 751 (Mass. App. Ct. 1999). "The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault

or battery…A principal may be liable when it ratifies an originally unauthorized tort." *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094, 1110-11 (2009).

Here, eBay and PFC both ratified the conduct of their employees. The members of the conspiracy charged criminally were fired (¶ 284), but Defendant Wenig was permitted to voluntarily leave eBay without terminating him for cause, thus allowing him to reap the rewards of not-for-cause termination. ¶¶ 287-288. While Defendant Wymer was terminated, it does not appear that any other adverse action was taken against him, and during the lobby with the Government, eBay did not urge criminal charges against Defendant Wymer. ¶¶ 289, 291. This was despite the fact that Defendant Wymer was uncooperative in the eBay and Morgan Lewis investigations, lied, and obstructed and destroyed evidence. ¶ 222. Defendant Cooke was promoted as Director of Security, and was not fired until he was charged criminally despite the fact that the eBay investigation would have revealed his participation in the conduct. ¶ 286. Defendant Jones remained in her role as a high-level executive and was permitted to retire with full benefits. ¶ 562.

Defendant eBay acquiesced to the conduct and failed to disavow it. Instead of conducting an actual internal investigation, Defendant eBay hired Morgan Lewis both to conduct an "investigation" and lobby to the Government not to charge eBay. ¶¶ 565-567. Defendant eBay never provided any transcripts or notes of any interviews of any employees, and provided only oral reports of some interviews. ¶ 291. Defendant eBay never shared the contents of the interviews with Defendants Wenig or Jones with the USAO. Defendant eBay hired Morgan Lewis on August 28, 2019 to conduct the investigation, but also retained the firm to represent eBay in conjunction with the USAO investigation, in order to convince the USAO not to

prosecute eBay. Morgan Lewis never compiled or drafted a report outlining its investigation or findings. ¶ 296.

Additionally, while Morgan Lewis and eBay did admit Defendants Wenig and Wymer's communications were "inappropriate," during its lobby to the USAO, they took the position that even if Defendant Wenig's conduct may have been negligent or reckless, it was not criminal. ¶ 293. When Morgan Lewis Attorney Andrew Phelan communicated with the USAO and shared interviews and other documents, he orally relayed the contents of several eBay employee interviews to AUSA Seth Kosto, but tellingly did not reveal the contents of the interviews with Defendant Wenig or Defendant Jones, two long-term executives within eBay and members of the Executive Leadership Team. ¶ 295.

Defendant eBay also entered into agreements with its directors and executive officers to require eBay to indemnify "such persons against expenses, judgments, fines, settlements and other amounts that such person becomes legally obligated to pay…provided such person acted in good faith and in a manner such person reasonably believes to be in or not opposed to the best interests of the Company." ¶ 570. This change in the bylaws expressly protects executives and directors from the conduct that created the causes of actions in this FAC, and demonstrates that Defendant eBay ratifies such conduct, and seeks to protect executives and directors in the future.

Moreover, the obsessive tracking of the Steiners and EcommerceBytes went on for months, and included a trip Defendant Gilbert made to Natick to scrawl "Fidomaster" on the Steiners' fence. Defendants Baugh, Harville and Zea disappeared for days on end without any apparent concern from supervisors, and there were a number of meetings on eBay property relating to the conspiracy. Other John and Jane Doe employees were present during the planning stages. Despite this, the conspiracy was able to not only carry on, but thrive. Where the conduct

was "open and notorious," a company can be said to have ratified the conduct. *See McKenney v. New York City Off-Track Betting Corp.*, 903 F.Supp. 619, 621 (S.D.N.Y. 1995).

Ultimately, the Steiners have set forth a plausible claim for ratification, so this Court should deny eBay's motion to dismiss as to this claim.

### XII.   Defendant PFC is liable under a theory of vicarious liability.

Massachusetts interprets the scope of vicarious liability broadly. *Miller v. Kurkjian*, 1999 Mass. Super. LEXIS 47 at *6 (1999). An employer is variously liable for the tortious conduct of its employee committed while acting in the scope of his employment. *Burroughs v. Commonwealth*, 423 Mass. 874, 877 (1996); *Restatement (Second) of Agency*, 219.

Conduct falls within the scope of employment if: (1) the conduct is "of the kind he is employed to perform,"; (2) "it occurs substantially within the authorized time and space limits," and (3) "it is motivated, at least in part, by a purpose to serve the employer." *Burroughs*, 423 Mass. at 877, *quoting Wang Lab, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 859 (1986).

