# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Ina Steiner,<br>David Steiner,<br>Steiner Associates, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>eBay, Inc.,<br>Progressive F.O.R.C.E. Concepts, LLC,<br>Devin Wenig,<br>Steve Wymer,<br>James Baugh,<br>David Harville,<br>Brian Gilbert,<br>Stephanie Popp,<br>Stephanie Stockwell,<br>Veronica Zea,<br>Philip Cooke, and<br>John and Jane DOE,<br><br>*Defendants*. | No. 1:21-cv-11181<br>Leave to File Granted<br>June 16, 2023 |

## DEFENDANT DEVIN WENIG'S REPLY TO PLAINTIFFS' OPPOSITION TO HIS MOTION TO DISMISS AMENDED COMPLAINT ("FAC")

To avoid dismissal, Plaintiffs' burden is to allege *facts* sufficient to "*show* a *plausible* entitlement to relief.*"   Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 10 (1st Cir. 2011) (emphasis added).[1]   Lacking any facts remotely sufficient to connect Wenig to the alleged harassment underlying their claims, Plaintiffs resort to innuendo and utterly baseless speculation, coupled with increasingly inflammatory rhetoric, often at odds with their own allegations.

*In determining the sufficiency of a complaint, the first step is "separating [its] factual allegations from its legal conclusions," the latter of which "are not entitled to a presumption of truth." Ocasio*, 640 F.3d at 10 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)) (emphasis added). In addition to legal conclusions, allegations should not be considered if they are "so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (citation omitted).  The second step of the analysis requires courts to "evaluate whether, taken as a whole," the remaining factual allegations "state a facially plausible legal claim." *Ocasio*, 640 F.3d at 10-11.

This plausibility standard requires Plaintiffs to do more than allege facts "consistent with" liability because such mere consistency "stops short of the line between possibility and plausibility of entitle[ment] to relief." *Twombly*, 550 U.S. at 557 (citation omitted).  The analysis is inherently comparative and requires the Court to weigh Plaintiffs' proffered inference against innocent explanations offered by the defense.  *See Id.* at 567 (noting "obvious alternative explanation" of alleged facts); *Iqbal*, 556 U.S. at 681 (allegations did not "plausibly establish" discriminatory intent "given more likely explanations" for alleged actions).  The task is "context specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Not only must a complaint set forth a plausible claim, "but also a plausible defendant."

---

[1] Plaintiffs misapprehend this fundamental point, claiming that dismissal is appropriate only if they "can prove no set of facts to support [the] claim for relief." Dkt. 221 at 17 (citation omitted).  The Supreme Court abrogated Plaintiffs' proffered standard more than 15 years ago.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007).

*Ocasio*, 640 F.3d at 16 (citation omitted).  A defendant's liability must be predicated upon his own alleged "personal involvement" in an asserted claim, not "solely on [his] position of authority." *Id.*[2]  Here, Plaintiffs' allegations fail to raise any right to relief *against Wenig* "above the speculative level."  *Twombly*, 550 U.S. at 555.  No one, other than Plaintiffs, has ever claimed that Wenig had anything to do with the harassment.  Their entire case relies on a distortion of three words ("take her down") from an August 1, 2019 text message to Steve Wymer (not the harassment actors) which they mischaracterize two dozen times as a "directive" for the criminally charged defendants to engage in the bizarre harassment outlined in the FAC.  *See* Dkt. 221 at 1, 2, 3, 17, 18, 19, 21, 22, 23, 24, 29, 31, 33, 36, 38, 39, 40, 41, 42, 64, 66, 70, 82.  But Plaintiffs' out of context repetition, baseless inference, and conclusory characterization do not make it so.

