```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   INA STEINER, et al,                    )
                                            )
 4                    Plaintiffs            )
                                            )
 5            -VS-                          )  CA No. 21-11181-PBS
                                            )  Pages 1 - 105
 6   eBAY INC., et al,                      )
                                            )
 7                    Defendants            )

 8

 9                 MOTION HEARING BY VIDEO

10          BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE
11

12

13

14

15                              United States District Court
                                1 Courthouse Way
16                              Boston, Massachusetts  02210
                                August 10, 2023, 9:10 a.m.
17

18

19

20

21

22                        LEE A. MARZILLI
                       OFFICIAL COURT REPORTER
23                   United States District Court
                   1 Courthouse Way, Room 7200
24                       Boston, MA  02210
                         leemarz@aol.com
25
```

```
 1    A P P E A R A N C E S:

 2
      FOR THE PLAINTIFFS:
 3
      ROSEMARY C. SCAPICCHIO, ESQ.
 4    Law Office of Rosemary C. Scapicchio
      107 Union Wharf
 5    Boston, MA 02109

 6
      FOR THE DEFENDANTS:
 7
      DANIEL J. FEITH, ESQ.
 8    Sidley Austin LLP
      1501 K Street, NW
 9    Washington, DC 2000

10    JACK W. PIROZZOLO, ESQ. and
      KATHRYN LUNDWALL, ALLESSI, ESQ.
11    Sidley Austin LLP
      60 State Street
12    34th Floor
      Boston, MA 02109
13
      MATTHEW J. HOLMES, ESQ.
14    Morrison Mahoney LLP
      250 Summer Street
15    Boston, MA 02210-1181

16    ABBE DAVID LOWELL, ESQ.
      Winston & Strawn, LLP
17    1901 L Street, NW
      Washington, DC 20036
18
      MARTIN G. WEINBERG, ESQ.
19    Martin G. Weinberg, PC
      20 Park Plaza
20    Suite 1000
      Boston, MA 02116
21
      CAZ HASHEMI, ESQ.
22    Wilson Sonsini Goodrich & Rosati
      650 Page Mill Road
23    Palo Alto, CA 93404

24

25
```

1    APPEARANCES:   (Cont'd)

2

     FOR THE DEFENDANTS:

3

     MICHAEL J. PINEAULT, ESQ.

4    Anderson & Kreiger LLP
     50 Milk Street

5    Ste 21st Floor
     Boston, MA 02109

6

     ANDREW O'CONNOR, ESQ. and

7    BRIEN T. O'CONNOR, ESQ.
     Ropes & Gray — MA

8    Prudential Tower
     800 Boylston Street

9    Boston, MA 02199-3600

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2              THE CLERK:  I think, Counsel, the Judge is still

3     trying to connect.  I can see her audio is not connected

4     yet, but I believe we have all 50 people.

5              Judge, can you hear me?  It's Maryellen.

6              THE COURT:  Yes, I can.  Can you hear me?

7              THE CLERK:  Yes, I can.  Thank you.  So I believe

8     we have about 50 participants, and I'll just let everyone

9     know that anybody who is not an attorney should not have

10    their video up, and you should all mute.  Anyone who's an

11    attorney should keep it up just till I call the case, and

12    then the Judge will direct you how to go from there.

13             So our Court Reporter is Lee Marzilli, and you can

14    see her name listed in the block.  And anyone on the press

15    as well, you should not keep your videos on, only the

16    attorneys for the moment.

17             Judge, I'll call the case.

18             THE COURT:  Thank you.

19             THE CLERK:  The Court calls Civil Action 21-11181,

20    Steiner, et al v. eBay Inc. et al.  Could counsel please

21    identify themselves.

22             THE COURT:  Well, actually, I'm going to do it

23    just a little bit differently because there's so many

24    attorneys and so many motions.  So I'm sort of thinking,

25    there was an agreed-upon agenda and lineup, which is in

1    Docket 257, which was extremely helpful, and so what I

2    thought I would do is start with the attorneys for the party

3    that's going to argue first, and that's eBay, and I think

4    it's Mr. Pirozollo, and, of course, Ms. Scapicchio.  And

5    then it's going to be roughly ten minutes a side, as I think

6    we've agreed, and then we'll go back down through the whole

7    list.  And let's say then the next one is PFC, so I'll have

8    those attorneys introduce themselves, and that might be

9    easier for me.  So in the meantime, everybody else should

10    turn off their video until it's their turn.

11            Let me also say that it's about what, 9:10 right

12    now?  At some point in the vicinity of 11:00 o'clock, I will

13    probably take a break so that the Court Reporter,

14    Ms. Marzilli, can have a break, but there's a hard stop, and

15    we can do any cleanup afterwards.  But I also want to talk

16    about the progress of the case and not just these individual

17    motions, what I need to do to go forward and that sort of

18    thing.

19            So we're first talking about eBay.  So I know

20    Mr. Pirozollo is listed.  Mr. Weinberg, are you also

21    representing eBay?

22            MR. WEINBERG:  No, I'm not, your Honor.  I'm just

23    searching for the "stop video."  But good morning, Judge.

24            THE COURT:  Good morning to you.  There we go.

25    Now, I see somebody's office, Brenda Haag?

1          MR. PIROZOLLO:  I'm not sure she has an appearance

2     here.

3          THE COURT:  Okay.

4          THE CLERK:  I'm trying to find her.  I don't know

5     who she is, but she's not giving me an option to stop her --

6     I don't know who she is.  Just a minute.  I'm trying to play

7     with this.

8          THE COURT:  I'm not even getting to look at a

9     pretty picture.  A blank wall?

10         THE CLERK:  It says it's connecting to audio.

11         THE COURT:  I don't know, but I don't want to hold

12    it up.  Ms. Haag, sort of strike out your video, please.

13         THE CLERK:  I can remove her, but I don't know who

14    she is.

15         THE COURT:  Does anyone know who she is?

16         MS. SCAPICCHIO:  I do not, your Honor.

17         MR. PIROZOLLO:  I don't believe she has an

18    appearance in this case.  I'm not quite sure --

19         THE COURT:  Well, why don't you just send her out

20    then.  She's not responding.

21         THE CLERK:  Okay, she's not, so let me remove her.

22    I don't know if she can come back in, but that's the best I

23    can do.  I'll remove her.

24         THE COURT:  Okay.  Okay, I think we're ready.

25    It's now, I have 9:12.  I guess I'll start with

1   Mr. Pirozollo.

2             MR. PIROZOLLO:  Good morning, your Honor.

3             THE COURT:  It's your motion to dismiss.

4             MR. PIROZOLLO:  Yes, your Honor.  Thank you.  So I

5   just want to say that present with me are also Kathryn

6   Alessi and Dan Feith on behalf of eBay.  You just can't see

7   them on their camera.  And you've given us ten minutes.  I

8   would just ask, if it's permissible, for two minutes for

9   rebuttal as well, go with eight minutes and then reserve two

10  minutes for rebuttal.

11            THE COURT:  That's good.

12            MR. PIROZOLLO:  Thank you, your Honor.  So this

13  morning I'm going to address just three issues that are

14  raised in our motion papers.  The first is the stalking

15  count, Count 2; the second is the ratification count, which

16  is Count 14; and, third, I'm going to address just a piece

17  of Count 6, the negligent supervision count with respect to

18  its application to the Board of Directors of eBay.  So those

19  are the three items that I'm going to address this morning.

20  Obviously, if you have any specific questions on anything

21  else, I'll do my best to answer them, your Honor.

22            So starting first with the California stalking

23  statute which is Count 2, the Court should dismiss Count 2

24  because under a straightforward application of the

25  controlling choice of law principles in Massachusetts,

1    Massachusetts law applies here, and Massachusetts does not

2    recognize a civil cause of action for stalking.  Under

3    *Klaxon*, the Massachusetts choice of law rule applies here.

4    There is a conflict between Massachusetts and California

5    because Massachusetts law does not recognize a statutory or

6    common law right of action for stalking, whereas California

7    does.

8           The application of the <u>Restatement</u> factors, which

9    are under Section 145, which are the applicable factors that

10   Massachusetts law applies, overwhelmingly favor the law of

11   Massachusetts as the applicable law here.  First, the

12   plaintiffs suffered their injuries in Massachusetts, and I'm

13   happy to address that in more detail, but that is --

14          THE COURT:  You know, I should say for the

15   record -- I know you know this, but I don't know that

16   everyone does -- I actually know this case really well

17   because I had extensive criminal proceedings involving two

18   of the people who were charged, Mr. Baugh and Mr. Harville,

19   some of the more prominent people alleged here, so some of

20   the facts you can assume I know.

21          MR. PIROZOLLO:  Okay, so I won't go into those

22   facts because I do know you know them very well.  But with

23   regard to the relevant decision rubric that's set out, all

24   four factors overwhelmingly favor Massachusetts here.  And

25   so with that, I'm going to address some of the points the

1    plaintiffs have made as to why California law should apply

2    here and the count shouldn't be dismissed.  So --

3           THE COURT:  What would you say the closest

4    Massachusetts cause of action would be, intentional

5    infliction of emotional distress?

6           MR. PIROZOLLO:  Correct.  That really is the most.

7    And if you look at the California statute, you'll see that

8    specifically within the body of that statute, it addresses a

9    concept similar to the intentional infliction of emotional

10   distress.  In fact, it sets forth a little bit lower

11   standard, which, again, one reason perhaps why there's a

12   conflict here; but you have intentional infliction of

13   emotional distress in Massachusetts, that's the closest

14   analog here.

15          So the plaintiffs say California law should apply

16   notwithstanding the analysis of the Restatement, and I just

17   want to address those points very briefly.  First, they say

18   there is no conflict here.  That is flat wrong.  The *Levin*

19   case which we cite in our papers makes it very clear:  When

20   one state has a cause of action and the other doesn't, there

21   is a conflict which triggers the choice-of-law analysis

22   under the Restatement.

23          Second, if you look at the briefing, the

24   plaintiffs have really not grappled with in any way the four

25   factors.  They do not cite a single case, not one, that

1    weighs the factors in a way that would suggest that

2    California law applies here.

3           Instead, and this is my third point, they rely

4    largely on cases out of California that say there should be

5    extraterritorial application of the California statute, but

6    that's not the issue with regard to choice of law.  The

7    question of whether it applies extraterritorially, and those

8    are the cases, the *Diamond* case and the *Norwest* case that we

9    see in their papers, the question of extraterritoriality, if

10   it doesn't apply extraterritorially, there's no

11   choice-of-law analysis at all.  They simply are not

12   applicable to the question that the Court has here with

13   regard to which state has the greater interest, and so they

14   are totally inapposite.

15          In addition, the theory on the suggestion that

16   because California may have an interest in protecting people

17   who may be injured outside the state --

18          THE COURT:  You know what?  Can I say, I think I

19   have a good handle on the California thing, and I am very

20   interested in the ratification/negligent supervision issues

21   because I don't really even understand the claim.  To some

22   extent, is the claim -- I hadn't been focused on the Board

23   of Directors before.  So why is it the Board of Directors

24   rather than the corporation as a whole?  Wouldn't the

25   corporation be liable for negligent supervision?  And if the

1    CEO and Mr. Wymer acted inappropriately, the corporation is

2    liable, so why am I exonerating the Board of Directors?

3               MR. PIROZOLLO:  So I am not sure I fully

4    understand the question, exonerating --

5               THE COURT:  In other words, usually it's the

6    corporation, right?  So if the CEO acts inappropriately,

7    they're strictly liable.

8               MR. PIROZOLLO:  Vicariously liable.

9               THE COURT:  Vicariously.  I'm sorry.  So why do I

10   need to focus on either negligent supervision or

11   ratification, since they're vicariously liable, fair enough,

12   in any event?

13              MR. PIROZOLLO:  Well, I mean, one of the points we

14   have made and I intended to make today is that the whole

15   ratification count doesn't really make sense in this

16   context.  If you look at the ratification case law, it has

17   to do with how a principal can be liable for the actions of

18   an agent and whether it somehow after the fact ratified the

19   conduct.  It's irrelevant in this context, and it also

20   doesn't apply because ratification would be in a situation

21   where sort of after the fact, someone says, "Okay, we're

22   going to embrace this conduct."  It simply does not apply in

23   any respect here because, as alleged in the complaint, the

24   company took prompt action.

25              THE COURT:  Yes, but the company -- the company is

1    on the hook, no matter what, if the CEO acts inappropriately,

2    right?

3            MR. PIROZOLLO:  To the extent the CEO's conduct

4    was within the scope of his employment, yes, but not if it

5    was outside the scope of his employment, no, there would not

6    be vicarious liability for that.

7            THE COURT:  That's a different issue, but at the

8    end of the day, I mean, I think it's almost an abstract

9    debate here because if the CEO launched a missile and was

10   reckless about it, let's say, the company is liable.  I

11   don't know why I have to -- is the Board of Directors

12   somehow individually liable at this point?  I don't think

13   they're looking for that.  They're not suing the Board of

14   Directors, just the company.

15           MR. PIROZOLLO:  Well, to the extent that is in

16   fact the claim.  Now, I would say that the plaintiffs seem

17   to be arguing that they are suing the Board here directly.

18           THE COURT:  But they're not named defendants.

19           MR. PIROZOLLO:  Correct, they're not named

20   defendants.  And so to the extent that the claim is viewed

21   as a claim against the Board -- and this is going to be my

22   point on negligent supervision -- is that we will rest on

23   our brief with regard to the negligent supervision of all of

24   the executives of all of the employees.  But if you look at

25   the briefing, particularly the surreply, if you look at the

1    surreply, the plaintiffs argue that the Board should be held

2    liable.  That has not been pled.

3            THE COURT:  No, it hasn't been.

4            MR. PIROZOLLO:  And to the extent they are

5    suggesting that there should be a claim against the Board

6    here, there isn't, there shouldn't be; and one of the things

7    that we want to make clear is that to the extent that is

8    part of the claim, it should be dismissed out because

9    there's no basis --

10           THE COURT:  But I'm not sure why it needs to be,

11   since the corporation nonetheless is an entity under the

12   law, and it's strictly liable, vicariously liable, whatever

13   you want to say, for the actions of its agent acting to

14   further its purpose.  I mean, I don't know why I need to get

15   into what the Board knew or didn't know, I mean, unless it

16   maybe goes to punitive damages at some point along the way,

17   but I don't even need that to proceed in this case.

18           I suppose there's an argument, well, they must

19   have liked the conduct well enough because they gave this

20   incredibly high severance package, but --

21           MR. PIROZOLLO:  It's irrelevant.

22           THE COURT:  -- I don't know whether I'm just

23   engaging in an academic exercise here.

24           MR. PIROZOLLO:  But it is irrelevant, and

25   therefore we should be absolutely clear that it's not part

1    of this case.  Down the line here, we've only partially --

2         THE COURT:  What are you worried about?  I'm just

3    not getting this debate.

4         MR. PIROZOLLO:  Two things, your Honor, two

5    things --

6         THE COURT:  The supervision is liable.  Wenig or

7    Wymer or maybe some of the others are liable.

8         MR. PIROZOLLO:  The reason this matters is because

9    this is going to matter to the scope of discovery, your

10   Honor, down the line.

11        THE COURT:  I see.  That's what you're worried

12   about, you don't want the Board minutes to be disclosed, but

13   they may be anyway, regardless.

14        MR. PIROZOLLO:  Right.  However, if it's not a

15   part of the claim in the case, it would not be appropriate

16   for discovery, or would at least at a minimum limit

17   discovery with regard whatever the Board -- and I imagine

18   that we're going to be in fights before you down the line

19   here on that issue, and it's going to be important.  It's

20   really important to frame up the case as to what is and is

21   not appropriately in dispute because that's going to matter.

