UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                                                24-CR-_____

EBAY INC.,

    Defendant.

<u>DEFERRED PROSECUTION AGREEMENT</u>

    Defendant eBay Inc. (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Attorney's Office for the District of Massachusetts ("the U.S. Attorney's Office"), enter into this Deferred Prosecution Agreement (the "Agreement").

<u>Criminal Information and Acceptance of Responsibility</u>

    1.    The Company acknowledges and agrees that the U.S. Attorney's Office will file the attached six-count criminal Information in the United States District Court for the District of Massachusetts charging the Company with (i) two counts of interstate travel with the intent to harass and intimidate, in violation of Title 18, United States Code, Section 2261A(1)(B); (ii) two counts of using electronic communications services to harass and intimidate, in violation of Title 18, United States Code, Section 2261A(2)(B); (iii) one count of witness tampering, in violation of Title 18, United States Code, Section 1512(b)(3); and (iv) one count of altering documents with the intent to impede, obstruct, and influence the investigation of a matter within the jurisdiction of the Federal Bureau of Investigation, in violation of Title 18, United States Code, Section 1519 ("the Information"). In so doing, the Company: (a) knowingly waives any right it may have to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161,

1

and Federal Rule of Criminal Procedure 48(b); (b) agrees to venue of the case in the District of

Massachusetts and knowingly waives any objection with respect to venue to any charges by the

United States arising out of the conduct described in the Statement of Facts attached hereto as

Attachment A; (c) knowingly waives any applicable statute of limitations and any legal or

procedural defects in the Information; and (d) consents to the filing of the Information, as

provided under the terms of this Agreement, in the United States District Court for the District of

Massachusetts. The U.S. Attorney's Office agrees to defer prosecution of the Company pursuant

to the terms and conditions described below.

   2.  The Company admits, accepts, and acknowledges that it is responsible under

United States law for the acts of its officers, directors, employees, and agents as charged in the

Information, and as set forth in the attached Statement of Facts, and that the allegations described

in the Information and the facts described in the attached Statement of Facts are true and

accurate.  The Company agrees that, effective as of the date the Company signs this Agreement,

in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts

set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be

admissible as: (a) substantive evidence offered by the government in its case-in-chief and

rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and

(c) evidence at any sentencing hearing or other hearing.  In addition, in connection therewith, the

Company agrees not to assert any claim under the United States Constitution, Rule 410 of the

Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section

1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that the Statement

of Facts should be suppressed, excluded, or is otherwise inadmissible as evidence in any form.

The Company further agrees, as described in Paragraph 24 below, that it shall not, through

present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts.

Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained by the Company, as described in Paragraphs 11 to 14 below (the "Term"). The Company agrees, however, that, in the event the U.S. Attorney's Office determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the U.S. Attorney's Office, in its sole discretion, for up to a total additional time period of one year, without prejudice to the U.S. Attorney's Office's right to proceed as provided in Paragraphs 17 to 21 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the monitorship or compliance reporting obligations described in Attachment D, for an equivalent period.

Relevant Considerations

4.      The U.S. Attorney's Office enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.      the nature, seriousness, and pervasiveness of the offense conduct, as described in the Statement of Facts, including the involvement of senior company employees in a

3

harassment and intimidation campaign targeting journalists with whose reporting individuals in corporate management took issue;

      b.    the impact of the offense conduct on the victims and their expressed views regarding this Agreement, *see Justice Manual*, 9-28.1400 and the Attorney General Guidelines for Victim and Witness Assistance;

      c.    the Company received full credit for its cooperation with the U.S. Attorney's Office's investigation, including:  proactively disclosing certain evidence of which the United States was previously unaware; providing information obtained through its internal investigation, which allowed the government to preserve and obtain evidence as part of its own independent investigation; making detailed factual presentations to the U.S. Attorney's Office; voluntarily facilitating interviews of employees; and collecting and producing voluminous relevant documents to the U.S. Attorney's Office;

      d.    the Company engaged in extensive remedial measures, including: (i) commencing remedial measures based on internal investigations of the misconduct prior to the commencement of the U.S. Attorney's Office investigation; (ii) strengthening its corporate governance by appointing numerous new individuals to senior management and Board of Directors positions; (iii) strengthening its compliance organization by hiring or appointing additional compliance personnel, including the appointment of a Chief Ethics Officer, who reports directly to the Company's General Counsel and the Chair of the Audit Committee of the Board of Directors; (iv) updating its code of conduct, policies, procedures, and internal controls relating to, among other things, safety and security, ethical leadership, the use of company-issued communications resources, management of commercial agents and other third parties, and expense reimbursement; (v) enhancing its internal reporting, investigations and risk assessment

processes; (vi) overhauling its compliance training and communications; and (vii) disciplining certain employees involved in the relevant conduct, including terminating Executive 2, the Company's former Chief Communications Officer;

      e.    the Company permitted its then-Chief Executive Officer to resign following the offense conduct described in the Statement of Facts, and, in doing so, stated only that "a number of considerations" led the then-CEO and the Company to mutually agree "that a new CEO is best for the Company". The Company did not publicly reprimand the CEO for his actions with respect to the conduct described in the Statement of Facts—including his statements concerning the victims—or for the corporate culture that he oversaw that permitted the offense conduct to occur. Instead, it lauded him in its public announcement of his departure as "a tireless advocate for driving improvement in the business" and paid him contractual severance benefits of more than $40 million;

      f.    the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program) but, despite its extensive remedial measures described above, the Company to date has not fully implemented or tested its enhanced compliance program, and thus the imposition of an independent compliance monitor for a term of three years, as described more fully below and in Attachment D, is necessary to prevent the recurrence of misconduct;

      g.    the Company has been the subject of alleged violations of civil law or regulations of the Environmental Protection Agency and the Drug Enforcement Administration, but has no prior criminal history;

5

h.    the unavailability or inadequacy of civil or regulatory enforcement

actions;

i.    potential collateral consequences, including whether there is

disproportionate harm to shareholders, employees, and others not proven personally culpable;

and

j.    the Company has agreed to continue to cooperate with the U.S. Attorney's

Office in any ongoing investigation as described in Paragraph 5 below.

Accordingly, after considering (a) through (j) above, the U.S. Attorney's Office believes

that the appropriate resolution in this case is a Deferred Prosecution Agreement with the

Company; a criminal monetary penalty in the amount of $3,000,000, the maximum applicable

fine permitted by statute upon the Company's conviction of the six counts charged in the

Information; and the imposition of a three-year independent compliance monitor.

<u>Future Cooperation and Disclosure Requirements</u>

5.    The U.S. Attorney's Office has conducted an extensive investigation of the

conduct described in this Agreement and the attached Statement of Facts since September 2019

that has resulted in felony criminal convictions of six Company employees and a Company

contractor, and sentences of imprisonment of between 12 and 57 months for four of those

defendants.  The Company has cooperated fully with the U.S. Attorney's Office in this

investigation to date.  The Company shall continue to cooperate fully as requested by the U.S.

Attorney's Office in any and all matters relating to the conduct described in this Agreement and

the attached Statement of Facts and other conduct under investigation by the U.S. Attorney's

Office at any time during the Term, until the later of the date upon which all investigations and

prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of

the U.S. Attorney's Office, the Company shall also cooperate fully with other domestic or

foreign law enforcement and regulatory authorities and agencies in any investigation of the

Company or any of its subsidiaries or affiliates, or any of its present or former officers, directors,

employees, agents, and consultants, or any other party, in any and all matters relating to the

conduct described in this Agreement and the attached Statement of Facts and other conduct

under investigation by the U.S. Attorney's Office at any time during the Term.  The Company's

cooperation pursuant to this Paragraph is subject to applicable law and regulations as well as

valid claims of attorney-client privilege or attorney work product doctrine; however, the

Company must provide to the U.S. Attorney's Office a log of any information or cooperation

that is not provided based on an assertion of law, regulation, or privilege, and the Company bears

the burden of establishing the validity of any such assertion.  The Company agrees, in any and all

matters related to the conduct described in this Agreement and the attached Statement of Facts

and other conduct under investigation by the U.S. Attorney's Office, that its cooperation

pursuant to this Paragraph shall include, but not be limited to, the following:

      a.      The Company shall timely and truthfully disclose all factual information

with respect to its activities, those of its subsidiaries and affiliates, and those of its present and

former directors, officers, employees, agents, and consultants, including any evidence or

allegations and internal or external investigations, about which the Company has any knowledge

or about which the U.S. Attorney's Office may inquire.  This obligation of truthful disclosure

includes, but is not limited to, the obligation of the Company to provide to the U.S. Attorney's

Office, upon request, any document, record, or other tangible evidence about which the U.S.

Attorney's Office may inquire of the Company.

b.      Upon request of the U.S. Attorney's Office, the Company shall designate knowledgeable employees, agents, or attorneys to provide to the U.S. Attorney's Office the information and materials described in Paragraph 5(a) above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.      The Company shall use its best efforts to make available for interviews or testimony, as requested by the U.S. Attorney's Office, present or former officers, directors, employees, agents, and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.      With respect to any information, testimony, documents, records, or other tangible evidence provided to the U.S. Attorney's Office pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable laws and regulations, to other governmental authorities, including United States authorities and those of a foreign government, of such materials as the U.S. Attorney's Office, in its sole discretion, shall deem appropriate.

6.      In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the criminal laws of the United States by the Company, its officers, directors, employees or agents had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the U.S. Attorney's Office.

