**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Ina Steiner,<br>David Steiner,<br>Steiner Associates, LLC,<br><br>      *Plaintiffs*,<br><br>  v.<br><br>eBay, Inc.,<br>Progressive F.O.R.C.E. Concepts, LLC,<br>Devin Wenig,<br>Steve Wymer,<br>Wendy Jones,<br>James Baugh,<br>David Harville,<br>Brian Gilbert,<br>Stephanie Popp,<br>Stephanie Stockwell,<br>Veronica Zea,<br>Philip Cooke, and<br>John and Jane DOE,<br><br>      *Defendants*. | No. 1:21-cv-11181 |

**DEFENDANT DEVIN WENIG'S SUPPLEMENTAL BRIEF IN SUPPORT OF
<u>HIS MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

I.    Mr. Baugh's testimony further refuted Plaintiffs' "facts."............................................2

II.   Mr. Baugh's testimony further exposed the legal infirmities of Plaintiffs' claims. ...10

    A.    Intent-Based Claims.......................................................................................11

    B.    Negligence Claims .........................................................................................15

    C.    Civil Conspiracy............................................................................................18

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Barrigas v. United States,*
   2018 WL 1244780 (D. Mass. Mar. 9, 2018)................................................................14, 15

*Cremaldi-Vickery v. Otis Elevator, Inc.,*
   782 N.E.2d 48, 2003 WL 168452 (Mass. App. Ct. Jan. 21, 2003)...................................11, 14

*Delaney v. Reynolds,*
   825 N.E.2d 554 (Mass. 2005) ...........................................................................................15

*Diaz v. Devlin,*
   229 F. Supp. 3d 101 (D. Mass. 2017)................................................................................14

*Dilbert v. Hanover Ins. Co.,*
   825 N.E.2d 1071 (Mass. App. Ct. 2005) .......................................................................11, 14

*Go-Best Assets Ltd. v. Citizens Bank,*
   972 N.E.2d 426 (Mass. 2012) ...........................................................................................19

*Leavitt v. Brockton Hosp., Inc.,*
   907 N.E.2d 213 (Mass. 2009) ...........................................................................................15

*Mass. Sch. of Law. at Andover, Inc. v. Am. Bar Ass'n,*
   1997 WL 136240 (D. Mass. Mar. 3, 1997), *aff'd*, 142 F.3d 26 (1st Cir. 1998) .....................17

*Morehouse v. Berkshire Gas Co.,*
   989 F. Supp. 54 (D. Mass. 1997).......................................................................................11

*Rua v. Glodis,*
   52 F. Supp. 3d 84 (D. Mass. 2014), *aff'd*, 2015 WL 13933038 (1st Cir. Dec.
   21, 2015) .......................................................................................................................14

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
   145 S. Ct. 1556 (2025).....................................................................................................18

*Thomas v. Harrison,*
   909 F.3d 483 (1st Cir. 2018).............................................................................................18

*Twitter, Inc. v. Taamneh,*
   598 U.S. 471 (2023)........................................................................................................18

*Vicarelli v. Bus. Intern., Inc.,*
   973 F. Supp. 241 (D. Mass. 1997)......................................................................................16

**Other Authorities**

Restatement (Second) of Torts § 158...........................................................................................14

Pursuant to the Court's procedural order, ECF 691, Mr. Wenig hereby submits this supplemental memorandum in support of his motion for summary judgment.

## INTRODUCTION

For more than four years, Plaintiffs have argued that a single phrase, contained in two texts and shorn of any context, sustains nine stigmatizing civil claims against Devin Wenig. Facing the scythe of summary judgment and a record devoid of evidence against Mr. Wenig, Plaintiffs asked the Court to accept inferences stacked upon inferences, claiming they were supported by material "facts" purportedly showing Mr. Wenig's knowledge of, involvement in, and acquiescence to the despicable harassment campaign at the center of this case. Neither the facts in the record after extensive discovery nor the law applied to those facts supported that strategy, much less Plaintiffs' attempt to show triable claims.

After oral argument on the summary judgment motions, undoubtedly realizing the absence of admissible evidence supporting their claims, Plaintiffs announced that they had settled their case against Jim Baugh, the architect of the terror campaign against them, in exchange for his testimony. Plaintiffs told the Court that it should allow Mr. Baugh's testimony because he "directly interacted with the executive defendants regarding Plaintiffs" and "[i]t cannot be disputed that [Mr.] Baugh's testimony on these matters is relevant to the claims and defenses asserted in this action." ECF 636 at 4. Plaintiffs hoped Mr. Baugh's deposition testimony would support the negative inferences against Mr. Wenig they wanted the Court to draw, and defeat Mr. Wenig's summary judgment motion.

Just the opposite happened. At every turn, Mr. Baugh refuted Plaintiffs' allegations about Mr. Wenig and conclusively established that Mr. Wenig did not direct or initiate nor have any

1

involvement in the harassment campaign against Plaintiffs. Mr. Baugh even undermined the meaning Plaintiffs seek to overlay onto the texts at the heart of their case against Mr. Wenig.

Mr. Baugh's testimony also confirmed what Mr. Wenig said in his filings and at oral argument: that Plaintiffs (i) have lumped Mr. Wenig in with others by hiding behind the phrase "the Executive Leadership Team did X" to obscure that there is no evidence specifically against him, and (ii) have misstated what Mr. Wenig has said and misattributed things to Mr. Wenig which never occurred as their basis for asking the Court to continue the case. Mr. Baugh further testified that the statements from his sentencing memorandum about what the ELT allegedly did or said or believed—which Plaintiffs trumpeted in their briefing and at argument, and represented would accurately capture his testimony, ECF 636 at 11—did *not* include Mr. Wenig, that statements Plaintiffs claimed were made by Mr. Wenig were *not* accurate, and that Plaintiff's characterizations about Mr. Wenig's communications were *wrong*.

