UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                       )
INA STEINER, DAVID STEINER, and        )
STEINER ASSOCIATES, LLC,               )
                                       )
                  Plaintiffs,          )    Civil Action
                                       )    No. 21-cv-11181-PBS
v.                                     )
                                       )
EBAY, INC., et al.,                    )
                                       )
                  Defendants.          )
_____)

<u>**MEMORANDUM AND ORDER**</u>

August 12, 2025

Saris, J.

<u>**INTRODUCTION**</u>

In 2019, Plaintiffs Ina and David Steiner, a married couple living in Natick, Massachusetts, became the target of a months-long harassment and intimidation scheme. The Steiners own and operate a trade publication, eCommerceBytes, which reports on e-commerce companies such as Defendant eBay, Inc. ("eBay"). A group of eBay employees devised and engaged in a campaign of harassment, stalking, and threats to stop the Steiners from reporting about eBay. The conduct carried out by the group included sending the Steiners threatening online messages; arranging for the delivery of disturbing packages, such as fly larvae, live spiders, cockroaches, a Halloween mask of a bloody pig face, a funeral

wreath, and a book entitled "Grief Diaries: Surviving Loss of a Spouse"; signing the Steiners up for unwanted email subscriptions; publicly posting the Steiners' address inviting strangers for parties; and traveling to Massachusetts, surveilling the Steiners' home, and stalking them. The government subsequently brought federal criminal charges against seven individuals involved in the conspiracy. All seven have pled guilty.

The Steiners bring this civil suit against those seven individuals, in addition to five other parties: eBay, three former eBay executives ("Executive Defendants"), and a separate company, Defendant Progressive F.O.R.C.E. Concepts, LLC ("PFC"). The latter five parties now move for summary judgment.

After a hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** eBay's motion for partial summary judgment (Dkt. 486) and the Executive Defendants' motions for summary judgment (Dkts. 484, 491, 493). The Court **ALLOWS** PFC's motion for summary judgment (Dkt. 490).

## BACKGROUND

Drawing all reasonable inferences in favor of the Steiners, the Court treats the following facts as undisputed. See Quintana-Dieppa v. Dep't of Army, 130 F.4th 1, 7 (1st Cir. 2025).

I.    **The Parties**

Ina Steiner and David Steiner reside in Natick, Massachusetts. They own and operate Steiner Associates, LLC, through which they publish eCommerceBytes, an online trade publication they started in 1999. The publication reports on e-commerce platforms.

eBay is an e-commerce corporation that operates online marketplaces. Defendant Devin Wenig is eBay's former Chief Executive Officer ("CEO"). Defendant Steve Wymer is eBay's former Chief Communications Officer. Defendant Wendy Jones is eBay's former Senior Vice President of Global Operations. Wymer and Jones reported directly to Wenig. PFC is a contracting company that provides security and intelligence personnel. In January 2019, eBay contracted PFC to supply intelligence analysts to work on eBay's security team in its Global Security and Resiliency Department ("Security Department"). The relationship between the two companies was governed by a Master Services Agreement.

II.   **eBay's Global Security and Resiliency Department**

As the former Senior Director of Safety and Security, Jim Baugh headed eBay's Security Department. Prior to joining eBay, Baugh worked for United States government intelligence and private security companies. At eBay, the Security Department was responsible for managing crises and threats to people at eBay or the brand. To do so, Baugh oversaw a security team, which included

Brian Gilbert, eBay's former Senior Manager of Special Operations; Stephanie Popp, eBay's former Senior Manager of the Global Intelligence Center; Stephanie Stockwell, eBay's former manager of the Global Intelligence Center; David Harville, eBay's former Director of Global Resiliency; Philip Cooke, eBay's former Security Operations Manager; and Veronica Zea, a PFC employee contracted out to eBay as an intelligence analyst.

Baugh reported directly to Jones, and his workspace was near her office. They would have one-on-one meetings two to four times per month. Baugh had a growing alcohol addiction during his time at eBay. By the summer of 2019, he was consuming around ten alcoholic drinks per day, including workdays. However, Baugh did his best to hide his drinking problems from those above him at eBay, including Jones, by avoiding getting drunk before his meetings.

## III.  <u>Communications About the Steiners and the First Boston Visit</u>

By the spring of 2019, the Executive Defendants became increasingly concerned about eCommerceBytes' coverage of eBay. On April 10, 2019, Wymer sent a text to Wenig with a link to an article written by Ina Steiner reporting that Wenig was compensated 152 times that of an average eBay employee. Along with the link, Wymer texted, "We are going to crush this lady." Dkt. 569-1 ¶ 21 (alteration in original). On April 20, 2019, in reference to negative coverage about eBay by the Wall Street Journal, Wenig

texted Wymer: "Fuck them. The journal is next on the list after [Ina Steiner]." Id. ¶ 23.

On May 23, 2019, Jones and Baugh met to discuss the Steiners, during which Jones asked Baugh, "Where are you at on this issue?" Dkt. 697-1 at 112:19-20.[1] Baugh told her that they were "still working on things." Id. at 112:21. In response, Jones asked Baugh to deal with it "off the radar." Id. at 112:25-113:1. In addition, she asked him to let her know if he "need[ed] any help with it . . . but [she] d[id]n't want to know the details." Id. at 113:1-3. At a different meeting with Jones, Baugh played for her a recorded call between a security team member using a false identity and a subject associated with "FidoMaster." FidoMaster is the username of a commenter on eCommerceBytes who often posted criticism of eBay and who the security team believed was connected to the Steiners. After hearing the recording, Jones fist bumped Baugh.

On May 31, 2019, in reference to an eCommerceBytes article written by Ina Steiner, Wenig wrote to Wymer: "I couldn't care less what she says" and "[t]ake her down." Dkt. 569-1 ¶ 27 (alteration in original). Wymer shared Wenig's text with Jones that same day. Jones referred to Steiner as a "cow," and Wymer replied, "Her day is coming." Id. ¶ 28. Jones then texted "I can't

---

[1] Baugh's deposition testimony was taken over two days, and transcripts from both days are appended within the same document. As a result, the same deposition page number may appear twice; all citations therefore are to the PDF page numbers.

wait" and let Wymer know that Baugh came to her with some thoughts and she had told him to "stand down and leave it alone." Id. Wymer told Jones she was "too kind" and to tell Baugh to be his "advisor on this issue." Id. He concluded that "[s]ome times you just need to make an example out of someone" and that Ina Steiner "needs to be crushed." Id. Jones replied that she had told Baugh she "would raise to" Wymer and Wymer "would let [Baugh] know if [he] want[ed] [Baugh] to proceed." Id. Wymer replied to this final message with a thumbs up emoji. Id.

A week later, Baugh directed Gilbert to travel to Boston to surveil the Steiners and to pay for the trip with a PFC-issued credit card. Once in Boston, Gilbert graffitied the word "FidoMaster" on the Steiners' fence. Though Baugh did not inform anyone of Gilbert's trip beforehand, after Gilbert vandalized the Steiners' fence, Baugh told Wymer that his team had given the Steiners a "tap on the shoulder." Dkt. 697-1 at 624:25-625:5. Baugh was intentionally vague because Wymer had previously instructed Baugh to let him know if Baugh required assistance but to not share the details of any plans.

On August 1, 2019, after Ina Steiner had published an article about a lawsuit eBay had filed against Amazon, Wenig texted Wymer: "Ina is out with a hot piece on the litigation. If we are ever going to take her down . . . now is the time." Dkt. 569-1 ¶ 40 (alteration in original). Wymer responded: "On it." Id. ¶ 41. At

6

the time of this exchange, Wenig was on a sabbatical. Wymer later texted Baugh: "I want her DONE." Dkt. 697-43. Baugh then asked, "[Wenig] said to burn her to the ground correct?" Id. Wymer replied: "She is a biased troll who needs to get BURNED DOWN." Id. He continued: "I want to see ashes. As long as it takes. Whatever it takes." Id. Finally, Wymer assured Baugh that he would "embrace managing any bad fall out. We need to STOP her." Dkt. 533-1 ¶ 40.