The Massachusetts Supreme Judicial Court provides a broad scope to vicarious liability based on actual authority under the following rationale:

> As between two innocent parties – the principal-master and the third party – the principal-master who for his own purposes places another in a position to do harm to a third party should bear the loss…A principal who requires an agent to transact his business, and can only get that business done if third parties deal with the agent as if with the principal, cannot complain inf the innocent third party suffers loss by reason of the agent's act. Similarly, the master who must put an instrument into his servant's hands in order to get his business done, must also bear the loss if the servant causes harm to a stranger in the use of that instrument as the business is transacted.
> *Kansallis Finance Ltd. v. Fern*, 421 Mass. 659, 664-665 (1996).

Here, Defendant Zea was an employee of PFC, and was merely working as a subcontractor for eBay. Defendant PFC made decisions as to where and with which company to place Defendant Zea, they made the decision as to whether to terminate Defendant Zea, and she

had a PFC supervisor that would travel to eBay headquarters to check in and oversee her and other PFC contractors. Defendant Zea reported conduct occurring at eBay to her PFC supervisor, who would share the information with Defendants Baugh and Popp, suggesting Defendant PFC did not merely supply contractors; they provided oversight and frequently communicated with eBay regarding its employees.

Not only was Defendant Zea an employee, the conduct that gives rise to tort liability occurred within the scope of Defendant Zea's employment with PFC. *See Burroughs*, 423 Mass. at 877. First, the conduct is the kind Defendant Zea was employed to perform. Defendant Zea was assigned to the security department at eBay, and was tasked with identifying and monitoring Persons of Interest. During the course of her assignment, she was tasked by eBay – the contracting company – to monitor EcommerceBytes, and travelled to Natick with other security team members to monitor and surveil the Steiners. While Defendant Zea and the others ultimately committed numerous torts, she was initially performing the security duties that fell within the scope of her employment.

Second, the conduct occurred "substantially within authorized time and space limits." *Id.* Defendant Zea and the others sent Tweets, packages and travelled to Natick during work hours. They initially booked tickets to attend a conference in Boston, which would fall within the scope of their permitted training.

Third, Defendant Zea's actions were "motivated, at least in part, by a purpose to serve the employer." *Id.* Defendant Zea was first employed by Concentric Advisors, working as a contractor for eBay. Once Concentric was fired, PFC was hired as the contracting company, and PFC gained a multi-million dollar contract and was able to expand its employee base. PFC also had an expensing loophole, where it was making 5% off of each purchase paid for by eBay.

Therefore, in order to keep her employment with PFC, Defendant Zea had a stake in keeping good relations with eBay, and ensuring she remained as a contractor with eBay; complying with the goals of eBay directly benefited her employer. In other words, assisting eBay in taking down EcommerceBytes and the Steiners directly impacted PFC, who gained financially by means of the contract with eBay. As a result, Defendant Zea's actions were motivated by not only her desire to assist eBay, but also to assist her employer.

Considering the totality of the factors, Defendant Zea was an employee of PFC and was acting within the scope of her employment. As a result, PFC is vicariously liable for her conduct. *See Burroughs*, 423 Mass. at 877; *Wang Lab, Inc. v. Business Incentives, Inc.,* 398 Mass. 854, 859 (1986).

### XIII.   Defendant PFC and Defendant Krystek's claims that Massachusetts lacks personal jurisdiction over them fails.

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction 'is the functional equivalent of a state court sitting in the forum state." *Daynard v. Ness Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 51 (1st Cir. 2002). Accordingly, personal jurisdiction is assessed through the lens of the Massachusetts long-arm statute and the Constitution. *Lyle Richards Int'l, Ltd. V. Ashworth, Inc.,* 132 F.3d 111, 112 (1st Cir. 1997). Because courts construe "the Massachusetts long-arm statute as being coextensive with the limits permitted by the Constitution," this Court may "turn directly to the constitutional test for determining specific jurisdiction." *Adelson v. Hananel*, 652 F.3d 75, 80 (1st Cir. 2011).