Plaintiffs' other factual allegations, taken at face value only for purposes of this Motion to Dismiss,[3] only serve to undermine the plausibility of their proffered inference.  As the below chart illustrates, Plaintiffs repeatedly, and implausibly, twist and distort their own allegations to make it appear otherwise:

| **Allegation** | **Plaintiffs' Characterization** | **Wenig Response** |
|---|---|---|
| "On May 31, 2019," Wenig texted Wymer regarding Ina Steiner, "'I couldn't care less what she says,['] then seconds later added, '[t]ake | "Wenig and . . . Wymer engaged in months-long discussions aimed at silencing and taking [Plaintiffs] down." Dkt. 221 at 38. | "[I]n June of 2019," *i.e.* one day after Wenig's text message, "executives, including . . . Wenig and Wymer, retained a consultant |

[2] Accordingly, Plaintiffs' characterization of "the culture [Wenig's] tenure as CEO created at eBay" is only relevant to the extent the alleged facts are tied specifically to him.  Dkt. 221 at 23.  For example, Plaintiffs allege no facts in support of their conclusory suggestion that Wenig "knew or should have known" that Baugh stabbed a chair.  *Id.* at 29-30; *see also* FAC ¶ 318 (failing to mention Wenig in connection with alleged chair stabbing).  In any event, Plaintiffs' characterization of eBay's culture is unsupported by factual allegations and contradicted by a wide array of publicly available information.  *See* Dkt. 79-1 at 2.

[3] Several of Plaintiffs' allegations are demonstrably false.  For example, Plaintiffs rely repeatedly and heavily upon a text purportedly sent by Wenig's wife to Baugh.  *See* Dkt. 221 at 24, 28, 34, 37, 38, 39, 40, 73.  Had Plaintiffs provided a copy of the full message, it would make clear that the text was not actually sent to Baugh, that it was sent prior to Wenig's planned sabbatical, and that it contained a direct threat posted on Plaintiffs' website.  In any event, the mere fact that Wenig's wife expressed concern for her husband's safety after a commenter spoke of a "crash landing" right before he was flying does not support any reasonable inference that Plaintiffs' "reporting had become all-consuming" to Wenig.  Dkt. 221 at 39.

| Allegation | Plaintiffs' Characterization | Wenig Response |
|---|---|---|
| her down.'" FAC ¶ 66. | | firm.  The consultant firm produced a report" that "outlined strategies that would *drive the Steiners' articles lower in search engine results . . . .*" FAC ¶¶ 69-70 (emphasis added).<br><br>Plaintiffs never mention this lawful retention of a communications consultant, nor explain why or how, two months later, the exact same colloquial phrase had become a secret code word for criminal harassment. |
| On August 6, 2019, General Counsel Marie Huber, in response to an email from Wenig forwarding a complaint about FidoMaster, said eBay had "escalated through legal channels at Twitter and they've said that this doesn't violate their policies." FAC ¶ 92. | "There were discussions between . . . Wenig, Wymer, Jones, Baugh and the legal department relating to the fact that there were no further legal means to shut things down, and that the communications department had no tools at its disposal. . . .  Wenig ordered . . . Wymer to 'take her down.'" Dkt. 221 at 21 (citations omitted). | The email from Huber came *five days after* Wenig's August 1 text and therefore cannot plausibly support any inference that the prior message was motivated by a perceived lack of legal alternatives.  Plaintiffs' inference is directly contradicted by Wenig going out of his way to forward the August 6 complaint to eBay's General Counsel asking about possible legal recourse. *See* FAC ¶ 91. This is an entirely implausible action for someone to take who is plotting a criminal harassment campaign. |
| | Referring to Wenig as "the stealthiest" because he "appeared to have limited phone communications relating to the campaign against Plaintiffs." Dkt. 221 at 4. | Plaintiffs' suggested inference is that the *lack of* alleged communications implicating Wenig in the harassment is somehow *evidence* of his involvement. This inverse inference is altogether implausible in light of the obvious alternative. |