22        And then the second thing I would say --

23        THE COURT:  So ratification matters to you

24   primarily because of the concern with the scope of discovery

25   of the Board.  I'll hear from Ms. Scapicchio on this because

```
 1    I'm already after the thing.  And the same issue would be
 2    true of negligent supervision?  I view that as a culpability
 3    of the corporation, right, negligently supervising the
 4    president?
 5              MS. SCAPICCHIO:  Are you talking to me, Judge,
 6    now?
 7              THE COURT:  No.  It's the same issue as
 8    ratification, right?
 9              MR. PIROZOLLO:  It is the same issue.  I just want
10    to briefly say as to punitive damages, of course if the
11    stalking claim is dismissed, there won't be punitive damages
12    here in the case.
13              THE COURT:  Okay, thank you.
14              All right, Ms. Scapicchio.
15              MS. SCAPICCHIO:  Oh, so, Judge, if I can first
16    respond to the stalking, and you said you had your mind made
17    up, but if I can just --
18              THE COURT:  No, I didn't say it was made up.  It's
19    just it's a very narrow issue.
20              MS. SCAPICCHIO:  I understand that, Judge, but
21    here's my argument on that, and I thought we had laid it out
22    in the memo, but when you do the choice-of-law analysis,
23    certainly the injury occurred in Massachusetts.  The place
24    the conduct occurred, number two in the Restatement factors,
25    you know, the place the conduct occurred is certainly
```

1    California.  The Tweets originated from California.  The

2    packages originated from California.  The online threats

3    originated from California.  The document originated from

4    California.  The GPS tracking purchases were in California.

5    Their putting the GPS or practicing putting the GPS on the

6    cars happened in California.  And even when the defendants

7    came to Massachusetts to stalk the Steiners in person, they

8    continued to send Tweets and packages from California.  And

9    they monitored the Natick Police dispatch from California so

10   that they could tell the people who were on the ground what

11   the Natick Police were getting in terms of any information

12   about what they were doing.  So I would say that the first

13   and second factors are completely met.

14           In terms of residency --

15           THE COURT:  I just, you know, does it argue too

16   much to say California law applies?  Isn't that true for all

17   of your causes of action, other than maybe false imprisonment?

18   I mean, it just makes a mess of the case.  You know, this

19   one, the bulk of it is in Massachusetts; this one, the bulk

20   of it is in California.

21           MS. SCAPICCHIO:  So I'm not suggesting that we

22   parse this out.  I'm just trying to get the Court to focus

23   on those four Restatement factors because the defendants in

24   this case are claiming that we didn't sort of flesh this out

25   in the briefing.  I think we did.  And I think if you go

 1    through the last two, you know, the residence, eBay is

 2    incorporated in Delaware and their place of business is

 3    California, and the relationship between the parties is

 4    certainly California.  It didn't matter to EcommerceBytes

 5    and the Steiners where they did their reporting from,

 6    whether it was Natick or anywhere else.  Their reporting is

 7    centered on Wenig and E-Bay and everything that happened in

 8    California.  So I think when you go through the factors,

 9    Judge, that there is enough there to apply the California

10    stalking statute.

11            And one of the cases that we cite, Judge, is

12    *Northwest Mortgage Incorporated v. Superior Court*, and in

13    that case, the court indicated that where the entire conduct

14    occurred outside of California, then the statute doesn't

15    apply, but there is no bar to applying that statute when

16    some of the conduct occurs outside of California.  So I just

17    wanted to bring that to the Court's attention.

18            In terms of ratification, Judge, it's important to

19    us too, both for punitive damages under the stalking statute

20    and for eBay's awarding of $67 million to Wenig.  That had

21    to have been discussed at the Board of Directors meeting.

22    The firing of Wymer had to have been discussed at the Board

23    of Directors meetings.  The allowance of --

24            THE COURT:  Wait.  Those are two really different

25    things.

```
1            MS. SCAPICCHIO:  I understand.  I understand,
2    Judge.
3            THE COURT:  The hiring, I don't see any issue -- I
4    don't know how that even factors into ratification or
5    negligent supervision, the hiring.
6            MS. SCAPICCHIO:  Well, I think one of the factors,
7    Judge, is when they went to the government looking for a
8    resolution to not get charged criminally in this case, the
9    company itself.  Even though it knew that Wymer had deleted
10   information, even though it knew that Wymer had engaged in
11   conduct with Baugh the entire time, gave the directive to
12   Baugh, they never even suggested to the government that
13   Wenig be charged.  In fact, I think they did the exact
14   opposite based on --
15           THE COURT:  You're talking about Wymer or Wenig?
16           MS. SCAPICCHIO:  I'm sorry, Wymer, Judge.  I
17   apologize.
18           THE COURT:  I get the two W's mixed up sometimes
19   too.
20           MS. SCAPICCHIO:  I apologize, Judge.  I'm talking
21   about Wymer.
22           THE COURT:  You're referring to Wymer now.
23           MS. SCAPICCHIO:  What I'm suggesting, Judge, is
24   that the conduct of the company matters with respect to
25   Wenig, Wymer, and Jones.
```

1           THE COURT:  All right, but let me just say this.

2     This is what confused me.  eBay is a corporation.  It's

3     liable for the actions of its employees within the scope of

4     its responsibility.

5           MS. SCAPICCHIO:  Yes.

6           THE COURT:  Vicarious liability, we all agree.

7           MS. SCAPICCHIO:  Yes.

8           THE COURT:  Why do I need to resolve the

9     ratification issue?  It seems almost irrelevant.  And I also

10    don't know of any case law about how paying a severance

11    package, even though we might say, "Why do they give someone

12    who caused this problem so much money?" I don't view that as

13    a -- is there a case that would says that's a ratification?

14          MS. SCAPICCHIO:  Well, Judge, I think the cases

15    that we cite on ratification talk about the types of

16    information.  We certainly don't have all of the information

17    at this point, Judge, as to why --

18          THE COURT:  I know that, I know that, but you're

19    stuck in Federal Court, which is *Iqbal/Twombly*, so I need to

20    at least think there's a plausible thing.  Are you going

21    after the Board of Directors as opposed to the corporation,

22    because they're not individually charged?

23          MS. SCAPICCHIO:  They're not individually charged,

24    Judge.  We haven't named them as defendants.

25          THE COURT:  Okay.

1        MS. SCAPICCHIO:  And so we are not at this point

2   doing anything.  We did just, so the Court remembers, file a

3   motion for discovery asking for information regarding --

4        THE COURT:  I know, but this case is old.  I'm

5   moving this case.

6        MS. SCAPICCHIO:  And I appreciate that, and my

7   clients appreciate that.

8        THE COURT:  It's real old, and we're not going to

9   hold discovery up for these motions.

10        MS. SCAPICCHIO:  I would not want to hold

11   discovery up, Judge, but I also would not want to be

12   precluded from the discovery I think is necessary.

13        THE COURT:  I'm not debating discovery right now,

14   but --

15        MS. SCAPICCHIO:  But here's the problem, Judge:

16   If you dismiss the ratification claim, then the argument

17   from all of the defendants, especially eBay, is going to be

18   we don't get access to anything as far as --

19        THE COURT:  That's a discovery debate down the

20   road.  I don't care.  I am dealing with innumerable motions

21   to dismiss, ops, replies, surreplies, from innumerable

22   people.  I'm one session, and I'm not here to just get

23   involved in futuristic issues of what may or may not limit

24   discovery or what may or may not limit damages.  I'm dealing

25   with whether there's a plausible claim, and I think there's

1    a plausible claim against eBay because of vicarious

2    liability, but I'm not sure that the ratification -- I'm not

3    sure it matters, let's start there, and I don't know why it

4    matters, and I'm not sure I'm going to hold anything up to

5    decide whether it matters or not.

6             MS. SCAPICCHIO:  And, Judge, we would rest on our

7    memo which explains --

8             THE COURT:  Okay.

9             MS. SCAPICCHIO:  You know, one thing I want to

10   point out is that there are some claims in eBay's filing

11   that says that, you know, we admitted that they did an

12   investigation.  Our claim is always they did a sham

13   investigation; it wasn't a real investigation.  And I just

14   wanted to bring that to the Court's attention, and I'll rest

15   on my brief for the rest of it.

16            THE COURT:  Okay, thank you.

17            So, as I understand it, Mr. Pirozollo, there's no

18   move to dismiss the entire complaint about eBay, and this is

19   a partial motion to dismiss.

20            MR. PIROZOLLO:  That is correct, your Honor.

21            THE COURT:  So as far as I'm concerned, nothing

22   you've raised, except potentially the California issue, will

23   affect this litigation dramatically in terms of the money at

24   stake or that sort of thing.

25            MR. PIROZOLLO:  It is nevertheless appropriate to

1    dismiss those aspects of the case with regard to particular

2    defendants or theories because they do not have a viable or

3    plausible claim, so --

4          THE COURT:  I understand.  Or I could hold it to

5    summary judgment if it doesn't affect the scope of the case.

6    In other words, I've got piles and piles and piles on my

7    desk right now, and so I'm trying to figure out what are the

8    claims that might make a difference in terms of, you said

9    this case should be settled or will be settled or something

10   like that, that might affect how this case progresses.  And

11   I'll get to settlement later, but because of the notion of

12   vicarious liability, I'm not sure ratification or negligent

13   supervision matters much.

14         MR. PIROZOLLO:  Thank you, your Honor.  I want

15   just to point you to one piece of authority with regard to

16   the choice of law.  So in the Restatement, Section 146

17   specifically addresses the choice of law where the injury is

18   out of state.

19         THE COURT:  Okay, thank you.  Thank you very much.

20   Okay, we're going to move on to the next one.  I'm pretty

21   much on time.  Okay, thank you very much, and I'm going to

22   move on to the one I know the least about, PFC.  I'm glad

23   that's high on my list.

24         Maryellen is doing a terrific job trying to

25   organize all this.  She's soloing it today because my docket

1    clerk is on vacation, or actually in training, so I'm very

2    appreciative.

3           So I know Ms. Scapicchio is going to be here on

4    all of it, and when you need a break, Ms. Scapicchio, let me

5    know because --

6           MS. SCAPICCHIO:  I am fine, Judge.  I'll do

7    whatever you want to do.

8           THE COURT:  Okay, so, Mr. Holmes, are you

9    representing PFC?

10          MR. HOLMES:  Yes, your Honor.  Matthew Holmes on

11   behalf of PFC.

12          THE COURT:  Whether this is good or not, I don't

13   know, but I know the least about your client.  This is not

14   something that came up, I believe, at least in my criminal

15   case.  So go.  It's now 9:37.

16          MR. HOLMES:  Thank you, your Honor.  And I would

17   suggest that the reason you know the least about PFC is

18   because PFC out of all the defendants, with the exception of

19   Mr. Krystek, its CEO, PFC has the least involvement in this

20   case and the least involvement in the bad acts that are

21   alleged by the plaintiff.

22          So PFC is a security company or a collection of

23   security companies, and they provide various services to

24   different corporate entities, including at the relevant time

25   periods eBay.  So PFC, the relevant services that PFC was

1  providing to eBay are that they staffed one analyst for

2  eBay's Global Intelligence Center, and that was Veronica Zee

3  or Zea.  So plaintiff alleges that --

4          THE COURT:  Now, she's your employee, right?

5          MR. HOLMES:  She was technically an employee of --

6          THE COURT:  Not technically.  She was an employee.

7  At least no one has fought on that.

8          MR. HOLMES:  I'm sorry?

9          THE COURT:  No one has fought about the fact that

10 she was one of your employees.

11          MR. HOLMES:  Correct, your Honor.  She's a W-2

12 employee of PFC contracted out to eBay.

13          THE COURT:  Fine, okay.

14          MR. HOLMES:  And plaintiff has alleged that PFC in

15 fact interviewed, selected, and hired Ms. Zea, which for the

16 purposes of this hearing we are forced to accept; but the

17 plaintiff's allegations make clear that Ms. Zea was under

18 the direction and control of eBay.  She was hired as an

19 analyst.  She was staffed at eBay's Global Intelligence

20 Center.  Her role, her job was to provide intelligence

21 analysis to eBay.  There is no allegation that her role

22 involved going out into the field, involved taking any sort

23 of physical action, providing physical security, doing

24 anything other than sitting behind a desk.

25          There's no allegation that PFC anticipated or

1    should have anticipated that Zea would have taken direct

2    action at the behest of eBay in any context.  The only

3    allegation is that she was hired as an analyst.  And in fact

4    plaintiffs repeatedly allege that Baugh directed and

5    controlled Ms. Zea, that in terms of the specific bad acts

6    that they allege she was involved in or that she committed,

7    they always allege that this was done at the behest, at the

8    direction, at the command or the instruction of Mr. Baugh.

9    And in fact if you look at --

10              THE COURT:  But isn't there a body of law -- so

11   she was basically paid a salary by you?

12              MR. HOLMES:  Correct.

13              THE COURT:  Her expenses were paid by you?

14              MR. HOLMES:  Correct.

15              THE COURT:  You had a supervisor go out to eBay to

16   see what she was doing?

17              MR. HOLMES:  That's alleged.

18              THE COURT:  Alleged, right.  So even if they

19   didn't actually know what it is she was doing, just going

20   back to what I asked Mr. Pirozollo about, aren't you

21   vicariously liable for her actions?

22              MR. HOLMES:  Absolutely not because she was so far

23   outside the scope of her employment, and there's no

24   reason --

25              THE COURT:  Isn't that something I'd be better off

1   dealing with at summary judgment?  In other words, as I

2   understand it, there was supervision of her, and they were

3   paying expenses that went out to Massachusetts.  I forget

4   exactly what the expenses were but some of the expenses that

5   were incurred as a result of what was going on in

6   Massachusetts.  I don't know that I can do that on a motion

7   to dismiss.  It's plausible that it was within the scope of

8   her responsibilities.

9           MR. HOLMES:  I don't believe it is, your Honor,

10  and --

11          THE COURT:  Why?

12          MR. HOLMES:  -- I can explain why.  So, first of

13  all, as we discussed, Zea was hired and employed as an

14  analyst.  Her job, role, title, nothing involved going out

15  in the field taking direct physical action.

16          The plaintiffs allege that Zea used the PFC credit

17  card to finance a lot of the bad acts alleged as part of

18  this conspiracy, and they talk about this expensing

19  loophole, but all of the things that they talk about Zea

20  funding or financing, and PFC through Zea funding or

21  financing in an effort to advance this campaign against the

22  Steiners, there's no allegation that PFC was aware of it.

23  So they allege that she made some fairly standard, innocuous

24  purchases --

25          THE COURT:  But weren't some of them from

1    Massachusetts?  I forget.  They were.  Some of them involve

2    Massachusetts, so you knew she was in the field.

3              MR. HOLMES:  They don't even allege that PFC was

4    aware of --

5              THE COURT:  Were some of them from Massachusetts?

6              MR. HOLMES:  I'm sorry?

7              THE COURT:  Were some of the expenses from

8    Massachusetts?

9              MR. HOLMES:  Yes, your Honor.  I believe the car

10   rental, maybe some pizza deliveries, and --

11             THE COURT:  Yes, yes, yes, that's what I remember.

12   Unfortunately, I don't know whether I knew that from the

13   civil case or the criminal case, but, yes, that's right.

14             MR. HOLMES:  But there's no allegation that PFC

15   knew she was in Massachusetts or knew that she was making

16   these purchases in Massachusetts.

17             THE COURT:  PFC is a corporation, so it's --

18             MR. HOLMES:  Or anybody at PFC.

19             THE COURT:  Somebody in your finance department

20   knew.

21             MR. HOLMES:  So that's the crux of it, your Honor.

22   So all of these purchases, all of this funding and financing,

23   all of these bad acts are alleged to have taken place in

24   August.  This entire conspiracy unraveled in August of 2019,

25   and so there's no reason that PFC should have been aware of

 1    it.  If we're talking about purchases that are made on a

 2    credit card, it's I think common knowledge, you know, that

 3    the Court is capable of taking judicial notice of that

 4    credit card statements are sent once a month at the end of

 5    the month or at the end of the period.  So there's no reason

 6    that PFC should know that on August 9 or August 10, Zea made

 7    these purchases in Massachusetts until sometime in September,

 8    at which point this entire thing had fallen apart, and

 9    that's really the crux of it.

10            The only purchases that plaintiff alleges that PFC

11    was actually aware of -- and I think this is a really

12    crucial distinction -- the plaintiffs allege that PFC was

13    aware of a series of purchases wholly unrelated to the

14    Steiners, and they do not allege that PFC was ever aware of

15    any of the purchases related to the Steiners.  And that's

16    the crux of it.  That's the most important distinction.