<u>Payment of Monetary Penalty</u>

7.      The Company agrees to pay a total monetary penalty in the amount of $3,000,000 (the "Total Criminal Penalty"). This is the maximum applicable fine permitted by statute upon the Company's conviction of the six counts charged in the Information. The Company and the U.S. Attorney's Office agree that the Company will pay the United States Treasury $3,000,000, equal to the Total Criminal Penalty, within ten business days of the execution of this Agreement. Nothing in this Agreement shall be deemed an agreement by the U.S. Attorney's Office that the Total Criminal Penalty is the maximum penalty that may be imposed in any future prosecution, and the U.S. Attorney's Office is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the U.S. Attorney's Office agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Penalty. The Company will not use the Total Criminal Penalty to offset any potential civil liability to the victims, and it will not accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

<u>Conditional Release from Liability</u>

8.      Subject to Paragraphs 17 to 21, the U.S. Attorney's Office agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company or any of its direct or indirect affiliates, subsidiaries or joint ventures relating to any of the conduct described in the attached Statement of Facts or the criminal Information filed pursuant to

9

this Agreement. The U.S. Attorney's Office, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

        a.      This Agreement does not provide any protection against prosecution of any future conduct by the Company.

        b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

<u>Corporate Compliance Program</u>

9.      The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of federal criminal laws throughout its operations, including those of its affiliates, subsidiaries, agents, and joint ventures, including, but not limited to, the minimum elements set forth in Attachment C.

10.      In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding compliance with federal criminal laws. Where necessary and appropriate, the Company agrees to modify its existing compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous compliance program that incorporates relevant internal accounting controls, as well as policies

and procedures designed to effectively detect and deter violations of federal criminal laws. The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C. In assessing the Company's compliance program, the U.S. Attorney's Office, in its sole discretion, may consider the Monitor's certification decision.

<u>Independent Compliance Monitor</u>

11.     Promptly after the U.S. Attorney's Office's selection pursuant to Paragraph 13 below, the Company agrees to retain a Monitor for the term specified in Paragraph 14. The Monitor's duties and authority, and the obligations of the Company with respect to the Monitor and the U.S. Attorney's Office, are set forth in Attachment D, which is incorporated by reference into this Agreement. Within ten (10) business days after the date of execution of this Agreement, the Company shall submit a written proposal identifying three monitor candidates, and, at a minimum, provide the following:

a.     a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

b.     a written certification by the Company that it will not employ or be affiliated with the monitor for a period of not less than two years from the date of the termination of the monitorship;

c.     a written certification by each of the candidates that the candidate is not a current or recent (*i.e.*, within the prior two years) employee, agent, or representative of the Company and holds no interest in, and has no relationship with, the Company, its subsidiaries, affiliates or related entities, or its employees, officers, or directors;

      d.     a written certification by each of the candidates that the candidate has notified any clients that the candidate represents in a matter involving the U.S. Attorney's Office (or any other Department of Justice component), and that the candidate has either obtained a waiver from those clients or has withdrawn as counsel in the other matter(s); and

      e.     a statement identifying the monitor candidate that is the Company's first, second, and third choice to serve as the Monitor.

12.     The monitor candidates or their team members shall have, at a minimum, the following qualifications:

      a.     a demonstrated expertise with respect to the federal criminal laws, including experience counseling on criminal matters;

      b.     experience designing and/or reviewing corporate compliance policies, procedures, and internal controls;

      c.     the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

      d.     sufficient independence from the Company to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

13.     The U.S. Attorney's Office retains the right, in its sole discretion, to choose the Monitor from among the candidates proposed by the Company. Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion. If the U.S. Attorney's Office determines, in its sole discretion, that any or all of the three candidates lack the requisite qualifications, it shall notify the Company and request that the Company propose another candidate or candidates within twenty (20) business days. This process shall continue until a Monitor acceptable to both parties is chosen. The U.S. Attorney's Office and the

Company will use their best efforts to complete the selection process within sixty (60) calendar days of the execution of this Agreement. The U.S. Attorney's Office retains the right to determine that the Monitor should be removed if, in the U.S. Attorney's Office's sole discretion, the Monitor fails to conduct the monitorship effectively, fails to comply with this Agreement, or no longer meets the qualifications outlined in Paragraph 12 above. If the Monitor resigns, is removed, or is otherwise unable to fulfill the Monitor's obligations as set out herein and in Attachment D, the Company shall within twenty (20) business days recommend a pool of three qualified monitor candidates from which the U.S. Attorney's Office will choose a replacement, following the process outlined above.

14.    The Monitor's term shall be three years from the date on which the Monitor is retained by the Company, subject to extension as described in Paragraph 3. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D. The Company agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Company discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term. Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Monitor or the Monitor's firm may undertake in connection with related resolutions with foreign or other domestic authorities.

<u>Deferred Prosecution</u>

15.    In consideration of the undertakings agreed to by the Company herein, the U.S. Attorney's Office agrees that any prosecution of the Company for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term. To the extent there is

13

conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of this Agreement.

16.     The U.S. Attorney's Office further agrees that if the Company fully complies with all of its obligations under this Agreement, the U.S. Attorney's Office will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within six months after the Agreement's expiration, the U.S. Attorney's Office shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts. If, however, the U.S. Attorney's Office determines during this six-month period that the Company breached the Agreement during the Term, as described in Paragraph 17, the U.S. Attorney's Office's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 19 to 20, remains in full effect.

<u>Breach of the Agreement</u>

17.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) deliberately provides in connection with this Agreement false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 9 and 10 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the United States, would be violations of federal criminal law; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether

the U.S. Attorney's Office becomes aware of such a breach after the Term is complete, the

Company shall thereafter be subject to prosecution for any federal criminal violation of which

the U.S. Attorney's Office has knowledge, including, but not limited to, the charges in the

Information described in Paragraph 1, which may be pursued by the U.S. Attorney's Office in

the U.S. District Court for the District of Massachusetts or any other appropriate venue.

Determination of whether the Company has breached the Agreement and whether to pursue

prosecution of the Company shall be in the U.S. Attorney's Office's sole discretion.  Any such

prosecution may be premised on information provided by the Company or its personnel.  Any

such prosecution relating to the conduct described in the attached Statement of Facts or relating

to conduct known to the U.S. Attorney's Office prior to the date on which this Agreement was

signed that is not time-barred by the applicable statute of limitations on the date of the signing of

this Agreement may be commenced against the Company, notwithstanding the expiration of the

statute of limitations, between the signing of this Agreement and the expiration of the Term plus

one year.  Thus, by signing this Agreement, the Company agrees that the statute of limitations

with respect to any such prosecution that is not time-barred on the date of the signing of this

Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the

statute of limitations as to any violation of federal law that occurs during the Term will be tolled

from the date upon which the violation occurs until the earlier of the date upon which the U.S.

Attorney's Office is made aware of the violation or the duration of the Term plus five years, and

that this period shall be excluded from any calculation of time for purposes of the application of

the statute of limitations.

      18.    In the event the U.S. Attorney's Office determines that the Company has breached

this Agreement, the U.S. Attorney's Office agrees to provide the Company with written notice of

such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the U.S. Attorney's Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the U.S. Attorney's Office shall consider in determining whether to pursue prosecution of the Company.

19.    In the event that the U.S. Attorney's Office determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the U.S. Attorney's Office or to the Court, including the attached Statement of Facts, and any testimony given by or on behalf of the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the U.S. Attorney's Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the U.S. Attorney's Office.

20.    The Company acknowledges that the U.S. Attorney's Office has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.  The Company

16

further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

21.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the U.S. Attorney's Office in the form of executing the document attached as Attachment E to this Agreement that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the District of Massachusetts.

<u>Sale, Merger, or Other Change in Corporate Form of Company</u>

22.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations, that is material either to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the U.S. Attorney's Office's ability to determine a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The

Company shall provide notice to the U.S. Attorney's Office at least thirty (30) days prior to

undertaking any such sale, merger, transfer, or other change in corporate form.  The U.S.

Attorney's Office shall notify the Company prior to such transaction (or series of transactions) if

it determines that the transaction(s) will have the effect of circumventing or frustrating the

enforcement purposes of this Agreement.  At any time during the Term the Company engages in

a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of

this Agreement, the U.S. Attorney's Office may deem it a breach of this Agreement pursuant to

Paragraphs 17 to 21 of this Agreement.  Nothing herein shall restrict the Company from

indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties

or other costs arising from any conduct that may have occurred prior to the date of the

transaction, so long as such indemnification does not have the effect of circumventing or

frustrating the enforcement purposes of this Agreement, as determined by the U.S. Attorney's

Office.

Public Statements by Company

23.    Within twenty-four (24) hours of the filing of the Information, the Company will

(a) make this Agreement and the Statement of Facts conspicuously available to the public on its

website for the duration of this Agreement; and (b) communicate to all Company employees that

the Company has entered into this Agreement and make available this Agreement and Statement

of Facts to all such employees.

24.    The Company expressly agrees that it shall not, through present or future

attorneys, officers, directors, employees, agents, or any other person authorized to speak for the

Company make any public statement, in litigation or otherwise, contradicting the acceptance of

responsibility by the Company set forth above or the facts described in the attached Statement of

18

Facts.  Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 17 to 21 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be in the sole discretion of the U.S. Attorney's Office.  If the U.S. Attorney's Office determines that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the U.S. Attorney's Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

25.     The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the U.S. Attorney's Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the U.S. Attorney's Office and the Company; and (b) whether the U.S. Attorney's Office has any objection to the release.

19

26.     The U.S. Attorney's Office agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the U.S. Attorney's Office is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

Limitations on Binding Effect of Agreement

27.     This Agreement is binding on the Company and the U.S. Attorney's Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the U.S. Attorney's Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.  If the Court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), all the provisions of this Agreement shall be deemed null and void, and the Term shall be deemed to have not begun, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

Notice

28.     Any notice to the U.S. Attorney's Office under this Agreement shall be given by electronic mail and/or personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, with copies by electronic mail, addressed to the Chief and Deputy

20

Chief, Securities, Financial & Cyber Frauds Unit, U.S. Attorney's Office for the District of

Massachusetts, One Courthouse Way, Boston, Massachusetts 02210.  Any notice to the

Company under this Agreement shall be given by personal delivery, overnight delivery by a

recognized delivery service, or registered or certified mail, with copies by electronic mail,

addressed to Office of the General Counsel, eBay Inc., 2025 Hamilton Avenue, San Jose,

California, 95125.  Notice shall be effective upon actual receipt by the U.S. Attorney's Office or

the Company.