The net result of Mr. Baugh's testimony is that there now is no fact and no reasonable inference from any fact that defeats Mr. Wenig's motion for summary judgment. There is no evidence of his knowledge of any wrongdoing or the potential of any wronging. There is no evidence of any intentional conduct to set in motion or participate in any wrongdoing, conspiracy, or agreement to have others do wrong. Nor is there evidence of any negligent behavior that allowed wrongdoing. On the contrary, there is ample evidence—confirmed by the "linchpin" witness himself—that Plaintiffs' case against Mr. Wenig is, and always has been, groundless.

## I.    Mr. Baugh's testimony further refuted Plaintiffs' "facts."

Over the course of his fourteen-hour deposition, Mr. Baugh dismantled, one by one, the pillars of Plaintiffs' case against Devin Wenig. As the Court will recall, in support of their assertion that there "are questions of fact as to the extent of Mr. Wenig's involvement in the [Natick] operation," (ECF 526 at 1), Plaintiffs argued that (i) Mr. Baugh was in "direct communication with

[Mr.] Wenig and other executives who reported to Wenig" (*id.*), (ii) Mr. Wenig directed Mr. Baugh, both directly and through others, to harm the Steiners (ECF 590 at 3), (iii) Mr. Wenig knew Mr. Baugh was a "violent and deranged individual" because he saw Mr. Baugh's "active shooter drills" and a video that Mr. Baugh had of Ms. Zea falling off a chair (ECF 526 at 9–10, 15), (iv) ██████████████████████████████████████████████████████ (*id.* at 10; ECF 590 at 1), (v) Mr. Baugh and his team went to great lengths to protect Wenig and other executives (ECF 590 at 10), and (vi) Mr. Wenig deliberately placed "buffers between himself and those doing the actual dirty work." ECF 526 at 9.

Plaintiffs have likewise raised a host of other "facts"—ranging from the purported gifting of a CIA emblem to texts sent by Mr. Wenig's wife—that were untethered to specific claims but nevertheless said to try to establish Mr. Wenig's liability. Some of Plaintiffs' factual contentions (*e.g.*, ██████████████████████████████████████████ (ECF 526 at 3)) can tenably, though incorrectly, be said to relate to their claims; some of those also being inaccurate (*e.g.*, ████████████████████████████ (ECF 526 at 7)) are also so irrelevant and trivial that their inclusion defies explanation. Yet there is a uniting thread: Mr. Baugh unequivocally established each not to be true.

As further detailed in the chart below, Mr. Baugh's testimony guts every single one of Plaintiffs' "fact-based" assertions and inferences regarding Mr. Wenig's purported initiation, involvement, acquiescence, or sanctioning of the Natick Events. It also defeats Plaintiffs' attempts to show that Mr. Wenig could or should have foreseen the horrific events at Natick. And it proves the breathtaking scope of the falsities and misrepresentations of "facts," whether tethered to Plaintiffs' claims or not, upon which Plaintiffs' case theory against Mr. Wenig rests.

| UNDISPUTED FACT: | |
|---|---|
| **Mr. Wenig never directed nor sanctioned the actions of Mr. Baugh and his team.** | |
| **Plaintiffs' Allegations** | **What Mr. Baugh Has Now Testified** |
| "Wenig directed, encouraged, and sanctioned the actions of Baugh and his team." ECF 590 at 5; *see also* ECF 526 at 12, 17; ECF 590 at 6, 7, 8, 10.<br><br>██████████ ECF 532 ¶ 75. | Mr. Wenig never instructed or directed Mr. Baugh to take any action against the Steiners. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 366:3–7.<br><br>Mr. Baugh never discussed the plans or actions taken to harass the Steiners with Mr. Wenig, including before, during, or after the Natick Events. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 365:12–20.<br><br>"Mr. Wenig never instructed [Mr. Baugh] or directed [Mr. Baugh] to" "intimidate the Steiners," "harass them," "threaten them," "defame them." ECF 697-1, Day 1 J. Baugh Dep. Tr. 366:3–16.<br><br>"As [the Natick] events were unfolding [Mr. Baugh] went out of [his] way to make sure the folks at eBay were not finding out." ECF 697-1, Day 1 J. Baugh Dep. Tr. 365:21–366:1. |
| Mr. Baugh stated that Mr. Wenig had told him to burn her to the ground. *See* ECF 532 ¶ 45; *see also id.* ¶ 52. | Mr. Wenig never told Mr. Baugh to "burn her to the ground." ECF 697-1, Day 1 J. Baugh Dep. Tr. 363:12–23. |
| ██████████ ECF 532 ¶ 97. | Mr. Baugh did not "have any agreement with Mr. Wenig that [Mr. Baugh] would take actions to harass, to threaten, to make uncomfortable with -- the Steiners[.]" *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 366:17–23 |
| ██████████ ECF 532 ¶ 71. | Mr. Wenig never sent emails to Mr. Baugh about the Steiners. *See* ECF 697-1, Day 1, J. Baugh Dep. Tr. 378:24–379:8. |
| Mr. Wenig's "directives and communications to Baugh and the security team" make him responsible for defamation. ECF 526 at 18. | Mr. Wenig never instructed anyone to defame the Steiners. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 366:15–16. |