On August 7, 2019, Baugh met with Wymer in his office. During the meeting, Wymer appeared agitated. Wymer made statements to Baugh suggesting that he take any necessary steps to neutralize the Steiners and identify the person behind the FidoMaster account. In particular, Baugh remembers Wymer stating that "[t]he only thing that matters is that it stops." Dkt. 697-1 at 270:1-3. He assured Baugh that his team would have support from the "top" if they ran into any legal problems. See id. at 273:18-274:2. Both Wenig and Wymer deleted text messages that were exchanged during this period.

## IV.  **Harassment and Intimidation Campaign**

On August 6, 2019, Baugh had two separate meetings with members of his security team to plan their operation against the Steiners. The plan included sending disturbing and unwanted deliveries and launching an online harassment campaign. In particular, the deliveries and online actions taken by Baugh and his team included:

- Sending Twitter direct messages to the Steiners that were vulgar and threatening, stating: "WTF . . . whats it goin to take for u to answer me??"; "I guess im goin to have to get ur attention another way bitch . . ."; "U dont have the balls to talk to me?? Stop hiding behind ur computer screen u fuckin cunt!!!"; "UR fat fuck pussy husband needs to put u in line cunt"; and "after [Mr. Steiner] takes the plugs out of his asshole . . . fucking pussies!!!"

- Ordering live spiders, fly larvae, live cockroaches, a Halloween mask of a bloody pig face, a funeral wreath, and a book entitled "Grief Diaries: Surviving Loss of a Spouse" for delivery at the Steiners' home

- Sending pornographic magazines to the Steiners' neighbors with David Steiner's name on the mailing label

- Attempting to order a pig fetus for delivery to the Steiners' home;

- Ordering pizza for delivery at the Steiners' home at 4:30 in the morning

- Publicly tweeting at Ms. Steiner with her name, age, address, and telephone number, asking, "Dis ur address???"

- Posting two Craigslist advertisements with the Steiners' address soliciting strangers to come to their home

Dkt. 569-1 ¶ 55 (alterations in original). The expenses associated with these activities were paid with credit card PFC issued to Zea and paid the upfront costs for. eBay acknowledges and takes responsibility for these actions.

In addition to the online and delivery-based harassment, Baugh and members of his team traveled to Natick a second time to stalk and surveil the Steiners. On August 15, 2019, Baugh, Harville, and Zea unsuccessfully attempted to install a GPS tracking device on the Steiners' car. The next day, they rented a vehicle and began monitoring the Steiners' home, following them by

car when they left. Over several days, they circled the block and followed David Steiner through town. During this period, "the Steiners were terrified to leave their house." Dkt. 569-1 ¶ 76. Although they did leave their home on seven occasions, each trip was made out of necessity -- to purchase groceries, buy security equipment, or meet with police. They did not leave their home to celebrate their thirty-first wedding anniversary.

## V.   **An Investigation and a Coverup**

The Steiners reported the conduct to the Natick Police Department ("NPD"), which began an investigation on August 16, 2019. eBay began its own investigation on August 22, 2019, after being contacted by the NPD. Baugh and his security team obstructed the NPD and eBay investigations.

After NPD began its investigation, Wymer called Baugh to indicate that he and Jones were aware of the NPD criminal investigation. He equated the harassment to "TP'ing" a house and told Baugh to "stick to [his] guns." Dkt. 697-1 at 304:16-305:2.

On August 23, Baugh texted Wymer: "We will continue to cooperate [with eBay's internal investigation], but not sure how much longer we can keep this up." Id. at 291:5-11. Baugh assured Wymer that no crime was committed.

After a series of interviews by eBay's legal team, on August 30, eBay placed Baugh, Popp, and Harville on administrative leave, and in September 2019, terminated their employment,

together with that of Gilbert and Stockwell. eBay also terminated Zea's contract. That month, eBay's Board of Directors voted to request Wenig's resignation, which would be treated as a termination without cause, in part because of the criminal conduct against the Steiners. Accordingly, as alleged in the complaint, Wenig received a severance package of $57 million. <u>See</u> Dkt. 176 ¶ 14. eBay retained Jones and allowed her to retire with full benefits in 2020. eBay terminated Wymer's employment for cause.

## VI. <u>Criminal Proceedings</u>

The U.S. Attorney's Office subsequently brought criminal charges against the seven defendants from Baugh's security team. All seven have pled guilty to criminal charges arising from the misconduct.

Baugh and Harville pled guilty to conspiracy to commit stalking and to substantive counts of stalking. Baugh also pled guilty to witness tampering and evidence destruction. Baugh was sentenced to 57 months, and Harville was sentenced to 24 months of imprisonment.

Popp, Stockwell, Zea, Gilbert, and Cooke pled guilty to conspiracy to commit cyberstalking and witness tampering. Popp was sentenced to one year and one day of imprisonment. Stockwell and Zea were each sentenced to two years of probation. Cooke was sentenced to 18 months of imprisonment, and Gilbert was sentenced to time served.

## VII. <u>Procedural History</u>

Plaintiffs initiated this civil suit on July 21, 2021, against eleven named Defendants. On March 1, 2023, Plaintiffs filed an amended complaint adding new factual allegations, causes of action, and defendants.

In April 2023, eleven of the thirteen defendants filed motions to dismiss. On December 12, 2023, the Court ruled on those motions, dismissing Defendant Steve Krystek for lack of personal jurisdiction and dismissing Plaintiffs' claims for stalking, assault, and negligent hiring. <u>See</u> Dkt. 309.

In November 2024, the Court issued an order on partial summary judgment resolving a dispute over which state's law governs punitive damages. It held that California law governs punitive damages for Plaintiffs' intentional infliction of emotional distress ("IIED") and civil conspiracy claims, while Massachusetts law governs the remaining claims. <u>See</u> <u>Steiner v. eBay, Inc.</u>, 755 F. Supp. 3d 101, 108-11 (D. Mass. 2024). eBay moved to certify the Court's order for interlocutory appeal. The Court denied that request. <u>See</u> <u>Steiner v. eBay, Inc.</u>, 763 F. Supp. 3d 101, 105 (D. Mass. 2025).

In October 2024, Defendants eBay, Wymer, Wenig, Jones, and PFC filed motions for summary judgment. Following a hearing in March 2025, Plaintiffs informed the Court that Baugh, who had previously invoked the Fifth Amendment, would now cooperate and

11

provide testimony in this case. See Dkt. 611. The Court allowed the parties to depose Baugh, which they did over two days, concluding on July 9, 2025. The parties filed supplemental summary judgment briefs the following week.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[] all reasonable inferences" in its favor. Id. (quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

The party seeking summary judgment "must [first] adumbrate 'an absence of evidence to support the nonmoving party's case.'" Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (alteration in original) (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)). Once the movant does so, "[t]he

burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." Id. To satisfy this burden, the nonmovant "must present definite, competent evidence" demonstrating that a trialworthy issue exists. Id. (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. Kinzer, 99 F.4th at 108 (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

## DISCUSSION

### I.    Defamatory Statements

eBay moves for summary judgment on Plaintiffs' defamation claim.[2] Although Plaintiffs initially identified forty-seven defamatory statements, their opposition only addresses a subset. Therefore, the Court examines only the statements Plaintiffs have preserved and treats the remainder as waived. See Montany v. Univ. of New Eng., 858 F.3d 34, 41 (1st Cir. 2017) (holding that the plaintiff's failure to put forth any argument in her opposition to the defendants' motion for summary judgment on a particular claim constituted abandonment of the claim); Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 57 (1st Cir. 2014) (finding that the

---

[2] This section focuses on eBay's motion for summary judgment on the defamation claim. Where the other Defendants adopt eBay's arguments and those arguments apply with equal force, the Court's reasoning applies to them as well.

plaintiffs waived a claim after they did nothing to develop the claim and did not address it in their summary judgment papers).

To succeed on a defamation claim under Massachusetts law, Plaintiffs must establish four elements:

> (1) that "the defendants made a statement, concerning the plaintiffs, to a third party"; (2) that the statement was defamatory such that it "could damage the plaintiffs' reputation in the community"; (3) that "the defendants were at fault in making the statement"; and (4) that "the statement either caused the plaintiffs economic loss or is actionable without proof of economic loss."

Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (cleaned up) (quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510-11 (Mass. 2003)).[3]

eBay argues that none of the challenged statements meets the required elements of defamation under Massachusetts law. The statements in question fall into three categories: Craigslist advertisements, tweets, and newsletter signups. The Court addresses each in turn.