The Massachusetts long-arm statute "deals with torts committed by persons who have no ongoing relationship with the forum state," and applies when the act causing the injury occurs in Massachusetts. *Bay Promo, LLC v. Alaniz*, 2021 U.S. Dist. LEXIS 82088 (D. Mass. 2021),

*quoting Ticketmaster-N.Y., Inc. v. Alioto*, 26 F.3d 201, 205 (1st Cir. 1994). The long-arm statute does not require that a defendant be physically present in Massachusetts at the time the plaintiff was injured, as long as the act that is the "but for" cause of the injury was purposely directed at the plaintiff in Massachusetts. *Id.*

First, the Court is to determine whether the long-arm statute applies and then the next question is whether exercising personal jurisdiction over the defendant satisfies constitutional due process requirements. Personal jurisdiction over a defendant is constitutionally sound if the requirements for exercising either specific or general jurisdiction over the defendant apply. *Cossaboon v. Me. Med. Ctr.*, 600 F.3d 25, 31 (1st Cir. 2010).

Specific jurisdiction exists where the plaintiff's cause of action arises from or relates directly to the defendant's contacts with the forum state, *Prizker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994); general jurisdiction is broader, and "subjects the defendant to suit in the forum state's courts 'in respect to all matters, even those that are unrelated to the defendant's contacts with the forum.'" *Cossaboon*, 600 F.3d at 31, quoting *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir. 1999). The First Circuit applies a three factor test in determining whether specific jurisdiction is appropriate: "(1) whether the claims arise out of or related to the defendant's in-state activities, (2) whether the defendant has purposefully availed itself to the laws of the forum state, and (3) whether the exercise of jurisdiction is reasonable under the circumstances." *Pesmel N. Am., LLC v. Caraustar Indus., Inc,*, 754 F. Supp. 2d 168, 172 (D. Mass. 2010).

The first prong, relatedness, "'is a flexible, relaxed' standard that focuses on the nexus between the plaintiff's claim and the defendant's contacts with the forum state." *Id.,* quoting *Astro-Med*, 591 F.3d at 9. One co-defendant may have its contacts with a state imputed to

another co-defendant where the co-defendants lead "the public to believe they were co-venturers" or where one co-defendant ratifies the other co-defendant's transactional contact with the forum state by "knowingly accepting the benefits of the transaction." *Daynard*, 290 F.3d at 57, 60.

The second prong, purposeful availment, requires some act or series of acts "by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The purposeful availment test "focuses on the defendant's intentionality," and "is only satisfied when the defendant purposefully and voluntarily directs his activities towards the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." *United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 623-24 (1st Cir. 2001). The final prong, reasonableness, turns on a series of so-called "Gestalt factors," including: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. *Cossaboon*, 600 F.3d at 33 n. 3.

a.  <u>PFC's agent, Defendant Zea, caused injury in Massachusetts and so Defendant PFC is subject to personal jurisdiction in Massachusetts.</u>

Here, the long-arm statute applies where Defendant Zea – acting as an employee and agent for PFC – both directed acts at the Steiners from California into Massachusetts, and where Defendant Zea physically travelled to Massachusetts and caused the Steiners injury in Massachusetts. Cf. *Bay Promo, LLC v. Alaniz*, 2021 U.S. Dist. LEXIS 82088 (D. Mass. 2021),

Moreover, all of the Constitutional factors weigh in favor of subjecting PFC to personal jurisdiction. Defendant Zea was an employee of PFC at the time of the events, and she was acting within the scope of her employment as a security analyst contracted with eBay. *See Wang Labs, Inc. v. Bus. Incentives, Inc.*, 398 Mass. 854, 859 (1986) (employee's conduct falls within scope of employment if: (1) it is the kind for which he is hired to perform, (2) it occurs within the authorized time and space limits, and (3) it was motivated, at least in part, by a purpose to serve the employer"). As such, PFC is vicariously liable for her conduct.

The claims against PFC arise out of Defendant Zea's purposeful contacts with Massachusetts. Not only did Defendant Zea assist in sending packages to the Steiners in Massachusetts for the purpose of harassing and threatening them, she physically traveled to Natick, financed by PFC, to stalk, surveil, threaten and harass the Steiners, which she pled guilty to. *See Pesmel N. Am., LLC,* 754 F. Supp. 2d at 172.  Defendant PFC paid the travel expenses for Zea and other Defendants including plane tickets, hotel rooms, car rentals, meals.  Defendant PFC also funded the conspiracy by paying the expenses for the mailings of the pig mask, the funeral wreath, the spiders, the cockroaches, the gift cards, and the laptops.  Defendant Zea also purposefully availed herself to Massachusetts jurisdiction where all activities were voluntarily and purposely directed to Massachusetts. *Id.* Lastly, Massachusetts has an interest in adjudicating the dispute where citizens of California travelled into Massachusetts to torture Massachusetts citizens, the forum is more convenient for the Steiners, all but two causes of action deal with Massachusetts law, and all other Defendants will proceed in Massachusetts. *See Cossaboon*, 600 F.3d at 33 n. 3.