| Allegation | Plaintiffs' Characterization | Wenig Response |
|---|---|---|
| "It is no coincidence in time, . . . Wenig issued the directive to take Ina Steiner down the same day he began sabbatical and travelled to Italy for the month, allowing him a measure of plausible deniability." FAC ¶ 83. | "[D]irecting his subordinates to engage in the conspiracy while he knew he would be on sabbatical is the attempt at 'plausible deniability.'" Dkt. 221 at 11. | Wenig's message was in relation to a story published that day by Plaintiffs (of which he could not have had prior knowledge) and could not have been manufactured to coincide with his travel plans which were planned months in advance. |
| On August 1, 2019, Wenig texted Wymer, "'[Ina] is out with a hot piece on the litigation. If we are ever going to take her down . . . now is the time.' . . . Wymer responded, '[o]n it.'" FAC ¶ 82. | "Wenig, Jones and Wymer set the plan in motion and enlisted . . . Baugh to carry out the directives." Dkt. 221 at 2. | Plaintiffs make no *factual* allegation that Wenig "enlisted" Baugh to do anything; the FAC does not allege any communication between Wenig and Baugh regarding Plaintiffs or Baugh's conduct.[4] |
| At criminal plea hearings, government recited, "Senior executives…at eBay were frustrated with the newsletter's tone and content and with the tone and content of comments that appeared underneath the newsletter's article. The stalking campaign…arose from communications between eBay senior executives and Jim Baugh . . . ." FAC ¶ 366j. | "Every defendant who has pled guilty in the criminal cases admitted that their actions were premised upon directives from . . . Wenig and Wymer . . . ." Dkt. 221 at 33.<br><br>"[T]he Defendants charged criminally were – quite literally – carrying out [Wenig, Wymer, and Jones's] orders." Dkt. 221 at 35. | Wenig's name does not appear in any of the relevant plea transcripts, and no criminal defendant has stated that Wenig "direct[ed]" any of the alleged harassment. It is patently false, and unsupported by the FAC, to assert that Wenig "quite literally" ordered anyone to stalk or harass Plaintiffs. |
| "Although supposedly hired to conduct an[] internal investigation, neither Morgan Lewis or [sic] any attorney acting on its behalf ever prepared a report outlining the investigation, or its findings. The investigation was a sham." FAC ¶ 296. | "Plaintiffs . . . allege that the 'outside investigation' was a sham – so any purported 'clearing' of Wenig was also a sham." Dkt. 221 at 10 (citation and footnote omitted). | Plaintiffs' characterization of eBay's internal investigation as a "sham" is the epitome of a conclusory allegation unsupported by the FAC's factual content. It is also belied by Plaintiffs' reliance upon certain cherry-picked aspects of the investigation's findings. *See* Dkt. 229 at 4-5. |

---

[4] As reflected in a document previously submitted by Plaintiffs in this litigation, on August 6, 2019, in response to a text message from Baugh regarding the complaint Wenig forwarded to legal that day, Wenig wrote, "It's cool don't worry. You know this comes with the territory and it's part of running w consumer company. I'm relaxed." Dkt. 146-1 at 16. This is the antithesis of a directive to criminally harass anyone.

| <u>Allegation</u> | <u>Plaintiffs' Characterization</u> | <u>Wenig Response</u> |
|---|---|---|
| "Wenig, Wymer, and Jones became obsessed with . . . Ina Steiner's reporting.  They directed their subordinates to monitor the reporting on an hourly basis, then directed the acts that resulted in the stalking, harassment, threats, and torture of the Steiners." FAC ¶ 459. | Referring to "Wenig's obsession with taking Ina Steiner down."  Dkt. 221 at 10. | Plaintiffs allege only four allegedly relevant communications out of thousands by Wenig over a period of several months.  This self-evidently is far from being "obsessed." |
| | Referring to "Wenig's frequent and direct communication with either Baugh, or Wymer who disseminated his communications to Baugh." Dkt. 221 at 10. | The record in this case reflects only two texts between Wenig and Baugh during the relevant timeframe, one of which never occurred.  *See* Dkt. 197 at 6 n.6 (noting that "[t]he Cavalry is back" was not sent to Baugh).  The other ("[i]t's cool don't worry"), is the antithesis of a directive to commit a tort.  *See supra* n.4. |
| | "[T]here are additional emails, texts, and call logs . . . that may evince the level of . . . Wenig and Wymer's knowledge, their directives, and how involved they were in each of the torts alleged." Dkt. 221 at 66. | Plaintiffs' burden to show a plausible entitlement to relief to obtain discovery is not satisfied by rank speculation regarding additional materials that *may* come to light in discovery. |
| "eBay and its executives, including . . . Wenig . . . , were well aware of . . . Baugh's background . . . [,] expected he would use strategies and tactics he learned in service of the U.S. government to address . . . the Steiners. . . . [and t]he purpose . . . was to use him as a tool to carry out the company's objectives, while attempting to shield . . . C-Suite[] executives from | Same.  Dkt. 221 at 26. | Plaintiffs' inference is altogether implausible.  The obvious alternative inference is that eBay believed Baugh's government experience would be valuable to his legitimate private security work.  Security professionals with government experience are favored by companies of every size and across industries. |

| Allegation | Plaintiffs' Characterization | Wenig Response |
|---|---|---|
| liability."  FAC ¶¶ 303, 307. | | |