17            So plaintiff alleges that PFC knew Zea used their

18    corporate credit card to fund expensive dinners for other

19    eBay personnel and to fund trips to strip clubs for herself

20    and other eBay personnel, and they allege that PFC --

21            THE COURT:  And were those in July?

22            MR. HOLMES:  I think they were in June.  I think

23    they were June and --

24            THE COURT:  Well, they would have known about

25    that.

```
 1            MR. HOLMES:  Sure they would have known about

 2   that, but that's not sufficient to put them on notice that

 3   she was then going to start sending --

 4            THE COURT:  Don't you think it's a little bit of a

 5   red flag, spending money on strip clubs?  Here's an analyst

 6   in a desk job?

 7            MR. HOLMES:  On a business trip, going to a

 8   business dinner and then going to an entertainment in the

 9   afternoon, I mean, I --

10            THE COURT:  A strip club.

11            MR. HOLMES:  I know it's a strip club and it's

12   tawdry, but it's also legal.  It's just completely --

13            THE COURT:  It just belies the notion that she was

14   sort of, I don't know, a bookish lady tied to a desk.

15            MR. HOLMES:  Well, your Honor, if it was a trip to

16   an expensive dinner and then tickets to "Hamilton," it

17   wouldn't be any sort of red flag --

18            THE COURT:  It could also be a heads-up she wasn't

19   just doing analysis.  Anyway, all right, I get your point.

20   Is there any other thing you wanted to --

21            MR. HOLMES:  Just that everything else sort of

22   flows from this concept that PFC was not aware of, did not

23   direct, did not control Zea's actions in terms of the

24   Steiners; and so without that, the negligent supervision

25   fails.  Without that, the plaintiffs can't bootstrap
```

1    personal jurisdiction onto PFC because PFC didn't even know

2    that its employee, which was a long servant to eBay, didn't

3    even know that their employee was in Massachusetts.

4              THE COURT:  All right, thank you.

5              All right, Ms. Scapicchio.

6              MS. SCAPICCHIO:  Thank you, your Honor.  So I

7    disagree with the defendants on almost every point.  So PFC

8    certainly hired Zea, fired Zea, supervised Zea, sent people

9    to eBay -- it's all pled in the complaint -- to supervise

10   her, to meet with her, and in fact the --

11             THE COURT:  Can I ask you this:  How frequently --

12             (Interruption in Zoom audio.)

13             MS. SCAPICCHIO:  -- by and talked to her, so

14   certainly they either knew or should have known at that

15   point.  But more importantly, Judge, when they say they

16   didn't know, one of the things that we allege in the

17   complaint is that PFC increased her credit limit to almost

18   $20,000.  As somebody who is --

19             THE COURT:  When?

20             MS. SCAPICCHIO:  -- at a desk job --

21             THE COURT:  When?

22             MS. SCAPICCHIO:  I think it says that they

23   increased the credit limit sometime in July, so that should

24   have been a red herring.  Why are they increasing somebody

25   who --

1          THE COURT:  I think you meant a red flag, not a

2     red herring.

3          MS. SCAPICCHIO:  Sorry.  Red flag.  It should have

4     been a red flag for them at that point, Judge.

5          And with respect to what PFC did, we don't know

6     right now, Judge, because they haven't conducted any

7     discovery, what bills they paid.  We know that PFC made

8     5 percent on everything that Zea charged on that credit

9     card.  They got the $4 million contract from eBay.  Prior to

10    that, they were a three-person company.  eBay was their

11    biggest employer certainly at that point.  They then have

12    Zea with this credit card.  And just so we're clear, there

13    are other employees there like Cooke and Stockwell that

14    started at PFC and transitioned all the way over to eBay and

15    became employees of eBay.

16         That's not what happened with Zea.  Zea stayed an

17    employee of PFC so that this conspiracy could be funded.

18    The idea that they would increase her credit limit to

19    $20,000, somebody who's supposed to have a desk job as a

20    cybersecurity analyst, they should have started questioning

21    at that point why she would need a $20,000 expense account.

22    And if they didn't know that she was spending all this money

23    on a credit card, then why did they increase her credit

24    limit, Judge?  And that's all, I think, pled in the

25    complaint.

1            And what we're suggesting, Judge, is that, you

2     know, certainly they're vicariously liable for everything

3     that she did.  She not only is somebody who went to Boston,

4     but she purchased the plane tickets, she charged the hotel,

5     she charged the dinners.  They had to have known she was in

6     Boston.  How are they not saying, "Wait.  Why are you in

7     Boston at this point when you're supposed to be on a desk

8     job?  What are you doing in Boston?"  And in fact, you know,

9     she's participating in this conspiracy, and at the same

10    time, Mr. Krystek is having regular meetings with Mr. Baugh

11    because they're friends and they meet frequently, and

12    they're talking to each other, and this whole thing happens

13    because Mr. Baugh is friends with Mr. Krystek.  That's

14    how --

15            THE COURT:  Wait, wait, wait, wait.  I think we're

16    jumping into Mr. Krystek right now, although I understand,

17    what is he, the managing member?  I forget what his role is.

18            MS. SCAPICCHIO:  He's the president.

19            THE COURT:  He's the president.

20            MS. SCAPICCHIO:  So in terms of the company's

21    liability, Judge, I don't think that there's anything the

22    plaintiff says anything other than she's an employee of PFC.

23    PFC is vicariously liable for her actions.  She was involved

24    from the beginning.  She sent the Tweets.  She's the one who

25    chose, with the assistance of others, the Samoan-looking

1   person to be on the other end of those Tweets.  She's the

2   one who was in the meetings talking about what else --

3               (Interrupted Zoom audio.)

4               MS. SCAPICCHIO:  -- being a chain saw.

5               THE COURT:  No, I understand, I fully understand

6   her culpability.

7               MS. SCAPICCHIO:  Right.

8               THE COURT:  And so the question is, is she a rogue

9   employee totally outside the scope?  And what you're saying

10  is, by increasing her credit limit and the fact that there

11  was supervision of her, and the friendship between the

12  president and Mr. Baugh, that there's at least a plausible

13  claim that she was acting within the scope of her employment.

14              MS. SCAPICCHIO:  There is, your Honor.  And I

15  think what else is pled in the complaint is that in January

16  of 2019 is when the analysts started monitoring the

17  newsletters for EcommerceBytes at all hours of the day and

18  the night, which is pled in the complaint, because the

19  executive leadership were expressing frustration.  That

20  January, 2019, is then followed by -- it coincides with the

21  hiring of PFC.  So it almost starts from the very beginning

22  that when PFC is hired, their focus is the Steiners and

23  EcommerceBytes.  That's what it is.  And that's why they

24  leave Zea in place and she doesn't become an employee of

25  eBay, because they need to finance the conspiracy at that

1    point, Judge.  And we're saying the hiring of PFC that

2    coincides with the focus of the Steiners, and then the

3    absolute stalking of the Steiners while she was being

4    supervised by PFC, brings them in and makes them vicariously

5    liable for all of her conduct.

6                THE COURT:  Okay, thank you very much.

7                Do you want a brief opportunity for rebuttal, or

8    are we done here?

9                MR. HOLMES:  We will rest on our brief for the

10   remainder, your Honor.

11               THE COURT:  Okay.  All right, so now I move on to

12   I guess either Mr. Weinberg or Mr. Lowell?

13               MR. WEINBERG:  Good morning, Judge.  I'm going to

14   take one minute of time, and Mr. Lowell is going to make the

15   principal presentation.  I just wanted to make two quick

16   points because of the massive pleadings in front of you,

17   your Honor.  One is that clearly torts were committed by

18   Mr. Baugh.  Your Honor is familiar with the facts.  They're

19   so extreme, the conduct, so unpredictable, the words

20   "bizarre, criminal, extraordinary," the more they are, the

21   less foreseeable it is to Mr. Wenig, who's thousands of

22   miles away at the time of the commission of the torts.

23               And, second, foreseeability by itself is not

24   sufficient to match the required elements of vicarious

25   liability, which principally is advanced by the plaintiffs

1    on an aiding and abetting theory.  And I just wanted to call

2    attention -- and I only do this, Judge, because you have

3    hundreds of pages in front of you -- to two cases that set

4    the standards for aiding and abetting, the first being the

5    nine-nothing May, 2023 opinion of the Supreme Court in the

6    *Twitter v. Taamneh* case where the court wanted to set

7    boundaries --

8              THE COURT:  Excuse me.  Could you give me that

9    cite again.

10             MR. WEINBERG:  Sure, Judge.  It's 598 U.S. 471.

11   And the court wanted to set boundaries to try to separate

12   the risks that innocent people would be held civilly

13   responsible for the tortious conduct of others.  And they

14   required in that case -- and the issue was whether Twitter

15   was responsible for the conduct of ISIS -- saying, "You need

16   to have proof of conscious, culpable participation of the

17   aider and abetter in the principal's torts."

18             And that goes along with the First Circuit formula

19   for aiding and abetting, and I would provide the Court with

20   Judge Lipez's formula in the case *Taylor v. American*

21   *Chemistry*, which is 576 Fed 3d 16, where he requires

22   unlawful intent and looks at two distinct mental elements,

23   both of which we contend are absent in this case:  Knowledge

24   that the other's conduct is malicious.  We argue that

25   Mr. Baugh's tortious conduct occurred after the critical

1    three-word message that Mr. Lowell will address.  And,

2    second, an intent to substantially assist or encourage that

3    conduct, which, again, Mr. Lowell will take the time to

4    address factually as being absent in regards to the factual

5    rather than conclusory allegations as to Mr. Wenig's role in

6    this alleged case.

7            And with that, I would turn it over to Mr. Lowell.

8            Thank you, Judge.

9            THE COURT:  Okay.

10           MR. LOWELL:  Thank you, Mr. Weinberg, and good

11   morning, your Honor.

12           THE COURT:  You know, you're a little soft there,

13   so I'm hoping that you'll --

14           MR. LOWELL:  All right.  Of all the things people

15   have ever accused me of, being soft is not one.  So is that

16   better?

17           THE COURT:  That sounds much better.

18           MR. LOWELL:  All right, thank you.  I think the

19   most use I can have in the time I have, based on what I've

20   heard already, is to address the critical component of what

21   the Court has to decide, which is, in the pleading stage

22   that we're in, the Court is going to have to determine

23   whether the plaintiff has alleged well-pled facts that set

24   out a plausible theory.  And all of the torts, intentional

25   infliction, assault, stalking, civil rights statute,

1   defamation, trespass and false imprisonment, as it applies

2   to Mr. Wenig, suffer from the same flaw, which is, you have

3   to find what he did and you have to parse out what he did.

4   And I already see from the exchanges you had, even though I

5   know that you're asking hypothetical questions, but let me

6   address those.

7           So the most important thing, for example, to point

8   out of what he did, we all know the one thing that the

9   plaintiffs keep pointing out dozens of times, one text,

10  August the 1st, in the context of that exchange with the

11  phrase "take her down," which has to be looked at in its

12  context of all that has occurred.

13          Before I come back to that one, your Honor, let me

14  address the other things that I've heard.  For example, the

15  plaintiff has pointed out -- and, Judge, you picked up on

16  it -- the issue of Mr. Wenig's severance of however much it

17  was, as if that has something to do with the legal theory of

18  ratification, which you already pointed out you didn't see

19  the connection.  But it leaves an impression that something

20  bad has happened because he was let go or he arranged his

21  going as if it had anything to do with the events in this

22  case, and everybody knows that that's not the case.  He has

23  been the CEO for five years.  He has been in the employment

24  before that.  He took eBay, for example, from 99 million

25  users to 160 million and arranged for the merging of PayPal.

1   So if you're talking about why he left, as the plaintiffs

2   tried to allege that it had something to do with the conduct

3   in this case, it had nothing to do with it based on a

4   disagreement he had with his Board of Directors.  They do

5   that again and again.  Let me give you an example.

6           THE COURT:  You know, I'm not as concerned about

7   the severance as far as, I mean, having followed this case.

8   As I understand it, Mr. Baugh, now, where was his desk?

9           MR. LOWELL:  Another of the impressions that the

10  plaintiffs want to give you.  Mr. Baugh had his office

11  elsewhere.  He did have a -- what do you call it? -- a

12  cubby, a place nearby a conference room of Mr. Wenig's, and

13  the plaintiffs say, "You see, that meant they were in

14  constant communication."  There's nothing that indicates

15  they were in constant communication.

16          THE COURT:  But I'm at the motion to dismiss

17  stage, okay?  So if you combine the fact that he's got a

18  nesting spot right outside where the CEO sits, the fact that

19  he says "Take her down," and the fact that he was apparently

20  allegedly obsessed with -- what's it called, Ecommerce,

21  Ebytes? -- whatever it's called, is it not plausible that he

22  basically launched a missile?

23          MR. LOWELL:  It is not plausible other than if you

24  build inference on top of inference based on facts that are

25  misstated.  So if you're saying, Judge, that if you're going

1    to look at three words in one text out of the thousands and

2    thousands of communications that were in the case adjudicated

3    criminally, the U.S. Attorney, eBay's internal, plus the

4    fact that on any particular day, Mr. Baugh was sitting

5    somewhere in proximity to a conference room of Mr. Wenig and

6    that's enough?  Well, I can't say, okay, I have nothing to

7    say about that because --

8              THE COURT:  It's just the question of plausibility:

9    did he know?  Did he launch?  In the criminal side of

10   things, was it willfully blind?  He may have, you know,

11   hidden in the sense of, you know, hear no evil/see no evil,

12   "Just take care of it."  Is that enough?  I mean, that's the

13   thing I'm struggling with, "Just take care of it."

14             MR. LOWELL:  Okay.  Well, if you want to have the

15   plaintiff accept the premise that that's what it meant,

16   "Just take care of it," you can't do that, Judge, without

17   looking at all the other contextual issues that are in the

18   massive amount of pleadings.  Please let me give you a few

19   of them.

20             THE COURT:  Okay, go for it.

21             MR. LOWELL:  Okay.  All right, so, please, this is

22   going to be what you would also have to look at.  You have

23   to look at "Take her down" based on what had happened months

24   before when the issue was whether we were going to hire,

25   "we" being eBay, was going to hire a consultant using the

1    exact same phrase, not for the purposes of doing anything

2    illegal, but for the purposes of hiring a consultant to see

3    what could be done on Internet searches, the exact same

4    phrase.

5           Let me ask you this, your Honor:  If the inference

6    to be drawn from using the phrase "Take her down" is "I am

7    launching an illegal criminal conspiracy," why didn't it

8    happen when he said "Take her down" the first time to the

9    people he said it to?  That is the phrase, and it doesn't

10   relate to "Just do it, don't tell me, just do it" because

11   then how do you explain the last three months?

12          I'll give you another example.  The plaintiffs

13   point out an August 6 exchange in which, for example, at the

14   end Mr. Wymer says "Do what it takes."  And the plaintiffs

15   do what they do all the time:  They lump all the defendants

16   together, and you said sometimes you mistake one of the W's

17   from another.  It's my job to distinguish those W's and

18   every other individual defendant.

19          What happened on August 6?  The general counsel,

20   Mr. Wymer, Mr. Baugh, and others are talking; Mr. Wenig is

21   included.  And then what happens?  He is dropped from the

22   email exchange by Mr. Wymer and others when Mr. Wymer gets

23   to the point of using the phrase "Do whatever it takes."

24   You'd not know that from the plaintiff.  You wouldn't know

25   from the plaintiff, who actually misstates on phrases like

1    "Burn to the ground" and says that Mr. Wenig made that

2    communication or was part of it, that it was between

3    Mr. Wymer and others or Ms. Jones.  Or "Take off the radar,

4    do it off the radar," the plaintiff alleges that phrase is

5    part of communications that Mr. Wenig was in.  We've pointed

6    out in great detail that that is not the case.  That is,

7    again, Mr. Wymer, Mr. Baugh, Ms. Jones or others.  If you

8    take the allegations --

9            THE COURT:  You're saying that all of these

10   C-suite-type people, not the CEO but Jones, Wymer,

11   et cetera, were planning this plot, and they just didn't

12   tell their boss?