Complete Agreement

29.     This Agreement, including its attachments, sets forth all the terms of the

agreement between the Company and the U.S. Attorney's Office.  No amendments,

modifications or additions to this Agreement shall be valid unless they are in writing and signed

by the U.S. Attorney's Office, the attorneys for the Company and a duly authorized

representative of the Company.

ACKNOWLEDGMENT ON BEHALF OF EBAY INC.

We, Jamie Iannone, Chief Executive Officer, and Steve Priest, Chief Financial Officer, and the duly authorized representatives of eBay Inc., hereby expressly acknowledge the following: (1) that we have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Information and Statement of Facts; (2) that we have had an opportunity to discuss this Agreement fully and freely with eBay Inc.'s counsel, Sidley Austin LLP; (3) that eBay Inc. fully and completely understands each and every one of the terms of this Agreement; (4) that eBay Inc. is fully satisfied with the advice and representation provided to it by its counsel, Sidley Austin LLP; (5) that we are authorized, on behalf of eBay Inc., to enter into this Agreement; and (6) that eBay Inc. has signed this Agreement knowingly and voluntarily.

EBAY, INC.

Date: January 10, 2024          By: _____
                                JAMIE IANNONE
                                Chief Executive Officer


Date: January 10, 2024          By: _____
                                STEVE PRIEST
                                Chief Financial Officer

## ACKNOWLEDGMENT BY COUNSEL OF EBAY INC.

I, Jack Pirozzolo, the attorney representing eBay Inc., hereby expressly acknowledge the following:  (1) that I have reviewed and discussed this Agreement with my client; (2) that I have explained fully each one of the terms of the Agreement to my client; (3) that I have answered fully each and every question put to me by my client regarding the Agreement; and (4) that I believe my client fully and completely understands all of the Agreement's terms.

January 12, 2024

JACK PIROZZOLO
Sidley Austin LLP
Attorney for eBay Inc.

ON BEHALF OF THE GOVERNMENT

JOSHUA S. LEVY
ACTING UNITED STATES ATTORNEY

Date:  January 11, 2024          By: _____

Seth B. Kosto
Assistant United States Attorney

24

**ATTACHMENT A**

STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the District of Massachusetts (the "U.S. Attorney's Office") and eBay Inc. ("eBay" or "the Company"). eBay hereby agrees and stipulates that the following information is true and accurate. eBay admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the United States pursue the prosecution that is deferred by this Agreement, eBay (including its subsidiaries and majority-owned, operationally controlled affiliates) agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

*eBay*

1.      In 2019, eBay was a multinational ecommerce business that operated marketplaces that connected online sellers and their customers. eBay was headquartered in San Jose, California.

2.      Executive 1 was eBay's Chief Executive Officer.

3.      Executive 2, who joined eBay in February 2019, was the Company's Chief Communications Officer.

4.      Executive 3 was eBay's Senior Vice President for Global Operations.

5.      Jim Baugh ("Baugh") was eBay's Senior Director of Safety & Security—an eBay division responsible for, in general terms, the physical security and reputation of eBay's employees and facilities worldwide. Baugh reported to Executive 3.

6.      David Harville ("Harville"), who reported to Baugh, was eBay's Director of Global Resiliency, a unit focused on ensuring that eBay could continue to operate after business disruptions, such as security threats, political unrest, or natural disasters.

7.      Stephanie Popp ("Popp") was eBay's Senior Manager of Global Intelligence and served as Baugh's de facto chief of staff.  Before May 2019, Popp managed eBay's Global Intelligence Center ("GIC"), an intelligence and analytics group within the GSR that supported eBay's security operations.

8.      Stephanie Stockwell ("Stockwell") was an intelligence analyst in the GIC who became its manager in mid-2019, when eBay promoted Popp.

9.      Veronica Zea ("Zea") was an eBay contractor who worked as an intelligence analyst in the GIC.

10.     Brian Gilbert ("Gilbert") and Philip Cooke ("Cooke") were retired Santa Clara, California police captains.  Each worked at eBay and had responsibilities for, among other things, safety and security at eBay facilities, executive protection, and special events security.

*EcommerceBytes*

11.     Ina and David Steiner were a married couple living in Natick, Massachusetts.  The Steiners co-founded EcommerceBytes, a website that since 1999 had reported on ecommerce companies, including eBay.  Ina Steiner was the editor and reporter for EcommerceBytes; David Steiner served as its publisher.

*Events Preceding the Harassment and Intimidation Campaign*

12.     By the spring of 2019, EcommerceBytes' reporting was a source of frustration at eBay.  Executives 1, 2, and 3, Baugh, and others at eBay viewed Ina Steiner's reporting adversarially and sometimes used coarse and aggressive language in messages and e-mails about

2

her and EcommerceBytes.

13.     On August 2, 2018, for example, Executive 2's predecessor as Chief
Communications Officer wrote to Executive 3 that Executive 1 had "asked us to determine a more
holistic strategy to counteract some of [Ina Steiner's] persistent flame throwing." In response,
Executive 3 wrote, "We have to win hearts and minds to make it and Ina is more destructive with
sellers than you guys give her credit for." Executive 3 then forwarded the email chain to Executive
1, asking to "talk to you a bit about how we get this place fighting and not whining…it's pervasive
and destructive. I am ALL IN and we can do this- we just need more fight from more people –
including our leaders!"

14.     On September 21, 2018, responding to a summary of positive media coverage about
an eBay initiative, Executive 3 e-mailed, "We should clap back at Ina – this is a good thing and
we should tell them that…i know comms doesn't want us to engage with them, but I want to."

15.     On March 1, 2019, upon learning from a communications employee that "Ina has
ignored our correction and has not acknowledged [an eBay communications employee's] e-mail
at all," Executive 2 responded:  "Lame. I want to blow her site up."

16.     On March 13, 2019, Executive 1 messaged Executive 2 about a "list of sites for
sellers that didn't include Ina today. W[e s]hould find a way to promote it. It's a way to diminish
her without saying it. I tweeted it out. Take a look." Executive 2 immediately messaged two
eBay employees about the same list:  "How can we promote it just to 'eff with her? Totally
diminishing for her. I just had [Executive 1] tweet it out. 😉 Take a look."

17.     On April 10, 2019, reacting to EcommerceBytes' coverage of Executive 1's
compensation, Executive 2 messaged Executive 1, "we are going to crush this lady."

18.    On April 20, 2019, discussing the *Wall Street Journal*'s coverage of Executive 1, Executive 1 messaged Executive 2, "F[***] them.  The journal is next on the list after i[n]a."

*Fidomaster*

19.    By the spring of 2019, an anonymous internet user known variously as "Fidomaster", "Dan Davis", and "unsuckebay" (hereinafter "Fidomaster") had also become a source of frustration to Executive 1, Executive 2, Baugh, and others at eBay.

20.    On February 22, 2019, for example, a communications employee asked Baugh and Popp to "dig up some intel" on Fidomaster, noting "He's been relentlessly trolling eBay and [Executive 1] on twitter…."  At Executive 2's direction, Baugh caused the GIC to prepare a report concerning Fidomaster.  The March 2019 report concluded that Fidomaster was an "anonymous twitter user that posts negative content about eBay and its senior leadership."  It also asserted that "Fidomaster" communicated with Ina Steiner about issues pertaining to eBay, noting "Steiner and eCommerceBytes are known for publishing negative content about eBay and its executives."

21.    In approximately April or May 2019, Baugh met with GIC employees and told them the GIC would be writing an anonymous, handwritten, and threatening letter to Ina Steiner, to get her to stop publishing articles critical of eBay.  The letter was never sent.

*Walker's West*

22.    On or about May 21, 2019, EcommerceBytes published an article entitled, "*Did You Know eBay Built a Lavish NYC Pub-Style Lounge*?"  The article reported that Executive 1 had commissioned the construction of a pub—Walker's West—on eBay's corporate campus, modelling it after a New York City bar.  The article contained links to a contractor's website, which featured pictures of the project and a description of the pub.

4

23.     Baugh alerted Executive 3 to the article by email that night, with the subject "Fwd: Ina Steiner – Walker's West."

24.     On May 22, 2019, at 9:10 a.m. (PDT), Executive 3 forwarded Baugh's email to Executive 2 and an eBay facilities employee, asking, of the contractor, "Why in the world would they think it's ok to do this and with this level of color???"  eBay directed the contractor to take down its website.  Executive 3, copying Executive 2 and Baugh, later emailed, "this is ridiculous and has caused serious problems."

25.     Within hours, Executive 2 contacted a public relations consultant about the Walker's West article.  Executive 2 wrote:  "I'm just no longer accepting 'ignore' as a broader strategy and want to fight back.  Look forward to talking ASAP to get your assessment of how to do that most [e]ffectively."

26.     Thereafter, eBay communications employees sent information to the consultant about the Steiners, including their buying-selling history on eBay and the perspectives of eBay employees who knew them.