| UNDISPUTED FACT: | |
|---|---|
| **Mr. Baugh hid his improper and illegal behavior from Mr. Wenig and others.** | |
| **Plaintiffs' Allegation** | **What Mr. Baugh Has Now Testified** |
| Mr. Wenig ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ See ECF 590 at 1; *see also id.* at 3, 7, 8. | Mr. Baugh gave those around him "every reason to perceive [him]" as a person who "had it all together, confident, reliable, able to handle anything." ECF 697-1, Day 1 J. Baugh Dep. Tr. 94:5–21.<br><br>"So as to maintain [the] outside persona of a competent professional who had it all together, [Mr. Baugh] avoided getting visibly drunk when [he] met with people above [him] at work." ECF 697-1, Day 1 J. Baugh Dep. Tr. 146:17–22.<br><br>Mr. Baugh did not drink in front of Mr. Wenig because he was "responsible for his protection," so Mr. Wenig "would therefore not see that [Mr. Baugh] drink[s]." ECF 697-1, Day 1, J. Baugh Dep. Tr. 333:21–334:5. |
| "Baugh conducted 'active shooter drills where *leadership would pretend to shoot us in the middle of eBay's campus for all staff to watch*, or earthquake drills where they would blast airhorns in our ears while timing our response to write an email with no grammatical errors.'" ECF 526 at 9 (emphasis in original). | The active shooter drills were done when the executives were not present. *See* ECF 697-1, Day 1, J. Baugh Dep. Tr. 119:15–120:13.<br><br>The disaster drill that Mr. Wenig participated in was a "tabletop" conference room event, not outside on the campus [and did not involve any pretend shooting]. *See* ECF 697-1, Day 1, J. Baugh Dep. Tr. 399:12–400:1. |
| Mr. Baugh was ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See* ECF 590 at 3. | Mr. Baugh never told Mr. Wenig the details of his "covert operation[s]." *See* ECF 697-1, Day 1, J. Baugh Dep. Tr. 346:3–13.<br><br>Mr. Baugh "[n]ever shared classified information with any executive team member." ECF 697-1, Day 2, J. Baugh Dep. Tr. 37:2–3. |

5

| UNDISPUTED FACT: | |
| --- | --- |
| **Mr. Baugh never told Mr. Wenig about any alleged link between FidoMaster, unsuckeBay, and the Steiners.** | |
| **Plaintiffs' Allegation** | **What Mr. Baugh Has Now Testified** |
| "The ELT suspected that FidoMaster was either an alter-ego or collaborator of the Steiners, and that, together, they incited hostility from the seller 'fringe' who posed a physical security threat to eBay employees." ECF 533-5 at 8. | Mr. Baugh never "communicated to Mr. Wenig either any suspicion – or . . . rumor – that either unsuckeBay or FidoMaster had anything to do with the Steiners." *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 360:20–25.<br><br>Mr. Wenig "never said to [Mr. Baugh] that he suspected FidoMaster to be . . . an alter ego or collaborator with the Steiners." ECF 697-1, Day 1 J. Baugh Dep. Tr. 392:7–393:13. |

| UNDISPUTED FACT: | |
| --- | --- |
| **When Mr. Baugh was referring to the ELT or eBay Corporate in his sentencing memo, he was not referring to Mr. Wenig.** | |
| **Plaintiffs' Allegation** | **What Mr. Baugh Has Now Testified** |
| "In the immediate aftermath of the vandalism, the ELT was pleased, because they [sic] executives perceived that negative postings had subsided." ECF 533-5 at 13; *see also* ECF 526 at 3; ECF 532 ¶ 34; *see generally* ECF 636 at 11 ("[Plaintiffs] are well-aware that Baugh's testimony will be consistent with his sentencing memorandum."). | The reference to the ELT members who were purportedly pleased in wake of the fence does not include Mr. Wenig. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 394:10–23. |
| "The ELT suspected the Steiners and FidoMaster of colluding with and possibly receiving funding from an activist investor, Elliott Management, that was critical of eBay executives and wanted to obtain seats on the company's board." ECF 533-5 at 8; *see generally* ECF 636 at 11. | Mr. Wenig never exchanged communications with Mr. Baugh that indicated Mr. Wenig "suspected the Steiners and Fidomaster of colluding with and possibly receiving funding from an activist, investor, Elliott Management[.]" *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 393:3–13.<br><br>In the phrase "the ELT suspected the Steiners and FidoMaster," Mr. Baugh "[didn't] mean Mr. Wenig." ECF 697-1, Day 1 J. Baugh Dep. Tr. 393:14–16. |
| "The Steiners were a 'threat' that Wenig, Wymer, Jones, and Huber were obsessed with neutralizing." ECF 533-5 at 3; *see generally* ECF 636 at 11. | Mr. Wenig never "said that he believed the Steiners were a threat that needed to be neutralized." ECF 697-1, Day 1 J. Baugh Dep. Tr. 389:5–13. |