---

[3] The parties dispute whether Ina Steiner is a limited-purpose public figure. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 351–52 (1974) (distinguishing public figures from private individuals). If so, Plaintiffs would be required to prove "actual malice" in addition to the standard elements of defamation. See McKee v. Cosby, 874 F.3d 54, 61 (1st Cir. 2017); HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 767 (Mass. 2013). Because the record is replete with evidence from which a jury could find actual malice, the Court need not resolve the public figure question at summary judgment.

A.    **Craigslist Advertisements**

The following two Craigslist advertisements were posted on August 18, 2019:



Dkt. 505-14 ¶ 102.



Id. ¶ 106.

eBay first argues that the advertisements are not actionable because Plaintiffs lack evidence that any third party actually viewed them. To satisfy the publication element of defamation, a plaintiff must show that "the defamatory communication is transmitted to even one person other than the plaintiff." Phelan v. May Dep't Stores Co., 819 N.E.2d 550, 554 (Mass. 2004).

Plaintiffs satisfy the publication element by pointing to "more foot traffic on [their] quiet little one-way street" on the day of and immediately following the Craigslist advertisements. Dkt. 533-39 at 9. eBay argues that the connection between the foot traffic and the Craigslist posts is speculative and insufficient at this stage, citing to Doe v. UMass-Amherst, 708 F. Supp. 3d 100 (D. Mass. 2023), appeal dismissed, No. 23-1118 (1st Cir. May 27, 2025). In Doe, the plaintiff alleged that defamatory statements in her personnel file caused another institution to deny her employment transfer, arguing based on "intuiti[on]" that the institution must have reviewed the file. Id. at 138. The court rejected the claim for lack of publication, finding the plaintiff's theory was speculative and unsupported by "concrete or objective facts." Id.

But this case differs in two respects. First, Craigslist advertisements, unlike a company's personnel files, are public by design. Second, Plaintiffs point to a concrete, observable fact -- the increased foot traffic around the Steiners' home -- supporting a reasonable inference in Plaintiffs' favor that third parties viewed the Craigslist advertisements. See Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp., 376 F.3d 8, 17 (1st Cir. 2004) (explaining that a court must draw "reasonable inferences . . . in favor of the non-moving party on summary judgment" and that those inferences may be "properly be drawn from circumstantial evidence"

16

(quoting Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co., 169 F.3d 43, 56 (1st Cir. 1999))). Thus, Plaintiffs satisfy the publication element.

eBay next argues that neither Craigslist advertisement is "of and concerning" Plaintiffs because neither names them. A defamatory statement that does not identify a plaintiff by name can still be "of and concerning" her if "the defendant intended its words to refer to the plaintiff and . . . they were so understood." Eyal v. Helen Broad. Corp., 583 N.E.2d 228, 231 (Mass. 1991) (quoting New Eng. Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co., 480 N.E.2d 1005, 1012 (Mass. 1985)).

The first Craigslist advertisement was not "of and concerning" Plaintiffs. The advertisement uses Plaintiffs' street address but states that it is posted by "fun locals" throwing a party "while the owners are out of town." Dkt. 505-14 ¶ 102. While the address may be identifiable as belonging to Plaintiffs, the language of the post indicates the authors are not the Plaintiffs and makes clear the homeowners are not home. On these facts, no reasonable juror could find that this advertisement was "of and concerning" Plaintiffs. Summary judgment is therefore warranted as to the first advertisement.

The second Craigslist advertisement presents a closer call. In addition to listing Plaintiffs' address,[4] the post describes the authors as a "M/F couple" and a "mature (50s) married couple." Id. ¶ 106. Whether this description, coupled with Plaintiffs' address, is sufficient to make Plaintiffs "readily identifiable" is a factual question. Brauer v. Globe Newspaper Co., 217 N.E.2d 736, 739 (Mass. 1966). A reasonable factfinder could find that given the combination of Plaintiffs' address, age range, marital status, and sex, the advertisement and its lewd description of the authors' sexual preferences were "of and concerning" Plaintiffs. See Solstein v. Mirra, 488 F. Supp. 3d 86, 101 (S.D.N.Y. 2020) (holding that a photograph of the plaintiff's driveway along with his home address and data on his house plausibly qualified as "of and concerning" the plaintiff); see also Restatement (Second) of Torts § 617 cmt. a (Am. L. Inst. 1965) (explaining that whether a statement was "of and concerning the plaintiff" is "ordinarily for the jury or trier of fact to determine"). Accordingly, the Court allows eBay's motion for summary judgment with respect to the defamation claim regarding the first Craigslist advertisement but denies the motion with the respect to the second.

---

[4] Although the excerpt of the post provided to the Court does not list an address, Defendants do not seem to contest that the original post did.

B.    **Professional Statements**

eBay moves for summary judgment on the challenged statements related to Ina Steiner's reporting, arguing that these are non-actionable insults, hyperbole, or opinion. Plaintiffs respond that such statements are factual and actionable even if "couched in terms of an opinion." Dkt. 587 at 13.

Statements of pure opinion are constitutionally protected because "they are not susceptible of being proved true or false." Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015). "A statement couched as an opinion," often described as a "mixed" opinion, may be actionable if it "presents or implies the existence of facts which are capable of being proven true or false." Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 127 (1st Cir. 1997); see Restatement (Second) of Torts § 566 cmt. b (explaining that the "mixed type" of opinion, "which, while an opinion in form or context, is apparently based on facts," may be actionable). Thus, "the relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of [defamatory] fact." Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724, 727 (1st Cir. 1992).

Courts may decide as a matter of law whether a statement is a nonactionable opinion or asserts a verifiable fact. See Piccone, 785 F.3d at 772. That inquiry requires examining "the totality of

19

the circumstances in which the specific challenged statements were made, including the general tenor and context of the conversation." Id. "[R]idicule and simple verbal abuse" do not give rise to liability for defamation. Fleming v. Benzaquin, 454 N.E.2d 95, 100 (Mass. 1983).

Many of the challenged statements -- such as those referring to Ina Steiner and her reporting as "shoddy," "biased," "bush league," "drivel," or "BS" -- are mere "epithets" that "are insufficiently fact-based" to ground a defamation claim. Levinsky's, 127 F.3d at 130-31 (holding that "trashy" was not actionable); see Cole v. Westinghouse Broad. Co., 435 N.E.2d 1021, 1026 (Mass. 1982) (holding that phrases "sloppy and irresponsible reporting" and "history of bad reporting techniques" were nonactionable); see also Old Dominion Branch No. 496 v. Austin, 418 U.S. 264, 284-86, (1974) ("traitor"); Greenbelt Coop. Publ'g Ass'n v. Bresler, 398 U.S. 6, 13-14, (1970) ("blackmail"); Phantom Touring, 953 F.2d at 728 ("a rip-off, a fraud, a scandal, a snake-oil job"); McCabe v. Rattiner, 814 F.2d 839, 842-43 (1st Cir. 1987) ("scam").

Plaintiffs point to two tweets that accused Ina Steiner of destroying families and, in one instance, of lying. See Dkt. 523-1 ¶¶ 49-50 ("20 yrs of lies n distroin familys . . . dunt b proud of dat u wurthless BITCH!!!" and "U R NOT A JOURNALIST!! . . . U R DISTROIN FAMILYS N BIZNESS" (alterations in original)). They

20

argue these are actionable mixed opinions implying the existence of undisclosed facts. eBay responds that, given the informal and hyperbolic nature of Twitter, these statements would be readily understood as non-literal opinions. See Cole, 435 N.E.2d at 1025 (explaining that when deciding whether a statement constitutes fact or opinion, a "court must consider . . . the medium by which the statement is disseminated" (quoting Info. Control Corp. v. Genesis One Comput. Corp., 611 F.2d 781, 784 (9th Cir. 1980))).

While some courts have found tweets nonactionable, there is no talismanic Twitter defense to defamation. Compare Ganske v. Mensch, 480 F. Supp. 3d 542, 552–553 (S.D.N.Y. 2020) (finding that tweets were not actionable in part because Twitter is "freewheeling" and "informal") with AvePoint, Inc. v. Power Tools, Inc., 981 F. Supp. 2d 496, 509 (W.D. Va. 2013) (finding that a tweet consisted of an actionable statement because it "contain[ed] a factual assertion"). Instead, speech on Twitter, like all speech, must be assessed on a case-by-case basis. See Piccone, 785 F.3d at 772.