As such, PFC should be subjected to personal jurisdiction in Massachusetts.

b.  <u>Contrary to Defendant Krystek's assertions, he is also subject to personal jurisdiction.</u>

If the corporation is subject to specific jurisdiction, personal jurisdiction for a corporate officer may be based upon his acts on behalf of the corporation.  This theory, however, requires "more than mere participation in the corporation's affairs."  *Id.* at 280.  The defendant must be a "primary participant" in the alleged wrongdoing.  *See LaVallee v. Parrot-Ice Drink Prod. of Am., Inc.*, 193 F. Supp. 2d 296, 302 (D. Mass. 2002).  The court asks "whether an officer or employee derived personal benefit from their contacts in Massachusetts and/or acted beyond the scope of their employment."  *M-R Logistics,* 537 F. Supp. 2d at 280; see also *Grice*, 280 F. Supp. 3d at 278.

A corporate officer may also be subject to personal jurisdiction if the corporation is subject to the long-arm statute, and jurisdiction falls within Constitutional bounds if the corporate officer can be said to be the "alter ego" of the Corporation. Under this theory, the corporate officer must have "an identity of interest with the corporation itself (i.e., the corporation and the corporation's president)." *See M–R Logistics*, 537 F.Supp.2d at 280; *Grice*, 280 F. Supp. 3d at 279.

Defendant Krystek was a primary participant in the wrongdoing where his approval of expenses directly enabled Defendants Zea, Baugh, Popp and Harville to travel to Boston in order to stalk, harass and surveil the Steiners, and attempt to attach a GPS device on their vehicle to commit further acts against them. This allows Massachusetts to exercise personal jurisdiction over him. *See LaVallee v. Parrot-Ice Drink Prod. of Am., Inc*., 193 F. Supp. 2d 296, 302 (D. Mass. 2002).

Moreover, prior to securing the eBay contract, there were only three employees (¶ 349), and the relationship between Defendant Krystek and Defendant Baugh (who oversaw the tortious

activity) was extremely close and stretched back decades (¶ 344, 348).  PFC was only able to

expand to a multi-million dollar company because of Defendant Krystek's relationship with

Baugh, and the acquisition of the eBay contract through Defendant Baugh. Moreover, Defendant

Baugh facilitated Defendants' Krystek and PFC's acquisition of the contract because he knew of

Defendant Krystek's values, and that he would be a willing participant in expensing loophole

and in fact, Defendant Krystek gained financially from the arrangement. Where Defendant

Krystek was the alter-ego of the company, and where the acts and harm were ultimately carried

out in Massachusetts, he is subject to personal jurisdiction. *See M–R Logistics*, 537 F.Supp.2d at

280; *Grice*, 280 F. Supp. 3d at 279.

## **CONCLUSION**

Wherefore, the Plaintiffs respectfully request that this Court deny all Defendants'

Motions to Dismiss.  In the alternative, if this Court deems that any claim is susceptible to being

dismissed, Plaintiffs request that this court allow them limited discovery, with leave to further

amend their FAC.


Respectfully submitted,
INA AND DAVID STEINER
By their attorney,

/s/ Rosemary Curran Scapicchio
Rosemary C. Scapicchio, BBO No. 558312
Law Office of Rosemary Scapicchio
107 Union Wharf
Boston, MA 02109
617.263.7400
Rosemary@Scapicchiolaw.com

Respectfully submitted,
STEINER ASSOCIATES, LLC
By its attorney,

/s/ Jillise McDonough
Jillise McDonough, BBO No. 688694
Law Office of Jillise McDonough
107 Union Wharf
Boston, MA 02109
617.263.7400
Jillise@Scapicchiolaw.com

## CERTIFICATION PURSUANT TO L.R. 7.1(a)(2)

Pursuant to Local Rule 7.1(a)(2), the undersigned counsel certifies that counsel for

Plaintiffs emailed all defense counsel to determine if any assented to this Motion, and all object.

Dated:    June 12, 2023              Signed: /s/ Rosemary Scapicchio

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of

record for each party and upon any party appearing pro se by complying with this Court's

directives on electronic filing.

Dated:    June 12, 2023              Signed: /s/ Rosemary Scapicchio