Plaintiffs argue that Wenig's Motion to Dismiss "begs the question as to what he believed would happen."  Dkt. 221 at 41.  Based on Plaintiffs' own allegations, the answer is simple: Wenig, the CEO of a Fortune 500 company, believed that sending a colloquial message "take her down" only to his head of communications (Wymer) would mean what it meant two months *prior* when a materially identical message resulted in the retention of a communications consultant to explore legitimate and lawful ways to lower (*i.e.*, "take down") the search results and rebut the substance of Plaintiffs' reporting on eBay.  The utter implausibility of Plaintiffs' contrary inference is the fact that, in the midst of the alleged harassment campaign and five days *after* Wenig's purported "match-lighting" message, Wenig forwarded the FidoMaster complaint to eBay's legal department, asking about *lawful* recourse.

The transcript of Baugh's sentencing hearing, accepting full responsibility for Plaintiffs' harassment, and eBay's presentation to the government, reflecting Wenig's lack of knowledge about or direction for Baugh's misconduct, only further undermine the plausibility of any claim against Wenig.  Dismissal is appropriate even without consideration of these materials, but this Court can and should consider them as further support for Wenig's argument.  *See* Dkt. 229.

With respect to the various asserted intentional torts, Plaintiffs make no serious contention that Wenig's three-word text to Wymer was itself tortious or that he personally committed any alleged tort.  Instead, Plaintiffs' Opposition repeatedly falls back on the indirect theory of aiding and abetting.  *See* Dkt. 221 at 65 (stalking), 70 (Massachusetts Civil Rights Act), 74 (trespass); FAC ¶ 522 (defamation).[5]

---

[5] Plaintiffs' discussion of false imprisonment does not so much as mention Wenig, *see* Dkt. 221 at 76-78, much less explain how the FAC plausibly alleges that he acted with the requisite "specific intent to confine."  Dkt. 197 at 16

Plaintiffs concede that aiding and abetting requires the defendant's knowledge that other persons were "committing the relevant tort." *Mass. Port Auth. v. Turo Inc.*, 487 Mass. 235, 244 (2021); *see also Kyte v. Philip Morris Inc.*, 408 Mass. 162, 168 (1990) (granting summary judgment where defendant "had no specific knowledge" of illegal cigarette sales); *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 35 n.21 (1st Cir. 2009) ("Massachusetts aiding and abetting liability generally requires that a defendant share the mental state of the principal violator.").

The Supreme Court just sharpened these requirements in *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023), where the plaintiffs claimed that social media companies were civilly liable for aiding and abetting an ISIS terrorist attack. The Court observed that "[a]iding and abetting is an ancient criminal law doctrine that has substantially influenced its analog in tort," but the concept has "never been boundless." *Id.* at 1220 (citation omitted). "[O]verly broad liability would allow for one person [to] be made a trespasser and even a felon against his or her consent, and by the mere rashness or precipitancy or overheated zeal of another." *Id.* at 1221 (citation omitted). Accordingly, courts have consistently cabined aiding and abetting liability to require "conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 1223. And, because "aiding and abetting is inherently a rule of secondary liability for specific wrongful acts," the defendant's conscious participation must relate to the particular "actionable wrong" at issue. *Id.* at 1223-24.