13           MR. LOWELL:  I think it's the inference that you

14   should draw from what you can see.  Why do you keep the CEO

15   off?  Why is it that when the, that you know from the other

16   case, the allegation is that Mr. Wymer, for example, did

17   share his texts with anybody, including Mr. Wenig,

18   especially Mr. Wenig, when he's dropped off of an email

19   exchange in which the offensive language occurs, that he's

20   not on that?  Whether or not the plaintiff alleges that he's

21   part of something by lumping the word "defendants" when you

22   parse it through on each of these, are you asking is it

23   these people that are doing something without the CEO?  I

24   guess you could hypothesize that he must have known something

25   or that they said something --

 1          THE COURT:  But that's not the issue.  Is it

 2     plausible to claim that he knew?

 3          MR. LOWELL:  It depends on whether you're going to

 4     use "plausible" as a definition of mathematically,

 5     theoretically, with no allegations possible, versus what you

 6     have in front of you:  emails in which he's dropped,

 7     plaintiffs saying he's part of communications where he

 8     clearly isn't, plaintiff alleging that he was dismissed

 9     because of these acts when that's not the case.  The

10     plaintiffs saying, "Judge, it's plausible because look how

11     he's not in the communications."  The plaintiff says, "That

12     means he was the most stealthy of all of them."  That's the

13     opposite of what you should conclude as plausible.

14          And, last, as an example, what about this one:

15     You should know that Mr. Wenig had something to do with this

16     because he created for himself plausible deniability by

17     taking a sabbatical at the exact time that Mr. Baugh and

18     others were engaged in the conduct that is the alleged torts

19     that were committed?  That is a great example of how it's

20     not plausible.  Her allegation of plausible deniability is

21     implausible inference that the Court can use to keep

22     Mr. Wenig in when you just don't accept the lumping of all

23     the defendants together.

24          So for the torts that I have pointed out, that

25     each of them require the Court's careful analysis as to what

1    the defendant did himself.  He had to take the tortious act.

2    He had to be the one to have the same intent as the most

3    involved, people involved.  He has to have committed the

4    extreme and unconscionable acts for the tort of intentional

5    infliction.  He has to do these things.

6          And then, as Mr. Weinberg pointed out, when you

7    can't do that, if you carefully look at each element of the

8    tort and match it to what is existing, then you have to look

9    at whether or not there's something like a conspiracy or

10   aiding and abetting.  And the language Mr. Weinberg and the

11   cases he cites indicate that that's even a higher.  As, for

12   example, one more case on this law.

13         THE COURT:  Yes, because you're up against the ten

14   minutes right now.  Thank you.

15         MR. LOWELL:  Okay, thank you.  So as to the

16   foreseeability aspect, foreseeability cuts against the

17   negligence claim and the negligence claim of even

18   supervision.  Like, I mean, again, look at what the

19   plaintiffs allege:  Mr. Wenig failed to properly supervise

20   in a negligent fashion because he didn't stop Mr. Baugh from

21   being a national security person or doing a shooter drill.

22   Again, that's the opposite inference that you should draw at

23   a time in which, for example, other Silicon Valleys are

24   having these kinds of things.  That's what I'm asking the

25   Court to carefully do, which is to not just accept the

1    premise.

2            And as to that last phrase, as the plaintiffs want

3    you to do, "Take her down," "Take her down" can be explained

4    by the two things I pointed out:  One, what happened three

5    months before when it was Mr. Wenig seeking a legal

6    recourse?  And I can't say it any better than the

7    U.S. Attorney did when he was interviewed on 60 Minutes as

8    to the kind of language people use when they're being

9    flippant.  But as he pointed, and I won't -- again, it's in

10   our pleading, but let me just conclude with that, given the

11   time --

12           THE COURT:  I forget.  Who was it interviewed on

13   60 Minutes?

14           MR. LOWELL:  It was the U.S. Attorney himself.

15           MS. SCAPICCHIO:  Lelling.

16           MR. WEINBERG:  Mr. Lelling, your Honor.

17           THE COURT:  Lelling.  Was that from Mr. Lelling?

18           MR. LOWELL:  Yes.  And, again, you know, I'm not

19   going to quote the whole thing, but "People say things like

20   that," meaning the phrases used, "all the time, especially

21   senior people at companies.  It's not the same as 'I am

22   knowingly joining a conspiracy,'" et cetera, et cetera.

23           So all I'm asking on behalf of Mr. Wenig, Judge,

24   is when you're parsing through the allegations to see

25   whether there are plausible, well-pled facts, look at the

 1    three words that come up.  And plaintiff is desperately

 2    looking for anything else, like he sits outside the office,

 3    like he was part of communication that he wasn't part of,

 4    like he must have gone on sabbatical because he was trying

 5    to have plausible deniability, or the lack of communications

 6    between the participants and Mr. Wenig means that he was

 7    involved.

 8              THE COURT:  All right, thank you.

 9              MS. SCAPICCHIO:  So the argument that

10    Attorney Lowell is making might be great for summary

11    judgment, but we're at motion to dismiss stage, Judge.  So

12    all of the deniability that Mr. Wenig includes in his motion

13    to dismiss are facts that are within Mr. Wenig's possession,

14    not pled in the complaint.  And as you know, a well-pleaded

15    complaint, we have to assume the facts are true.  So when

16    the defendant tries to focus and say this is all about three

17    words, it's not about three words, Judge.  It starts with

18    the hiring of PFC, which you have to believe that Wenig

19    authorizes.  And when Wenig authorizes the hiring of PFC in

20    January of 2019 --

21              THE COURT:  Why do I have to assume he authorized

22    it?

23              MS. SCAPICCHIO:  Because he's the CEO.

24              THE COURT:  Well, I don't know.

25              MS. SCAPICCHIO:  But he has to know.  They're

1    going to spend $4 million and not tell the CEO they're

2    spending $4 million?  I think it's plausible that he knew,

3    Judge.  It's plausible.  And when they did that, that's when

4    the focus started on the Steiners.  That's when the order

5    came down to the GAC to monitor the Steiners, monitor the

6    newsletter all hours of the day and night.  That's what

7    happened, Judge.

8            And then we get into Wenig's obsession, talking

9    back and forth about, you know, "Ina's out with another hot

10   piece on a litigation."  All of that information that

11   Mr. Wenig gives back and forth as the CEO, Judge.

12           Now, he is the CEO of this company.  He knows the

13   power of his words.  For the defendants to come in and say

14   they're just words, he said "Take her down," and he gave

15   that directive to Wenig.  And at that point, Judge, just so

16   we're clear, he also endorsed the culture at eBay.  If you

17   want to talk about why he's talking to Wymer, Wymer had just

18   started with the company probably two months before he's

19   having these conversations with Wenig, and he felt

20   comfortable enough to display his hatred and his animosity

21   to the Steiners.  Where do we think that came from, Judge?

22   I mean, it's plausible that it came from Wenig because

23   that's who he's talking to, Judge.  The fact he's ordering

24   the round-the-clock surveillance of the Steiners at this

25   point and Wymer felt comfortable enough to display his

1    hatred and animosity of the Steiners without any fear of

2    getting any retribution whatsoever, all of the reporting and

3    the sources of their discussions that were the bulk of why

4    these actions took place surrounded Wenig.  Why does Baugh

5    care about what the Steiners are doing unless he's getting

6    directives from Wenig and Wymer as to what to do?  He's

7    going to do what he's told to do in this case.

8            And then why is Wenig's wife texting Baugh, as the

9    director of security, talking about how upset Wenig is with

10   what's going on?  All of this is pled in the complaint.

11   Baugh has Wenig's personal cellphone number, and after Baugh

12   gets fired, Wenig texts him, although he's supposed to be

13   upset about what Baugh did, he texts that he was sorry to

14   see him go -- that's what he said -- and that Baugh

15   responded his loyalty would pay off.

16           But I think the most telling, Judge, is when he

17   gets back from his sabbatical, he texts "The calvary is

18   back."  That's what he texts, "The calvary is back."  If he

19   knows nothing about what's going on, if he's not involved at

20   all in this conspiracy, if he didn't mean "take her down"

21   the way that he instructed his company to do, then why would

22   he have to say "The calvary is back"?  Who is he?  Is he the

23   calvary?  Because we're alleging in our complaint that

24   absolutely he is.  He knew what was going on.  He knew that

25   everything had imploded while he was gone, and he tried to

1    calm his staff down by saying "The calvary is back."

2           And, Judge, all of this happened, all of this

3    happened after.  I know that Attorney Lowell was focused on

4    this must have been the same thing as when they hired the

5    outside company to try to get the Steiners' website lower in

6    the ratings.  That failed, and we allege that in the

7    complaint.  None of this started until their actions to try

8    to get the website lower failed, their actions to Legal

9    failed, and Legal said, "There's nothing more we can do

10   legally."  And that's when it was "Take her down" from

11   Wenig, delivered to Wymer who said "Burn it to the ground,"

12   and then Jones who said "Do it off the radar."  Those are

13   the three C-suite people who are giving directives in this

14   case, Judge, all centered around Wenig and his dislike and

15   inability to deal with Ina Steiner's First Amendment right

16   of press to talk about what she thought was wrong with how

17   eBay was being run.  This all centered on him.  It started

18   from him.

19          So I think the Court is right when they say he

20   launched the missile.  He can't just light the match in the

21   middle of the floor and drop it and walk away and say, "I

22   had no idea."  And so why then would he say "The calvary is

23   back," Judge?

24          And then to get back to Attorney Weinberg's

25   argument at the beginning, Judge, he quoted the U.S. Supreme

1    Court case.  That was on Internet speech, Judge.  That's

2    what that case involved.  It was a Section 230 case on

3    Internet speech.  And in that case, it was all about the

4    corporation's liability, not about an individual person

5    within the corporation who lights the fire that starts the

6    forest fire and then claims he doesn't know what's going on.

7           So I would suggest, Judge, that it's certainly

8    plausible that Mr. Wenig knew.  That's all we're required to

9    prove.  I think we pled within the complaint all the reasons

10   why it's plausible, and I think that when you look at the

11   timeline, Judge, of the fact that he, you know, that the

12   focus is on the Steiners as soon as PFC is hired, that legal

13   remedies aren't going to work, that communications can't

14   stop the Steiners reporting, that the consulting report that

15   they generated can't stop the Steiners reporting, that's

16   when the directive to "Take her down" takes place, and

17   that's why Wenig is responsible, Judge.

18          So it's not three words; it's not one text.  It's

19   the totality of what was happening, and it's the power that

20   the CEO has when he issues a directive like that, Judge.

21   That's why it's plausible, and that's why you should deny

22   the motion.

23          MR. LOWELL:  Would you give me a minute then just

24   to ask the Court to look at four things --

25          THE COURT:  I know you don't like to be known as

1    quiet, but I didn't hear what you just said.

2            MR. LOWELL:  I'm so sorry.  I don't know what's

3    wrong with my mic.  I was asking for one minute to ask the

4    Court --

5            THE COURT:  Okay.

6            MR. LOWELL:  So let me just go backwards.  The CEO

7    comes back from a sabbatical and sends a text not to the

8    person that Ms. Scapicchio and the plaintiff says but to a

9    different individual than Mr. Baugh.  That is for the twenty

10   things that are going on in the company.  It's not like the

11   only thing going on in the company.

12           THE COURT:  To whom was it sent?

13           MR. LOWELL:  Mr. Wymer.

14           THE COURT:  All right.

15           MR. LOWELL:  Second of all, when it says the

16   obsession, the obsession is based on plaintiffs alleging

17   something about Mr. Wenig's wife.  You'll see in the record

18   that what Mr. Wenig's wife was concerned about was the fact

19   that there were threats being made to his safety, and she

20   should be obsessed about it.  It has nothing to do with

21   what's happening in Mississippi, but that's in the record.

22           Third, when she points out that therefore that

23   something is plausible because he says at the end he's sorry

24   to see him go, that's not what the text indicates.  It was

25   after Mr. Baugh and his team was fired, and then he said, "I

```
 1    enjoyed working with you," et cetera, and Mr. Wenig's
 2    response was, "I feel the same."  It's just that they always
 3    pick something and twist it to try to support the finding
 4    that something is plausible by something like the sabbatical
 5    or him sitting outside the office one day out of every
 6    three.  But all I'm asking is for you to look at what
 7    they've alleged as against what we've pointed out is
 8    misdirection, and, finally, apply that to the elements of
 9    the tort, and you'll find that many of those torts, if not
10    all the torts, will not satisfy the requirement of what is
11    properly pled plausibility.  Thank you.
12            THE COURT:  Thank you.
13            MS. SCAPICCHIO:  If I can just respond briefly?
14            THE COURT:  One minute.
15            MS. SCAPICCHIO:  Thank you.  I appreciate that.
16    So when Mr. Lowell claims that we are twisting things, we
17    are taking our information directly from the information
18    that was generated from all of the available public sources
19    in the criminal case, Judge.  We haven't twisted a single
20    solitary thing.  We have reported what we understand that
21    the text to be, and if Attorney Lowell wants them to mean
22    something different or wants them to put them in context,
23    that's a summary judgment issue.
24            THE COURT:  All right, I don't have --
25            MS. SCAPICCHIO:  -- to deal with it.  But it is
```

1    plausible, Judge, and their idea that we're taking it out of

2    context is just offensive.

3              THE COURT:  Okay.  All right, now we're moving on

4    to Stephen Wymer, and I'm going to ask, because we've been

5    going for about an hour right now, Lee, do you want ten

6    minutes, or are you okay?

7              THE REPORTER:  I'm okay.

8              THE COURT:  Okay, all right.

9              MR. HASHEMI:  Good morning, your Honor.  Caz

10   Hashemi on behalf of Steve Wymer.  For this argument, your

11   Honor, I plan to focus on three things, but I will spend the

12   most time on the specific text messages and communications

13   by Mr. Wymer alleged in the complaint and heavily relied

14   upon by plaintiffs as a basis for the claims against him.

15   All of the plaintiffs' causes of action against Mr. Wymer

16   require a showing of plausibility for at least one or more

17   of the items I'm about to cover.

18             The first item real quick, the complaint does not

19   allege that Mr. Wymer participated in or was physically

20   involved in the criminal actions.  In fact, it notes that he

21   did not physically participate in Paragraph 216.  The

22   complaint does not allege that Mr. Wymer attended any of the

23   meetings for the charged defendants on their crimes or that

24   Mr. Wymer even knew those meetings were occurring.

25             The second area real quick as well, Mr. Wymer's

1    unawareness of red flags associated with Baugh.  There are

2    no factual allegations showing that Wymer knew Baugh was

3    capable of or predisposed to the behavior employed against

4    plaintiffs.  Mr. Wymer did not supervise Baugh or the

5    security team.  He had no role in hiring Baugh, and he is

6    not alleged to have known about Baugh's prior work and

7    covert operations.  The complaint alleges that others at

8    eBay knew Baugh had worked in covert operations, like Wenig

9    and Jones, but not Wymer.  And the complaint does not

10   adequately allege that Wymer knew about Baugh's concerning

11   behavior, like stabbing chairs and playing graphic videos.

12   Plaintiffs' surreply asks the Court to infer that based on

13   the workspace and the proximity to Wymer's conference room.

14   The complaint states no facts, your Honor, suggesting that

15   Wymer was present when Baugh stabbed the chair, showed

16   graphic videos and the like, nor is it alleged that Baugh

17   did any of these things at his workstation or Wymer --

18          THE COURT:  Can I just say, who did supervise

19   Baugh?  I actually thought Wymer did.

20          MR. HASHEMI:  Wendy Jones is the direct

21   supervisor, as alleged in the complaint, and Jones reported

22   to Wenig.

23          THE COURT:  So what was Wymer's role?  I mean, he

24   was certainly sending out some of the more --

25          MR. HASHEMI:  And I'm going to get to that in a

1      second, but I think --

2              THE COURT:  -- that misses, so what was his role

3      if he wasn't at all responsible for this operation?

4              MR. HASHEMI:  He was part of Devin Wenig's direct

5      team, but as alleged in the complaint, Mr. Baugh reported

6      directly to Wendy Jones, Paragraph 3 and 32, who in turn

7      reported to Devin Wenig, Paragraph 3 and 40.  Mr. Wymer had

8      no direct supervisory role over Mr. Baugh.