27.     On or about May 31, 2019, Executive 2 and Executive 3 exchanged messages regarding Ina Steiner and EcommerceBytes.  In relevant part:

    a.      Executive 2 described an EcommerceBytes article discussing Executive 1's presentation to shareholders during eBay's 2019 annual meeting as "[s]hockingly reasonable";

    b.      Executive 3 referred to Ina Steiner as a "cow";

    c.      Executive 2 responded, "Her day is coming…"

    d.      Executive 3 stated, "I can't wait.  // Jim Baugh came to me with some thoughts and I told him to stand down and leave it alone."

e.     Executive 2 responded, "You are being too kind… tell him to be my advisor on this issue // Some times you just need to make an example out of someone.  Justice // We are too nice.  She needs to be crushed"

f.     Executive 3 responded, "I told [Baugh] I would raise to you and you would let him know if you want him to proceed – but knew you were working on something and didn't want to step into that."

g.     Executive 2 responded with a "thumbs up" emoji.

28.     On or about June 6, 2019, Baugh tasked the GIC with tracking all of Ina Steiner's and EcommerceBytes' articles and social media posts concerning eBay.

29.     On or about June 7, 2019, beneath the letters "FYSA" [For Your Situational Awareness], Executive 2 forwarded to Baugh the emails about the Steiners that eBay had shared with the public relations consultant.

30.     On or about June 7, 2019, at Baugh's direction, Gilbert (the retired police captain) traveled to the Boston area to surveil the Steiners.

31.     On or about June 8, 2019, Baugh called the Steiners' home in the middle of the night and hung up without speaking to them.

32.     On or about June 8, 2019, Gilbert went to the Steiners' home in Natick and scrawled the name "Fidomaster" on their fence.

33.     On or about June 17, 2019, the consultant proposed steps to reduce the Steiners' and EcommerceBytes' impact on eBay.  The consultant recommended that eBay either (1) create or promote company-friendly content that would drive EcommerceBytes' posts lower in search engine results; or (2) terminate the Steiners' eBay accounts for violations of the company's Terms of Use.  Neither proposal was adopted.

34.     On or about June 25, 2019, Executive 2 messaged two eBay communications employees about an EcommerceBytes article comparing eBay and another ecommerce company.

After observing that he could not "complain about [Ina Steiner] pointing out fair bumps in our road", Executive 2 stated: "Love it when a secret, we can't speak it out loud plan comes together... 👁", and added, "We always reserve the right to go 0-60 and get crazy on her ass, but this is a huge adjustment the last month. Ever since the Walker's post... 😊".

*The Harassment and Intimidation Campaign*

35.    On or about August 1, 2019, the *New York Times* reported that eBay had accused Amazon in a lawsuit of unlawfully poaching eBay sellers to Amazon's online marketplace.

36.    That day, at approximately 1:46 p.m. (EDT), Ina Steiner posted an article on EcommerceBytes under the headline, "eBay RICO Lawsuit Meant to Curb Seller Exodus to Amazon?" She wrote: "[Executive 1] has been unable to stop a decline in market sales, but trying to dissuade sellers from turning to Amazon (and trying to get Amazon to stop recruiting sellers) may not be the best tactic."

37.    At approximately 2:19 p.m. (EDT), Executive 1 texted Executive 2: "Ina is out with a hot piece on the litigation.  If we are ever going to take her down..now is the time."

38.    Executive 2 responded at approximately 2:36 p.m. (EDT): "On it."

39.    As set forth below, a series of text messages followed between Executive 2 and Baugh, beginning with Executive 2  passing along Executive 1's suggestion that "we … take her down":



40.     Executive 2 and Baugh's August 1, 2019 conversation continued by text, with

Baugh committing to put in motion a "plan B" and Executive 2 committing to "embrace

managing any bad fall out."



41.     Baugh continued, stating falsely that Fidomaster—whom he referred to as the

"unsuck idiot"—was David Steiner "or [an]other close associate" of Ina Steiner's:



> Regarding the unsuck idiot, I have further reason to believe he is either her husband or other close associate. I've been communicating with him every day. I told him I have an incriminating video that he needs to see. He bit on it hook line and sinker
>
> I want to leave it at a hotel concierge for him. If I can get him to pick it up, his ass is mine

42.    Baugh concluded the August 1 exchange with Executive 2 as follows:

> Confidential obviously
>
> Rest assured, I will handle Ina

Delivered

43.    On or about August 6, 2019, an eBay seller contacted Executive 1 to complain about @unsuckebay, one of the Twitter accounts controlled by Fidomaster. The seller's complaint led Executive 2, Executive 1, Baugh, and eBay's general counsel to communicate about eBay's unsuccessful efforts to have the Twitter account shut down.[1]

44.    Executive 2's email concluded: "I am utterly vexed by this! This twitter account [Fidomaster] dominates our social narrative with his CONSTANT obsession with trolling us. It's more than annoying, it's very damaging."

45.    The email noted that Fidomaster "and the eCom[m]ercebytes gal"—a reference to Ina Steiner—were "infatuated with eBay" and "have seemingly dedicated their lives to erroneously trashing us as a way to build their own brand—or even build a business." It continued, "This issue

---

[1]Baugh messaged privately to Executive 1 that Baugh was using an alias Twitter account in an attempt to trick Fidomaster into identifying himself. Baugh stated, "Sorry I have not found him yet, but when I do, it will be fixed".

gives me ulcers, harms employee moral, and trickles into everything about our brand. I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the 'blind eye toward graffiti that turns into mayhem' syndrome and I'm sick about it. Whatever. It. Takes."

46.    On or about August 7, 2019, at 4:59 p.m. (PDT), Baugh asked Executive 2 by message, "If I can neutralize Ina's website in two weeks or less, does that work for you?" Within minutes, Executive 2 responded: "I want to see ashes. As long as it takes. Whatever it takes."

47.    After receiving Executive 2's text messages and emails about the Steiners, EcommerceBytes, and Fidomaster, Baugh shared them with, among others, Harville, Gilbert, Cooke, Popp, Stockwell, and Zea.

48.    Beginning on or about August 5, 2019 and continuing through at least September 6, 2019, Baugh, Harville, Gilbert, Cooke, Popp, Stockwell, and Zea (together "the Individual Defendants") worked together to harass and intimidate the Steiners, and to place them under surveillance with the intent to harass and intimidate them, through repeated and hostile Twitter messages, deliveries of unwanted—and in some instances disturbing—items to the Steiners' home, and travel to Massachusetts to conduct physical surveillance. The Individual Defendants' conduct caused, attempted to cause, and would reasonably have been expected to cause substantial emotional distress to the Steiners.

49.    The purposes of the harassment campaign were, among other things, to distract the Steiners from publishing EcommerceBytes, to alter the website's coverage of eBay, and to gather information that the Individual Defendants could use to discredit the Steiners and EcommerceBytes.

50.     The Individual Defendants took steps to conceal their harassment campaign from eBay investigators and state and federal authorities, by, among other things, using non-eBay electronic communications platforms, billing expenses related to the campaign to an outside contractor, monitoring law enforcement communications, forging records, lying to investigators, and destroying evidence.

51.     Among the manner and means by which Individual Defendants carried out the harassment campaign were the following:

a.     Creating Twitter accounts in false names that featured ominous profile photos.

b.     Using these Twitter accounts to send threatening private direct messages ("DMs") to Ina Steiner about her, David Steiner, and EcommerceBytes.

c.     Publicly posting the Steiners' home address on Twitter, while suggesting in threatening messages that eBay sellers who were angry about EcommcerceBytes' coverage were going to visit the Steiners' home.

d.     Ordering unwanted and scary items and services to the Steiners' home, and ordering items intended to embarrass the Steiners to their neighbors' addresses.

e.     Posting online advertisements for fictitious events at the Steiners' home, including sexual encounters, to encourage strangers to visit them there.

f.     Traveling to Natick to install a GPS device on the Steiners' car, and to surveil the Steiners in their home and in their community.

g.     Monitoring law enforcement communications to avoid detection.

h.     Establishing false cover stories for the surveillance trip, including that the coconspirators were investigating the Steiners for threatening Executive 1.

i.     Continuing surveillance, even after the Steiners had detected it, with the purpose of intimidating them.

j.     Disguising their roles in the conspiracy by harassing and intimidating the Steiners using prepaid cell phones and laptops, VPN services, overseas email accounts, and prepaid debit cards purchased with cash.

k.     Offering the Steiners assistance with the very harassment they were committing, to earn the Steiners' good will ("the White Knight Strategy").

11

l.  Making false and misleading statements to NPD personnel who were investigating the threatening communications, harassing deliveries, and surveillance of the Steiners.

m.  Communicating by WhatsApp regarding how to harass the Steiners and how to respond to the NPD investigation.

n.  Creating a "dossier" of their own threats to the Steiners, which they planned to show to the NPD as proof that Zea and Harville were in Massachusetts investigating the harassment of the Steiners (purportedly by third parties).

o.  Exchanging ideas about how best to thwart the NPD investigation, including creating false suspects, continuing the harassing deliveries, fabricating cover stories, and intervening with any San Jose area police that the NPD contacted to further its investigation.

p.  Lying to eBay investigators who were responding to NPD requests for eBay's assistance.

q.  Exchanging ideas about how best to thwart eBay's internal investigation.

r.  Deleting the contents of computers, cell phones, and social media accounts that evidenced the harassment and intimidation campaign and the defendants' and their coconspirators' efforts to obstruct the NPD investigation.
    <u>Actions in Furtherance of the Harassment and Intimidation Campaign</u>

52.  From on or about August 5, 2019 through at least September 6, 2019, the Individual Defendants took the following steps, among others, as part of the harassment and intimidation campaign:

a.  On or about August 6, 2019, Baugh, Gilbert, Cooke, and Popp met at eBay headquarters to plan the White Knight Strategy.

b.  On or about August 6, 2019, Baugh, Popp, Stockwell, Zea, and other members of the GIC met at eBay headquarters to plan the delivery to the Steiners' home of unwanted and disturbing items to distract the Steiners from publishing the Newsletter.

c.  On or about August 6, 2019, Stockwell purchased a laptop computer at a Best Buy store in San Jose, California for use in the harassment and intimidation campaign.