6

| UNDISPUTED FACT: |
| --- |
| **When Mr. Baugh was referring to the ELT or eBay Corporate in his sentencing memo, he was not referring to Mr. Wenig.** |

| Plaintiffs' Allegation | What Mr. Baugh Has Now Testified |
| --- | --- |
| "Mr. Baugh faced intense, relentless pressure from multiple executives (who have evaded criminal responsibility), including the CEO Devin Wenig, SVP Steve Wymer, COO Wendy Jones, and General Counsel Marie Huber, to do something, anything, about the 'threat' which, they knew and told Mr. Baugh repeatedly, could not be solved through ordinary 'lawyer' tools." ECF 533-5 at 2; *see generally* ECF 636 at 11. | "Mr. Wenig never said to [Mr. Baugh] that he believed that [the Steiners were] a threat for which lawyer tools could not be used[.]" ECF 697-1, Day 1 J. Baugh Dep. Tr. 387:10– 388:3.<br><br>Mr. Baugh "never had a direct conversation about Mr. or Mrs. Steiner with Mr. Wenig." ECF 697-1, Day 2 J. Baugh Dep. Tr. 94:20– 22.<br><br>Mr. Baugh "had the impression that when Mr. Wymer was telling [him] things about Mr. [Mr. Wenig] that [Mr. Wymer] might not be telling it to [Mr. Baugh] accurately." ECF 697-1, Day 1 J. Baugh Dep. Tr. 383:24– 384:1. |
| "eBay corporate is willing to absorb any legal exposure." ECF 533-5 at 19; *see generally* ECF 636 at 11. | Mr. Baugh never "heard . . . from Mr. Wenig" that "eBay corporate is willing to absorb any legal exposure" and did not understand "eBay corporate" to "includ[e] Mr. Wenig in that[.]" ECF 697-1, Day 1 J. Baugh Dep. Tr. 394:24– 395:18.<br><br>At the very same time that others were plotting and planning action against the Steiners (on August 6, 2019) and Mr. Baugh claims some to be "obsessed," Mr. Wenig wrote to Mr. Baugh about an unrelated security threat saying: "It's cool. Don't worry, you know this comes with the territory; and it's part of running with consumer company. I'm relaxed." ECF 697-1, Day 1 J. Baugh Dep. Tr. 360:9–14. |
| Mr. Baugh was "assured . . . 'executive level support' if efforts led to 'any legal problems.'" ECF 533-5 at 19; *see also* ECF 526 at 5; ECF 532 ¶ 53; ECF 590 at 2; *see generally* ECF 636 at 11. | After the Natick events, Mr. Baugh "didn't ask [Mr. Wenig] for any legal support or protection" and was not "referring to . . . anything Mr. Wenig said" when using "phrases like . . . top cover or support[.]" *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 366:24– 367:15. |

| UNDISPUTED FACT: When Mr. Baugh was referring to the ELT or eBay Corporate in his sentencing memo, he was not referring to Mr. Wenig. | |
| --- | --- |
| **Plaintiffs' Allegation** | **What Mr. Baugh Has Now Testified** |
| "Although pushing back against a powerful CEO may not have been realistic, Mr. Baugh could and should have exercised good judgment." ECF 533-5 at 3; *see generally* ECF 636 at 11. | Mr. Wenig never said something in terms of the Steiners for which Mr. Baugh needed to push back. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 389:14–24. |

| UNDISPUTED FACT: Mr. Wenig never told Mr. Baugh the Steiners were an existential threat. | |
| --- | --- |
| **Plaintiffs' Allegation** | **What Mr. Baugh Has Now Testified** |
| "The Executive Leadership Team ('ELT'), which included Wenig, Wymer, and Jones, viewed eCommerceBytes as 'an existential threat to the company.'" ECF 532 ¶ 19; *see also* ECF 526 at 2. | "[N]o one more senior to [Mr. Baugh] in the organization told" him that EcommerceBytes was an "existential threat[] to the company." Mr. Baugh "drew an assumption." ECF 697-1, Day 2 J. Baugh Dep. Tr. 40:19–41:10. |

| UNDISPUTED FACT: Mr. Wenig and Mr. Baugh did not communicate about the Steiners' fence. | |
| --- | --- |
| **Plaintiffs' Allegation** | **What Mr. Baugh Has Now Testified** |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ECF 526 at 3; *see also* ECF 532 ¶¶ 29–33; ECF 590 at 1. | Mr. Baugh never told "Mr. Wenig before, during, or after anything about painting of [the Steiners'] fence." ECF 697-1, Day 1 J. Baugh Dep. Tr. 367:22–368:3; 380:23–381:4.<br><br>In Mr. Baugh's and "Mr. Wenig's conversations about a fence . . . between '17 and '19, [Mr. Baugh is] clear that [he was] raising . . . the security fence" with Mr. Wenig. ECF 697-1, Day 1 J. Baugh Dep. Tr. 368:4–10. |

8

| UNDISPUTED FACT: | |
| :---: | :---: |
| **Mr. Wenig's communications with Mr. Baugh were professional and pertained only to legitimate security concerns.** | |
| **Plaintiffs' Allegation** | **What Mr. Baugh Has Now Testified** |
| <br>ECF 526 at 7<br><br>"Baugh was in direct communication with Wenig, as well as with other executives that reported to Wenig." ECF 526 at 1. | Mr. Wenig and Mr. Baugh communicated about "security issue[s]." *See, e.g.,* ECF 697-1, Day 1 J. Baugh Dep. Tr. 344:11–18; 356:22–357:1; 368:25–369:21; 377:1–4.<br><br>Mr. Wenig "did not consult with [Mr. Baugh] about eBay's communications strategy." ECF 697-1, Day 1 J. Baugh Dep. Tr. 344:19–345:5.<br><br>"Mr. Wenig did not consult with [Mr. Baugh] as to how to respond to criticism." ECF 697-1, Day 1 J. Baugh Dep. Tr. 345:6–9.<br><br>Mr. Baugh "did not have conversations with [Mr. Wenig] about the business decisions he had to make as the CEO." ECF 697-1, Day 1 J. Baugh Dep. Tr. 345:10–13.<br><br>Cindy Wenig messaged Dan Cory, not Mr. Baugh, about the threats posted about Mr. Wenig online. *See* ECF 697-1, Day 2, J. Baugh Dep. Tr. 152:10–21.<br><br>Mr. Baugh and Cindy Wenig only communicated about security issues. *See, e.g.,* ECF 697-1, Day 2 J. Baugh Dep. Tr. 188:21–24.<br><br>Mr. Baugh only had Mr. Wenig's cell phone number "for security reasons." *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 335:13–21. |
|  ECF 526 at 2. | When Mr. Baugh was at the cubicle on the executive floor "it was for the purposes of doing the logistics for and arrangements for and plans for whatever security was needed for Mr. Wenig or others." *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 336:9–20. |