Accusations of lying can be actionable if they imply undisclosed facts. See Milkovich v. Lorain J. Co., 497 U.S. 1, 18-19 (1990). The statements here did not provide the underlying facts for any reader to form her own conclusion as to whether Ina Steiner lied or destroyed families. However, "consider[ing] all the words used, not merely a particular phrase," Damon v. Moore, 520 F.3d

98, 105 (1st Cir. 2008) (alteration in original) (quoting <u>Amrak</u> <u>Prods., Inc. v. Morton</u>, 410 F.3d 69, 73 (1st Cir. 2005)), the tweets used such excessive language, including "BITCH," informal slang, and all-caps formatting, that a reasonable reader could not fairly identify the opinion as one rooted in fact. <u>See</u> <u>Feld v.</u> <u>Conway</u>, 16 F. Supp. 3d 1, 4 (D. Mass. 2014) (finding tweet that called the plaintiff "fucking crazy" nonactionable when viewed in context). Therefore, eBay's motion for summary judgment is allowed with respect to the statements concerning Ina Steiner as a professional.

### C.    Newsletter Sign-ups

eBay argues that the challenged statements involving "signing Plaintiff[s] up for newsletters of a political, sexual, and medical nature," Dkt. 488-1 at 28, are not defamatory for two reasons: first, most sign-ups occur automatically and thus are not published to a third party; and second, the only instance Plaintiffs claim a third party viewed a sign-up involved a sex-toy franchisee inquiry, which was seen only by the franchisor and was not defamatory. Plaintiffs contend that they are unable to respond because "eBay failed to identify most of the newsletters at issue" and has not presented any evidence that specific newsletters are automated. Dkt. 587 at 13.

The Court finds eBay's arguments persuasive. eBay points to deposition testimony from Ina Steiner acknowledging that

newsletter sign-ups appeared to be automatically processed and that she had no evidence mailing lists were shared with other companies. See Dkt. 505-11 at 39. Plaintiffs offer no rebuttal to this testimony. Without evidence that any of the sign-ups were communicated to third parties, Plaintiffs have not met the publication element. See Phelan, 819 N.E.2d at 554.

As for the one instance of confirmed third-party contact -- a call from the adult sex-toy store after Plaintiffs were signed up as potential franchisees -- the statement is not defamatory. The statement implied that Plaintiffs had an interest in starting a franchise and was seen solely by the business receiving the inquiry. No evidence suggests that this would tend to lower Plaintiffs' standing in the eyes of that particular audience. Cf. Damon, 520 F.3d at 104 ("[I]f the community or audience includes a professional group to which the subject of the statement belongs, the question is the effect of the statement upon that group with its special professional standards." (alteration in original) (quoting Kelly v. Loew's Inc., 76 F. Supp. 473, 486 (D. Mass. 1948))).

## II.  **Negligent Retention**

eBay moves for summary judgment on Plaintiffs' negligent retention claim, arguing that it had no reason to know of any misconduct by Baugh indicating violent tendencies or unfitness. Plaintiffs respond that there is evidence of Baugh's workplace

misconduct, aggressive behavior, and alcohol abuse that eBay either knew or should have known about, including warnings in Baugh's 2018 performance review.

Employers such as eBay have a duty to exercise reasonable care in the retention of their employees. See Foster v. Loft, Inc., 526 N.E.2d 1309, 1310 (Mass. App. Ct. 1988). "To establish an employer's liability for negligently . . . retaining an employee, a plaintiff must show that," during the course of employment, "the 'employer [became] aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment.'" Helfman v. Ne. Univ., 149 N.E.3d 758, 775 (Mass. 2020) (alteration in original) (quoting Foster, 526 N.E.2d at 1311). An employer must avoid retaining an employee whom the employer "knows or should know is a person unworthy[] by habits, temperament, or nature." Foster, 526 N.E.2d at 1310-11 (quoting Annotation, Liability of Employer, Other Than Carrier, for a Personal Assault upon Customer, Patron, or Other Invitee, 34 A.L.R.2d 372, 390 (1954)).

The record does not show that eBay was aware or should have been aware of Baugh's violent tendencies, workplace misconduct, or alcohol abuse. Plaintiffs claim that Baugh created a "fear-driven" work environment that included "violent and belligerent behavior towards co-workers." Dkt. 569-1 ¶¶ 56-57. But Baugh testified in

24

his deposition that he hid his misconduct from eBay's executives. In particular, he held the active shooter drills that Plaintiffs point to after hours. Though Plaintiffs argue that Baugh mistreated his subordinates, none of his subordinates lodged a complaint through the internal reporting channels outlined in eBay's employee trainings, which they had completed. Plaintiffs contend that this silence reflects a culture of fear and retaliation, not the absence of misconduct. While that may be so, the focus "is the supervisors' conduct, rather than the employee's intentional conduct." Theisz v. Mass. Bay Transp. Auth., 231 N.E.3d 369, 373 (Mass. App. Ct. 2024), aff'd, 252 N.E.3d 1028 (Mass. 2025). Without complaints or observable misconduct, Plaintiffs have not shown that eBay had actual or constructive knowledge of Baugh's unfitness.

Nor does the record show that eBay knew or should have known of Baugh's alcohol abuse. Baugh admitted he had a drinking problem but said he concealed it from eBay's executives. Jones was made aware of only one instance where Baugh drank too much during the evening of a business trip to London in June 2019. Afterwards, Jones told Baugh that his behavior was unacceptable, expressed surprise that he, of all her employees, was the one to become intoxicated, and asked if he needed help. This was the only time Jones, Wenig, or Wymer heard of Baugh drinking on the job.

Finally, Baugh's 2018 performance evaluation is not the canary in the coal mine Plaintiffs portray it to be. That evaluation referred to Baugh as "irrational," "nervous," and "need[ing] help to lead." Dkt. 697-9 at 3-5. However, Baugh's deposition provided context for those statements that undermines these concerns. Jones's statement that Baugh acted "irrational[ly]" in some of his dealings with workplace resources was with regards to a project to install perimeter fencing around eBay's campus and other maintenance defects, not interpersonal conflict. Dkt. 697-1 at 57:10-58:24. Baugh also admitted to acting nervously in 2018 in response to budget cuts and security demands. In another instance, Jones provided feedback that Baugh waited too long to use the proper reporting channels after Popp reported sexual harassment by another eBay employee to him. Lastly, Baugh explained that the "needs help to lead" comment came from the head of human resources, who Baugh claims retaliated after he criticized one of her hiring decisions.

Importantly, nowhere in the performance review is there any mention of violent behavior or misconduct of the kind now alleged. On the contrary, the evaluation includes praise for Baugh's leadership and professionalism. For example, Jones commented that Baugh "did a great job re-building a world class team," was "exceptional" in his handling of the primary crisis communication

26

center for eBay, and "was an absolute pleasure" to work with. Dkt. 697-9 at 2-3.

Notably, eBay has moved for summary judgment only on the negligent retention claim and not on the claim of negligent supervision. See Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 613 (D. Mass. 2016) (explaining that negligent retention falls under the umbrella of negligent supervision). Here, a genuine factual dispute exists as to whether Baugh was adequately supervised during the late summer of 2019 when much of the alleged harassment occurred. Therefore, while the Court allows eBay's motion with respect to the negligent retention claim, the claim of negligent supervision still remains.

## III. **False Imprisonment**

eBay argues that the Steiners were not falsely imprisoned for two reasons: first, there is no evidence that Defendants intended to confine Plaintiffs; and second, Plaintiffs were not "complete[ly]" confined because they left their house and car on multiple occasions. Restatement (Second) of Torts § 36(1).

False imprisonment is the "intentional and unlawful confinement of a person, either directly or indirectly, of which the person confined is conscious or is harmed by such confinement." Jonielunas v. City of Worcester Police Dep't, 338 F. Supp. 2d 173, 177 (D. Mass. 2004). "While 'confinement' can be imposed by physical barriers or physical force, much less will do -- although

27

how much less becomes cloudy at the margins." McCann v. Wal-Mart Stores, Inc., 210 F.3d 51, 53 (1st Cir. 2000). For instance, threats of force may suffice, including "by words as well as by other acts," so long as the actor "has the apparent intention and ability to apply force to the other's person immediately upon the other's attempting to escape from the area [of confinement]." Restatement (Second) of Torts § 40 & cmt. a. An actor has the requisite intent when "his act was done for the purpose of imposing confinement upon the other or with knowledge that such confinement would, to a substantial certainty, result from it." Id. § 35 cmt. d.