Under the foregoing principles, all aiding and abetting claims against Wenig fail. Plaintiffs do not even attempt to argue that Wenig intended or assisted in any of the specific intentional torts alleged in the FAC. Under *Twitter*, it is not enough for Plaintiffs to contend that "[a]ny reasonable person could foresee that *some* harm to the Steiners would result from" Wenig's purported

---

(citation omitted). Accordingly, that count clearly must be dismissed. While Plaintiffs' Opposition does not mention aiding and abetting liability with respect to the intentional infliction of emotional distress count, there is no precedent to support a claim that any of the alleged conduct *by Wenig* was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Dkt. 197 at 13 (citation omitted).

"directive[]."  Dkt. 221 at 22.  Here, as in *Twitter*, the "relationship between" Wenig and the underlying torts "is highly attenuated," and dismissal is required.  143 S. Ct. at 1227.

To hold Wenig liable for aiding and abetting would be to punish him for Baugh's "rashness," just as the *Twitter* Court warned against.  *Bird v. Lynn*, 49 Ky. 422 (1850), the case cited by the Supreme Court, arose from a beating by one defendant (Bird) but the analysis focused on another defendant, Jouett, allegedly liable due to his wife's conduct.  "There was no proof that [Jouett's wife] was present at the commission of the trespass," but the trial judge instructed the jury that Jouett could be liable if his wife "encouraged the trespass."  *Id.* at 422.  The court opined that:

> To make Mrs. Jouett liable . . . by words used on a prior occasion, those words must have had a *direct relation to the trespass* . . . .  If it were sufficient that the act was done in consequence of the words spoken, . . . the mere expression of just anger or resentment . . . might make the party using such expressions . . . liable for the inconsiderate act of another [and] there would be no safety except in such universal caution and reserve as is neither to be expected nor desired.

*Id.* at 423 (emphasis added).

In the context of conspiracy, aiding and abetting's "close cousin," the requirement of an "agreement with the primary wrongdoer to commit wrongful acts" serves as "a significant limiting principle."  *Twitter*, 143 S. Ct. at 1221.  As explained in Wenig's opening Motion, the lack of any such alleged agreement between Wenig and any other defendant to tortiously harm Plaintiffs (and the lack of any tortious conduct by Wenig himself) dooms the claim.  Plaintiffs' response is to baldly contend that all defendants agreed to "ensur[e] the Steiners no longer reported on eBay in what they perceived to be a negative manner."  Dkt. 221 at 79.  But, even if that were supported by *factual* allegations (which it is not), under *Twitter* it is insufficient.  Under Plaintiffs' theory, Wenig could be liable even if he intended to take lawful actions to address Plaintiffs' reporting.  Instead, in order to be a co-conspirator, a defendant must agree "to commit *wrongful* acts."  *Twitter*,

143 S. Ct. at 1221 (emphasis added); *see also, e.g.*, *Hiam v. HomeAway.com, Inc.*, 267 F. Supp. 3d 338, 353 (D. Mass. 2017).  Plaintiffs' failure to plausibly allege any agreement by Wenig to engage in any of the harassment underlying the counts alleging intentional torts forecloses their claims from moving forward on this basis.

Plaintiffs do not rely on an aiding and abetting theory to support their negligence-based claims and for good reason: "courts have found the concept of secondary liability for negligence to be inherently contradictory."  *BankUnited, N.A. v. Milliman, Inc.*, No. 15-CV-1357, 2016 WL 8999079, at *5 (M.D. Fla. Jan. 15, 2016) (citation omitted).  Accordingly, they must establish each required element with respect to Wenig's own conduct.

As set out in Wenig's opening Motion, Baugh's intervening criminal conduct represents a superseding cause, utterly unforeseeable to Wenig, that precludes any finding of proximate causation as a matter of law.  *See, e.g.*, *Kent v. Commonwealth*, 437 Mass. 312, 322 (2002) (dismissing negligence claims on proximate causation grounds "in light of the intervening events present and acknowledged in the complaint"); *Litowsky v. Ascho Power Techs., L.P.*, 4 F. Supp. 3d 328, 329 (D. Mass. 2014) (dismissal "where Plaintiff 'has no reasonable expectation of proving that [his injury] was a foreseeable result of the defendant's negligent conduct'") (quoting *Herbert v. Enos*, 60 Mass. App. Ct. 817, 820-21 (2004)).[6]  The lack of foreseeability of Baugh's conduct also implicates the existence (or lack thereof) of any duty, *see* Dkt. 221 at 20, which is "a question of law . . . appropriately considered on a motion to dismiss."  *Westgate v. Vibra Hosp.*, 102 Mass. App. Ct. 1110, at *1 (2023) (unpublished); *see also, e.g.*, *Gaines v. Gen. Motors Corp.*, 789 F. Supp. 38, 39 (D. Mass. 1991) ("Massachusetts has been particularly reluctant to find a duty to take precautions against possible criminal activity.").