9              THE COURT:  What was Wymer's role?

10             MR. HASHEMI:  He was the chief communications

11     officer, your Honor.  And the third area I'm going to turn

12     to now is just the text messages and communications.  In the

13     absence of his participation in events, in the absence of

14     his awareness of Baugh's background and predisposition, the

15     complaint, respectfully, mischaracterizes as directives to

16     Baugh to commit crimes Mr. Wymer's communications to Baugh.

17     The allegations do not plausibly show that there were

18     directives to commit crimes.

19             As an initial matter, your Honor, hyperbolic

20     language at the workplace is not unprecedented and not

21     unheard of, but the charged defendants' acts were

22     unprecedented and unheard of.  The complaint pleads no facts

23     suggesting that anything remotely similar had ever happened

24     at eBay, or any other workplace.  No one working in a

25     professional environment could reasonably anticipate a

1   colleague responding to concerns about online reporting by

2   making death threats, sending spiders, delivering a fetal

3   pig, or terrorizing the online reporter at her home.

4        When anyone hears of the actions taken here, the

5   first response is shock and disbelief.  That is the very

6   reason that makes the actions unforeseeable.  The complaint

7   pleads no facts showing that Wymer should have reasonably

8   anticipated that Baugh responding to his communications was

9   a bizarre terror campaign.  The conduct that actually

10  occurred was not foreseeable.  One could imagine, your

11  Honor, efforts by eBay regarding plaintiffs' website might

12  impact the success of the online business, such as reducing

13  readership, reducing visibility; but the actual harm

14  suffered -- death threats, physical acts at their home and

15  criminal acts -- was completely different from any

16  foreseeable business injury.  It's just not plausible to

17  infer that Wymer could have anticipated this type of

18  physical actions.  The hyperbolic messages like "We need to

19  stop her," which the plaintiffs emphasize, "She needs to get

20  burned down, whatever it takes, I want to see ashes," do not

21  plausibly lead to the claim that Wymer directed the criminal

22  acts when viewed in the context of discussions regarding

23  plaintiff's website.  And Wymer's text messages get this

24  attention because --

25        THE COURT:  I understand you're saying that a lot

1   of people have sort of macho talk or -- what do you call

2   it -- hyperbolic talk, but that's just one way of arguing

3   it.  Another plausible way of arguing it is, he meant it.  I

4   mean, I can't do that on a motion to dismiss.  I mean, there

5   are two equally plausible explanations.  In fact, in the

6   context, it's probably more plausible that he meant it.

7          MR. HASHEMI:  Well, it's not enough to be

8   conceivable.  *Twombly* noted that, and --

9          THE COURT:  It's not just possible.  It's got to

10  be plausible.  But it doesn't have to be probable either.  I

11  mean, people play this game, right?

12         MR. HASHEMI:  Absolutely, your Honor, and the

13  Supreme Court said judicial review, you have to draw on your

14  judicial experience and common sense.  I'm just asking you

15  to just step back and perhaps this example:  If an officer

16  at a Fortune 500 company is frustrated at a competitor at,

17  say, Company ABC -- that has happened, I'm pretty sure --

18  and texts a colleague, "We need to crush and annihilate

19  Executive 1 at Company ABC, whatever it takes," it's just

20  not reasonable or plausible or foreseeable that the

21  recipient of that text message would interpret that text

22  message as a directive to physically harm and terrorize

23  Executive 1 in Company ABC.  It may be animated and

24  hyperbolic to use "crush and annihilate" in that context,

25  but the text itself is not unlawful.  If that were the case,

 1     this would be happening all the time.  Something like this

 2     has never happened in corporate America for a reason:  It's

 3     completely unforeseeable.

 4            And the complaint actually points to a text

 5     message that's incorporated into the complaint that

 6     establishes, we believe, and it's plausible to interpret for

 7     your Honor, the opposite of Wymer's knowledge.

 8     Paragraph 266 of the complaint quotes a portion of the text

 9     from Baugh to Wymer on August 23, 2019, after the charged

10     defendants cease their bad acts against plaintiffs.

11     Plaintiffs omit the language showing Wymer's lack of

12     knowledge, but the entire message is incorporated into the

13     complaint and should be considered by your Honor in its

14     entirety.

15            The complete message is found at Paragraph 177,

16     ECF 1-1, of the declaration of --

17            THE COURT:  Whoa, whoa, whoa.  Too fast, too fast.

18            MR. HASHEMI:  Sorry, forgive me -- is found at

19     Paragraph 177, ECF 1-1 of the declaration that plaintiffs

20     previously attached as Exhibit 8 to their original

21     complaint, and it begins like this.  It's after the acts

22     occur, your Honor, quote, "Hi, Steve, this is Jim Baugh's

23     personal cell.  My team ran an op on our friends in Boston.

24     Nothing illegal occurred, and we were actually intending to

25     team up with her and get her on our side in a positive

1    matter."  It goes on to say twice that "We're cooperating in

2    an internal investigation" and reiterates that no crime was

3    committed.

4              This message establishes several points, your

5    Honor.  First, Baugh had not told Wymer what his team was

6    doing.  Otherwise, he would not have led with, quote, "My

7    team ran an op."

8              Second, Baugh viewed Wymer as an outsider and

9    treated him as such.  This is clear from Baugh's use of "we"

10   and "my people," which necessarily excludes Wymer.

11             Third, even at this stage, Baugh was downplaying

12   his actions in a text to Wymer, saying no crime was

13   committed multiple times and putting an innocuous spin on

14   things.

15             And, finally, Wymer and Baugh were not personally

16   and professionally close.  Wymer did not have Baugh's

17   personal cellphone number.  Others did, which is why Baugh

18   identified himself as the sender, "This is Jim Baugh's

19   personal cell."  If Wymer wasn't in on the scheme or aware

20   of it, it would be reasonable to assume Wymer would have

21   Baugh's personal cell phone number.

22             Your Honor, two other things that the plaintiffs

23   have raised in their papers, and I want to be respectful of

24   the time.  Plaintiffs ask why --

25             THE COURT:  You have one more minute.  You're

1    good.

2           MR. HASHEMI:  Okay, I have one more minute?  Okay,

3    I'm going to go to the deleted texts then because I know

4    counsel for plaintiffs already brought that up.

5           The allegation that Wymer, your Honor, deleted

6    texts -- and they're the allegations in the complaint -- and

7    calling (Inaudible) with Baugh and Wenig does not save

8    plaintiff's claim.  The plaintiff, first of all, does not

9    allege that these deletions were themselves unlawful.  There

10    is no allegation, for instance, that anyone had instructed

11    or ordered Wymer to preserve data at the time of the alleged

12    deletions.  Rather, plaintiffs seek to use the deletions,

13    your Honor, to support an inference, and the inference being

14    that Wymer sent these messages with the knowledge or intent

15    that Baugh would harm plaintiffs.  They need to plausibly

16    show the messages would have been incriminating.  Despite

17    the alleged deletions, plaintiffs quote Wymer's messages in

18    the complaint --

19           THE COURT:  Could you refresh my recollection?

20    Which were the deleted texts?

21           MR. HASHEMI:  Well, the plaintiffs have made the

22    allegation that Mr. Wymer deleted texts with Baugh and Wymer

23    during this time period.  They don't identify the specific

24    texts.

25           THE COURT:  I see, so we don't have them now?

```
 1              MR. HASHEMI:  Well, the point I'm making, your
 2   Honor, is, the texts that they do cite repeatedly in their
 3   complaint, presumably these are alleged deleted texts --
 4              THE COURT:  Those are the ones that were allegedly
 5   deleted, the ones that, you know, the "Take her down" type
 6   of --
 7              MR. HASHEMI:  Well, I guess what we're stuck
 8   with --
 9              THE COURT:  Are those the ones allegedly deleted?
10              MR. HASHEMI:  We have to be bound by the complaint,
11   so I'm going to stick with the complaint.  There are
12   allegations that Mr. Wymer deleted text messages.  They
13   don't specify which ones.  My point is, there's a lot of
14   text messages quoted by Mr. Wymer, so there's a sender and a
15   recipient, there are text messages', and it's also
16   reasonable to assume that the relevant text messages related
17   to Wymer and Baugh would have been revealed in the criminal
18   case.  And our point is, none of the alleged messages to or
19   from Wymer plausibly show that Wymer intended or expected
20   Baugh to commit crimes against plaintiffs.  And you would
21   expect that those messages would have come out, and none
22   plausibly show that Mr. Wymer knew or saw, had reason to
23   believe that Mr. Baugh would engage in this criminal
24   behavior, and I understand my ten minutes is up.
25              THE COURT:  It is.  Okay, Ms. Scapicchio.
```

 1          MS. SCAPICCHIO:  Thank you, your Honor.  So one of

 2     the first things that Mr. Wymer did, Judge, is he told Baugh

 3     that he was giving these directives that came from

 4     Mr. Wenig.  That's what he told Baugh, okay?  And in terms

 5     of the deleted texts, just so we can get that out of the

 6     way, when Mr. Wymer did finally turn in his phone, it was

 7     blank, everything had been deleted, Judge; and that's where

 8     we're getting the idea that he deleted his text messages

 9     because that was the allegation as far as the government was

10     concerned.  And that's what happened, Judge.  So the fact

11     that --

12          THE COURT:  Those haven't been found?  No forensic

13     expert would have gone into the phone that you know?

14          MS. SCAPICCHIO:  Well, we don't have any discovery,

15     Judge, and so we don't know what exactly happened; and

16     because Mr. Wymer wasn't charged criminally, we don't know

17     if anybody looked at the phone forensically at this point,

18     Judge.  I mean, certainly eBay would still have custody of

19     that phone, I assume, and a forensic expert could determine,

20     you know, what was deleted from the phones.  But when the

21     phone was turned in to eBay, it had none of the

22     communications that we know existed because we have them

23     from other places.  So he certainly deleted the information

24     that would have connected him to this conspiracy, Judge.

25     Nobody else deleted the stuff on his phone.  It was him.

1    And it's plausible that he deleted that because he didn't

2    want his conduct to be uncovered because he intended the

3    conduct to happen.

4              So here is what Wymer did in addition to --

5    everything is pled in the complaint, Judge.  Wymer

6    disseminated Wenig's directives to Baugh, and then he

7    promised Baugh top cover and backing with any legal issues

8    that he might run into.  And so at that point, eBay had

9    already determined that their work with respect to the

10   website, trying to get the website further down in the

11   reporting, I think they said that they hired someone to do a

12   strategy where they would drive the Steiners' articles lower

13   in the search engine results.  And in that case, Judge,

14   that's what they had done prior to these conversations that

15   Wymer is involved in.

16             So when Wymer gets involved, he takes the

17   directive from Wenig.  The directive is, you know, to --

18   well, he takes the directive from Wymer.  His directive to

19   Baugh is to burn her to the ground.

20             Now, the defendants want to say that's related to

21   the website, and, again, a summary judgment issue maybe but

22   not for right now.  Our allegation is, that showed his

23   intent to be involved in this conspiracy.

24             In addition, he then promises top cover, whatever

25   that means, to a security person.  So he's not saying this

1    to other people in his department.  He's talking to the head

2    of security, and he's telling them, "We'll give you top

3    cover, and we'll provide legal assistance if you need it."

4    So why would they need legal assistance, because they've

5    already determined eBay Legal can't do anything to stop the

6    Steiners reporting?

7            In addition, on August 6 Wymer said to Baugh that

8    "We are all done if this reporting doesn't stop.  You'll get

9    cover from Legal.  Do whatever it takes to stop."  And he

10   kept in contact with Baugh throughout, "Do whatever it

11   takes."  And then Baugh plans the trip to Natick.  And when

12   Wymer was in the PR Department, if things were going to be

13   done the legal way, why wouldn't he do it and tell one of

14   his actual subordinates to say, "Hey, this is what's

15   happening here.  This is what we're going to do.  This is

16   all about the website"?  Why are they talking to Mr. Baugh

17   about, you know, about allegedly getting rid of a website?

18   He's security.  He's not somebody who would deal with that.

19           So I would suggest, Judge, that in addition, when

20   Wymer spoke to Baugh after the email from the Natick

21   Police -- so Natick Police sends an email saying

22   "Something's going on here.  We want to know what's going

23   on."  Wymer then speaks to Baugh, at least as far as the

24   email we have, that the Natick Police were sent to the

25   (Inaudible).  And what happens at that point, Judge, is that

1    there's one eleven-minute call --

2              THE COURT:  You're speaking too quickly here.

3              MS. SCAPICCHIO:  So eBay finds out that Natick

4    Police is involved, okay?  And then there's an email that

5    goes between Wymer and Baugh, okay?  And that email was

6    followed by, I don't know, an eleven-minute conversation and

7    another twelve-minute conversation, and then Wymer deletes

8    those call logs and texts with Baugh.

9              MR. HASHEMI:  Your Honor, may I just have one

10   minute?

11             THE COURT:  No, no.  She's not done.  I don't

12   think she's done.

13             MR. HASHEMI:  I'm sorry.

14             MS. SCAPICCHIO:  I am not, Judge.  So our claim is

15   that Baugh would not have taken upon himself to plan and

16   carry out this scheme if it wasn't directed by Wenig and

17   Wymer in this case, Judge.  And Wymer is the one who is --

18   at least as far as the PowerPoint is concerned, even eBay

19   says he could be criminally charged.  That's what they say

20   in their PowerPoint:  He could be criminally charged.  So

21   the idea, Judge, that he's the one in this case who was

22   communicating the directives from Wenig and was

23   communicating directly for Baugh in this case, Judge, and I

24   would suggest that all of these issues together with respect

25   to what's going on, and combined with what was happening in

1    the C-suite, Judge, I would suggest that a plausible

2    explanation is that Wymer intended for it to happen.  And

3    their arguments that it was limited to the website, their

4    arguments that he didn't intend it, those are all summary

5    judgment arguments, Judge, not before you here today because

6    the plausibility argument works.  The plausibility argument

7    suggests that he sent the text.  The plausibility argument,

8    he was Baugh's contact.  Jones was Baugh's supervisor, but

9    he was Baugh's contact in terms of communicating Wenig's

10   directives directly to him.  And I suggest that's enough for

11   the plausibility argument, Judge, and I would suggest that

12   if you look at everything that we've put in our memo

13   regarding Wymer and Wymer's actions, he said "Burn her to

14   the ground," he said, you know, "Do whatever it takes," all

15   of those directives to Baugh are what generated this

16   conspiracy.

17         So, again, he's communicating Wenig's directives,

18   and Wymer is directing them directly to Baugh and telling

19   him "Do what it takes," understanding that Jones is saying

20   "Do it off the radar" and "Do whatever it takes.  Burn her

21   to the ground.  I want to see ashes."  I don't know how you

22   say that those are hyperboles or some hyperbolistic

23   language.  They're evidence of Wymer's intent, and I think

24   it's plausible that they're evidence of Wymer's intent, and

25   I'll ask you not to dismiss any of the claims against

1    Mr. Wymer.

2              THE COURT:  Okay.  Did you have one minute you

3    wanted?

4              MR. HASHEMI:  Yeah, rapid fire.  First --

5              THE COURT:  No, not rapid because I've got a court

6    reporter and I'm getting tired.

7              MR. HASHEMI:  I'll do it within a minute.  The

8    first point, eBay's PowerPoint to the government,

9    respectfully, I don't think it says what counsel just said.

10   Slide 10, quote, "We did not find evidence Wymer actually

11   directed or knew that the criminal acts would follow," end

12   quote.

13             With respect to the point about Baugh being a

14   security person, why would he do online research?  I would

15   just refer the Court to Paragraph 58.  In March, 2019, the

16   general counsel asked Baugh to look into a Twitter account

17   named Fidomaster and, quote, "Give us as much info as

18   possible," end quote.  That's the general counsel going to

19   the security person, as counsel referred to him.

20             Paragraph 59, the general counsel asked Baugh to

21   inquire about a Twitter handle of a Board member and figure

22   the identity of another handle.

23             And the final thing, your Honor, the "whatever it

24   takes" phrase, in Paragraphs 91, 92, and 109, Mr. Wymer uses

25   that language in connection with a communication that

1    includes the Legal Department and the general counsel when

2    they're talking about how to respond to a Twitter imposter.

3    That is the language that is used in a completely innocuous

4    context, and it's just not plausible.