12

d.   On or about August 6, 2019, Popp created a Twitter account in the name of "@Tui_Elei" that used a picture of a skeleton mask as a profile picture.

e.   On or about August 7, 2019, Popp sent the following DMs from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

   • "[Ina]…whats your prblem w/ ebay?  You know thats how we pay rent..."

   • "HELLO!!!!!!!"

f.   On or about August 8, 2019, Zea and a GIC analyst purchased prepaid debit cards with cash at a Santa Clara, California supermarket for use in ordering harassing deliveries to be sent to Ina and David Steiner.

g.   On or about August 9, 2019, Popp sent the following DMs from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

   • "WTF…whats it goin to take for u to answer me??"

   • "I guess im goin to have to get ur attention another way bitch…"

   • "U dont have the balls to talk to me?? Stop hiding behind ur computer screen u fuckin cunt!!!"

h.   On or about August 9, 2019, Stockwell used an anonymous email account to order live spiders and fly larvae for delivery to the Steiners' home.

i.   On or about August 9, 2019, one or more of the Individual Defendants ordered a subscription for pornographic magazines in the name of David Steiner to be sent to the Steiners' neighbors.

j.   On or about August 9, 2019, one or more of the Individual Defendants attempted to order a pig fetus for delivery to the Steiners' home.

k.   On or about August 10, 2019, one or more of the Individual Defendants ordered a Halloween Pig Mask for delivery to the Steiners' home.

l.   On or about August 10, 2019, Popp sent the following DM from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

   • "DO I HAVE UR ATTENTION NOW????"

m.   On or about August 10, 2019, Popp sent the following DMs from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

13

- "Ur fat fuck pussy husband [David Steiner's first name] needs to put u in line cunt"

- "after he takes the plugs out of his asshole... fuckin pussies!!!"

n.  On or about August 11, 2019, Baugh directed Harville to travel with him to Boston for an "op" targeting Ina Steiner and her website (*i.e.*, EcommerceBytes).

o.  On or about August 11, 2019, Baugh sent Harville the following text message: "I won't send the bosses texts, but I've been ordered to find and destroy." Harville replied, "Copy. Totally black[.] I'm deleting this now."

p.  On or about August 12, 2019, Baugh sent Popp, Stockwell, Zea, and other GIC analysts the following WhatsApp message: "Starting now through Tuesday night double our effort on everything. Spam, house deliveries, etc. I don't want anything delivered on Thursday, so the cut off should be Wednesday night – wake them up with a limo driver or something and then everything goes cold Thursday morning. … Take down all Craigslist posts late Wednesday night. Stop spam late Wednesday night etc."

q.  On or about August 12, 2019, one or more of the Individual Defendants sent a book titled "Grief Diaries: Surviving Loss of a Spouse" to the Steiners' home.

r.  On or about August 12, 2019, Popp used the @Tui_Elei Twitter account to post publicly to Ina Steiner's Twitter account: "Ina... wats ur problem with ebay??..."

s.  On or about August 12, 2019, Popp used the @Tui_Elei Twitter account to post publicly to Ina Steiner's Twitter account: "many familys including mine make money 2 pay 4 food cloths and rent by selling on ebay…UR stupid idiot comments r pushin buyers away from ebay and hurtin familys!! STOP IT NOW!!"

t.  On or about August 13, 2019, one or more of the Individual Defendants used a prepaid debit card to order a funeral wreath for delivery to the Steiners' home.

u.  On or about August 14, 2019, one or more of the Individual Defendants ordered live cockroaches for delivery to the Steiners' home.

v.  On or about August 14, 2019, Popp used the @Tui_Elei Twitter account to post a public message to Ina Steiner's Twitter account: "[First name of Ina Steiner] wen u hurt our bizness u hurt our familys…Ppl will do ANYTHING 2 protect family!!!!"

w.  On or about August 14, 2019, Baugh, Harville, Zea, Gilbert, and Popp met to discuss a trip to Natick, Massachusetts to install a GPS tracking device on the Steiners' car and to surveil the Steiners. At the meeting, Baugh instructed Zea to

14

stop harassing deliveries that would interfere with the surveillance operation.

x.  On or about August 14, 2019, Zea attempted to register herself and Harville for a software development conference in Boston as false cover for the surveillance trip.

y.  On or about August 15, 2019, Harville used his eBay-issued phone to visit a website that could be used to monitor the "Natick Police and Fire Live Audio Feed."

z.  On or about August 15, 2019, Baugh, Harville, and Zea flew from California to Boston, Massachusetts.

aa.  On or about August 15, 2019, Stockwell sent a text message to Harville providing the license plate numbers for the Steiners' cars.

bb.  On or about August 15, 2019, Baugh, Harville, and Zea drove to the Steiners' home in Natick and attempted unsuccessfully to install a GPS tracking device on the Steiners' car, which was locked in the Steiners' garage.

cc.  On or about August 15, 2019, Baugh, Harville, Popp, and Zea dialed in to a conference line to communicate during the surveillance operation and to monitor the NPD dispatch.

dd.  On or about August 15, 2019, Baugh directed Stockwell by WhatsApp message to prepare an eBay "Person of Interest" report ("POI Report") that listed the Steiners as eBay's top POIs. Baugh wrote, "In the narrative I need you to write that they have made direct threats to ebay, [eBay's CEO], and our employees (make it up)."

ee.  On or about August 16, 2019, Harville purchased tools at a Boston hardware store for the purpose of breaking into the Steiners' locked garage.

ff.  On or about August 16, 2019, Baugh, Harville, and Zea returned to Natick in a rented Dodge Caravan to surveil the Steiners and drove past their home repeatedly.

gg.  On or about August 16, 2019, Harville dialed in to the surveillance team's conference line.

hh.  On or about August 16, 2019, Baugh, Harville, and Zea followed David Steiner as he drove around Natick.

ii.  On or about August 16, 2019, believing that David Steiner had spotted the surveillance, Baugh returned the Dodge Caravan to the rental car agency.

jj.    On or about August 16, 2019, after the failed surveillance, Baugh directed that harassing deliveries to the Steiners resume.

kk.    On or about August 17, 2019, at 3:08 a.m. (EDT), Stockwell researched Boston-area 24-hour drain repair services on the internet for the purpose of sending a repairman to the Steiners' home in the middle of the night.

ll.    On or about August 17, 2019, one or more of the Individual Defendants ordered pizza to be delivered to the Steiners' home at 4:30 a.m., for payment upon delivery.

mm.    On or about August 17, 2019, Harville returned to California, and Popp traveled to Boston to replace him on the surveillance team.

nn.    On or about August 18, 2019, Popp replied to a public tweet on Ina Steiner's Twitter account using the @Tui_Elei account and stated: "Dis ur address???" The message was followed by information about Ina Steiner, accurately stating her name, age, address, and telephone number.

oo.    On or about August 18, 2019, Popp sent the following DM from the @Tui_Elei Twitter account to Ina Steiner's Twitter account: "U get my gifts cunt!!??"

pp.    On or about August 18, 2019, one or more of the Individual Defendants posted an advertisement on Craigslist claiming to be a married couple seeking a sexual partner or partners, and providing the Steiners' home address.

qq.    On or about August 18, 2019, Baugh, Popp, and Zea followed David Steiner as he drove in Natick.

rr.    On or about August 20, 2019, Baugh sent a text message to Popp, Gilbert, and Cooke that the Individual Defendants had "burned" two surveillance cars and that either the Steiners or the NPD were "seeing ghosts right now."

ss.    On or about August 20, 2019, Baugh forwarded to Gilbert the POI Report falsely indicating that the Steiners were security threats to eBay. In a WhatsApp message to Gilbert, Cooke, and Popp, Baugh stated: "Just sent poi doc with [the Steiners] included. I had GIC send this to me last week in case we got stopped..that way would at least have something to show to PD"

tt.    On or about August 20, 2019, after Twitter suspended the @Tui_Elei account for posting the Steiners' home address, Popp created a new Twitter account, @Elei_Tui, for use in harassing the Steiners.

16

uu.     On or about August 20, 2019, Popp also created two other Twitter accounts, including one that used the name of a prominent eBay seller.

vv.     On or about August 21, 2019, Zea and Baugh made false statements to an NPD detective who came to the surveillance team's hotel to investigate Zea and Harville's connection to the cyberstalking campaign.

ww.     On or about August 21, 2019, at approximately 9:36 a.m. (EDT), Baugh sent the following text message to Popp, Gilbert, and Cooke: "Natick detective is in lobby looking for [Zea]. I've taken her away from hotel headed to airport…Detective called her cell. I answered just now as her husband and played dumb."

xx.     On or about August 21, 2019, at approximately 9:39 a.m. (EDT), Gilbert proposed to Baugh, Cooke, and Popp bringing "dossiers" on the Steiners to the NPD: "Definitely want to make them look crazy."

yy.     On or about August 21, 2019, between approximately 10:30 a.m. and 12:00 p.m. (EDT), Popp sent more threatening tweets to and about Ina Steiner and the Newsletter ("the Concerning Tweets"). Popp used the three Twitter accounts that she had created the night before to have a public "conversation" on Twitter, asking over one account what Ina Steiner's address was, and responding from the other "guest I hav to pay Ina a visit."

zz.     On or about August 21, 2019, minutes after writing the Concerning Tweets, Popp forwarded images of the Concerning Tweets to Baugh and Gilbert, writing falsely that Ina Steiner was "really bringing out some angry Twitter users"

aaa.     On or about August 21, 2019, at approximately 12:34 p.m. (EDT), Baugh forwarded the Concerning Tweets to Harville.

bbb.     On or about August 21, 2019, at approximately 2:30 p.m. (EDT), executing the White Knight Strategy, Gilbert called the Steiners, identified himself as an eBay employee, and offered eBay's assistance.