| UNDISPUTED FACT: | |
|---|---|
| Mr. Wenig's communications with Mr. Baugh were professional and pertained only to legitimate security concerns. | |
| **Plaintiffs' Allegation** | **What Mr. Baugh Has Now Testified** |
| ██████████████████████ ██████████████████████ ██████████████████████ ████████ CF 176 ¶ 270; *see also* ECF 526 at 6; 3/10/2024 SJ Hearing Tr. 28:4–12. | Mr. Wenig sent the "cavalry is back" text not to Mr. Baugh but to Mr. Wymer. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 379:14–380:13. |

| UNDISPUTED FACT: | |
|---|---|
| It was clear to Mr. Baugh that Mr. Wenig prioritized ethical conduct at eBay. | |
| **Plaintiffs' Allegation** | **What Mr. Baugh Has Now Testified** |
| "'The Company did not publicly reprimand the CEO . . . for the corporate culture that he oversaw that permitted the offense conduct to occur.'" ECF 526 at 7. | It was clear "to [Mr. Baugh] . . . that the company acting ethically was important to Mr. Wenig[.]" *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 348:1–11. Mr. Wenig "had an entire day that the leadership did an offsite on ethics and other values. The entire senior team was there[.]" *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 347:18–25. |

## II.    Mr. Baugh's testimony further exposed the legal infirmities of Plaintiffs' claims.

There is significant overlap between the legal elements of Plaintiffs' various claims, as well as the facts and inferences that Plaintiffs contend support each claim. Consequently, Plaintiffs' claims fall on a discrete set of findings. Mr. Wenig's lack of intent forecloses Plaintiffs' Intentional Infliction of Emotional Distress ("IIED"), Trespass, and False Imprisonment Claims. The absence of proximate cause compels the dismissal of Plaintiffs' Negligence, Negligent Supervision, and IIED claims. The fact that Mr. Wenig did not make any agreement regarding or participate in any sort of purported conspiracy forecloses liability both for Civil Conspiracy as an

10

independent tort and as a separate basis of liability for all of Plaintiffs' claims (as Plaintiffs have incorrectly contended). *See* ECF 498 at 5-20; ECF 579 at 7-20.[1]

As discussed throughout these summary judgment proceedings, there are a host of reasons why Plaintiffs' claims should be dismissed as a matter of law, regardless of the "facts" Plaintiffs have put forward. That said, it is worthwhile to address here just how misguided the factual underpinning of Plaintiffs' legal claims is.

### A. *Intent-Based Claims*

For claims of IIED, Trespass, and False Imprisonment, Plaintiffs must prove that Mr. Wenig had a specific intent. *See Morehouse v. Berkshire Gas Co.*, 989 F. Supp. 54, 65–66 (D. Mass. 1997) (IIED); *Dilbert v. Hanover Ins. Co.*, 825 N.E.2d 1071, 1077 (Mass. App. Ct. 2005) (Trespass); *Cremaldi-Vickery v. Otis Elevator, Inc.*, 782 N.E.2d 48 (Table), 2003 WL 168452, at *2 (Mass. App. Ct. Jan. 21, 2003) (False Imprisonment).

To establish intent, Plaintiffs claim that Mr. Wenig discussed the Steiners with Mr. Baugh and directed him to take action against them. This is false. Mr. Baugh testified that the purported emails "[Mr. Wenig sent [] to [Mr.] Baugh about the Steiners," ECF 529 at 1, 4, 10, 15; ECF 532 ¶¶ 71, 75, "never happened," as at no point did the two *ever* communicate about Plaintiffs. ECF 697-1, Day 1 J. Baugh Dep. Tr. 378:21-379:8. Thus, Plaintiffs' attempt to portray Mr. Wenig as a man "obsessed" with the Steiners who was directing Mr. Baugh to undertake criminal action as a result of that obsession, *see, e.g.*, ECF 590 at 1; ECF 532 ¶¶ 19, 34, 52; *see also* ECF 533-5 at 3, is baseless. What is more, at the very time Mr. Baugh was hatching his plan to terrorize the Steiners (undisputably unbeknownst to Mr. Wenig), Mr. Baugh informed Mr. Wenig about steps Mr. Baugh

---

[1] Plaintiffs' MCRA and defamation claims also fail absent a conspiracy. *See* ECF 498 at 15–18; ECF 579 at 18–19.

had taken to identify an actual security threat and Mr. Wenig responded: "I'm cool. I'm relaxed. It comes with the turf [of being a CEO]." ECF 697-1, Day 1 J. Baugh Dep. Tr. 386:5–10. As Mr. Baugh agreed: these are "[n]ot quite the words of somebody who seems to be obsessed," ECF 697-1, Day 2 J. Baugh Dep. Tr. 190:12–19, and a far cry from the obsessed and unhinged CEO-villain Plaintiffs have tried to fashion. *Id.*