Here, a reasonable jury could conclude that Baugh and his security team engaged in a course of conduct -- including stalking, surveillance, and other intimidating behavior -- that was intended to instill fear in the Steiners and thereby restrain their freedom of movement. Such "fear of a personal difficulty" may give rise to a finding that Plaintiffs' "personal liberty" was unlawfully "restrained." Coblyn v. Kennedy's, Inc., 268 N.E.2d 860, 861 (Mass. 1971) (quoting Jacques v. Childs Dining Hall Co., 138 N.E. 843, 843 (Mass. 1923)).

False imprisonment also requires evidence of actual confinement, in other words, "that the victim[s] submit[ed]" to the actor's threats. McCann, 210 F.3d at 54. Though confinement within the boundaries fixed by the defendant must be "complete,"

28

the area of confinement "may be large and need not be stationary." Restatement (Second) of Torts § 36(1) & cmt. b; see Foley v. Polaroid Corp., 508 N.E.2d 72, 77 (Mass. 1987) ("[A] plaintiff who relinquishes his right to move about freely as the only available alternative to relinquishment of another right . . . is restrained . . . .").

eBay contends that the Steiners were never completely confined because they were free to leave the house, which they did on seven occasions over the three-week period. See, e.g., Dkt. 523-1 ¶¶ 90-99. However, Plaintiffs left their home and car out of necessity to purchase groceries and security equipment, to freeze their credit and set up informed delivery, and to speak with or be near to the police. Plaintiffs did not leave for any other matters -- such as to celebrate their wedding anniversary -- and stated that they "were terrified to leave their house." Dkt. 569-1 ¶ 76. Moreover, on at least three occasions, Plaintiffs were followed as they left their home and drove through town. A reasonable jury could conclude that Defendants, through a pattern of surveillance and intimidation, intentionally confined Plaintiffs to their home and car and that Plaintiffs submitted to that coercion. Accordingly, summary judgment on the false imprisonment claim is denied.

## IV.  **Ratification**

eBay moves for summary judgment on the issue of ratification, in part to avoid exposure to punitive damages for Plaintiffs' claims for IIED and civil conspiracy.[5] Under California law, punitive damages are available for torts committed with "oppression, fraud, or malice." Cal. Civ. Code § 3294(a). A corporate employer may be liable for punitive damages "based upon acts of an employee" if:

> the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

Id. § 3294(b).

Ratification occurs where "the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties." Coll. Hosp., Inc. v. Superior Ct., 882 P.2d 894, 907 (Cal. 1994). It often arises when an employer "fail[s] to intercede in a known pattern of workplace abuse, or fail[s] to investigate or discipline

---

[5] The Court previously held, in ruling on an earlier motion for partial summary judgment, that California law governs the issue of punitive damages with respect to Plaintiffs' claims for IIED and civil conspiracy. See Steiner, 755 F. Supp. 3d at 109.

the errant employee once such misconduct became known." Id.
Importantly, "[c]orporate ratification in the punitive damages
context requires actual knowledge of the conduct and its outrageous
nature." Id. at 908.

There is a genuine dispute of material fact as to whether
Wymer, an officer of eBay, ratified Baugh's actions, including
once eBay's internal investigation had begun.[6] After the NPD began
its investigation into the harassment of the Steiners, Wymer called
Baugh and asked whether the conduct in the police report was
carried out by his team. See Dkt. 697-1 at 285:25-286:1. Baugh
confirmed that it was. See id. Wymer equated the actions to "TP'ing
a house" and directed Baugh to "stick to [his] guns for now." Id.
at 304:10-16, 305:2. Baugh felt that Wymer seemed nervous and said
that he would not say anything to eBay's legal team during their
investigation. See id. at 305:3-9. The next day, on August 23,
2019, Baugh sent Wymer a text from his personal phone stating: "My
team ran an op on our friend in Boston." Id. at 289:24-290:2. Baugh
went on to assure Wymer that his team had not taken any illegal
actions. See id. at 290:7-9. However, at that point Wymer had seen
the police report and had already heard Baugh admit responsibility.
See id. at 293:17-294:4. Though Wymer never responded to those

---

[6] Defendants argue that any such ratification cannot bind eBay
because the investigation was already underway, but they cite no
authority for the proposition that post-investigation knowledge
and inaction cannot constitute ratification.

text messages, the fact that he received them, was told by Baugh that his team was responsible, and "fail[ed] to investigate or discipline" Baugh creates a triable issue as to whether Wymer ratified the conduct. Coll. Hosp. Inc., 882 P.2d at 907. Thus, the Court denies summary judgment on the ratification claim.

## V.    Damages

The Court next addresses eBay's arguments for summary judgment on the issues of consulting and goodwill damages. In general, recovery of "compensatory damages[] requires a showing that the claimed losses were proximately caused by the wrongful conduct of the defendant." O'Brien v. Pearson, 868 N.E.2d 118, 127 (Mass. 2007). Damages must also be established "to a reasonable degree of certainty," even if not with "mathematical precision." Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 543 (Mass. 2003) (first quoting Lowrie v. Castle, 113 N.E. 206, 210 (Mass. 1916); and then quoting Ricky Smith Pontiac, Inc. v. Subaru of New Eng., Inc., 440 N.E.2d 29, 48 (Mass. App. Ct. 1982)). In other words, a plaintiff cannot recover when such damages are "remote, speculative, hypothetical, and not within the realm of reasonable certainty." Augat, Inc. v. Aegis, Inc., 631 N.E.2d 995, 998 n.4 (Mass. 1994) (quoting Lowrie, 113 N.E. at 210); see Camar Corp. v. Preston Trucking Co., 221 F.3d 271, 277 (1st Cir. 2000).

A.    **Lost Consulting Fees**

Plaintiffs seek nearly $5 million in damages for a purported "lost business opportunity for consulting work." Dkt. 523-1 ¶ 129. "[D]amages for loss of prospective profits must be 'capable of ascertainment upon some definite standard, either of market value, established experience, or direct inference from known circumstances,'" and a plaintiff must "demonstrate[] 'with a fair degree of certainty what the profits would have been.'" Hendricks & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 217 (1st Cir. 1991) (quoting John Hetherington & Sons, Ltd. v. William Firth Co., 95 N.E. 961, 964 (Mass. 1911)). Such damages are often difficult to estimate due to "[m]anifest ambiguities in ascertaining what would have been the course of events in the face of complicated factors, under circumstances which never have come to pass, and inherent difficulties in calculating the amount of prospective gains." Augat, 631 N.E.2d at 998 n.4 (quoting Lowrie, 113 N.E. at 210).

Here, Plaintiffs' estimate of lost consulting fees is based on an hourly rate of $250 to $450. Ina Steiner had previously consulted only once, more than twenty-five years ago, and cannot recall her compensation. When asked how she arrived at her hourly rate estimate, she answered: "When we were filling out the interrogatories, we had to come up with a number. . . . [I]t was my best estimate." Dkt. 505-11 at 8:8-14. She acknowledged that "there wasn't enormous research . . . that went into this figure."

33

Id. at 8:16-17. David Steiner initially estimated an hourly consulting rate of $150, see Dkt. 505-9 at 7, but in a later supplemental interrogatory response increased it to the same figure based on "some cursory searches for related services." Dkt. 505-12 at 6:5-6; see Dkt. 505-59 at 3. Like Ina, David had not performed consulting work in more than two decades. Prior to the events of August 2019, Plaintiffs had not taken any steps towards establishing a consulting practice because they "hadn't sort of decided that that was something that [they] wanted to do at that time." Dkt. 505-7 at 23:6-8.

On this record, no reasonable jury could conclude that Plaintiffs' claimed consulting opportunity was sufficiently developed or that lost profits were ascertainable to a reasonable degree of certainty.