---

[6] Contrary to Plaintiffs' repeated implication, *see, e.g.*, Dkt. 221 at 36, mere but-for causation is insufficient.

A defendant's liability for negligence is limited to "the natural and probable consequences of his conduct." *Jorgensen v. Mass. Port Auth.*, 905 F.2d 515, 523 (1st Cir. 1990) (quoting *Dziokonski v. Babineau*, 375 Mass. 555 (1978)), and a defendant is not responsible for harm "intentionally caused by a third person and . . . not within the scope of the risk created by the [defendant's] conduct." Dkt. 221 at 23 (citation omitted). There can be no question that Baugh acted intentionally, indeed he pled guilty to that. And his criminal behavior was not within any scope of risk resulting from Wenig's own actions. Rather, Wenig was entitled to expect that Baugh would "obey the criminal law." *Gidwani v. Wasserman*, 373 Mass. 162, 166 (1977). Baugh's conduct was, by Plaintiffs' own account, utterly bizarre. It was the functional equivalent of a patron firing a gun to stop an argument at a bar: "such an outrageous method of ending a dispute that it cannot reasonably be called a consequence of any act for which the defendant was responsible." *Addison v. Green Café, Inc.*, 323 Mass. 620, 622 (1949).

The FAC fails to allege anything that Wenig knew or should have known about Baugh that would render his alleged conduct in this case remotely foreseeable and dooms the negligent supervision claim as well. *See, e.g.*, *Saldivar v. Racine*, 818 F.3d 14, 21-22 (1st Cir. 2016). Plaintiffs do not even attempt, in the FAC itself or their Opposition, to tie the allegations that Baugh "harassed, berated and intimidated his subordinates" to Wenig. Dkt. 221 at 29 (citing FAC ¶¶ 314-18, which mention Wenig only to assert it was "impossible" for him not to know about active shooter drills). This omission is fatal to their claim.[7]

---

[7] Plaintiffs also rely on a mischaracterization of the very same eBay presentation to the government that they contend the defendants should be precluded from relying upon. Contrary to Plaintiffs' characterization, eBay's mere statement that it had "uncovered new information about Baugh's unsuitability as a manager" does not "suggest[] . . . that eBay had at least *some* information about . . . Baugh's unsuitability as a manager before the conspiracy." Dkt. 221 at 26. To the contrary, the presentation went on to note, in the very next bullet, that Baugh's company files reflected "no red flags." Dkt. 117-1 at R25. In any event, absent any indication at all what the purported information regarding Baugh's "unsuitability" was, it cannot support a plausible inference that his subsequent actions were foreseeable to Wenig.

Dated: July 12, 2023                          Respectfully submitted,


                                              /s/ *Abbe David Lowell*
                                              Abbe David Lowell (*pro hac vice*)
                                              Andrew E. Tauber (*pro hac vice*)
                                              WINSTON & STRAWN LLP
                                              1901 L Street, NW
                                              Washington, DC 20036
                                              adlowell@winston.com
                                              atauber@winston.com
                                              (202) 282-5000

                                              /s/ *Martin G. Weinberg*
                                              Martin G. Weinberg, Esq.
                                              Martin G. Weinberg PC
                                              20 Park Plaza
                                              Suite 1000
                                              Boston, MA 02116
                                              owlmgw@att.net
                                              (617) 227-3700

                                              *Counsel for Devin Wenig*

**CERTIFICATE OF SERVICE**

I certify that on July 12, 2023, this document was served on all participating counsel via the CM/ECF system and on pro se defendant Stephanie Stockwell via email at stockwellstephanie21@gmail.com.

Dated: July 12, 2023                           By: _/s/ Martin G. Weinberg_