5                THE COURT:  Thank you.

6                MS. SCAPICCHIO:  If I could just respond briefly,

7    Judge.  First of all, eBay and the people at eBay thought

8    that the Steiners were Fidomaster, okay?  That's what they

9    believed, that they were Fidomaster, so certainly they were

10   talking about the Steiners at that point in time, Judge.

11               Secondly, with respect to the argument that

12   somehow this was related to Legal, before these actions took

13   place, there were texts that said, "eBay Legal, we can't do

14   anything more.  We're at the end of our rope here."  And

15   that's when all of these directives came to burn her to the

16   ground, to do whatever it takes.  All of that happened after

17   eBay Legal said, "We're done.  We've gone as far as we can.

18   There's nothing else we can do.  Now you guys take it over,"

19   and that's when it was "Do it off the radar," Judge.

20               THE COURT:  All right, thank you.

21               (Discussion off the record.)

22               THE COURT:  So we have us now at 10:30, so we will

23   come back on at 10:40.  We're making great time, but it's

24   because I'm holding people to a schedule, and it's a lot for

25   the Court Reporter, for me, and for others to just sort of

1    get it all down.  So ten minutes is appropriate, and I'll

2    see you, Maryellen, at 20 of or so, okay?

3              THE CLERK:  Yes.  Everyone can just shut off their

4    videos and then come back in.  Thank you.

5              (A recess was taken, 10:31 a.m.)

6              (Resumed, 10:43 a.m.)

7              THE COURT:  So far, you must -- you're

8    Mr. O'Connor, is that it?

9              MR. O'CONNOR:  I am, your Honor.

10             THE COURT:  You win the Zoom background award for

11   the day.

12             MR. O'CONNOR:  Thank you, your Honor.  I have to

13   credit my team for that one, but I appreciate it.  I'm here

14   with Brien O'Connor as well, my partner.  I'm Andrew

15   O'Connor.

16             MR. BRIEN O'CONNOR:  Hello, your Honor.

17             THE COURT:  Hello.  No relation, right?

18             MR. O'CONNOR:  No, no relation.  We're very clear

19   about that.

20             MR. BRIEN O'CONNOR:  No offense taken.

21             THE COURT:  Okay.  In Boston, that's such an

22   uncommon name, but, anyway, go ahead.

23             MR. O'CONNOR:  Well, plaintiffs have reminded us

24   defendants are confined to the allegations as they are pled

25   in the complaint, and in fairness, plaintiffs have to be

1    too.  And when you look at what's actually been pled, the

2    factual allegations against Ms. Jones, not the rhetoric in

3    the brief, not the conclusory statements, not the broad

4    brush strokes of "all defendants did this and that," what's

5    actually pled factually as to Ms. Jones is not enough to

6    sustain a claim here.  Plaintiffs added Ms. Jones late in

7    the game, but they lumped her in with Mr. Wenig and

8    Mr. Wymer and state she played some critical role in this

9    criminal bizarre conspiracy.  Those are pretty big claims,

10   and they need to be backed up with actual factual

11   allegations.  To plead a conspiracy, you have to plead facts

12   sufficient to show that Ms. Jones knew what was going on was

13   unlawful, that her own conduct was tortious.  Or, if you're

14   going to plead it through substantial assistance, you have

15   to plead facts sufficient to show that she knew what was

16   going on was unlawful, and she still substantially

17   contributed to that effort.

18          But that's not what the allegations in the

19   complaint actually suggest.  In the opposition, one of the

20   most eye-catching allegations that plaintiffs say proves the

21   case, or pleads it, at least, is that Ms. Jones heard a

22   recording of a harassing phone call to the Steiners.

23          THE COURT:  So, first of all, she's a lawyer,

24   right, and she's the supervisor of Baugh?  Would that be

25   fair?  She's the supervisor, right?

1        MR. O'CONNOR:  Indeed, she is the supervisor.  He

2   was one of thousands of employees within her division, that

3   is correct.

4        THE COURT:  And he was a direct-line report to

5   her?

6        MR. O'CONNOR:  He was one of her direct reports.

7        THE COURT:  All right.

8        MR. O'CONNOR:  Now, if we look to what the

9   opposition points to --

10        THE COURT:  And you said the key thing was that

11   she overheard one of the conversations?

12        MR. O'CONNOR:  Yes.  The opposition says she

13   overheard a harassing phone call to the Steiners, which

14   would be a pretty significant allegation.  The only problem

15   with it, except for the fact that it's categorically false,

16   is that it's not even the allegation in the complaint.  The

17   opposition says she heard a phone call with the Steiners,

18   but what the complaint actually says is, she heard a phone

19   call to an associate of Fidomaster.  And earlier we heard

20   plaintiffs didn't twist things, but in their surreply, they

21   don't even try to acknowledge the fact that they entirely

22   misstated, in a way that was incredibly advantageous to

23   them, what their own complaint says.

24        THE COURT:  Well, wait a minute, but she overheard

25   a harassing phone call to someone?

1          MR. O'CONNOR:  That's the allegation.  Now --

2          THE COURT:  You say it's not true, but, in any

3     event, I've got to take it as true that she overheard a

4     harassing phone call to an associate of Fidomaster, right?

5     And at the time they thought Fidomaster was the Steiners?

6          MR. O'CONNOR:  Right, and the "they" there is very

7     important, your Honor, that they understood it because

8     Ms. Jones didn't, and there's not a single allegation in the

9     complaint, not a single factual allegation that Ms. Jones

10    thought that this associate of Fidomaster or Fidomaster,

11    whoever that was, was in any way associated with the

12    Steiners.  And if there were such an allegation in the

13    complaint, we would have some serious questions about what's

14    a reasonable basis in law or fact --

15         THE COURT:  But you weren't answering my question.

16    Regardless of to whom it was, was it harassing?  What did it

17    say?

18         MR. O'CONNOR:  It wasn't harassing, it didn't

19    happen, but accepting the allegations in the complaint as

20    true, it was a harassing phone call.

21         THE COURT:  Okay.

22         MR. O'CONNOR:  But our point is, her overhearing a

23    harassing phone call, which we understand we have to accept

24    as true for purposes of this motion, is that sufficient to

25    plausibly allege that she joined an intentional, bizarre

1    criminal conspiracy that resulted in a campaign out in

2    Natick that involved spray painting fences and pig masks and

3    all sorts of other things completely unrelated to what they

4    say happened on this phone call?  That's too big a jump to

5    go from overhearing a phone call to joining an intentional

6    conspiracy targeting the plaintiffs, the Steiners in

7    particular.

8          Well, what else besides this phone call do

9    plaintiffs allege?  They say she hired Mr. Baugh, but that's

10   an innocuous fact, and there is no allegation that when she

11   hired Mr. Baugh, she had any idea he was planning on doing

12   any of these claims.  Plaintiffs say she promoted Mr. Cooke,

13   but there's not a single factual allegation in the complaint

14   that says that at the time when she promoted Mr. Cooke, she

15   had any idea about Mr. Cooke's involvement in any of these

16   events.  Plaintiffs may argue those points now, but they're

17   not supported by factual allegations in the complaint, and

18   that's what matters in the motion to dismiss.

19         Candidly, your Honor, their best argument as to

20   Ms. Jones relates to this allegation that you've heard

21   quoted a couple of times today, that in May of 2019 she

22   asked to huddle with Mr. Baugh and others to discuss a

23   contractor's disclosure of nonpublic information that was

24   then picked up on the EcommerceBytes log; and as part of

25   that discussion, plaintiffs allege Ms. Jones said, "Take

1    care of it off the radar."

2            Now, again, that allegation is false, but for

3    today we accept it as true.  But we have to accept it for

4    what it actually is and what it actually says.  The

5    complaint says she wanted this issue, quote, "the issue"

6    resolved off the radar, which was a blog post about this

7    contractor's work at eBay.  There was never any indication

8    that there was going to be the sort of harassment campaign

9    that followed, no indication that she endorsed some unlawful

10    course of conduct that unfolded after that.

11            When a supervisor, when a manager in the context

12    of a workplace has a conversation with their coworkers, it's

13    an unspoken assumption that the coworker is not going to go

14    around committing crimes in the course of their 9:00-to-5:00

15    job.  That's a fair assumption, one probably many of us make

16    every day.  And even accepting that isolated allegation in

17    2019 as true, it is too big a leap to get from May, 2019,

18    one blog post about a construction post, to August, the

19    horrendous things, the criminal things that happened in

20    Natick.  That is too big a leap, and under *Twombly* and

21    *Iqbal*, this Court does not have to follow plaintiffs over

22    the cliff.

23            Now, we might say that's good on the intentional

24    torts because she didn't intentionally join what ultimately

25    happened, but doesn't that leave some of the negligence

1    counts?  And at first I'd say you've got a lot more

2    streamlined cases than Ms. Jones getting those intentional

3    torts off the table.

4             But even for the negligence-based torts, of which

5    there are one or two, those fail for the same reasons:

6    Because it's just too big a leap to expect a manager in

7    corporate America to anticipate that one of their reportees

8    is going to take this completely unprecedented, unique --

9    we've never heard anything like this, nobody on this call

10   has, and because of that, Ms. Jones didn't have to

11   anticipate it either.  She's not required to be a mind

12   reader and figure out why or how or what Jim Baugh was

13   doing.  There's no obligation on managers to detect and

14   prevent this sort of thing unless there is significant red

15   flags.

16            And plaintiffs I'm sure will say, "Oh, there were

17   red flags here.  He was in the CIA."  But as a matter of law

18   and policy, serving our country in the CIA does not give

19   rise to an inference that they're going to be violent.  And

20   plaintiffs then might say, "Well, what about the live

21   shooter drills and the stabbing of the chair?"  Well, number

22   one, I think there's a difference between live shooter

23   drills and what actually happened out in Natick.  But,

24   number two, again, go back to the well-pled facts in the

25   complaint.  Where are the facts that would be sufficient to

1   show, if proven, that Ms. Jones knew about those incidents,

2   that she was there in whatever building his team worked in

3   and saw the videos that might have happened in a group of

4   security guards?  Those allegations aren't there in the

5   complaint because they can't be made.

6            And, respectfully, *Iqbal* and *Twombly* compel the

7   Court to exercise common sense here and think about what

8   your average manager or supervisor in a workplace would

9   expect, and nobody in their right mind would expect what Jim

10  Baugh went off and did in Natick.

11           Thank you, your Honor.

12           THE COURT:  Thank you.  Ms. Scapicchio?

13           MS. SCAPICCHIO:  Thank you, your Honor.  So, first

14  of all, if I can just address the claim that it's limited to

15  this one, you know, "take it off the radar."  It's not.  So,

16  first of all, Baugh convinced Jones to fire the prior

17  director of security, Fitzgerald, and appoint him as the

18  director of security.  She did that.  That was the

19  initiation of what she did.  And then she understood that

20  PFC was coming in and that PFC would be involved.  She knew

21  that.

22           She was Baugh's direct supervisor.  We pled that

23  he reported to her weekly, that she reported to Wenig when

24  he reported to her.  She asked Baugh to handle this off the

25  radar after they were told that Legal couldn't stop the

1    Steiners' reporting, after they were told that the company

2    that they hired to do the analysis to see whether or not

3    they could get the EcommerceBytes website lower in the

4    search engine didn't work, that it was clear at that point

5    that the focus was on the Steiners.

6              And when she gave the fist bump -- we have that

7    one email.  I'm sure there's others, but that's the one we

8    have.  And just so we're clear, we don't have Jones's, or

9    Wenig's for that matter, emails because the government never

10   asked for them, so they weren't part of the criminal case,

11   but we expect to get them in the course of discovery.

12             But, in any event, when she gave the fist bump,

13   the fist bump was in response to an eBay employee who was

14   impersonating -- well, an eBay employee was calling

15   pretending to be someone that they thought was associated

16   with Fidomaster, who everybody thought at that point was an

17   alterego of the Steiners.  That was her fist bump.

18             THE COURT:  Say that again?

19             MS. SCAPICCHIO:  So what happened with the fist

20   bump is, she gave Baugh a fist bump when Baugh played a call

21   where he had someone pretend to have an eBay employee call

22   someone that they thought was associated with Fidomaster.

23   She gave the fist bump in relationship to that.

24             THE COURT:  It was like playacting?

25             MS. SCAPICCHIO:  Well, they were trying to figure

1    out who -- they were trying to find out who Fidomaster was,

2    and they thought the Steiners were Fidomaster.  So they were

3    sending eBay employees in to have these conversations to see

4    if they could smoke somebody out to say --

5              THE COURT:  Conversations with whom?

6              MS. SCAPICCHIO:  Conversations with people who

7    associated, they thought, with Fidomaster.

8              THE COURT:  So it wasn't the Steiners, but they

9    thought that maybe they were associated with the Steiners?

10             MS. SCAPICCHIO:  No.  Everybody thought that

11   Fidomaster was the Steiners.

12             THE COURT:  Who was Fidomaster?

13             MS. SCAPICCHIO:  Fidomaster is someone who is out

14   there, Judge.  Somebody at some point in this conspiracy, at

15   least in the federal case, went to the Steiners' house and

16   scrawled the word "Fidomaster" on their fence.

17             THE COURT:  But it turns out it's a completely

18   separate entity, at least as far as we know?

19             MS. SCAPICCHIO:  Well, no.  As far as the

20   defendants are concerned, they were related.  That's the

21   point, Judge.

22             THE COURT:  Right, but they turned out to be

23   wrong?

24             MS. SCAPICCHIO:  They turned out to be wrong, but

25   their actions and when they took the actions, they were

1    under the belief that David Steiner was Fidomaster.  That's

2    what they believed.

3           So, Judge, when she asked Baugh to handle this off

4    the radar, combined with the fist bump, combined with the

5    directive from Wenig to take her down, combined with "burn

6    her to the ground."  And then, Judge, eBay claims that they

7    did an investigation.  We say it's a sham, but certainly she

8    would have been privy to that investigation.  The

9    investigation had to have revealed Cooke's criminal conduct,

10   and she appointed Cooke the head of the security unit, and

11   she had to have understood it's criminal liability at that

12   point, if eBay actually did the investigation that they said

13   they did.  And all of a sudden Cooke is head of that

14   security unit until he gets criminally charged, and that's

15   when they fire him.  But for the period of time where --

16          THE COURT:  Excuse me.  When you keep saying it's

17   a sham investigation, are you referring to the investigation

18   that eventually was working with the government, the

19   investigators?

20          MS. SCAPICCHIO:  What I'm saying is, Judge, if

21   they were going to do a thorough investigation, you would

22   assume they would have secured everybody's phones.  They

23   would have forensically analyzed everybody's phones.  They

24   would have had that available and would have made that

25   available to the government.

```
1              THE COURT:  When you say "they," are you talking
2        about Latham, or are you talking about some internal thing
3        that the government set up with --
4              MS. SCAPICCHIO:  No.  eBay is claiming --
5              THE COURT:  Mr. Pirozollo's law firm.  I'm sorry.
6              MS. SCAPICCHIO:  Right.  So --
7              THE COURT:  Are you referring to his law firm
8        conducted a sham investigation?
9              MS. SCAPICCHIO:  No.  There was another law firm
10       involved in supposedly doing an external investigation into
11       these allegations.
12             THE COURT:  Which law firm was that?
13             MS. SCAPICCHIO:  It was -- I think it was -- was
14       it Latham?  I don't remember, Judge, off the top of my head.
15             THE COURT:  Yes, somehow that name stuck in my
16       mind, but it has nothing to do with any of these --
17             MS. SCAPICCHIO:  Morgan Lewis, it was Morgan
18       Lewis, Judge.  Morgan Lewis is who they hired.  And so
19       Morgan Lewis allegedly does this investigation.  There's a
20       report out there from Morgan Lewis that we still don't have.
21       But, in any event, Judge, when Jones promotes Cooke after
22       Cooke's criminal liability in this case, you know, in my
23       mind, it's not limited to her saying, you know, "Do this off
24       the radar."  It's much more involved than that.  Even that
25       one comment, "Do it off the radar," you know, the defendants
```

1   are now saying she meant something different to that.  And,

2   again, that's a question for summary judgment, if that's

3   what they want to argue in summary judgment.  But we've pled

4   in the complaint that when she gave that directive to do it

5   off the radar, when she issued that to Baugh, who she was

6   meeting with weekly, who she was his direct support, she

7   understood what Baugh was going to do, and she didn't want

8   to know anything about it.  She can't be willfully blind to

9   what's happening when she tells him, "Don't tell me what's

10  happening," and then she comes in here, then comes in here

11  and says they can't prove what was happening because she

12  said "Do it off the radar."  It's that circular reasoning,

13  Judge.  And I would suggest, as far as she's concerned,

14  there is certainly enough to plausibly bring her in because

15  of her comments, because of her direct connection with

16  Baugh.  What did she think Baugh was doing in Boston?  What

17  did she think Baugh was doing spending all this money?  What

18  did she think Baugh was doing with respect to --

19            THE COURT:  I thought you said that the money was

20  being spent offline with this other company.