ccc.     After the call, Gilbert messaged Baugh, Popp, and Cooke that the Steiners were "totally rattled and immediately referred [Gilbert] to Natick PD".

ddd.     Thereafter, still on August 21, 2019, Gilbert spoke, text messaged, and emailed with an NPD detective who was handling the investigation into the harassment of the Steiners. Gilbert falsely claimed not to know Zea or Harville and falsely stated that he had to travel to Toronto and New York but would instead attempt to come to Boston to meet with the NPD.

eee.     On or about August 21, 2019, after learning that the NPD was investigating the use of a prepaid debit card to purchase pizzas for delivery to the Steiners, Baugh and Popp directed Stockwell to prepare a list of eBay "Persons of Interest" in the

17

San Francisco Bay Area that could be used (as part of Gilbert's "dossier") to deflect attention from Zea.

fff.    On or about August 21, 2019, Stockwell created the document that Baugh requested—"Bay Area POIs_August 2019.docx"—and emailed it to Popp and Baugh, who forwarded it to Gilbert for use in the NPD meeting.

ggg.    On or about August 22, 2019, Gilbert and another eBay employee met with three NPD officers at the NPD. During the meeting, Gilbert falsely stated that:

- Zea and Harville had come to Boston to attend a conference;

- Popp was Zea's supervisor; and

- Popp had assigned Zea to a Person of Interest investigation regarding the Steiners, and that Zea had driven to Natick "on her own."

hhh.    On or about August 22, 2019, after the NPD meeting, Popp used one of the new Twitter accounts to post "@[Newsletter] 20 yrs of lies n distroin familys... dunt b proud of dat u wurthless BITCH!!! i wil distroy ur family n bizness 2... C how u like it...\n\n@Elei_Tui wen r we goin 2 visit her in natik???"

iii.    On or about August 23, 2019, Harville falsely told eBay investigators that he had traveled to Boston to attend a conference, he had not been in Natick, and he had not had any interaction with the Steiners or the NPD.

jjj.    On or about August 23, 2019, Baugh falsely told eBay investigators his team was not responsible for harassing messages or deliveries and that his team had been in Natick to investigate threats to the Steiners.

kkk.    On August 23, 2019, at 5:15 p.m. (PDT), Baugh messaged Executive 2 as follows:

Hi [Executive 2] – this is Jim Baugh's personal cell. My team ran an Op on our friend in Boston. Nothing illegal occurred and we were actually intending to team up with her and get her on our side in a positive manner. However, small town police got a couple of rental car plates and tracked it back to my people and the hotel the were staying at. They sent a note to ebay investigations GAP team who then passed it to legal and they are conducting an internal investigation on us. We are cooperating, but I know they realize something is off. We will continue to cooperate, but not sure how much longer we can keep this up. If there is any way to get some top cover that would be great. If not, I just wanted you to have a heads up because they are aware that multiple members of the ELT are not a fan of that website to include ███ and his wife. Again, no crime was committed and

18

local police don't have a case. I don't want our legal team to give them one. Let me know if you want to discuss this weekend.

lll.  On or about August 26, 2019, Harville falsely told eBay investigators that he didn't know whether Zea had gone to Natick and that he had not worked on a matter involving the Steiners.

mmm. On or after August 26, 2019, Baugh, Harville, Popp, Zea, Gilbert, and others deleted and attempted to delete data from their mobile phones that evidenced the conspiracy, including WhatsApp messages.

nnn.  On or about August 27, 2019, Harville falsely told eBay investigators that he had attended a conference in Boston with Zea.

ooo.  On or about August 28, 2019, Baugh falsely told eBay investigators that his team was not responsible for the deliveries or harassing communications.

ppp.  On or about August 30, 2019, Baugh directed an eBay employee to retrieve computers from the GIC and to bring them to his house.

qqq.  On or about August 30, 2019, after receiving an email from an eBay investigator directing him to preserve relevant information and to turn in his eBay-issued cell phone, Harville messaged Baugh, Gilbert, and Popp, "Want me to wipe it."

rrr.  On or about August 30, 2019, Harville turned in his eBay-issued cell phone from which significant data related to his trip to Natick had been deleted.

sss.  On or about September 6, 2019, Popp posted five new Tweets to one of the Twitter accounts that the Individual Defendants had used to harass the Steiners, to suggest that those responsible for harassing the Steiners were still at large.

Executive 2's Receipt of Information Regarding the Harassment and Intimidation Campaign

53.     On or about August 20, 2019, an NPD detective emailed eBay to request

assistance with the NPD's investigation into the harassment of the Steiners.

54.     On or about August 21, 2019, at approximately 2:49 p.m. (PDT), an eBay

communications employee forwarded to Executive 2, who was traveling overseas, an email

containing the NPD request, underneath an "exploding head" emoji.

55.     At approximately 3:05 p.m. (PDT), Executive 2 responded, "Please do not do anything until I can check a few things…I don't want us to engage.  Who specifically did the local police contact first at eBay."

56.     On or about August 22, 2019, eBay's General Counsel emailed Executive 2, Executive 3, and another eBay executive, informing them that the Steiners had contacted the NPD about being harassed, and that eBay would be beginning an internal investigation immediately ("the GC Email").  The GC Email enclosed a copy of a second NPD request to eBay for assistance in the investigation that identified Harville and Zea's possible involvement in the harassment.

57.     On or about August 23, 2019, at approximately 5:15 p.m. (PDT), Baugh messaged Executive 2 as follows:

> Hi [Executive 2] – this is Jim Baugh's personal cell.  My team ran an Op on our friend in Boston.  Nothing illegal occurred and we were actually intending to team up with her and get her on our side in a positive manner. However, small town police got a couple of rental car plates and tracked it back to my people and the hotel the were staying at. They sent a note to ebay investigations GAP team who then passed it to legal and they are conducting an internal investigation on us. We are cooperating, but I know they realize something is off. We will continue to cooperate, but not sure how much longer we can keep this up. If there is any way to get some top cover that would be great. If not, I just wanted you to have a heads up because they are aware that multiple members of the ELT are not a fan of that website to include ▇▇ and his wife. Again, no crime was committed and local police don't have a case. I don't want our legal team to give them one. Let me know if you want to discuss this weekend.

58.     On or about August 23, 2019, at approximately 5:24 p.m. (PDT), Executive 2 and Baugh spoke by phone for approximately 10 minutes.

59.     On or about August 27, 2019 and August 28, 2019, eBay investigators interviewed Executive 2 regarding the harassment and intimidation of the Steiners.

60.     On or about August 30, 2019, eBay investigators obtained forensic copies of Executive 2's eBay-issued and personal cell phones.

61.     Executive 2's cell phones did not contain the message from Baugh described in paragraph 57 above or the other August 2019 messages between Baugh and Executive 2 regarding Ina Steiner and EcommerceBytes, indicating that those messages had, at some point, been deleted.

**ATTACHMENT B**

**ACTION BY UNANIMOUS WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS OF eBay Inc.**
**JANUARY 9, 2024**

In accordance with Section 141(f) of the Delaware General Corporation Law (the "DGCL") and the Bylaws of eBay Inc., a Delaware corporation (the "Company"), the undersigned, constituting all of the members of the Company's Board of Directors (the "Board"), hereby take the following actions and adopt the following resolutions by unanimous written consent without a meeting:

WHEREAS, the Company has been engaged in discussions with the United States Attorney's Office for the District of Massachusetts ("the U.S. Attorney's Office") regarding issues arising in relation to the involvement of Company employees in an August 2019 harassment and intimidation campaign targeting David and Ina Steiner; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the U.S. Attorney's Office; and

WHEREAS, the Company's outside counsel has advised the Board of its rights, possible defenses, the United States Sentencing Guidelines provisions, and the consequences of entering into such agreement with the U.S. Attorney's Office; and

WHEREAS, the Company believes that it is advisable and in the Company's best interests to resolve this matter and has negotiated a Deferred Prosecution Agreement with the U.S. Attorney's Office; and

WHEREAS, the Board has reviewed the Deferred Prosecution Agreement and has determined that entering into it in order to resolve this matter is in the best interests of the Company;

NOW, THEREFORE, BE IT RESOLVED, that the Company (a) acknowledges the filing of the six-count Information charging the Company with violation of (i) two counts of interstate travel with the intent to harass and intimidate, in violation of Title 18, United States Code, Section 2261A(1)(B); (ii) two counts of using electronic communications services to harass and intimidate, in violation of Title 18, United States Code, Section 2261A(2)(B); (iii) one count of witness tampering, in violation of Title 18, United States Code, Section 1512(b)(3); and (iv) one count of altering documents with the intent to impede, obstruct, and influence the investigation of a matter within the jurisdiction of the Federal Bureau of Investigation, in violation of Title 18, United States Code, Section 1519; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the U.S. Attorney's Office; and (c) agrees to accept a monetary penalty against the Company totaling $3,000,000, and to pay such penalty to the United States Treasury with respect to the conduct described in the Information;

RESOLVED FURTHER, that the Company accepts the terms and conditions of the Deferred Prosecution Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the Deferred Prosecution Agreement and any charges by the United States arising out of the conduct described in the Deferred Prosecution Agreement's attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the Deferred Prosecution Agreement, in the United States District Court for the District of Massachusetts; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Deferred Prosecution Agreement's attached Statement of Facts or relating to conduct

known to the U.S. Attorney's Office prior to the date on which the Deferred Prosecution

Agreement was signed that is not time-barred by the applicable statute of limitations on the date

of the signing of the Deferred Prosecution Agreement;

   RESOLVED FURTHER, that the Company's Chief Executive Officer, Jamie Iannone,

and the Company's Chief Financial Officer, Steve Priest, are hereby authorized, empowered and

directed, on behalf of the Company, to execute the Deferred Prosecution Agreement;

   RESOLVED FURTHER, that the Deferred Prosecution Agreement, proposed by the

U.S. Attorney's Office on January 9, 2024, is hereby adopted and approved in all respects; and

be it

   RESOLVED FURTHER, that this unanimous written consent may be executed in any

number of counterparts, any of which may be executed and transmitted electronically, and each

of which will be deemed to be an original, and all of which, when taken together, will be deemed

to constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of

this unanimous written consent may be substituted or used in lieu of the original writing for any

and all purposes for which the original writing could be used.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this unanimous written consent as of the first date written above and direct that it be filed with the minutes of proceedings of the Board.