Plaintiffs also assert that ███████████████████████████████████ ███████ ECF 590 at 11; ECF 526 at 3, but that too is false, as Mr. Baugh testified that he never told "Mr. Wenig before, during, or after anything about the painting of [the Steiners'] fence" and confirmed that any reference he made to Mr. Wenig about a "fence" was for a perimeter security fence that Mr. Baugh had been seeking to have installed for years. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 367:22–369:3; 380:23–381:4. So too with the allegation that Mr. Wenig relied on intermediaries to direct actions against the Steiners: Mr. Baugh testified that he did not understand the "take her down" text that was sent to Mr. Wymer as a directive for Mr. Baugh to take action against Plaintiffs, and that he otherwise never received a "direct order" (whether through Mr. Wymer or others) concerning the Steiners from Mr. Wenig. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 384:3–24, 398:5–146. Mr. Baugh also refuted Plaintiffs claim that Mr. Wenig ever sought "plausible deniability" from Mr. Baugh. Mr. Baugh explained that "plausible deniability" (or "willful blindness") was when someone had said to him they "did not want to know the details," but he stated clearly that there was never a single instance where Mr. Wenig told Mr. Baugh he (Wenig) did not want to know details. ECF 697-1, Day 2 J. Baugh Dep. Tr. 196:1–198:8. Put simply, Mr. Baugh affirmed what the evidentiary record already showed: Mr. Wenig *never* instructed Mr. Baugh, whether directly or through others, to initiate or take harassment actions against the Plaintiffs. Mr. Wenig never communicated once with Mr. Baugh about the Plaintiffs.

12

*See, e.g.*, ECF 697-1, Day 1 J. Baugh Dep. Tr. 365:12–20, 378:21–379:8, Day 2 J. Baugh Dep. Tr. 94:20–22.

Mr. Baugh also rebuffed Plaintiffs' efforts to use Mr. Baugh's sentencing memorandum as a mechanism by which to conflate the actions, communications, and, most critically, the intent of Mr. Wenig with that of other ELT members. As detailed previously (ECF 609 at 49:6–50:5), Plaintiffs' Opposition is rife with such mischaracterizations. Despite all evidence to the contrary, Plaintiffs repeatedly suggested that references to the "ELT" in Mr. Baugh's sentencing memorandum were intended to encompass Mr. Wenig and implicated his awareness of the Natick Events and their orchestration. *See, e.g.*, ECF 532 ¶¶ 19, 34, 52–53. Mr. Baugh put the lie to this. As one example, Plaintiffs contend that Baugh's sentencing memorandum establishes that the ELT, "which included, [Mr.] Wenig" purportedly suspected that FidoMaster was an associate of Plaintiffs, and that consequently Mr. Wenig "direct[ed]" Mr. Baugh to identify the individual behind the anonymous account. ECF 532 at ¶¶ 19, 52; ECF 533-5 at 8, 10, 19. Not so: as Mr. Baugh testified, Mr. Wenig never suggested that he believed FidoMaster and the Steiners were collaborating, and Mr. Wenig and Mr. Baugh never discussed any suspected or actual link between FidoMaster and the Steiners. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 360:20–25, 393:3–16. Mr. Baugh's testimony put an end to Plaintiffs' calculated (and brazen) attempt to improperly group FidoMaster and unsuckeBay—which were perceived as potential security threats to Mr. Wenig and eBay, ECF 697-1, Day 1 J. Baugh Dep. Tr. 348:22–349:15—with eCommerceBytes or the Steiners to create the misimpression that Mr. Wenig and Mr. Baugh ever discussed the Steiners or actions to be taken against them. *See* ECF 697-1, Day 1, J. Baugh Dep. Tr. at 360:20–25, 365:12–20, Day 2 J. Baugh Dep. Tr. at 94:20–22, 193:7–21; ECF 578 ¶ 71.

As another, Plaintiffs claim that the ELT—again, purportedly including Mr. Wenig based on Mr. Baugh's sentencing memorandum— ████████████████████████████ ████████████████████ ECF 532 ¶ 34; ECF 526 at 3. And again, Mr. Baugh rejected Plaintiffs' contortion of his sentencing memorandum, clarifying that the reference to "executives" did *not* include Mr. Wenig. ECF 697-1, Day 1 J. Baugh Dep. Tr. 394:10–23.

Plaintiffs did not present any evidence of an intent on Mr. Wenig's part prior to Mr. Baugh's testimony. Mr. Baugh further confirmed that no such evidence exists. Nor did Plaintiffs' attempt to characterize a text by Mr. Wenig saying farewell to Mr. Baugh as a promise that Mr. Baugh's "loyalty would pay off" withstand Mr. Baugh's testimony, ECF 526 at 10; ECF 532 ¶ 74, as he made clear that this was not "an accurate reflection" and that "there's hardly anything true about that" representation. ECF 697-1, Day 1 J. Baugh Dep. Tr. 404:5–22. With this goes Plaintiffs' intent-based claims. *Diaz v. Devlin*, 229 F. Supp. 3d 101, 113 (D. Mass. 2017) (citing *Rua v. Glodis*, 52 F. Supp. 3d 84, 100 (D. Mass. 2014) (dismissing IIED claim where plaintiff failed to show that defendants engaged in intentional conduct), *aff'd*, 2015 WL 13933038 (1st Cir. Dec. 21, 2015)); *Dilbert v. Hanover Ins. Co.*, 825 N.E.2d 1071, 1077 (Mass. App. Ct. 2005) (explaining that liability for trespass arises if a person "'intentionally [] enters land in the possession of [an]other, or causes . . . a third person to do so.'") (quoting Restatement (Second) of Torts § 158); *Cremaldi-Vickery v. Otis Elevator, Inc.*, 782 N.E.2d 48 (Table), 2003 WL 168452, at *2 (Mass. App. Ct. 2003) (affirming dismissal of false imprisonment claims on summary judgment because defendant had no "specific intent to confine" plaintiff).