## B.  Goodwill Damages

Plaintiffs also seek $10 million in connection with loss of goodwill and value of their business. A goodwill loss amount must be "adequately supported," typically through "data concerning the reduced value of businesses." S. Port Marine, LLC v. Gulf Oil Ltd. P'ship, 234 F.3d 58, 67-68 (1st Cir. 2000); see 38 Am. Jur. 2d Good Will § 17 (2025) ("The measure of damage to business property, such as good will, is based on the measurement of the difference in value of the property before and after the injury.").

eBay argues that Plaintiffs' $10 million loss figure is based solely on speculation. In their sur-reply, Plaintiffs introduce the expert testimony of Kristin K. Kucsma to substantiate their claimed losses. eBay has challenged the admissibility of that testimony, and the Court will resolve the dispute in connection with the pending Daubert motions.

## VI.  **Executive Defendants' Motions for Summary Judgment**

The Executive Defendants move for summary judgment on Plaintiffs' intentional tort, civil conspiracy, and negligence claims. The Court addresses each set of claims in turn.

### A.  **Intentional Torts**

Plaintiffs bring claims against the Executive Defendants for defamation, IIED, trespass, false imprisonment, and violation of the Massachusetts Civil Rights Act ("MCRA"). They argue that the Executive Defendants either aided and abetted or directed Baugh and his security team to commit these intentional torts. Under Massachusetts law, to hold a party liable for aiding and abetting a tort, a plaintiff must show that (1) a third-party "committed the relevant tort," (2) the defendant "knew [the third-party] was committing the tort," and (3) the defendant "actively participated in or substantially assisted in the commission of the tort." Go-Best Assets Ltd. v. Citizens Bank of Mass., 972 N.E.2d 426, 438 (Mass. 2012).

Plaintiffs also assert claims of civil conspiracy under Massachusetts law. Massachusetts law provides for two types of civil conspiracy: true conspiracy and concerted action conspiracy. See Greene v. Philip Morris USA Inc., 208 N.E.3d 676, 682 (Mass. 2023). Plaintiffs do not allege a true conspiracy.

A concerted action claim is "akin to a theory of common law joint liability in tort." Id. at 683 (quoting Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994)). This form "of civil conspiracy requires an underlying tort [and t]he conspiracy consists in agreeing to, or assisting in, this underlying tort." Thomas v. Harrington, 909 F.3d 483, 490 (1st Cir. 2018) (alteration in original) (quoting Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009)). "To prove a 'concerted action' conspiracy, a plaintiff must show that defendants either (1) acted 'in concert with or pursuant to a common design with' the tortfeasor or (2) 'gave substantial assistance to' the tortfeasor's conduct." Id. (quoting Kyte v. Philip Morris Inc., 556 N.E.2d 1025, 1027 (Mass. 1990)). To recover under a substantial assistance theory, a plaintiff must show that (1) the defendant provided assistance or encouragement to a tortfeasor, (2) the assistance was a substantial factor in bringing about the tortious conduct, and (3) the defendant acted with the requisite wrongful intent. See Taylor, 576 F.3d at 35.

>     1.   *Jones*

Jones argues she is entitled to summary judgment because there is no evidence she had knowledge of, or substantially assisted, Baugh's conduct. Plaintiffs cite a May 2019 meeting in which Jones told Baugh to "deal with the issue 'off the radar' since comms and legal couldn't handle it" and instructed him to not tell her any of the details. Dkt. 697-1 at 624:3-9.

A reasonable juror could not find that Jones had actual knowledge of the tortious conduct that followed. Baugh never informed Jones of his team's operation against the Steiners, and Plaintiffs present no evidence that Jones learned of the conduct before reading the NPD police report.

A reasonable jury could infer that Jones's ignorance was deliberate. In the May 2019 meeting between Baugh and Jones, Jones told Baugh that she did not "want to know the details" of what Baugh was doing to investigate the FidoMaster account, which Baugh suspected was connected to the Steiners. Id. at 113:2-3. After that meeting, Jones did not ask Baugh for any details about his approach to the Steiners. However, while willful blindness may establish aiding-and-abetting liability in the criminal context, see, e.g., United States v. Ford, 821 F.3d 63, 73-74 (1st Cir. 2016), the Massachusetts Supreme Judicial Court ("SJC") has not yet extended this principle to the civil context. And "[w]here a state's highest court has not spoken directly," federal courts are

"not in a position . . . to blaze a new trail." Forbes v. BB&S Acquisition Corp., 22 F.4th 22, 25 (1st Cir. 2021) (quoting Jones v. Secord, 684 F.3d 1, 11 (1st Cir. 2012)).

Nevertheless, Plaintiffs may proceed on a separate theory: that Jones directly induced or authorized Baugh's tortious conduct. "[O]ne who intentionally induces another to commit any tortious act that results in damage to the plaintiff" may be held liable for that tortious act. Alberts v. Devine, 479 N.E.2d 113, 121 (Mass. 1985); see DiMare v. RealtyTrac, Inc., 714 F. Supp. 2d 199, 210 (D. Mass. 2010) (explaining that an individual may be liable for the intentional tort of another if she "directed, encouraged, or sanctioned" the tortious actions); see also Bertram v. WFI Stadium, Inc., 41 A.3d 1239, 1248 (D.C. 2012) ("Corporate officers are personally liable for torts which they commit, participate in, or inspire . . . ." (quoting Lawlor v. District of Columbia, 758 A.2d 964, 974 (D.C. 2000))).

Drawing all reasonable inferences in Plaintiffs' favor, the record supports that theory here. After Jones asked Baugh to "deal with the issue 'off the radar,'" at a different meeting, Baugh played for Jones a recorded call between a security team member using a false identity and a subject they believed to be associated with the Steiners. Upon hearing the recording, Jones fist bumped Baugh. After those meetings, Baugh came to Jones with "some thoughts" on how to address the Steiners. Dkt. 569-1 ¶ 28. In

38

Jones's texts with Wymer, Jones said she initially told Baugh "to stand down" but then told Baugh she would raise the issue with Wymer and see if Wymer "want[ed] him to proceed." Id. Furthermore, unlike Jones's ordinary supervision of Baugh, where she "consistently ask[ed him] to follow up with her on [his] tasks," Jones chose not to ask for updates on Baugh's dealings with the Steiners. Dkt. 697-1 at 603:20-604:10.

A reasonable juror could interpret Jones's instruction to "deal with this 'off the radar,'" coupled with her deliberate refusal to follow up, as intentionally encouraging Baugh to act tortiously and unethically. See id. at 601:15-17 (describing Baugh's perception of Jones's deliberate ignorance of his operation with the Steiners as signaling an expectation that he would act "potentially unethical[ly]"). In addition, Jones's statements that she was available to "help" as needed could reasonably be inferred as "substantial assistance or encouragement" that was a "substantial factor in causing the resulting tort," Taylor, 576 F.3d at 35 (quoting Restatement (Second) of Torts § 876 & cmt. d), particularly since Baugh testified that without the executives' "input," he would not have given the Steiners "a second look." Dkt. 697-1 at 590:19-24. Therefore, Jones's motion for summary judgment with respect to the intentional torts, including civil conspiracy, is denied.

2. *Wenig*

Wenig's statements also support a finding that he intended to induce Baugh's conduct. Plaintiffs' primary argument against Wenig is that his communications regarding the Steiners set Baugh and his team's conduct into motion. Prior to Baugh's deposition, Plaintiffs referenced multiple communications between Baugh and Wenig they claimed pertained to the Steiners. However, Baugh clarified during his deposition that these statements were misattributed to Wenig and that Wenig never communicated directly with Baugh with regards to the Steiners.

Wenig himself referenced the Steiners twice in messages to Wymer. In May 2019, he responded to an article written by Ina Steiner with the comment "[t]ake her down." Dkt. 569-1 ¶ 27 (alteration in original). On August 1, 2019, Wenig again texted Wymer: "If we are ever going to take [Ina Steiner] down . . . now is the time." Id. ¶ 40 (alteration in original). That day, Wymer passed along to Baugh Wenig's instruction to take Ina Steiner down. Id. ¶ 42.

This troubling language may reasonably read as encouragement or inducement of Baugh's operation, especially given Baugh's testimony that he would not have pursued the Steiners without executive "input." Dkt. 697-1 at 590:19-24. Viewed in the light most favorable to Plaintiffs, these facts are sufficient to support a finding that Wenig's encouragement was a "substantial factor" in

the events that followed. Taylor, 576 F.3d at 35 (quoting Restatement (Second) of Torts § 876 cmt. d). Accordingly, the Court denies Wenig's motion for summary judgment on the intentional tort and civil conspiracy claims.