21            MS. SCAPICCHIO:  What was happening, PFC was

22  paying for everything.  They were then marking up their

23  expenses 5 percent and billing them back to eBay, and eBay

24  was ultimately reimbursing PFC.

25            THE COURT:  Who at eBay?  Did she have to sign

1      off?

2              MS. SCAPICCHIO:  I don't know, Judge.  She's the

3      head of that department.  Maybe she did, maybe she didn't, I

4      don't know, but I know that the expenses would have to go

5      through her department.  If she's the head of that

6      department, I'm sure she would have had to be aware of them,

7      and that's the way it's pled in the complaint, Judge.  So

8      when PFC was paying Zea's credit cards and all of the

9      expenses that Zea had, they were adding a 5 percent markup,

10     like most companies do, and they were billing it back to

11     eBay, and eBay was ultimately paying them, all of the

12     expenses.

13             And so again, Judge, she was the head of that

14     department, and whether she had a thousand people or one

15     person to supervise, it doesn't matter.  She had an

16     obligation to know what was going on.  She was meeting him

17     weekly.  So how was he accounting for his time when he's

18     spending all of his time investigating the Steiners and

19     planning this entire conspiracy?  What does she think he's

20     doing during that time period?  What does he tell her about

21     going to Boston and his need to go to Boston?  We don't have

22     any of that information, Judge, but certainly we have enough

23     to plausibly suggest, when she tells the director of

24     security to handle it off the radar screen is after all of

25     this happens with respect to the legal entities can no

1    longer do anything; their outside company couldn't stop the

2    Steiners reporting.  He understood, Judge, and I think it's

3    plausible that he understood, based on not just that one

4    single "Handle it off the radar" but the totality of the

5    circumstances and her relationship with Baugh.  She was

6    responsible for him, Judge.

7              THE COURT:  All right, thank you.  We'll move

8    on --

9              MR. O'CONNOR:  I just want to encourage the Court,

10   number one, to look back to what I actually said in the

11   complaint because a lot of what we just heard from

12   plaintiff's counsel is not only wrong, but it's not in the

13   complaint.  The idea that she promoted Cooke after criminal

14   liability was established, that's false.  She asked, well,

15   "What did she think all the expenses were for?"  Go back to

16   the complaint.  There's no allegation that Ms. Jones ever

17   knew about these expenses for one of her many employees.

18             So we have to go back to what's actually pled and

19   to cut through all the hand-waving.  We heard about "burn it

20   down" and all these other things.  Those are other defendants.

21   Look at what's pled to Ms. Jones, and as to Ms. Jones, *Iqbal*

22   and *Twombly* requires dismissal.

23             THE COURT:  Thank you.  All right, we're going to

24   go on to the last person, who is actually the person I know

25   the very least about.  I don't know if his name came up at

 1    all in the criminal case, or at least that I remember.

 2    There are certain details, as you can tell, I've forgotten.

 3             All right, so we have Mr. Holmes again for

 4    Mr. Krystek, and, of course, Ms. Scapicchio who's been

 5    soloing it.  Okay, go ahead, Mr. Holmes.

 6             MR. HOLMES:  Thank you, your Honor.

 7             THE COURT:  Now, who's Krystek?  I understand that

 8    he's with PFC, but maybe you can just give me a little

 9    background on him.

10             MR. HOLMES:  Sure.  Mr. Krystek is one of the

11    founders and he's the president and CEO of PFC.

12             THE COURT:  Is PFC a corporation, or is it an LLC?

13             MR. HOLMES:  I believe it's an LLC, your Honor.

14             THE COURT:  Okay, so he's the principal, what do

15    they call him, principal member of it?

16             MR. HOLMES:  Something along those lines.

17             THE COURT:  Okay.  And how many people are at PFC?

18             MR. HOLMES:  In terms of at the corporate

19    headquarters or sort of worldwide?

20             THE COURT:  Well, let's start with either.

21             MR. HOLMES:  Administratively, at the corporate

22    headquarters, I think there's probably between 20 and 30

23    people.

24             THE COURT:  Okay.  And then they have all these

25    employees they send out to different locations?  Is that it?

```
 1              MR. HOLMES:  Correct, and they provide a variety

 2     of services to different individuals and corporations

 3     ranging from, you know, intelligence analysis gathering.

 4     They do physical security.  They do physical security on a

 5     permanent basis, on a limited basis for trips for

 6     individuals, all sorts of things.

 7              THE COURT:  Okay, thank you.  So it's in California.

 8              MR. HOLMES:  Nevada.

 9              THE COURT:  Nevada, okay.  And where's Krystek

10     from?

11              MR. HOLMES:  Nevada.

12              THE COURT:  So Krystek lives in Nevada?

13              MR. HOLMES:  Yes, your Honor.

14              THE COURT:  Okay.  Okay, so the reason I'm asking

15     all this is because I know that there's a personal

16     jurisdiction issue as well, so you should probably address

17     both the 12(b)(6) and the personal jurisdiction.

18              MR. HOLMES:  Thank you, your Honor.  And so, first

19     of all, in terms of personal jurisdiction, Mr. Krystek is

20     not alleged to have ever stepped foot in Massachusetts, to

21     have communicated with, reached out to, had any involvement

22     with the jurisdiction.  And as far as I know, he's never

23     been to Massachusetts; he's never visited Boston.  Certainly

24     there's no allegation that he has.  And I think it's

25     important to note that he was not -- you know, while he's
```

1   the president of PFC, he's not Ms. Zea's direct supervisor.

2   There's I believe at least a couple levels between himself

3   and an analyst like Ms. Zea.  So there's no direct

4   supervision, which is really a large part of the basis of

5   the fact that there's no -- the argument that there is no

6   basis to add him.

7            You know, there's no allegation that he was

8   directing or controlling Ms. Zea's actions.  There's no

9   allegation that he was directly supervising her actions.

10  You know, I think it's telling that plaintiff makes the

11  specific allegation that "Zea's actions inflicted upon the

12  Steiners were ordered by and foreseeable by Wenig, Wymer,

13  and Jones," and that's in their complaint.  And then today,

14  during an earlier argument, plaintiff's counsel stated that

15  these are the three C-suite people giving direction,

16  referring to Wenig, Wymer, and Jones.

17           These specific allegations of direction and

18  control and foreseeability were made by plaintiff as to

19  those three individuals.  They weren't made as to

20  Mr. Krystek, and there's a reason that they weren't made to

21  Mr. Krystek, is because there's no basis to make that

22  allegation.  There's no allegation anywhere in the complaint

23  that Mr. Krystek ordered or should have foreseen Zea's

24  actions in this.  And the specific allegations as to

25  Mr. Krystek are few and far between.  There are numerous

1      sort of conclusory "knew of, approved, funded, financed,"

2      but in terms of actual specific factual allegations about

3      Steve Krystek, there's a sort of nebulous allegation that he

4      is a long-time friend of Mr. Baugh, that he knew about

5      expensive dinners and entertainment that Zea financed with a

6      PFC credit card, and that in September of 2019, Mr. Baugh

7      urged Mr. Krystek to retain Zea as an employee, which

8      plaintiffs appear to be sort of spinning as an attempt at a

9      coverup.  But what they don't allege is that Mr. Krystek

10     agreed to it, and in fact the allegation --

11             THE COURT:  So Krystek, what was the core

12     allegation?  There's a coverup?

13             MR. HOLMES:  So there was an allegation that in

14     September, 2019, Mr. Baugh and Mr. Krystek had a dinner

15     together, and that Mr. Baugh urged Mr. Krystek to not

16     terminate Veronica Zea, and also to not terminate

17     Ms. Stockwell, who was at that time an eBay employee --

18             THE COURT:  Where was the meeting, in California

19     or Nevada?

20             MR. HOLMES:  I believe it was in California.  But

21     what they don't allege is that Mr. Krystek agreed to this

22     course of action or that he went through with this course of

23     action.  In fact, they allege that PFC subsequently very

24     shortly after fired Ms. Zea.  So that really speaks to a

25     lack of coordination between Mr. Baugh and Mr. Krystek, not

1   what plaintiffs are alleging.  And I believe there are some

2   allegations that he would periodically visit the GAC at

3   eBay, but there's nothing to allege that he knew who the

4   Steiners were, period.  There's no allegation that Steve

5   Krystek ever heard the name "Steiner" before all of this

6   unraveled.  There's no allegation that he directed or

7   controlled Zea's actions.  There's no allegation that he was

8   aware of her actions.  There's just nothing factual or

9   substantive to link Mr. Krystek to this proceeding, to this

10  claim.

11          And there's some procedural deficiencies in

12  addition to this lawsuit:  First of all, the lack of

13  personal jurisdiction with the forum state, and, second of

14  all, the plaintiffs never received leave of court to add him

15  as a defendant.  They never filed a motion to amend the

16  complaint to add him as a defendant.  The Court ordered or

17  allowed the plaintiffs to amend their complaint, and I

18  believe the language was "because the complaint would

19  benefit from specific reframing and focus."  This is not a

20  license to then add defendants --

21          THE COURT:  Anyway, that's sort of a procedural

22  flaw because I would just allow them to move to amend, and

23  then I'd be back where I am.  So I'm not here to sort of --

24  I get your point, but I'm not going to dismiss it and then

25  let them move to amend and then -- I'm trying to move this

1   case.

2            MR. HOLMES:  Fair enough, your Honor, although

3   leaving that aside, there's just a dearth of any factual

4   allegation --

5            THE COURT:  Yes, I get that, but let me jump to

6   Mr. Krystek because this is one where, unlike all the rest

7   of them, I know nothing about Mr. Krystek, and I am

8   concerned about personal jurisdiction.  It's the most -- in

9   some ways, this and the California stalking are the two in

10  some ways most serious issues here for you.  I don't see how

11  it gets him to Massachusetts, at least not what I've seen so

12  far.

13           MS. SCAPICCHIO:  So, Judge, there are two theories

14  under which we're saying you can find that there's personal

15  jurisdiction:  One is that he's the alterego of the

16  corporation, and in that sense, we are saying he is in fact

17  the corporation.

18           THE COURT:  Did you plead him as the alterego?  Is

19  that part of it?

20           MS. SCAPICCHIO:  I believe we pled, Judge, in both

21  of our responses that -- I think it said that -- that he was

22  the alterego of the corporation.  So with respect to that

23  allegation, Judge, before the eBay contact, there were only

24  three employees of PFC.

25           THE COURT:  Wait a minute.  This is an LLC.

```
 1            MS. SCAPICCHIO:  Right.

 2            THE COURT:  So by definition, if he's the

 3     president and CEO, in what sense are you saying he's the

 4     alterego?  I mean, he's --

 5            MS. SCAPICCHIO:  Well, I'm saying it in the sense

 6     that he was the company, Judge, before the eBay contract.

 7     That's what we're saying.  And these are the things that

 8     we're relying on to say that he's in.  We're saying --

 9            THE COURT:  What's your evidence that he was the

10     company other than a normal LLC where you have a CEO and

11     president?  Was he the hundred percent stockholder?

12            MS. SCAPICCHIO:  We don't know that, Judge.  I

13     can't say --

14            THE COURT:  I don't know that you've pled an

15     alterego, there are enough facts to get you there.

16            MS. SCAPICCHIO:  So, Judge, this is what we've

17     pled:  He approved the bills that allowed the conspiracy to

18     occur, including when Defendant Zea purchased the tickets to

19     Boston, not only for herself but at least for two eBay

20     employees, Defendants Baugh and Harville; that he frequently

21     met with Defendant Baugh, including after the campaign was

22     exposed; that he would also travel to eBay --

23            THE COURT:  Wait a minute.  Did he approve the

24     bills as they were coming in, or do you have any allegations

25     that he was the -- I understand that the corporation or the
```

1    limited liability -- when did he approve the bills?

2         MS. SCAPICCHIO:  I don't know, Judge.  I don't

3    know the answer to that question.  It's not pled.  I will

4    tell you that right up front, it's not pled, because we

5    don't have that information.  Again, we asked for it in

6    discovery, we didn't get it, and so we don't have it.

7         So with respect to Defendant Krystek, he would

8    also travel to eBay -- and this is pled at Paragraph 351 --

9    and meet with employees at eBay, other contractors at eBay,

10   demonstrating that he was in some ways supervising those

11   employees, including the Defendant Zea.  He placed Zea in a

12   company that performed cybersecurity, but he permitted her

13   to travel to Natick to conduct this physical surveillance.

14   Even after Defendant Zea was using the company credit card

15   for thousands of dollars' worth of expenses, her credit line

16   was increased, and that Defendant Krystek still continued to

17   approve bills and charge eBay a 5 percent surcharge --

18   that's in our amended complaint, paragraphs 329, 353 to

19   354 -- and that he was aware that Zea's supervisors laughed

20   at the strip club and other expenses rather than questioning

21   their validity and doing anything about it; and that all of

22   these actions allowed the conspiracy to flourish where Zea

23   and Baugh and the others could use the expenses of PFC to be

24   able to further this conspiracy.

25        So we're suggesting, Judge -- and I will admit, of

1    all of the defendants, he's the one we have the least

2    information about.  I understand that completely, Judge, and

3    I'm hopeful that if the Court is considering in any way

4    dismissing him, that you at least let us conduct limited

5    discovery first because I think there is information out

6    there, Judge, that suggests that PFC --

7              THE COURT:  Well, let me just say, whatever I do

8    with him, though, you get discovery generally because he

9    might have information.  But, in any event --

10             MS. SCAPICCHIO:  I understand, Judge.  You know, I

11   hear the Court's concerns and I understand.  I don't agree

12   with you on the stalking stuff, but I understand the issues

13   with it.  I do think the Court has personal jurisdiction

14   over him, and I think he did enough to make a plausible

15   claim that he was involved, Judge.

16             THE COURT:  All right, thank you.

17             All right, now, let's jump to everyone on the call

18   because I need to move this case forward.

19             MR. HOLMES:  Your Honor, could I just reply very

20   briefly?

21             THE COURT:  Oh, of course.

22             MR. HOLMES:  One point I want to hit is that there

23   is no allegation, there's nothing pled in the complaint that

24   Mr. Krystek is the alterego of the corporation.  It's simply

25   not pled in the amended complaint.

1          THE COURT:  Thank you.  I appreciate that.

2          Okay, so over the break I did spend some time

3    talking to Ms. Molloy, and I have no Rule 16 scheduling

4    conference, and so I'd like to short-circuit that a little

5    bit here because this is an old, old case.  I can't

6    remember -- I inherited it, so I don't really know the full

7    history here, but we're now at two years; and if I were to

8    wait till I wrote everything up or even started writing a

9    few of the issues up, it would create another hiatus.

10         So has discovery started in this case?  And maybe

11   we can jump in with all the lawyers, Mr. Pirozollo, all

12   the -- what?

13         MS. SCAPICCHIO:  Discovery has not started, and we

14   would ask that today we put together a discovery schedule.

15         THE COURT:  Well, I'm going to do a discovery

16   schedule right now.

17         MS. SCAPICCHIO:  Okay, great.  Thanks.

18         THE COURT:  And then it would be subject to

19   amendment, but we're going to kick-start discovery this

20   day --

21         MS. SCAPICCHIO:  Thank you, Judge.

22         THE COURT:  -- with everyone except with respect

23   to the last gentleman I talked to.

24         MS. SCAPICCHIO:  Krystek.

25         THE COURT:  Mr. Krystek may not stay in the case,

1    at least for the moment.

2            So I was thinking a year.  There are a lot of

3    parties involved here.  Of course, I haven't even heard from

4    everyone.  I didn't hear from any of the criminal defendants

5    because at least some of those counts are going to stick.