_____
Jamie Iannone

_____
Paul S. Pressler              9 Jan, 2024 9:09:04 AM MST

_____
Adriane M. Brown

_____
Aparna Chennapragada        9 Jan, 2024 10:57:57 PM MST

_____
Logan D. Green               9 Jan, 2024 3:52:36 PM MST

_____
E. Carol Hayles                    3:37 PM MST

_____
Shripriya Mahesh             9 Jan, 2024 6:49:38 PM MST

_____
Mohak Shroff                                      MST

_____
Perry M. Traquina            9 Jan, 2024 4:13:45 AM MST

## ATTACHMENT C

CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance codes, policies, and procedures relating to the misconduct described in the Statement of Facts and its compliance with criminal laws, eBay Inc. ("the Company"), on behalf of itself and its subsidiaries and affiliates, agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures. Where necessary and appropriate, the Company agrees to modify its existing compliance programs, including internal controls, compliance policies, and procedures, in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of criminal laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance codes, policies, and procedures:

### Commitment to Compliance

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policies against violations of the law, and demonstrate rigorous adherence by example. The Company will also ensure that middle management, in turn, reinforce those standards and encourage employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations at all levels of the Company.

1

Policies and Procedures

2.    The Company will develop and promulgate a clearly articulated and visible

corporate policy relating to the misconduct described in the Statement of Facts and its

compliance with criminal laws, which policy shall be memorialized in a written compliance

code.

3.    The Company will develop and promulgate compliance policies and procedures

designed to reduce the prospect of violations of the criminal laws and the Company's compliance

codes, and the Company will take appropriate measures to encourage and support the observance

of ethics and compliance policies and procedures against violation of the criminal laws by

personnel at all levels of the Company.  These policies and procedures shall apply to all

directors, officers, and employees and, where necessary and appropriate, outside parties acting

on behalf of the Company, including, but not limited to, agents and intermediaries, consultants,

representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint

venture partners (collectively, "agents and business partners").  The Company shall notify all

employees that compliance with the policies and procedures is the duty of individuals at all

levels of the Company.  Such policies and procedures shall address, at a minimum:

     a.    hospitality, entertainment, and expenses;

     b.    business travel;

     c.    the consumption of alcohol to excess on Company premises and during

            Company-sponsored travel;

     d.    the use of Company communications platforms and the use of ephemeral

            and encrypted messaging applications for Company communications;

    e.     the tone and content of Company communications, including that of senior management;

    f.     the Company's Communications function;

    g.     the Company's Safety & Security function;

    h.     communications with and concerning law enforcement;

    i.     the Company's Person of Interest program;

    j.     the Company's use of third party contractors; and

    k.     the Company's personnel practices as they relate to exit interviews.

4.     The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts, with a focus on operational expenses.  This system shall be designed to provide reasonable assurances that:

    a.     transactions are executed in accordance with management's general or specific authorization;

    b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

    c.     access to assets is permitted only in accordance with management's general or specific authorization; and

    d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

### Periodic Risk-Based Review

5.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the risks facing the Company, including, but not limited to, the Company's past misconduct described in the Statement of Facts and the policies and procedures described in Paragraph 3.

6.      The Company shall review its compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

### Proper Oversight and Independence

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance codes, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### Training and Guidance

8.      The Company will implement mechanisms designed to ensure that its compliance codes, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales,

4

legal, security, communications, compliance, finance, personnel), or positions that otherwise pose a risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

9.    The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance codes, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

<u>Internal Reporting and Investigation</u>

10.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the criminal laws or the Company's compliance codes, policies, and procedures.

11.    The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the criminal laws or the Company's compliance codes, policies, and procedures. The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

Enforcement and Discipline

12.     The Company will implement mechanisms designed to effectively enforce its compliance codes, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the criminal laws and the Company's compliance codes, policies, and procedures by the Company's directors, officers, and employees.  Such procedures should be applied consistently, fairly and in a manner commensurate with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance codes, policies, and procedures and making modifications necessary to ensure the overall compliance program is effective.

Third-Party Relationships

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.      properly documented due diligence pertaining to the hiring, appropriate and regular oversight, and off-boarding of agents and business partners;

b.      informing agents and business partners of the Company's commitment to abiding by applicable laws, and of the Company's compliance codes, policies, and procedures; and

6

      c.     seeking a reciprocal commitment from agents and business partners.  The Company will understand and record the business rationale for using a third party in a transaction, and will conduct adequate due diligence with respect to the risks posed by a third-party partner.  The Company will ensure that contract terms with third parties specifically describe the services to be performed, that the third party is actually performing the described work, and that its compensation is commensurate with the work being provided in that industry and geographical region.  The Company will engage in ongoing monitoring of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

15.    Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the law, which may, depending upon the circumstances, include: (a) representations and undertakings relating to compliance with the laws; (b) rights to conduct audits of the books, records, and accounts of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the laws, the Company's compliance codes, policies, or procedures, or the representations and undertakings related to such matters.

<u>Monitoring Communications</u>

16.    The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the use of personal communications devices or third-party messaging platforms for Company business, including the use of ephemeral and encrypted messaging applications.

<u>Mergers and Acquisitions</u>

17.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conducts appropriate risk-based due diligence on potential new business entities, including appropriate due diligence by legal, accounting, and compliance personnel.

18.     The Company will ensure that the Company's compliance codes, policies, and procedures apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

        a.     train the directors, officers, employees, agents, and business partners consistent with Paragraphs 8 and 9 above on the criminal laws and the Company's compliance codes, policies, and procedures regarding criminal laws; and

        b.     where warranted, conduct a review of all newly acquired or merged businesses as quickly as practicable.

<u>Monitoring, Testing, and Remediation</u>

19.     In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its compliance codes, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of laws and the Company's codes, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.  The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.  Based on such review and testing and their analysis of any prior misconduct, the

Company will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

## ATTACHMENT D

INDEPENDENT COMPLIANCE MONITOR

The duties and authority of the independent compliance monitor (the "Monitor"), and the obligations of eBay Inc. (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Attorney's Office for the District of Massachusetts (the "U.S. Attorney's Office"), are as described below:

1.      The Company will retain the Monitor for a period of not less than 36 months (the "Term of the Monitorship").  Subject to certain conditions specified below that would, in the sole discretion of the U.S. Attorney's Office, allow for an extension of the Term of the Monitorship, the Monitor shall be retained until the Deferred Prosecution Agreement ("the Agreement") expires.

### Monitor's Mandate

2.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C.  During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the Company's compliance code, policies, and procedures as they relate to the Company's current and ongoing compliance with federal criminal laws and take such reasonable steps as, in the Monitor's view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective implementation of, the Corporate Compliance Program described in Attachment C of the Agreement.

1

## Company's Obligations

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in the Monitor's view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations.  To that end, the Company shall:  facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5 to 6; and provide guidance on applicable local law (such as relevant data protection and labor laws).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Company to the Monitor concerning violations of criminal laws or the Company's compliance codes, policies and procedures shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the U.S. Attorney's Office, pursuant to the Agreement.

## Withholding Access

5.      The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be

2

inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.     If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the U.S. Attorney's Office. Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access. The U.S. Attorney's Office may then consider whether to make a further request for access to such information, documents, records, facilities, or employees. Nothing in Paragraphs 5 or 6 of this Attachment D, however, shall be construed to require the Company to waive the protections of the attorney-client privilege or the work product doctrine.

<u>Monitor's Coordination with the Company and Review Methodology</u>

7.     In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.     The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, compliance

risks presented by the Company's misconduct described in the Statement of Facts and the

Corporate Compliance Program described in Attachment C to the Agreement.

9.     In undertaking the reviews to carry out the Mandate, the Monitor shall formulate

conclusions based on, among other things: (a) inspection of relevant documents, including the

Company's current compliance code, policies and procedures; (b) on-site observation of selected

systems and procedures of the Company at sample sites, including internal accounting controls,

record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant

current and, where appropriate, former directors, officers, employees, business partners, agents,

and other persons at mutually convenient times and places; and (d) analyses, studies, and testing

of the Company's compliance program.

<u>Monitor's Written Work Plans</u>

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall

conduct an initial ("first") review and prepare a first report, followed by at least two follow-up

reviews and reports as described in Paragraphs 16-21 below.  With respect to the initial report,

after consultation with the Company and the U.S. Attorney's Office, the Monitor shall prepare

the first written work plan within sixty (60) calendar days of being retained, and the Company

shall (and the U.S. Attorney's Office may) provide comments within thirty (30) calendar days

after receipt of the written work plan.  With respect to each follow-up report, after consultation

with the Company and the U.S. Attorney's Office, the Monitor shall prepare a written work plan

at least thirty (30) calendar days prior to commencing a review, and the Company shall (and the

U.S. Attorney's Office may) provide comments within twenty (20) calendar days after receipt of

the written work plan.  Any disputes between the Company and the Monitor with respect to any

written work plan shall be decided by the U.S. Attorney's Office in its sole discretion.

4

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents.  The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement.  In developing such understanding, the Monitor is to rely to the extent possible on available information and documents provided by the Company.  It is not intended that the Monitor will conduct the Monitor's own inquiry into the historical events that gave rise to the Agreement.