### B. Negligence Claims

Plaintiffs' negligence claims cannot withstand summary judgment, either. As a matter of law, Plaintiffs are unable to establish that Mr. Wenig owed them a duty of care. *See Barrigas v.*

14

*United States*, 2018 WL 1244780, at \*8 (D. Mass. Mar. 9, 2018); *see also* ECF 498 at 11–13; ECF 579 at 16–17. Nor can they overcome the fact that the Criminal Defendants' horrific conduct was an "extraordinary" intervening event that forecloses a finding of proximate cause. *See Delaney v. Reynolds*, 825 N.E.2d 554, 556–57 (Mass. 2005); *see also* ECF 498 at 9–10, 13, ECF 579 at 17–18.

Moreover, the Natick Events were not a foreseeable consequence of Mr. Wenig's text messages regarding a communications strategy to his head communications officer, Mr. Wymer. *See Leavitt v. Brockton Hosp., Inc.*, 907 N.E.2d 213, 219–20 (Mass. 2009) (dismissing claim where injury was not within the scope of foreseeable consequences). As Mr. Wenig's motion made clear, Mr. Wenig's text messages to Mr. Wymer concerned a legitimate "take down" communications strategy, and nothing more. *See, e.g.*, ECF 498 at 3; ECF 492 ¶¶ 14–28. Mr. Baugh acknowledged this point at his deposition as he confirmed that Mr. Wenig sent those texts *only* to Mr. Wymer, ECF 697-1, Day 1 J. Baugh Dep. Tr. 396:13–398:16, and that even Mr. Wymer understood Mr. Wenig's text to mean Mr. Wenig wanted to "take the [eCommerceBytes] website down legally." ECF 697-1, Day 2 J. Baugh Dep. Tr. 192:12–193:6. Moreover, the fact that Mr. Wymer understood that Mr. Wenig meant "take the website down legally," *id.*; ECF 697-78 at 2, further forecloses any foreseeability even based on a claim that Mr. Wenig failed to supervise Mr. Wymer.

Mr. Baugh also testified, as did Mr. Steiner himself, that "context is everything." ECF 697-1, Day 2 J. Baugh Dep. Tr. 191:18–21; ECF 527 ¶ 35. He also confirmed that others used the phrase "take down" to mean have the contractor "take down" the Walker's West floorplans from their website (ECF 697-1, Day 2 J. Baugh Dep. T0. 191:24–192:10) or to "take the website down legally." *Id.* at 193:1–6.

15

Plaintiffs also cannot show that Mr. Wenig "knew, or should have known, that the offending employee had a proclivity to commit the complained-of acts, and that the employer nevertheless failed to take corrective action." *Vicarelli v. Bus. Intern., Inc.*, 973 F. Supp. 241, 246 (D. Mass. 1997).

The sheer inaccuracy of Plaintiffs' allegations concerning the foreseeability of Mr. Baugh's actions due to his purported proclivity for violence—which Plaintiffs assert supports both a finding of proximate cause and their claim of negligent supervision, ECF 526 at 14–16; ECF 590 at 1, 6–8—warrants discussion in light of Mr. Baugh's testimony. Mr. Baugh first put to rest the notion that the Natick Events were foreseeable to Mr. Wenig in light of his workplace behavior. To the contrary, Mr. Baugh testified that he went to great lengths not only to hide any traces of the Natick Events, and their orchestration, from Mr. Wenig, but that he was at pains to appear an exemplary employee in their interactions. Despite his self-professed difficulties with alcohol abuse, Mr. Baugh testified he never drank while he was working with Mr. Wenig. *See* ECF 697-1, Day 1, J. Baugh Dep. Tr. 333:21–334:5, Day 2 J. Baugh Dep. Tr. 201:8–22. Mr. Baugh likewise recognized that Mr. Wenig "put into effect a compliance training for every employee, and the security team contributed to that [compliance training]" and Mr. Wenig "[spoke] to [Mr. Baugh's] team . . . about the role security plays . . . [in] the values of the company and ethics" upon Mr. Baugh's request. ECF 697-1, Day 1, J. Baugh Dep. Tr. 347:13–348:11.

He also corrected Plaintiffs' misrepresentation of the various security drills he ran that purportedly showed a proclivity to violence. As to emergency response team drills that Mr. Baugh spearheaded—an eminently sensible decision in light of the fact that another tech company, YouTube (which Mr. Baugh described as being "down the street," ECF 697-1, Day 1, J. Baugh Dep. Tr. 369:20–370:1), experienced a deadly campus shooting (ECF 579 at 10–11)—Mr. Baugh

16

clarified that executives were not present during those drills as they were done after hours. ECF 697-1, Day 1, J. Baugh Dep. Tr. 119:15–120:13. And the sole disaster drill that Mr. Wenig participated in was simply a "tabletop" exercise, where individuals discussed possible emergency scenarios and responses while gathered in a conference room. ECF 697-1, Day 1, J. Baugh Dep. Tr. 399:12–400:5.