### 3. Wymer

The record brims with communications from Wymer that a reasonable juror could interpret as "direct[ing], encourag[ing], or sanction[ing]" the tortious actions. DiMare, 714 F. Supp. 2d at 210.

As early as April 2019, Wymer expressed hostility towards the Steiners, texting Wenig "[w]e are going to crush this lady" in reference to Ina Steiner. Dkt. 569-1 ¶ 21. The following month, after Jones told him that she had directed Baugh to stand down, Wymer replied that he wanted Baugh to be his "advisor on this issue" because "[s]ome times you just need to make an example out of someone" and Ina Steiner "need[ed] to be crushed." Id. ¶ 28.

Wymer continued to communicate with Baugh. After a member of Baugh's team graffitied the Steiners' fence, Baugh told Wymer that his team had given the Steiners "a tap on the shoulder," intentionally withholding further detail because, like Jones, Wymer had told him not to share specifics. Dkt. 697-1 at 624:25-625:18. A few weeks later when Wenig texted Wymer "[i]f we are ever going to take her down . . . now is the time," Wymer replied, "On it." Dkt. 569-1 ¶¶ 40-41 (second alteration in original). Wymer

then texted Baugh a series of escalating messages, stating that Ina Steiner needed to be "DONE," "BURNED DOWN," and "STOPPED" through "Whatever. It. T[ook]." Dkt. 697-43. He asked for "ashes" and reassured Baugh that he would "embrace managing any bad fall out." Id.; Dkt. 533-1 ¶ 40.

Immediately before Baugh and his team traveled to Natick, Baugh met with Wymer in his office. According to Baugh's deposition, Wymer was visibly agitated and reiterated that "[t]he only thing that matters is that it stops." Dkt. 697-1 at 270:1-3. He also reassured Baugh that he had executive-level support if any legal issues arose.

Taken together, these communications amount to far more than "mere passive nonfeasance." Twitter, Inc. v. Taamneh, 598 U.S. 471, 500 (2023). A reasonable jury could conclude that Wymer induced, encouraged, or authorized the tortious campaign against the Steiners. And because intent is "most suited for jury determinations," the question of Wymer's liability must be reserved for the jury. Petitti v. New Eng. Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990). Thus, the Court denies summary judgment on the intentional tort claims asserted against Wymer.

## B. Negligent Torts

Plaintiffs bring claims of negligence and negligent infliction of emotional distress ("NIED") against the Executive Defendants and negligent supervision against Jones and Wenig.

42

Because Plaintiffs do not develop a theory of negligence apart from their NIED and negligent supervision claims, the Court allows the Executive Defendants' motions for summary judgment as to the standalone negligence claims.

To recover for NIED, "a plaintiff must establish (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology, i.e., objective corroboration of the emotional distress alleged; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." ABC Soils, Inc. v. DRS Power Tech., Inc., 386 F. Supp. 3d 107, 112 (D. Mass. 2019). Thus, "one must establish negligence to successfully set forth a claim for [NIED]." Doe v. Stonehill Coll., Inc., 55 F.4th 302, 338 (1st Cir. 2022). To establish the negligence prong of an NIED claim, a plaintiff "must allege that 'the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage.'" Id. (citing Jupin v. Kask, 849 N.E.2d 829, 834-35 (Mass. 2006)).

To prevail on a negligent supervision claim, a plaintiff must demonstrate that the defendant failed to use reasonable care in supervising an employee and that this failure was the proximate cause of the plaintiff's harm. See Limone v. United States, 497 F.

Supp. 2d 143, 233 (D. Mass. 2007) (citing Foster, 526 N.E.2d at 1310), aff'd on other grounds, 579 F.3d 79 (1st Cir. 2009).

        1.   *Jones*

Just as a reasonable jury could find Jones liable for the intentional tort claims, a reasonable jury could conclude that she is liable under a theory of negligence. As previously noted, the record shows that in May 2019, Jones told Baugh "to deal with the issue" of the online criticism of eBay "'off the radar' since comms and legal couldn't handle it" and then instructed him not to tell her any of the details. Dkt. 697-1 at 624:3–9. That same month, when Baugh came to her with "some thoughts" about how to deal with the Steiners, she "told him to stand down" but also said she would raise the matter with Wymer to see if Wymer "want[ed] him to proceed." Dkt. 569-1 ¶ 28.

Afterward, Jones took no steps to inquire into Baugh's actions or assess what he was doing. A reasonable jury could find that Jones deliberately created plausible deniability by declining to ask questions and that her failure to supervise was unreasonable under the circumstances. See Helfman, 149 N.E.3d at 775 (explaining that liability may attach for failing to investigate where danger is known or should be known).

Jones responds that Baugh's conduct was unforeseeable and that she had no reason to expect he would engage in such extreme behavior. But foreseeability in negligence "does not require the

precise sequence of events or manner of injury [to be] foreseeable." Jupin, 849 N.E.2d at 837 n.8 (quoting Andrew J. McClurg, Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms, 32 Conn. L. Rev. 1189, 1232 (2000)). Here, a jury could reasonably find that Baugh's conduct was foreseeable to Jones. Jones had listened to Baugh's "thoughts" about how to handle the Steiners and had already told him to proceed "off the radar" and to withhold details. Dkt. 569-1 ¶¶ 25, 28. Given those circumstances, a jury could conclude that Jones anticipated Baugh might act improperly and chose not to supervise him. The Court denies summary judgment as to Jones on the negligent supervision and NIED claims.

>    *2.    Wymer*

As stated above, Wymer's communications with Baugh could support a finding of intentional inducement. However, alternatively, a reasonable jury could conclude that Wymer failed to exercise reasonable care in his directives to Baugh. Moreover, Wymer, like Jones, expressly declined to ask for details about Baugh's plan and did not take any steps to limit or monitor Baugh's conduct. Wymer also failed to report or investigate Baugh even after he took credit for the disturbing incidents in the NPD report. In these circumstances, a jury could find Wymer failed to exercise reasonable care. Thus, the Court denies Wymer's motion for summary judgment with respect to the NIED claim.

3.   *Wenig*

Plaintiffs' claims of negligent supervision and NIED against Wenig also survive summary judgment.

Wenig argues that he had no duty of care to the Steiners because he "provided the Steiners no 'services.'" Dkt. 498-1 at 19 (quoting Santos v. Kim, 706 N.E.2d 658, 662 (Mass. 1999)). However, the SJC has held that "as a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others." Correa v. Schoeck, 98 N.E.3d 191, 201 (Mass. 2018) (quoting Jupin, 849 N.E.2d at 835). For a duty to arise, "the risk of harm to another [must] be recognizable or foreseeable." Jupin, 849 N.E.2d at 835.

Wenig contends that Baugh's criminal conduct was unforeseeable. A third party's criminal conduct is foreseeable when "the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a . . . crime." Id. at 836 (alteration in original) (quoting Restatement (Second) of Torts § 448).

While Wenig's role in the events may have been more attenuated than Jones's and Wymer's given that he was on sabbatical during the relevant period, a jury could still find that he acted negligently. He expressed hostility towards Ina Steiner and twice instructed Wymer to "take her down," including immediately before

46

the message was relayed to Baugh and Baugh traveled to Massachusetts. Wenig took no steps to clarify what action Wymer and Baugh might take or to ensure that any responses were ethical. A jury could reasonably conclude that Wenig's conduct contributed to the risk of harm and that he failed to take reasonable care to prevent foreseeable misconduct by his subordinates. Accordingly, Wenig's motion for summary judgment is denied with respect to the negligent supervision and NIED claims.

## VII. **PFC's Motion for Summary Judgment**

Plaintiffs bring two sets of claims against PFC. The first seeks to hold PFC vicariously liable for the conduct of its employee, Zea, who Plaintiffs argue is herself liable for IIED, NIED, negligence, violations of the MCRA, defamation, trespass, false imprisonment, and civil conspiracy. The second set of claims seeks to hold PFC directly liable for negligent supervision and retention, as well as for civil conspiracy.