6    And so I was thinking that I would not stay discovery

7    pending my rulings on stuff, and I thought -- what's today,

8    August the 10th, I think?

9            THE CLERK:  10th, yes.

10           THE COURT:  So August 10 of 2024, would that

11   accommodate at least to kick-start this thing?  There's so

12   many people and so many players, but also so much has been

13   done.  There's been a criminal case.  There's been an

14   internal investigation, newspaper coverage.  I mean, we know

15   a lot already, so I'm thinking, does that seem acceptable

16   for right now?  Document and forensic exam of phones and

17   document production may be something, especially with

18   respect to the new defendants rather than the ones that were

19   involved criminally, so I'm thinking I'm going to do

20   8/10/2024.

21           THE CLERK:  Judge, what is that for?  I'm just

22   jotting it down.

23           THE COURT:  Fact discovery.

24           THE CLERK:  Okay, thank you.

25           THE COURT:  Who's the magistrate judge assigned to

1    this?

2             THE CLERK:  Hold on.  I have that.  I can tell

3    you.  I think it is -- it came in in July of 2021, and the

4    magistrate judge assigned was Judge Dein.

5             THE COURT:  All right, so at least with respect

6    to, you know, any discovery battles, it will be her.

7             Then I think it was eBay that suggested that this

8    might be appropriate for settlement.  Have you made a demand

9    yet, Ms. Scapicchio?

10             MS. SCAPICCHIO:  We have, your Honor.

11             THE COURT:  Has there been a counter?

12             MR. PIROZOLLO:  Yes, your Honor.  There's actually

13    an open mediation, your Honor.  This is a matter of the

14    public record.  We had an open mediation.  It's still open.

15    And, yeah, as we've been consistently saying, eBay would

16    like to reach an appropriate resolution with the Steiners,

17    but so far --

18             THE COURT:  Yes, you've been saying that all

19    along, which I appreciate, which I appreciate.

20             MR. PIROZOLLO:  Yes, and so far, at least, the

21    mediation has not been successful, but we remain hopeful

22    that we can come to some resolution at some point.

23             THE COURT:  Who's the mediator?

24             MR. PIROZOLLO:  Paul Finn.

25             THE COURT:  Okay, and mutually agreed upon?

1          MR. PIROZOLLO:  Yes.

2          MS. SCAPICCHIO:  Yes, your Honor.

3          THE COURT:  And just with eBay and the plaintiffs,

4     or is it with all the defendants?

5          MR. PIROZOLLO:  So far at least, it's just with

6     eBay and the plaintiffs.

7          THE COURT:  All right, I don't know whether the

8     others would be in a position, A, what kind of deep pockets

9     they have, what kind of ability they have, but, B, also

10    whether or not they could pay for a mediator.  And I'm

11    wondering if any of the rest of them, whether I should refer

12    to a magistrate judge the whole case, or whether that would

13    be something that would make sense for you all to confer.  I

14    was thinking after fact discovery was complete, at the very

15    latest, we would have a mediation before we did the rest of

16    it.

17         MS. SCAPICCHIO:  Can I just say that my clients

18    are asking that at this point, because there are so many

19    lawyers involved, that we actually set a trial date.  That's

20    what they're asking me to ask you.

21         THE COURT:  And I actually agree.  I was going to

22    do it.  I completely agree with them.

23         My biggest fear is something you kept saying,

24    Ms. Scapicchio, which is after summary judgment briefing,

25    because it's so voluminous after motion to dismiss, I can't

1  even imagine the record that I'm going to get from everybody

2  on a motion for summary judgment.  That's my biggest concern

3  here.  So I'm going to set -- I also want a mediation, so I

4  want you all by -- can we say by September 15 to confer on a

5  possible way of mediating this and a timetable for it?  I

6  often think the lawyers are better about this.  Anyone who's

7  willing to mediate it but can't afford it, I can use a

8  magistrate judge to do that.  And there may be some people

9  who have no money at all, so it's hard to say.  And maybe

10  Mr. Finn would be -- eBay would be willing to pay for

11  Mr. Finn involving all people.  I don't know that, that

12  maybe PFC would have to kick in some.  But, in any event,

13  it's unlikely to be dismissed in its entirety, so I leave

14  that up to you to come back on September 15 for a proposal

15  on how to mediate the thing.  But in the meantime, what I'm

16  going to say is by 9 -- I don't think there's a need that I

17  know of right now for expert discovery.  I could potentially

18  see an economic damages person for whether -- but I don't

19  want to wait for that because I think it would primarily go

20  to an economic damages model for the company.  It could

21  potentially be a psychiatrist if it was emotional distress.

22  It could potentially be forensic analysis of phones.  I

23  mean, it's hard for me to foresee right now.  But at least

24  right now, I would not be inclined to hold up for expert

25  discovery.  So I'm saying 9/15/24 for motions for summary

1    judgment, limited to the local page limits; 10/15/24 for the

2    ops; why don't we say 11/1 for the reply and 11/15 for the

3    surreply.  And I don't care, those may be weekends, I'm just

4    ball-parking it.  I'm going to ask you to confer and come up

5    with a schedule to confirm this, and you certainly have the

6    latitude to adjust for a few days if it's weekends.  I don't

7    want people to be stuck over Thanksgiving or the like.

8            And then assuming for a minute that I am -- I

9    don't know -- because you're pushing it into the holiday

10   season, I'm sort of looking for something along the lines of

11   a February or March, 2025 trial date to get through all

12   this.

13           Mem, I know you probably don't even have a

14   calendar open for that.

15           THE CLERK:  I don't.  I only have up right now --

16   I mean, maybe somebody else, one of the attorneys can pull

17   it up.  Right now what I have up is the 2024, but if you're

18   going to do it in January or February of 2025, we could do a

19   pretrial in November or December of 2024.

20           THE COURT:  No.  I would never be able to even

21   read the summary judgment by then, so why don't we have a

22   pretrial in early January.

23           THE CLERK:  Of 2025, right?

24           THE COURT:  Yes.

25           THE CLERK:  So we can all just come up with a

1   date.  If it falls on the wrong date, we can fix that on the

2   docket.  Do you want to do it after New Year's of 2025?

3               THE COURT:  You think people might be busy on New

4   Years?  Give people a nice New Years and maybe do it the

5   second week in January?

6               THE CLERK:  The second week.  All right, so let's

7   do it January 12 -- it may be a Friday or a Thursday -- of

8   2025.

9               THE COURT:  Okay, and then --

10              THE CLERK:  At 2:30.

11              MR. PIROZOLLO:  And, Ms. Molloy, I think I have --

12   2025, that's a Sunday, so the 13th or 14th.  I have a 2025

13   calendar.

14              THE CLERK:  All right, so what's the Thursday?

15              MR. PIROZOLLO:  The Thursday is the 16th.

16              THE CLERK:  Do you want to do it the 16th then?

17              THE COURT:  And then I'm assuming, based on what I

18   know about this case, that many of them will be disputed

19   issues of fact.  I've heard some of it play out right here.

20   And so then would March 1, 2025, give me time to rule on

21   motions in limine, get you time to prepare?  I'm assuming it

22   would be, at minimum, a three-week trial, something along

23   those lines.  So March what?  Do we have the first week in

24   March?

25              THE CLERK:  March 3 in 2025 is the first week and

1    the first Monday of 2025.

2            THE COURT:  Okay.  Now, that still seems a long

3    way out for me.  I just don't -- unless I just -- well, let

4    me ask you this.  And I know I heard from everyone they're

5    anticipating summary judgment, so I could just -- I've done

6    this in multidistrict litigation cases.  It's just something

7    to throw out there.  I mean, what if we were to just shorten

8    this?  I couldn't possibly -- let's assume -- how many

9    defendants are there now, thirteen or something like that?

10   Just take two or three?  I couldn't possibly try with

11   thirteen defendants.  It's not going to happen.  So we could

12   bifurcate it into potentially -- the criminal defendants

13   almost get summary judgment on the issues to which they pled

14   guilty.  So I don't know whether or not this is something

15   you might want to consider, all of you, as to how to slice

16   and dice this into a manageable trial.  I'm hoping it

17   settles, as you can well imagine, but if it doesn't, I can't

18   try this number of people.  And even if I knocked off a few

19   along the way, like, you know, personal jurisdiction or some

20   such, or somebody claimed stuff about Ms. Jones that just

21   wasn't true, even if that turned out to be the case, still,

22   I've got a lot of people.

23           MS. SCAPICCHIO:  I'm happy to speak to my clients

24   about bifurcation, and I'm happy to speak to the defendants

25   about their thoughts on bifurcation.  I agree with the Court

1    that the criminal defendants are probably more prone to

2    summary judgment, so it's probably just the six defendants

3    that are here today that we should probably focus on.

4            THE COURT:  Yes, but even six defendants is rough.

5    But regardless, regardless, I probably will deal with that,

6    I'll probably have a summary judgment hearing in December,

7    or perhaps late November, as soon as it all comes in.

8            Do you want to set something now, Mem?

9            THE CLERK:  Yes.  So what do you want?  We're

10   talking 2024, right?

11           THE COURT:  Yes.

12           THE CLERK:  And you're talking November or

13   December for a hearing of 2024?  Did you want to do it after

14   Thanksgiving week or before?

15           THE COURT:  Well, I couldn't possibly read all of

16   these, and I may have to do them one by one, but at least to

17   get started.  I only have other cases --

18           THE CLERK:  The surreply right now is due on

19   11/15/2024, and that's actually a Friday.

20           THE COURT:  Maybe right before Thanksgiving?

21   Well, no, that's too hard for me.  How about a week or two

22   after Thanksgiving?

23           THE CLERK:  How about the first week of December

24   or the second week, just for argument on summary judgment?

25           THE COURT:  Do the second week.

```
 1              THE CLERK:  All right, so the second week of

 2    December, 2024.  We can do it Thursday, December 5, 2024, at

 3    2:30.

 4              THE COURT:  Wait.  2024 could --

 5              THE CLERK:  We're in 2023.

 6              THE COURT:  All right, so 12 what?

 7              THE CLERK:  12/5/24, a year from now, at 2:30.

 8              THE COURT:  Okay.

 9              THE CLERK:  And, yes, the reply is due on

10    11/15/2024.

11              THE COURT:  And all local page limits have to be

12    limited as such.  I am just not sure, given the number of

13    defendants, how feasible this is to do by March of 2025, but

14    what I'm sort of hoping is that either there will be a

15    global resolution or at least a few people will settle to

16    start streamlining this a bit.  And what I'm most interested

17    in is a plan to try and mediate it for those who can mediate

18    it.  For those who are claiming, oh, there's just no factual

19    basis and completely bogus in terms of some of the

20    allegations, then I'll just have to get to summary judgment.

21    I don't know a way around it.

22              Is there anything else that I need to address at

23    this point?  I'll obviously have to address the motions to

24    dismiss filed by the ones who are criminal defendants.  And

25    I will just caution and say, I'm unlikely, highly unlikely
```

1  to write an opinion on every issue or even address every

2  issue.  For example, there are some interesting little state

3  questions, like what's state torts, what's a false

4  imprisonment claim?  I don't have the bandwidth to do that.

5  I'm at this point looking to see if I've got any defendant

6  in there who just shouldn't even be part of this mix, is

7  primarily what I'm looking for right now to make sure I do

8  individual justice.  But that doesn't necessarily mean going

9  through every count.  So it's just a warning because I'm

10  trying to move this because the case is finally so old.  So

11  I thank you all and --

12          THE CLERK:  Judge, one quick question.  Can

13  counsel all confer and then submit the proposed or the joint

14  statement within two weeks?  That's 8/25.  Or would you

15  like --

16          THE COURT:  I'm not here to destroy someone's

17  summer vacation because at least in Massachusetts, the last

18  two weeks in August are holy.  They're Cape Cod time,

19  they're vacation time, they're "sit on the beach" time.  So

20  how about by the second week in September, as long as we

21  don't hit Rosh Hashanah or Yom Kippur or some of those

22  holidays?

23          THE CLERK:  How about September 8th or the 15th?

24  That's going into Rosh Hashanah.

25          THE COURT:  So make it for maybe the 14th?

1          THE CLERK:  Okay, the 14th.

2          THE COURT:  Does that hit anybody's holiday at

3   this point?  Okay.  And, by the way, let me just say, the

4   most common motion I get by far and away is a motion for

5   additional time and a motion for continuance.  Please, I

6   don't know how you can get things assented to if there are,

7   like, a trillion defendants, but I am likely to allow short

8   continuances for weddings and sickness and all that kind of

9   stuff, but not -- given that I'm trying to go in a fairly

10  tight tether, not a month-long thing, not like multi-month

11  thing.  And to some extent, this is going to hurt

12  Ms. Scapicchio more than it's going to hurt the rest of you

13  because I don't know what kind of team you have there, but

14  we really need to keep this going.

15         MS. SCAPICCHIO:  I have no problem complying with

16  all the dates, Judge.

17         THE COURT:  Okay, done.  Okay, thank you very

18  much.  Have a nice rest of the summer.

19         MR. LOWELL:  Before we leave, could I indulge one

20  comment to make sure I understand?

21         THE COURT:  Sure.  Well, where are you right now,

22  by the way?

23         MR. LOWELL:  I am in my office in Washington, D.C.

24  What you see behind me is 19th Street abandoned, both

25  because that's what happens in DC and also the summer.

1          THE COURT:  Yes, it does look pretty bleak there.

2          MR. LOWELL:  Believe me --

3          THE COURT:  I wouldn't want to own the real estate

4    in your area, so --

5          MR. LOWELL:  If you've been following the news

6    about what's happening in the downtown areas in cities,

7    Washington in particular, people are beside themselves

8    trying to figure what to do, so, yeah, it's not --

9          MR. WEINBERG:  It was empty otherwise.  It's not

10   just Fridays.

11         MR. LOWELL:  The only point I'd like to make, and

12   maybe it is self-evident, was I understood what you said a

13   moment ago about what would be in a written opinion,

14   et cetera; but as people are trying to contemplate in a

15   civil case what might bring the parties together to be

16   realistic on both sides and what would trim what would be

17   left for summary judgment, I'd make the obvious point that

18   not every claim of every tort as to what you are sifting

19   through the evidence for may survive, and that would have an

20   impact on how many summary judgments there are and what

21   would be the possibility of settlement.  I know you know

22   that.  I don't mean to be the master of the obvious, but I

23   needed to say it.

24         THE COURT:  No, it's a really good point, and I

25   feel like it was, you know, from first-year Professor Keeton

1    kind of thing, like, what is false imprisonment?  What is an

2    assault?  I mean, some of it's first-year, first-class tort

3    questions, but I'm just not sure that would shorten or

4    streamline the case is the thing.

5          MR. LOWELL:  But, however, it might change the

6    dynamic of how this case gets resolved, so --

7          THE COURT:  Right.  And I would actually ask

8    plaintiff's counsel to -- a jury couldn't absorb all this

9    anyway, so, I mean, maybe to at some point think about

10   streamlining the claims.  Like, this screams out for

11   intentional infliction of emotional distress and negligent

12   supervision.  I mean, there are certain claims that might

13   get you the relief that you want without having to walk

14   through all the counts that you threw in and the kitchen

15   sink, but I just don't know that I'll have the bandwidth to

16   sit and write that kind of opinion in a reasonable

17   timeframe.  But I'll do what I can, and there it is.

18         MS. SCAPICCHIO:  Understood, your Honor.  Thank

19   you.

20         THE COURT:  All right, thank you.  All right,

21   thank you.  Bye-bye, everyone.

22            (Adjourned, 11:37 a.m.)

23

24

25

1              C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7              I, Lee A. Marzilli, Official Federal Court

8    Reporter, do hereby certify that the foregoing transcript,

9    Pages 1 through 105 inclusive, was recorded by me

10   stenographically at the time and place aforesaid in Civil

11   Action No. 21-11181-PBS, Ina Steiner, et al v. eBay Inc., et

12   al, and thereafter by me reduced to typewriting and is a

13   true and accurate record of the proceedings.

14             Dated this 15th day of August, 2023.

15

16

17

18

19             /s/ Lee A. Marzilli
               _____
20             LEE A. MARZILLI, CRR
               OFFICIAL COURT REPORTER
21

22

23

24

25