<u>Initial Review</u>

12.     The first review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the U.S. Attorney's Office).  The Monitor shall issue a written report within one hundred fifty (150) calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's compliance code and policies.  The Monitor should consult with the Company concerning the Monitor's findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate.  The Monitor may also choose to share a draft of the Monitor's reports with the Company and the U.S. Attorney's Office prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures, and practices.  Rather, the reports should focus on areas the Monitor has identified as

5

requiring recommendations for improvement or which the Monitor otherwise concludes merit

particular attention.  The Monitor shall provide the report to the Board of Directors of the

Company and contemporaneously transmit copies to:

Chief—Securities, Financial & Cyber Frauds Unit
Deputy Chief—Securities, Financial & Cyber Frauds Unit
U.S. Attorney's Office for the District of Massachusetts
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210

After consultation with the Company, the Monitor may extend the time period for issuance of the

first report for a brief period of time with prior written approval of the U.S. Attorney's Office.

13.     Within ninety (90) calendar days after receiving the Monitor's first report, the

Company shall adopt and implement all recommendations in the report, unless, within thirty (30)

calendar days of receiving the report, the Company notifies in writing the Monitor and the U.S.

Attorney's Office of any recommendations that the Company considers unduly burdensome,

inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise

inadvisable.  With respect to any such recommendation, the Company need not adopt that

recommendation within the ninety (90) calendar days of receiving the report but shall propose in

writing to the Monitor and the U.S. Attorney's Office an alternative policy, procedure, or system

designed to achieve the same objective or purpose.  As to any recommendation on which the

Company and the Monitor do not agree, such parties shall attempt in good faith to reach an

agreement within forty-five (45) calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable

alternative proposal, the Company shall promptly consult with the U.S. Attorney's Office.  The

U.S. Attorney's Office may consider the Monitor's recommendation and the Company's reasons

for not adopting the recommendation in determining whether the Company has fully complied

with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within ninety (90) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the U.S. Attorney's Office.

Follow-Up Review(s)

16.     A follow-up review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor, and the U.S. Attorney's Office). The Monitor shall issue a written follow-up report within one hundred twenty (120) calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the first review.  After consultation with the Company, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the U.S. Attorney's Office.

17.     Within ninety (90) calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report.  If the Company considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the Monitor and the U.S. Attorney's Office of any such recommendations in writing within thirty (30) calendar days after receiving the report.  The Company need not adopt those recommendations within the ninety (90) calendar days of receiving the report but shall propose in writing to the Monitor and the U.S. Attorney's Office an alternative policy, procedure, or

7

system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18.      In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the U.S. Attorney's Office. The U.S. Attorney's Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within ninety (90) days calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the U.S. Attorney's Office.

19.      The Monitor shall undertake a second follow-up review not later than one hundred fifty calendar (150) days after the issuance of the first follow-up report. The Monitor shall issue a second follow-up report within one hundred twenty (120) calendar days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16 to 18.

20.      Within ninety (90) calendar days after receiving the Monitor's second follow-up report, the Company shall adopt and implement all recommendations in the report. If the Company considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the Monitor and the U.S. Attorney's Office of any such recommendations in writing within thirty (30) calendar days after receiving the report. The Company need not adopt those

recommendations within the ninety (90) calendar days of receiving the report but shall propose in writing to the Monitor and the U.S. Attorney's Office an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

21.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the U.S. Attorney's Office. The U.S. Attorney's Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within ninety (90) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the U.S. Attorney's Office.

<u>Certification of Compliance and Termination of the Monitorship</u>

22.     No later than ninety (90) days before the end of the Term of the Monitorship, if the Monitor believes that the Company's compliance program is reasonably designed and implemented to detect and prevent violations of the federal criminal laws and is functioning effectively, the Monitor shall certify the Company's compliance with its compliance obligations under the Agreement and shall then submit to the U.S. Attorney's Office a written report ("Certification Report"). The Certification Report shall set forth an overview of the Company's remediation efforts to date, including the implementation status of the Monitor's recommendations, and an assessment of the sustainability of the Company's remediation efforts.

No later than sixty (60) days before the end of the Term of the Monitorship, the Company shall certify in writing to the U.S. Attorney's Office, with a copy to the Monitor, that the Company has adopted and implemented all of the Monitor's recommendations in the reports, or the agreed-upon alternatives.  The Monitor or the Company may extend the time period for issuance of the Certification Report or the Company's certification, respectively, with prior written approval of the U.S. Attorney's Office.

23.    At such time as the U.S. Attorney's Office approves the Certification Report and the Company's certification, the monitorship shall be terminated.

<u>Extension of the Term of the Monitorship</u>

24.    If, however, at the conclusion of the one hundred and twenty (120) calendar-day period following the issuance of the second follow-up report, the U.S. Attorney's Office concludes that the Company has not by that time successfully satisfied its compliance obligations under the Agreement, the Term of the Monitorship shall be extended for one year.

25.    Under such circumstances, the Monitor shall commence the third follow-up ("fourth") review no later than sixty (60) calendar days after the U.S. Attorney's Office concludes that the Company has not successfully satisfied its compliance obligations under the Agreement (unless otherwise agreed by the Company, the Monitor, and the U.S. Attorney's Office).  The Monitor shall issue a written report within one hundred twenty (120) calendar days of commencing the fourth review in the same fashion as set forth in Paragraph 12 with respect to the first review and in accordance with the procedures for follow-up reports set forth in Paragraphs 16 to 18.  A determination to terminate the monitorship shall then be made in accordance with Paragraphs 22 to 23.

26.     If, after completing the fourth review, the U.S. Attorney's Office again concludes that the Company has not successfully satisfied its obligations under the Agreement with respect to the Monitor's Mandate, the Term of the Monitorship shall be extended until expiration of the Agreement, and the Monitor shall commence a fourth follow-up ("fifth") review within sixty (60) calendar days after the U.S. Attorney's Office concludes that the Company has not successfully satisfied its compliance obligations under the Agreement (unless otherwise agreed by the Company, the Monitor, and the U.S. Attorney's Office).  The Monitor shall issue a written report within one hundred twenty (120) calendar days of commencing the fifth review in the same fashion as set forth in Paragraph 12 with respect to the first review and in accordance with the procedures for follow-up reports set forth in Paragraphs 16 to 18.

<u>Monitor's Discovery of Potential or Actual Misconduct</u>

27.     (a) Except as set forth below in sub-paragraphs (b) and (c), should the Monitor discover during the course of their engagement that any person within the Company or any entity or person working, directly or indirectly, for or on behalf of the Company may have violated the Company's compliance code, policies, and procedures with respect to areas within the Mandate ("Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed.  The Monitor also may report Potential Misconduct to the U.S. Attorney's Office at any time, and shall report Potential Misconduct to the U.S. Attorney's Office when it requests the information.

(b) In some instances, the Monitor should immediately report Potential

11

Misconduct directly to the U.S. Attorney's Office, and not to the Company.  The presence of any of the following militates in favor of reporting Potential Misconduct directly to the U.S. Attorney's Office, and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c) If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the U.S. Attorney's Office.  Then, after consultation with the U.S. Attorney's Office, the Monitor shall disclose the Actual Misconduct to the General Counsel, Chief Ethics and Compliance Officer, and/or the Audit Committee of the Company.

(d) The Monitor shall address in their reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the U.S. Attorney's Office or not. Further, if the Company or any entity or person working directly or indirectly on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the U.S. Attorney's Office and address the Company's failure to disclose the necessary information in the Monitor's reports.

(e) Neither the Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

<u>Meetings During Pendency of Monitorship</u>

28.     At least annually, and more frequently if appropriate, representatives from the Company and the U.S. Attorney's Office will meet to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the U.S. Attorney's Office, including with respect to the scope or costs of the monitorship.

<u>Contemplated Confidentiality of Monitor's Reports</u>

29.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the U.S. Attorney's Office determines in its sole discretion that disclosure would be in furtherance of the U.S. Attorney's Office's discharge of its duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

CERTIFICATION – EBAY INC.

To:    United States Department of Justice
        U.S. Attorney's Office for the District of Massachusetts
        Attention: Chief, Securities, Financial and Cyber Frauds Unit

Re:    Deferred Prosecution Agreement Disclosure Certification

        The undersigned certify, pursuant to Paragraph 21 of the Deferred Prosecution

Agreement ("DPA") filed on January 11, 2024, in the U.S. District Court for the District of

Massachusetts, by and between the U.S. Attorney's Office and eBay Inc. (the "Company"), that

undersigned are aware of the Company's disclosure obligations under Paragraph 6 of the DPA

and that the Company has disclosed to the U.S. Attorney's Office any and all evidence or

allegations of conduct required pursuant to Paragraph 6 of the DPA, which includes evidence or

allegations that may constitute a violation of federal criminal laws had the conduct occurred

within the jurisdiction of the United States ("Disclosable Information"). This obligation to

disclose information extends to any and all Disclosable Information that has been identified

through the Company's compliance and controls program, whistleblower channel, internal audit

reports, due diligence procedures, investigation process, or other processes. The undersigned

further acknowledge and agree that the reporting requirement contained in Paragraph 6 and the

representations contained in this certification constitute a significant and important component of

the DPA and the U.S. Attorney's Office's determination whether the Company has satisfied its

obligations under the DPA.

        The undersigned hereby certify respectively that s/he is the Chief Executive Officer

("CEO") of the Company and that s/he is the Chief Financial Officer ("CFO") of the Company

and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

      This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the District of Massachusetts. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the District of Massachusetts.

By: _____    Dated: _____

JAMIE IANNONE

CEO

eBay Inc.

By: _____    Dated: _____

STEVE PRIEST

CFO

eBay Inc.