Finally, Mr. Baugh rebuffed the notion that his communications with Mr. Wenig would have alerted Mr. Wenig to his violent capacities. Mr. Baugh and Mr. Wenig kept a highly professional relationship, with their conversation strictly focused on Mr. Baugh's security work. *See, e.g.*, ECF 697-1, Day 1 J. Baugh Dep. Tr. 344:11–18; 356:22–357:1; 368:25–369:21; 377:1–4. Contrary to Plaintiffs' repeated suggestions, Mr. Baugh also verified that Mr. Wenig was unaware of the details of Mr. Wenig's past government work, and would have no basis to view Mr. Baugh as an individual inclined to violence on this basis. ECF 697-1, Day 1, J. Baugh Dep. Tr. 346:3–13; *see also* Day 2, J. Baugh Dep. Tr. 36:24–37:3 (Mr. Baugh "[n]ever shared classified information with any executive leadership team member."). As mentioned above, Mr. Baugh confirmed that, as the record had already well established, he and the Criminal Defendants went to great lengths to ensure that no one at eBay—Mr. Wenig included—was aware that they were orchestrating the Natick Events. ECF 697-1, Day 1 J. Baugh Dep. Tr. 365:21–366:2. Far from supporting a finding of foreseeability, Mr. Baugh's testimony makes crystal clear that Mr. Wenig could never have reasonably expected the Natick Events to take place.

### C. Civil Conspiracy

There are two theories of civil conspiracy: concerted action and aiding and abetting. To prevail on the concerted action doctrine of civil conspiracy, Plaintiffs needed to show some type of "agreement" to engage in tortious activity. *Mass. Sch. of Law. at Andover, Inc. v. Am. Bar Ass'n,*

1997 WL 136240, at *5 (D. Mass. Mar. 3, 1997), *aff'd*, 142 F.3d 26 (1st Cir. 1998). To prevail on aiding and abetting, Plaintiffs needed to demonstrate "that the . . . conduct [of another person] constitute[d] a breach of duty and g[ave] substantial assistance or encouragement to the other so to conduct himself." *Thomas v. Harrison*, 909 F.3d 483, 491 (1st Cir. 2018) (internal quotations omitted). The assistance provided must be "a substantial factor in causing the resulting tort." *Id.* (internal quotations omitted). Further, Plaintiffs must demonstrate that Mr. Wenig had an "'unlawful intent,' consisting of both 'knowledge that the other's conduct is tortious[] and an intent to substantially assist or encourage that conduct.' Merely showing the defendant's 'general awareness' that [his] ostensible co-conspirator is engaged in tortious acts is insufficient." *Id.* (internal citations omitted); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 472 (2023) (recognizing that aiding and abetting liability requires "conscious, voluntary, and culpable participation in another's wrongdoing"); *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556, 1566 (2025) ("[A]iding and abetting usually requires misfeasance rather than nonfeasance. Absent an independent duty to act, a person's failure[s], omissions, or inactions—even if in some sense blameworthy—will rarely support aiding-and-abetting liability.") (internal quotations and citations omitted).

Mr. Baugh's testimony further foreclosed a finding of liability under either theory. As to concerted action and the existence of an agreement to engage in tortious activity, Mr. Baugh put it most succinctly:

> Q: In all of your dealings with Mr. Wenig leading up to the time that you started your campaign of harassment against the Steiners, did you have any agreement with Mr. Wenig that you would take actions to harass, to threaten, to make uncomfortable with -- the Steiners with him, any agreement at all?
>
> A: No.

18

ECF 697-1, Day 1 J. Baugh Dep. Tr. 366:17–23. Mr. Baugh likewise disposed of the notion that Mr. Wenig could be found liable under a theory of aiding and abetting. While discussed previously, it bears repeating: Mr. Baugh testified that he did not understand the take her down text to be a direction to put in motion a harassment campaign, ECF 697-1, Day 1 J. Baugh Dep. Tr. 397:20–398:16, that he received no "direct order" from Mr. Wenig to take action against the Steiners, ECF 697-1, Day 1 J. Baugh Dep. Tr. 384:3–16, and that he never discussed the plans or actions taken to harass the Steiners with Mr. Wenig, including before, during, or after, ECF 697-1, Day 1 J. Baugh Dep. Tr. 365:12–20. Mr. Baugh also established that he went out of his way to ensure that no one, other than the Criminal Defendants, had any awareness of the planned events in Natick. *See* ECF 697-1, Day 1 J. Baugh Dep. Tr. 365:21–366:2. A claim of aiding and abetting cannot survive such clear and refuting evidence. *See Go-Best Assets Ltd. v. Citizens Bank*, 972 N.E.2d 426, 429 (Mass. 2012) (finding no aiding and abetting liability "where [defendant] had no knowledge of [his purported co-conspirator's] scheme to defraud").

## CONCLUSION

For the reasons detailed in Mr. Wenig's Motion for Summary Judgment, Sur-Reply Brief, and here, summary judgment should be granted in his favor on all claims.

Dated: July 16, 2025

Respectfully submitted,


_/s/ Kelly A. Librera_
Abbe David Lowell (*pro hac vice*)
Lowell & Associates, PLLC
1250 H Street, N.W., Suite 250
Washington, D.C. 20005
alowellpublicoutreach@lowellandassociates.com
O: 202-964-6110
F: +1 202-964-6116


Kelly A. Librera (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
klibrera@winston.com
(212) 294-6700


Martin G. Weinberg, Esq.
Martin G. Weinberg PC
20 Park Plaza
Suite 1000
Boston, MA 02116
owlmgw@att.net
(617) 227-3700

*Counsel for Devin Wenig*

20

## CERTIFICATE OF SERVICE

I, Kelly A. Librera, hereby certify that on this date, July 16, 2025, a copy of the foregoing Supplemental Brief in support of Mr. Wenig's Motion for Summary Judgment has been served via Electronic Court Filing system on all registered participants.


/s/ *Kelly A. Librera*
Kelly A. Librera