PFC contends that it cannot be held vicariously liable for Zea's conduct under the borrowed servant doctrine or, alternatively, because Zea was acting outside the scope of her employment during the harassment campaign. It further argues that the direct liability claims fail as a matter of law because PFC owed no duty to the Steiners and, even if it did, Plaintiffs have not shown that any breach by PFC proximately caused their injuries. Finally, PFC maintains that there is no evidence that it entered

into any agreement with eBay or Zea to support a claim of civil conspiracy or that it substantially assisted in any tortious conduct. The Court addresses each of these arguments in turn.

### A.   Borrowed Servant Doctrine

PFC argues that Zea functioned as a "borrowed servant" while working at eBay, such that any vicarious liability for her actions attaches to eBay, not PFC. Under Massachusetts law, the "test for determining borrowed servant status is 'whether, in the particular service which [the employee] is engaged to perform, he continues [to be] liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired.'" Hohenleitner v. Quorum Health Res., Inc., 758 N.E.2d 616, 624 (Mass. 2001) (quoting Coughlan v. City of Cambridge, 44 N.E. 218, 219 (Mass. 1896)); see Restatement (Second) of Agency § 220(1) (Am. L. Inst. 1958) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control."). Courts distinguish between "authoritative direction and control" on the one hand and "mere suggestion as to details or the necessary cooperation" on the other. Kelley v. S. Pac. Co., 419 U.S. 318, 329 (1974) (quoting Standard Oil Co. v. Anderson, 212 U.S. 215, 222 (1909)). The inquiry into who exercised the right of control is a "question of fact" that involves "weighing a variety of factors," none of which

48

is dispositive. Wilson v. Nooter Corp., 475 F.2d 497, 501 (1st Cir. 1973) (quoting Restatement (Second) of Agency § 227 cmt. a); see Restatement (Second) of Agency § 220(2) (listing illustrative factors).

Plaintiffs point to the Master Services Agreement ("MSA") between eBay and PFC, which states that "all personnel of PFC[] are and shall at all times be under the direct and exclusive control of PFC[]" and that "eBay acknowledges and agrees that only PFC[] will control how the Protective Services are performed." Dkt. 504-9 ¶ 4. PFC, in turn, emphasizes the parties' course of conduct, noting that the MSA also required PFC to "tak[e] into account, at all times, eBay's preferences as they may be expressed from time to time." Id.

While contractual language is "relevant," it is "not dispositive." Hohenleitner, 758 N.E.2d at 626. Here, the undisputed facts demonstrate that eBay exercised "authoritative control and direction" over Zea in practice. Kelley, 419 U.S. at 329 (quoting Anderson, 212 U.S. at 222). It was eBay, not PFC, that hired Zea. While embedded at eBay, Zea received her daily assignments, performance evaluations, and supervision from eBay personnel. See Ledbetter v. M. B. Foster Elec. Co., 260 N.E.2d 174, 175 (1970) (holding that tortfeasors were borrowed servants because they took directions from the borrowing company). eBay also controlled compensation and advancement decisions for PFC

personnel assigned to it. In contrast, PFC's role was purely administrative: it processed payroll, issued Zea a corporate credit card, and fronted expenses approved by eBay. PFC exercised no control over the substance or supervision of Zea's work. On this record, no reasonable juror could find that PFC, rather than eBay, exercised control over Zea during the relevant period. Accordingly, summary judgment in favor of PFC is warranted on all claims based on vicarious liability for Zea's conduct.

**B.    Direct Liability Claims Against PFC**

Plaintiffs also bring direct liability claims against PFC for negligent supervision and retention, as well as civil conspiracy.

*1.    Negligent Retention and Negligent Supervision*

Plaintiffs argue that PFC failed to fulfill its contractual obligations under the MSA to supervise its employees and that this failure allowed Zea to participate in the harassment campaign against the Steiners. In support, they cite the MSA's requirement that PFC "designate a Project Manager" to whom PFC personnel would "solely report to and be directed by." Dkt. 504-9 ¶ 10.1. It is undisputed that PFC failed to do so. Plaintiffs argue that this failure, as well as PFC's lack of oversight over Zea's conduct and questionable credit card expenses, constituted a breach of duty to the Steiners that proximately caused their injuries. PFC responds that it owed no duty to the Steiners and, even if it did, its

conduct was not the proximate cause of their injuries. The Court agrees with PFC.

To establish negligent retention and supervision, Plaintiffs must demonstrate that there was a duty of care owed to them by PFC and that this duty was breached. See Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 368 (D. Mass. 2002). While in some circumstances a contractual obligation may give rise to a duty to nonparties, that duty arises only where the nonparties are "foreseeably exposed to danger and injured as a result of [the defendant's] negligent failure to carry out [a contractual] obligation." Parent v. Stone & Webster Eng'g Corp., 556 N.E.2d 1009, 1012 (Mass. 1990) (quoting Banaghan v. Dewey, 162 N.E.2d 807, 812 (Mass. 1959)). "However, failure to perform a contractual obligation is not a tort in the absence of a duty to act apart from the promise made." Anderson v. Fox Hill Vill. Homeowners Corp., 676 N.E.2d 821, 823 (Mass. 1997).

Here, the MSA required PFC to designate a project manager to supervise Zea and to work with eBay to "mutually design and agree upon Training Requirements." Dkt. 504-9 at 27. PFC never designated a project manager and Zea received no training or supervision from PFC.

But even if PFC breached a duty of care to the Steiners with respect to the supervision and retention of its employees, Plaintiffs fail to establish proximate cause. See Limone, 497 F.

Supp. 2d at 233 (explaining that to prevail on a negligent
supervision claim a plaintiff must establish the negligent
supervision proximately caused plaintiff's injuries). No
reasonable juror could find that the failure to supervise caused
the Steiners harm. Plaintiffs argue that PFC should have discovered
Zea's misconduct through review of her credit card expenses. But
the cited expenses do not support an inference that PFC was on
notice of the risk of harm to the Steiners in particular.

For example, in June 2019, Zea used her PFC credit card to
purchase travel for Gilbert, who then spray-painted the Steiners'
fence. In July 2019, she used the same credit card at a Las Vegas
strip club. eBay reviewed and submitted the latter expense to PFC
on August 5, 2019. While these expenses may have raised questions
of internal policy compliance, they did not suggest unlawful
conduct of the kind later carried out against the Steiners. Baugh
testified that it was "typical" for members of his security team
to purchase travel for other members and that such conduct would
not raise "red flags" to PFC. Dkt. 697-1 at 431:2-11. And while a
strip club visit may be unprofessional, it does not indicate
tortious intent with respect to the Steiners. Moreover, the strip
club charge was submitted to PFC just days before Zea and the
others traveled to Natick. PFC's limited role in expense oversight,
combined with the timing of the charges, precludes a finding that
PFC could have prevented the conduct even with closer review.

52

In short, Plaintiffs have not shown that a failure of supervision by PFC was a proximate cause of the injuries they allege. The Court therefore allows summary judgment for PFC on Plaintiffs' direct negligence claims, including negligent supervision and retention.

### 2. Civil Conspiracy

Plaintiffs also seek to hold PFC directly liable for civil conspiracy. To prevail, Plaintiffs must show either a common design or substantial assistance in furtherance of a tortious act. See Thomas, 909 F.3d at 490. Plaintiffs offer no evidence that PFC entered into any agreement with Baugh, Zea, or eBay to orchestrate or advance the harassment campaign against the Steiners. Nor do they identify any acts by PFC that meaningfully assisted, encouraged, or enabled the campaign.

To the contrary, the undisputed evidence demonstrates that Baugh concealed the campaign from PFC entirely. He testified that no one at PFC was informed of or involved in the operation and that he deliberately hid it from the company. On this record, no reasonable jury could find that PFC knowingly participated in a common design or substantially assisted in the commission of any tort. Therefore, summary judgment is allowed in favor of PFC on the civil conspiracy claim.

## ORDER

For the foregoing reasons, the Court **ALLOWS** eBay's motion for partial summary judgment (Dkt. 486) with respect to the alleged defamatory Twitter statements, newsletter sign-ups, the out-of-town Craigslist post, negligent retention, and the claim for lost consulting fees and otherwise **DENIES** the motion. The Court **ALLOWS** the Executive Defendants' motions for summary judgment (Dkts. 484, 491, 493) with respect to the alleged defamatory statements described above and the standalone negligent claims and otherwise **DENIES** the motions. The Court **ALLOWS** PFC's motion for summary judgment (Dkt. 490).

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge